# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>            v.<br><br>TACTILE SYSTEMS TECHNOLOGY, INC., GERALD R. MATTYS, LYNN BLAKE, and BRENT A. MOEN,<br><br>                              Defendants. | No.<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION .................................................... 1

II.     JURISDICTION AND VENUE.......................................................................... 5

III.    PARTIES ........................................................................................................ 6

IV.    SUBSTANTIVE ALLEGATIONS .................................................................. 8

      A.      Tactile's Business................................................................................ 8

      B.      Materially False and Misleading Statements ................................... 9

      C.      The *Qui Tam* Action and Defendants' False Denials.................................. 14

      D.      The Truth Emerges .......................................................................... 21

V.     CLASS ACTION ALLEGATIONS................................................................ 23

VI.    FRAUD ON THE MARKET ......................................................................... 25

VII.   NO SAFE HARBOR...................................................................................... 26

VIII.   LOSS CAUSATION ...................................................................................... 26

IX.    SCIENTER ALLEGATIONS ........................................................................ 26

X.     CLAIMS FOR RELIEF ................................................................................. 27

XI.    PRAYER FOR RELIEF ................................................................................ 28

XII.   DEMAND FOR JURY TRIAL ...................................................................... 29

Plaintiff Brian Mart ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tactile Systems Technology, Inc. ("Tactile" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Tactile securities between May 7, 2018 and June 8, 2020, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     Tactile is a medical technology company.  The Company is engaged in developing and providing medical devices for the treatment of chronic diseases at home. Among other devices, Tactile manufactures and distributes the Flexitouch and Entre

Systems, pneumatic compression devices (PCDs) that help control symptoms of lymphedema, a chronic and progressive medical condition that is often an unintended consequence of cancer treatment.  The Company also manufactures and distributes the ACTitouch System, a medical device used to treat venous leg ulcers and chronic venous insufficiency.

3.     Tactile's medical devices are covered under existing reimbursement codes, and the Company has secured coverage for its solutions with, among other payers, Medicare, the Veteran's Administration ("VA") and certain Medicaid programs. A substantial portion of Tactile's annual revenues come in the form of reimbursements from these third party public payers.

4.     Given its dependence on third party public payers, Tactile's compliance with applicable federal and state rules and regulations is critical to the Company's success.  Among the statutory framework Tactile must comply with are various fraud and abuse regulations, including the Federal Anti-kickback and Self-Referral laws, the federal false statements statute, the Federal False Claims Act and Civil Monetary Penalties Law, and state fraud and abuse provisions.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies, and financial results. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) while Tactile publicly touted a $4 plus billion or $5 plus billion market opportunity, in truth, the total addressable market for Tactile's PCDs was materially smaller; (2) to induce sales growth and share gains, Tactile and/or

its employees were engaged in illicit and illegal sales and marketing activities in violation of applicable federal and state rules and public payer regulations; (3) the foregoing illicit and illegal sales and marketing activities increased the risk of a Medicare audit of Tactile's claims and criminal and civil liability; (4) Tactile's revenues were in part the product of unlawful conduct and thus unsustainable; and that as a result of the foregoing, (5) Defendants' public statements, including Tactile's year-over-year revenue growth, the purported growth drivers, and the effectiveness of Tactile's internal controls over financial reporting were materially false and misleading at all relevant times.

6.     On March 20, 2019, after market hours, an amended federal *Qui Tam* complaint filed against Tactile by one of the Company's competitors and pending in the Southern District of Texas was unsealed.[1] Though Defendants had previously characterized the suit as lacking merit to investors, the *Qui Tam* complaint – made available to the public for the first time – contained detailed allegations of illegal sales practices on the part of Tactile, causing the Company to submit fraudulent claims to Medicare and the VA. Specifically, the *Qui Tam* complaint accused Tactile of illegally paying hospital staff to induce physicians to prescribe its medical devices.  The *Qui Tam* complaint further alleged that the Company had violated the Anti-Kickback statute by paying physicians to be "advisors" and "paid spokesmen" when these financial relationships were merely a way to secure those doctors' business.

