# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TACTILE SYSTEMS TECHNOLOGY, INC., GERALD R. MATTYS, LYNN L. BLAKE, BRENT A. MOEN, ROBERT J. FOLKES, BRYAN F. RISHE, WILLIAM W. BURKE, RICHARD J. NIGON, AND KEVIN H. ROCHE,<br><br>Defendants. | Civ. No. 0:20-cv-02074-NEB-BRT<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT |

4827-5349-0661.v1

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 2

II.   JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES .............................................................................................................. 6

    A.    Lead Plaintiff ............................................................................................. 6

    B.    Defendants .................................................................................................. 6

IV.   SUBSTANTIVE ALLEGATIONS ................................................................. 11

    A.    Tactile's Business and Lymphedema ..................................................... 11

    B.    Tactile's Fraudulent Course of Conduct ............................................... 15

        1.   Tactile Paid Illegal Kickbacks to Induce Flexitouch Sales .............. 16

        2.   Tactile Submitted False Claims to Federal Health Care
            Programs .......................................................................................... 23

        3.   Defendants Fabricated Flexitouch's Market Size ............................ 27

            a.    Tactile's Total Addressable Market ...................................... 27

            b.    Defendants Made False and Misleading Statements
                Regarding Lymphedema's Prevalence ................................. 32

    C.    Tactile's Reported Revenues Concealed Defendants' Kickback
        Scheme and Misrepresented the Total Addressable Market ...................... 34

        1.   Defendants' Class Period Representations to Investors
            Portrayed a Company Enjoying Approximately 30% Revenue
            Growth from Its Flagship Product and a Largely Untapped
            Market to Perpetuate that Revenue Growth ..................................... 34

        2.   Mattys Took Advantage of Insider Knowledge to Sell
            Millions of Dollars in Tactile Shares Before the *Qui Tam*
            Action Was Publicly Disclosed .......................................................... 37

        3.   Even When the *Qui Tam* Action Began to Reveal that Tactile
            Engaged in Illegal Sales Practices, Defendants Continued to

- i -

**Page**

Fraudulently Highlight Tactile's Strong Earnings and Expansive Market Opportunity Until the Truth Was Fully Disclosed ........................................................................ 41

D.   Defendants Omitted "Known Trends or Uncertainties" in Violation of Item 303(a) of Regulation S-K ............................................... 48

E.   Post-Class Period Developments Confirmed the Class Period's Fraud ................................................................................................ 51

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................................ 53

A.   First Quarter 2018 ................................................................ 53

B.   Second Quarter 2018 ............................................................ 57

C.   Third Quarter 2018 ............................................................... 60

D.   Fourth Quarter 2018 ............................................................. 63

E.   First Quarter 2019 ................................................................ 69

F.   Second Quarter 2019 ............................................................ 73

G.   Third Quarter 2019 ............................................................... 77

H.   Fourth Quarter 2019 ............................................................. 79

I.   First Quarter 2020 ................................................................ 86

VI.   LOSS CAUSATION/ECONOMIC LOSS ........................................... 89

VII.   ADDITIONAL SCIENTER ALLEGATIONS ..................................... 91

A.   The Insider Trading Defendants Profited from Rampant Insider Trading ................................................................................. 92

B.   Bonus Compensation Also Motivated Defendants' Fraud ...... 106

C.   Defendants Set Incentive Compensation for Tactile's Sales Management to Sell Flexitouch ............................................. 109

4827-5349-0661.v1

**Page**

D.      Defendants Mattys, Folkes, and Rishe Were Central in Determining Sales Strategies ................................................................................ 111

E.      Tactile Management Closely Tracked Flexitouch Sales ........................... 113

F.      Flexitouch Sales Were Critical to Tactile's Core Operations ................... 113

G.      Defendants Personally Reviewed and Approved Public Statements ........ 114

H.      Tactile Executives' Departures Support Inference of Scienter ................. 115

VIII.   PRESUMPTION OF RELIANCE ........................................................................ 116

IX.     CLASS ACTION ALLEGATIONS ...................................................................... 117

COUNT I ........................................................................................................................ 120

COUNT II ....................................................................................................................... 121

COUNT III ...................................................................................................................... 122

COUNT IV ...................................................................................................................... 124

X.      PRAYER FOR RELIEF ....................................................................................... 127

XI.     JURY DEMAND ................................................................................................... 128

4827-5349-0661.v1

Lead Plaintiff St. Clair County Employees' Retirement System ("Lead Plaintiff"), by and through its undersigned counsel, brings this securities class action on behalf of purchasers or acquirers of the common stock of Tactile Systems Technology, Inc., d/b/a Tactile Medical ("Tactile" or the "Company") between May 7, 2018 through June 8, 2020, inclusive (the "Class Period"), and were damaged thereby.[1]  Lead Plaintiff seeks to recover damages caused by Defendants' violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based primarily upon the independent investigation of its attorneys. This investigation included, but was not limited to, a review and analyses of: (i) Tactile's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Tactile's public conference calls; (iii) Tactile's press releases and other information made available on its website; (iv) analyst reports regarding Tactile and other reports or statements made by third parties; (v) media reports regarding Tactile; (vi) medical journal articles; (vii) public court dockets; (viii) analyses of Tactile's stock price movement and pricing and

---

[1]     Excluded from the Class, as defined below, are defendants Tactile, Gerald R. Mattys, Lynn L. Blake, Brent A. Moen, Robert J. Folkes, Bryan F. Rishe, William W. Burke, Richard J. Nigon, and Kevin H. Roche (hereinafter "Defendants"), and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

- 1 -

volume data; (ix) analyses of insiders' trades of Tactile's stock; (x) interviews with a witness, and former employee of the Company, knowledgeable of relevant information; and (xi) other material and data identified herein.  Lead Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Tactile is a medical technology company that develops and sells medical devices for the treatment of chronic diseases at home.  The Company's devices provide therapeutic treatment of lymphedema and chronic venous insufficiency ("CVI").  Lymphedema is a type of chronic swelling that occurs when lymphatic vessels are unable to drain lymph fluid properly.  CVI is a disease that occurs when venous walls or valves function improperly, making it difficult for blood to flow.

2.    Tactile's flagship product was Flexitouch, a pneumatic compression device ("PCD") designed for the at-home treatment of lymphedema and advanced CVI.  Flexitouch accounted for roughly 90% of the Company's revenue during the Class Period.

3.    Throughout the Class Period, Defendants repeatedly told investors that based on their "exceptional" Flexitouch sales, Tactile was putting up quarter after quarter of around 30% year-over-year revenue growth.  To further generate interest in the stock, Defendants set a pattern of raising and beating revenue guidance each quarter, citing the past quarter's "phenomenal" and "impressive sales performance" in Flexitouch.  In particular, Defendants pointed to the "***very strong***" sales in its Veterans Administration ("VA") channel and sales

growth in the healthcare channel covered by the Center for Medicare & Medicaid Services ("CMS") as driving the Company's revenue growth.

4.     Defendants further fueled their revenue story by falsely overstating to investors the addressable market for Flexitouch.  In fact, a study co-authored by Tactile's own Chief Medical Officer suggested the total addressable market for Flexitouch was at least three times smaller than Defendants falsely reported.  Thus, with seemingly unstoppable reported revenue growth and upbeat representations to investors regarding an untapped market of lymphedema patients – promising even more revenue growth – Tactile's stock climbed from $36.92 per share at the beginning of the Class Period, to reach a high of $76.29 per share on February 25, 2019.  As Defendants fraudulently reported soaring revenues with room to grow, Tactile insiders took advantage of the artificially inflated stock price and *sold more than $38 million* of their Tactile shares during the Class Period, *reaping over $27 million in total profits*.

5.     But Defendants' revenue story was a fabrication.  In truth, Defendants had concealed from investors that to boost the Company's revenues, Tactile was engaging in unlawful kickback schemes and submitting false claims to federal healthcare programs like the VA and CMS.  Specifically, Tactile's fraudulent course of conduct included:

        (a)     Illegally remunerating physicians to induce them to prescribe Tactile's products;

        (b)     Illegally remunerating hospital staff and therapists to induce them to persuade physicians to prescribe Tactile's products;

(c)     Illegally submitting false claims for reimbursement to CMS by assisting physicians in falsifying medical necessity forms;

(d)     Overstating its revenues earned from the VA and CMS; and

(e)     Reporting to investors that their total addressable market ("TAM") and the prevalence of lymphedema was considerably larger than it was.

6.     Then, on March 20, 2019, the amended complaint of a *qui tam* lawsuit naming Tactile as the defendant for illegal sales practices was unsealed.  Once analysts uncovered and reported on allegations of Tactile's perpetration of a kickback scheme and false claims made to Medicare, Medicaid and the VA, Tactile's stock dropped 7.53% from $60.10 per share on March 20, 2019 to close at $55.57 per share on March 22, 2019.  Yet, Defendants hastened to minimize the seriousness of the allegations by calling the *qui tam* action "meritless" and providing interviews to the analysts who published their version of events.

7.     Finally, on June 8, 2020, *Seeking Alpha* published a report by OSS Research titled "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy."  The report provided new information on the kickback scheme and the false claims that Tactile had made to third-party payers, and called into question for the first time the Company's reported addressable market for Flexitouch.  On this news, the Company's stock price fell 12.8%, or $6.95, from the prior trading day's high of $54.21 per share to close at $47.26 per share.  This represented an over 38% drop from the Class Period high.

- 4 -



8.      As a result of the fraudulent conduct alleged herein, Lead Plaintiff and other members of the Class purchased Tactile common stock at artificially inflated prices and suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).  The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa).  A substantial portion of the acts in furtherance of the

- 5 -

alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District.  In addition, during the Class Period the Company's headquarters were located in this District at 3701 Wayzata Boulevard, Suite 300, Minneapolis, Minnesota 55416.  The Company's current address is 1331 Tyler Street, Suite 200, Minneapolis, Minnesota 55413.

11.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## III.   PARTIES

### A.     Lead Plaintiff

12.     Lead Plaintiff St. Clair County Employees' Retirement System provides pension plans, retirement plans, and various other benefits to its participants.  As set forth in the accompanying certification attached hereto, Lead Plaintiff purchased Tactile securities during the Class Period and suffered damages as a result of the federal securities laws violations detailed below.

### B.     Defendants

13.     Defendant Tactile Systems Technology, Inc. is a medical device company that specializes in manufacturing and developing devices to treat lymphedema, chronic swelling, and venous ulcers.  It is incorporated in Delaware and headquartered in Minneapolis.  In September 2013, it began doing business as "Tactile Medical."  On August 2, 2016, the Company closed its initial public offering of its common stock, which resulted in the sale of

- 6 -

4,120,000 shares of common stock at a public offering price of $10.00. During the Class Period, the Company's common stock traded on the NASDAQ stock exchange under the symbol "TCMD."

14.     Defendant Gerald R. Mattys ("Mattys") was Tactile's Chief Executive Officer ("CEO") and a member of the Board of Directors (the "Board") from 2005 until he retired on June 8, 2020. As CEO and a Board member, Mattys regularly spoke on Tactile's behalf in releases, conference calls, and SEC filings. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Mattys signed and certified the Company's Forms 10-Q and 10-K filed with the SEC, as discussed in further detail below. During the Class Period, while in possession of material, non-public information, he sold at least 276,787 shares of his stock at artificially inflated prices for proceeds of approximately $17,534,888, including shares Mattys sold contemporaneously with purchases by members of the Class.

15.     Defendant Lynn L. Blake ("Blake") was Tactile's Chief Financial Officer ("CFO") from April 2016 until she resigned on September 1, 2018. She remained employed by the Company as a consultant until March 2019. As CFO, Defendant Blake regularly spoke on Tactile's behalf in releases, conference calls, and signed SEC filings. Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Blake signed and certified the Company's Forms 10-Q and 10-K filed with the SEC, as discussed in further detail below. During the Class Period, while in possession of material, non-public information, she sold at least 6,322 shares of her stock at artificially inflated prices for proceeds of approximately $347,021, including shares Blake sold contemporaneously with purchases by members of the Class.

4827-5349-0661.v1

16.     Defendant Brent A. Moen ("Moen") became Tactile's CFO on September 2, 2018, and was CFO through the end of the Class Period.  As the Company's CFO, Defendant Moen regularly spoke on the Company's behalf in releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, Defendant Moen signed and certified the Company's Forms 10-Q and 10-K filed with the SEC, as discussed in further detail below.

17.     Defendant Robert J. Folkes ("Folkes") was Tactile's CFO from February 2005 to April 2016.  In February 2015, he became Tactile's Chief Operating Officer ("COO"), a position he held until he was terminated in September 2020.  During the Class Period, while in possession of material, non-public information, he sold at least 154,487 shares of his stock at artificially inflated prices for proceeds of approximately $8,766,755, including shares Folkes sold contemporaneously with purchases by members of the Class.

18.     Defendant Bryan F. Rishe ("Rishe") was Tactile's Senior Vice President of Sales ("SVP") throughout the Class Period.  He managed the entire field sales team, including the VA sales team.  He was directly involved in pressing the Company's sales representatives to exceed their sales quotas so the Company could report revenue growth each quarter.  In a signed declaration filed in an employment discrimination case, Rishe stated that he was "responsible for leading sales strategy and execution through a team of Area Directors and Region and District Managers in order to achieve revenue growth goals for Tactile."  He further affirmed that as a part of Tactile's annual planning process, he reviewed year-over-year growth "on a number of metrics."  He declared that "[t]hese growth numbers are very important to Tactile."  During the Class Period, while in possession of

- 8 -

material, non-public information, he sold at least 133,289 shares of his stock at artificially inflated prices for proceeds of approximately $7,294,280, including shares Rishe sold contemporaneously with purchases by members of the Class.

19.     Defendant William W. Burke ("Burke") was a member of Tactile's Board and a member of the Board's audit and compliance committees throughout the Class Period.  As a member of the audit and compliance committees, he was responsible for overseeing the Company's compliance and risk management processes, including compliance with anti-kickback laws and the False Claims Act.  During the Class Period, he sold at least 16,662 shares of his stock at artificially inflated prices for proceeds of approximately $924,961, while in possession of material, non-public information, including shares Burke sold contemporaneously with purchases by members of the Class.

20.     Defendant Richard J. Nigon ("Nigon") was a member of Tactile's Board, a member of the Board's compliance committee, and chairman of the Board's audit committee throughout the Class Period.  As a member of the compliance committee and chairman of the audit committee, he was responsible for overseeing the Company's compliance and risk management processes, including compliance with anti-kickback laws and the False Claims Act.  During the Class Period, he sold at least 26,876 shares of his stock at artificially inflated prices for proceeds of approximately $1,343,375, while in possession of material, non-public information, including shares Nigon sold contemporaneously with purchases by members of the Class.

21.     Defendant Kevin H. Roche ("Roche") was a member of Tactile's Board, a member of the Board's audit committee, and chairman of the Board's compliance committee

- 9 -

throughout the Class Period.  As a member of the audit committee and chairman of the compliance committee, he was responsible for overseeing the Company's compliance and risk management processes, including compliance with anti-kickback laws and the False Claims Act.  During the Class Period, he sold at least 50,000 shares of his stock at artificially inflated prices for proceeds of approximately $2,608,247, while in possession of material, non-public information, including shares Roche sold contemporaneously with purchases by members of the Class.

22.     Because of their improper Class Period sales of Tactile shares, Defendants Mattys, Blake, Folkes, Rishe, Burke, Nigon, and Roche are also collectively referred to as the "Insider Trading Defendants."

23.     Defendants Mattys, Blake, Moen, Folkes, Rishe, Burke, Nigon, and Roche, are collectively referred to as the "Individual Defendants."

24.     Additionally, because of their positions, the Individual Defendants possessed the power and authority to control the contents of the Company's quarterly reports, press releases, and conference calls with securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, making their positive

- 10 -

representations materially false and misleading.  The Individual Defendants are liable as control persons for the false and misleading statements and omissions pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Tactile's Business and Lymphedema

25.    Tactile is a medical technology company that manufactures and sells medical devices for the at-home treatment of chronic diseases, including lymphedema and CVI.  Its primary product, Flexitouch, including its latest generation system which came online during the Class Period, the Flexitouch Plus, is the Company's proprietary at-home solution for lymphedema.

26.    Lymphedema is a chronic disease characterized by swelling in the arms, legs, neck, trunk, and other parts of the body.  It occurs when the body's lymphatic vessels (vessels that transport lymph fluid) are unable to drain lymph fluid from affected parts of the body, resulting in swelling.  Lymphedema may result from any condition or procedure that damages the lymph nodes or lymphatic vessels, such as cancer, radiation, surgery, obesity, infection, scar tissue formation, trauma, or chronic venous insufficiency.  While there is no known cure for lymphedema, it is typically managed with diligent treatment.

27.    Treatment varies depending on the severity of the condition, which has four stages.  In lymphedema's first stage, sometimes called "Stage 0" because the lymphedema is latent, no swelling is present, although lymph fluid transport has been impaired.  A patient may remain in this latent stage for months or years before swelling appears.  In Stage 1, some swelling appears, but it can be reduced with elevation.  In Stage 2, swelling worsens, and elevation rarely reduces the swelling.  In Stage 3, swelling is present, but skin changes

4827-5349-0661.v1

also occur, including fat deposits and warty overgrowths.  Adequate treatment can slow or prevent progression from one stage to the next.

28.    Treatments include manual lymph drainage, compression therapy, exercise, and skin care.  Manual lymph drainage is a tissue massage that is designed to stimulate the lymph vessels, which helps to accelerate lymph drainage.  It is typically performed by a physical therapist.  Compression therapy includes the use of bandages and wraps that help to force fluid around the body.  The typical first line of lymphedema treatment is called complete decongestive therapy ("CDT").  It consists of a combination of manual lymph drainage, compression therapy, exercise, and skin care, and it is considered the gold standard of lymphedema treatment.

29.    For more advanced cases, or cases for which CDT has failed to effectively improve symptoms, physicians may prescribe surgery or a PCD.  A PCD is a machine that has an inflatable sleeve or vest-like garment attached to it, with multiple chambers (like balloons) that inflate one after the other to stimulate the flow of lymph fluid in the right direction.

30.    There are two types of PCDs: basic and advanced.  Physicians typically must prescribe basic PCDs before prescribing any advanced PCD.  Under the standardized Healthcare Common Procedure Coding System ("HCPCS") used by private insurers and CMS, simple PCDs, described as the "segmental home model without calibrated gradient pressure" are assigned HCPCS Code E0651.  As Defendants described in their 2019 Form 10-K, their Entre system was "simple" or a "basic pneumatic compression device" suitable for "patients who do not yet qualify for insurance coverage of an advanced compression

- 12 -

device such as our Flexitouch Plus system." Advanced PCDs like Flexitouch are described as the "segmental home model with calibrated gradient pressure" and are assigned HCPCS Code E0652. Mattys informed investors that the average selling price of Flexitouch is "basically a 3 to 4x increase . . . compared to an Entré."

31.    Tactile derives roughly 90% of its revenue from sales of its Flexitouch. The Flexitouch is an automated and programmable PCD that is meant for at-home treatment, and it is designed to stimulate the lymphatic system similar to manual lymph drainage therapy. The device consists of an electronic controller unit and multiple contoured garment configurations for the legs, arms, head, neck, trunk, or chest. Tactile derives a small fraction of its revenue from sales of Entre.

| Year | Total Revenues ($ millions) | Flexitouch Revenues ($ millions) | Combined Entre and Actitouch Revenues ($ millions) | Flexitouch System Percentage of Total Revenues (%) |
|------|------|------|------|------|
| 2017 | $109.3 | $100.3 | $9 | 92% |
| 2018 | $143.8 | $131.9 | $11.8 | 92% |
| 2019 | $189.5 | $171.3 | $18.2 | 90% |
| 2020 | $187.1 | $163.9 | $23.2 | 88% |

32.    Tactile's devices are used primarily to treat lymphedema, but they also may be used to treat swelling related to CVI, which is called phlebolymphedema. CVI is a condition that occurs when venous walls and/or valves do not function properly, which makes it difficult for the blood to return to the heart from the legs, and causes blood to pool in the

veins.  CVI symptoms include varicose veins, swelling, and skin changes.  In severe CVI cases, vein malfunction affects the lymphatic system, which causes lymph fluid to collect in the affected area, causing phlebolymphedema.  Phlebolymphedema is an emerging concept, and it has not been extensively researched.  For that reason, some private insurers consider PCD treatment to be investigational and do not cover it.

33.    Tactile's business relies in large part on third-party payers, which include private insurers, Medicare and Medicaid, and the VA.  The table below shows Tactile's revenues from third-party-payers:

| | Private Insurers<br>$ million<br>*% Revenues* | VA<br>$ million<br>*% Revenues* | Medicare<br>$ million<br>*% Revenues* |
|---|---|---|---|
| **2017** | $80.9<br><br>74% | $19.7<br><br>18% | $8.6<br><br>8% |
| **2018** | $102.2<br><br>71% | $28.0<br><br>20% | $13.5<br><br>9% |
| **2019** | $136.4<br><br>72% | $31.3<br><br>17% | $21.8<br><br>11% |
| **2020** | $132.8<br><br>71% | $24.5<br><br>13% | $29.9<br><br>16% |

34.    As stated in its 2018 Form 10-K, Tactile recognized revenue from the sale of its products "upon transfer of control of the product to the customer at a transaction price determined by collection history."  Generally, revenue was recognized upon shipment.  As the Company explained, the transaction price was "impacted by multiple factors," such as,

- 14 -

for private insurers, "the payment history of the applicable payer drawn from actual write-off and collections experience from the payer over a rolling 12-month period, as well as historical patient collections." Thus, such payments "typically are less than our standard charge and represent an implicit price concession, resulting in variable consideration." Meanwhile, in the VA channel, the Company's "contract is with the [VA] rather than the patient. . . . These contracts determine the amount of consideration, which is typically paid in full within 2-3 days of shipment, and therefore there is no implicit price concession."

**B.   Tactile's Fraudulent Course of Conduct**

35.   Throughout the Class Period, Defendants engaged in a scheme that enabled them to artificially inflate Tactile's stock price and profit from over $30 million in illegal insider trading sales.  First, Defendants paid illegal kickbacks to clinicians to induce the prescription of Flexitouch.  Second, Defendants assisted physicians in submitting false reimbursement claims to Medicare.  Third, Defendants overstated their CMS and VA revenue as the RAC Audit imposed greater scrutiny on submitted claims.  Fourth, Defendants distorted clinical study results to exaggerate the number of lymphedema patients in the U.S.  This allowed them to vastly overstate the Company's TAM.  The illegal kickbacks and false claims allowed Defendants to sell Flexitouch to patients that otherwise would not have qualified for it.  As a result of the illegal sales practices, false CMS and VA revenue recognition, and falsely reporting the findings from clinical medical studies, Tactile deceived investors that their growing revenues were earned by legitimate means and that the revenue could continue in an outsized market.  When the truth was revealed – after the

Insider Trading Defendants had raked in millions of dollars from selling Tactile shares – investors suffered losses.

