UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. 0:20-cv-02074-NEB-BRT |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| TACTILE SYSTEMS TECHNOLOGY, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**<u>DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS</u>**

Date: June 18, 2021.

**FAEGRE DRINKER BIDDLE &
REATH LLP**
Wendy J. Wildung (#117055)
Matthew Kilby (#0335083)
Anderson C. Tuggle (#0400277)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
wendy.wildung@faegredrinker.com
matthew.kilby@faegredrinker.com
anderson.tuggle@faegredrinker.com

*Attorneys for Defendants*

US.133109482.13

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

STATEMENT OF FACTS ..................................................................... 3

ARGUMENT: THE AMENDED COMPLAINT SHOULD BE DISMISSED................ 7

    I.      THE AC FAILS TO STATE A CLAIM UNDER SECTION 10(B)........... 7

          A.     COUNT I FOR STATEMENT LIABILITY FAILS. ....................... 8

               1.     THE AC LACKS RELIABLE SOURCES. .......................... 8

                    a.     ALLEGATIONS FROM THE CONTESTED *QUI TAM* SUIT ARE INSUFFICIENT.................... 10

                    b.     ALLEGATIONS FROM THE OSS REPORT ARE INSUFFICIENT.............................................. 14

                    c.     ALLEGATIONS FROM THE FORMER EMPLOYEE SHOULD BE DISREGARDED......... 17

               2.     THE AC DOES NOT PLEAD ACTIONABLE STATEMENTS.................................................... 18

                    a.     PLAINTIFF FAILS TO IDENTIFY THE STATEMENTS AT ISSUE OR WHY THEY ARE MISLEADING.................................. 18

                    b.     PLAINTIFF FAILS TO PLEAD SPECIFIC FACTS SHOWING FALSITY.............................. 19

                         (i)     STATEMENTS ABOUT VA AND MEDICARE REVENUE................................ 20

                         (ii)    STATEMENTS ABOUT TAM. ..................... 23

                         (iii)   STATEMENTS ABOUT LYMPHEDEMA DIAGNOSES. .................... 24

                         (iv)   MATTYS'S STATEMENTS ......................... 25

               3.     ITEM 303 DID NOT MANDATE ADDITIONAL DISCLOSURES................................................. 26

                4.     THE AC DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER. ........................... 27

                    a.     PLAINTIFF'S GENERALIZED ALLEGATIONS OF KNOWLEDGE DO NOT SHOW SCIENTER.................................. 28

-i-

# TABLE OF CONTENTS
(continued)

**Page**

b.    PLAINTIFF'S ALLEGATIONS OF MOTIVE DO NOT SHOW SCIENTER. ................................. 30

(i)    INCENTIVE COMPENSATION ALLEGATIONS. ............................................. 31

(ii)    STOCK SALES ALLEGATIONS. ................... 31

c.    NONE OF PLAINTIFF'S OTHER ALLEGATIONS SHOWS SCIENTER. ................... 36

d.    AN INFERENCE OF NON-CULPABLE INTENT IS MORE COMPELLING. ...................... 37

B.    COUNT II FOR SCHEME LIABILITY FAILS. .......................... 38

II.    THE AC FAILS TO STATE A CLAIM UNDER SECTION 20(a). ......... 40

III.    THE AC FAILS TO STATE A CLAIM UNDER SECTION 20A. .......... 42

CONCLUSION ............................................................................... 44

-ii-

**INTRODUCTION**

Tactile Systems Technology, Inc. ("Tactile") is a relatively new public company that develops and sells pneumatic compression devices for the at-home treatment of lymphedema and chronic venous insufficiency ("CVI").  (¶1.)[1]  Tactile's revenues principally come from third-party payors, including the VA and Medicare.  (¶33.)

In early 2019, one of Tactile's competitors for VA business in Texas filed a *qui tam* lawsuit accusing Tactile of violating the federal Anti-Kickback Statute ("AKS") and the federal False Claims Act ("FCA").  After investigating the allegations the government declined to intervene, and Tactile is vigorously defending the lawsuit.  The *qui tam* allegations were later repeated and amplified in a short-seller's "report" posted on the internet on June 8, 2020.  This lawsuit followed the short-seller report.

Despite the obvious self-interest of the competitor and the short-seller in smearing Tactile, Tactile has maintained or grown its revenues, and been profitable.  No government investigation or action has been commenced or is pending.  The *qui tam* and short-seller's allegations remain what they were to begin with: speculative and unproven.

Unproven, speculative allegations don't improve with repetition.  Yet that's what Plaintiff attempts in its Amended Complaint ("AC").  The AC regurgitates the *qui tam* and short-seller allegations, claims Tactile is engaged in "illegal sales practices," and asserts that a large (and indiscriminate) group of Defendants—Tactile, its CEO, its former CFO, its current CFO, its former COO, its former SVP-Sales, and three of its

---

[1] Citations are to the Amended Complaint.

1

outside directors—committed federal securities fraud during the time period from May 7, 2018 through June 8, 2020 ("Class Period") by (1) failing to disclose Tactile's supposed illegal conduct, (2) misrepresenting the size of the potential market for Tactile's devices, and (3) selling Tactile stock.

Plaintiff's liability theories are based upon speculation draped in rhetorical excess. The AC doesn't meet the high standards for pleading securities fraud imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") or Rule 9(b) because it:

- Fails to identify the public statements being challenged with the specificity the PSLRA requires;

- Rests its allegations about "illegal sales practices" upon self-interested, unreliable sources that lack personal knowledge;

- Fails to plead facts indicating that Defendants' public statements were false or misleading when made, relying instead upon mischaracterizations of those statements;

- Engages in impermissible "group pleading" as to the individual Defendants, including conclusory allegations as to what they knew and when they knew it;

- Fails to plead facts giving rise to a strong inference of scienter as to any Defendant; and

- Fails to plead facts showing the individual Defendants' stock sales were made while in possession of material, nonpublic information or contemporaneously with Plaintiff's purchase transaction.

Defendants therefore move to dismiss the AC.  The Court should grant Defendants' motion for the reasons that follow.

## STATEMENT OF FACTS[2]

### Tactile's Business and Performance

Tactile was formed in 1995 and became a public company as of 8/2/16. (¶13.) During the Class Period Tactile sold two main types of pneumatic compression devices: the Entre (Billing Code E0651), a basic device; and the Flexitouch (Billing Code E0652), an advanced device. (¶30.) Flexitouch sales generate approximately 90% of Tactile's revenues. (¶31.) Tactile employs a direct-to-patient and provider model "through which we obtain patient referrals from clinicians, manage insurance claims on behalf of our patients and their clinicians, deliver our solutions directly to patients and train them on the proper use of our solutions in their homes," thereby capturing "both the manufacturer and distributor margins." (2018-10-K, at 3, Ex. 22.)

Tactile's revenues grew significantly throughout the Class Period, from $109,283,000 in FY2017 to $189,492,000 in FY2019. (2020-10-K, at 70, Ex. 39.) The revenues mostly came from third-party payors. (¶33.) Private insurers were the largest category, representing 71%-74% of Tactile's revenues in each year 2017-2020. (*Id.*) The VA represented 18% of Tactile's 2017 revenues; its share gradually declined to 13% of

---

[2] Defendants reference and submit as exhibits ("Ex. ") to the Declaration of Wendy J. Wildung: the docket from the *qui tam* action; a chart comparing the AC's allegations to allegations made in the *qui tam* action; the short-seller reports referenced in the AC; a chart detailing Tactile's stock prices; a chart summarizing the individual Defendants' stock sales; two articles referenced in the AC; and SEC filings, press releases, and earnings-call transcripts. Because these exhibits are either documents on which the AC relies, documents incorporated by reference, matters of public record, or matters of which a court may take judicial notice, the Court may consider them here. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *DittmerProps., L.P. v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013).

2020 revenues, although that percentage change is in part attributable to revenue increases from other sources.  (*Id.*)  Medicare revenues grew, from $8.6 million in 2017 to $29.9 million in 2020 and from 8% to 16% of overall revenues.  (*Id.*)

The COVID-19 pandemic negatively affected Tactile's business due to "the decline in the number of patients that healthcare facilities and clinics are able to treat due to enhanced safety protocols."  (1Q2021-10Q, at 10, Ex. 40.)  Still, Tactile reported generally comparable revenues between FY2019 and FY2020 (2020-10-K, at 70, Ex. 39 ($189,492,000 FY2019 revenue and $187,130,000 FY2020 revenue)), and between Q12020 and Q12021 (1Q2021-10Q, at 19, Ex. 40 (showing $43,675,000 Q12020 revenue and $42,772,000 Q12021 revenue)).  Tactile's Medicare revenues increased from $6,380,000 in Q12020 to $8,643,000 in Q12021.  (*Id.*)

**The *Qui Tam* Action**

On 1/23/19, a competitor for VA business filed a *qui tam* complaint alleging Tactile was violating the AKA and FCA by paying money "to doctors through speaker programs to induce them to write prescriptions for Flexitouch" and to therapists who train patients to use Tactile's devices.[3] (¶90.)  The trainer program allegedly induced trainers, who also worked at medical facilities, to influence prescribers they worked with to prescribe Tactile devices.  (*Id.*)  The government investigated and declined to intervene (Ex. 1, Dkt. 5), so in accordance with the FCA, *see* 31 U.S.C. §3730(b)(2), the complaint

---

[3] Tactile publicly reported that as of 12/31/19, it had contracted with over "560 licensed, independent healthcare practitioners as home trainers who educate patients on the proper use of our solutions."  (2019-10-K, at 4, Ex. 35.)

was unsealed on 3/20/19.  (¶101.)  Tactile's stock price declined two days later to $55.57 per share.  (¶215.)