---

[1] *United States ex rel. Veterans First Medical Supply, LLC v. Tactile Medical Systems Technology, Inc.,* No. 18-2871, ECF No. 15 (S.D. Tex.) ("*Qui Tam* Action").

7.     Securities analysts covering the Company then released detailed reports summarizing the *Qui Tam* complaint's allegations and identifying correspondent risks. This included Northland Capital Markets, which in a March 22, 2019 report entitled "Unsealed *qui tam* raises questions . . .", concluded, "Suffice it to say, there will be a tug of war for some time moving forward."

8.     Following these disclosures, the price of Tactile shares fell $4.53 per share over the next two trading days, or 7.5%, from a close price of $60.10 per share on March 20, 2019 to a close price of $55.57 on March 22, 2019.

9.     Then, on February 21, 2020, the court issued an order in the *Qui Tam* Action, denying Tactile's motion to dismiss the *Qui Tam* complaint in its entirety. Though the Company attempted to downplay the import of the ruling in a February 24, 2020 press release, analysts were not buying it.  For example, in a February 24, 2020 report to clients entitled "Tactile's Motion to Dismiss Qui Tam Gets Denied," analysts at Oppenheimer stated, "The motion to dismiss the qui tam has now been denied. *Only two options remain—either this qui tam gets settled out of court, or it goes to discovery. Neither seem appealing, in our view, as far as Tactile is concerned*."[2]

10.     Following these disclosures, the price of Tactile shares fell $6.65 per share over the course of a single trading day, or 10.59%, from an opening price of $62.74 per share on February 21, 2020 to a close price of $56.09 on February 24, 2020.

---

[2] Emphasis in original.

11.    Finally, on June 8, 2020, research firm OSS Research published a scathing report about the Company entitled "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy." In the report, OSS Research accused Tactile of (1) overstating its total addressable market (TAM) by nearly $4.7 billion, (2) using a "'daisy-chaining kick-back scheme' that has resulted in rampant overprescribing and rapid market share gains at the expense of patients, insurers and the public," and (3) concealing Medicare audits resulting in denials, for failure to establish medical necessity, of a whopping 71% of Tactile's submitted claims.

12.    On this news, the Company's stock price fell $6.05, or 11.69%, from its June 8, 2020 opening price of $51.72 per share to a June 9, 2020 close of $45.67.

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

14.    The federal law claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts

with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

18.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

### III.     PARTIES

19.     Plaintiff Brian Mart is an individual who resides in North Carolina. As set forth in his Certification filed contemporaneously herewith, acquired shares of Tactile common stock at artificially inflated prices, and has been damaged.

20.     Defendant Tactile Systems Technology, Inc is incorporated under the laws of the State of Delaware, with its principal place of business at 3701 Wayzata Boulevard, Suite 300, Minneapolis, MN 55416.  Its common stock trades on the NASDAQ stock exchange under the symbol TCMD.

21.     Defendant Gerald R. Mattys served as Tactile's Chief Executive Officer and as a member of Tactile's Board of Directors from February 2005 through June 8, 2020, when Defendant Mattys' previously announced retirement became effective. Pursuant to a Transition and Consulting Agreement, dated as of January 10, 2020, entered

into between Tactile and Defendant Mattys, Defendant Mattys remains a consultant to Tactile.

22.     Defendant Lynn Blake served as Tactile's Chief Financial Officer from April 2016 through September 1, 2018, when Defendant Blake resigned purportedly due to "personal reasons and not due to any disagreement with the Company on any matter, including related to the Company's operations, policies, practices, financial reporting or controls."[3]  Thereafter, Defendant Blake acted as a consultant to Company until March 2019.

23.     Defendant Brent A. Moen is Tactile Chief Financial Officer, having served in that capacity since September 2, 2018.