### 1.    Tactile Paid Illegal Kickbacks to Induce Flexitouch Sales

36.    Tactile engaged in a kickback scheme that illegally remunerated hospital staff and physicians to induce them to prescribe Tactile's products.  This practice violated the federal Anti-Kickback Statute (the "AKS").  The AKS criminalizes the knowing and willful offer or payment of remuneration to any person to induce that person to: (1) refer for furnishing or arrange for furnishing any item or service for which payment may be made under a federal healthcare program; or (2) purchase, lease, order, or arrange for or recommend the purchasing, leasing, or ordering of any item for which payment may be made under a federal healthcare program.[2]  Remuneration under the AKS means anything of value, regardless of its form.  Defendants knew that it was unlawful to remunerate health care providers to induce them to prescribe Tactile's devices.  In the Company's 2018 and 2019 Forms 10-K filed with the SEC, Defendants disclosed:

> The Federal Anti-Kickback Statute, among other things, prohibits the knowing and willful offer, payment, solicitation or receipt of any form of remuneration, whether directly or indirectly and overtly or covertly, in return for, or to induce the referral of an individual for the: furnishing or arranging for the furnishing of items or services reimbursable in whole or in part under Medicare, Medicaid or other federal healthcare programs; or purchase, lease, or order of, or the arrangement or recommendation of the purchasing, leasing,

---

[2]    The AKS includes a safe harbor that exempts payments made for personal services. During the Class Period, the safe harbor had seven requirements.  One requirement was that the contract for the personal services set in advance the aggregate payment to be paid over the term of the contract.  None of the following arrangements set aggregate compensation in advance: (1) Tactile's Physician Speaking Agreement; (2) Tactile's Contract Trainer Program; and (3) Tactile's Scientific Advisory Board and Speaker Consultant Agreement. Accordingly, none of the arrangements fell within the safe harbor.

or ordering of any item or service reimbursable in whole or in part under Medicare, Medicaid or other federal healthcare programs.

*      *      *

Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs.  In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations.   Any penalties, damages, fines, exclusions, curtailment or restructuring of our operations could adversely affect our ability to operate our business, our financial condition and our results of operations.

37.    Nevertheless, Tactile violated the AKS by remunerating health care providers to induce them to prescribe Tactile's devices.  First, according to the *qui tam* lawsuit, Tactile ran a Key Opinion Leader ("KOL") program under which it remunerated healthcare providers to induce them to promote and prescribe its products.  Tactile recruited KOL providers that were likely to produce a high number of referrals.  A sealed exhibit cited in the summary judgment briefing for the *qui tam* lawsuit stated: "'Key Opinion Leaders or KOLs are clinicians who have a high referral rate to us, regularly identify and diagnose lymphedema and/or chronic venous insufficiency and have a well-known and highly credible background with which to influence others.'"  In a presentation given at the Company's 2018 National Sales Meeting, Defendant Rishe presented a slide that highlighted: "'KOL SPEAKERS PROGRAM – THE MOST EFFECTIVE TOOL EVER FOR GAINING ACCESS IN YOUR HARD TO SEE ACCOUNTS AND A STRONG COORELATION [sic] TO IMMEDIATE NEW REFERRALS.'"

- 17 -

38.    Tactile also tracked the referrals it garnered from its KOL doctors.  As demonstrated by the chart below, in 2019 Tactile received a significant number of referrals from its paid KOL doctors:

| KOL Doctor | Remuneration Received from Tactile in 2019 | Number of Tactile Devices Referred in 2019 |
|---|---|---|
| Matthew M. Melin | $102,129.06 | 109 |
| Ron J. Karni | $84,935.05 | 123 |
| Igor A. Altman | $45,376.75 | 45 |
| Vinay Satwah | $27,819.12 | 179 |
| Nicholas Morrissey | $21,912.14 | 197 |
| Mihir Bhayani | $16,799.25 | 25 |
| Michael A. Vasquez | $6,188.06 | 23 |
| Jay K. Radhakrishnan | $2,863.64 | 158 |
| Willy Yung Wei-Chi | $1,817.22 | 12 |
| **TOTAL** | **$309,840.26** | **871** |

39.    Although the Company characterized the remuneration as speaking and consulting fees, the events at which the KOL doctors spoke were often hosted at luxury hotels and lavish restaurants, and 90% were not certified continuing education programs. These were the exact kind of "speaking arrangements" that were recently flagged as high risk for fraud and abuse in the Department of Health and Human Services Office of the Inspector General's recent "Special Fraud Alert."  The alert noted the fraud risks inherent in speaker programs and discussed that the U.S. Department of Justice and Office of Inspector General ("OIG") had investigated numerous cases in which compensation for "speaking events" was found to be illegal remuneration.  Notably, the alert provided a list of "suspect characteristics" that, taken separately or together, may indicate a speaker program that violates the AKS.  The list included:

4827-5349-0661.v1

(a)     "Alcohol is available or a meal exceeding modest value is provided to the attendees of the program (the concern is heightened when the alcohol is free)";

(b)     "The program is held at a location that is not conducive to the exchange of educational information (*e.g.*, restaurants or entertainment or sports venues)"; and

(c)     "The company's sales or marketing business units influence the selection of speakers or the company selects Health Care Professional speakers or attendees based on past or expected revenue that the speakers or attendees have or will generate by prescribing or ordering the company's product(s) (*e.g.*, a return on investment analysis is considered in identifying participants)."

40.     Tactile's events demonstrate each of the three suspect characteristics listed above.  For example, Tactile paid Dr. Ron J. Karni to travel to Los Angeles, Las Vegas, and Scottsdale to give a series of presentations.  The presentation in Las Vegas took place at Lawry's The Prime Rib steakhouse.  It included a private dinner that was attended by 20 people, including four VA employees.  The dinner bill totaled $2,782.89, or $139.14 per person.  Notably, VA employees are prohibited from accepting any gift with a value greater than $20.  The Company also paid for Dr. Karni's stay in a king suite at the Wynn Encore Tower on the Las Vegas strip.  Two days later, the Company paid Dr. Karni to give a presentation at Tommy Bahama in Scottsdale, Arizona.  Tactile remunerated Dr. Karni $17,209.29 for the one-week trip.

41.     Tactile also hosted lavish dinners and extravagant "cocktail receptions" for high-referring health care providers.  The dinners were organized by Tactile's marketing department and hosted by salespeople.  When determining the event's invitees, the Company

- 19 -

identified "warm" leads and accounts that had referred patients before the event. Tactile was also careful not to invite health care providers that it thought may not provide a great return on investment. For example, in one conversation, a Tactile employee stated: "'I feel hesitant to have Dr. Satwah or any other MDs fly out to speak to a group which I am not confident will render a great ROI.'"

42.     Tactile also used the KOL program to target the VA. For example, in 2018 and 2019, Tactile remunerated San Francisco VA physician Dr. Arman Kirakosian a total of $4,401.58. In 2019, Dr. Kirakosian prescribed at least three Tactile devices, and from 2017 to 2020, the San Francisco VA reported the highest cost in the United States for orders for Tactile's devices. Further, at the Company's 2018 national sales meeting, Rishe presented slides that exclaimed: "'WHAT YA'LL ARE DOING IN THE VA CHANNEL IS NOTHING SHORT OF SPECTACULAR!'" and "'SO WE'VE STARTED THE VA MILLION DOLLAR CLUB.'"

43.     In addition to the KOL program and events, Tactile illicitly increased its Flexitouch sales by remunerating non-physician health care providers to induce them to convince physicians to prescribe Flexitouch. Lymphedema therapists often recommend and influence what lymphedema treatment patients receive. According to Tactile's filings with the SEC, it hired "over 560 licensed, independent healthcare practitioners as home trainers" to assist patients on how to use Flexitouch. But assisting patients was not the trainers' only purpose – Tactile intended the trainers to increase referrals for Flexitouch. As Tactile noted in its Form 10-K for the year ended December 31, 2018, "[t]hese trainers are healthcare professionals . . . *who we have identified through our sales and marketing interest*."

- 20 -

Strikingly, in an effort to conceal its illegal kickbacks to trainers, Tactile eliminated this last quote in the next year's Form 10-K.

44.     The scheme worked as follows:  Staff in Tactile's Minneapolis offices assigned and coordinated the trainers for home visits.  Tactile paid the trainers $150 per training. Notably, these trainers were employed at the very hospitals and other facilities in which Tactile sought to sell its products.  The trainers were incentivized to refer physicians to Flexitouch because encouraging Flexitouch prescriptions helped secure their continuing assignment by Tactile to future in-home training sessions.  In fact, the Company evaluated the trainers not on their ability to successfully train patients in the product, but rather in getting more referrals for Flexitouch.  One Tactile evaluator for a trainer's "performance assessment" wrote: "***Wish she'd get more patients***."  Thus, even Tactile's compliance officer, a lawyer, documented that Tactile's arrangements with therapists posed a high "Business Risk" for "kickbacks."

45.     According to a former Senior Sales Specialist employed by Tactile from August 2011 through September 2015, her superior, a Regional Director who reported directly to Defendant Rishe, instructed her that she should not hire or keep a trainer unless they provided referrals for the Company.  On at least two occasions, when trainers were not providing enough referrals, the Regional Director told the Senior Sales Specialist to dismiss those trainers.  She further recalled that two of her trainers were her best source of sales through referrals.  The Senior Sales Specialist only learned at her next company that expecting referrals was improper.

- 21 -

46.     Thus, this scheme violated the AKS and was illegal because the trainers that Tactile hired were in a position to recommend that physicians prescribe Tactile's devices. Tactile rewarded those trainers who obtained satisfactory numbers of referrals with more training assignments.

47.     Furthermore, the contract trainer kickback scheme directly involved the VA. For example, during the Class Period, Tactile remunerated at least two VA hospital employees to recommend that VA physicians prescribe Tactile's devices.  For example, in 2018 Tactile remunerated VA employee Norma Gonzalez $3,250 for services provided to patients.  Tactile also remunerated VA employee Brandi Rhoudes for services provided to patients.   In 2018, Tactile remunerated Ms. Rhoudes $17,350, and in 2019, Tactile remunerated Ms. Rhoudes $9,775.   At the Company's 2018 national sales meeting, Defendant Rishe commented on contract trainers' ability to expand business into the VA, stating: "'SO HOLD BACK ON VA FOR NOW – UNTIL WE CAN GET ON THE FSS [FEDERAL SUPPLY SCHEDULE] BUT LETS PLAN TO CAPITIZE [SIC] ON THIS BILATERAL FEATURE WITH *THERAPISTS*, VASCULAR AND EVEN WC [WOUND CARE] ACCOUNTS.'"

48.     The risks associated with the kickback scheme were severe.  Criminal penalties and administrative sanctions for violating the AKS include fines, jail time, and exclusion from participation in the federal healthcare programs such as Medicare and VA health care programs.   The Exclusion Statute, 42 U.S.C. §1320a-7, requires the OIG to exclude individuals and entities from participation in all federal health care programs if the individuals or entities are convicted of Medicare or Medicaid fraud, as well as any other

- 22 -

offenses related to the delivery of items or services under Medicare or Medicaid.  The Exclusion Statute also allows the OIG to exclude individuals and entities from participation in all federal health care programs if the individuals or entities are found to have engaged in unlawful kickback arrangements.  Throughout the Class Period, approximately one-third of Tactile's revenue came from CMS and the VA.  Thus, Tactile's kickback schemes risked Tactile losing nearly one-third of its business if, through a finding of any violation of the AKS, Tactile was excluded from participating in the federal health care programs.

### 2.     Tactile Submitted False Claims to Federal Health Care Programs

49.     Tactile also violated the False Claims Act, which prohibits any person from: (1) knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval; and (2) knowingly making or causing to be made a false record or statement material to a false or fraudulent claim.  Tactile knew that it was subject to and violated the False Claims Act.  In its 2018 and 2019 Forms 10-K filed with the SEC, the Company disclosed:

> The federal false statements statute prohibits knowingly and willfully falsifying, concealing, or omitting a material fact or making any materially false statement in connection with the delivery of healthcare benefits, items, or services.  In addition to criminal penalties, violation of this statute may result in collateral administrative sanctions, ***including exclusion from participation in Medicare, Medicaid and other federal health care programs***.

> *             *             *

> In addition, we bill Medicare Part B and other insurers directly for each sale to patients.  As a result, we must comply with all laws, rules and regulations associated with filing claims with the Medicare program, including the Social Security Act, Medicare regulations, the Federal False Claims Act and the Civil Monetary Penalties Law, as well as a variety of additional federal and state laws.  During an audit, insurers typically expect to find

- 23 -

explicit documentation in the medical record to support a claim. Physicians and other clinicians, who are responsible for prescribing our products for patients, are expected to create and maintain the medical records that form the basis for the claims we submit to Medicare and other insurers.

50.     Nevertheless, the Company violated the False Claims Act by falsely certifying that it complied with the AKS. CMS requires that when a provider submits a claim, the provider certifies that it is in compliance with, among other laws, the AKS. Falsely certifying compliance with the AKS in connection with a claim submitted to a federally-funded insurance program is actionable under the False Claims Act. Accordingly, an AKS violation is also a False Claims Act violation when the provider submits a claim to a federal health care program and falsely certifies that it has complied with the AKS.

51.     As described above, Tactile violated the AKS by submitting claims to federal health care programs in connection with kickbacks paid to doctors and trainers. Tactile accordingly also violated the False Claims Act by falsely certifying compliance with the AKS in connection to claims submitted to federal health care programs.

52.     Second, Tactile violated the False Claims Act by providing false medical necessity information. Before CMS will cover a PCD, it requires that the prescribing physician sign a certificate of medical necessity explaining why the device is medically necessary. When determining medical necessity, the physician is required to describe previous treatments that were attempted but failed to alleviate symptoms. Notably, CMS will cover an advanced PCD only when the patient "has unique characteristics that prevent them from receiving satisfactory pneumatic compression treatment using a nonsegmented device in conjunction with a segmented appliance or a segmented compression device

without manual control of pressure in each chamber." The prescribing physician must also provide documentation that four weeks of more conservative therapy failed to significantly improve symptoms.

53.     Describing Tactile's process for getting Medicare reimbursement for Flexitouch, the former Senior Sales Specialist stated that the Entre, Tactile's basic E0651 pump, was "*designed for failure*" and that Tactile had no interest in patients continuing to use them. In fact, Tactile had developed the Entre merely to "demo" to the patients for an hour and then record that the treatment had failed – rather than treat the patient with the basic pump for four weeks and record whether there was improvement. She had not been instructed to monitor the patient with the basic PCD for 30 days, which she later came to understand was the criteria under Medicare.

54.     Further, Tactile sales representatives and therapists routinely provided pre-filled medical necessity forms to prescribing physicians, according to a *Seeking Alpha* report. For example, the report provided a copy of a fax that a Tactile sales representative sent to a physician. The fax included a draft medical necessity narrative that the sender instructed the physician to copy onto his or her letterhead and sign. The report also provides examples of pre-filled PCD prescriptions that Tactile sales representatives sent to prescribing physicians, with instructions directing the physician to sign. Further, the report contained a copy of a "medical justification template" that a Tactile representative sent to doctors at a Dallas, Texas VA hospital. In red at the top of the form, the sales representative urged: "Please note that Medical Justification is KEY to getting your patient the Flexitouch Plus Pump. The more documentation of WHY they need FT [Flexitouch] over a high pressure squeeze and

- 25 -

hold pump (veterans first pump) that has no clinical evidence, the better." The representative then provided eight examples of language the physician could use to demonstrate medical necessity, and instructed the physician to choose two. Many of the examples give reasons describing why a basic pump would be ineffective.

55.    Had Tactile provided accurate narratives that the treating physician reviewed and then signed, the practice may have been legal. However, on January 23, 2019, CMS's Recovery Audit Contractor ("RAC") announced a "complex" audit of PCDs and the medical necessity requirement. In its first round of audits, the auditor flagged 71% of Tactile's claims for failure to establish medical necessity. In December 2019, the auditor requested further claims for review. 81% of the claims requested from Tactile in the second round of audits were retroactively denied for lack of medical necessity. Further, between the two waves, the percentage of audit claims that were directed to Tactile increased from 5% to 12%.

56.    The risks associated with the false claims violations were severe. Civil penalties include fines up to three times the amount the government paid for each false claim plus an additional penalty of up to $22,363 for each false claim paid. Under the Exclusion Statute, false claims violations can also lead to permanent exclusion from federal healthcare programs. Throughout the Class Period, roughly one-third of Tactile's revenue came from CMS and the VA. If Tactile were to be excluded from participation in the federal health care programs, it would lose one-third of its business.

- 26 -

### 3. Defendants Fabricated Flexitouch's Market Size

57. To assure investors that Tactile could sustain its approximately 30% revenue growth, Defendants made false and misleading statements regarding the market size for Flexitouch. Specifically, Defendants misled investors regarding: (1) Tactile's TAM, which is typically used to calculate the revenue opportunity available for a product; and (2) lymphedema's prevalence in the United States.

### a. Tactile's Total Addressable Market

58. During the Class Period, Tactile's TAM was calculated by multiplying the diagnoses of U.S. lymphedema patients by the average cost of Tactile's products. As the Company explained to investors in its 2018 Form 10-K, TAM was "based on the number of patients diagnosed with lymphedema and our average selling price per device."

59. Tactile significantly overstated the number of U.S. lymphedema diagnoses. In 2018, Tactile determined based on a claims data analysis that there were 1.1 million lymphedema diagnoses, and in 2019, there were 1.3 million. With the U.S. population at approximately 325 million people, the incidence rates for lymphedema, according to Defendants, was 0.3% in 2018 and 0.4 % in 2019.

60. According to a May 2019 investor presentation, Tactile assumed that its average selling price per device was the cost of its Flexitouch, which was roughly $4,000. Thus, in 2018, Tactile calculated its reported TAM by multiplying the 1.1 million lymphedema diagnoses by $4,000, and arrived at a $4.4 billion TAM. In 2019, Tactile calculated its reported TAM by multiplying the 1.3 million lymphedema diagnoses by

- 27 -

$4,000, and arrived at a roughly $5 billion TAM.  These were the TAM figures that Tactile reported to investors.

61.     However, as *Seeking Alpha* revealed in its report "Strong Sell On Tactile Systems: Bloated Stock Needs Compression Therapy" published on June 8, 2020, "[t]he true addressable market for Flexitouch is significantly lower."   Compared to Defendants' estimates of $4-$5 billion, *Seeking Alpha* estimated Flexitouch's TAM to be only approximately $300 million.

62.     *Seeking Alpha's* conclusion was based in part on an article co-authored by Tactile's own Chief Medical Officer, Thomas O'Donnell, who was appointed in July 2017. The article was titled: "Health and economic benefits of advanced pneumatic compression devices in patients with phlebolymphedema" ("O'Donnell Study").

63.     The study performed a claims data analysis of health insurance claims from Blue Health Intelligence ("BHI"), a research database, for the full years 2012-2016.  The database contained data on over 165 million members of individual Blue Cross Blue Shield plans from across the U.S.  It is the same database that Defendants claimed to have used to report their overstated figures of 1.1 and 1.3 million new diagnoses for the 12 months ended June 30, 2018 and 2019, respectively.

64.     The O'Donnell Study identified 81,366 out of 165 million patients on BHI were diagnosed with lymphedema not caused by filarial worms.  The finding indicates that the incidence rate during that period was .05% – six times smaller than the incidence rate reported by Defendants in 2018.  Using the incidence rate from the O'Donnell Study and applying it to the average U.S. population yields only about 160,000 new lymphedema

- 28 -

diagnoses per year for the years 2012-2016.  Even assuming an 18% growth rate of lymphedema diagnoses each year, as Tactile claims in its 2019 Form 10-K, that would result in 310,200 new diagnoses in the year 2020.  The resulting TAM is at least three times smaller than Defendants reported.

65.     Moreover, as *Seeking Alpha* notes, because "the 81,366 figure is over four years, . . . the annual incidence would be even lower."

66.     In addition to the fact Tactile's own Chief Medical Officer authored an article that did not support the reported incidence rates for lymphedema, Defendants overstated Flexitouch's TAM for another reason: not everyone diagnosed with lymphedema has symptoms serious enough to require Flexitouch.  Flexitouch is prescribed only for later-stage cases of lymphedema in which the patient has suffered from more severe swelling and in which traditional methods for lymphedema treatment have not worked.  In fact, more conservative CDT treatments of lymphedema, such as compression garments or bandages, manual lymph drainage, exercise, and elevation can slow progression of and even improve a patient's lymphedema.  To that end, the National Lymphedema Network published a position paper called "The Diagnosis and Treatment of Lymphedema" that reported on CDT's ability to improve lymphedema patients' limb volume and quality of life:

> CDT has been shown to be effective in large numbers of case studies demonstrating limb volume reductions of 50-70% or more, improved appearance of the limb, reduced symptoms, improved quality of life, and fewer infections after treatment.  Even people with progressive lymphedema for 30 years or more before starting CDT have been shown to respond.

Similarly, the National Comprehensive Cancer Network has stated that early diagnosis and treatment improves both the prognosis and the condition.

- 29 -

67.     Thus, third-party payers required proof that the lymphedema conditions had not improved through CDT methods before covering more expensive treatment options like PCDs.   For example, the CMS's National Coverage Determination for Pneumatic Compression Devices required "a four-week trial of conservative therapy" resulting in no significant improvement before a PCD would be covered in the home:

> Pneumatic compression devices are covered in the home setting for the treatment of lymphedema if the patient has undergone a *four-week trial of conservative therapy and the treating physician determines that there has been no significant improvement* or if significant symptoms remain after the trial.  The trial of conservative therapy must include use of an appropriate compression bandage system or compression garment, exercise, and elevation of the limb.  The garment may be prefabricated or custom-fabricated but must provide adequate graduated compression.

68.     It also required a 6-month trial of conservative therapy before it would provide coverage for a PCD to treat chronic venous insufficiency:

> Pneumatic compression devices are covered in the home setting for the treatment of CVI of the lower extremities only if the patient has one or more venous stasis ulcer(s) which have failed to heal after a *6 month trial of conservative therapy directed by the treating physician*.  The trial of conservative therapy must include a compression bandage system or compression garment, appropriate dressings for the wound, exercise, and elevation of the limb.

69.     Private payers likewise set strict requirements.  For example, the Corporate Medical Policy for Blue Cross Insurance of North Carolina in 2020 emphasized that "[p]neumatic compression devices *are covered as a treatment of last resort*."  (Emphasis in original.)  It provided that "**ALL**" of the following criteria must be met before eligibility for coverage of a PCD is met:

> (a)     Confirmed diagnosis of primary or secondary lymphedema; *and*

(b)     Lymphedema is associated with functional impairment, e.g., impairment of activities of daily living; ***and***

(c)     When there is failure of a four-week trial of conservative medical therapies (examples include elevation of the affected limb, exercise, massage, use of an appropriate compression bandage system or compression garment); ***and***

(d)     The patient has demonstrated compliance with past recommended medical treatment(s).

(Emphasis in original.)