Tactile has denied the *qui tam* allegations and filed counterclaims.  Ex. 1 is the docket from the suit, showing active litigation and a recent order from the presiding judge denying plaintiff's dispositive motion and granting summary judgment to Tactile on two of three counts.  (Dkt. 114.)  The AC repeats allegations and information from the *qui tam* plaintiff, including a demonstrative exhibit the *qui tam* plaintiff created (¶38), and from the *qui tam* plaintiff's former expert (he has resigned) (¶¶130-31).  Ex. 2 is a chart matching the allegations of the AC to documents on file in the *qui tam* action.

**The OSS Report**

On 6/8/20, a previously unknown person or entity calling itself "OSS Research" posted a "report" (Ex. 3) entitled "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy" on the website *Seeking Alpha*.  (¶116.)  The report didn't provide information about OSS Research—not even contact information—or name its author.  It said the author "has a short position in [Tactile stock] and may buy or sell the Company's securities at any time."  (6/8/20 Report, at 31, Ex. 3.)  The report claimed that its information all came "from public sources."  (*Id.*)

The OSS report discussed the *qui tam* suit and repeated its allegations (*id.* 12-15), quoted from unnamed, vaguely described, industry participants (*id.* 8, 14, 24, 27), and contained the author's "analysis" of public data about certain Medicare RAC

audits[4] of Tactile's E0651 (Entre) claims (*id.* 20-26).  As the author had intended, the

OSS report drove Tactile's stock price down from a close of $52.54 to a close of $47.26

on 6/8/20.  (¶217; Stock Chart, at 14, Ex. 5.)

The AC, at ¶¶50-52, 55-56, repeats the information from the OSS report and a

follow-up report OSS posted on 12/10/20 (Ex. 4).

**This Action**

Brian Mart filed this action on 9/29/20 against Tactile and its CEO and CFOs.  St.

Clair County Employees' Retirement System was appointed lead Plaintiff on 2/1/21 and

filed the AC on 4/19/21.  The AC alleges the following counts:

> **Count I**:  Violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5(b), against Tactile; its CEO Gerald Mattys; Lynn Blake, its CFO until 9/1/18; and Brent Moen, its CFO since 9/2/18.

> **Count II**:  Violation of Section 10(b) and Rules 10b-5(a)&(c) against Tactile, Mattys, Blake, Moen, and the following additional individuals: Robert Folkes, Tactile's former COO; Bryan Rishe, Tactile's former SVP-Sales; and outside directors William Burke, Richard Nigon, and Kevin Roche.

> **Count III**:  Controlling person claims against all Defendants under Section 20(a) of the 1934 Act, 15 U.S.C. §78t(a).

> **Count IV**:  Violation of Section 20A of the 1934 Act, 15 U.S.C. §78t-1(a), against all individual Defendants except Moen for alleged insider trading.

The AC alleges that Tactile's "reported revenues were in part the product of illegal

sales practices, including engaging in kickback schemes to push Flexitouch sales in the

---

[4] "Recovery Audit Contractors" (RAC) are private companies retained by Centers for Medicare & Medicaid Services (CMS) to audit Medicare reimbursements.  RACs are paid on a contingency fee basis from the money they claw back for CMS.  42 U.S.C. § 1395ddd(h)(1); 2019-10-K, at 39, Ex. 35.

VA and CMS channels and submitting false claims to CMS"; Defendants "failed to disclose that the Company was exposed to an extreme risk of legal and regulatory scrutiny that put nearly 30% of its business related to its VA and CMS channels at risk"; and Tactile and Mattys overstated Flexitouch's "Total Addressable Market" ("TAM") by "at least three times." (¶145; *see e.g.*, ¶¶132, 138, 153, 166, 175.)

### ARGUMENT: THE AMENDED COMPLAINT SHOULD BE DISMISSED.

### I.    THE AC FAILS TO STATE A CLAIM UNDER SECTION 10(b).

Section 10(b) prohibits fraud in connection with the purchase or sale of securities. Rule 10b-5 promulgated thereunder specifies that it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. §240.10b-5.  Count I alleges liability for false or misleading statements, as prescribed by Rule 10b-5(b).  Count II alleges scheme liability, as prescribed by Rules 10b-5(a)&(c).

To plead either count, Plaintiff must satisfy Rule 9(b) and the PSLRA.  "The PSLRA heightens the Federal Rule of Civil Procedure 12(b)(6) standard in two important ways."  *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 958 (8th Cir. 2008).  A claim for statement liability must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(l).  For both statement and scheme claims, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]."  15 U.S.C. §78u-4(b)(2).

While well-pleaded allegations of fact must be taken as true, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute."  *Fla. State Bd. of Admin.* v. *Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001); *accord In re Hutchinson Tech.*, 536 F.3d at 958 ("[W]e reject unwarranted inferences and conclusory or catch-all assertions of law[.]").

Neither of Plaintiff's Section 10(b) claims meets these standards.

## A.    Count I For Statement Liability Fails.

Plaintiff fails to adequately plead, with the requisite level of reliable factual detail, two of the necessary elements of a statement-liability claim under Rule 10b-5(b): (1) that Defendants made a material misrepresentation or omission (2) with scienter.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

### 1.    The AC Lacks Reliable Sources.

The AC's most glaring deficiency is its lack of reliable sources.  Other than its allegations as to Plaintiff's identity and purchase of Tactile stock (AC ¶12), which are based upon Plaintiff's personal knowledge, the AC is based entirely upon information and belief pleading.  (AC at p.1.)

Allegations "made on information and belief" require a plaintiff "to state *with particularity* all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(l) (emphasis

-8-

added).  *See In re Retek Inc. Sec.*, No. 02-4209, 2004 U.S. Dist. LEXIS 6006, at \*13-18 (D. Minn. Mar. 30, 2004) (this requirement encompasses "all allegations not plead[ed] on the basis of personal knowledge," including those based on investigation of counsel). Particularity in pleading sources is required so the Court may evaluate whether sources of "information and belief" allegations are themselves reliable—*i.e.*, that the person whose knowledge a complaint ultimately relies upon (since it is not the plaintiff) was in a position to know the facts alleged.  *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) (disregarding allegations that did not "provide the sources' basis of knowledge"); *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (disregarding plaintiff's "reliance on the allegations of confidential sources"); *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1081-82 (D. Minn. 2017), *aff'd*, 955 F.3d 738 (8th Cir. 2020) (other sources "may be used to support allegations showing that statements were false or misleading" only if "the basis for the sources' knowledge is described with particularity").

To determine whether a source is reliable, "a court must conduct an examination of the detail provided by the . . . sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881-83 (D. Minn. 2007) (citation and quotation omitted), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

The AC's core allegations are that Tactile engaged in illegal sales practices.  Those allegations come from: (1) papers filed by the *qui tam* plaintiff (¶¶5, 35-44, 47-48, 130);

(2) the OSS reports (¶¶50-52, 55-56); and (3) an anonymous former employee who quit Tactile three years before the Class Period (¶¶45, 53).[5] None of these sources is reliable under PSLRA standards, and none suffices to show that Tactile engaged in illegal conduct during the Class Period.

### a.   Allegations from the contested *qui tam* suit are insufficient.

Plaintiff cannot satisfy the PSLRA's strict pleading requirements by copying allegations from another lawsuit—that only compounds the deficiency, akin to double-hearsay. Accordingly, such allegations are often disregarded. *See Teamsters Loc. 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 468 (E.D. Pa. 2019) (dismissing suit; "the Court cannot ignore the fact that the allegations raised in the [six] qui tam cases are just that—allegations. . . . Liability was not admitted, and thus, the allegations made in those suits remain unsubstantiated"); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 507-08 (D. Del. 2013) (dismissing suit; a "*qui tam* complaint is also an unreliable source"); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017, 2013 U.S. Dist. LEXIS 107559, at *11-12 (S.D.N.Y. July 31, 2013) (dismissing suit; "[a]llowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support"); *Gaer v. Educ. Mgmt. Corp.*, No. 10-1061, 2011 U.S. Dist. LEXIS 111803, at *4-5 (W.D. Pa. Sep. 29, 2011) (dismissing suit; declining "to give weight to the allegations in the qui tam case").