24.     Defendants Mattys, Blake and Moen are collectively referred to herein as the "Individual Defendants."

25.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false

---

[3] Press Release, *Globe Newswire*, "Tactile Medical Announces Chief Financial Officer Transition" (Aug. 6, 2018).

statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Tactile's Business

26.   Tactile, incorporated in 1995, is a medical technology company that develops and provides medical devices for the treatment of chronic diseases at home. Tactile's principal area of therapeutic focus is vascular disease, with a goal of advancing the standard of care in treating lymphedema[4] and chronic venous insufficiency.[5]

27.   Tactile's flagship medical device is its Flexitouch system, which is purportedly an advanced at-home solution for lymphedema patients, and has traditionally generated approximately 90% of Tactile's annual revenue.  Tactile also offers its Entre system, a simple at-home solution for patients with chronic swelling, as well as its

---

[4] Lymphedema is a type of chronic swelling, or edema, which occurs in the arms, legs, neck, trunk or other body parts when the lymphatic vessels are unable to adequately drain protein-rich lymph fluid from these regions

[5] Chronic venous insufficiency is a condition that occurs when the venous wall and/or valves in the veins are not working effectively, making it difficult for blood to return to the heart from the affected region. This pooling or collecting of blood in the veins can result in painful, slow-healing wounds on the lower leg, called venous leg ulcers.

Actitouch system, a home-based solution for chronic venous insufficiency patients that may be worn throughout the day.

28.   Centers for Medicare and Medicaid Services, or CMS, which is the agency within the Department of Health and Human Services that administers both Medicare and Medicaid, has approved pneumatic compression devices, or PCDs, including Tactile's products, for coverage for the treatment of lymphedema or for the treatment of chronic venous insufficiency with venous stasis ulcers.  As a result, in addition to payments received from private payers (e.g., insurers or patients), a material portion of Tactile's annual revenues come in the form of reimbursement from public third party payers such as Medicare, the VA and certain Medicaid programs in the United States.  Indeed, such public third payers are historically responsible for roughly 25% of Tactile's annual revenues.

29.    Given its dependence on third party public payers, Tactile's compliance with applicable federal and state rules and regulations is critical to the Company's success.  Among the statutory framework Tactile must comply with are various fraud and abuse regulations, including the Federal Anti-kickback and Self-Referral laws, the federal false statements statute, the Federal False Claims Act and Civil Monetary Penalties Law, and state fraud and abuse provisions.

**B.    Materially False and Misleading Statements**

30.   The Class Period begins on May 7, 2018.  On that day, Defendants announced Tactile's first quarter financial results for the period ended March 31, 2018 by issuing a press release filed on Form 8K with the SEC.  In the press release, Defendant

Mattys emphasized the Company's dramatic "year-over-year" revenue growth, claiming that it was driven by "increasing awareness of, and demand for, our Flexitouch system in the lymphedema market," "the expansion of [Tactile's] sales team in recent years," and "strong growth in sales to the Veterans Administration hospital system:"

**First Quarter 2018 Summary:**

- First quarter revenues increased 35% year-over-year, to $26.8 million, compared to $19.9 million in first quarter 2017.

- Flexitouch revenues increased 40% year-over-year, to $24.5 million, compared to $17.5 million in first quarter 2017.

. . .

"Our first quarter sales performance, marked by 40% growth in sales of our Flexitouch system, represents an exciting start to 2018 and reflects the increasing awareness of, and demand for, our Flexitouch system in the lymphedema market," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "Our Flexitouch sales growth during the quarter continued to benefit from the expansion of our sales team in recent years, our efforts to target high-volume accounts and our expansion of in-network coverage with commercial insurers. In addition, we saw strong growth in sales to the **Veterans Administration** hospital system. We also made progress preparing for the commercialization of our latest-generation Flexitouch system, the Flexitouch Plus, which we launched in early April."

31.     On the Q1 2018 earnings call held the same day, Defendant Mattys again emphasized the Company's "strong sales" and "enhanced sales strategy" with respect to the VA, stating:

In addition to these important long-term drivers of growth, our Flexitouch sales growth in the first quarter also benefited from strong sales into the Veterans Administration hospital system.

As discussed on prior calls, the VA represents an important focus area for our sales organization during the first quarter of each calendar year, because our veteran patients do not have copayment obligations. As a result, their

purchasing activity tends to be less seasonal than for our patients covered by commercial insurers with the annual deductibles.

The success we're seeing in the VA hospital system is also a result of the enhanced sales strategy we implemented throughout the course of last year. Specifically, we added a number of dedicated VA specialists who help our reps to more effectively market and sell within the VA hospital network. We remain very pleased with the success of this initiative.