70.     Blue Cross also determined that advanced PCDs (HCPCS Code E0652) – like Flexitouch – were "considered medically necessary only when the patient has unique characteristics that prevent them from receiving satisfactory pneumatic compression treatment using a nonsegmented device with a segmented appliance/sleeve or a segmented compression device without manual control of pressure in each chamber."

71.     Likewise, Aetna stated in its policy guidance that simple PCDs were considered medically necessary only when all of the following were met: (1) a diagnosis of lymphedema; (2) with persistent chronic and severe lymphedema, as documented by a clinical finding of, for example, "deformity of elephantiasis" or skin breakdown with persisting lymphorrhea; and (3) a four-week, documented trial of conservative therapy, including compliant use of compression bandages or garments, regular exercise, and elevation of the limb.  Even if all of the above requirements were met, advanced PCDs, such as the Flexitouch, were not considered medically necessary unless the patient's lymphedema

- 31 -

also (1) extended onto the chest, trunk, or abdomen; and (2) failed to improve after a four-week trial on a simple PCD.

72.     Thus, insurance providers have in place stringent requirements that disqualify many lymphedema patients from using even a basic PCD, and have even stricter requirements preventing access to advanced PCDs such as the Flexitouch.  By using *all* diagnoses of lymphedema, without qualification, to calculate its total addressable market, Defendants made false and misleading statements about its TAM.

### b.     Defendants Made False and Misleading Statements Regarding Lymphedema's Prevalence

73.     To support statements claiming that Flexitouch had a large market, Defendants told investors that the U.S. lymphedema prevalence was *20 million patients*.  Prevalence refers to the total number of lymphedema patients in the U.S.

74.     During an earnings conference call in which Defendants presented Tactile's business and performance for year-end 2019, Defendant Mattys told investors that the prevalence of phlebolymphedema, which is lymphedema caused by CVI, "is approximately 16 million in the U.S. alone. . . .  This implies that the estimated prevalence of lymphedema in the U.S. is considerably larger than previous estimates of 5 million."  As the Company's press release reported on the same day, with the newly identified cases of phlebolymphedema, the total lymphedema prevalence increased "four-fold to over 20 million individuals."

75.     The study he cited to support his statement was called "The Clinical Characteristics of Lower Extremity Lymphedema in 440 Patients."  Notably, its lead author,

Steven M. Dean, was a member of Tactile's Medical Scientific Board.  Moreover, between 2017 and 2019, Tactile had paid Dr. Dean over $70,000 in "consulting fees," as well as funds for food, drink and lodging.  Tactile provided a grant for an independent analysis of the statistical section in the study.

76.     The study's purpose was to determine the cause of each studied patient's lymphedema.  It was not designed to estimate prevalence and in fact, ***did not suggest that 16 million individuals in the U.S. had phlebolymphedema***.  Rather, the study's only mention of the 16 million figure was in stating: "[I]t has been estimated that 5% of the population have ***some skin changes associated with CVI***, which equates to a four-fold increase in [phlebolymphedema] prevalence of 16 million individuals."  In other words, the study equated "skin changes associated with CVI" to phlebolymphedema.

77.     Yet, not all patients suffering with CVI, an issue with blood flow through the veins, develop phlebolymphedema.  According to the Lymphatic Education & Research Network, phlebolymphedema occurs when CVI becomes more advanced.  Thus, contrary to the conclusion drawn by the Tactile-sponsored study, merely because 5% of the U.S. population may have some skin changes associated with CVI, does not mean that 5% of the population has phlebolymphedema caused by CVI.

78.     In sum, Tactile sold to investors the story of a $4-$5 billion addressable market that was underpenetrated and quickly growing.  In reality, Defendants had vastly overstated Flexitouch's market opportunity.

C.    **Tactile's Reported Revenues Concealed Defendants' Kickback Scheme and Misrepresented the Total Addressable Market**

1.    **Defendants' Class Period Representations to Investors Portrayed a Company Enjoying Approximately 30% Revenue Growth from Its Flagship Product and a Largely Untapped Market to Perpetuate that Revenue Growth**

79.    On May 7, 2018, at the start of the Class Period, Tactile issued its 1Q18 press release announcing that "Q1 Revenues Increased 35% Year-over-Year; Flexitouch Revenues Up 40%." The press release quoted Defendant Mattys, who described the reasons for Flexitouch sales growth, including "'strong . . . sales'" in the VA sector, while concealing Tactile's illegal sales practices:

> "Our Flexitouch sales growth during the quarter continued to benefit from the expansion of our sales team in recent years, our efforts to target high-volume accounts and our expansion of in-network coverage with commercial insurers. In addition, we saw strong growth in sales to the Veterans Administration hospital system. We also made progress preparing for the commercialization of our latest-generation Flexitouch system, the Flexitouch Plus, which we launched in early April."

80.    Mattys further noted that "'based on our strong start in the first quarter,'" the Company was increasing its 2018 revenue guidance.

81.    The same day, Defendants held their 1Q18 conference call. During the call, Defendant Mattys reiterated the Company's 35% year-over-year revenue growth that was "driven by sales of our Flexitouch System." Again, Mattys misleadingly attributed Flexitouch's sales growth solely to legitimate activities – such as "the expansion of our field sales organization in recent years, our efforts to focus our sales team on targeting high-diagnosing clinicians and our expanded in-network coverage with commercial insurers" – while omitting the Company's illegal sales practices.

- 34 -

82.     Mattys further highlighted as contributing to the Company's revenue growth the "***strong sales into the Veterans Administration hospital system***," which was a result of the "enhanced sales strategy" implemented for the VA channel.  As a result, Mattys reported that the "VA [was] one of their big accounts in the first quarter," with "23% of sales" for the quarter "versus 18% last year for the first quarter."

83.     Yet Defendants' overwhelmingly positive reporting regarding Tactile's substantial revenue growth in 1Q18, "driven by sales of our Flexitouch system," was materially misleading.  Defendants failed to disclose that illegal sales practices, such as kickbacks to doctors and trainers for inducing sales to VA patients, and the false claims submitted to CMS, had helped spur the reported revenue growth through the over-prescription of Flexitouch.

84.     On August 6, 2018, Tactile filed a Form 8-K with the SEC announcing that Defendant Blake would resign "for personal reasons" effective September 1, 2018.  The Company also announced that the Board had approved the appointment of Defendant Moen to replace Defendant Blake as CFO and Secretary, effective as of September 2, 2018.

85.     The Company continued to announce its positive revenue results based on illegal sales practices the next quarter.  On August 6, 2018, Defendants announced their 2Q18 financial results and reported 30% year-over-year total revenue growth from Flexitouch.  Because of the reportedly outsized revenue growth, the Company again raised its year-end revenue guidance.

86.     The Company hosted an earnings call for investors on the same day. Defendant Mattys emphasized that Tactile's "Flexitouch sales growth also benefited from

- 35 -

*very strong sales into the Veterans Administration hospital system*.  Sales into the VA over the first half of 2018 represented approximately 21% of our total revenue compared to approximately 18% in the first half of 2017."  During the earnings call, Mattys also emphasized the overstated "$4 billion-plus" market share opportunity to sell Flexitouch.

87.     In 3Q18, Defendants continued to underscore Tactile's growth in Flexitouch revenues, driven in part by sales into the VA channel, while they concealed that illegal sales practices had augmented the sales of Flexitouch to patients covered by federally funded healthcare programs.  In its press release filed November 5, 2018 on a Form 8-K to announce its 3Q18 results, Tactile reported a stunning 28% increase in total year-over-year revenues, from $28.3 million in 3Q17 to $36.3 million in 3Q18.  Once again, the revenue growth was attributed to Flexitouch sales, which saw its revenue increase 27% year-over-year to $33.3 million in 3Q18, compared to $26.2 million in 3Q17.  Mattys was quoted stating: "'Our third quarter revenue growth of 28% represents a continuation of the strong performance we have achieved throughout 2018.'"  Mattys stated that "'Flexitouch system sales continue to drive our revenue growth,'" and that the Company's "'focused selling strategy targeting high-volume accounts *and the Veterans Administration healthcare system*'" were drivers of that growth.  With another quarter of positive revenue growth, Defendants once again increased their year-end revenue guidance.

88.     Later on November 5, 2018, Tactile hosted an earnings call for investors to discuss the 3Q18 results.  Defendant Mattys touted the "impressive sales performance over the first 9 months of 2018" and identified the Flexitouch system as "the primary driver of our growth, increasing 31% year-over-year to $89.2 million."  Mattys also singled out the

- 36 -

contribution of sales in the VA, detailing that "*our Flexitouch sales growth continued to benefit from very strong sales*" into the VA.  Specifically, "[s]ales into the VA over the first 9 months of 2018 increased 44% year-over-year, representing approximately 20% of our total revenue compared to approximately 19% in the first 9 months of 2017."

> ### 2. Mattys Took Advantage of Insider Knowledge to Sell Millions of Dollars in Tactile Shares Before the *Qui Tam* Action Was Publicly Disclosed

89.     As 2019 began, Defendants continued to emphasize to the market the pace of the Company's revenue growth for the remainder of 2018, while concealing the illegal sales practices undertaken to sell Flexitouch to patients with health care coverage provided by the VA and CMS.  On January 7, 2019, Tactile issued a press release on a Form 8-K that provided its preliminary results for 4Q18 and FY18.  Mattys, quoted in the press release, highlighted the Company's "'strong execution'" and "'revenue growth in excess of 30%, driven by sales of our Flexitouch systems.'"  Mattys stated that the drivers of the Flexitouch sales included the Company's "'targeted selling strategy focused on our most productive accounts and strong sales growth in the Veterans Administration channel.'"  Mattys further stated that in 2019, the Company would "'continue to expand our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency.'"  With the reiteration of revenue growth exceeding 30% and an expanding market for Flexitouch, Tactile's stock price climbed 26% from its close on January 7, 2019 at $47.35 per share to $59.73 on January 8, 2019, and continued to climb in the weeks after.

90.     Then, on January 23, 2019, Veterans First Medical Supply LLC ("VFMS") filed a sealed amended complaint against Tactile alleging, in part, that Tactile had violated

the False Claims Act, 31 U.S.C. §3729, by making false claims and statements to the United States under the Medicare and Medicaid Programs for goods or services procured by health care facilities and hospitals, including a VA Medical Center in Houston, Texas. The *qui tam* amended complaint alleged that, in violation of the federal AKS, Tactile made illegal remunerations to doctors through speaker programs to induce them to write prescriptions for Flexitouch. VFMS also alleged that Tactile paid illegal kickbacks to clinicians who were employees of the hospitals from which the Flexitouch systems were prescribed. Tactile recruited these clinicians at the hospitals where it tried to sell Flexitouch with the intention that the payments to the trainers would induce more prescriptions of Flexitouch.

91.     The Company was served with the *qui tam* sealed amended complaint on February 13, 2019. Meanwhile, the market remained in the dark, as Tactile's stock prices continued to climb to over $70 per share.

92.     Mattys took advantage of his insider knowledge. The combined total of insider sales in the two days after the Company was served with the *qui tam* sealed amended complaint were the largest that Mattys made during the Class Period – and were made when the stock had nearly reached its Class Period high. On February 14 and 15, 2019, in the two days ***after*** the Company was served with the *qui tam* action's sealed amended complaint, ***and two weeks before the Company publicly disclosed the qui tam action to investors for the first time***, Mattys raked in ***$3.5 million*** in proceeds for ***$2.8 million in profits*** from sales of his Tactile stock.

93.     But while Defendants mentioned the *qui tam* action in their 2018 Form 10-K, they dismissed it as meritless. Identifying the *qui tam* action as *United States ex rel.*

- 38 -

*Veterans First Medical Supply, LLC v. Tactile Medical Systems Technology, Inc.*, No. 4:18-cv-02871 (S.D. Tex.), Tactile's 2018 Form 10-K minimized the import of the action, stating that "[f]rom time to time, we may be subject to various claims and legal proceedings arising in the ordinary course of business."  According to Tactile, *qui tam* suits have "increased significantly in the healthcare industry in recent years" because the federal AKS and the False Claims Act allow any person to sue on behalf of the government and to share in the amounts paid by the entity to the government in fines or settlement.  Tactile further noted that the *qui tam* action against the Company was brought by one of Tactile's competitors on behalf of the United States, and that the United States had declined to intervene in the action. Tactile stated that the lawsuit's allegations were "without merit and we intend to vigorously defend against the lawsuit."

94.     Defendants coupled these strenuous denials of wrongdoing with their continued emphasis on Tactile's blockbuster revenue growth and expansive addressable market.

95.     Specifically, on February 28, 2019, in a press release emphasizing in bold italics at the top, "Q4 Revenue Increased 33% Year-over-Year; 2018 Revenue Up 32%," Mattys exclaimed that the Company's 4Q18 and FY18 results were "'well ahead of our expectations.'"   Driving the 32% year-over-year total revenue increase for 2018 was Flexitouch's revenue increase of 31% year-over-year.  The press release also highlighted the "'***strong growth***'" in the VA channel and the continued expansion of "'our share of the $4+ billion'" lymphedema TAM.   The press release further announced that the Company

- 39 -

expected continuing revenue growth in 2019, setting their revenue growth outlook at 20% to 22% year-over-year.

96.     On that day's earnings call with investors to present the 4Q18 and FY18 financial results, Mattys continued to be upbeat: "Simply stated, 2018 was a ***phenomenal year*** for Tactile Medical.  We achieved revenue of $143.8 million for the full year, representing 32% growth year-over-year, exceeding our 2018 guidance range.  Our 2018 revenue growth was driven by sales of our Flexitouch systems, which increased 31% year-over-year to $131.9 million."

97.     Ignoring the allegations in the *qui tam* action, Mattys also highlighted during the call the "***exceptionally strong sales***" in the VA channel, detailing that "[s]ales into the VA in 2018 increased 42% year-over-year and represented approximately 20% of our total revenue compared to approximately 18% in 2017."

98.     Defendants also continued to misrepresent the addressable market size by introducing investors to Tactile-led claims data analyses that purportedly showed the number of new lymphedema diagnoses per year increasing at a rapid pace.  For example, during the conference call regarding the Company's results for the fourth quarter and full year of 2018, Defendant Mattys stated:

> [O]ur addressable patient population remains vastly underpenetrated, given that Tactile Medical shipped over 32,000 Flexitouch systems during 2018.  With this in mind, despite our rapid pace of growth, ***we're still in the early stages of penetrating our addressable market opportunity in the U.S***.
>
> \*     \*     \*
>
> In conclusion, for all these reasons, Tactile Medical will continue to lead the U.S. lymphedema market and grow our share of the ***$4 billion plus opportunity*** that it represents in 2019 and in the years to come.

- 40 -

99.     When an analyst later asked about plans to expand sales beyond the U.S. border, Mattys reiterated that:

> [W]e are so underpenetrated in the U.S. market that, that is our laser focus for 2019.  We sold 35,000 units last year – ***32,000, sorry, units last year and that's on 1.1 million patients diagnosed***.  So this is a vastly underpenetrated market that we're in now, and we want to try to focus our efforts there.

100.    Thus, as far as investors knew, the *qui tam* action was a non-issue while Tactile's investment story continued to be one of unfettered growth within a vast and underpenetrated market.  As a result, even after Mattys's blockbuster sale before disclosing the *qui tam* action, the Insider Trading Defendants continued to sell their shares while Tactile's securities traded at artificially inflated prices.

**3.      Even When the *Qui Tam* Action Began to Reveal that Tactile Engaged in Illegal Sales Practices, Defendants Continued to Fraudulently Highlight Tactile's Strong Earnings and Expansive Market Opportunity Until the Truth Was Fully Disclosed**

101.    Then, on March 20, 2019, after market hours, the *qui tam* action's amended complaint was unsealed and made public for the first time.  In the *qui tam* amended complaint, VFMS alleged that Tactile paid "remuneration" or kickbacks to "influencers" to induce them to write prescriptions for Flexitouch, in violation of the False Claims Act and AKS.  The *qui tam* amended complaint alleged that Tactile hired medical facility employees as independent contract trainers, and paid them a flat rate of $150 plus mileage for each patient that the contract trainer set up with Flexitouch.  As the *qui tam* amended complaint detailed, Tactile's payments to the independent contract trainers who also worked at the very medical facilities where PCDs were prescribed were to influence the physicians at the clinic or medical facility to prescribe Flexitouch.  VFMS alleged that as a result of this improper

- 41 -

relationship, there were false certifications in forms submitted to CMS requiring physicians to attest to the medical necessity of prescribing the Flexitouch system. The *qui tam* amended complaint also alleged that the Company violated the AKS by paying doctors to be "advisors" and "paid spokesmen."

102. On March 22, 2019, securities analysts from Northland Capital and Guggenheim Securities, LLC ("Guggenheim") issued reports regarding the newly unsealed *qui tam* amended complaint. Northland Capital issued a report titled: "Unsealed *qui tam* raises questions. . . ." in which it provided "key details" of the allegations and a summary of Tactile's response to the allegations. The analyst concluded that as a result of the allegations brought in the *qui tam* action, "there will be a tug of war for some time moving forward." For their reports, the analysts also interviewed Tactile management, who refuted the claims in the *qui tam* action – claiming that Tactile was unaware of false certifications and "refut[ing] the notion" that it pays physicians kickbacks.

103. Following these disclosures, the price of Tactile shares plunged 7.5%, or $4.53 from its closing price on March 20, 2019, to close at $55.57 on March 22, 2019.

104. Nevertheless, Defendants maintained the artificial inflation in Tactile securities through their continued denial of the *qui tam* amended complaint's allegations and promotion of the Company's revenue growth and addressable market.

105. On May 6, 2019, the Company issued a press release in which Mattys applauded "'an exciting start to 2019'" and another quarter with "'strong adoption of our Flexitouch Plus system.'" The Company reported that the 1Q19 total revenue had increased 40% year-over-year, to $37.6 million, with the adoption of new lease accounting rules

- 42 -

accounting for 10% of the year-over-year increase in total revenue.  Flexitouch revenue increased 39% year-over-year, to $34.1 million, compared to $24.5 million in 1Q18.  Mattys attributed the 1Q19 revenue results to, among other items, '"investments we have made in our sales team"' and '"the continuation of our targeted sales strategy focused on high-volume accounts."'  As a result of the '"better than expected revenue performance,"' Mattys announced that an increase of '"our full year 2019 outlook"' to '"now expect total revenue to increase 25% to 27% year-over-year in 2019.  We remain confident in our ability to deliver strong revenue growth and improved profitability, as we continue *to expand our penetration of the $4+ billion U.S. lymphedema and chronic venous insufficiency markets*."'

106.   Defendants maintained their upbeat message during the 1Q19 earnings conference call held the same day, in which Mattys reported Tactile's 40% revenue growth year-over-year, "driven by sales and rentals of our Flexitouch Systems, which increased 39% year-over-year to $34.1 million."

107.   During the call, Mattys further reiterated the strength of the VA channel, stating: "We also continue to see *strong performance in the VA* during the first quarter, in part due to the efforts of our dedicated VA specialists, who have helped our sales reps market more effectively within the VA Hospital System."

108.   When responding to a question from a Guggenheim Securities analyst regarding the *qui tam* action, Mattys minimized the allegations and refused to provide details:

> The suit was brought by a competitor and the U.S. declined to intervene or join the suit.  That suit was unsealed on March 20 of this year.  We continue to believe the allegations are without merit and we'll vigorously defend

ourselves.  In fact, we filed a motion to dismiss the suit on April 5 of this year.  But as for additional details, our policy is not to discuss details of outstanding litigation until we get a little further in the process.

In fact, when the analyst pressed for more information on the allegations regarding Tactile's "network of in-home trainers," Mattys responded: "[W]e're not going to discuss any of the single items that were brought up in the litigation.  We don't believe those allegations have any merit."

109.    Though the Company's VA channel was under fire as a result of the *qui tam* action, Defendants continued to hold forth their emphasis on "exceptional" earnings growth when announcing their 2Q19 financial results on August 5, 2019.  Mattys was quoted in the press release reporting Tactile's 2Q19 results: "'The second quarter of 2019 was marked by ***exceptional*** company performance as evidenced by our 32% revenue growth year-over-year and improved profitability.'"

110.    In addition, Defendants started to pivot from identifying the VA as a source of revenue growth to focusing on their Medicare channel.  The Company's press release noted that its Flexitouch sales were driven in part by "growth in the Medicare channel."  Moreover, maintaining that Flexitouch enjoyed an expansive market, Mattys reiterated that the Company remained focused on "'penetrat[ing] the ***more than $4 billion U.S. lymphedema and chronic venous insufficiency market***.'"  Thus, based on the "'stronger than anticipated performance'" in 2Q19, the Company once again raised its 2019 revenue guidance to 26.5% to 28% year-over-year growth.

111.    Defendants kept up their misrepresentations in 3Q19, with Mattys noting in the press release issued on November 4, 2019 that "'[o]ur strong execution continued in the third

- 44 -

quarter with revenue growth of 37% year-over-year"' and the Company identifying the Medicare channel as a factor driving its growth in Flexitouch revenues.  The Company further announced that it was raising its revenue guidance again, expecting to achieve 29% to 30% year-over-year revenue growth.  Mattys again highlighted the "'more than $4 billion U.S. market opportunity'" for Flexitouch.

112.   On February 26, 2020, when announcing the Company's results for the full year 2019, Defendants reported that their already inflated market opportunity figure had increased to $5 billion and provided falsely inflated prevalence figures based on the mischaracterization of a study's findings.  On this point, Mattys underscored during the earnings conference call that "the 1.3 million patients diagnosed represents a $5 billion plus addressable U.S. market opportunity, one that we believe remains very underpenetrated with only 40,000 Flexitouch systems shipped during 2019."

113.   In Tactile's press release filed the same day on a Form 8-K with the SEC, the Company again highlighted its revenue growth, stating: "Total revenue increased 32% year-over-year, to $189.5 million, compared to $143.8 million in 2018" and "Flexitouch revenue increased 30% year-over-year, to $171.3 million, compared to $131.9 million in 2018." Tactile also reported that the growth was "largely driven by . . . growth in the number of Medicare patients served." The Company reported that for 2020 it expected revenue growth of 20% to 22% year over year.

114.   On April 7, 2020, the Company issued a press release disclosing its preliminary estimated revenue results for 1Q20.  While it withdrew its full year 2020 financial outlook because of the COVID-19 pandemic, it still anticipated revenue for the

quarter to show growth of approximately 14% to 17%. Mattys was quoted in the press release stating that "'we expect COVID-19 will continue to impact our near-term financial results; however, we remain confident in our long-term opportunity related to the $5+ billion U.S. lymphedema market.'"

115. On May 4, 2020, Tactile announced its results for 1Q20. Defendants still highlighted Tactile's revenue growth in its press release filed on Form 8-K with the SEC, reporting that "[t]otal revenue increased 16% year-over-year, to $43.7 million, compared to $37.6 million in first quarter 2019" and that "Flexitouch revenue increased 13% year-over-year, to $38.6 million, compared to $34.1 million in first quarter 2019." The Company noted that the revenue increase was driven in part by "growth in the number of Medicare patients served." Addressing the COVID-19 pandemic in the press release, Mattys was quoted: "'While we are not currently able to predict the extent to which the COVID-19 crisis will impact our business over the near term, we remain confident in our long-term opportunity related to the growing $5+ billion U.S. lymphedema market.'"