---

[5] The AC also borrows allegations and testimony from an employment lawsuit, but those allegations do not relate to alleged illegal conduct. (¶¶18, 259, 261, 265, 268, 272.)

Courts who disregard cribbed allegations reason that a securities plaintiff cannot rely on allegations in another complaint to satisfy its investigatory obligations imposed by the PSLRA and Rule 11—those obligations cannot be outsourced to other litigants from a different action.  *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 811-12 (N.D. Cal. 2019) (dismissing suit; plaintiffs did not satisfy their Rule 11 obligation by alleging "'facts' simply because they appear in FTC's Complaint"); *VNB Realty, Inc. v. Bank of Am. Corp.*, 11 Civ. 6805, 2013 U.S. Dist. LEXIS 132250, at *20-24 (S.D.N.Y. Sep. 16, 2013) (same); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004-06 (N.D. Cal. 2008) (striking allegations based on an SEC complaint and dismissing suit).

Judge Frank of this Court reached the same conclusion in *Shoemaker v. Cardiovascular Systems, Inc.*, a case also involving allegations that a defendant paid kickbacks to physicians prescribing medical devices.  No. 16-568, 2017 U.S. Dist. LEXIS 47972 (D. Minn. Mar. 29, 2017).  Judge Frank cautioned plaintiffs against incorporating wholesale the allegations from a *qui tam* complaint into their securities fraud complaint as inconsistent with both the PSLRA and Rule 11.  *Id*. at *6 n.5.  In granting dismissal, Judge Frank declined to credit any *qui tam* allegations that had not been substantiated by other credible sources, like confidential witnesses, doctors, or patients.  *Id.* at *24-26. This Court should do the same.

Even if the Court were to consider the many allegations Plaintiff cribbed from the *qui tam* plaintiff, it should still conclude they are insufficient to show illegal conduct. When a securities plaintiff rests its fraud claims on failure to disclose allegedly illegal conduct, it must, at minimum, "plead *particular* facts that, if true, would constitute illegal

-11-

conduct." *Id.* at *20-21 (emphasis added); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 19 Civ. 7536, 2021 U.S. Dist. LEXIS 61182, at *26-27 (S.D.N.Y. Mar. 30, 2021) (same). That's because "[a]llowing shareholders to sue based on conclusory allegations that a company has engaged in widespread illegal conduct without adequately pleading facts that demonstrate illegal conduct would just allow strike suits." *Shoemaker*, 2017 U.S. Dist. LEXIS 47972, at *20-21.

It follows that allegations of widespread illegal conduct need not be credited where a complaint offers only a few examples and anecdotal evidence. *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1054–55 (D. Minn. 2018) (granting dismissal; plaintiff's assertions of a "widespread" kickback scheme "amounted to," in reality, only "a patchwork of alleged misconduct"). Rather, the complaint "must identify 'the who, what, when, where, and how of the alleged improper transaction[s]'" constituting the illegal misconduct. *Menora Mivtachim*, 2021 U.S. Dist. LEXIS 61182, at *26 (citation omitted).

Judged against these standards, the AC falls short. Broad allegations such as "Defendants paid illegal kickbacks to clinicians to induce the prescription of Flexitouch" and "assisted physicians in submitting false reimbursement claims to Medicare" (¶¶35-36) without alleging any of the details—the dates, amounts of kickbacks, the clinicians, or the false claims submitted—are insufficient. *Menora Mivtachim Ins. Ltd.*, 2021 U.S. Dist. LEXIS 61182, at *33-34 (dismissing claims where plaintiff failed to "identify who received the supposedly improper payments, who carried out the payments, when those

-12-

payments were tendered, where those payments were made, or how the payments were made").

Even where the AC provides some specifics, it either omits other required detail or does not allege illegality. For example, Plaintiff repeats the *qui tam* plaintiff's allegation that "Tactile recruited KOL providers that were likely to produce a high number of referrals" (¶37), but doesn't identify when this occurred or what providers were involved. As another example, the AC reproduces a chart created by the *qui tam* plaintiff that lists nine physicians from an unidentified geographical area. (¶38.) The chart includes a column "Remuneration Received from Tactile" adjacent to a column "Number of Tactile Devices Referred." The AC insinuates that this chart supports a conclusion that Tactile "remunerate[ed] health care providers *to induce them* to prescribe Tactile's devices" (¶37) (emphasis added), but nothing about the chart itself indicates that. Other allegations similarly lack detail:

- Allegations about presentations by Dr. Karni. (¶40.) No dates are alleged, nor does Plaintiff allege that reimbursement of Dr. Karni's travel expenses constituted payment for referrals.
- Allegations about "lavish diners and extravagant 'cocktail receptions'" to which Tactile invited "accounts that had referred patients." (¶41.) No details are provided, nor does Plaintiff allege that no legitimate business was conducted.
- Allegation "Tactile remunerated San Francisco VA physician Dr. Arman Kirakosian" $4,401.58 in 2018 and 2019, and he prescribed "at least three

-13-

Tactile devices." (¶42.)  The AC does not allege the payment was in exchange for prescriptions.  Nor could one modest payment to a single physician, even if problematic, demonstrate widespread illegal conduct.

All told, the allegations Plaintiff improperly lifted from the *qui tam* plaintiff do not meet the PSLRA's standards for pleading illegal conduct.

      **b.**      **Allegations from the OSS report are insufficient.**

Plaintiff doesn't allege any facts regarding OSS, and it appears to be defunct (if it ever was a legitimate entity—there doesn't appear to be any such registered entity in the United States).  The only reports OSS appears to have issued in its fleeting existence are the two Tactile reports.  Since then, it has allowed its website to expire, *see* https://ossresearch.com/.

Short sellers like OSS "operate by speculating that the price of a security will decrease," and therefore "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).  In considering whether to credit allegations copied from self-interested, anonymous short-seller reports, courts "have critically analyzed" them using "similar caution and care as with respect to attributions to [confidential witnesses]." *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  A short-seller report that is based upon anonymous witnesses or other sources, has not been independently investigated and confirmed by plaintiff's counsel, and is not corroborated by other well-pleaded facts, lacks reliability and thus is not probative of falsity or scienter. *Id.* at 803-04; *Diaz v. N. Dynasty Minerals*, 17-CV-1241, 2018 U.S. Dist.

-14-

LEXIS 237781, at *17-20 (C.D. Cal. Apr. 30, 2018) (dismissing claims based on allegations borrowed from short report because report relied on confidential sources whose reliability was not shown).

Because the OSS report's author was patently self-interested and anonymous, and because OSS lacks a track record of reliability, the Court should not credit any AC allegations based upon the OSS report absent corroboration from other, reliable sources. The *qui tam* action does not provide that corroboration, for the reasons discussed *supra* at 10-14. Nor do other "sources" referenced in the OSS report provide adequate corroboration because the report lacks facts showing they are reliable.

For example, Plaintiff's allegation that "Tactile sales representatives and therapists routinely provided pre-filled medical necessity forms to prescribing physicians" (¶54) is attributed to the 12/10/20 OSS report, whose author claimed to have documents provided by "a reputable industry insider who works closely with lymphedema patients, distributors, and manufacturers." (Report, at 16, Ex. 4.) This description does not come close to providing the detail courts require to assess the reliability of an anonymous source. *See, e.g.*, *In re NVE Corp.*, 551 F. Supp. 2d at 881; *Long Miao*, 442 F. Supp. 3d at 802-04 (declining to credit non-employee anonymous sources quoted in short-seller report described as "interviewees" or "sales agent[s] that work[ed] with [Defendants'] investment products").

The AC also makes exaggerated claims based upon limited information in the OSS report. Plaintiff's allegations that "lymphedema industry executives . . . disclosed that Tactile's kickback violations were wide-spread and well-known within the industry" are

-15-

attributed to the 6/8/20 OSS report.  (¶¶116-19.)  But none of the "executives" cited in that report are alleged to have said this.  Instead, the report said an unidentified "senior executive" from an unidentified "distributor" claimed physicians were prescribing "whatever treatment protocols the lymphedema therapist or nurse draws up" (6/8/20 Report, at 14, Ex. 3), and an unidentified "senior executive" from an unidentified "supplier" claimed one therapist—also unidentified—was recommending "mid-teens patients a month for a Tactile device" (*id.*).  Even if the report's sheer vagueness surrounding the "senior executives" and their information (*i.e.*, vague as to their bases for knowledge, timing, scope, and magnitude) were not disqualifying, the report never explains why a physician prescribing what a therapist recommends, or why a therapist both recommending Tactile products and training other patients on those products, amounts to illegal conduct.  *Diaz*, 2018 U.S. Dist. LEXIS 237781, at *17-20; *Menora Mivtachim Ins. Ltd.*, 2021 U.S. Dist. LEXIS 61182, at *34-37.