32.     Moreover, in the Q1 2018 quarterly report filed on Form 10Q, Defendants Mattys and Blake signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud in the Q1 2018 10Q. The report also stated that the Company's internal control over financial reporting was effective as of March 31, 2018.

33.     On August 6, 2018, Tactile announced its second quarter financial results for the period ended June 30, 2018 by issuing a press release filed on Form 8K.  In the press release, Defendant Mattys emphasized the Company's revenue growth, which he stated "reflect strong operating and financial performance this year," "fueled by the powerful combination of a focused selling strategy, targeting high-volume accounts and the Veterans Administration hospital system, strong sales team execution:"

**Second Quarter 2018 Summary**:

- Total revenue increased 30% year-over-year, to $34.1 million, compared to $26.3 million in second quarter 2017.

- Flexitouch revenue increased 30% year-over-year, to $31.4 million, compared to $24.2 million in second quarter 2017.

. . .

"Our second quarter and first half results reflect strong operating and financial performance this year," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "Flexitouch system sales continue to drive our revenue growth – increasing 34% over the first six months of 2018 – fueled by the powerful combination of a focused selling strategy, targeting high-volume accounts and the **Veterans Administration** hospital system, strong sales team execution and our expansion of in-network coverage with commercial insurers. Our second quarter revenue growth also benefitted from the full launch of our new Flexitouch Plus system, which is progressing well and continues to garner positive feedback from clinicians and patients. In addition to our robust revenue growth in the second quarter and first half of 2018, we also achieved improved operating income.

34.     Moreover, in the Q2 2018 quarterly report filed on Form 10Q, Defendants Mattys and Blake signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud in the 2Q 2018 10Q. The report also stated that the Company's internal control over financial reporting was effective as of June 30, 2018.

35.     On November 5, 2018, Tactile announced its third quarter 2018 financial results for the period ended September 30, 2018 by issuing a press release filed on Form 8K.  In the press release, Defendant Mattys emphasized the Company's revenue growth, which he claimed was "fueled by strong sales team execution and a positive overall response to the new Flexitouch Plus system:"

**Third Quarter 2018 Summary:**

- Total revenue increased 28% year-over-year, to $36.3 million, compared to $28.3 million in third quarter 2017.

- Flexitouch revenue increased 27% year-over-year, to $33.3 million, compared to $26.2 million in third quarter 2017.

- Operating income increased 17% year-over-year to $1.4 million, compared to operating income of $1.2 million in third quarter 2017.

- Net income increased 30% year-over-year to $1.7 million, compared to net income of $1.3 million in third quarter 2017.

- Adjusted EBITDA increased 83% year-over-year to $4.6 million compared to Adjusted EBITDA of $2.5 million in third quarter 2017.

. . .

"Our third quarter revenue growth of 28% represents a continuation of the strong performance we have achieved throughout 2018," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "Flexitouch system sales continue to drive our revenue growth – increasing 31% over the first nine months of 2018 – fueled by strong sales team execution and a positive overall response to the new Flexitouch Plus system, which we launched earlier this year."

. . .

"We remain confident in our ability to continue driving strong growth as we maximize the powerful combination of an expanding sales force, a focused selling strategy targeting high-volume accounts and the **Veterans Administration** healthcare system, and our expansion of in-network coverage with commercial insurers."

36.     In the Q3 2018 quarterly report filed on Form 10Q that same day, Defendants Mattys and Moen signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud in the 3Q 2018 10Q. The report also stated that the Company's internal control over financial reporting was effective as of September 30, 2018.

**C.      The *Qui Tam* Action and Defendants' False Denials**

37.      On February 28, 2019, Tactile filed its Annual Report on Form 10K with

the SEC, disclosing that on February 13, 2019, Tactile was served with a sealed amended

complaint venued in the United States District Court in the Southern District of Texas,

Houston Division, captioned *United States ex rel. Veterans First Medical Supply, LLC v.*

*Tactile Medical Systems Technology, Inc.,* Case No. 18-2871, which had been filed on

January 23, 2019. Tactile explained that the complaint was a *qui tam* action on behalf of

the United States brought by one of its competitors, alleging that Tactile violated the

Federal Anti-Kickback Statute because it submitted false claims and made false

statements in connection with the Medicare and Medicaid programs, and had engaged in

unlawful retaliation in violation of the Federal False Claims Act.