116. Then, on June 8, 2020, *Seeking Alpha* issued its report called "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy." The report disclosed additional information regarding the kickback and false claims schemes, including: (1) quotes from lymphedema industry executives that elaborated on the schemes; (2) additional detail regarding the mechanics of the contract trainer kickbacks and why they were illegal; and (3) disclosure and discussion of the RAC audit, its results, implications, and ramifications. It also debunked Tactile's addressable market calculations.

- 46 -

117.   First, the report contained statements from lymphedema industry executives that both shed more light on the mechanics of the schemes and disclosed that Tactile's kickback violations were wide-spread and well-known within the industry.  While these statements corroborated the *qui tam* allegations, they also disclosed additional information about the Company's illegal sales practices.  For example, lymphedema industry executives offered additional examples of kickback and false claims violations, including:

(1)   Tactile reps encouraging patients and therapists not to take CDT or basic devices seriously, that way they can get the advanced device later;

(2)   Sending pre-filled prescriptions via fax to prescribers; and

(3)   Fudging timelines to superficially meet coverage requirements.

118.   The statements from the lymphedema industry executives also provided new details about the mechanics of the contract trainer kickback scheme.  For example, according to an executive cited in the article, the therapists could influence prescriptions:

"So if you have lymphedema, you go to your GP which is the prescriber a lot of times over here.  But they're sending patients out for lymphedema treatment, and then whatever treatment protocols the lymphedema therapist or nurse draws up, the prescriber just signs off on it."

119.   Other executives gave concrete examples of therapists involved in the scheme and explained how, even if the therapists were not doing trainings for their own patients, they were still able influence prescriptions and be rewarded for their referrals:

And I talked to [a therapist] who said he's referring out about [mid-teens] patients a month for a Tactile device.  And then I asked him, 'How many setups are you doing then in turn?'  And he said he's probably doing about the same in setups, and he gets $150 per [setup] . . . It's meant a lot for his family.

- 47 -

120.     The *Seeking Alpha* report also disclosed for the first time the results, implications, and ramifications of the RAC audit.  The report discussed that in January 2019, the RAC auditor began a CMS-approved audit of PCDs and the medical necessity requirement.  It also reported that Tactile had the most audited claims denied for lack of medical necessity, with 71% of its claims flagged for failure to establish medical necessity.  As the report stated, the high denial rate strongly suggests that the Company was engaged in billing fraud.  The report also disclosed that, since the start of the RAC audit, Tactile's accounts receivables for Medicare-related accounts had increased by 50% and that the audit was increasingly focused on Tactile, exposing it to a greater risk of claw backs.  For example, in the audit's second round of requested claims, more than 75% of the requested claims were directed at Tactile.

121.     Finally, as explained above in §IV.B.3., the *Seeking Alpha* report analyzed Defendants' statements regarding the addressable market for Flexitouch and demonstrated that these statements were in fact significantly overstated.

122.     With this new information, the stock plunged 12.8%, or $6.95, from the prior trading day's high of $54.21 per share to close at $47.26 per share.

### D.     Defendants Omitted "Known Trends or Uncertainties" in Violation of Item 303(a) of Regulation S-K

123.     Tactile's SEC filings, including the Forms 10-Q and Forms 10-K filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350.  Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303").  Among other things, Item 303 required

Tactile to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

124.    Throughout the Class Period, Tactile was required under Item 303 to disclose the fact that the Company's illegal sales practices put at risk a material portion of the Company's reported revenue – in particular the revenues obtained from Tactile's CMS and VA business segments.  Defendants knew that these practices presented a significant uncertainty given that these practices were illegal, and the revenues and income they generated were therefore unsustainable.  In fact, Defendants represented in their 2018 Form 10-K that "to the extent we are found to not be in compliance" with the AKS or the False Claims Act, in addition to damages and penalties, "***the federal government may also seek exclusion from participation in all federal health care programs***."  As Defendants knew, the repercussions for noncompliance with the AKS or the False Claims Act were material, as Defendants "***may be required to curtail or restructure our operations***.  Any penalties, damages, fines, exclusions, curtailment or restructuring of our operations could adversely affect our ability to operate our business, our financial condition and our results of operations."

125.    Specifically, Defendants' illegal sales practices involving kickbacks to doctors and trainers, and the false claims made to federal healthcare programs, created a known uncertainty that the federal healthcare programs would seek Tactile's exclusion from participation, thus affecting nearly 30% of Tactile's revenues.  Additionally, since Medicaid programs and some commercial insurance plans "are frequently influenced by Medicare

- 49 -

coverage determinations," Medicare's decision to exclude Flexitouch coverage could have even wider consequences. As Defendants recognized in their Forms 10-K: "We believe a reduction or elimination of coverage or reimbursement of our products by Medicare would likely cause some commercial third-party payers to implement similar reductions in their coverage or reimbursement of our products."

126.  In fact, in the Company's VA channel, allegations of the kickback scheme had already started to affect the Company's sales as, according to the *Seeking Alpha* report published on June 8, 2020, the VA "clamped down on PCD spending since the lawsuit was filed." The report analyzed VA spending obtained through a Freedom of Information Act ("FOIA") request, and noted that the E0652 reimbursement, which had seen "significant acceleration starting in 2017" driven in large part by Tactile, had fallen off since the filing of the *qui tam* lawsuit. In fact, Mattys noted during the earnings conference call for year-end 2019 that "[t]here is no doubt the *qui tam* lawsuit has impacted results again in the fourth quarter." And while in 1Q20, the VA revived its E0652 spending for the industry generally, increasing it by 6%, Tactile's VA revenue declined 8% for that same period. As *Seeking Alpha* concluded, such trends indicate that "Tactile has started losing share" as a result of the exposure of its illegal selling practices.

127.  Thus, Defendants' engagement in and failure to disclose the illegal sales practices rendered a failure to comply with Item 303 because Defendants failed to disclose a known trend or uncertainty that could negatively impact Tactile's revenues and income.

E.    **Post-Class Period Developments Confirmed the Class Period's Fraud**

128.    On December 10, 2020, *Seeking Alpha* published a follow-up article reporting that Tactile appeared to be overstating its revenue from Medicare and the VA.  According to the article, Tactile's self-reported Medicare revenue was $22 million in 2019, while Medicare records provided pursuant to a FOIA request showed that Medicare paid only $14 million to Tactile in 2019 – suggesting that Tactile overstated its Medicare revenue by 58% in 2019.  The overstatement continued into 2020.  Tactile's self-reported Medicare revenue for the first half of 2020 was roughly $11 million, while FOIA records show that Medicare paid $6 million to Tactile in the first half of 2020.  Similarly, Tactile's self-reported VA revenue was $31 million in 2019, while VA records provided pursuant to a FOIA request demonstrate that the VA paid only $25 million to Tactile in 2019.

129.    Apart from the revenue overstatements, the report also revealed that: (1) Tactile's retroactive claim denial rate in the RAC Audit had increased to 81%; (2) the RAC Audit was increasingly focused on Tactile; and (3) since the RAC Audit began, Medicare denials of both E0651 and E0652 devices billed by Tactile had dramatically increased.  Specifically, the article noted that in December 2019, data produced pursuant to a FOIA request showed the RAC Auditor requested from Tactile an additional 121 claims for audit, and that 81% of those claims were denied.  It also noted that FOIA data demonstrated that from February to August 2019, only 5.3% of the auditor's requested claims were Tactile's claims, but from September 2019 to December 2020, 11.7% of the auditor's requested claims were Tactile's – suggesting that the auditor was increasingly focused on Tactile.  The report

- 51 -

finally noted that from March 2019 to July 2020, Medicare denial rates for Tactile claims for E0651 and E0652 reimbursement had increased from 2.1% to 6.3%.

130.    Other details of Defendants' misconduct were later disclosed in the *qui tam* action. On January 2, 2021, VFMS filed a motion for partial summary judgment in the *qui tam* lawsuit. With the motion, VFMS filed a declaration of Thomas Suehs, who was the Executive Commissioner for Texas Health and Human Services Commission from 2009 to 2012. In the declaration, Mr. Suehs stated that:

> I would like this Court to be aware that, while serving as Texas HHSC Executive Commissioner, if I had known that Tactile's business agreements targeted health care professionals in positions of influence over prescriptions, that Tactile remunerated these clinicians, or that these clinicians promoted Tactile's products, my administration and I would not have approved or allowed Tactile to be approved as a Medicaid Provider. I also would like this Court to know that my administration and I would not have allowed Tactile to participate in the Texas Medicaid program if Tactile had admitted that it engaged in such conduct.

131.    In his expert report, Mr. Suehs also stated:

- "[Tactile] is engaged in systemic and pervasive misconduct over a period of many years, resulting in artificially increased need/demand for its E0651 and E0652 pneumatic compression devices and excessive claims being submitted to and paid by Government healthcare programs.";

- "As a DMEPOS, Tactile is subject to and prohibited from engaging in conduct that violates the False Claims Act or the Anti-Kickback Statute. However, Tactile violates both";

- "In sum, Tactile's illegal activities are the very sort of activities that I sought to detect and prevent while I served as executive commissioner of Health and Human Services";

- "The volume, manner, nature and extent of these payments to 'trainers' evidences a ***clear intent by Tactile to induce such persons to indirectly arrange for furnishing and for recommending ordering Tactile pneumatic compression devices*** for which payment is made in whole or in part under a Federal health care program. Tactile's methodology involves indirect

- 52 -

inducements managed by personnel in Tactile's headquarters whereby training opportunities are auctioned to 1099 therapists on a 'first come first serve' basis, often involving substantial mileage reimbursements that on the surface are not commercially reasonable";

- "Based on third-party, complex analysis and review of Tactile's CMS claims for 2019, 75% of all Tactile claims to the government for reimbursement are not medically necessary"; and

- "Tactile's business model places significant reliance on the use of hundreds of clinical insiders who, posing as in-home trainers, promote the purchase or ordering of Tactile's products at the insiders' clinics . . . ."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

132.    Throughout the Class Period, Defendants made numerous false and misleading statements and omissions, including: (1) attributing Tactile's revenue growth and strong sales to legitimate business practices, while concealing the illegal kickback and false claims schemes that were key drivers of the Company's revenue growth and implicated Tactile's VA and CMS sales channels; (2) stating that they complied with the AKS and False Claims Act; (3) overstating Flexitouch's TAM; and (4) falsely denying the merits of the *qui tam* lawsuit while failing to acknowledge its risks.

### A.    First Quarter 2018

133.    On May 7, 2018, Tactile issued its 1Q18 press release, which announced: "Q1 Revenues Increased 35% Year-over-Year, Flexitouch Revenues Up 40%."   Defendant Mattys was quoted in the press release stating that 1Q18 was "'marked by 40% growth in sales of our Flexitouch system.'"   He further stated:

"Our Flexitouch sales growth during the quarter continued to benefit from the expansion of our sales team in recent years, our efforts to target high-volume accounts and our expansion of in-network coverage with commercial insurers. In addition, *we saw strong growth in sales to the Veterans Administration*

- 53 -

*hospital system*.  We also made progress preparing for the commercialization of our latest-generation Flexitouch system, the Flexitouch Plus, which we launched in early April."

134.   Following the issuance of the press release, Defendants Mattys and Blake hosted on the same day a conference call with investors and analysts to discuss the Company's earnings for the first quarter of 2018.  Specifically, Defendants Mattys and Blake made the following statements:

[Mattys:]   Our total revenue growth was driven by sales of our Flexitouch system, which grew 40% year-over-year to $24.5 million in the first quarter. . . .

Specifically, our Flexitouch sales growth during the first quarter benefited from; the expansion of our field sales organization in recent years, our efforts to focus our sales team on targeting high-diagnosing clinicians and our expanded in-network coverage with commercial insurers.

These key drivers each contributed to the strong top line growth we have reported over the past 2 years, and remain the primary strategic focus areas for our organization *as we pursue the $4 billion-plus addressable market opportunity in the United States lymphedema market*.

\*       \*       \*

In addition to these important long-term drivers of growth, our Flexitouch sales growth in the first quarter also benefited from strong sales into the Veterans Administration hospital system.

\*       \*       \*

The success we're seeing in the VA hospital system is also a result of the enhanced sales strategy we implemented throughout the course of last year.

Specifically, we added a number of dedicated VA specialists who help our reps to more effectively market and sell within the VA hospital network.

[Blake:]   Our revenue performance was driven by Flexitouch System sales, which increased $7 million or 40% year-over-year to $24.5 million.  The increase in Flexitouch System sales was due to the expansion of our sales force, *growth in the Veterans Administration channel*, increased physician

- 54 -

and patient awareness of the treatment options for lymphedema and increased contractual coverage with national and regional insurance payers.

135.    Also on May 7, 2018, Defendants issued and filed with the SEC Tactile's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 ("1Q18 Form 10-Q"), signed by Blake.

136.    The 1Q18 Form 10-Q reported the Company's financial results for the quarter ended March 31, 2018, including its increased revenues, which Defendants attributed "to an increase of approximately $7.0 million, or 40% in sales of our Flexitouch system" that included "growth in the Veterans Administration channel":

> Revenues increased $7.0 million, or 35%, to $26.8 million in the three months ended March 31, 2018, compared to $19.9 million in the three months ended March 31, 2017.  The growth in revenues was attributable to an increase of approximately $7.0 million, or 40%, in sales of our Flexitouch system in the three months ended March 31, 2018. *The increase in Flexitouch system sales was largely driven by expansion of our salesforce, growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded increased contractual coverage with national and regional insurance payers.

137.    The 1Q18 Form 10-Q included certifications signed by Defendants Mattys and Blake pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002, SEC Rules 13a-15(e), 13a-15(f), 15d-15(e), 15d-15(f) and 18 U.S.C. §1350 (the "SOX Certifications").  The SOX Certifications of both Defendants Mattys and Blake made substantially identical false certifications stating the following:

> 1.      I have reviewed this Quarterly Report on Form 10-Q of Tactile Systems Technology, Inc.;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.     Designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us . . .;

        *     *     *

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting . . .; and

    b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

138.   The statements in ¶¶133-136 above were materially false and misleading and omitted material facts because:

    (a)     the "'strong growth'" in the VA channel was in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)      the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(c)      the "$4 billion-plus addressable market opportunity" was overstated by at least three times;

(d)      in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(e)      Defendants had failed to design internal controls to address the fraud alleged herein.

**B.      Second Quarter 2018**

139.    On August 6, 2018, Tactile issued a press release reporting its 2Q18 results on a Form 8-K filed with the SEC and signed by Blake.  In it, the Company reported:

> Total revenue for the second quarter of 2018 increased $7.9 million, or 30%, to $34.1 million, compared to $26.3 million for the quarter ended June 30, 2017.  The increase in revenue was primarily attributable to an increase of $7.1 million, or 30%, in Flexitouch system sales.  The increase in Flexitouch system sales was largely driven by expansion of our salesforce, ***growth in the Veterans Administration channel***, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

140.    The press release also quoted Defendant Mattys emphasizing the Company's strategy of targeting the VA system:

> "Flexitouch system sales continue to drive our revenue growth – increasing 34% over the first six months of 2018 – fueled by the powerful combination of a focused selling strategy, ***targeting high-volume accounts and the Veterans***

*Administration hospital system*, strong sales team execution and our expansion of in-network coverage with commercial insurers."

141.   The same day, Defendants Mattys and Blake hosted a conference call to discuss the Company's earnings for 2Q18.   On the call, Mattys made the following statements:

> We reported impressive sales performance over the first 6 months of 2018, generating total revenue of $61 million, representing 32% growth year-over-year.   Sales of our Flexitouch Systems were the primary driver to our growth in the period, increasing 34% year-over-year to $55.9 million.
>
> *          *          *
>
> In addition to these primary growth drivers, our Flexitouch sales growth also benefited from ***very strong sales into the Veterans Administration hospital system***.   Sales into the VA over the first half of 2018 represented approximately 21% of our total revenue compared to approximately 18% in the first half of 2017.
>
> *          *          *
>
> In conclusion, with our enhanced Flexitouch Plus system on the market, compelling new clinical and economic evidence in support of our therapy and a recently expanded IP portfolio, we are now better positioned to continue our leadership of the U.S. lymphedema market and grow our share of this ***$4 billion-plus opportunity***.

142.   Also on August 6, 2018, Defendants issued and filed with the SEC Tactile's Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 ("2Q18 Form 10-Q"), signed by Defendant Blake.

143.   The 2Q18 Form 10-Q reiterated that following information regarding Tactile's revenues:

> The growth in revenues was attributable to an increase of approximately $7.1 million, or 30%, in sales of our Flexitouch system in the three months ended June 30, 2018 and an increase of approximately $14.2 million, or 34%, in sales of our Flexitouch system in the six months ended June 30, 2018.   ***The increase***

- 58 -

*in Flexitouch system sales was largely driven by* expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

144. Defendants Mattys and Blake signed the SOX Certifications that were included in the 2Q18 Form 10-Q and that were substantially identical to the SOX Certifications alleged in ¶137.

145. The statements in ¶¶139-143 above were materially false and misleading and omitted material facts because:

(a) the "very strong sales into the Veterans Administration hospital system" and the "growth" in the VA channel, highlighted as a factor "driv[ing]" the "increase in Flexitouch system sales" was in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b) the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(c) the "$4 billion plus opportunity" for the Flexitouch market was overstated by at least three times;

(d) in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(e)    Defendants had failed to design internal controls to address the fraud alleged herein.

## C.    Third Quarter 2018

146.    On November 5, 2018, Tactile issued its press release reporting its 3Q18 financial results on a Form 8-K filed with the SEC and signed by Defendant Moen.  The Company reported:

> Total revenue for the third quarter of 2018 increased $8.0 million, or 28%, to $36.3 million, compared to $28.3 million for the quarter ended September 30, 2017.  The increase in revenue was primarily attributable to an increase of $7.1 million, or 27%, in Flexitouch system sales.  The increase in Flexitouch system sales was largely driven by expansion of our salesforce, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

147.    The press release quoted Defendant Mattys explaining the Flexitouch system as a driver for revenue growth:

> "Flexitouch system sales continue to drive our revenue growth – increasing 31% over the first nine months of 2018 – fueled by strong sales team execution and a positive overall response to the new Flexitouch Plus system, which we launched earlier this year. . . ."
>
> . . . "We remain confident in our ability to continue driving strong growth as we maximize the powerful combination of an expanding sales force, *a focused selling strategy targeting high-volume accounts and the Veterans Administration healthcare system*, and our expansion of in-network coverage with commercial insurers."

148.    Defendants held an earnings call with investors the same day to discuss the financial results for 3Q18.  During the call, Mattys discussed the "primary growth drivers [for] Flexitouch sales," and highlighted sales into the VA:

> We achieved an impressive sales performance over the first 9 months of 2018, generating revenue of $97.3 million representing 31% growth year-over-

- 60 -

year. Sales of our Flexitouch Systems continue to be the primary driver of our growth, increasing 31% year-over-year to $89.2 million.

\*     \*     \*

In addition to these primary growth drivers, our Flexitouch sales growth continued to benefit from very strong sales into the Veterans Administration health care system. Sales into the VA over the first 9 months of 2018 increased 44% year-over-year, representing approximately 20% of our total revenue compared to approximately 19% in the first 9 months of 2017.

\*     \*     \*

Our Flexitouch Plus System remains our primary driver of growth, and we're confident in our ability to continue driving strong growth as we maximize the powerful combination of an expanding sales force, *a focused selling strategy targeting high-volume accounts and the Veterans Administration channel* and our expansion of in-network coverage with commercial insurers.

149.    Mattys also made false statements regarding Flexitouch's TAM, stating: "We believe we are incredibly well positioned to continue our leadership of the U.S. lymphedema market and grow our share of the *$4-plus billion market opportunity* that it represents."

150.    Also on November 5, 2018, Defendants issued and filed with the SEC Tactile's Quarterly Report on Form 10-Q for the period ended September 30, 2018 ("3Q18 Form 10-Q"), signed by Defendant Moen.

151.    The 3Q18 Form 10-Q reiterated that following information regarding Tactile's revenues:

Revenues increased $8.0 million, or 28%, to $36.3 million in the three months ended September 30, 2018, compared to $28.3 million in the three months ended September 30, 2017. Revenues increased $22.9 million, or 31%, to $97.3 million in the nine months ended September 30, 2018, compared to $74.4 million in the nine months ended September 30, 2017. The growth in revenues was attributable to an increase of approximately $7.1 million, or 27%, in sales of our Flexitouch system in the three months ended September 30, 2018 and an increase of approximately $21.3 million, or 31%,

- 61 -

in sales of our Flexitouch system in the nine months ended September 30, 2018. The increase in Flexitouch system sales was largely driven by expansion of our salesforce, ***growth in the Veterans Administration channel***, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

152.    Defendants Mattys and Moen signed the SOX Certifications that were included in the 3Q18 Form 10-Q and that were substantially identical to the SOX Certifications alleged in ¶137.

153.    The statements in ¶¶146-151 above were materially false and misleading and omitted material facts because:

(a)    the "growth" in the VA channel that was highlighted as one factor "driv[ing]" the "increase in Flexitouch system sales" was in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)    the "focused selling strategy" in the VA channel concealed that Defendants used illegal sales practices including kickbacks to doctors and contract trainers to push Flexitouch sales;

(c)    the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(d)    the "$4 billion-plus addressable market opportunity" was overstated by at least three times;

(e)    in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its

business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(f)     Defendants had failed to design internal controls to address the fraud alleged herein.

### D.     Fourth Quarter 2018

154.    On January 7, 2019, Tactile issued a press release on a Form 8-K filed with the SEC.  Defendant Moen signed the Form 8-K.  The press release reported on Tactile's preliminary full year and 4Q18 results and quoted Mattys stating:

> "We are excited to close the year with another quarter of strong execution, *with revenue growth in excess of 30%, driven by sales of our Flexitouch systems* . . . .  Our Flexitouch sales this quarter were driven by several of our primary growth drivers, including the expansion of and continuing execution from our field sales team, and higher than expected volume from a direct contract with a large commercial payer initiated in the third quarter.  2018 was an exceptional year for Tactile Medical, with record sales growth driven by the successful launch of our Flexitouch Plus system in the second quarter, our targeted selling strategy focused on our most productive accounts *and strong sales growth in the Veterans Administration channel*."

> . . . "Looking ahead to 2019, we remain confident in our ability to deliver 20% plus revenue growth and improving profitability as we continue to *expand our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency*."