Finally, the AC's reliance upon the short seller's supposed "analysis" of data about certain Medicare RAC audits (6/8/20 Report, at 20, Ex. 3) is misplaced.  That analysis supposedly showed that 71% of an unidentified number of Tactile's *Entre* claims (Billing Code E0561) subject to a RAC audit as of 12/31/19 had been "flagged for issues." (*Id.* 21-23.)  Plaintiff cites it as support for allegations that Tactile's Medicare revenues for *Flexitouch* claims (Billing Code E0562) were at risk.  But Entre and Flexitouch are two different products, and there's nothing in either the OSS report or the AC to suggest that RAC audits for one are predictive of RAC audits for the other.

Further, even if the short seller's "analysis" of RAC claims didn't involve the wrong product, it wouldn't be predictive of whether Medicare ultimately pays Tactile claims. As Tactile discloses (and Plaintiff does not dispute):

> A portion of our claims to Medicare are initially denied, and enter the appeals process, where many are ultimately reviewed by an Administrative Law Judge. <u>After final adjudication of all claims, approximately 90% of the claims submitted are approved</u> . . . .

(*E.g.*, 2018-10-K, at 77, Ex. 22 (emphasis added).) Tactile reported a 90% approval rate on Medicare claims throughout and after the Class Period. (2019-10-K, at 72-73, Ex. 35 (approximately 90% claim approval rate for 2019); 2020-10-K, at 77, Ex. 39 (same for 2020).) And the AC admits Tactile's Medicare revenues *increased* in dollars and as a percentage of overall revenues during the Class Period. (¶33.) This all contradicts OSS's speculation that Medicare was growing hesitant to approve Tactile claims.

In sum, the OSS report is not a reliable source for Plaintiff's allegations that Tactile engaged in illegal conduct.

### c.      **Allegations from the former employee should be disregarded.**

Plaintiff's only other source is an anonymous former "Senior Sales Specialist" who worked for Tactile at some undisclosed location from August 2011 through September 2015. (AC ¶¶45, 53.) The AC claims that at some unspecified time, one of

-17-

the Senior Sales Specialist's bosses (unidentified) told her not to hire or keep trainers unless they "provided referrals for the Company." (¶45.)[6]

The information from this source is too vague and anecdotal to be credited, and irrelevant besides. The former employee left Tactile *three years before* the start of the Class Period and so lacks personal knowledge of Defendants' Class Period conduct. Nothing she says is probative of whether Defendants made false statements with scienter during the Class Period. *In re NVE Corp*, 551 F. Supp. 2d at 882-83 (disregarding confidential source who worked at company before the class period); *In re Gander Mt. Co.*, No. 05-183, 2006 U.S. Dist. LEXIS 1973, at *30-31 (D. Minn. Jan. 17, 2006) (same); *Menora Mivtachim Ins.*, 2021 U.S. Dist. LEXIS 61182, at *31-32 (same).

Because Plaintiff has no personal knowledge of illegal conduct, and because it does not proffer any reliable sources for its allegations of illegal conduct, Plaintiff's claims premised upon the existence of illegal conduct cannot stand.

### 2. The AC Does Not Plead Actionable Statements.

### a. Plaintiff fails to identify the statements at issue or why they are misleading.

Plaintiff practices a style of pleading the Eighth Circuit has deemed insufficient under the PSLRA. The AC contains a section (¶¶132-209) labeled "Defendants' False and Misleading Statements and Omissions" that quotes at length from public

---

[6] Plaintiff calls this a "scheme" and conclusorily alleges that it violated the AKS because "trainers that Tactile hired were in a position to recommend that physicians prescribe Tactile's devices." (¶46.) Plaintiff never explains how paying trainers (who cannot prescribe Flexitouch) for training work they actually perform is illegal.

-18-

disclosures without specifying which of the quoted statements are being challenged. Some of the language is bolded, but the significance of the bolding is not explained. "[A]bsent an indication of precisely *what* statements [plaintiff] alleges to be misleading, it is difficult, if not impossible, to determine whether the complaint adequately specified *why* each statement was misleading." *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009).

Further, while the AC follows some (but not all) of its lengthy quotes with a repetitive summary of purportedly undisclosed information (*e.g.*, ¶¶183, 209), it is not readily apparent how the information relates to the quoted statements. Such broad allegations "do not necessarily show that the defendants' statements were misleading or provide the level of particularity required by the PSLRA." *Novastar*, 579 F.3d at 884 (citation omitted); *see also In re Apogee Enters.*, No. 18-cv-3097, 2020 U.S. Dist. LEXIS 51706, at *28 (D. Minn. Mar. 25, 2020) (similarly pled allegations insufficient where "Defendants and the Court are left to guess if every statement quoted in the referenced ten paragraphs is alleged to be misleading, or only a part of them"); *McDonald v. Compellent Techs., Inc.*, 805 F. Supp. 2d 725, 734-35 (D. Minn. 2011) (complaint failed to "specify" which statements in quoted text were allegedly false or misleading).

b.    **Plaintiff fails to plead specific facts showing falsity.**

If Plaintiff intends to challenge the bolded statements, then the AC must be dismissed because it doesn't plead specific facts to show that any of those statements were false or misleading. Those statements fall into four categories:

(1) statements about results from Tactile's sales to the VA and/or Medicare during a just-completed reporting period, characterizations of those results (*e.g.*, "strong"), and Tactile's plans to grow or focus on those channels in future periods (for VA, ¶¶133, 134, 136, 139, 140-41, 143, 146-48, 151, 154-55, 157-58, 161, 177, 197; for Medicare, ¶¶161, 167, 173, 176-78, 181, 184, 186-87, 191, 205);

(2) statements about TAM, including Tactile's intent to pursue an estimated $4 billion +, later an estimated $5 billion, "market opportunity" (¶¶134, 141, 149, 154, 156, 163, 168, 171, 179, 185, 190, 193, 199, 204, 207, 208);

 (3) statements about Tactile's data analysis of certain medical claims (¶¶159, 163), and about an estimate of the number of people who may suffer from or be at risk for lymphedema (¶¶192, 194-95, 199, 206, 208); and

(4) statements by Mattys during a 5/6/19 analysts' call that "[W]e don't believe those allegations [in the recently unsealed *qui tam* complaint] have any merit" (¶172).

Conclusory allegations of falsity, *Hutchinson Tech.*, 536 F.3d at 958, or "showing in hindsight that the statement is false," *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008) (citation and quotation omitted), do not satisfy the PSLRA.  Instead, Plaintiff must allege "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002); *In re Apogee Enters.*, 2020 U.S. Dist. LEXIS 51706, at *23.  The AC fails this test.

### (i)    Statements about VA and Medicare revenue.

These were general, positive statements about Tactile's business and opportunities in the respective distribution channels, accompanied by the reported revenues for VA and Medicare sales during the applicable periods.  The statements themselves—*e.g.*, growth in VA sales was "strong" (¶¶79, 89)—were inactionable "puffery."  *See In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 n.2 (8th Cir. 2020); *In re Stratasys Ltd. S'holder Sec.*

-20-

*Litig.*, 864 F.3d 879, 882 (8th Cir. 2017). Investors would have relied upon Tactile's reported financial results, not upon Defendants' characterizations of those results. Importantly, Tactile's reported financial statements are not shown to have been false,[7] have never been withdrawn or restated, and are *consistent* with Defendants' general, positive statements. *See Hutchinson Tech.*, 536 F.3d at 960 (affirming dismissal; "Hutchinson has never restated its financials, and there are no people, documents, or sources that say Hutchinson's numbers were false.").

Nevertheless, Plaintiff attempts to manufacture falsity by claiming Defendants had a duty to disclose that Tactile's good financial results were based upon illegal conduct. The AC does not show Tactile's sales practices are illegal. *See supra* at 11-14. Moreover, that would not, standing alone, suffice to plead falsity.[8] "[D]isclosure is not a rite of confession," and companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS*

---

[7] The AC alleges Tactile's "reported revenues from the CMS and VA" for quarters beginning 1Q2019 were "overstated." (¶¶175(c), 183(c), 189(c).) This kind of allegation, devoid of specific amounts or facts, is far too vague and conclusory to show falsity, much less that any amounts Plaintiff might wish to complain about were material. *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005) (dismissal affirmed; complaint failed to allege "the amount of any overstatements, . . . the complaint's general description of the pulling in [of revenues], without more, cannot satisfy the heightened falsity pleading standard").

[8] An additional reason why allegations of "illegal sales practices" do not render true financial reports misleading by omission is that the relationship between them is too attenuated. *See Plymouth Cty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-cv-871, 2019 U.S. Dist. LEXIS 124014, at *41 (D. Minn. July 25, 2019), *report and recommendation adopted by* 2019 U.S. Dist. LEXIS 154078 (D. Minn. Sept. 10, 2019) ("[I]llegal conduct does not establish a Rule 10b-5 violation unless made in conjunction with a misleading statement.").

*AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citations omitted).  There is no duty to disclose "a matter of opinion, predictions, or a belief as to the legality of the company's own actions" unless the company has "knowledge of wrongdoing."  *Kushner v. Beverly Enters.*, 317 F.3d 820, 831 (8th Cir. 2003).

The AC repeats the unproven allegations of others, but does not plead any facts demonstrating Defendants had *knowledge* of *actual wrongdoing*.  In its SEC filings, Tactile informed investors of the potential legal and regulatory risks it faces, including the lack of definitive regulatory guidance as to how the AKA applies to Tactile's trainer program (¶200); the FCA, and the relief the government might seek if Tactile were found to be non-compliant with federal laws (¶201); the operation of Tactile's trainer program (2019-10-K, at 4, 12, Ex. 35); the *qui tam* complaint and its allegations (*id*. 63); and the risk Tactile's employees or business partners might engage in illegal activity (*id*. 19). Tactile disclosed that if it were sued for illegal activity, and was unsuccessful in defending itself:

> those actions could have a significant impact on our business, including the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, possible exclusion from participation in Medicare, Medicaid and other federal healthcare programs, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

(*Id*. 37.)

Tactile's disclosures informed investors of everything they were entitled to know about the relevant legal and regulatory landscape.  *See, e.g., City of Pontiac*, 752 F.3d at 184 ("by disclosing its involvement in multiple legal proceedings and government

-22-

investigations" and indicating its exposure to financial and other risks, company "complied with its disclosure obligations"); *In re H & R Block Sec. Litig.*, 527 F. Supp. 2d 922, 929 (W.D. Mo. 2007) (absent "a clear allegation that the defendants knew of the scheme and its illegal nature at the time . . . there is nothing further to disclose"). Plaintiff's attempt to transform true statements about Tactile's financial performance into misleading statements therefore fails.

### (ii)    Statements about TAM.

The AC concedes Tactile defined and calculated TAM as estimated future diagnoses of U.S. lymphedema patients multiplied by the average cost of Tactile's products.  (¶58.) Tactile repeatedly disclosed TAM is an "estimate," and its "internal estimates are based in large part *on current trends* in diagnosing lymphedema and chronic venous insufficiency."  (*E.g.*, 2018-10-K, at 37, Ex. 22 (emphasis added).) Tactile warned its estimates "may prove to be incorrect," and "[i]f the actual number of patients who would benefit from our products and the total addressable market for our products is smaller than we have estimated, our future growth could be adversely impacted."  (*Id.*)  Although Defendants spoke about TAM as a "market opportunity" (*e.g.*, ¶¶179, 193), they did not make predictions about how much of that market Tactile would capture.

Plaintiff's theory of falsity treats TAM as the equivalent of a representation about actual or guaranteed diagnoses (as opposed to anticipated diagnoses based upon trends) and about Tactile's future revenues.  It isn't, and no reasonable investor would have understood it to be.  Moreover, the AC does not allege that the TAM estimate Defendants

-23-

stated publicly was different than the TAM estimate Tactile used internally.  Plaintiff should not be allowed to concoct falsity by mischaracterizing what Defendants said and meant.

### (iii)    Statements about lymphedema diagnoses.

The AC challenges the internal data analyses of medical claims Tactile had performed at year-ends 2018 and 2019, and that showed 1.1 million patients diagnosed with lymphedema in the 12-month period ending 6/30/18 and 1.3 million in the 12-month period ending 6/30/19.  Tactile reported those analyses in its 10-Ks, and Mattys referenced the 1.1 million in Tactile's 4Q2018 earnings call.  (¶¶159, 163, 199.)  Plaintiff doesn't allege Tactile had not performed those analyses and reached those conclusions, or that Tactile didn't honestly believe the numbers it reported.  Instead, Plaintiff's challenge is based upon the OSS report, which in turn relied upon—and misconstrued—the O'Donnell Study referenced at ¶¶62-65.  (Ex. 8.)  That was a study of data from a different time period (2012-2016) and it did not make claims regarding the incident rate of lymphedema in the "average U.S. population," which is the information OSS (and thus Plaintiff) seeks to draw from the study.  (¶¶62-64; *see* Ex. 8.)  Moreover, the study states "[i]t is well established" that lymphedema is "underdiagnosed."  (Ex. 8, 579.)  In short, the O'Donnell Study was apples-to-oranges with Tactile's 2018 and 2019 analyses, and does not contradict them.

The AC also challenges statements made by Defendants on 2/26/20 about a new clinical study (Ex. 9) suggesting "the prevalence of lymphedema due to CVI is approximately 16 million individuals in the United States."  (¶192; *also* ¶¶194, 206, 208.)

-24-

CVI-related lymphedema is an emerging diagnosis. (¶194.) Plaintiff suggests Defendants' statements overhyped the study because Tactile's estimate of prevalence was based upon "skin changes associated with CVI," not diagnoses of CVI. (¶76.) The study itself was published, so investors could evaluate it themselves. More importantly, during a conference call with analysts *on the same date* the study was announced, Mattys stated the 16-million estimate was based upon "prior literature estimating that 5% of the population has some skin changes associated with CVI." (¶194.) Because Defendants disclosed the exact information Plaintiff claims was needed, Plaintiff's challenge to Defendants' statements about the study fails.

### (iv) Mattys's statements that "we" do not "believe" the allegations in the *qui tam* lawsuit "have any merit."

These are opinions subject to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185-86, 189-90 (2015). Under *Omnicare*, statements of opinion or belief are actionable only if (1) they are not believed by the speaker, (2) they contain "embedded statements of fact," or (3) they omit material facts "about the speaker's basis for holding that view" that would likely "conflict with what a reasonable investor would take from the statement itself." *Id*. at 184-89.

The AC does not allege Mattys thought the *qui tam* suit had merit, or made an off-the-cuff statement without advice of counsel. Nor does it allege Mattys was privy to inside information—such as an internal investigation or audit—proving that the *qui tam* suit is in fact meritorious. There is nothing misleading about Mattys's routine—and wholly reasonable—denial of the merits of a lawsuit that Tactile is actively contesting.

-25-

*See, e.g.*, *Hall v. Johnson & Johnson*, No. 18-1833, 2019 U.S. Dist. LEXIS 221513, at

*68-69 (D.N.J. Dec. 27, 2019) (finding near-identical statements non-actionable, noting

the lack of specific facts "suggesting that Defendants knew they had no viable defenses

against the lawsuit"), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *Axar Master Fund, Ltd. v.*

*Bedford*, 308 F. Supp. 3d 743, 756–57 (S.D.N.Y. 2018) (same).

### 3.    Item 303 Did Not Mandate Additional Disclosures.

Plaintiff improperly attempts to use Item 303 to create a broad-based duty to

disclose "the Company's illegal sales practices put at risk a material portion of the

Company's reported revenue."  (¶124.)  Item 303 is the SEC regulation requiring

companies to discuss "known trends or uncertainties" that are "reasonably likely to have

a material favorable or unfavorable impact on net sales or revenues or income from

continuing operations" in the MD&A section of quarterly and annual reports.  17 C.F.R.

§229.303(b)(2)(ii).

Item 303 is inapplicable[9] because, as explained *infra* at 27-30, the AC does not

show Tactile's management "knew" of *any* "illegal sales practices," much less a "trend"

of illegal conduct.  *See, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Conagra*

*Brands, Inc.*, 495 F. Supp. 3d 622, 647 (N.D. Ill. 2020) (rejecting Item 303 claim;

plaintiffs failed to "adequately allege" any underlying illegal behavior or facts

---

[9] Item 303 is also inapplicable because, as explained in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055–56 (9th Cir. 2014), and *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000), a plaintiff cannot enforce an Item 303 violation through Rule 10b-5.  But because Plaintiff's argument plainly fails on the merits, the Court need not reach this alternative ground.  *See, e.g.*, *In re Target Corp.*, 275 F. Supp. 3d at 1081 (noting there exists a circuit split on this issue, but ultimately choosing to reject Item 303 claim on the merits).

"show[ing] a 'known' trend or uncertainty from Defendants' point of view with respect to [the at-issue product's] pricing, margins, volume, or promotional practices") (citation omitted).  Nor does the AC plead facts indicating Tactile's management thought its sales practices supposedly would put Tactile's revenues at risk or that Tactile's revenues have been adversely affected.  Tactile's revenues from government-payors actually increased after the *qui tam's* filing.  (¶33.)  Even in retrospect, there was no materially significant "trend" or "uncertainty" for Tactile to disclose.