38.      Nonetheless, Tactile's securities continued to trade at artificially inflated

prices throughout the Class Period as a result of Defendants' strong denials of the *Qui*

*Tam* complaint's allegations and positive statements touting the Company's revenue

growth and sales practices.

39.      For example, in the February 28, 2019 10K, Defendants stated, "We

believe that the allegations in the lawsuit are without merit and we intend to vigorously

defend against the lawsuit."

40.      Moreover, on February 28, 2019, Defendants announced its fourth quarter

2018 and full year 2018 financial results for the period ended December 31, 2018 by

issuing a press release filed on Form 8K.  In the press release, Defendant Mattys touted

the Company's revenue growth, which attributed to "strong execution:"

**Full Year 2018 Summary:**

- Full year 2018 revenue increased 32% year-over-year, to $143.8 million, compared to $109.3 million in 2017.

- Flexitouch revenue increased 31% year-over-year, to $131.9 million, compared to $100.3 million in 2017.

. . .

**Fourth Quarter 2018 Summary:**

- Fourth quarter revenue increased 33% year-over-year, to $46.4 million, compared to $34.9 million in fourth quarter 2017.

- Flexitouch revenue increased 32% year-over-year, to $42.7 million, compared to $32.4 million in fourth quarter 2017.

. . .

 "We delivered strong operating and financial results in 2018 with full year revenue growth of 32%, well ahead of our expectations," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "The top-line growth was driven by the successful launch of our Flexitouch Plus system, continuation of our targeted sales strategy focused on high-volume accounts and strong growth in the **Veterans Administration** channel. We also made further progress toward expanding our portfolio of clinical evidence and increasing awareness among clinicians, payers and patients of the benefits of our clinically proven, cost-effective, at-home treatments for chronic conditions."

41.    Moreover, in the Annual Report filed on Form 10K, Defendants Mattys and Moen signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud in the 2018 10K. The report also stated that the Company's internal control over financial reporting was effective as of December 31, 2018.

42.     But on March 20, 2019, after market hours, the *Qui Tam* complaint was unsealed and made public for the first time.  In the complaint, Veterans First alleged that it was a business that has been adversely affected by illegal sales practices on the part of Tactile, practices that have caused fraudulent claims to be submitted to Medicare and the Veteran's Administration. Specifically, the *Qui Tam* complaint alleged that Tactile has paid hospital staff to induce physicians to prescribe its pneumatic compression devices. In particular, Veterans First alleged that the Company contracts with physical therapists, nurses, and physician's assistants across the country to go into patient's homes and educate them on the proper use of their pump. These independent contractors are referred to as influencers.  Veterans First alleged that this financial relationship is used to induce physicians to prescribe its products.  Veterans First alleges that as a result of this improper relationship, there have been false certifications of CMS Form 486 which requires the physician to attest to medical necessity of Tactile pumps.  By way of example, Veterans First alleges that a nurse in Big Springs VA in Texas influenced purchases of Tactile products, resulting in sales going from $100,000 in 2016 to $500,000 in 2017.  Veterans First also alleges instances in which Tactile sales representatives wearing white coats pretended to be doctors and told patients that they needed pumps.

43.     In addition, the *Qui Tam* complaint alleged that the Company has violated the Anti-Kickback Statute by paying physicians to be "advisors" and "paid spokesmen" when these financial relationships were merely guise to secure those doctors' business.

44.     Thereafter, on March 22, 2019, securities analysts at Northland Capital Markets and Guggenheim issued detailed reports to clients, indicating that they had the

chance to review the complaints and discuss the allegations with Tactile's management. The analysts' reports provided in-depth summaries of the *Qui Tam* complaint's allegations and the questions and risks presented by the lawsuit. Indeed, in its March 22, 2019 report entitled "Unsealed qui tam raises questions . . ." Northland Capital Markets concluded, "Suffice it to say, there will be a tug of war for some time moving forward."