155.    On February 28, 2019, Tactile issued a press release on a Form 8-K filed with the SEC.  Defendant Moen signed the Form 8-K.  The press release reported on Tactile's 4Q18 and full year 2018 financial results.  The Company reported:

> Revenue for the fourth quarter of 2018 increased $11.6 million, or 33%, to $46.4 million, compared to $34.9 million for the quarter ended December 31, 2017.  The increase in revenue was primarily attributable to an increase of $10.3 million, or 32%, in sales of the Flexitouch system.  The increase in Flexitouch system sales was driven by continued expansion of our salesforce,

- 63 -

the successful roll-out of our new Flexitouch Plus system, **growth in the Veterans Administration channel**, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

156.   Defendant Mattys was quoted in the press release:

"The top-line growth was driven by the successful launch of our Flexitouch Plus system, continuation of our targeted sales strategy focused on high-volume accounts and **strong growth in the Veterans Administration channel**. We also made further progress toward expanding our portfolio of clinical evidence and increasing awareness among clinicians, payers and patients of the benefits of our clinically proven, cost-effective, at-home treatments for chronic conditions."

. . . "Looking ahead to 2019, we remain confident in our ability to deliver 20%+ revenue growth and improved profitability, as we continue to **expand our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency**."

157.   Also on February 28, 2019, Tactile held an earnings call for investors to report its 4Q18 and FY18 results.  Mattys spoke regarding Tactile's revenue growth and the contributions by the VA sales channel in driving sales:

Simply stated, 2018 was a phenomenal year for Tactile Medical.  We achieved revenue of $143.8 million for the full year, representing 32% growth year-over-year, exceeding our 2018 guidance range.  Our 2018 revenue growth was driven by sales of our Flexitouch systems, which increased 31% year-over-year to $131.9 million.

\*     \*     \*

**[W]e also achieved exceptionally strong sales in the VA health care system throughout 2018.  Sales into the VA in 2018 increased 42% year-over-year** and represented approximately 20% of our total revenue compared to approximately 18% in 2017.

Our success in the VA throughout 2018 was primarily due to the continued effectiveness of our team of dedicated VA specialists, whose expertise helps our sales team navigate the VA system and optimize their selling efforts there.

158.   Defendant Moen likewise reported on Tactile' revenue performance for 4Q18:

- 64 -

The increase in Flexitouch System sales was largely driven by expansion of our sales force, the successful rollout of our new Flexitouch Plus system, *growth in the Veterans Administration channel*, increased physician and patient awareness of the treatment options for lymphedema and expanded contractual coverage with national and regional insurance payers.

159.   Mattys further reported on Tactile's market opportunity for the Flexitouch system:

> With respect to our account targeting strategy, we performed another data analysis of medical claims in December of 2018. *The data showed there were 1.1 million patients diagnosed with lymphedema in the 12-month period ending June 30, 2018*, compared to 700,000 patients in the 12-month period ending December 31 of 2013, the first time we performed this analysis. This represents a compounded annual growth rate of 11% over the last 4.5 years.
>
> \*        \*        \*
>
> We sold 35,000 units last year *– 32,000, sorry, units last year and that's on 1.1 million patients diagnosed*. So this is a vastly underpenetrated market that we're in now, and we want to try to focus our efforts there.
>
> \*        \*        \*
>
> In conclusion, for all these reasons, Tactile Medical will continue to lead the U.S. lymphedema market and grow our share of the *$4 billion plus opportunity* that it represents in 2019 and in the years to come.

160.   On February 28, 2019, Tactile also filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2018 ("2018 Form 10-K"). The 2018 Form 10-K was signed by Mattys, Moen, Burke, Nigon, Roche, Peter Soderberg, Raymond Huggenberger and Cheryl Pegus. Defendants Mattys and Moen signed the SOX Certifications that were included in the 2018 Form 10-K and that were substantially identical to the SOX Certifications alleged in ¶137.

- 65 -

161.   Tactile's 2018 Form 10-K made the following statement regarding sales to the VA and Medicare:

We sell our products either directly to patients or to the Veterans Administration on behalf of patients, who are referred to us by physicians, therapists or nurses.  We bill payers, such as private insurers, Medicare, or Medicaid, on behalf of our patients and bill patients directly for their cost-sharing amounts, including any portion of an unsatisfied deductible and any copayments or co-insurance.  We bill the Veterans Administration directly for the purchase of our product on behalf of the patient.  *Approximately 20% of our revenues in 2018 and 18% of our revenues in 2017 came from the Veterans Administration.  Approximately 9% of our revenues in 2018 and 8% of our revenues in 2017 came from Medicare patients*.

162.   Tactile's 2018 Form 10-K made the following statement regarding its Medicare segment:

Because Medicare criteria is extensive, we have a team dedicated to educating prescribers to help them understand how Medicare policy affects their patients and the medical record documentation needed to meet both [National Coverage Determination] and [Local Coverage Determination] requirements.  We maintain open communication with physician key opinion leaders and with Medicare contractors to provide data as it becomes available that could potentially influence coverage decisions.  *We also continue to closely monitor our Medicare business to identify trends that could have a negative impact on certain Medicare patients' access to our products*, which in turn could have an adverse effect on our business and results of operations.

163.   Tactile's 2018 Form 10-K also cited its claims data analysis and represented that the Company's TAM exceeded $4.2 billion:

We estimate that more than five million people in the United States are living with lymphedema.  *Based on an analysis of claims data commissioned by us, we estimated that approximately 1.1 million patients were diagnosed with lymphedema during the 12 months ended December 31, 2018*.  Based on a similar analysis of claims data commissioned by us, we estimated that there were approximately 700,000 patients diagnosed with lymphedema during the 12 months ended June 30, 2014.  This represents a 10.6% average annual increase in the number of patients diagnosed with lymphedema over the period from June 30, 2014 to December 31, 2018.  *We estimate that the addressable market opportunity for our Flexitouch system exceeds $4.2*

*billion in the United States, which is based on the number of patients diagnosed with lymphedema and our average selling price per device*.

164.   The 2018 Form 10-K made the following statement regarding the federal AKS and Self-Referral Laws:

The Federal Anti-Kickback Statute applies to certain arrangements with healthcare providers, product end users and other parties, including marketing arrangements and discounts and other financial incentives offered to our clinicians in connection with the sales of our products. *Although we believe that we have structured such arrangements to be in compliance with the Anti-Kickback Statute and other applicable laws, regulatory authorities may determine that our marketing, pricing, or other activities violate the Federal Anti-Kickback Statute or other applicable laws*. Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs. In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations. Any penalties, damages, fines, exclusions, curtailment or restructuring of our operations could adversely affect our ability to operate our business, our financial condition and our results of operations.

The Ethics in Patient Referrals Act, commonly known as the "Stark Law," prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity, including a company that furnishes durable medical equipment, in which the physician or an immediate family member of such physician has an ownership or investment interest or with which the physician has entered into a compensation arrangement unless an exception applies. Violation of the Stark Law could result in denial of payment, disgorgement of reimbursements received under a noncompliant arrangement, civil penalties and exclusion from Medicare or other governmental programs. *Although we believe that we have structured our provider arrangements to comply with current Stark Law requirements, these requirements are highly technical and there can be no guarantee that regulatory authorities will not determine or assert that our arrangements do not meet applicable Stark Law exceptions*.

Additionally, *because some of these laws continue to evolve, we lack definitive guidance as to the application of certain key aspects of these laws as they relate to our arrangements with providers with respect to patient training*. We cannot predict the final form that these regulations will take or the effect that the final regulations will have on us. As a result, our provider

- 67 -

arrangements may ultimately be found to be non-compliant with applicable federal law.

165.   The 2018 Form 10-K made the following statement regarding the False Claims Act:

> *Although we believe that we are in compliance with the Federal False Claims Act as well as the Civil Monetary Penalties laws, if we are found in violation of the same*, penalties include fines ranging from $11,181 to $22,363 for each false claim violation of the Federal False Claims Act and varying amounts based on the type of violation of the Civil Monetary Penalties Law), plus up to three times the amount of damages that the federal government sustained because of the act of that person.

166.   The statements in ¶¶154-159, 161-165 above were materially false and misleading and omitted material facts because:

(a)   the "exceptionally strong sales in the VA health care system" and the "strong sales growth in the Veterans Administration channel," highlighted as a factor "driv[ing]" Flexitouch's "records sales growth" was in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)   the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(c)   the "$4 billion plus opportunity" was overstated by at least three times;

(d)   the "close[] monitor[ing]" of the Medicare business "to identify trends that could have a negative impact on certain Medicare patients' access to our products" omitted the Company's engagement in kickback schemes and submissions of false claims that risked a negative impact on the Medicare business;

- 68 -

(e)      Defendants' stated belief in their compliance with the AKS, the Stark Laws, and the False Claims Act lacked any basis given the Company's ongoing kickback schemes and submissions of false claims;

(f)      Tactile's "arrangements with providers with respect to patient training" violated the AKS, enacted in 1972, and the Stark Law, enacted in 1989, neither of which was "continu[ing] to evolve";

(g)      in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(h)      Defendants had failed to design internal controls to address the fraud alleged herein.

### E.      First Quarter 2019

167.      On May 6, 2019, Tactile issued its press release reporting its 1Q19 financial results on a Form 8-K filed with the SEC and signed by Moen.  The Company reported:

> Revenue for the first quarter of 2019 increased $10.8 million, or 40%, to $37.6 million, compared to $26.8 million for the quarter ended March 31, 2018.  The increase in revenue was attributable to an increase of $9.6 million, or 39%, in sales and rentals of the Flexitouch system and an increase of approximately $1.2 million, or 51%, in sales and rentals of our Entre/Actitouch systems in the three months ended March 31, 2019.  The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, ***growth in the Medicare channel***, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

168.      Mattys was quoted in the 1Q19 press release praising Tactile's "'exciting start to 2019'" and penetration into the lymphedema market:

- 69 -

"Our first quarter performance reflects an exciting start to 2019, driven by strong adoption of our Flexitouch Plus system . . . . First quarter revenue results benefitted from the investments we have made in our sales team, the continuation of our targeted sales strategy focused on high-volume accounts and stronger than expected sales volumes due to a new contract with a large commercial payer."

\* \* \*

"We remain confident in our ability to deliver strong revenue growth and improved profitability, as we continue to expand our penetration of *the $4+ billion U.S. lymphedema and chronic venous insufficiency markets*."

169.   During the 1Q19 earnings conference call held the same day for investors, Mattys made the following statement regarding the VA channel: "We also continue to see strong performance in the VA during the first quarter, in part due to the efforts of our dedicated VA specialists, who have helped our sales reps market more effectively within the VA Hospital System."

170.   Mattys also received a question from an analyst at William Blair & Company LLC ("William Blair") regarding the VA channel's sales performance:

[William Blair Analyst:] The first one for me is maybe a little bit of a focus on the VA, which I think was roughly about 20% of total sales this quarter. Still showing some nice growth, but down maybe from 23% in the year-ago period. Can you give us a little bit of color, how much of that is because of the change in rev[enue] rec[ognition] as that maybe changed the mix? . . .

[Mattys:] . . . *So we have a bit of a tough comp here in the VA channel specifically, last year being so successful*. We did see higher than our growth rate for the channel in shipments and did see some ASP drop by signing the new Federal Supply Schedule contract that we did in the third quarter of last year. So volume is still ticking along pretty nicely.

171.   Mattys also reiterated Tactile's ability to access "the more than $4 billion U.S. lymphedema market":

- 70 -

Based on our latest analysis of claims data, we also estimated 11% annualized compounded growth in the number of patients diagnosed with lymphedema over the last 5 years.  And more broadly, we continue to see mounting qualitative evidence of the increasing awareness of lymphedema and its treatment.  In 2019, we look forward to demonstrating our commitment to leadership in the ***more than $4 billion U.S. lymphedema market*** as we continue to expand our share and deliver high-quality products and service to our patient and clinician customers.

172.    Regarding the *qui tam* action, Mattys had the following exchange with an analyst when the earnings call was opened up to analyst questions:

> [Guggenheim Analyst:]  Okay.  And then, Jerry, can you provide any update on the legal action that was initiated back in the first quarter, the *qui tam* suits from one of your competitors, anything you can say there about where that stands?

> [Mattys:]  Sure, Chris.  I'll just reiterate what we've said previously and then I'll let you know where we are today.  As we discussed in the 10-K, we were served with a sealed complaint in the U.S. District Court of Southern District of Texas on February 13.  The suit was brought by a competitor and the U.S. declined to intervene or join the suit.  That suit was unsealed on March 20 of this year.  ***We continue to believe the allegations are without merit*** and we'll vigorously defend ourselves.  In fact, we filed a motion to dismiss the suit on April 5 of this year.  But as for additional details, our policy is not to discuss details of outstanding litigation until we get a little further in the process.

> [Guggenheim Analyst:]  Understood.  There was 1 particular aspect of that complaint, which related to your network of in-home trainers.  Maybe it's worth just spending a minute on that particular operating structure, your confidence in its legality and why it's important to the business?

> [Mattys:]  Yes, Chris, we're not going to discuss any of the single items that were brought up in the litigation.  ***We don't believe those allegations have any merit***.  And we're certainly looking forward to the opportunity to present that case.

173.    Also on May 6, 2019, Defendants issued and filed with the SEC Tactile's Form 10-Q for the period ended March 31, 2019 ("1Q19 Form 10-Q"), signed by Defendant Moen.

The Company reported the following regarding its revenues for 1Q19:

- 71 -

Revenues increased $10.8 million, or 40%, to $37.6 million in the three months ended March 31, 2019, compared to $26.8 million in the three months ended March 31, 2018.  The growth in revenues was attributable to an increase of approximately $9.6 million, or 39%, in sales and rentals of our Flexitouch system and an increase of approximately $1.2 million, or 51%, in sales and rentals of our Entre/Actitouch systems in the three months ended March 31, 2019.  The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, ***growth in the Medicare channel***, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

174.   The 1Q19 Form 10-Q was signed by Defendant Moen on May 6, 2019.  Defendants Mattys and Moen signed the SOX Certifications that were included in the 1Q19 Form 10-Q and that were substantially identical to the SOX Certifications alleged in ¶137.

175.   The statements in ¶¶167-173 above were materially false and misleading and omitted material facts because:

(a)   the "growth" in the Medicare channel that was highlighted as one factor "driv[ing]" the "increase in Flexitouch system sales" was in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)   the "tough comp here in the VA channel" concealed the illegal sales practices conducted in the VA channel and the fact that as a result of the *qui tam* action alleging such illegal sales practices, the VA had slowed its spending on Flexitouch;

(c)   the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

(d)   discarding the *qui tam* action's allegation as "without merit" concealed the Company's ongoing illegal sales practices;

- 72 -

(e)      the Company's reported revenues were in part the product of illegal sales practices, including the use of kickbacks to push Flexitouch sales into the VA and CMS channels and the submission of false claims to CMS;

(f)      the "more than $4 billion U.S. lymphedema market" was overstated by at least three times;

(g)      in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(h)      Defendants had failed to design internal controls to address the fraud alleged herein.

### F.      Second Quarter 2019

176.      On August 5, 2019, Tactile issued its press release reporting its 1Q19 financial results on a Form 8-K filed with the SEC and signed by Moen.  The Company stated:

> Revenue for the second quarter of 2019 increased $11.1 million, or 32%, to $45.2 million, compared to $34.1 million for the quarter ended June 30, 2018.  The increase in revenue was attributable to an increase of $9.6 million, or 31%, in sales and rentals of the Flexitouch system and an increase of $1.5 million, or 53%, in sales and rentals of our Entre systems in the quarter ended June 30, 2019.  The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, expanded contractual coverage with national and regional insurance payers and ***growth in the Medicare channel***.

177.      On the same day, the Company hosted an earnings conference call for investors.  Mattys stated:

- 73 -

We achieved exceptional company performance during the first 6 months of 2019 with total revenue of $82.8 million, representing 36% growth year-over-year. Flexitouch Plus System sales and rentals were the primary driver of our revenue growth in the period, increasing 34% year-over-year to $75.1 million.

\*      \*      \*

***We also experienced strong sales to patients with Medicare and VA coverage during the first half of the year****.*

Our performance serving the Medicare population has been particularly strong this year, representing 11% of our total revenues in the first 6 months compared to 8% in the same period last year. We believe that our decision in 2018 to transition Entré and ACTitouch order processing from our field team to our internal team of specialists has been an important contributor to this strong performance.

In the Veterans Administration channel, our sales performance continued to benefit from the new Federal Supply Schedule contract that we were awarded for our Flexitouch Plus System last September, along with the continued efforts of our dedicated VA specialists.

178.    Moen likewise reported on the Company's revenue:

Total revenue for the second quarter increased 32% to $45.2 million compared to $34.1 million for the quarter ended June 30, 2018. Our total revenue performance in the quarter was driven by sales and rentals of our Flexitouch systems, which increased $9.6 million or 31% year-over-year to $41 million. The increase in our Flexitouch revenue was largely driven by the expansion of our sales force, increasing physician and patient awareness of the treatment options for lymphedema, expanded contractual coverage with insurance payers, and ***growth in the Medicare channel***.

179.    Mattys represented that he saw "a bright future" was in store for the Company because certain "macro dynamics," including "the more than $4 billion addressable U.S. market opportunity that remains in front of us":

We continue to see a bright future in store for our company as we look at a number of important macro dynamics, including: the growing awareness of lymphedema in the market at both the clinician and patient level; ***the more than $4 billion addressable U.S. market opportunity*** that remains in front of

- 74 -

us; and our unique position in the market, with an established direct-to-patient-and-provider model, proven reimbursement and payer relations expertise and innovative products, supported by extensive clinical and economic evidence.

180.   Mattys also received questioning from an analyst from Piper Jaffray Companies, who was "surprised" by the difference in growth drivers.  The analyst stated: "It used to be very VA-heavier just given the growth rate there.  But this year, it seems to be Medicare, less VA and more commercial.  So maybe comment on that."  Mattys responded in part:

> In the first half of the year, Medicare made up 11% of sales versus 8% last year.  We think the single biggest reason for that shift has been the move inside to lift the burden of paperwork and order processing from our field team so that they may focus on Flexitouch sales.

> *      *      *

> We've made our biggest addition in VA reps last year, in 2018.  So for the first half of the year, the VA made up 19% of total revenue versus 20% over the same period last year.  ***We're very happy with the VA performance. Overall, it was up 22% year-over-year in that particular segment***.

181.   Also on August 5, 2019, Defendants issued and filed with the SEC Tactile's Form 10-Q for the period ended June 30, 2019 ("2Q19 Form 10-Q"), signed by Defendant Moen.  The Company reported the following regarding its revenues for 2Q19:

> Revenues increased $11.1 million, or 32%, to $45.2 million in the three months ended June 30, 2019, compared to $34.1 million in the three months ended June 30, 2018.  Revenues increased $21.8 million, or 36%, to $82.8 million in the six months ended June 30, 2019, compared to $61.0 million in the six months ended June 30, 2018.  The growth in revenues was attributable to an increase of approximately $9.6 million, or 31%, in sales and rentals of our Flexitouch system in the three months ended June 30, 2019, and an increase of approximately $19.2 million, or 34%, in the six months ended June 30, 2019.  The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, expanded contractual

- 75 -

coverage with national and regional insurance payers *and growth in the Medicare channel.*

182.   Defendants Mattys and Moen signed the SOX Certifications that were included in the 2Q19 Form 10-Q and that were substantially identical to the SOX Certifications alleged in ¶137.

183.   The statements in ¶¶176-181 above were materially false and misleading and omitted material facts because:

(a)   the "strong sales to patients with Medicare and VA coverage," the 22% year-over-year growth in the VA channel, and the "growth" in the Medicare channel that were highlighted as factors "driv[ing]" the "increase in Flexitouch system sales" were in truth based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)   the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(c)   the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

(d)   the "more than $4 billion addressable U.S. market opportunity" was overstated by at least three times;

(e)   in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its

- 76 -

business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(f)     Defendants had failed to design internal controls to address the fraud alleged herein.

### G.   Third Quarter 2019

184.     On November 4, 2019, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release announcing the Company's 3Q19 financial results for the period ended September 30, 2019.  The Company reported:

> Revenue for the third quarter of 2019 increased $13.3 million, or 37%, to $49.6 million, compared to $36.3 million for the quarter ended September 30, 2018.  The increase in revenue was attributable to an increase of $11.4 million, or 34%, in sales and rentals of the Flexitouch system and an increase of $1.9 million, or 64%, in sales and rentals of the Entre system in the quarter ended September 30, 2019.  This revenue increase was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and *growth in the Medicare channel*.

185.     On the same day, the Company hosted an earnings conference call for investors.  Mattys emphasized the Company's Flexitouch market:

> As we exit the year, we will continue to reinforce our leadership in the more than *$4 billion U.S. market opportunity for lymphedema and chronic venous insufficiency* by expanding and enhancing the productivity of our field sales organization and continuing to capitalize on the strong market response to our Flexitouch Plus system, our high diagnosing account targeting strategy and our broad in-network coverage with commercial payers.

186.     Moen reported the following on the Company's revenues:

> The increase in Flexitouch revenue was largely driven by the expansion of our sales force, increasing physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with insurance payers and *growth in the Medicare channel*.

- 77 -

187.    Also on November 4, 2019, Defendants issued and filed with the SEC Tactile's Form 10-Q for the period ended September 30, 2019 ("3Q19 Form 10-Q"), signed by Defendant Moen.  The Company reported the following regarding its revenues for 3Q19:

> Revenue increased $13.3 million, or 37%, to $49.6 million in the three months ended September 30, 2019, compared to $36.3 million in the three months ended September 30, 2018.  Revenue increased $35.1 million, or 36%, to $132.4 million in the nine months ended September 30, 2019, compared to $97.3 million in the nine months ended September 30, 2018.  The growth in revenue was primarily attributable to an increase of approximately $11.4 million, or 34%, in sales and rentals of our Flexitouch system in the three months ended September 30, 2019, and an increase of approximately $30.6 million, or 34%, in the nine months ended September 30, 2019.  The increase in Flexitouch system sales and rentals was largely driven by expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, the broad in-network coverage with national and regional insurance payers ***and growth in the Medicare channel***.

188.    Defendants Mattys and Moen signed the SOX Certifications that were included in the 3Q19 Form 10-Q and that were substantially identical to the SOX Certifications alleged in ¶137.

189.    The statements in ¶¶184-187 above were materially false and misleading and omitted material facts because:

(a)     the "growth" in the Medicare channel that was highlighted as one factor "driv[ing]" the "increase in Flexitouch system sales" was based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)     the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

- 78 -

(c)     the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

(d)     the "$4 billion U.S. market opportunity" for Flexitouch was overstated by at least three times;

(e)     in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(f)     Defendants had failed to design internal controls to address the fraud alleged herein.

## H.     Fourth Quarter 2019

190.    On January 13, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release announcing the Company's preliminary full year and 4Q19 revenue results, and announced Mattys's intention to retire in 2020.  Quoted in the press release, Mattys reported on the Company's 2019 performance and on the lymphedema market:

> "Our solid execution during the fourth quarter enabled us to bring 2019 to a strong close, with improved profitability and expected full year 2019 revenue growth of approximately 31% driven by investments in the field sales team, solid market adoption of the Flexitouch Plus system, a targeting strategy focused on the most productive accounts in the lymphedema market and the broad in-network coverage we have obtained with commercial payers.  As we enter 2020, *we remain focused on expanding our share of the $4+ billion U.S. market in lymphedema and chronic venous insufficiency* and believe

- 79 -

we are poised to deliver another year of 20% plus revenue growth and improved profitability."