### 4.    The AC Does Not Plead A Strong Inference Of Scienter.

Scienter "requires a showing of reckless or intentional wrongdoing."  *Elam*, 544 F.3d at 928 (citation and quotation omitted).  To meet the PSLRA's scienter-pleading requirement, the AC must contain *sufficient specific* facts to give rise to a "strong" inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.*  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

Further, Plaintiff must "raise a strong inference of scienter for each defendant and with respect to each alleged misrepresentation."  *Horizon Asset Mgmt.*, 580 F.3d at 761. In this Circuit, Plaintiff may not mix-and-match the statements of one Defendant, with the knowledge or motive of a different Defendant, in an attempt to state a viable claim. *See In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009), *aff'd sub nom.*, *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010).

-27-

Plaintiff attempts to plead scienter by combining unsupported allegations of knowledge with motive allegations, mixing-and-matching Defendants, and throwing in canned allegations about core operations, SOX certifications, and executive departures. None of them, either collectively or individually, gives rise to a cogent and compelling inference of scienter as to any Defendant.

### a.    Plaintiff's generalized allegations of knowledge do not show scienter.

To create a strong inference of scienter from allegations of knowledge, the AC must sufficiently allege (1) Defendants knew specific facts suggesting their public statements were inaccurate when made, *see Kushner*, 317 F.3d at 827-28, and (2) Defendants knew or were reckless in not knowing their failure to disclose those facts "present[ed] a danger of misleading buyers or sellers." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011) (citation omitted). Where "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *In re NVE Corp.*, 551 F. Supp. 2d at 886-87 (citation and quotation omitted). Plaintiff's generalized allegations that Defendants knew of illegal but undisclosed conduct fail on every level.

As an initial matter, because Plaintiff has not sufficiently alleged any illegal conduct, it also has not alleged any Defendant's knowledge thereof. *See, e.g.*, *Schaffer v. Horizon Pharma PLC*, 16-CV-1763, 2018 U.S. Dist. LEXIS 8114, at *43 (S.D.N.Y. Jan. 18, 2018) (dismissing suit where plaintiffs "fail[ed] to plausibly allege the existence of any such kickbacks, much less knowledge of such kickbacks by Horizon's senior management").

-28-

Beyond that, the AC lacks facts showing any Defendant had actual knowledge of illegal conduct. *See Menora Mivtachim Ins. Ltd.*, 2021 U.S. Dist. LEXIS 61182, at *63. The AC's paragraphs describing the supposed "kickbacks" do not allege any Defendant was aware of improper payments to physicians, or that Tactile's training program was supposedly illegal. (¶¶5, 35-44, 47-48, 130-31.)[10] No Defendants are referenced in the AC's paragraphs regarding the alleged submission of false Medicare or VA claims. (¶¶50-56.) With respect to the TAM issue, no Defendant is alleged to have been aware of what Plaintiff claims are the "true" facts regarding TAM. (¶¶58-78, 192, 194-95, 203, 206-209.)[11] Nor is any Defendant even mentioned in the paragraphs concerning RAC audits. (¶¶120,129.)

Plaintiff tries to overcome this defect by alleging some Defendants set sales strategy, quotas, bonuses, and other compensation for sales management and representatives, and closely tracked Flexitouch sales. (¶¶251-66.)[12] The same could be said of thousands of businesses and their management. Plaintiff nonetheless wants the

---

[10] The only Defendant referenced in these allegations is Rishe, who allegedly presented slides at Tactile's 2018 National Sales Meeting regarding the "KOL Speakers Program," a slide stating "What Ya'll are doing in the VA Channel is nothing short of spectacular," and a slide stating "hold back on VA for now—until we can get on the FSS [Federal Supply Schedule]." (¶¶37, 42, 47.) He isn't alleged to have had knowledge of any kickback payments.

[11] Plaintiff alleges Mattys commented on the prevalence of phlebolymphedema, but not that he was aware of facts suggesting what he said was false (because it wasn't). (*E.g.*, ¶74.)

[12] These allegations are made only as to Mattys, Blake, Folkes, Rishe, and in minor part, Moen, but not as to Burke, Nigon, or Roche.

Court to infer from these unremarkable facts that Defendants "reward[ed] aggressive and even illegal sales tactics," and "knew or were reckless in not knowing that their revenues were misstated and based on illegal sales practices." (¶¶257, 264, 266.) That's both too broad a leap and an unwarranted one.

Plaintiff does not allege with particularity that *any* Defendant—much less *each* Defendant—believed (or possessed contemporaneous information suggesting) Tactile's sales practices were illegal, or Tactile financial information was inaccurate, or any of Tactile's SEC filings or public statements might mislead investors. Without such allegations, Plaintiff has not pleaded scienter based on knowledge of contrary facts. *See, e.g.*, *Kushner*, 317 F.3d at 829 (affirming dismissal where "[n]oticeably lacking is any assertion that the defendants knew that the budgeted Medicare hours were being met fraudulently"); *Detroit Gen. Ret. Sys.*, 621 F.3d at 808 (affirming dismissal where plaintiff "has not alleged facts to support the inference that any particular individual" was aware of information plaintiff claims should have been disclosed); *Rumbaugh v. USANA Health Scis., Inc.*, No. 2:17-CV-106, 2018 U.S. Dist. LEXIS 179352, at *23-24 (D. Utah Oct. 16, 2018) (access to sales reports insufficient to support scienter where no allegation they revealed "improper conduct in China").

### b.   Plaintiff's allegations of motive do not show scienter.

Plaintiff alleges the individual Defendants had various motives to commit fraud: (1) for management (Mattys, Moen, Blake, Folkes, and Rishe), to earn incentive compensation (¶¶245–50); and (2) for all except Moen, to profit from personal stock sales (¶¶220–44). But motive allegations are supportive of scienter only if the pleaded facts

-30-

reveal something more than generic motives generally possessed by all corporate officers and directors. The AC lacks such facts.

### (i)   Incentive compensation allegations.

"[M]erely pleading that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings." *Horizon Asset Mgmt.*, 580 F.3d at 766 (citation omitted). Rather, a plaintiff "must show that the benefit to an individual defendant is *unusual*, for example, that the benefit is of an *overwhelming* magnitude and received under *suspicious* circumstances." *Id.* (emphases added).

The AC acknowledges the individual Defendants' bonuses, which ranged between $78,406 and $728,471, were paid on an annual basis, per a pre-set schedule, and approved by Tactile's Compensation Committee. (¶¶245-47, 249.) There was nothing "overwhelming" or "suspicious" about them. *See, e.g.*, *Horizon Asset Mgmt.*, 580 F.3d at 766 ($258,000 in "short-term incentive" bonus payments did not show scienter, in part because "no allegations of suspicious timing"); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) (same, aggregate bonus of approximately $1 million); *Kushner*, 317 F.3d at 830 (same, defendant received an individual bonus of $630,000 (in 1997 dollars) under a "performance plan").

### (ii)   Stock sales allegations.

All corporate executives can be expected to sell stock. *McCall v. Scott*, 239 F.3d 808, 825, *amended in part by* 250 F.3d 997 (6th Cir. 2001); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("[m]anagers sell stock all the time"). As a result,

-31-

"[i]nsider stock sales are not inherently suspicious." *In re Navarre*, 299 F.3d at 747.

Rather, such sales become suspicious *only if* "the level of trading is *dramatically* out of

line with prior trading practices *at times calculated* to maximize the personal benefit from

undisclosed inside information." *In re Target Corp.*, 955 F.3d at 743 (emphasis added)

(finding insider sales not probative of scienter); *In re Navarre*, 299 F.3d at 747 (same).

The AC lists stock sales made by the individual Defendants during the Class

Period (¶¶220–44), but fails to plead the kinds of specific facts needed to show those

sales were suspicious or unusual for at least five reasons.

*First*, almost all of the stock sales were made pursuant to 10b5-1 trading plans.

Such plans allow a corporate insider to "lay out the dates at which trades will be made in

advance and give up control of the trades to a broker," *Elam*, 544 F.3d at 928 n.3, and are

specifically permitted by regulation, 17 C.F.R. §240.10b5-1(c)(1)(i).[13]  Sales made

pursuant to 10b5-1 plans are "not suspicious" for scienter purposes.[14]  *Elam*, 544 F.3d at

928; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11

(9th Cir. 2008) ("Sales according to pre-determined plans may rebut an inference of

---

[13] Of the 180 sales alleged in the AC, only 19 were *not* made pursuant to 10b5-1 plans: one for Blake; four for Folkes; two for Burke; five for Nigon; and seven for Roche. (¶¶230, 233, 239, 241, 243.)  Plaintiff alleges nothing specifically suspicious about any of these off-plan sales.