45.     Following these disclosures, the price of Tactile shares fell $4.53 per share over the next two trading days, or 7.5%, from a close price of $60.10 per share on March 20, 2019 to a close price of $55.57 on March 22, 2019.

46.     Nevertheless, Defendants maintained the artificial inflation in Tactile securities through their continued denial of the *Qui Tam* complaint's allegations and promoting of the Company's revenue growth and sales execution.

47.     For instance, on May 6, 2019, Tactile announced its first quarter financial results for the period ended March 31, 2019 by issuing a press release filed on Form 8K. In the press release, Defendant Mattys emphasized the Company's revenue growth and targeted sales strategy, and expressed optimism for Tactile's continued success given its purported "$4+ billion" Total Addressable Market (TAM):

**First Quarter 2019 Summary:**

- First quarter total revenue increased 40% year-over-year, to $37.6 million, compared to $26.8 million in first quarter 2018; the adoption of new lease accounting rules accounted for 10 percentage points of the year-over-year increase in total revenue.

- Flexitouch revenue increased 39% year-over-year, to $34.1 million, compared to $24.5 million in first quarter 2018.

. . .

"Our first quarter performance reflects an exciting start to 2019, driven by strong adoption of our Flexitouch Plus system," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "First quarter revenue results benefitted from the investments we have made in our sales team, the continuation of our targeted sales strategy focused on high-volume accounts and stronger than expected sales volumes due to a new contract with a large commercial payer. Our total revenue growth also benefitted from the adoption of the new accounting standard for leases which calls for recognizing rental revenue upon the commencement of the rental agreement, versus our past practice of recognizing revenue over the life of the rental."

. . .

We remain confident in our ability to deliver strong revenue growth and improved profitability, as we continue to expand our penetration of the $4+ billion *U.S.* lymphedema and chronic venous insufficiency markets."

48.     On the Q1 2019 earnings call hosted by Defendants Mattys and Moen, analysts pressed Defendants on the status of the *Qui Tam* action.  Defendants Mattys and Moen both responded by stating they continued to believe the allegations are without merit and that the Company had filed a motion to dismiss the suit.

49.     Similarly, on August 5, 2019, Tactile announced its second quarter financial results for the period ended June 30, 2019 by issuing a press release filed on Form 8K.  In the press release, Defendant Mattys stressed the Company's revenue growth, attributing the success in large part to the "expansion of our sales team." Defendant Mattys also emphasized the Company's $4 billion TAM:

**Second Quarter 2019 Summary:**

- Second quarter total revenue increased 32% year-over-year, to $45.2 million, compared to $34.1 million in second quarter 2018; the adoption of new lease accounting rules contributed five percentage points of the year-over-year increase in total revenue.

- Flexitouch revenue increased 31% year-over-year, to $41.0 million, compared to $31.4 million in second quarter 2018.

. . .

The second quarter of 2019 was marked by exceptional company performance as evidenced by our 32% revenue growth year-over-year and improved profitability," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "Our sales performance benefited from the continuing adoption of our Flexitouch Plus system in the market and the impact of several important growth drivers, including the continued expansion of our field sales team, our success in focusing on the most productive accounts and strong sales volumes due to a contract with a large commercial payer."

. . .

We remain focused on executing against our strategy to penetrate the more than $4 billion *U.S.* lymphedema and chronic venous insufficiency market by helping people with chronic diseases live better and care for themselves at home."

50.     Likewise, on November 4, 2019, Tactile announced its third quarter financial results for the period ended September 30, 2019 by issuing a press release filed on Form 8K.  In the press release, Defendant Mattys again highlighted the Company's revenue growth and opportunity to "increase our share of the more than $4 billion U.S. market opportunity that [lymphedema and chronic venous insufficiency] represent:"

**Third Quarter 2019 Summary:**

- Third quarter total revenue increased 37% year-over-year, to $49.6 million, compared to $36.3 million in third quarter 2018; the adoption of new lease accounting standards contributed three percentage points of the year-over-year increase in total revenue.

- Operating income of $3.2 million, compared to $1.4 million in third quarter 2018.

- Net income of $2.4 million, compared to $1.7 million in third quarter 2018.

- Adjusted EBITDA of $6.4 million, compared to $4.6 million in third quarter 2018.