191.    On February 26, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release reporting the Company's 4Q19 and full year 2019 financial results.  Specifically, the Company reported:

> Revenue in the fourth quarter of 2019 increased $10.6 million, or 23%, to $57.1 million, compared to $46.4 million in the fourth quarter of 2018.  The increase in revenue was attributable to an increase of $8.8 million, or 21%, in sales and rentals of the Flexitouch system and an increase of $1.8 million, or 48%, in sales and rentals of the Entre system in the quarter ended December 31, 2019.  This revenue increase was largely driven by expansion of our sales force, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and **growth in the number of Medicare patients served**.

192.    The Company also announced the results of a new medical study, based on which the Company reported a "four-fold" increase to the prevalence of lymphedema:

> On February 13, 2020, the Company announced the publication of a new clinical study demonstrating the prevalence of chronic venous insufficiency-related lymphedema ("CVI related lymphedema," also known as "Phlebolymphedema").  Researchers concluded that chronic venous insufficiency, not cancer-related therapy, may be the most common cause of lower extremity lymphedema in the United States.  The new study suggests that the prevalence of lymphedema due to CVI is approximately 16 million individuals in the United States.  ***This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, increases the total prevalence estimates four-fold to over 20 million individuals***.

193.    The press release quoted Mattys reporting on the Company's "'impressive performance'" and the growing lymphedema market:

> "We are pleased to report another quarter of impressive performance, which resulted in revenue growth of 23% year-over-year," said Gerald R. Mattys, Chief Executive Officer of Tactile Medical.  "Our solid execution during the fourth quarter enabled us to bring 2019 to a strong close, with improved profitability and full year revenue growth of 32%.  Our success was

- 80 -

driven by investments in expanding our field sales team, solid market adoption of the Flexitouch Plus system, a targeting strategy focused on the most productive accounts in the lymphedema market and the broad in-network coverage we have obtained with commercial payers. *As we enter 2020, we remain focused on increasing our share of the growing $5+ billion addressable U.S. market opportunity in lymphedema and chronic venous insufficiency* and believe we are poised to deliver 20% or more top line growth and another year of improved profitability."

194.    On the same day, the Company hosted an earnings conference call for investors.  Mattys reiterated the study results that reported an increase in the prevalence of lymphedema:

This study, titled the clinical characteristics of lower extremity lymphedema in 440 patients, was a 3-year single-center retrospective study that documented the prevalence and manifestations of the 4 most commonly encountered causes of lower extremity lymphedema patients, who presented to an oncology-affiliated physical therapy lymphedema center.  Researchers found that CVI was the most common cause of lymphedema, responsible for 41.8% of lower extremity lymphedema cases.

While cancer has historically been considered to be the most common cause of lower extremity lymphedema, the findings of this study highlight the potential large population of patients with phlebolymphedema and the need for further research and increased awareness of this condition. ***Importantly, the researchers of this study suggested that the prevalence of phlebolymphedema is approximately 16 million in the U.S. alone***, citing prior literature estimating that 5% of the population has some skin changes associated with CVI.  This implies that the estimated prevalence of lymphedema in the U.S. is considerably larger than previous estimates of 5 million and highlights the need for increased awareness across the medical community to address this much larger, underdiagnosed and underserved patient population.

195.    Mattys also commented on the under-penetration of Flexitouch's market:

In December of 2019, we conducted another analysis of U.S. medical claims data, which showed that there were 1.3 million patients diagnosed with lymphedema in the 12-month period ending June 30, 2019, an increase of 18% in 1 year.  This updated analysis suggests that the annual number of patients diagnosed has grown at a compounded annual growth rate of 12% over the last 5.5 years compared to the 700,000 patients diagnosed in the 12-month period

ending December 31, 2013, which was the first period of data we evaluated. *Importantly, the 1.3 million patients diagnosed represents a $5 billion plus addressable U.S. market opportunity, one that we believe remains very underpenetrated with only 40,000 Flexitouch systems shipped during 2019*.

196.    Also on February 26, 2020, Tactile filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 Form 10-K").  The 2019 Form 10-K was signed by Mattys, Moen, Soderberg, Burke, Huggenberger, Nigon, Pegus and Roche.

197.    The 2019 Form 10-K made the following statement regarding revenue growth:

Revenue increased $34.5 million, or 32%, to $143.8 million in the year ended December 31, 2018, compared to $109.3 million in the year ended December 31, 2017.  The growth in revenue was attributable to an increase of approximately $31.6 million, or 31%, in sales and rentals of our Flexitouch system and an increase of approximately $2.9 million, or 32%, in sales and rentals of our Entre and Actitouch systems in the year ended December 31, 2018.  The increase in Flexitouch system sales was largely driven by expansion of our sales force, increased volume due to a new contract with a large private insurer, the launch of the Flexitouch Plus product, our third-generation Flexitouch product, and *sales growth in the Veterans Administration channel*.

198.    Tactile's 2019 Form 10-K made the following statement regarding its Medicare segment:

Because Medicare criteria is extensive, we have a team dedicated to educating prescribers to help them understand how Medicare policy affects their patients and the medical record documentation needed to meet both [National Coverage Determination] and [Local Coverage Determination] requirements.  We maintain open communication with physician key opinion leaders and with Medicare contractors to provide data as it becomes available that could potentially influence coverage decisions.  *We also continue to closely monitor our Medicare business to identify trends that could have a negative impact on certain Medicare patients' access to our products*, which in turn could have an adverse effect on our business and results of operations.

199.    Tactile's 2019 Form 10-K also reported on its TAM:

- 82 -

Based on a study performed by Dr. Steven Dean et al., it is estimated that more than 16 million people in the United States are living with lymphedema due to CVI. This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, increases the prevalence estimates four-fold to over 20 million individuals. In order to more accurately target patients actively looking for a treatment option we have performed an analysis of claims data. *We estimated that approximately 1.3 million patients were diagnosed with lymphedema during the 12 months ended June 30, 2019*. Based on a similar analysis of claims data commissioned by us, we estimated that there were approximately 1.1 million patients diagnosed with lymphedema during the 12 months ended June 30, 2018. This represents an 18% year-over-year increase in the number of patients diagnosed with lymphedema in a one-year period. *We estimate that the addressable market opportunity for our Flexitouch system exceeds $5.0 billion in the United States, which is based on the number of patients diagnosed with lymphedema and our average selling price per device*.

200.    The 2019 Form 10-K made the following statements regarding violations of the

federal AKS and Self-Referral Laws:

The Federal Anti-Kickback Statute applies to certain arrangements with healthcare providers, product end users and other parties, including marketing arrangements and discounts and other financial incentives offered to our clinicians in connection with the sales of our products. Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs. In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations.

The Ethics in Patient Referrals Act, commonly known as the "Stark Law," prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity, including a company that furnishes durable medical equipment, in which the physician or an immediate family member of such physician has an ownership or investment interest or with which the physician has entered into a compensation arrangement unless an exception applies. Violation of the Stark Law could result in denial of payment, disgorgement of reimbursements received under a noncompliant arrangement, civil penalties and exclusion from Medicare or other governmental programs.

*Additionally, because some of these laws continue to evolve, we lack definitive guidance as to the application of certain key aspects of these laws*

- 83 -

*as they relate to our arrangements with providers with respect to patient training*.  We cannot predict the final form that these regulations will take or the effect that the final regulations will have on us.  As a result, our provider arrangements may ultimately be found to be non-compliant with applicable federal law.

201.   The 2019 Form 10-K made the following statements regarding violations of the

False Claims Act:

*Although we believe that we are in compliance with the Federal False Claims Act as well as the Civil Monetary Penalties laws*, if we are found in violation of the same, penalties include fines for each false claim violation of the Federal False Claims Act and varying amounts based on the type of violation of the Civil Monetary Penalties Law, plus up to three times the amount of damages that the federal government sustained because of the act of that person.  In addition, the federal government may also seek exclusion from participation in all federal health care programs.

202.   Defendants Mattys and Moen signed the SOX Certifications that were included

in the 2019 Form 10-K and that were substantially identical to the SOX Certifications

alleged in ¶137.

203.   The statements in ¶¶190-195, 197-202 above were materially false and

misleading and omitted material facts because:

(a)    the "growth in the number of Medicare patients served" and the "sales

growth in the Veterans Administration channel" highlighted as factors "driv[ing]" the

"increase in Flexitouch system sales" were based in part on illegal and unsustainable sales

practices involving kickbacks paid to doctors and contract trainers;

(b)    the Company's reported revenues were in part the product of illegal

sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA

and CMS channels and submitting false claims to CMS;

- 84 -

(c)     the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

(d)     the "$4 billion plus opportunity" for Flexitouch sales was overstated by at least three times;

(e)     the newly augmented "addressable market opportunity for our Flexitouch system exceed[ing] $5.0 billion in the United States" was overstated by at least four times;

(f)     the reportedly increased estimated lymphedema prevalence in the U.S. by "four-fold to over 20 million individuals" was based merely on a study's report of "skin changes associated with CVI," and CVI does not necessarily develop into lymphedema;

(g)     the "close[] monitor[ing]" of the Medicare business "to identify trends that could have a negative impact on certain Medicare patients' access to our products" omitted the Company's engagement in kickback schemes and submissions of false claims that risked a negative impact on the Medicare business;

(h)     Defendants' stated belief in their compliance with the False Claims Act lacked any basis given the Company's ongoing kickback schemes and submissions of false claims;

(i)     Tactile's "arrangements with providers with respect to patient training" violated the AKS, enacted in 1972, and the Stark Law, enacted in 1989, neither of which was "continu[ing] to evolve";

- 85 -

(j)      in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(k)      Defendants had failed to design internal controls to address the fraud alleged herein.

## I.      First Quarter 2020

204.    On April 7, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release, dated April 6, 2020, preliminarily announcing the Company's 1Q20 financial results for the period ended March 31, 2020.  In it, the Company withdrew its 2020 financial outlook and provided a business update on the Company's response to the COVID-19 pandemic.  The Company noted that its 1Q20 total revenue was negatively impacted in March by the COVID-19 pandemic.   Yet, Mattys was quoted in the press release underscoring the lymphedema market available for its products:

> "As most of our clinician customers practice outside of the hospital, they can respond to patient requests for therapy and interact with us virtually.  To date, our supply chain has been functioning well, and we have multiple safeguards in place designed to satisfy future demand for our products.  Finally, we expect COVID-19 will continue to impact our near-term financial results; however, we remain confident in our ***long-term opportunity related to the $5+ billion U.S. lymphedema market*** and plan to continue expanding our commercial organization this year to further enhance our growth profile."

205.    On May 4, 2020, Tactile filed with the SEC a Form 8-K signed by Moen that attached a press release of the same date announcing the Company's 1Q20 financial results for the period ended March 31, 2020.  The Company reported:

- 86 -

The increase in revenue was attributable to an increase of $4.5 million, or 13%, in sales and rentals of the Flexitouch system and an increase of $1.6 million, or 45%, in sales and rentals of the Entre system in the quarter ended March 31, 2020.  The overall revenue increase was largely driven by the continued expansion of our salesforce, increased physician and patient awareness of the treatment options for lymphedema, broad in-network coverage with national and regional insurance payers and ***growth in the number of Medicare patients served***.

206.    The press release also reiterated Defendants' conclusions regarding the increased prevalence of lymphedema:

The new study suggests that the prevalence of lymphedema due to CVI is ***approximately 16 million individuals in the United States***.  This, in addition to the estimated five million individuals living in the U.S. with cancer-related and primary lymphedema, ***increases the total prevalence estimates four-fold to over 20 million individuals***.

207.    Mattys was also quoted in the press release underscoring the growing lymphedema market:

"While we are not currently able to predict the extent to which the COVID-19 crisis will impact our business over the near term, ***we remain confident in our long-term opportunity related to the growing $5+ billion U.S. lymphedema market***."

208.    On the same day, the Company hosted an earnings conference call for investors.  Mattys continued to emphasize the size the lymphedema market:

We remain confident in our long-term prospects.  Lymphedema is a chronic and progressive condition, which ***represents a $5 billion-plus market opportunity*** with over 1.3 million patients diagnosed last year.  February study published in the Journal of Vascular Surgery: Venous and Lymphatic Disorders, suggested that ***chronic venous insufficiency induced lymphedema afflicts as many as 16 million individuals in the United States***.

209.    The statements in ¶¶204-208 above were materially false and misleading and omitted material facts because:

- 87 -

(a)     the "growth in the number of Medicare patients served" that was highlighted as a factor "driv[ing]" the "overall revenue increase" was based in part on illegal and unsustainable sales practices involving kickbacks paid to doctors and contract trainers;

(b)     the Company's reported revenues were in part the product of illegal sales practices, including engaging in kickback schemes to push Flexitouch sales in the VA and CMS channels and submitting false claims to CMS;

(c)     the Company's reported revenues from CMS and the VA were overstated, particularly in light of the RAC audit process imposing greater scrutiny on submitted claims;

(d)     the "$5 billion-plus market opportunity" for Flexitouch was overstated by at least four times;

(e)     the reportedly increased estimated lymphedema prevalence in the U.S. by "four-fold to over 20 million individuals" was based merely on a study's report of "skin changes associated with CVI," and CVI does not necessarily develop into lymphedema;

(f)     in violation of Item 303, Defendants failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk of exclusion from participating in the federal healthcare programs; and

(g)     Defendants had failed to design internal controls to address the fraud alleged herein.

- 88 -

## VI.   LOSS CAUSATION/ECONOMIC LOSS

210.   Prior to and during the Class Period, Defendants engaged in a scheme to defraud and issued materially false and misleading statements concerning the Company's true financial condition.   Specifically, as a result of illegal sales practices, Defendants reported consistent revenue growth.   Moreover, the Company knowingly misrepresented that its growth was the result of a large and untapped addressable market.   When the truth began to emerge, Defendants continued to conceal the Company's scheme by stating the *qui tam* lawsuit lacked merit and denying the allegations therein.

211.   The conduct alleged herein and the materially false and misleading statements made during the Class Period caused Tactile's common stock to trade at artificially inflated prices as high as $76.29 per share during the Class Period – and operated as a fraud or deceit on investors in the Company's common stock.

212.   Later, when the relevant truth was disclosed regarding Defendants' engagement in a kickback scheme, Tactile's stock price suffered significant declines, as the artificial inflation came out of the stock price.

213.   On March 20, 2019, after market hours, the *qui tam* amended complaint that was filed against Tactile was unsealed.   Although Defendants had previously disclosed that a *qui tam* lawsuit had been filed, Defendants had insisted that the lawsuit was "without merit." Now that the lawsuit was unsealed, however, analysts were able and did release detailed reports on the *qui tam* amended complaint's allegations.

214.   On March 22, 2019, Northland Capital Markets also issued a report titled: "Unsealed *qui tam* raises questions. . . ."   It reported that the *qui tam* amended complaint

- 89 -

"makes a whole host of allegations against Tactile." The report laid out the details of the kickback scheme and noted that "there will be a tug of war for some time moving forward." Guggenheim also issued a report analyzing the unsealed *qui tam* amended complaint's allegations and noted that Tactile's stock had fallen "due in large part to the disclosure that that a *qui tam* suit was filed against the company alleging violations of the False Claims Act governing interactions with CMS and the VA system."

215.    As a result of these disclosures, Tactile's stock dropped 7.53% from $60.10 per share on March 20, 2019 to close at $55.57 per share on March 22, 2019.

216.    On June 8, 2020, *Seeking Alpha* published a report called: "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy," written by OSS Research. While a different version of the report was originally posted on May 30, 2020 on ossresearch.com, the website had never before published any report about any stock. Until June 2020, ossresearch.com had no web traffic according to a web traffic analytics report. Thus, when *Seeking Alpha* "welcomed" OSS Research as a new contributor on June 8, 2020, no other major news source, including *Bloomberg News*, had picked up the report and the market was unaware of the information.

217.    Upon *Seeking Alpha*'s publication of the report, the market swiftly reacted to the new information disclosing: (i) additional details regarding the illegal sales practices in which Tactile engaged; (ii) that Tactile was at the center of a CMS audit process finding that submitted claims for Flexitouch had failed to establish medical necessity; and (iii) that Tactile's TAM was a fraction of the size Tactile had disclosed. On this news, the

Company's stock price fell 12.8%, or $6.95, from the prior trading day's high of $54.21 per share to close at $47.26 per share.

218. Like other members of the Class of purchasers of Tactile Systems common stock who purchased at artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss, *i.e.*, damages, when Tactile's stock price declined following these disclosures.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

219. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Tactile common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tactile, their control over, and/or receipt or modification of Tactile's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential, proprietary information concerning Tactile, participated in the fraudulent scheme alleged herein. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

A.    **The Insider Trading Defendants Profited from Rampant Insider Trading**

220.    The Insider Trading Defendants' illegal scheme allowed them to realize a total of *$38,819,527* in illegal insider trading proceeds during the Class Period – ***reaping total profits of $27,827,366*** – and demonstrating both motive and opportunity to disseminate false positive information and capitalize on an artificially increased stock price.  As demonstrated below, Defendants' sales were very unusual in both timing and amount, calculated to maximize personal benefit from the fraud, dramatically out of line with their pre-Class Period trading practices, and made shortly after the dissemination of false positive statements.  The sales also represented large proportions of each Defendant's total shares:

| Insider Trading Defendant | Class Period Shares Sold | Class Period Insider Trading Proceeds | Class Period Insider Trading Profits | Percentage of Shares Sold During the Class Period |
|---|---|---|---|---|
| Gerald R. Mattys | 276,787 | $17,534,888 | $11,444,744 | 46.01% |
| Lynn L. Blake | 6,322 | $347,021 | $282,999 | 19.43% |
| Robert L. Folkes | 154,487 | $8,766,755 | $5,638,760 | 66.94% |
| Bryan F. Rishe | 133,289 | $7,294,280 | $6,140,690 | 76.33% |
| Richard J. Nigon | 26,876 | $1,343,375 | $786,965 | 59.05% |
| Kevin H. Roche | 50,000 | $2,608,247 | $2,608,247 | 56.83% |
| William W. Burke | 16,662 | $924,961 | $824,961 | 74.04% |

221.    ***Defendant Mattys***.  Mattys was motivated to engage in the course of conduct alleged herein to sell over 276,000 Tactile shares, from which he reaped $17,534,888 in proceeds and $11,444,744 in profits:

| Defendant Mattys Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 6/26/2018 | $54.27 | 14,210 | $771,177 |
| 6/26/2018 | $54.67 | 5,790 | $316,539 |

- 92 -

| | | | |
|---|---|---|---|
| 7/17/2018 | $55.01 | 931 | $51,214 |
| 7/17/2018 | $54.48 | 24,069 | $1,311,279 |
| 8/21/2018 | $61.99 | 3,221 | $199,670 |
| 8/21/2018 | $63.02 | 2,337 | $147,278 |
| 9/17/2018 | $66.52 | 5,450 | $362,534 |
| 9/17/2018 | $67.13 | 1,530 | $102,709 |
| 9/17/2018 | $68.46 | 3,000 | $205,380 |
| 9/17/2018 | $65.34 | 11,118 | $726,450 |
| 10/22/2018 | $64.99 | 7,900 | $513,421 |
| 10/22/2018 | $63.67 | 13,386 | $852,287 |
| 10/22/2018 | $64.38 | 17,714 | $1,140,427 |
| 11/19/2018 | $56.27 | 3,000 | $168,810 |
| 11/19/2018 | $57.98 | 800 | $46,384 |
| 11/19/2018 | $55.53 | 14,469 | $803,464 |
| 2/14/2019 | $70.66 | 21,803 | $1,540,600 |
| 2/14/2019 | $69.50 | 11,245 | $781,528 |
| 2/14/2019 | $71.43 | 3,070 | $219,290 |
| 2/15/2019 | $69.97 | 12,408 | $868,188 |
| 2/15/2019 | $70.47 | 1,474 | $103,873 |
| 3/1/2019 | $69.54 | 3,400 | $236,436 |
| 3/1/2019 | $72.53 | 4,840 | $351,045 |
| 3/1/2019 | $73.33 | 5,068 | $371,636 |
| 3/1/2019 | $71.71 | 2,875 | $206,166 |
| 3/1/2019 | $70.33 | 9,819 | $690,570 |
| 3/1/2019 | $74.58 | 1,300 | $96,954 |
| 12/23/2019 | $69.85 | 30,000 | $2,095,500 |
| 3/5/2020 | $48.49 | 560 | $27,154 |
| 4/28/2020 | $54.95 | 100 | $5,495 |
| 4/29/2020 | $55.48 | 28,115 | $1,559,820 |
| 4/29/2020 | $56.14 | 11,785 | $661,610 |
| **Class Period Total** | | **276,787** | **$17,534,888** |

222.   Mattys's Class Period insider trading is dramatically out of line with his pre-Class Period trading.  In the twelve months before the Class Period, Mattys's stock sales totaled $4,505,316, and his highest-ever one-day trading totaled 21,613 shares for $562,586. During the Class Period, Mattys sold *$17,534,888* of his stock – a nearly ***400% increase*** from his pre-Class Period sales – and nearly half of his total Tactile holdings.

- 93 -

223.    Many of Mattys's single-day trades during the Class Period were double or triple his highest single-day trades before the Class Period.  For example, for his first Class Period sale, Mattys sold 20,000 shares for $1,087,716 – double his highest single-day proceeds pre-Class Period.

224.    Mattys's sales also are plainly calculated to maximize his personal benefit.  As the Company's false statements and omissions caused the stock price to increase, Mattys took advantage by increasing his stock sales, and as the stock price decreased following partial corrective disclosures, Mattys's sales decreased with it.  *See* chart below:



225.    Mattys's most unusually timed sales occurred on February 14 and 15, 2019 – the two days **after** the Company was served with the *qui tam* action's sealed amended

- 94 -

complaint, less than two weeks before the investors knew of the *qui tam* action's existence, and one month before the *qui tam* amended complaint was unsealed and investors learned of its allegations detailing Tactile's illegal sales practices.  On February 14, 2019, Mattys sold 36,118 shares for proceeds of $2,506,135, and on February 15, 2019, he sold 13,882 shares for proceeds of $972,06, totaling ***$3,478,196*** in proceeds of his Tactile stock – close to his ***total*** sales for the ***entire year*** before the Class Period.

226.    While Mattys's stock sales were made pursuant to 10(b)(5)-1 insider trading plans, the plans themselves indicate abuse of the insider trading laws.  For example, Mattys's first Class Period insider trading plan was adopted on May 9, 2018.  He used this plan to execute his first three Class Period sales – on June 26, 2018, July 17, 2018, and August 21, 2018.  However, by May 9, 2018, the Company was already engaged in the kickback and false claims schemes, and had already begun issuing false statements concerning its revenue and the size of its addressable market.  Mattys accordingly adopted his first insider trading plan while he was in possession of material, nonpublic information.