[14] The AC suggests it is improper to change 10b5-1 plans, or to sell pursuant to multiple 10b5-1 plans.  (¶¶227, 233, 236, 239.)  These suggestions don't deserve weight without specific facts suggesting a defendant entered into a new plan at a suspicious time, which facts are lacking here.  *See, e.g.*, *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 524 (D. Mass. 2014) (individual defendant entered into five plans over course of 33-month class period; no plausible scienter inference), *aff'd sub nom.*, *Fire & Police Pension Ass'n of Colo. v. Abiomed*, 778 F.3d 228 (1st Cir. 2015).

-32-

scienter.") (citation omitted); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("It is well established that 'trades under 10b5-1 plans do not raise a strong inference of scienter.'") (citation omitted).

*Second*, the length of the Class Period —25 months—undermines any adverse inference because it would be common for insiders to sell some stock over such a lengthy period, and because it is implausible to think Defendants possessed material nonpublic information on each trading day during that lengthy period.  It follows that "[c]ourts have regularly concluded that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year." *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 120 (3d Cir. 2018).

*Third*, the mere fact that the individual Defendants *earned more* from Class Period sales than pre-Class Period sales (¶¶222, 229, 232, 238) does not mean those sales are suspect. *In re Target Corp.*, 955 F.3d at 743.  "[P]roceeds alone are insufficient to demonstrate unusual or suspicious trading activity." *Woolgar v. Kingstone Co.*, 477 F. Supp. 3d 193, 236 (S.D.N.Y. 2020).  The individual Defendants helmed a new and growing public company whose stock price rose over time (*see* Stock Chart, Ex. 5), and so naturally made more money from stock sales over time. *See In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 348 (D. Mass. 2020) (it is "perfectly natural for [insiders] to sell their stock as share price increase[s]; that they did so is not, on its own, material evidence of scienter").  Moreover, although the individual Defendants sold *somewhat* more often during the Class Period than before, they also made sales before and after the Class Period.  There isn't anything dramatic about those variations one way or the other.

-33-

(*E.g.*, Stock Sales Chart, at 4-6, Ex. 6 (showing Folkes sold stock 27 times in the 15 months pre-Class Period, and 62 times in the 25-month Class Period, which are roughly equivalent rates).)

*Fourth*, Plaintiff is wrong to suggest the individual Defendants sold off "large proportions of" their stock during the Class Period. (¶220.) As their Form 4s show, they were mostly selling *new* stock options as those options vested. (*See generally* Stock Sales Chart, Ex. 6.) Most of them ended the Class Period still holding significant amounts of Tactile stock.[15] (*Id.*) "It defies reason" that an insider "looking to profit on a fraudulently inflated stock price" would engage in such behavior. *Glaser*, 772 F. Supp. 2d at 593; *see also Metzler*, 540 F.3d at 1067 (no inference of scienter where defendants simply, and "regularly," "sold as their options vested"). Mattys, Tactile's CEO and spokesperson, *held more* Tactile stock at the end of the Class Period than he did at the beginning. (Stock Sales Chart, at 2, Ex. 6.) This cannot be squared with an inference of scienter. *See Shoemaker*, 300 F. Supp. 3d at 1054 n.7 (no inference of scienter where defendants "actual[ly] substantially increased their holdings [of company stock] during the Class Period").

---

[15] Outside directors Nigon and Roche, among others, ended up holding somewhat fewer Tactile shares at the end of the Class Period. (Stock Sales Chart, at 11-12, Ex. 6.) As outside directors, they were distanced from Tactile's day-to-day operations. The AC does not plead any specific material nonpublic information either of them knew at the time of their sales, *see infra* at 42, nor does it show their Class Period sales "coincide[d] with false or misleading statements." *In re Navarre*, 299 F.3d at 747–48 (even selling 100% of stock holdings in two days was not suspicious absent more facts).

*Finally*, on the rare occasion the AC highlights a particular sale, it still fails to show the sale was suspicious.

· Allegation that Mattys's 2/14/19 and 2/15/19 sales were "unusually timed" because they occurred after Tactile had been served with the *qui tam* complaint but before the complaint had been unsealed. (¶225.) Those sales are not suspicious because, the AC concedes (¶227), they were made pursuant to a 10b5-1 plan Mattys entered into on 12/12/18—*two months before* the *qui tam* complaint was served. (*See also* 2/9/19 Form 4, Ex. 7.)

· Allegation that Blake made her largest stock sale on 8/16/18 outside her 10b5-1 plan. (¶230.) Blake was retiring (*id.*), and it is "normal and expected" for an insider to sell stock upon their retirement. *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013).

· Allegation that Roche sometimes sold stock a few days after earnings announcements. (¶243.) Not only is the timing unsuspicious, it is precisely what the law requires insiders to do: wait until a company's most recent results, whether good or bad, have been made public before trading in the company's securities.

At bottom, the AC fails to do what the Eighth Circuit requires: show that insiders sold substantial amounts of stock "at times calculated to maximize the personal benefit from undisclosed inside information." *In re Target Corp.*, 955 F.3d at 743 (citation omitted). If anything, the AC's charts show the opposite: sales when Tactile's stock price was higher, when it was lower, and when it was mid-priced, without any obvious

-35-

coordination among the insiders. None of the AC's stock sale allegations support an inference of scienter.

### c.      None of Plaintiff's other allegations shows scienter.

**Core operations:** Plaintiff's allegation that "the Company's kickback and false claims schemes" were critical to Tactile's success (¶267), and therefore knowledge of such schemes should be "imputed to the Individual Defendants" (¶270), adds nothing to the scienter analysis. This is a weak variant of the "core operations" presumption the Eighth Circuit has declined to adopt. *Elam*, 544 F.3d at 929. Moreover, that Court has observed the theory would still require allegations of specific contrary facts that were well known within Tactile at the time of the misstatements, which Plaintiff has not pleaded here with particularity. *Id.* at 929-30.

**SOX certifications:** Bald assertions that SOX certifications were false—which is all the AC offers (¶¶137, 273)—do not contribute to an inference of scienter. *See, e.g.*, *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008); *Horizon Asset Mgmt.*, 580 F.3d at 766. Moreover, SOX certifications attest to the accuracy of Tactile's reported financial statements, but the AC lacks facts showing Tactile's reported numbers were false. There was thus no good faith basis to include allegations of false SOX certifications in the AC.

**Executive departures:** Executive turnover is not uncommon. Hence, executive departures are unsuspicious absent particularized facts that a departure is related to the alleged fraud.

> Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons.

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (resignations in the wake of accounting restatements suggested departures due to the restatements, not fraud); *see also Ceridian*, 542 F.3d at 248-49 (stronger inference was officers were fired for incompetence, not fraud).

The AC alleges Mattys, Folkes, and Blake left Tactile for a variety of unrelated reasons (retirement for Mattys, position elimination for Folkes, and personal reasons for Blake) on widely-separated dates. (¶¶274-76.) It lacks any facts tying their departures to any wrongdoing, much less to an alleged fraud. Thus, the AC's allegations about executive departures should be ignored in evaluating scienter.

### d. An inference of non-culpable intent is more compelling.

Plaintiff would have the Court believe that for the last three-plus years, Tactile has been engaging in illegal sales practices that, for some inexplicable reason, have not led to investigations or enforcement actions by regulators, accounting restatements, or a drop-off in revenues. According to Plaintiff, only those self-interested in harming Tactile—the competitor who filed the *qui tam* lawsuit and an anonymous short seller—have discerned the truth. This is an implausible theory.

An inference of non-culpable intent is far more compelling. A competitor filed a *qui tam* lawsuit to damage Tactile and gain market share, and a short-seller sought to

-37-

profit by amplifying the *qui tam* allegations.  Defendants believe the allegations lack

merit; Tactile is vigorously defending the *qui tam* suit, as it is entitled to do.  At the same

time, Tactile has been candid with investors that its business is subject to a complex

regulatory scheme, and the regulations governing sales practices are subject to

interpretation.  (*E.g.*, 2018-10-K, at 17-25, Ex. 22.)  Tactile has repeatedly warned

investors that although it seeks to comply with the law, there are risks its understanding

of allowable conduct could be in error, or that its employees and business partners might

engage in illegal conduct, either of which could have significant adverse consequences

for Tactile.  (*Id*. 22.)  These cautionary disclosures undercut any inference of scienter.

*See Minneapolis Firefighters' Relief Ass'n*, 641 F.3d at 1030; *Horizon Asset Mgmt.*, 580

F.3d at 764 ("continued disclosures" of control problems weakened inference of

scienter); *In re Apogee Enters.*, 2020 U.S. Dist. LEXIS 51706, at *40.

**B.      Count II For Scheme Liability Fails.**

The elements of a claim for scheme liability are "that the defendant (1) committed

a deceptive or manipulative act, (2) with scienter, (3) that the act affected the market for

securities or was otherwise in connection with [plaintiffs'] purchase or sale, and (4) that

the defendants' actions caused the plaintiffs' injuries."  *W. Va. Pipe Trades Health &*

*Welfare Fund v. Medtronic, Inc.*, 299 F. Supp. 3d 1055, 1062 (D. Minn. 2018) (citation

omitted).