 "Our strong execution continued in the third quarter with revenue growth of 37% year-over-year and steady improvements in profitability," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "These accomplishments were primarily driven by the ongoing investments in the field sales team, in combination with solid market adoption of the Flexitouch Plus system, a keen focus on targeting the most productive accounts in the lymphedema market and the broad in-network coverage we have obtained with commercial payers."

**Mr. Mattys** continued, "We are raising our 2019 revenue guidance today and look forward to closing out the year with financial and operational momentum as we continue to deliver on our strategy to raise awareness of lymphedema and chronic venous insufficiency, bring our at-home therapies to new patients and increase our share of the more than $4 billion U.S. market opportunity that these chronic conditions represent."

51.    The statements referenced in ¶¶ 30-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) while Tactile publicly touted a $4 plus billion or $5 plus billion market opportunity, in truth, the total addressable market for Tactile's PCDs was materially smaller; (2) to induce sales growth and share gains, Tactile and/or its employees were engaged in illicit and illegal sales and marketing activities in violation of applicable federal and state rules and public payer regulations; (3) the foregoing illicit and illegal sales and marketing activities increased the risk of a Medicare audit of Tactile's claims and criminal and civil liability; (4) Tactile's revenues were in part the product of unlawful conduct and thus unsustainable; and that as a result of the foregoing,

(5) Defendants' public statements, including its year-over-year revenue growth, the purported growth drivers, and the effectiveness of Tactile's internal controls over financial reporting were materially false and misleading at all relevant times.

**D.     The Truth Emerges**

52.     On February 21, 2020, the Honorable George C. Hanks, Jr. of the Southern District of Texas issued an order in the *Qui Tam* Action, denying Tactile's motion to dismiss the *Qui Tam* complaint in its entirety.  Shortly thereafter, on February 24, 2020, the Company issued a press release announcing an update to *Qui Tam* action, in which Defendant Mattys tried to place a positive spin on the order:

> **Tactile Systems Technology, Inc.** ("Tactile Medical") (Nasdaq: TCMD), a medical technology company focused on developing medical devices for the at-home treatment of chronic diseases, announced today that the Company's motion to dismiss the qui tam complaint filed against the Company has been denied by the court.
>
> "We are disappointed that our motion to dismiss was denied and we will continue to defend ourselves against these allegations as the litigation moves forward," said **Gerald R. Mattys**, Chief Executive Officer of **Tactile Medical**. "The judge's decision was in no way an indication of wrongdoing on our behalf, or a validation of the merits of the allegations; it merely represents a determination that there was sufficient information in the complaint to move to the next step in the process. We are now working expeditiously to respond to the complaint formally and will continue to update the investment community of material developments in the litigation process going forward."
>
> **Background:**
>
> On February 13, 2019, the Company was served with a sealed amended complaint venued in the **United States District Court** in the *Southern District* of *Texas*,   Houston   Division,   captioned *United      States* ex rel **Veterans First Medical Supply, LLC** vs. **Tactile Medical Systems Technology, Inc.**, Case No. 18-2871, which had been filed on January 23, 2019. The   complaint   was   a   qui   tam   action   on   behalf   of *the   United*

*States* brought by one of the Company's competitors. The United States has declined to intervene in this action. The complaint was unsealed on March 20, 2019 and the Company filed a motion to dismiss on April 5, 2019. This motion to dismiss was denied on February 21, 2020.

53.     Securities analysts covering the Company were unpersuaded by Defendants' spin on the order.  For example, in a February 24, 2020 report to clients entitled "Tactile's Motion to Dismiss Qui Tam Gets Denied," analysts at Oppenheimer stated, "The motion to dismiss the qui tam has now been denied. *Only two options remain—either this qui tam gets settled out of court, or it goes to discovery. Neither seem appealing, in our view, as far as Tactile is concerned*."

54.     Following these disclosures, the price of Tactile shares fell $6.65 per share over the course of a single trading day, or 10.59%, from an opening price of $62.74 per share on February 21, 2020 to a close price of $56.09 on February 24, 2020.