227.    Further, Mattys adopted seven separate insider trading plans during the Class Period.  Because he sold shares on thirteen separate days during the Class Period, roughly every other sale during the Class Period was made pursuant to a different insider trading plan:

| Adoption Date of New 10(b)(5)-1 Plan | Trades Made Pursuant to The Plan |
|---|---|
| May 9, 2018 | June 26, 2018<br>July 17, 2018<br>August 21, 2018 |
| August 21, 2018 | September 17, 2018<br>October 22, 2018 |
| September 10, 2018 | November 19, 2018 |

- 95 -

| December 12, 2018 | February 14, 2018<br>February 15, 2018<br>March 1, 2019 |
| May 8, 2019 | December 23, 2019 |
| June 10, 2019 | March 5, 2020 |
| March 13, 2020 | April 28, 2020<br>April 29, 2020 |

228. ***Defendant Blake***.  Blake was motivated to engage in the course of conduct alleged herein to sell over 6,000 Tactile shares, from which she reaped $347,021 in proceeds and $282,999 in profits:

| Defendant Blake Sale Date | Price | Shares Sold | Proceeds |
| --- | --- | --- | --- |
| 5/15/2018 | $44.95 | 556 | $24,992 |
| 7/31/2018 | $48.08 | 766 | $36,829 |
| 8/16/2018 | $57.04 | 5,000 | $285,200 |
| **Class Period Total** | | **6,322** | **$347,021** |

229.  Blake's insider trading was unusual in timing and amount because her trading during the Class Period was dramatically out of line with her trading before the Class Period. In fact, in the approximately 15 months before the Class Period, Blake sold 11,945 shares for $490,578.  By contrast, in only the approximately four months during the Class Period while still CFO of Tactile, she sold 6,322 shares for $347,021.  Her average monthly insider trading proceeds during the Class Period were accordingly ***265% higher*** than her average monthly proceeds before the Class Period.  Before the Class Period, her largest sale was of 2,727 shares for $52,495.  During the Class Period, her largest sale was of 5,000 shares for $285,200 – ***543% more*** than her largest pre-Class Period sale.

- 96 -

230.    The timing of her largest sale during the Class Period was also calculated to maximize her personal benefit.  Her largest sale was made on August 16, 2018 – after the false and misleading statements in the 1Q18 and 2Q18 earnings announcements had dramatically increased the stock price from roughly $35 per share pre-Class-Period to $57.04 per share, and before any corrective disclosures inevitably decreased the price.  The sale was also made two weeks before Blake's retirement became effective.  As she made her exit from the Company, Blake also capitalized on the material, nonpublic information she possessed regarding Tactile's fraudulent course of business.  Notably, Blake had a 10(b)(5)-1 insider trading plan that was effective during the Class Period.  She made each of her Class Period sales pursuant to this plan, *except for her large August 16, 2018 sale*, which was not made pursuant to her insider trading plan.

231.    *Defendant Folkes*.  Folkes was motivated to engage in the course of conduct alleged herein to sell over 154,000 Tactile shares, from which he reaped $8,766,755 in proceeds and $5,638,760 in profits:

| Defendant Folkes Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/18/2018 | $46.05 | 2,482 | $114,296 |
| 6/1/2018 | $49.78 | 3,044 | $151,530 |
| 6/18/2018 | $55.92 | 1,082 | $60,505 |
| 6/18/2018 | $55.32 | 1,400 | $77,448 |
| 7/2/2018 | $51.50 | 3,043 | $156,715 |
| 7/18/2018 | $54.55 | 2,482 | $135,393 |
| 8/1/2018 | $47.54 | 3,043 | $144,664 |
| 8/17/2018 | $57.95 | 2,482 | $143,832 |
| 9/4/2018 | $67.25 | 2,000 | $134,500 |
| 9/4/2018 | $67.77 | 1,044 | $70,752 |
| 9/10/2018 | $70.05 | 5,000 | $350,250 |
| 9/18/2018 | $64.73 | 2,482 | $160,660 |
| 10/1/2018 | $71.54 | 3,044 | $217,768 |

- 97 -

| | | | |
|---|---|---|---|
| 10/18/2018 | $65.82 | 2,483 | $163,431 |
| 11/1/2018 | $65.29 | 3,043 | $198,677 |
| 11/27/2018 | $54.07 | 2,067 | $111,763 |
| 11/27/2018 | $53.35 | 12,248 | $653,431 |
| 11/28/2018 | $52.58 | 7,535 | $396,190 |
| 11/28/2018 | $54.21 | 240 | $13,010 |
| 11/28/2018 | $53.39 | 1,100 | $58,729 |
| 12/3/2018 | $56.27 | 3,043 | $171,230 |
| 1/2/2019 | $45.42 | 3,044 | $138,258 |
| 1/15/2019 | $59.49 | 2,500 | $148,725 |
| 1/17/2019 | $60.85 | 2,500 | $152,125 |
| 2/1/2019 | $66.04 | 3,044 | $201,026 |
| 2/11/2019 | $68.61 | 2,500 | $171,525 |
| 2/13/2019 | $70.22 | 2,500 | $175,550 |
| 3/1/2019 | $69.00 | 3,044 | $210,036 |
| 3/12/2019 | $70.36 | 2,500 | $175,900 |
| 3/14/2019 | $61.72 | 2,500 | $154,300 |
| 4/16/2019 | $52.45 | 2,500 | $131,125 |
| 4/18/2019 | $49.83 | 2,500 | $124,575 |
| 5/13/2019 | $53.25 | 1,574 | $83,816 |
| 5/13/2019 | $54.40 | 926 | $50,374 |
| 5/15/2019 | $51.52 | 100 | $5,152 |
| 5/15/2019 | $50.40 | 2,400 | $120,960 |
| 5/21/2019 | $50.00 | 10,607 | $530,350 |
| 6/11/2019 | $53.80 | 2,500 | $134,500 |
| 6/13/2019 | $52.75 | 2,500 | $131,875 |
| 6/20/2019 | $56.02 | 2,106 | $117,978 |
| 6/27/2019 | $52.38 | 2,106 | $110,312 |
| 7/11/2019 | $55.31 | 2,106 | $116,483 |
| 7/25/2019 | $55.17 | 506 | $27,916 |
| 7/25/2019 | $54.49 | 1,600 | $87,184 |
| 8/8/2019 | $51.13 | 2,106 | $107,680 |
| 8/22/2019 | $50.85 | 2,106 | $107,090 |
| 9/12/2019 | $50.11 | 2,106 | $105,532 |
| 9/26/2019 | $45.11 | 2,106 | $95,002 |
| 10/10/2019 | $42.29 | 2,106 | $89,063 |
| 10/24/2019 | $45.38 | 2,106 | $95,570 |
| 11/7/2019 | $51.27 | 2,106 | $107,975 |
| 11/21/2019 | $58.21 | 2,106 | $122,590 |
| 11/22/2019 | $60.12 | 2,273 | $136,653 |
| 12/12/2019 | $65.04 | 2,106 | $136,974 |
| 12/26/2019 | $71.04 | 127 | $9,022 |

| 12/26/2019 | $69.30 | 1,479 | $102,495 |
| 12/26/2019 | $70.40 | 500 | $35,200 |
| 1/9/2020 | $68.02 | 2,106 | $143,250 |
| 1/23/2020 | $57.21 | 2,106 | $120,484 |
| 2/6/2020 | $59.17 | 2,106 | $124,612 |
| 2/20/2020 | $63.62 | 2,106 | $133,984 |
| 3/5/2020 | $48.67 | 180 | $8,761 |
| **Class Period Total** | | **154,487** | **$8,766,755** |

232.   Folkes's sales were also unusual in timing and amount.  Before the Class
Period, he sold once or twice per month for no more than $300,000 per month.  Beginning in
September 2018 – after the misstatements and omissions inflated the stock price but before
any corrective disclosures – Folkes's sales skyrocketed.  In September 2018 alone he sold
$716,162 worth of his shares, and in November 2018 alone he sold $1,431,800 worth of his
shares – ***477% more*** than his monthly pre-Class Period sales.  These sales ranged from
roughly $53 to $71 per share – substantially higher than pre-Class Period prices, and near the
Class Period high.

233.   Folkes's 10(b)(5)-1 insider trading plans also indicate his abuse of the insider
trading laws.  During the Class Period, he traded pursuant to five separate insider trading
plans.  His first plan was adopted before the Class Period, but on the first day of the Class
Period, he adopted a new plan.  He later adopted three additional plans during the Class
Period.  Each plan that he adopted during the Class Period was adopted while he was in
possession of material, nonpublic information concerning Tactile's fraudulent course of
conduct.  Further, his four largest trading days during the Class Period were made outside of
any trading plan.  On September 10, 2018, he sold 5,000 shares for $350,250.  On November
27, 2018, he sold 14,315 shares for $765,194.  The following day, he sold 8,875 shares for

- 99 -

$467,929.  On May 21, 2019, he sold 10,607 shares for $530,350.  The sales made outside of Folkes's insider trading plans totaled roughly one quarter of his overall Class Period insider trading proceeds.

234.  ***Defendant Rishe***.  Rishe was motivated to engage in the course of conduct alleged herein to sell over 133,000 Tactile shares, from which he reaped proceeds of $7,294,280 and profits of $6,140,690:

| Defendant Rishe Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/21/2018 | $46.02 | 1,500 | $69,030 |
| 6/15/2018 | $54.77 | 900 | $49,293 |
| 6/15/2018 | $55.59 | 2,100 | $116,739 |
| 6/20/2018 | $55.69 | 1,500 | $83,535 |
| 7/16/2018 | $52.49 | 3,000 | $157,470 |
| 8/15/2018 | $57.48 | 2,900 | $166,692 |
| 8/15/2018 | $58.47 | 100 | $5,847 |
| 9/14/2018 | $68.63 | 2,476 | $169,928 |
| 9/14/2018 | $69.30 | 524 | $36,313 |
| 10/15/2018 | $61.72 | 3,000 | $185,160 |
| 11/15/2018 | $56.66 | 3,000 | $169,980 |
| 12/14/2018 | $51.22 | 3,000 | $153,660 |
| 1/15/2019 | $59.49 | 3,000 | $178,470 |
| 2/15/2019 | $69.44 | 3,000 | $208,320 |
| 3/15/2019 | $62.70 | 3,000 | $188,100 |
| 4/15/2019 | $52.98 | 3,000 | $158,940 |
| 5/15/2019 | $51.16 | 100 | $5,116 |
| 5/15/2019 | $50.39 | 2,900 | $146,131 |
| 6/10/2019 | $53.75 | 193 | $10,374 |
| 6/10/2019 | $53.25 | 4,619 | $245,962 |
| 6/25/2019 | $53.44 | 2,725 | $145,624 |
| 6/25/2019 | $54.31 | 2,087 | $113,345 |
| 7/10/2019 | $55.09 | 3,580 | $197,222 |
| 7/10/2019 | $55.78 | 1,233 | $68,777 |
| 7/25/2019 | $54.19 | 4,012 | $217,410 |
| 7/25/2019 | $54.92 | 800 | $43,936 |
| 8/12/2019 | $48.63 | 4,613 | $224,330 |
| 8/12/2019 | $49.69 | 200 | $9,938 |

- 100 -

| 8/26/2019 | $48.56 | 4,099 | $199,047 |
|-----------|--------|-------|----------|
| 8/26/2019 | $48.98 | 713 | $34,923 |
| 9/10/2019 | $49.00 | 1,213 | $59,437 |
| 9/10/2019 | $48.59 | 3,600 | $174,924 |
| 9/25/2019 | $45.77 | 4,512 | $206,514 |
| 9/25/2019 | $46.30 | 300 | $13,890 |
| 10/10/2019 | $43.19 | 201 | $8,681 |
| 10/10/2019 | $42.62 | 4,612 | $196,563 |
| 10/25/2019 | $44.88 | 4,812 | $215,963 |
| 11/11/2019 | $51.75 | 2,713 | $140,398 |
| 11/11/2019 | $51.24 | 2,100 | $107,604 |
| 11/25/2019 | $62.05 | 1,157 | $71,792 |
| 11/25/2019 | $61.80 | 3,655 | $225,879 |
| 12/10/2019 | $64.23 | 4,813 | $309,139 |
| 12/23/2019 | $70.00 | 3,409 | $238,630 |
| 12/26/2019 | $70.81 | 305 | $21,597 |
| 12/26/2019 | $69.09 | 3,980 | $274,978 |
| 12/26/2019 | $70.04 | 527 | $36,911 |
| 1/10/2020 | $68.77 | 2,331 | $160,303 |
| 1/24/2020 | $58.19 | 2,330 | $135,583 |
| 2/10/2020 | $58.63 | 2,330 | $136,608 |
| 2/25/2020 | $55.75 | 2,330 | $129,898 |
| 3/5/2020 | $48.87 | 204 | $9,969 |
| 3/10/2020 | $43.75 | 2,330 | $101,938 |
| 3/25/2020 | $40.00 | 2,331 | $93,240 |
| 4/13/2020 | $47.26 | 2,330 | $110,116 |
| 4/27/2020 | $52.66 | 2,330 | $122,698 |
| 5/11/2020 | $49.22 | 2,330 | $114,683 |
| 5/26/2020 | $50.10 | 2,330 | $116,733 |
| **Class Period Total** | | **133,289** | **$7,294,280** |

235.   Rishe's sales were also unusual in timing and amount.  Before the Class Period, he mechanically sold 3,000 shares each month.  In June 2019 – while the Company continued to lie about its revenue growth, its total addressable market, and the merits of the *qui tam* lawsuit – he increased his monthly sales three-fold to 9,625 shares per month.  As SVP of sales, Rishe knew and had directed the illegal sales practices.  Rishe further knew

- 101 -

that these illegal sales practices had contributed to the Company's reported revenue growth, which had thereby falsely inflated Tactile's share price. Meanwhile, as Rishe knew, the Company risked losing approximately 30% of its business through violations of the AKS and False Claims Act and that contrary to Defendants' statements to investors, the *qui tam* lawsuit had merit. Cashing in before the fraud was revealed, Rishe dumped 76.33% of his shares during the Class Period.

236.    His Class Period sales were also made pursuant to five separate 10(b)(5)-1 insider trading plans. His first Class Period sale was made on May 21, 2018, pursuant to a plan adopted on May 31, 2017. Yet, on May 11, 2018 – four days into the Class Period – he adopted a new plan. He adopted additional plans on May 9, 2019, November 21, 2019, and June 6, 2019. Each of the plans adopted during the Class Period was adopted while Rishe was in possession of material, nonpublic information concerning Tactile's fraudulent course of conduct.

237.    ***Defendant Burke***. Burke was motivated to engage in the course of conduct alleged herein to sell over 16,000 Tactile shares, from which he reaped proceeds of $924,961 and profits of $824,961:

| Defendant Burke Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/14/2018 | $45.86 | 700 | $32,102 |
| 8/9/2018 | $58.74 | 5,000 | $293,700 |
| 5/14/2019 | $52.65 | 412 | $21,692 |
| 6/18/2019 | $55.00 | 10,000 | $550,000 |
| 5/13/2020 | $49.94 | 550 | $27,467 |
| **Class Period Total** | | **16,662** | **$924,961** |

- 102 -

238.    Burke's Class Period trading was also dramatically out of line with his pre-Class Period trading.  In the year before the Class Period, he sold only 3,500 shares for $95,595.  During the Class Period, he sold 16,662 shares for $924,961 – ***967%*** more than he sold before the Class Period.  His largest sale during the Class Period was of 10,000 shares for $550,000 on June 18, 2019.  This sale was five times larger than any of his pre-Class Period sales.  It was also made while the stock price was inflated by the false and misleading statements regarding Tactile's revenue growth and total addressable market.  As a member of the Board's compliance and audit committees – responsible for compliance with the very laws that the scheme violated – Burke knew the truth about the kickback scheme and the False Claims Act violations, and he knew that the Company was lying about the merits of the *qui tam* lawsuit.  His sales of 74% of his stock during the Class Period accordingly demonstrate his motive and opportunity to profit from the temporarily inflated price before further disclosures would inevitably cause the price to plummet.

239.    Defendant Burke did not trade pursuant to a 10(b)(5)-1 trading plan for his first two sales of the Class Period.  However, his three other sales during the Class Period were made pursuant to three separate trading plans.  He sold on May 14, 2019 pursuant to a plan he adopted on December 11, 2018.  He sold on June 18, 2019 pursuant to a plan he adopted on May 8, 2019, and he sold on May 13, 2020 pursuant to a plan he adopted on November 27, 2019.  Each plan was adopted well into the Class Period, while Burke was in possession of material, nonpublic information concerning Tactile's fraudulent course of business.

- 103 -

240.   **Defendant Nigon**.  Nigon was motivated to engage in the course of conduct alleged herein to sell over 26,000 Tactile shares, from which he reaped $1,343,375 in proceeds and $786,965 in profits:

| Defendant Nigon Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/15/2019 | $50.33 | 15,000 | $754,950 |
| 9/4/2019 | $49.35 | 39 | $1,925 |
| 9/5/2019 | $49.35 | 1,900 | $93,765 |
| 9/9/2019 | $49.30 | 5,354 | $263,952 |
| 9/10/2019 | $49.92 | 4,583 | $228,783 |
| **Class Period Total** | | **26,876** | **$1,343,375** |

241.   Nigon's sales were unusual in timing and amount.  Nigon sold no stock before the Class Period, but from May 2019 to September 2019 – in a mere five months – he sold **59%** of his holdings for **$1,343,375**.  As a member of the Board's compliance committee and chairman of the audit committee – responsible for compliance with the very laws that the scheme violated – Nigon knew the truth about the kickback scheme and the False Claims Act violations, and he knew that the Company was lying about its revenue growth, total addressable market, and the merits of the *qui tam* lawsuit.  Notably, his five-month sell-off occurred after the stock rebounded following the Company's denials in 2018 10-K about the *qui tam* lawsuit's merit.   While the price was artificially inflated, Nigon seized the opportunity to profit from the lies by selling 59% of his stock before the full truth of the scheme could be revealed.  None of Defendant Nigon's insider trades during the Class Period were made pursuant to a 10(b)(5)-1 insider trading plan.

242. ***Defendant Roche***.  Roche was motivated to engage in the course of conduct alleged herein to sell at least 50,000 Tactile shares, from which he reaped $2,608,247 in proceeds and $2,608,247 in profits:

| Defendant Roche Sale Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/10/2018 | $44.41 | 15,000 | $666,150 |
| 8/9/2018 | $58.19 | 1,134 | $65,987 |
| 8/9/2018 | $59.25 | 1,645 | $97,466 |
| 8/10/2018 | $57.37 | 12,221 | $701,119 |
| 5/10/2019 | $57.25 | 10,093 | $577,824 |
| 5/30/2019 | $50.00 | 4,907 | $245,350 |
| 8/22/2019 | $50.87 | 5,000 | $254,350 |
| **Class Period Total** | | **50,000** | **$2,608,247** |

243. Roche's Class Period trading was also unusual in timing and amount.  He routinely sold shares within days after false and misleading earnings announcements significantly increased the stock price.  His first Class Period sale occurred on May 10, 2018 – three days after the 1Q18 earnings announcement.  Before the announcement, the stock was trading at roughly $35 per share.  After the announcement, and when Roche sold, the stock was trading at roughly $44.41 per share – a 26.9% increase for Roche.  His second and third Class Period sales were on August 9 and 10, 2018 – three and four days after the 2Q18 earnings announcement.  Before the announcement, the stock was trading at roughly $48 per share.  After the announcement, and when Roche sold, the stock was trading at roughly $58 per share – a roughly 20% increase for Roche.  He sold again on May 10, 2019, four days after the 1Q19 announcement.  Before the announcement, the stock was trading at roughly $53 per share.  After the announcement, when Roche traded, it was $57.25 per share – a roughly 7% increase for Roche.  Like his fellow audit and compliance committee Board

- 105 -

members, Defendant Roche also took advantage of his position and the public's unawareness to profit from the Company's misstatements and omissions.  None of Defendant Roche's Class Period insider sales were made pursuant to a 10(b)(5)-1 insider trading plan.

244.    Not only did the Insider Trading Defendants engage in a mass equity sell-off during the Class Period, but they also sold their shares at unusual times and amounts that were calculated to maximize their personal gain to their shareholders' detriment.

**B.    Bonus Compensation Also Motivated Defendants' Fraud**

245.    Bonus compensation paid to Tactile's management, including certain of the Individual Defendants, supports a strong inference of scienter.  Tactile adopted a Management Incentive Plan (the "MIP") on March 8, 2017 pursuant to which annual cash incentive opportunities were provided to the Company's executive officers and other employees.  The Compensation and Organization Committee of Tactile's Board (the "Compensation Committee"), which Defendant Burke chaired, determined which employees participated in the MIP and granted an award for the calendar year performance period.

246.    In March 2018, the Compensation Committee specified the performance goals under the MIP for the 2018 performance period.  The Compensation Committee weighted revenue performance at 80% of the overall award, and adjusted EBITDA performance for the remaining 20%.  The same weights applied for the 2019 and 2020 MIP.  The Compensation Committee also established the target dollar amount for each participant in the MIP.

247.    On February 22, 2019, the Compensation Committee determined that because revenue for 2018 was $143.8 million, the resulting percentage payout level relative to the

target amount for that metric was 150%.  The Compensation Committee also determined that because Adjusted EBITDA was $17.2 million, the resulting percentage payout level relative to the target amount for that metric was 137%.  Applying the applicable weightings to the revenue metric (80%) and the Adjusted EBITDA metric (20%), the weighted payout percentage resulted in 147.4% of the target dollar amount.  Thus, for 2018, the following Defendants earned non-equity MIP payments of 147.4% of the target dollar amount:

| Name | Base Salary | MIP Target Amount | 2019 MIP Payment |
|---|---|---|---|
| Gerald R. Mattys | $502,115 | $371,250 | $574,074 |
| Brent A. Moen | $104,942 | $53,207 | $78,406 |
| Lynn L. Blake | $212,019 | $160,500 | $157,447 |
| Robert J. Folkes | $315,192 | $157,500 | $232,092 |

Defendants Moen's and Blake's target dollar amount and accordingly their MIP payments were prorated based on the portion of 2018 when they served as officers of Tactile.

248.   For 2018, Defendant Rishe had a separate annual bonus arrangement.  Under that plan, Rishe earned, on a quarterly basis, bonus amounts based on the results against quota for two components: (1)  a quarterly revenue quota and bonus for attaining Flexitouch shipment quotas ("Revenue Quota"), and (2) a quarterly quota based on the amount of units sold into the Veterans Administration system ("VA Quota").  Specifically, under the Revenue Quota, Rishe could earn a quarterly bonus ranging from $3,000 if the threshold quota was attained to $37,500 if the maximum quota was attained.  Under the VA Quota, Rishe could earn a quarterly bonus ranging from $5,000 if the threshold quota was attained

- 107 -

to $14,000 if the maximum quota was attained.  The Compensation Committee designated Mattys to set the budgets, quotas, and targets in Rishe's bonus arrangement and to measure the Company's performance against them.  Pursuant to his 2018 incentive compensation plan, Rishe earned an aggregate bonus of $188,500, or 91.5% of the maximum possible under the plan.