The PSLRA's scienter pleading requirement applies to a "scheme" liability claim,

*In re Overstock Sec. Litig.*, No. 2:19-CV-709, 2020 U. S. Dist. LEXIS 179388, at *38-39

(D. Utah Sept. 28, 2020), as does Rule 9(b).  Rule 9(b) requires Plaintiff to "specify, with

particularity, *what* manipulative acts were performed, *which* defendants performed them, *when* the manipulative acts were performed, and *what* effect the scheme had on the securities at issue." *Pub. Pension Fund Grp. v. KV Pharm. Co*., 679 F.3d 972, 986 (8th Cir. 2012) (emphases added).

The AC does not contain any factual allegations unique to Count II, but simply recharacterizes its allegations of "illegal sales practices" as having occurred pursuant to a "scheme" in which each Defendant was a "primary participant", the purpose of which was to boost Tactile's revenues and stock price so that insiders could sell stock at "artificially inflated prices." (¶294.) This "group pleading" approach is too conclusory to satisfy Rule 9(b). *See KV Pharm.*, 679 F.3d at 986-87 (affirming dismissal where plaintiff failed to "allege what specific manipulative acts either [defendant] performed, or when the manipulative acts were performed"); *Quintero Cmty. Ass'n Inc. v. FDIC*, 792 F.3d 1002, 1010 (8th Cir. 2015) ("shotgun-style allegations of wrongdoing by all the Director Defendants 'generally, in a group pleading fashion . . . do[es] not satisfy Rule 9(b)'") (citation omitted). And even if one could simply bootstrap statement-liability

-39-

claims into a scheme-liability claim by adding the word "scheme,"[16] Count II would fail

for the same reasons as Count I fails: there are no actionable statements (or any other

"manipulative act"), and no scienter.

## II.    THE AC FAILS TO STATE A CLAIM UNDER SECTION 20(a).

Count III for controlling person liability under Section 20(a) of the 1934 Act, 15

U.S.C. §78t(a), requires that there be an underlying violation of Section 10(b).  Because

Plaintiff has not properly pleaded a Section 10(b) claim, its Section 20(a) claim must be

dismissed, too.  *Hutchinson Tech.*, 536 F.3d at 961.

Count III also fails as against Folkes, Rishe, Burke, Nigon, and Roche for lack of

sufficient relevant facts.  To state a controlling person claim, Plaintiff must plead the

individual (1) "actually exercised control over the general operations of the primary

violator" (here, Tactile), *and* (2) possessed "the power to determine the specific acts or

omissions upon which the underlying violation is predicated" (here, "illegal sales

practices" and public statements).  *Lusk v. Life Time Fitness, Inc.*, 213 F. Supp. 3d 1119,

1133 (D. Minn. 2016) (quoting *Lustgraaf v. Behrens*, 619 F.3d 867, 873-74 (8th Cir.

---

[16] Under current Eighth Circuit law, "a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)." *KV Pharm.*, 679 F.3d at 987.  Following the Supreme Court's recent decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)—which held that a person who knowingly disseminates false information prepared by others can be sued for scheme liability—some federal courts have concluded that scheme liability can be based upon the same or similar conduct as statement liability.  The Court need not reach the issue because Plaintiff's claim fails regardless.  *See In re Teva Sec. Litig.*, No. 3:17-cv-558 *et al.*, 2021 U.S. Dist. LEXIS 60195, at *22-24 (D. Conn. Mar. 30, 2021) (rejecting scheme-liability claim, even accepting for the sake of argument a broad interpretation of *Lorenzo*).

2010)) (emphasis added).  Plaintiff has pleaded Count III conclusorily and indiscriminately.[17]

The AC lacks facts showing that Folkes or Rishe, who were Tactile's COO and SVP- Sales respectively, had control over the general operations of Tactile.  Although CEOs and CFOs[18] are generally viewed as having broad corporate authority, other officers are not, and absent particularized facts showing such authority, they properly are dismissed from controlling person claims.  *See, e.g.*, *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d at 1101-1102 (dismissing conclusory Section 20(a) claim against vice president).

The controlling person claims against Burke, Nigon, and Roche, who were outside directors, should be dismissed for a different reason: the AC lacks facts showing they had the power to determine the specific acts or omissions on which Tactile's alleged liability is premised.  Outside directors are not usually responsible for a company's day-to-day business operations.  So where, as here, Plaintiff seeks to hold them liable as controlling persons over sales practices and management's public statements, Plaintiff must plead sufficient facts to show such matters rose to board-level authority and attention.  Absent

---

[17] For example, Plaintiff pleads both that all individual Defendants are "controlling persons" of Tactile (¶296), *and* that Tactile is the "controlling person" of them (¶298).

[18] Blake resigned as Tactile's CFO on 9/1/18.  (¶15.)  Thus, any claims premised upon statements or conduct after that date must be dismissed as to her.  *See In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1101 (D. Minn. 1998) (dismissing CFO from liability for post-resignation events).  Similarly, any claims against Moen premised upon statements or conduct that pre-date his becoming CFO on 9/2/18 must be dismissed as to him.

such facts, the AC doesn't contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).

## III.   THE AC FAILS TO STATE A CLAIM UNDER SECTION 20A.

Section 20A of the 1934 Act provides that those who sell a security "while in possession of material, nonpublic information," "shall be liable" to any person who "contemporaneously" purchased securities of that same class.  15 U.S.C. §78t-1(a).  Relying upon the same stock sale allegations underlying the Section 10(b) claims, Count IV alleges a Section 20A claim against Mattys, Blake, Folkes, Rishe, Burke, Nigon, and Roche.  (¶¶300–11.)

A predicate Section 10(b) violation is needed to have a Section 20A claim.  *See, e.g.*, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014).  Because Plaintiff has not adequately pleaded a Section 10(b) claim, its Section 20A claim fails as well.  *See In re K-tel Int'l, Inc., Sec. Litig.*, 107 F. Supp. 2d 994, 1005 (D. Minn. 2000), *aff'd*, 300 F.3d 881 (8th Cir. 2002).

Plaintiff's Section 20A claim also fails for lack of facts.  The AC identifies stock sales made by the Count IV Defendants on many dates during the Class Period, but it doesn't identify what material nonpublic information each of them supposedly possessed as of the date of each sale that would have made that sale improper.  Lumping all the Count IV Defendants in generalized allegations does not suffice to state a plausible claim, because they held different positions; each would have known different kinds of information, and that information would have varied over time.

-42-

Equally important, Plaintiff fails to meet the contemporaneous trading requirement of Section 20A.  For a trade to be "contemporaneous" in an efficient market (as Plaintiff alleges here, ¶278(c)), Plaintiff must have purchased Tactile stock on the *same day* the targeted Defendant sold stock, and *after* the insider's sale.  *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec. Derivative and "ERISA" Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007); *In re Emerson Radio Corp. Sec. Litig.*, No. 03-4201, 2005 U.S. Dist. LEXIS 49811, at *57-58 (D.N.J. Dec. 20, 2005); *cf. McDonald*, 805 F. Supp. 2d at 740-41 (Section 20A claim only available to those on the other side of the improper sale).

The AC makes the inadequate allegation that Defendants sold "contemporaneously with members of the Class, including Lead Plaintiff, who purchased Tactile shares on December 10, 2019."  (¶301.)  However, it "is insufficient that some class members traded contemporaneously as the lead plaintiff may not represent class members on claims it does not share."  *Middlesex Retirement Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 U.S. Dist. LEXIS 68419, at *38-39 (C.D. Cal. July 10, 2008); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1529-30 (8th Cir. 1996) (class representative must "suffer the same injury" as other class members) (citation omitted).

The only Count IV Defendant who sold Tactile stock into the market on Plaintiff's purchase date was Rishe, who sold 4,813 shares (¶234) pursuant to a Rule 10b5-1 plan Rishe had entered into several weeks earlier, on 11/21/19 (¶236).  Plaintiff asserts the plan "was adopted while Rishe was in possession of material, nonpublic information concerning Tactile's fraudulent course of conduct" (*id.*), but absent specific facts

-43-

-44-

identifying such information and putting it in Rishe's possession at the relevant times (11/21/19 and 12/10/19), the allegation is too conclusory to satisfy any pleading standard.

Accordingly, the Section 20A claim should be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' motion and dismiss the Amended Complaint with prejudice.

Date:  June 18, 2021.

**FAEGRE DRINKER BIDDLE & REATH LLP**

 */s/ Wendy J. Wildung*
Wendy J. Wildung (#117055)
Matthew Kilby (#0335083)
Anderson C. Tuggle (#0400277)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000
wendy.wildung@faegredrinker.com
matthew.kilby@faegredrinker.com
anderson.tuggle@faegredrinker.com

*Attorneys for Defendants*