55.     Then, on June 8, 2020, analyst OSS Research published a report entitled: "Strong Sell On Tactile Systems (TCMD): Bloated Stock Needs Compression Therapy." OSS wrote, "Tactile has sold to investors the story of a dominant player in an extremely underpenetrated market with a $5bn TAM growing at 20 – 30% annually. Numerous publicly available studies and claims databases suggest the addressable market is actually closer to $300mm – a fraction of what management claims in its earnings calls. In fact, Medicare has covered PCDs (Tactile's product classification) since 1986. This is not a novel product ripe for adoption."

56.     OSS Research's report also challenged the legitimacy of Tactile's purported revenue growth.  OSS Research stated, "Interviews with numerous industry

stakeholders and a recent Qui Tam lawsuit filed against the company have revealed the true source of Tactile's growth: a 'daisy-chaining' kick-back scheme that has resulted in rampant overprescribing and rapid market share gains at the expense of patients, insurers, and the public."

57.     OSS Research also wrote that Tactile's illegal marketing and sales activities were unsustainable, "These activities are coming to an end. Medicare has recently launched an industry-wide audit in which Tactile has been disproportionately targeted. 71% of Tactile's claims audited so far have been denied for failure to establish medical necessity. Management has made no mention of these audits to investors."

58.     The OSS Research report further observed that "[s]ince 2017, Tactile has seen multiple key departures" among its executive leadership and that "[v]arious insiders including the CEO, COO, and VP of Sales have sold more than 50% of their shareholdings in 2019 since the Qui Tam lawsuit was filed and Medicare audits were launched."

59.     On this news, the Company's stock price fell $6.05, or 11.69%, from its June 8, 2020 opening price of $51.72 per share to a June 9, 2020 close of $45.67.

## V.     CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Tactile securities between May 7, 2018 and June 8, 2020, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

61.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of June 8, 2020, Tactile had approximately 19.4 million shares of common stock outstanding.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.   Whether Defendants violated the Exchange Act;

    b.   Whether Defendants omitted and/or misrepresented material facts;

    c.   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.   Whether the price of the Company's stock was artificially inflated; and

    f.   The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    FRAUD ON THE MARKET

66.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  The omissions and misrepresentations were material;

c.  The Company's common stock traded in efficient markets;

d.  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.  Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

67.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of

the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## VII.   NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

69.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## VIII.  LOSS CAUSATION

70.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

71.     During the Class Period, Plaintiff and the Class purchased Tactile's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.   SCIENTER ALLEGATIONS

72.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Tactile, their control over, and/or receipt and/or modification of Tactile's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tactile, participated in the fraudulent scheme alleged herein.

## X.   CLAIMS FOR RELIEF

### Count One
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     During the Class Period, Defendant Tactile and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendant Tactile and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the  statements not misleading; and (iii) engaged in acts, practices, and

a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count Two**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)    awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(c)    awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED: September 29, 2020                    Respectfully submitted,


                                             By: /s/ Daniel C. Hedlund
                                             Daniel E. Gustafson (#202241)
                                             Daniel C. Hedlund (#258337)
                                             GUSTAFSON GLUEK PLLC
                                             Canadian Pacific Plaza
                                             120 South 6th Street, Suite 2600
                                             Minneapolis, MN  55402
                                             Telephone: (612) 333-8844
                                             dgustafson@gustafsongluek.com
                                             dhedlund@gustafsongluek.com

                                             Dennis Stewart
                                             GUSTAFSON GLUEK PLLC
                                             600 B Street, Suite 1700
                                             San Diego, CA, 92101
                                             Telephone: (612) 333-8844
                                             dstewart@gustafsongluek.com

                                             Reed R. Kathrein
                                             Lucas E. Gilmore
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             715 Hearst Avenue, Suite 202
                                             Berkeley, CA  94710
                                             Telephone: (510) 725-3000
                                             Facsimile:  (510) 725-3001
                                             reed@hbsslaw.com
                                             lucasg@hbsslaw.com

                                             Steve W. Berman
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1301 2nd Avenue, Suite 2000
                                             Seattle, WA  98101
                                             steve@hbsslaw.com
                                             Telephone: (206) 623-7292
                                             Facsimile:  (206) 623-0594

                                             *Attorneys for Plaintiff*