249.    On February 26, 2020, the Compensation Committee determined that because revenue for 2019 was $189.5 million, the resulting percentage payout level relative to the target amount for that metric was 150%.  The Compensation Committee also determined that because Adjusted EBITDA was $25.3 million, the resulting percentage payout level relative to the target amount for that metric was 132.5%.  Applying the applicable weightings to the revenue metric (80%) and the Adjusted EBITDA metric (20%), the weighted payout percentage resulted in 146.5% of the target dollar amount.  Thus, for 2019, the following Defendants earned non-equity MIP payments of 146.5% of the target dollar amount:

| Name | Base Salary | MIP Target Amount | 2019 MIP Payment |
|------|-------------|-------------------|------------------|
| Gerald R. Mattys | $573,750 | $497,250 | $728,471 |
| Brent A. Moen | $334,827 | $171,185 | $250,786 |
| Robert J. Folkes | $328,558 | $167,500 | $245,388 |
| Bryan F. Rishe | $333,462 | $153,000 | $224,145 |

250.    Because revenue performance had 80% weight in determining the MIP bonus payments, these Defendants were motivated to increase revenue, including through the illegitimate and unlawful means alleged herein.

- 108 -

**C.     Defendants Set Incentive Compensation for Tactile's Sales Management to Sell Flexitouch**

251.    The bonus compensation plan that Mattys, Blake, Moen, Folkes, and Rishe set for Tactile's sales management supports an inference of scienter.

252.    The 2018 Regional Manager & Area Director Incentive Compensation Plan (the "Plan"), effective April 1, 2018 through March 31, 2019, was to "motivate performance beyond base goals" for the Company's sales management – the regional managers and area directors – who reported directly to Rishe:

> These goals are to meet and exceed planned Revenue Targets, Product Ship Goals and OC [Order Completion] Quotas established by Tactile Medical . . . by rewarding Regional Managers & Area Directors for leading, motivating and managing the Product and Senior Sales Specialists and Associates in closing orders that are shipped to patients.

253.    The Plan was administered by Tactile's Sales Compensation Committee, which was comprised of the CEO (Mattys), the CFO (Blake, or upon her departure, Moen), COO (Folkes), SVP of Sales (Rishe), and VP of Marketing (Darren Wennen). The Sales Compensation Committee was "authorized to make all decisions as required in the administration of the Plan and to exercise its discretion to define, interpret, construe, apply and make any exceptions to the terms of the Plan."

254.    The Plan detailed "payouts" to the regional managers and area directors based on reaching certain sales targets. For example, the Plan set monthly order completion ("OC") incentives based on the percentage of the OC quota attained. Thus, in 2018, if 100% of the Flexitouch monthly OC quota was attained, regional managers or area directors either received a "Monthly Incentive Payout" of $3,000 if the E0651 quota was also 100% attained, or $2,000 if the E0651 quota was less than 100% attained. However, if less than 100%, but

- 109 -

more than 90%, of the Flexitouch quota was attained, then the regional managers or area directors received $1,000, regardless of whether the E0651 quota was met or even surpassed. And if Flexitouch sales were less than 90% of the quota, then no Monthly Incentive Payment was earned, regardless of whether the E0651 quota was met or surpassed.

255.   The Plan also provided a "Quarterly Shipment Revenue Target Incentive." Tactile generally recognized revenue from the sale of a product upon its shipment.  The quarterly bonus payout ranged from $3,000 for attaining 90% of the Shipment Revenue Target to $30,000 for attaining 130% of the Shipment Revenue Target.  There was no payout for performance below 90% of the Shipment Revenue Target.

256.   In addition, the Plan provided a "Quarterly VA Account Development Incentive to reward sales growth in the VA channel."  Thus, when a sales region met the quarterly VA revenue target, then the respective regional manager or area director was paid a bonus of $6,000 for the quarter.  If the region attained 130% of the VA revenue target, then the regional manager or area director was paid a bonus of $20,000 for the quarter.

257.   Finally, the Plan included a "Revenue Acceleration" provision that was "*designed to incentivize maximum revenue*."  Under this provision, the E0651 quota requirement was reduced by two for each Flexitouch order completion attained in excess of the Flexitouch quota requirement.  In this way, Defendants set a Plan to incentivize its sales force to sell Flexitouch by rewarding aggressive and even illegal sales tactics, thereby supporting an inference of scienter.

D.  **Defendants Mattys, Folkes, and Rishe Were Central in
Determining Sales Strategies**

258.   Defendants Mattys, Folkes, and Rishe were core members of management at
Tactile who determined the Company's sales strategy by setting sales quotas for the
Company's sales representatives, approving the sales team's incentive plans, setting the
regions covered by regional managers and area directors, determining the yearly budget, and
running the Quarterly Business Reviews and annual National Sales Meetings.

259.   During his deposition in the employment discrimination suit against the
Company, Mattys testified the "senior management team" usually begins the annual
budgeting process for the upcoming years "[a]round October."  As part of that process, Rishe
presented to the senior management team, which Mattys and Folkes, his recommendations
"once he's figured out what he wants to do the following year."  As Mattys testified, if the
recommendations met "the sales objectives that we've put in place, then those get approved
by the management team and presented to our board of directors."

260.   Mattys also testified about his involvement along with Rishe and Folkes in the
process for determining sales quotas, including for the 2018:

> [Attorney]:   How involved do you get in determining how quotas are going
> to be set at Tactile?
>
> [Mattys]:     I would say I'm involved.
>
> [Attorney]:   What is your involvement specifically?
>
> [Mattys]:     To review the proposed quotas by region, even by product
> specialist.
>
> [Attorney]:   Do you provide feedback to somebody about those proposals?
>
> [Mattys]:     Yes.

- 111 -

[Attorney]:   To whom do you provide the feedback?

[Mattys]:   Usually it's Bryan [Rishe].

[Attorney]:   From whom do you usually receive the proposals?

[Mattys]:   From Bryan and/or Bob [Folkes].

[Attorney]:   If I understand the process correctly for quota, Bryan or Bob, depending on the year, sends you a proposal, you give them comments and you -- you give them comments and feedback, correct? . . .

[Mattys]:   And we discuss to understand the rationale behind what's in the plan.

261.   As provided in the response to an interrogatory posed in the employment discrimination suit, the Company also affirmed the involvement of Mattys, Folkes, and Rishe in setting the salaries for the Regional Sales Managers and Area Directors:

Bryan Rishe and Bob Folkes work together in setting the compensation, including base salaries of Regional Sales Managers and Area Directors.  HR is also consulted on the base salary range and how to adjust base salaries for geography.  Jerry Mattys reviews and approves base salaries of Regional Sales Managers and Area Directors.

262.   In addition, Mattys testified that within guidelines set by the Compensation Committee of the Board, he could approve equity grants for area sales directors without getting approval for the specific grants.

263.   Likewise, Rishe testified that promotions from area director in sales to regional sales manager were "run through a committee, which was essentially" Mattys, Folkes, and Rishe.

264.   In their roles setting and monitoring Tactile's sales strategy, Mattys, Folkes and Rishe knew or were reckless in not knowing that their revenues were misstated and based on illegal sales practices.

- 112 -

### E.    Tactile Management Closely Tracked Flexitouch Sales

265.    Rishe and other Tactile employees testified in the employment discrimination action regarding the Company's enterprise software system, called FileMaker, that they "r[a]n the business on" and that generated and collected sales reports.  Tactile employees accessed the reports on their internal server called "Info Source."  ***Senior management and every member of the sales team received the "plan versus actual" report every night***; if executives or employees sought other reports, they could generate them on Info Source.  For instance, Rishe testified that for reviewing "the VA growth numbers," Folkes "has a report that he uses for VA commission calculation, and that would include – that would be encompassing all shipments."  Likewise, Mattys testified during his deposition in the employment discrimination case, senior management had "data . . . by individual representative," such that "[e]ach rep we track."

266.    By closely monitoring the Flexitouch sales, Mattys, Blake, Moen, Folkes, and Rishe knew, or were reckless in not knowing, that Tactile's reported revenues were misstated and based in part on illegal sales practices; that these practices put at risk approximately 30% of its business; and that the market for Flexitouch was smaller than disclosed.

### F.    Flexitouch Sales Were Critical to Tactile's Core Operations

267.    The Individual Defendants' knowledge that the Company's kickback and false claims schemes were a source of its financial success can be inferred because Flexitouch was Tactile's core product, the sale of which was critical to its business.  Specifically, the sale of Flexitouch accounted for approximately 90% of Tactile's revenues during the Class Period.

- 113 -

268.   In a declaration dated October 21, 2019 and filed in the employment discrimination action, Mattys attested that Flexitouch was the company's "signature product," and its "highest revenue producing product, responsible for the majority of Tactile's sales."

269.   Moreover, reporting Flexitouch's sales growth was critical to the Company. To convince investors that the Company was growing every quarter, Defendants increased Tactile's revenue outlook for the year until the COVID-19 pandemic.  As Mattys testified, "[g]rowth year-over-year is a big one for us."  Moreover, to persuade investors of its growth story, the Company made false and misleading statements regarding the market opportunity for Flexitouch, characterizing it as much larger than it was.

270.   Given the importance of Flexitouch and growing its sales for Tactile's business, knowledge of the illegal practices to promote Flexitouch sales as described above can be imputed to the Individual Defendants.

G.   **Defendants Personally Reviewed and Approved Public Statements**

271.   Before Defendants made statements to investors, they reviewed and approved the statements.  As part of this approval process, Defendants were in a position to know, and did know, that the statements made to investors were false and misleading, or omitted material information necessary to make the statements not misleading.

272.   In the course of his deposition in the employment discrimination action brought against the Company by Tracy Sempowich, Defendant Mattys admitted that that he "personally review[ed]" the drafts of the scripted remarks made during investor conference

- 114 -

calls.  He also testified that the call script was "actually reviewed by our audit committee of the board of directors."  During the Class Period, the audit committee comprised Defendant Nigon, the committee chairman, and Defendants Burke and Roche.

273.   Moreover, in connection with Tactile's public financial statements filed with the SEC during the Class Period, Defendants Mattys, Blake, and Moen issued SOX Certifications attesting that they each personally supervised and participated in the evaluation of Tactile's financial statements and that the Company's financial disclosures fairly and accurately presented its financial condition.

### H.   Tactile Executives' Departures Support Inference of Scienter

274.   The multiple departures by Tactile executives supports a strong inference of scienter.  On January 13, 2020, Tactile announced that Mattys, who at the time was 59 years old, had informed the Board on January 10, 2020 he intended to retire.  Mattys's departure announcement was in the wake of the *qui tam* lawsuit's filing, but before the full extent of the fraud was revealed in the *Seeking Alpha* article on June 8, 2020.

275.   Then, less than three months after the disclosures in *Seeking Alpha*, the Company made the stunning announcement on September 3, 2020 that "we have determined to eliminate the position of Chief Operating Officer," thus terminating Folkes.

276.   Other executives, meanwhile, made their exit from the Company before the fraud was revealed.  On August 6, 2018, Tactile filed a Form 8-K with the SEC announcing that Defendant Blake would resign "for personal reasons" effective September 1, 2018 – only four months into the Class Period.  The Company also announced on July 22, 2019, that

another senior Tactile executive, Mary Thompson, Senior Vice President of Reimbursement and Payer Relations was retiring, to be replaced by Jay Stracke.

277.   The large number of executives departing in a short period of time supports a strong inference that the illegal sales practices – concealed from investors – was known among the Company's top executives.

## VIII.   PRESUMPTION OF RELIANCE

278.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Lead Plaintiff and other members of the Class purchased Tactile common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

279.   At all relevant times, the market for Tactile common stock was efficient for the following reasons, among others:

(a)   As a regulated issuer, Tactile filed periodic public reports with the SEC; and

(b)     Tactile regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

280.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Tactile's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    CLASS ACTION ALLEGATIONS

281.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tactile common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives,

- 117 -

heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

282.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tactile common stock trades on the Nasdaq Global Market and according to the Company's SEC filings had more than 19 million shares outstanding as of February 19, 2020.  While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.  Class members who purchased Tactile common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

283.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)   whether Defendants violated the Exchange Act;
>
> (b)   whether Defendants engaged in a fraudulent scheme;
>
> (c)   whether the Insider Trading Defendants traded contemporaneously with the Class while in the possession of material, nonpublic information;
>
> (d)   whether Defendants omitted and/or misrepresented material facts;
>
> (e)   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(f)     whether Defendants knew or recklessly disregarded that their statements were materially false and misleading;

(g)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine or presumption;

(h)     whether the price of Tactile common stock was artificially inflated; and

(i)     the extent of damage sustained by Class members and the appropriate measure of damages.

284.   Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

285.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

286.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

287.   Lead Plaintiff makes the allegations herein based upon the investigation by Lead Plaintiff's counsel, which included a review of regulatory filings made by Tactile with the SEC, as well as other regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the

- 119 -

Company, and media reports about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I
### (False and Misleading Statements)

### Violation of §10(b) of the Exchange Act and
### Rule 10b-5(b) Promulgated Thereunder
### Against Tactile, Mattys, Blake, and Moen

288.    Lead Plaintiff incorporates by reference and realleges each and every allegation contained above, as if set forth fully herein.

289.    During the Class Period, Defendants made false and misleading statements of material fact and omitted material facts necessary to make the statements about Tactile's business and financial condition not misleading, given the circumstances in which they were made.

290.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations, including truthful, complete and accurate information with respect to the Company's operations and financial condition so that the Company's share price would be based on truthful, complete and accurate information.

291.    The allegations above establish a strong inference that Defendants acted with scienter throughout the Class Period, as they had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth

- 120 -

because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis.  By concealing these material facts from investors, Tactile maintained its artificially inflated share price throughout the Class Period, and the Insider Trading Defendants were able to sell off the majority of their stock at artificially inflated prices.

292.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT II**
**(Scheme Liability)**

**Violation of §10(b) of the Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder**
**Against All Defendants**

293.    Lead Plaintiff incorporates by reference and realleges each and every allegation contained above as if set forth fully herein.

294.    As early as 2018 and continuing through the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and other members of the Class; (ii) enable Tactile to artificially inflate the price of Tactile's common stock; (iii) cause Lead Plaintiff and other members of the Class to purchase Tactile's common stock at artificially inflated prices; and (iv) allow the Insider Trading Defendants to sell the majority of their stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the following actions:

- 121 -

(a)    Exaggerated and distorted clinical study results and claims data analyses to convey that Flexitouch's market size was three to four times greater than it actually was;

(b)    Paid illegal kickbacks to doctors and other hospital staff to induce them to prescribe the Flexitouch;

(c)    Submitted false reimbursement claims to Medicare;

(d)    Issued false and misleading statements, as alleged in §V, in furtherance of the scheme;

(e)    Each and every Defendant is sued as a primary participant in the wrongful and illegal conduct charged herein; and

(f)    The scheme and course of conduct alleged herein was intended to, and did, drive Flexitouch sales, and with it, Tactile's revenues and share price.

## COUNT III
### (Control Persons)

#### For Violation of §20(a) of the Exchange Act
#### Against Tactile and the Individual Defendants

295.    Lead Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

296.    Each of the Individual Defendants acted as a control person of the Company within the meaning of §20(a) of the Exchange Act (15 U.S.C. §78t(a)), as alleged herein. By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations, finances, and research, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements

- 122 -

that Lead Plaintiff contend are false and misleading.  Each Individual Defendant was provided with or had access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

297.    Each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control Tactile's public statements and participation in the fraudulent scheme as alleged herein, and exercised the same.  Further, each of the Individual Defendants had access to data, reports and results generated from clinical trials and claims data analyses.  The Individual Defendants had the power and ability to control (and did influence and control, directly or indirectly) the actions of Tactile and its employees, including their participation in the alleged fraudulent scheme and directing the content of Tactile's financial statements, releases and conference call statements.

298.    Tactile controlled the Individual Defendants and all of Tactile's employees and directors.

299.    By reason of such wrongful conduct, Tactile and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

- 123 -

**COUNT IV**
**(Insider Trading)**

**For Violations of §20A of the Exchange Act**
**Against the Insider Trading Defendants**

300.    Lead Plaintiff incorporates by reference and realleges each and every allegation contained above as if set forth fully herein.

301.    As detailed in §VII.A, the insider trading claims alleged herein arise from the Insider Trading Defendants' sale of 716,765 shares of Tactile common stock during the Class Period for illegal insider trading proceeds of $38.8 million and profits of $27.8 million. The Insider Trading Defendants made their illegal insider sales contemporaneously with members of the Class, including Lead Plaintiff, who purchased Tactile shares on December 10, 2019.  The Insider Trading Defendants' sales were suspicious because they were calculated to maximize personal benefit from the fraud, dramatically out of line with their pre-Class Period trading practices, and made shortly after the dissemination of false positive statements.

302.    During the Class Period, the Insider Trading Defendants were privy to confidential information concerning Tactile's operations, finances, financial condition and future business prospects, including, but not limited to, the false statements disseminated to the investing public.  Notwithstanding their duty to refrain from trading in Tactile common stock without disclosing the foregoing materially adverse facts, the Insider Trading Defendants sold Tactile common stock contemporaneously with the purchases of Tactile common stock by Lead Plaintiff and the other Class members.

- 124 -

303.    The Insider Trading Defendants were experienced investors that were well-aware of the prohibitions against insider trading.  Tactile's insider trading policy recognizes that "[f]ederal and state securities laws prohibit individuals from trading in the securities of a company while they are aware of material information about that company that is not generally known or available to the public."  Notably, the policy informs Tactile insiders that information concerning "[s]ignificant litigation exposure due to actual or threatened litigation" is material information on which the insiders are prohibited from trading.

304.    This claim is asserted pursuant to §20A of the Exchange Act, which provides, in part, that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

305.    Defendants Mattys, Blake, Burke, Nigon, and Roche violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by knowingly and recklessly making false and misleading statements and omitting to disclose material facts in the Company's quarterly and annual filings with the SEC, press releases, and conference calls.

306.    The Insider Trading Defendants also violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by carrying out a plan, scheme and course of conduct which was intended to and, did: (i) deceive the investing public, including Lead Plaintiff and other members of the Class; (ii) enable Tactile to artificially inflate the price of Tactile's common stock; (iii) cause Lead Plaintiff and other members of the Class to purchase

Tactile's common stock at artificially inflated prices; and (iv) allow the Insider Trading

Defendants to sell the majority of their stock at artificially inflated prices.

307.    The Insider Trading Defendants violated §10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by unlawfully trading Tactile stock throughout the Class

Period while in possession of material, non-public information.   The Insider Trading

Defendants owed a duty to Tactile and its shareholders to maintain the material, nonpublic

information in confidence and not trade on the basis of it.   In breach of that duty, the Insider

Trading Defendants knowingly and recklessly traded Tactile stock on the basis, and while in

possession, of the material, nonpublic information concerning Tactile's improper business

practices.   As beneficial owners of the sold shares, each Insider Trading Defendant expected

to, and did, receive a pecuniary benefit from the sale.

308.    The Individual Defendants also violated §20(a) of the Exchange Act.   By

reason of their positions of control and authority as officers and/or directors of Tactile, the

Insider Trading Defendants had the power and authority to cause Tactile to engage in the

conduct complained of herein.   They were able to and did control, directly and indirectly, the

decision-making of Tactile, including the content and dissemination of Tactile's public

statements and filings described herein, thereby causing the dissemination of the materially

false and misleading statements and omissions alleged herein.

309.    Lead Plaintiff and all similarly situated members of the Class: (i) have suffered

damages because they paid artificially inflated prices for Tactile stock as a result of the

violations herein described, and suffered economic losses as the truth was revealed through

several partial disclosures; (ii) have suffered damages because the Insider Trading

- 126 -

Defendants gained an advantageous market position through their possession of material, nonpublic information; and (iii) would not have purchased Tactile stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the Individual Defendants' false and misleading statements and material omissions.

310.    Under §20A of the Exchange Act, the Insider Trading Defendants are jointly and severally liable to Lead Plaintiff and the Class for all profits gained and losses avoided by them as a result of their insider trading.

311.    By virtue of the foregoing, the Insider Trading Defendants violated §20A of the Exchange Act.

## X.    PRAYER FOR RELIEF

Wherefore, Lead Plaintiff prays for relief and judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Lead Plaintiff and the Class members damages, including interest;

C.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees and expenses; and

D.    Awarding such equitable/ injunctive or other relief for the benefit of the Class as the court may deem just and proper.

4827-5349-0661.v1

## XI.   JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  April 19, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
JESSICA T. SHINNEFIELD
(admitted *pro hac vice*)
ASHLEY M. PRICE
(admitted *pro hac vice*)
NICOLE Q. GILLILAND
(admitted *pro hac vice*)

       s/ Ashley M. Price
ASHLEY M. PRICE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jshinnefield@rgrdlaw.com
aprice@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ZIMMERMAN REED LLP
CAROLYN G. ANDERSON, MN 275712
JUNE P. HOIDAL, MN 033330X
BEHDAD C. SADEGHI, MN 393374
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Behdad.Sadeghi@zimmreed.com

Local Counsel

- 128 -

VANOVERBEKE, MICHAUD &
    TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

- 129 -

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*St. Clair County Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-cv-00988 (M.D. Tenn.)
*In re Resideo Techs., Inc. Sec. Litig.*, No. 0:19-cv-02863 (D. Minn.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

TACTILE

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _17th_ day of November, 2020.

ST. CLAIR COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _Deborah L. Martin_

Its: _CHAIRPERSON BOARD OF TRUSTEES_

TACTILE

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/10/2019 | 2,494 | $64.86 |

Prices listed are rounded up to two decimal places.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 19, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Ashley M. Price*
ASHLEY M. PRICE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  aprice@rgrdlaw.com

# Mailing Information for a Case 0:20-cv-02074-NEB-BRT Mart v. Tactile Systems Technology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Carolyn G Anderson**
  carolyn.anderson@zimmreed.com,karen.colt@zimmreed.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lucas Gilmore**
  lucasg@hbsslaw.com,sf_filings@hbsslaw.com

- **Daniel E Gustafson**
  dgustafson@gustafsongluek.com,mmorgan@gustafsongluek.com

- **Daniel C Hedlund**
  dhedlund@gustafsongluek.com

- **June Pineda Hoidal**
  june.hoidal@zimmreed.com,julianne.vannorman@zimmreed.com

- **Matthew B Kilby**
  matthew.kilby@faegredrinker.com,terrilyn.storlien@faegredrinker.com

- **Ashley M Price**
  aprice@rgrdlaw.com,e_file_SD@rgrdlaw.com,mwaligurski@rgrdlaw.com

- **Behdad C Sadeghi**
  behdad.sadeghi@zimmreed.com,leslie.harms@zimmreed.com

- **Jessica Shinnefield**
  jshinnefield@rgrdlaw.com,e_file_SD@rgrdlaw.com,JShinnefield@ecf.courtdrive.com,mwaligurski@rgrdlaw.com

- **Wendy Jo Wildung**
  wendy.wildung@faegredrinker.com,terrilyn.storlien@faegredrinker.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)