# EXHIBIT 18

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-Q

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2018

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission file number: **001-37799**

# Tactile Systems Technology, Inc.

(Exact Name of Registrant as Specified in Its Charter)

| **Delaware** | | **41-1801204** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | | (I.R.S. Employer Identification Number) |

**1331 Tyler Street NE, Suite 200**
**Minneapolis, Minnesota 55413**

(Address and Zip Code of Principal Executive Offices)

**(612) 355-5100**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☒ |
|---|---|---|---|---|
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of November 1, 2018 there were 18,472,551 shares of common stock, $0.001 par value per share, outstanding.

Table of Contents

**TABLE OF CONTENTS**

**PART I—FINANCIAL INFORMATION**

| | | |
|---|---|---|
| Item 1. | Condensed Consolidated Financial Statements (unaudited) | 3 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4. | Controls and Procedures | 30 |

**PART II—OTHER INFORMATION**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 31 |
| Item 1A. | Risk Factors | 31 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 35 |
| Item 3. | Defaults Upon Senior Securities | 35 |
| Item 4. | Mine Safety Disclosures | 35 |
| Item 5. | Other Information | 35 |
| Item 6. | Exhibits | 37 |

1

**Forward-Looking Information**

All statements, other than statements of historical facts, contained in this Quarterly Report on Form 10-Q, including statements regarding our business, operations and financial performance and condition, as well as our plans, objectives and expectations for our business, operations and financial performance and condition, are forward-looking statements. In some cases, you can identify forward-looking statements by the following words: "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "target," "ongoing," "plan," "potential," "predict," "project," "should," "will," "would," or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these words. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our results, levels of activity, performance or achievements to be materially different from the information expressed or implied by the forward-looking statements in this Quarterly Report on Form 10-Q. Forward-looking statements may include, among other things, statements relating to:

· our expectations regarding the potential market size and widespread adoption of our products;

· our ability to increase awareness of lymphedema and chronic venous insufficiency and to demonstrate the clinical and economic benefits of our solutions to clinicians and patients;

· developments and projections relating to our competitors or our industry;

· the expected growth in our business and our organization, including outside of the United States;

· our ability to achieve and maintain adequate levels of coverage or reimbursement for our products and the effect of changes to the level of Medicare coverage;

· our financial performance, our estimates of our expenses, future revenues, capital requirements and our needs for, or ability to obtain, additional financing;

· our ability to retain and recruit key personnel, including the continued development and expansion of our sales and marketing organization;

· our ability to obtain an adequate supply of components for our products from our third-party suppliers;

· our ability to obtain and maintain intellectual property protection for our products or avoid claims of infringement;

· our ability to identify and develop new products;

· our compliance with extensive government regulation;

· the effects of current U.S. and foreign trade policy and tariff actions; and

· the volatility of our stock price.

You should read the matters described in "Risk Factors" and the other cautionary statements made in our Annual Report on Form 10-K for the year ended December 31, 2017 and in this Quarterly Report on Form 10-Q. We cannot assure you that the forward-looking statements in this report will prove to be accurate and therefore you are encouraged not to place undue reliance on forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. You are urged to carefully review and consider the various disclosures made by us in this report and in other filings with the Securities and Exchange Commission (the "SEC") that advise of the risks and factors that may affect our business. Other than as required by law, we undertake no obligation to update or revise these forward-looking statements, even though our situation may change in the future. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments that we may make.

**PART I—FINANCIAL INFORMATION**

**Item 1.  Financial Statements**

**Tactile Systems Technology, Inc.**
**Condensed Consolidated Balance Sheets**
**(Unaudited)**

| (In thousands, except share and per share data) | | September 30, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| *Assets* | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 23,136 | $ | 23,968 |
| Marketable securities | | 22,800 | | 19,944 |
| Accounts receivable, net | | 20,179 | | 17,623 |
| Inventories | | 14,919 | | 11,040 |
| Income taxes receivable | | 5,798 | | 2,119 |
| Prepaid expenses and other current assets | | 2,370 | | 2,178 |
| Total current assets | | 89,202 | | 76,872 |
| Property and equipment, net | | 4,063 | | 3,776 |
| **Other assets** | | | | |
| Intangible assets, net | | 3,035 | | 2,218 |
| Medicare accounts receivable, long-term | | 1,011 | | 2,718 |
| Deferred income taxes | | 4,057 | | 2,662 |
| Other non-current assets | | 367 | | 201 |
| Total other assets | | 8,470 | | 7,799 |
| **Total assets** | $ | 101,735 | $ | 88,447 |
| | | | | |
| *Liabilities and Stockholders' Equity* | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 3,929 | $ | 4,253 |
| Accrued payroll and related taxes | | 8,292 | | 6,706 |
| Accrued expenses | | 2,290 | | 2,598 |
| Future product royalties | | 6 | | 17 |
| Income taxes | | 1,801 | | 212 |
| Other current liabilities | | 439 | | 733 |
| Total current liabilities | | 16,757 | | 14,519 |
| **Long-term liabilities** | | | | |
| Accrued warranty reserve, long-term | | 1,560 | | 1,141 |
| Total liabilities | | 18,317 | | 15,660 |
| | | | | |
| **Commitments and Contingencies** (see Note 9) | | | | |
| | | | | |
| **Stockholders' equity** | | | | |
| Preferred stock, $0.001 par value, 50,000,000 shares authorized; none issued and outstanding as of September 30, 2018 and December 31, 2017 | | — | | — |
| Common stock, $0.001 par value, 300,000,000 shares authorized; 18,415,699 shares issued and outstanding as of September 30, 2018; 17,872,465 shares issued and 17,846,379 shares outstanding as of December 31, 2017 | | 18 | | 18 |
| Additional paid-in capital | | 76,081 | | 70,224 |
| Retained earnings | | 7,350 | | 3,082 |
| Accumulated other comprehensive loss | | (31) | | (44) |
| Less: treasury stock, at cost — none as of September 30, 2018 and 26,086 shares as of December 31, 2017 | | — | | (493) |
| Total stockholders' equity | | 83,418 | | 72,787 |
| **Total liabilities and stockholders' equity** | $ | 101,735 | $ | 88,447 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

3

**Tactile Systems Technology, Inc.**
**Condensed Consolidated Statements of Operations**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (In thousands, except share and per share data) | 2018 | 2017 | 2018 | 2017 |
| Revenues, net | $ 36,322 | $ 28,283 | $ 97,303 | $ 74,397 |
| **Cost of goods sold** | 10,141 | 7,528 | 27,060 | 20,186 |
| Gross profit | 26,181 | 20,755 | 70,243 | 54,211 |
| **Operating expenses** | | | | |
| Sales and marketing | 15,632 | 10,915 | 42,641 | 31,726 |
| Research and development | 1,223 | 1,116 | 3,949 | 3,699 |
| Reimbursement, general and administrative | 7,956 | 7,551 | 22,799 | 19,815 |
| Total operating expenses | 24,811 | 19,582 | 69,389 | 55,240 |
| Income (loss) from operations | 1,370 | 1,173 | 854 | (1,029) |
| **Other income** | 128 | 85 | 351 | 204 |
| Income (loss) before income taxes | 1,498 | 1,258 | 1,205 | (825) |
| **Income tax benefit** | (248) | (84) | (3,063) | (4,450) |
| **Net income** | $ 1,746 | $ 1,342 | $ 4,268 | $ 3,625 |
| **Net income per common share** | | | | |
| Basic | $ 0.10 | $ 0.08 | $ 0.23 | $ 0.21 |
| Diluted | $ 0.09 | $ 0.07 | $ 0.22 | $ 0.19 |
| **Weighted-average common shares used to compute net income per common share** | | | | |
| Basic | 18,344,956 | 17,603,293 | 18,166,999 | 17,222,072 |
| Diluted | 19,525,686 | 19,083,975 | 19,328,947 | 18,818,609 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**Tactile Systems Technology, Inc.**
**Condensed Consolidated Statements of Comprehensive Income**
**(Unaudited)**

| (In thousands) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Net income | $ 1,746 | $ 1,342 | $ 4,268 | $ 3,625 |
| Other comprehensive income (loss): | | | | |
| Unrealized gain (loss) on marketable securities | 10 | 3 | 29 | (18) |
| Income tax related to items of other comprehensive income (loss) | (3) | (1) | (16) | 11 |
| Total other comprehensive income (loss) | 7 | 2 | 13 | (7) |
| Comprehensive income | $ 1,753 | $ 1,344 | $ 4,281 | $ 3,618 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

5

**Tactile Systems Technology, Inc.**
**Condensed Consolidated Statements of Stockholders' Equity**
**(Unaudited)**

| (In thousands, except share data) | Common Stock Shares | Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | Treasury Stock | Total |
|---|---|---|---|---|---|---|---|
| **Balances, December 31, 2016** | 16,833,737 | $ 17 | $ 62,406 | $ (2,773) | $ (11) | $ — | $ 59,639 |
| Stock-based compensation | — | — | 3,104 | — | — | — | 3,104 |
| Exercise of common stock options and warrants and vesting of restricted stock units | 583,360 | 1 | 672 | — | — | — | 673 |
| Taxes paid for net share settlement of restricted stock units | — | — | (278) | — | — | — | (278) |
| Common shares issued for employee stock purchase plan | 259,981 | — | 2,210 | — | — | — | 2,210 |
| Shares repurchased to cover taxes from restricted stock award vesting | (26,086) | — | — | — | — | (493) | (493) |
| Comprehensive income for the period | — | — | — | 3,625 | (7) | — | 3,618 |
| **Balances, September 30, 2017** | 17,650,992 | $ 18 | $ 68,114 | $ 852 | $ (18) | $ (493) | $ 68,473 |
| | | | | | | | |
| **Balances, December 31, 2017** | 17,846,379 | 18 | 70,224 | 3,082 | (44) | (493) | 72,787 |
| Stock-based compensation | — | — | 5,638 | — | — | — | 5,638 |
| Exercise of common stock options and vesting of restricted stock units | 479,656 | — | 1,218 | — | — | — | 1,218 |
| Taxes paid for net share settlement of restricted stock units | — | — | (1,922) | — | — | — | (1,922) |
| Treasury stock issued for option exercises | 26,086 | — | (493) | — | — | 493 | — |
| Common shares issued for employee stock purchase plan | 63,578 | — | 1,416 | — | — | — | 1,416 |
| Comprehensive income for the period | — | — | — | 4,268 | 13 | — | 4,281 |
| **Balances, September 30, 2018** | 18,415,699 | $ 18 | $ 76,081 | $ 7,350 | $ (31) | $ — | $ 83,418 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**Tactile Systems Technology, Inc.**
**Condensed Consolidated Statements of Cash Flows**
**(Unaudited)**

|  | Nine Months Ended September 30, | |
|---|---|---|
| (In thousands) | 2018 | 2017 |
| **Cash flows from operating activities** | | |
| Net income | $ 4,268 | $ 3,625 |
| Adjustments to reconcile net income to net cash provided by operating activities | | |
| Depreciation and amortization | 2,474 | 1,073 |
| Deferred income taxes | (1,411) | — |
| Stock-based compensation expense | 5,638 | 3,104 |
| Change in allowance for doubtful accounts | 414 | (36) |
| Loss on disposal of equipment | 3 | — |
| Changes in assets and liabilities: | | |
| Accounts receivable | (2,970) | 460 |
| Inventories | (3,879) | (3,821) |
| Income taxes | (2,090) | (5,373) |
| Prepaid expenses and other assets | (1,358) | 130 |
| Medicare accounts receivable – long-term | 1,707 | 52 |
| Accounts payable | (508) | 87 |
| Accrued payroll and related taxes | 1,586 | (812) |
| Accrued expenses and other liabilities | (179) | 1,585 |
| Future product royalties | (11) | (41) |
| Net cash provided by operating activities | 3,684 | 33 |
| **Cash flows from investing activities** | | |
| Proceeds from sales and maturities of marketable securities | 13,000 | 1,000 |
| Purchases of marketable securities | (14,792) | (12,051) |
| Purchases of property and equipment | (2,384) | (1,953) |
| Intangible asset costs | (1,052) | (44) |
| Other investments | — | (145) |
| Net cash used in investing activities | (5,228) | (13,193) |
| **Cash flows from financing activities** | | |
| Taxes paid for net share settlement of restricted stock units | (1,922) | (278) |
| Proceeds from exercise of common stock options and warrants | 1,218 | 673 |
| Proceeds from the issuance of common stock from the employee stock purchase plan | 1,416 | 2,210 |
| Shares repurchased to cover taxes from restricted stock award vesting | — | (493) |
| Net cash provided by financing activities | 712 | 2,112 |
| Net change in cash and cash equivalents | (832) | (11,048) |
| **Cash and cash equivalents – beginning of period** | 23,968 | 30,701 |
| **Cash and cash equivalents – end of period** | $ 23,136 | $ 19,653 |
| **Supplemental cash flow disclosure** | | |
| Cash paid for interest | $ 3 | $ 1 |
| Cash paid for taxes | $ 448 | $ 923 |
| Capital expenditures incurred but not yet paid | $ 184 | $ 97 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

7

**Tactile Systems Technology, Inc.**
**Notes to the Condensed Consolidated Financial Statements**
**(Unaudited)**

**Note 1.  Nature of Business and Operations**

Tactile Systems Technology, Inc. ("we," "us," and "our") is the sole manufacturer and distributor of the Flexitouch and Entre systems, medical devices that help control symptoms of lymphedema, a chronic and progressive medical condition, and the Actitouch system, a medical device used to treat venous leg ulcers and chronic venous insufficiency. We provide our products for use in the home and sell them through vascular, wound and lymphedema clinics throughout the United States. We do business as "Tactile Medical."

We were originally incorporated in Minnesota under the name Tactile Systems Technology, Inc. on January 30, 1995. During 2006, we established a merger corporation and subsequently, on July 21, 2006, merged with and into this merger corporation, resulting in us being reincorporated as a Delaware corporation. The resulting corporation assumed the name Tactile Systems Technology, Inc. In September 2013, we began doing business as "Tactile Medical."

On August 2, 2016 we closed the initial public offering of our common stock, which resulted in the sale of 4,120,000 shares of our common stock at a public offering price of $10.00 per share. We received net proceeds from the initial public offering of approximately $35.4 million, after deducting underwriting discounts and approximately $2.9 million of transaction expenses. In connection with the closing of the initial public offering, all of our outstanding redeemable convertible preferred stock automatically converted to common stock on August 2, 2016. At August 2, 2016, we did not have any redeemable convertible preferred stock issued or outstanding.

Our business is affected by seasonality. In the first quarter of each year, when most patients have started a new insurance year and have not yet met their annual out-of-pocket payment obligations, we experience substantially reduced demand for our products. We typically experience higher sales in the third and fourth quarters as a result of patients having paid their annual insurance deductibles in full, thereby reducing their out-of-pocket costs for our products, and because patients often spend the remaining balances in their healthcare flexible spending accounts at that time. This seasonality applies only to purchases of our products by patients covered by commercial insurance and is not relevant to Medicare, Medicaid, or the Veterans Administration, as those payers either do not have plans that have declining deductibles over the course of the plan year or do not have plans that include patient deductibles for purchases of our products.

**Note 2.  Basis of Presentation**

Our accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial reporting and pursuant to the rules and regulations of the SEC. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (including those which are normal and recurring) considered necessary for a fair presentation of the interim financial information have been included. We have reclassified certain prior year amounts to conform to the current year's presentation.

The results for the nine months ended September 30, 2018 are not necessarily indicative of results to be expected for the year ending December 31, 2018, or for any other interim period or for any future year. The condensed consolidated interim financial statements should be read in conjunction with the audited financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2017.

*Principles of Consolidation*

The accompanying unaudited condensed consolidated financial statements include the accounts of Tactile Systems Technology, Inc. and its wholly owned subsidiary, Swelling Solutions, Inc. All intercompany balances and transactions have been eliminated in consolidation.

Table of Contents

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Comprehensive Income*

Comprehensive income reflects the change in equity of a business enterprise during a period from transactions and other events and circumstances from non-owner sources. Our comprehensive income represents net income adjusted for unrealized gains and losses on available-for-sale marketable securities.

*JOBS Act Accounting Election*

As an emerging growth company under the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), we currently are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies. We elected to take advantage of the extended transition period for adopting new or revised accounting standards that have different effective dates for public and private companies until such time as those standards apply to private companies. However, as of the last business day of our second fiscal quarter of 2018, the market value of our common stock that was held by non-affiliates exceeded $700 million, and as a result, we will no longer qualify as an emerging growth company as of December 31, 2018. Therefore, after that date, we will no longer be able to take advantage of the extended transition period for adopting new or revised accounting standards.

**Note 3.  Summary of Significant Accounting Policies**

*Significant Accounting Policies*

During the nine months ended September 30, 2018 there were no material changes in our significant accounting policies. See Note 3 - "Summary of Significant Accounting Policies" to the consolidated financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2017 for information regarding our significant accounting policies.

*Inventories*

Inventories are valued at the lower of cost (first-in, first-out method) or net realizable value. Inventories consisted of 45% finished goods and 55% component parts and work-in-process as of September 30, 2018 and 39% finished goods and 61% component parts and work-in-process as of December 31, 2017.

*Recent Accounting Pronouncements*

We currently are an "emerging growth company" as defined by the JOBS Act. The JOBS Act provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, (the "Securities Act"), for complying with new or revised accounting standards. In other words, an emerging growth company can selectively delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. In accordance with the JOBS Act, we elected to participate in the exemption and, as a result, our financial statements may not be comparable to the financial statements of issuers that are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies. Section 107 of the JOBS Act provides that we can elect to opt out of the extended transition period at any time, which election is irrevocable. However, as of the last business day of our second fiscal quarter of 2018, the market value of our common stock that was held by non-affiliates exceeded $700 million, and as a result, we will no longer qualify as an emerging growth company as of December 31, 2018 and will no longer be able to take advantage of the extended transition period. Therefore, as of December 31, 2018, we will be required to adopt new or revised accounting standards when they are applicable to public companies that are not emerging growth companies.

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, "*Revenue from Contracts with Customers.*" The new section replaces Section 605, "*Revenue*

*Recognition*," and creates modifications to various other revenue accounting standards for specialized transactions and industries. The section is intended to conform revenue accounting principles with concurrently issued International Financial Reporting Standards to reconcile previously differing treatment between U.S. practices and those of the rest of the world and to enhance disclosures related to disaggregated revenue information. The updated guidance will be effective for us for our annual reporting periods ending on December 31, 2018 and interim reporting periods thereafter due to the recent determination of our upcoming change in filing status. As a result, we commenced project planning for our implementation, which included engaging an accounting firm to assist us. Based on our qualitative assessment to date we have defined the contracts, determined the performance obligations, and assessed the use of the portfolio practical expedient under this standard. We will apply the portfolio approach in determining the transaction price as we have a large volume of contracts with similar characteristics. We are in the process of determining whether this standard will have a material impact on our financial statements. Should we determine an adjustment is required, we will apply the modified retrospective approach as our transition method, which involves recognizing the cumulative effect of initially applying the new revenue standard as an adjustment to the opening balance of retained earnings as of January 1, 2018.

In February 2016, the FASB issued ASU No. 2016-02, "*Leases*" (Topic 842), which supersedes the existing guidance for lease accounting, "*Leases*" (Topic 840). ASU No. 2016-02 requires lessees to recognize a lease liability and a right-of-use asset for all leases. Lessor accounting remains largely unchanged. The amendments in this ASU will be effective for us for interim and annual periods beginning after December 15, 2018. ASU No. 2016-02 requires a modified retrospective approach for all leases existing at, or entered into after, the date of initial adoption, with an option to elect to use certain transition relief. Due to the recent determination of our upcoming change in filing status, which has accelerated our required implementation date of this standard, we have commenced project planning for our implementation, which has included engaging an accounting firm to assist us. We are currently evaluating whether this standard will have a material impact on our financial statements.

In June 2016, the FASB issued ASU No. 2016-13, "*Financial Instruments — Credit Losses*," to require the measurement of expected credit losses for financial instruments held at the reporting date based on historical experience, current conditions and reasonable forecasts. The ASU will be effective for us for interim and annual periods beginning after December 15, 2019. Therefore, we plan to further evaluate the anticipated impact of the adoption of this ASU on our consolidated financial statements in future periods.

In August 2016, the FASB issued ASU No. 2016-15, "*Statement of Cash Flows (Topic 230) — Classification of Certain Cash Receipts and Cash Payments*," to provide clarity on how certain cash receipt and cash payment transactions are presented and classified within the statement of cash flows. The ASU will be effective for us for interim and annual periods beginning after December 15, 2018. We do not anticipate any material impact on our consolidated financial statements in future periods as a result of the adoption of this ASU.

In January 2017, the FASB issued ASU No. 2017-01 "*Business Combinations (Topic 805) — Clarifying the Definition of a Business*," to revise the definition of a business and provide new guidance to assist in the evaluation of transactions as either asset acquisitions (disposals) or business acquisitions (disposals). We currently are an "emerging growth company" as defined by the JOBS Act and this ASU will become effective for us on December 31, 2018 when we no longer qualify for that status. We have elected early adoption for interim transactions that have not previously been included in issued financial statements, which is permitted under this standard. The adoption of this standard did not have a material impact on our consolidated financial statements.

In July 2018, the FASB issued ASU No. 2018-07 "*Improvements to Non-employee Share-Based Payment Accounting*," which expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from non-employees. The ASU will be effective for us for fiscal years beginning after December 15, 2018, including interim periods within that fiscal year. We do not anticipate any material impact on our consolidated financial statements in future periods as a result of the adoption of this ASU.

**Note 4. Asset Acquisition**

On May 22, 2018, we acquired certain assets and the intellectual property of Wright Therapy Products, Inc. ("WTP") for total consideration of approximately $875,000 plus a potential earn-out to be amortized on a straight-line basis over the life of the related asset. The earn-out is based on certain revenue metrics over the seven-month period beginning June 30, 2018 and is capitalized to intangible assets. The assets include the rights to a portfolio of thirty-one

10

issued and pending patents that includes intellectual property related to WTP's pneumatic compression therapy devices and five related trademarks, as well as certain customer accounts. Due to the nature of these patents and related trademarks, as well as our planned use, they have been classified as defensive intangible assets on the balance sheet. The acquisition was recorded as an asset acquisition, and an allocation of the purchase price, based on relative fair value, has been completed as reflected below:

| (Dollars in thousands) | Gross Carrying Amount | Weighted-Average Amortization Period |
|---|---|---|
| Defensive intangible assets | $ 788 | 7 years |
| Customer accounts | 87 | 5 years |
| Total | $ 875 | |

**Note 5. Marketable Securities**

Our investments in marketable securities, all of which have original contractual maturities of six to twenty-four months, are classified as available-for-sale and consist of the following:

| | As of September 30, 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Unrealized | | | | Fair | |
| (In thousands) | Cost | | Gains | | Losses | | Value | |
| U.S. government and agency obligations | $ | 18,849 | $ | — | $ | 37 | $ | 18,812 |
| Corporate debt securities and certificates of deposit | | 3,992 | | — | | 4 | | 3,988 |
| Marketable securities | $ | 22,841 | $ | — | $ | 41 | $ | 22,800 |

| | As of December 31, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Unrealized | | | | Fair | |
| (In thousands) | Cost | | Gains | | Losses | | Value | |
| U.S. government and agency obligations | $ | 11,997 | $ | — | $ | 56 | $ | 11,941 |
| Corporate debt securities and certificates of deposit | | 8,017 | | — | | 14 | | 8,003 |
| Marketable securities | $ | 20,014 | $ | — | $ | 70 | $ | 19,944 |

Unrealized losses and fair value of marketable securities aggregated by investment category and the length of time the securities were in a continuous loss position were as follows:

| | As of September 30, 2018 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than 12 months | | | | 12 months or more | | | | Total | | | |
| | Fair Value | | Unrealized Losses | | Fair Value | | Unrealized Losses | | Fair Value | | Unrealized Losses | |
| (In thousands) | | | | | | | | | | | | |
| U.S. government and agency obligations | $ | 12,828 | $ | 21 | $ | 5,984 | $ | 16 | $ | 18,812 | $ | 37 |
| Corporate debt securities and certificates of deposit | | 1,493 | | 1 | | 997 | | 4 | | 2,490 | | 5 |
| Marketable securities | $ | 14,321 | $ | 22 | $ | 6,981 | $ | 20 | $ | 21,302 | $ | 42 |

11

| (In thousands) | As of December 31, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Less than 12 months | | 12 months or more | | Total | |
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. government and agency obligations | $ 5,974 | $ 25 | $ 5,967 | $ 31 | $ 11,941 | $ 56 |
| Corporate debt securities and certificates of deposit | 7,005 | 13 | 998 | 1 | 8,003 | 14 |
| Marketable securities | $ 12,979 | $ 38 | $ 6,965 | $ 32 | $ 19,944 | $ 70 |

**Note 6. Intangible Assets**

Our patents and other intangible assets, all of which are subject to amortization, are summarized as follows:

| (Dollars in thousands) | Weighted-Average Amortization Period | As of September 30, 2018 | | | As of December 31, 2017 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Gross Carrying Amount | Accumulated Amortization | Net Amount | Gross Carrying Amount | Accumulated Amortization | Net Amount |
| Patents | 8 years | $ 3,554 | $ 1,504 | $ 2,050 | $ 3,536 | $ 1,318 | $ 2,218 |
| Defensive intangible assets | 6 years | 930 | 42 | 888 | — | — | — |
| Customer accounts | 5 years | 103 | 6 | 97 | — | — | — |
| Total | | $ 4,587 | $ 1,552 | $ 3,035 | $ 3,536 | $ 1,318 | $ 2,218 |

Amortization expense was $0.1 million for each of the three months ended September 30, 2018 and 2017, and $0.2 million for each of the nine months ended September 30, 2018 and 2017. Future amortization expenses are expected as follows:

| (In thousands) | |
| --- | --- |
| 2018 (October 1 - December 31) | $ 104 |
| 2019 | 417 |
| 2020 | 417 |
| 2021 | 417 |
| 2022 | 417 |
| Thereafter | 1,263 |
| Total | $ 3,035 |

**Note 7. Accrued Expenses**

Accrued expenses consisted of the following:

| (In thousands) | As of September 30, 2018 | As of December 31, 2017 |
| --- | --- | --- |
| Warranty | $ 726 | $ 531 |
| Travel and business | 553 | 453 |
| Legal and consulting | 481 | 317 |
| Deferred rent | 159 | 173 |
| Accrued taxes | 84 | 1,070 |
| Clinical studies | 70 | 15 |
| Other | 217 | 39 |
| Total | $ 2,290 | $ 2,598 |

**Note 8.  Credit Agreement**

On August 3, 2018, we entered into a Credit Agreement (the "Credit Agreement") with Wells Fargo Bank, National Association.

The Credit Agreement provides for a new $10,000,000 revolving credit facility. The revolving credit facility expires on August 3, 2021. Subject to satisfaction of certain conditions, we may increase the amount of the revolving loans available under the Credit Agreement and/or add one or more term loan facilities in an amount not to exceed an incremental $25,000,000 in the aggregate, such that the total aggregate principal amount of loans available under the Credit Agreement (including under the revolving credit facility) does not exceed $35,000,000.

Amounts drawn under the revolving credit facility bear interest, at our option, at a rate equal to (a) the highest of (i) the prime rate, (ii) the federal funds rate plus 0.50% and (iii) LIBOR for an interest period of one month plus 1% (the "Base Rate") plus an applicable margin or (b) LIBOR plus the applicable margin. The applicable margin is 0.40% to 1.15% on loans bearing interest at the Base Rate and 1.40% to 2.15% on loans bearing interest at LIBOR, in each case depending on our consolidated total leverage ratio. Undrawn portions of the revolving credit facility are subject to an unused line fee at a rate per annum from 0.200% to 0.275%, depending on our consolidated total leverage ratio.

As of September 30, 2018 and the date on which we filed this report, we did not have any outstanding borrowings under the Credit Agreement.

Our obligations under the Credit Agreement are secured by a security interest in substantially all of our and our subsidiaries' assets and are also guaranteed by our subsidiaries.

The Credit Agreement limits our ability to make capital expenditures during a fiscal year in excess of the amounts set forth in the Credit Agreement, and requires that we (i) not permit, as of the last day of each fiscal quarter, our consolidated total leverage ratio to exceed 3.00 to 1.00 and (ii) maintain minimum cash and cash equivalents, measured on the last day of each fiscal quarter, of not less than $7,500,000 (subject to a temporary reduction to $5,000,000 for the two fiscal quarters immediately following a permitted acquisition). As of September 30, 2018, we were in compliance with all financial covenants under the Credit Agreement.

The Credit Agreement also contains certain other restrictions and covenants, which, among other things, restrict our ability to acquire or merge with another entity, dispose of our assets, make investments, loans or guarantees, incur additional indebtedness, create liens or other encumbrances, or pay dividends or make other distributions.

Amounts due under the Credit Agreement may be accelerated upon an Event of Default (as defined in the Credit Agreement), such as breach of a representation, covenant or agreement of ours, defaults with respect to certain of our other material indebtedness or the occurrence of bankruptcy if not otherwise waived or cured.

We may use the proceeds from advances under the revolving credit facility (i) to finance capital expenditures, (ii) to pay fees, commissions and expenses in connection with the Credit Agreement and (iii) for working capital and general corporate purposes.

**Note 9.  Commitments and Contingencies**

*Lease Obligations*

In March 2008, we entered into a non-cancelable operating lease agreement for building space for our corporate headquarters that provides for monthly rent, real estate taxes and operating expenses. This lease was subsequently extended to July 31, 2021.

In July 2016, we entered into a non-cancelable operating lease agreement for building space to accommodate the relocation of our manufacturing, quality, engineering and research and development functions. This lease agreement extends through November 2023 and provides for monthly rent, real estate taxes and operating expenses.

Rent expense was $0.4 million for the each of three months ended September 30, 2018 and 2017, and $1.2 million and $1.1 million for the nine months ended September 30, 2018 and 2017, respectively.

In July 2016, we entered into a fleet vehicle lease program for certain members of our field sales organization.

We also have operating lease agreements for certain computer and office equipment that expire in 2021. The leases provide an option to purchase the related equipment at fair market value at the end of the lease.

Future base minimum lease payments for all lease obligations are expected to be as follows for the years ending December 31:

| (In thousands) | Buildings | | Computer/Office Equipment | | Fleet Vehicle Program | | Total | |
|---|---|---|---|---|---|---|---|---|
| 2018 (October 1 - December 31) | $ | 227 | $ | 14 | $ | 55 | $ | 296 |
| 2019 | | 948 | | 51 | | 85 | | 1,084 |
| 2020 | | 954 | | 34 | | — | | 988 |
| 2021 | | 701 | | 3 | | — | | 704 |
| 2022 | | 352 | | — | | — | | 352 |
| Thereafter | | 268 | | — | | — | | 268 |
| Total | $ | 3,450 | $ | 102 | $ | 140 | $ | 3,692 |

*Major Vendors*

We had purchases from two major vendors that accounted for 45% and 41% of our total purchases for the three and nine months ended September 30, 2018, respectively. We had purchases from three major vendors that accounted for 47% and 39% of our total purchases for the three and nine months ended September 30, 2017, respectively.

*Purchase Commitments*

We issued purchase orders in 2017 totaling $1.7 million for items that we expect to receive between October and December of 2018. We issued purchase orders in the nine months ended September 30, 2018 totaling $15.0 million for items that we expect to receive in 2019.

*Retirement Plan*

We maintain a 401(k) retirement plan for our employees in which eligible employees can contribute a percentage of their pre-tax compensation. We may also make discretionary contributions to the 401(k) plan. We made contributions of $63,000 and $42,000 for the three months ended September 30, 2018 and 2017, respectively, and $174,000 and $135,000 for the nine months ended September 30, 2018 and 2017, respectively.

**Note 10.  Stockholders' Equity**

We completed an initial public offering of our common stock on August 2, 2016, in which we sold 4,120,000 shares of our common stock at a public offering price of $10.00 per share. Immediately prior to the completion of the initial public offering, all then-outstanding shares of our Series A and Series B preferred stock were converted into 5,924,453 shares of our common stock. Our Series A preferred stock converted to common stock at a ratio of 1-for-1.03 and our Series B preferred stock converted to common stock at a ratio of 1-for-1. In addition, immediately prior to the completion of the initial public offering, we issued 2,354,323 additional shares of our common stock that our Series A and Series B preferred stockholders were entitled to receive in connection with the conversion of the preferred stock, and we issued 956,842 shares of our common stock to pay accrued dividends on our Series B preferred stock. We also paid $8.2 million in cumulative accrued dividends to our Series A convertible preferred stockholders in connection with the initial public offering, including $0.1 million of dividends paid to the holders of the common restricted shares.

*Stock-Based Compensation*

Our 2016 Equity Incentive Plan (the "2016 Plan") authorizes us to grant stock options, stock appreciation rights, restricted stock, stock units and other stock-based awards to employees, non-employee directors and certain consultants and advisors. There were up to 4,800,000 shares of our common stock initially reserved for issuance pursuant to the 2016 Plan. The 2016 Plan provides that the number of shares reserved and available for issuance under the 2016 Plan will

14

automatically increase annually on January 1 of each calendar year, commencing in 2017 and ending on and including January 1, 2026, by an amount equal to the lesser of: (a) 5% of the number of common shares of stock outstanding as of December 31 of the immediately preceding calendar year, or (b) 2,500,000 shares; provided, however, that our Board of Directors may determine that any annual increase be a lesser number. In addition, all awards granted under our 2007 Omnibus Stock Plan and our 2003 Stock Option Plan that were outstanding when the 2016 Plan became effective and that are forfeited, expire, are cancelled, are settled for cash or otherwise not issued, will become available for issuance under the 2016 Plan. Effective January 1, 2017, 841,686 shares were added to the 2016 Plan, as available for issuance thereunder, pursuant to the automatic increase feature of the 2016 Plan. Effective January 1, 2018, 892,318 shares were added to the 2016 Plan, as available for issuance thereunder, pursuant to the automatic increase feature of the 2016 Plan. As of September 30, 2018, 5,226,592 shares were available for future grant pursuant to the 2016 Plan.

Upon adoption and approval of the 2016 Plan, all of our previous equity incentive compensation plans were terminated. However, existing awards under those plans continue to vest in accordance with the original vesting schedules and will expire at the end of their original terms.

We recorded stock-based compensation expense of $2.4 million and $1.0 million for the three months ended September 30, 2018 and 2017, respectively, and $5.6 million and $3.1 million for the nine months ended September 30, 2018 and 2017, respectively. This expense was allocated as follows:

| (In thousands) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Cost of goods sold | $ 69 | $ 4 | $ 178 | $ 102 |
| Sales and marketing expenses | 834 | 361 | 2,272 | 1,030 |
| Research and development expenses | 52 | 29 | 146 | 73 |
| Reimbursement, general and administrative expenses | 1,425 | 573 | 3,042 | 1,899 |
| Total stock-based compensation expense | $ 2,380 | $ 967 | $ 5,638 | $ 3,104 |

The stock-based compensation expense includes a modification of share-based awards held by a former executive resulting in a charge of $0.6 million for the three and nine months ended September 30, 2018. At September 30, 2018, there was approximately $0.7 million of estimated unrecognized pre-tax compensation expense that is expected to be recognized on a straight-line basis over 0.4 years.

*Stock Options*

Stock options issued to participants other than non-employees vest over three or four years and typically have a contractual term of seven or ten years. Annually, stock options are granted to our non-employee directors on the date of the annual meeting of stockholders and vest in full on the earlier of one year after the date of grant or on the date of the next year's annual meeting of stockholders. These options have a contractual term of seven years.

Stock-based compensation expense included in our Condensed Consolidated Statements of Operations for stock options was $0.8 million and $0.3 million for the three months ended September 30, 2018 and 2017, respectively, and  $1.8 million and $0.8 million for the nine months ended September 30, 2018 and 2017, respectively.

At September 30, 2018, there was approximately $5.0 million of total unrecognized pre-tax stock option expense under our equity compensation plans, which is expected to be recognized on a straight-line basis over a weighted-average period of 2.7 years.

15

Stock option activity for the nine months ended September 30, 2018 is summarized as follows:

| (In thousands except share, per share and years data) | Options Outstanding | | Weighted-Average Exercise Price Per Share[1] | | Weighted-Average Remaining Contractual Life | | Aggregate Intrinsic Value[2] |
|---|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | 1,487,720 | $ | 8.41 | | 6.2 years | $ | 29,611 |
| Granted | 136,224 | $ | 39.46 | | | | |
| Exercised | (388,261) | $ | 3.14 | | | $ | 16,826 |
| Cancelled | (28,824) | $ | 20.50 | | | | |
| Balance at September 30, 2018 | 1,206,859 | $ | 13.32 | | 6.3 years | $ | 69,667 |
| | | | | | | | |
| Options exercisable at September 30, 2018 | 706,423 | $ | 3.80 | | 4.8 years | $ | 47,505 |

(1) The exercise price of each option granted during the period shown was equal to the market price of the underlying stock on the date of grant.

(2) The aggregate intrinsic value of options exercised represents the difference between the exercise price of the option and the closing stock price of our common stock on the date of exercise. The aggregate intrinsic value of options outstanding represents the difference between the exercise price of the option and the closing stock price of our common stock on the last trading day of the period.

Options exercisable of 1,098,882 as of September 30, 2017 had a weighted-average exercise price of $2.12 per share.

*Time-Based Restricted Stock Units*

We have granted time-based restricted stock units to certain participants under the 2016 Plan that are stock-settled with common shares. Time-based restricted stock units granted under the 2016 Plan vest over one to three years. Stock-based compensation expense included in our Condensed Consolidated Statements of Operations for time-based restricted stock units was $1.3 million and $0.6 million for the three months ended September 30, 2018 and 2017, respectively, and $2.9 million and $1.8 million for the nine months ended September 30, 2018 and 2017, respectively. As of September 30, 2018, there was approximately $5.4 million of total unrecognized pre-tax compensation expense related to outstanding time-based restricted stock units that is expected to be recognized over a weighted-average period of 1.8 years. Our time-based restricted stock unit activity for the nine months ended September 30, 2018 was as follows:

| (In thousands except unit and per unit data) | Units Outstanding | | Weighted-Average Grant Date Fair Value Per Unit | | Aggregate Intrinsic Value[1] |
|---|---|---|---|---|---|
| Balance at December 31, 2017 | 441,507 | $ | 16.38 | $ | 12,795 |
| Granted | 92,109 | $ | 35.27 | | |
| Vested | (175,164) | $ | 14.75 | | |
| Cancelled | (27,229) | $ | 21.00 | | |
| Balance at September 30, 2018 | 331,223 | $ | 22.11 | $ | 23,533 |
| | | | | | |
| Deferred and unissued at September 30, 2018 [2] | 3,427 | $ | 31.28 | $ | 243 |

(1) The aggregate intrinsic value of restricted stock units outstanding was based on our closing stock price on the last trading day of the period.

(2) For the nine months ended September 30, 2018, there were 1,214 restricted stock units granted to non-employee directors in lieu of their quarterly cash retainer payments. These restricted stock units were fully vested upon grant and represent the right to receive one share of common stock, per unit, upon the earlier of the directors' termination of service as a director of ours or the occurrence of a change of control of us. These restricted stock units are included in the "Granted" line in the table above and are also included in the "Vested" line in the table above due to their being fully vested upon grant. As of September 30, 2018, there were 3,427 outstanding restricted stock units that have been granted to non-employee directors in lieu of their quarterly director retainer payments. These restricted stock units are not included in the "Balance at September 30, 2018" line in the table above because they are fully vested.

16

*Performance-Based Restricted Stock Units*

In February 2018, we granted 67,982 performance-based restricted stock units ("PSUs"), which represents the target number of PSUs under these awards, to certain participants under the 2016 Plan. These PSUs have both performance-based and time-based vesting features. The PSUs will be earned if and to the extent performance goals based on revenue and adjusted EBITDA are achieved in 2019. The number of PSUs earned will depend on the level at which the performance targets are achieved, and can range from 50% of target if threshold performance is achieved and up to 150% of target if maximum performance is achieved. One third of the earned PSUs will vest on the date the Compensation and Organization Committee certifies the number of PSUs earned, and the remaining two thirds of the earned PSUs will vest on the first anniversary of that certification date. All earned and vested PSUs will be settled in shares of common stock. Stock-based compensation expense included in our Condensed Consolidated Statements of Operations for PSUs was $0.2 million and $0.5 million for the three and nine months ended September 30, 2018, respectively, and $0 for the same periods in 2017. As of September 30, 2018, there was approximately $1.6 million of total unrecognized pre-tax compensation expense related to outstanding PSUs that is expected to be recognized over a weighted average period of 2.4 years. Our performance-based restricted stock unit activity for the nine-months ended September 30, 2018 was as follows:

| (In thousands except unit and per unit data) | Performance-Based Units Outstanding | | Weighted-Average Grant Date Fair Value Per Unit | | Aggregate Intrinsic Value [1] |
|---|---|---|---|---|---|
| Balance at December 31, 2017 | — | $ | — | $ | — |
| Granted | 67,982 | $ | 32.36 | | |
| Vested | — | $ | — | | |
| Cancelled | (5,253) | $ | 32.36 | | |
| Balance at September 30, 2018 | 62,729 | $ | 32.36 | $ | 4,457 |

(1)  The aggregate intrinsic value of performance-based restricted stock units outstanding was based on our closing stock price on the last trading day of the period.

*Employee Stock Purchase Plan*

Our employee stock purchase plan ("ESPP"), which was approved by our Board of Directors on April 27, 2016 and by our stockholders on June 20, 2016, allows participating employees to purchase shares of our common stock at a discount through payroll deductions. The plan is available to all our employees and employees of participating subsidiaries. Participating employees may purchase common stock, on a voluntary after-tax basis, at a price equal to 85% of the lower of the closing market price per share of our common stock on the first or last trading day of each stock purchase period. The plan provides for six-month purchase periods, beginning on May 16 and November 16 of each calendar year.

A total of 1.6 million shares of common stock was initially reserved for issuance under the ESPP, and this share reserve will automatically be supplemented each January 1, commencing in 2017 and ending on and including January 1, 2026, by an amount equal to the least of (1) 1% of the shares of our common stock outstanding on the immediately preceding December 31, (2) 500,000 shares or (3) such lesser amount as our Board of Directors may determine. Effective January 1, 2018, 178,463 shares were added to the ESPP, as available for issuance thereunder, pursuant to the automatic increase feature of the plan. On May 15, 2018, 63,578 shares were purchased under the ESPP, utilizing $1.4 million of employee contributions. As of September 30, 2018, 1,576,090 shares were available for future issuance under the ESPP. We recognized stock-based compensation expense associated with the ESPP of $0.1 million for each of the three-month periods ended September 30, 2018 and 2017, and $0.5 million for each of the nine-month periods ended September 30, 2018 and 2017.

**Note 11.  Income Taxes**

We record our interim provision for income taxes by applying our estimated annual effective tax rate to our year-to-date pre-tax income and adjusting for discrete tax items recorded in the period. Deferred income taxes result from temporary differences between the reporting of amounts for financial statement purposes and income tax purposes. These differences relate primarily to different methods used for income tax reporting purposes, including for depreciation and amortization, warranty and certain employee compensation related accruals, and deductions related to allowances for

17

doubtful accounts receivable and inventory reserves. Our provision for income taxes included current federal and state income tax expense, as well as deferred federal and state income tax expense.

The effective tax rate for the three months ended September 30, 2018 was a benefit of 16.5%, compared to a benefit of 6.7% for the three months ended September 30, 2017. The primary driver of the change in the effective tax rate was an increase in the tax benefits related to share-based compensation proportionate to pre-tax book income as compared to the same prior year period. We recorded an income tax benefit of $0.2 million and $0.1 million for the three months ended September 30, 2018 and 2017, respectively.

The effective tax rate for the nine months ended September 30, 2018 was a benefit of 254.3%, compared to a benefit of 539.1% for the nine months ended September 30, 2017. The primary driver of the change in our effective tax rate was a significant increase in tax benefits related to share-based compensation proportionate to pre-tax book income as compared to the same prior year period. We recorded an income tax benefit of $3.1 million and an income tax benefit of $4.5 million for the nine months ended September 30, 2018 and 2017, respectively.

We recognize the financial statement benefit of a tax position only after determining that the relevant tax authority is more likely than not to sustain the position following an audit. For tax positions meeting the more likely than not threshold, the amount recognized in the condensed consolidated financial statements is the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement with the relevant tax authority. As of September 30, 2018 we had an unrecognized tax benefit of approximately $1.8 million. Included in the balance of unrecognized tax benefits as of September 30, 2018 was $0.4 million of tax benefits that, if recognized, would impact the effective tax rate. Also included in the balance of unrecognized tax benefits as of September 30, 2018 was $1.4 million of tax benefits that, if recognized, would result in adjustments to other tax accounts, primarily deferred taxes.

We are currently under examination for our 2016 federal tax return. We are not currently under exam for income taxes by any other taxing jurisdictions. In the event of any future tax assessments, we have elected to record the income taxes and any related interest and penalties as income tax expense on our statement of operations.

**Note 12.  Net Income Per Share**

The following table sets forth the computation of our basic and diluted net income per share:

| (In thousands, except share and per share data) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Net income | $ 1,746 | $ 1,342 | $ 4,268 | $ 3,625 |
| Weighted-average shares outstanding | 18,344,956 | 17,603,293 | 18,166,999 | 17,222,072 |
| Effect of restricted stock units, common stock options, warrants, and employee stock purchase plan shares | 1,180,730 | 1,480,682 | 1,161,948 | 1,596,537 |
| Weighted-average shares used to compute diluted net income per share | 19,525,686 | 19,083,975 | 19,328,947 | 18,818,609 |
| Net income per share - Basic | $ 0.10 | $ 0.08 | $ 0.23 | $ 0.21 |
| Net income per share - Diluted | $ 0.09 | $ 0.07 | $ 0.22 | $ 0.19 |

18

The following common stock equivalents were excluded from the computation of diluted net income per share for the periods presented because including them would have been anti-dilutive:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Restricted stock units | — | — | 5,413 | 1,184 |
| Common stock options | 25,703 | 23,311 | 47,981 | 63,066 |
| Common stock warrants | — | — | — | — |
| Employee stock purchase plan | — | — | 28,996 | — |
| Total | 25,703 | 23,311 | 82,390 | 64,250 |

**Note 13.  Fair Value Measurements**

We determine the fair value of our assets and liabilities based on the exchange price that would be received for an asset or paid to transfer a liability (exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value maximize the use of observable inputs and minimize the use of unobservable inputs. We use a fair value hierarchy with three levels of inputs, of which the first two are considered observable and the last unobservable, to measure fair value. The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1). The next highest priority is based on quoted prices for similar assets or liabilities in active markets or quoted prices for identical or similar assets or liabilities in non-active markets or other observable inputs (Level 2). The lowest priority is given to unobservable inputs (Level 3). The following provides information regarding fair value measurements for our cash equivalents and marketable securities as of September 30, 2018 and December 31, 2017 according to the three-level fair value hierarchy:

| | As of September 30, 2018 | | | |
| --- | --- | --- | --- | --- |
| (In thousands) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Recurring Fair Value Measurements:** | | | | |
| Money market mutual funds | $ 5,260 | $ — | $ — | $ 5,260 |
| U.S. government and agency obligations | 11,833 | 6,979 | — | 18,812 |
| Corporate debt securities | — | 3,988 | — | 3,988 |
| Total | $ 17,093 | $ 10,967 | $ — | $ 28,060 |

| | As of December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| (In thousands) | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| **Recurring Fair Value Measurements:** | | | | |
| Money market mutual funds | $ 9,212 | $ — | $ — | $ 9,212 |
| U.S. government and agency obligations | 1,000 | 10,941 | — | 11,941 |
| Corporate debt securities | — | 8,003 | — | 8,003 |
| Total | $ 10,212 | $ 18,944 | $ — | $ 29,156 |

19

During the nine months ended September 30, 2018, there were no transfers within the three-level hierarchy. A significant transfer is recognized when the inputs used to value a security have been changed, which merits a transfer between the disclosed levels of the valuation hierarchy.

The fair values for our money market mutual funds, U.S. government and agency obligations and corporate debt securities are determined based on valuations provided by external investment managers who obtain them from a variety of industry standard data providers.

The carrying amounts of financial instruments such as cash equivalents, accounts receivable, other assets, accounts payable, accrued expenses and other liabilities approximate their related fair values due to the short-term maturities of these items. Non-financial assets, such as equipment and leasehold improvements, and intangible assets are subject to non-recurring fair value measurements if they are deemed impaired. We had no re-measurements of non-financial assets to fair value in the nine months ended September 30, 2018.

**Note 14.  Subsequent Events**

On October 15, 2018, we entered into a license agreement (the "License Agreement") with Sun Scientific, Inc. ("Sun Scientific") pursuant to which we licensed certain intellectual property of Sun Scientific, including related to its Aero-Wrap product, in the United States and Canada, for use in all medical applications, including but not limited to swelling/edema and ulcers (including lymphedema and chronic venous insufficiency conditions), but excluding the use of the intellectual property in the field of prophylaxis for deep vein thrombosis.

Pursuant to the License Agreement, we paid Sun Scientific an initiation fee of $4.0 million upon execution of the License Agreement. We have also agreed to pay Sun Scientific a royalty in a range of high single digits to low double digits as a percentage of the net sales of the products containing the licensed intellectual property and a contingency payment if the net sales of the Aero-Wrap product exceed $80 million within the first seven years of the term of the agreement. We have concluded as of September 30, 2018 that it is not probable the contingency payment threshold will be achieved. The contingency payment may be made, at our option, in cash or shares of our common stock.

The License Agreement will continue until the date of expiration of the last to expire or be invalidated of the licensed patents, subject to earlier termination under certain circumstances, including by either party upon a material breach, by us at any time upon six months' prior written notice or by Sun Scientific if specified events related to sales, use and commercialization occur.

On October 26, 2018, we entered into a non-cancelable office lease agreement for approximately 80,745 square feet for new corporate headquarters space in Minneapolis, Minnesota. The initial lease term is ten years and six months, with an option to renew for two periods of five years each. The base rent increases yearly during the initial term, commencing at approximately $106,000 per month during the first year of the initial term and increasing to approximately $134,300 per month during the last six months of the initial term, and we are also obligated for certain taxes and operating expenses. We expect to begin incurring rent expense related to this lease in the first quarter of 2019. We are looking to sub-lease our existing building space for the remainder of our lease obligation, which ends July 31, 2021.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and the accompanying notes thereto included elsewhere in this report.

**Overview**

We are a medical technology company that develops and provides innovative medical devices for the treatment of chronic diseases. Our mission is to help people suffering from chronic diseases live better and care for themselves at home. We focus our efforts on advancing the standard of care in treating chronic diseases in the home setting to improve patient outcomes and quality of life and help control rising healthcare expenditures. Our initial area of therapeutic focus is vascular disease, with a goal of advancing the standard of care in treating lymphedema and chronic venous insufficiency. We possess a unique, scalable platform to deliver at-home healthcare solutions throughout the United States. This evolving home care delivery model is recognized by policy makers and insurance payers as a key for controlling rising healthcare costs. Our solutions deliver cost-effective, clinically proven, long-term treatment for patients with these chronic diseases.

Our proprietary products are the Flexitouch, Entre, and Actitouch systems. A predecessor to our Flexitouch system received 510(k) clearance from the U.S. Food and Drug Administration (the "FDA") in July 2002, and we introduced the system to address the many limitations of self-administered home-based manual lymphatic drainage therapy. We began selling our more advanced Flexitouch system after receiving 510(k) clearance from the FDA in October 2006. In September 2016, we received 510(k) clearance from the FDA for the Flexitouch system in treating lymphedema of the head and neck. In June 2017, we announced that we received 510(k) clearance from the FDA for the Flexitouch Plus, the third-generation version of our Flexitouch system. We derive the vast majority of our revenues from our Flexitouch system. For the nine months ended September 30, 2018 and 2017, sales of our Flexitouch system represented 92% and 91% of our revenues, respectively.

In September 2012, we acquired our second proprietary product, the Actitouch system. The system received 510(k) clearance from the FDA in June 2013, and we began selling the product in September 2013 to address the many limitations of multilayered bandages that are worn by patients suffering from venous leg ulcers. We also introduced our Entre system in the United States in February 2013. The Entre system is sold to patients who need a more basic pump or who do not yet qualify for insurance reimbursement for an advanced compression device such as our Flexitouch system. For the nine months ended September 30, 2018 and 2017, sales of our Entre and Actitouch systems combined represented 8% and 9% of our revenues, respectively.

To support the growth of our business, we invest heavily in our commercial infrastructure, consisting of our direct salesforce, home training resources, reimbursement capabilities and clinical expertise. We market our products in the United States using a direct-to-patient and -provider model. Our direct salesforce has grown to a team of over 185 people as of September 30, 2018 compared to over 150 people as of September 30, 2017. This model allows us to directly approach patients and clinicians, whereby we disintermediate the traditional durable medical equipment channel, allowing us to capture both the manufacturer and distributor margins. We also utilize over 500 licensed, independent healthcare practitioners as home trainers who educate patients on the proper use of our systems. We invest substantial resources in our reimbursement and payer relations team, which consists of over 120 people. The reimbursement group focuses on verifying case-by-case benefits, obtaining prior authorization, billing and collecting payments from payers, and providing customer support services. Our payer relations group is responsible for developing relationships with insurance payer decision-makers to educate them on our product efficacy, developing overall payer coverage policies and reimbursement criteria, managing Medicare patient claims and contracts with payers, and serving as an advocacy liaison between patients, clinicians and payers throughout the appeals process. Our patients are reimbursed by government and private payers for the purchase of our products pursuant to established rates with each payer. We also have a clinical team, consisting of a scientific advisory board, in-house therapists and nurses, and a medical director (part-time), that serves as a resource to clinicians and patients and guides the development of clinical evidence in support of our products.

We rely on third-party contract manufacturers for the sourcing of parts, the assembly of our controllers and the manufacturing of the garments used with our systems. We conduct final assembly of the garments used with our Flexitouch system, perform quality assurance, and ship our products from our facility in Minneapolis, Minnesota.

For the three months ended September 30, 2018, we generated revenues of $36.3 million and had net income of $1.7 million, compared to revenues of $28.3 million and net income of $1.3 million for the three months ended September 30, 2017. For the nine months ended September 30, 2018, we generated revenues of $97.3 million and had net income of $4.3 million, compared to revenues of $74.4 million and net income of $3.6 million for the nine months ended September 30, 2017. Our primary sources of capital to date have been from operating income, private placements of our capital stock, and capital raised in our initial public offering, which closed on August 2, 2016. We operate in one segment for financial reporting purposes.

**Results of Operations**

*Comparison of the Three and Nine Months ended September 30, 2018 and 2017*

The following tables present our results of operations for the periods indicated.

| | Three Months Ended September 30, | | | | | | Change | |
|---|---|---|---|---|---|---|---|---|
| (Dollars in thousands) | | 2018 | | | 2017 | | $ | % |
| Condensed Consolidated Statement of Operations Data: | | | % of revenue | | | % of revenue | | |
| Revenues | $ | 36,322 | 100 % | $ | 28,283 | 100 % | $ 8,039 | 28 % |
| Cost of goods sold | | 10,141 | 28 % | | 7,528 | 27 % | 2,613 | 35 % |
| Gross profit | | 26,181 | 72 % | | 20,755 | 73 % | 5,426 | 26 % |
| Operating expenses | | | | | | | | |
| Sales and marketing | | 15,632 | 43 % | | 10,915 | 38 % | 4,717 | 43 % |
| Research and development | | 1,223 | 3 % | | 1,116 | 4 % | 107 | 10 % |
| Reimbursement, general and administrative | | 7,956 | 22 % | | 7,551 | 26 % | 405 | 5 % |
| Total operating expenses | | 24,811 | 68 % | | 19,582 | 68 % | 5,229 | 27 % |
| Income from operations | | 1,370 | 4 % | | 1,173 | 5 % | 197 | 17 % |
| Other income | | 128 | — % | | 85 | — % | 43 | 51 % |
| Income before income taxes | | 1,498 | 4 % | | 1,258 | 5 % | 240 | 19 % |
| Income tax benefit | | (248) | (1)% | | (84) | — % | (164) | 195 % |
| Net income | $ | 1,746 | 5 % | $ | 1,342 | 5 % | $ 404 | 30 % |

| | Nine Months Ended September 30, | | | | | | Change | |
|---|---|---|---|---|---|---|---|---|
| (Dollars in thousands) | | 2018 | | | 2017 | | $ | % |
| Condensed Consolidated Statement of Operations Data: | | | % of revenue | | | % of revenue | | |
| Revenues | $ | 97,303 | 100 % | $ | 74,397 | 100 % | $ 22,906 | 31 % |
| Cost of goods sold | | 27,060 | 28 % | | 20,186 | 27 % | 6,874 | 34 % |
| Gross profit | | 70,243 | 72 % | | 54,211 | 73 % | 16,032 | 30 % |
| Operating expenses | | | | | | | | |
| Sales and marketing | | 42,641 | 44 % | | 31,726 | 42 % | 10,915 | 34 % |
| Research and development | | 3,949 | 4 % | | 3,699 | 5 % | 250 | 7 % |
| Reimbursement, general and administrative | | 22,799 | 23 % | | 19,815 | 27 % | 2,984 | 15 % |
| Total operating expenses | | 69,389 | 71 % | | 55,240 | 74 % | 14,149 | 26 % |
| Income (loss) from operations | | 854 | 1 % | | (1,029) | (1)% | 1,883 | 183 % |
| Other income | | 351 | — % | | 204 | — % | 147 | 72 % |
| Income (loss) before income taxes | | 1,205 | 1 % | | (825) | (1)% | 2,030 | N.M. % |
| Income tax benefit | | (3,063) | (3)% | | (4,450) | (6)% | 1,387 | (31)% |
| Net income | $ | 4,268 | 4 % | $ | 3,625 | 5 % | $ 643 | 18 % |

"N.M." Not Meaningful

22

*Revenues*

Revenues increased $8.0 million, or 28%, to $36.3 million in the three months ended September 30, 2018, compared to $28.3 million in the three months ended September 30, 2017. Revenues increased $22.9 million, or 31%, to $97.3 million in the nine months ended September 30, 2018, compared to $74.4 million in the nine months ended September 30, 2017. The growth in revenues was attributable to an increase of approximately $7.1 million, or 27%, in sales of our Flexitouch system in the three months ended September 30, 2018 and an increase of approximately $21.3 million, or 31%, in sales of our Flexitouch system in the nine months ended September 30, 2018. The increase in Flexitouch system sales was largely driven by expansion of our salesforce, growth in the Veterans Administration channel, increased physician and patient awareness of the treatment options for lymphedema, and expanded contractual coverage with national and regional insurance payers.

Revenues from the Veterans Administration represented 19% and 20% of total revenues in the three months ended September 30, 2018 and 2017, respectively. Revenues from the Veterans Administration represented 20% and 19% of total revenues in the nine months ended September 30, 2018 and 2017, respectively. Revenues from Medicare represented 10% and 6% of total revenues in the three months ended September 30, 2018 and 2017, respectively. Revenues from Medicare represented 8% and 9% of total revenues in the nine months ended September 30, 2018 and 2017, respectively.

The following tables summarize our revenues by product for the three and nine months ended September 30, 2018 and 2017, both in dollars and percentage of total revenues:

| (Dollars in thousands) | Three Months Ended September 30, | | | | Change | | |
| | 2018 | | 2017 | | $ | | % |
|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | |
| Flexitouch system | $ | 33,330 | $ | 26,202 | $ | 7,128 | 27 % |
| Entre/Actitouch systems | | 2,992 | | 2,081 | | 911 | 44 % |
| Total | $ | 36,322 | $ | 28,283 | $ | 8,039 | 28 % |
| | | | | | | | |
| **Percentage of total revenues** | | | | | | | |
| Flexitouch system | | 92 % | | 93 % | | | |
| Entre/Actitouch systems | | 8 % | | 7 % | | | |
| Total | | 100 % | | 100 % | | | |

| (Dollars in thousands) | Nine Months Ended September 30, | | | | Change | | |
| | 2018 | | 2017 | | $ | | % |
|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | |
| Flexitouch system | $ | 89,216 | $ | 67,936 | $ | 21,280 | 31 % |
| Entre/Actitouch systems | | 8,087 | | 6,461 | | 1,626 | 25 % |
| Total | $ | 97,303 | $ | 74,397 | $ | 22,906 | 31 % |
| | | | | | | | |
| **Percentage of total revenues** | | | | | | | |
| Flexitouch system | | 92 % | | 91 % | | | |
| Entre/Actitouch systems | | 8 % | | 9 % | | | |
| Total | | 100 % | | 100 % | | | |

Our business is affected by seasonality. In the first quarter of each year, when most patients have started a new insurance year and have not yet met their annual out-of-pocket payment obligations, we experience substantially reduced demand for our products. We typically experience higher sales in the third and fourth quarters of the year as a result of patients having paid their annual insurance deductibles in full, thereby reducing their out-of-pocket costs for our products, and because patients often spend the remaining balances in their healthcare flexible spending accounts at that time. This seasonality applies only to purchases of our products by patients covered by commercial insurance and is not relevant to Medicare, Medicaid, or the Veterans Administration, as those payers either do not have plans that have declining

23

deductibles over the course of the plan year or do not have plans that include patient deductibles for purchases of our products.

### Cost of Goods Sold and Gross Margin

Cost of goods sold increased $2.6 million, or 35%, to $10.1 million in the three months ended September 30, 2018, compared to $7.5 million in the three months ended September 30, 2017. Cost of goods sold increased $6.9 million, or 34%, to $27.1 million in the nine months ended September 30, 2018, compared to $20.2 million in the nine months ended September 30, 2017. The increase in cost of goods sold in each of the three and nine months ended September 30, 2018 compared to the same periods in 2017 was primarily attributable to an increase in the number of Flexitouch systems sold, as well as additional manufacturing headcount to support increased volumes.

Gross margin was 72% of sales in each of the three and nine months ended September 30, 2018. Gross margin was 73% of sales in each of the three and nine months ended September 30, 2017. The current period gross margin rate was impacted by the launch of Flexitouch Plus, as well as a payment rate reduction associated with a national payer contract that became effective July 1, 2018.

### Sales and Marketing Expenses

Sales and marketing expenses increased $4.7 million, or 43%, to $15.6 million in the three months ended September 30, 2018, compared to $10.9 million in the three months ended September 30, 2017. The year-over-year increase was primarily driven by a $3.2 million increase in personnel-related compensation expense due to increased sales and marketing headcount, including $0.5 million of incremental stock-based compensation expense. In addition, other sales and marketing expenses increased $1.5 million, driven by increased spending associated with field sales meetings, travel and entertainment, recruiting, consulting and patient training expenses, including training associated with the full commercial launch of the Flexitouch Plus that began in April 2018.

Sales and marketing expenses increased $10.9 million, or 34%, to $42.6 million in the nine months ended September 30, 2018, compared to $31.7 million in the nine months ended September 30, 2017. The year-over-year increase was primarily driven by a $7.5 million increase in personnel-related compensation expense due to increased sales and marketing headcount, including $1.2 million of incremental stock-based compensation expense. In addition, other sales and marketing expenses increased $3.4 million, driven by increased spending associated with field sales meetings, travel and entertainment, recruiting, consulting and patient training expenses, including training associated with the full commercial launch of the Flexitouch Plus that began in April 2018.

### Research and Development Expenses

Research and development ("R&D") expenses increased $0.1 million, or 10%, to $1.2 million in the three months ended September 30, 2018, compared to $1.1 million in the three months ended September 30, 2017. The year-over-year increase was primarily attributable to increased product development costs.

R&D expenses increased $0.3 million, or 7%, to $3.9 million in the nine months ended September 30, 2018, compared to $3.7 million in the nine months ended September 30, 2017. The year-over-year increase was primarily attributable to increased product development costs, partially offset by decreased clinical studies expenses.

### Reimbursement, General and Administrative Expenses

Reimbursement, general and administrative expenses increased $0.4 million, or 5%, to $8.0 million in the three months ended September 30, 2018, compared to $7.6 million in the three months ended September 30, 2017. This increase was primarily attributable to a $1.3 million increase in personnel-related compensation expense as a result of increased headcount in our reimbursement operations, payer relations and corporate functions, including $0.9 million of incremental stock-based compensation expense, of which $0.6 million was related to the continued vesting of equity awards held by a former executive. These equity awards will continue to vest into the first quarter of 2019. The identified increases were partially offset by a $0.8 million year-over-year decrease in sales and use taxes due to a one-time charge in the prior year period.

24

Reimbursement, general and administrative expenses increased $3.0 million, or 15%, to $22.8 million in the nine months ended September 30, 2018, compared to $19.8 million in the nine months ended September 30, 2017. This increase was primarily attributable to a $2.9 million increase in personnel-related compensation expense as a result of increased headcount in our reimbursement operations, payer relations and corporate functions. This increase included $1.1 million of incremental stock-based compensation expense, of which $0.6 million was related to the continued vesting of equity awards held by a former executive. These equity awards will continue to vest into the first quarter of 2019. The increase in reimbursement, general and administrative expenses was also attributable to a $0.9 million increase in professional fees, legal expenses, recruiting, facilities and volume-based service charges. The identified increases were partially offset by a $0.8 million year-over-year decrease in accrued sales and use taxes due to a one-time charge in the prior year period.

### Other Income, Net

Other income was $128,000 and $85,000 for the three months ended September 30, 2018 and 2017, respectively, and $351,000 and $204,000 for the nine months ended September 30, 2018 and 2017, respectively. The increase in other income was primarily due to investment income earned on our marketable securities.

### Income Taxes

We recorded an income tax benefit of $0.2 million and $0.1 million in the three months ended September 30, 2018 and 2017, respectively. We recorded an income tax benefit of $3.1 million and $4.5 million in the nine months ended September 30, 2018 and 2017, respectively. The continued significant tax deductions related to tax benefits realized from the vesting of restricted stock units, the exercise of non-qualified stock options, and the disqualifying dispositions of incentive stock options and ESPP shares contributed to our net income for the three and nine months ended September 30, 2018.

### Liquidity and Capital Resources

### Cash Flows

At September 30, 2018, our principal sources of liquidity were cash and cash equivalents of $23.1 million, marketable securities of $22.8 million and net accounts receivable of $20.2 million, and the borrowing capacity available under our Credit Agreement.

The following table summarizes our cash flows for the periods indicated:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| (In thousands) | 2018 | 2017 |
| Net cash provided by (used in): | | |
| Operating activities | $ 3,684 | $ 33 |
| Investing activities | (5,228) | (13,193) |
| Financing activities | 712 | 2,112 |
| Net decrease in cash and cash equivalents | $ (832) | $ (11,048) |

### Operating Activities

Net cash provided by operating activities during the nine months ended September 30, 2018 was $3.7 million, resulting from net income of $4.3 million and non-cash net income adjustments of $7.1 million, which were partially offset by a net increase in operating assets and liabilities of $7.7 million. The non-cash net income adjustments primarily consisted of $5.6 million of stock-based compensation expense and $2.5 million of depreciation and amortization expense. The changes in net operating assets and liabilities were primarily due to a $2.1 million increase in income taxes, driven by the current period tax benefit associated with tax-deductible stock-based compensation activity, and a $3.9 million increase in inventories, associated with the commercial launch of our Flexitouch Plus.

25

Net cash provided by operating activities during the nine months ended September 30, 2017 was $33,000, resulting from net income of $3.6 million and non-cash net income adjustments of $4.1 million, including $3.1 million of stock-based compensation expense and $1.1 million of depreciation and amortization expense. This was partially offset by a $7.7 million increase in net operating assets and liabilities, primarily related to increases in income taxes receivable of $5.6 million and inventory of $3.8 million. The increase in income taxes receivable was a result of the significant tax benefits recognized in the period associated with tax-deductible share-based compensation activity. The increase in inventory was driven largely by the increased sales volume as well as purchases associated with product development and new product introductions.

*Investing Activities*

Net cash used in investing activities during the nine months ended September 30, 2018 was $5.2 million, consisting of $1.8 million in net purchases of marketable securities, $1.5 million in purchases of rental and demonstration equipment, $1.1 million related to the acquisition of patents and other intangible assets and $0.8 million in purchases of product tooling and computer and manufacturing equipment, leasehold improvements and furniture and fixtures.

Net cash used in investing activities during the nine months ended September 30, 2017 was $13.2 million, consisting primarily of $11.1 million in net purchases of marketable securities and $2.0 million in purchases of product tooling, computer and manufacturing equipment, and leasehold improvements.

*Financing Activities*

Net cash provided by financing activities during the nine months ended September 30, 2018 was $0.7 million, consisting of proceeds from the issuance of common stock under the ESPP of $1.4 million and proceeds from exercises of common stock options of $1.2 million, partially offset by $1.9 million in taxes paid for the net share settlement of restricted stock units.

Net cash provided by financing activities during the nine months ended September 30, 2017 was $2.1 million, consisting of proceeds from the issuance of common stock under the ESPP of $2.2 million and proceeds from exercises of common stock options and warrants of $0.7 million, partially offset by the purchase of treasury stock to fund taxes from restricted stock award vesting of $0.5 million and taxes paid for the net share settlement of restricted stock units of $0.3 million.

*Credit Agreement*

On August 3, 2018, we entered into the Credit Agreement, which expires on August 3, 2021. The Credit Agreement provides for a $10,000,000 revolving credit facility, with the ability to increase the amount of the revolving loans available and/or add one or more term loan facilities not to exceed an incremental $25,000,000, subject to satisfaction of certain conditions. As of September 30, 2018 and the date on which we filed this report, we did not have any outstanding borrowings under the Credit Agreement.

Our obligations under the Credit Agreement are secured by a security interest in substantially all of our and our subsidiaries' assets and are also guaranteed by our subsidiaries. The Credit Agreement contains a number of restrictions and covenants, including that we maintain compliance with a maximum leverage ratio and a minimum liquidity covenant. As of September 30, 2018, we were in compliance with all financial covenants under the Credit Agreement. For additional information on the Credit Agreement, see Note 8 – "Credit Agreement" to the condensed consolidated financial statements in this report.

*Adequacy of Capital Resources*

Our future capital requirements may vary significantly from those now planned and will depend on many factors, including:

- sales and marketing resources needed to further penetrate our market;

- expansion of our operations domestically and/or internationally;

· responses of competitors to our solutions and applications;

· costs associated with clinical research activities;

· costs to develop and implement new products; and

· use of capital for acquisitions, if any.

Historically, we have experienced increases in our expenditures consistent with the growth in our revenues, operations and personnel, and we anticipate that our expenditures will continue to increase as we expand our business.

We believe our cash, cash equivalents, marketable securities and cash flows from operations together with our new credit agreement will be sufficient to meet our working capital and capital expenditure requirements for at least the next twelve months.

Inflation and changing prices did not have a material effect on our business during the nine months ended September 30, 2018, and we do not expect that inflation or changing prices will materially affect our business in the foreseeable future.

In August 2017, we filed a shelf registration statement on Form S-3 with the SEC. Under the shelf registration statement, we may offer and sell from time to time up to $200 million of common stock, preferred stock, debt securities, warrants, rights or units. The shelf registration statement also registered for resale from time to time up to 5,703,534 shares of our common stock held by the selling stockholders named therein. In September 2017, certain of the selling stockholders completed a secondary offering of 3,795,000 shares of our common stock at a public offering price of $33.00 per share. We did not receive any proceeds from the sale of the shares by the selling stockholders.

27

**Contractual and Commercial Commitments Summary**

Our contractual obligations and commercial commitments as of September 30, 2018 are summarized below:

| (In thousands) | Total | | Less Than 1 Year | | 1-3 Years | | 3-5 Years | | More Than 5 Years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Payments Due By Period** | | | | | | | | |
| Purchase commitments [1] | $ | 16,686 | $ | 11,526 | $ | 5,160 | $ | — | $ | — |
| Operating lease obligations [2] | | 3,692 | | 1,109 | | 1,787 | | 796 | | — |
| Future product royalties [3] | | 6 | | 6 | | — | | — | | — |
| Total | $ | 20,384 | $ | 12,641 | $ | 6,947 | $ | 796 | $ | — |

(1)  We issued purchase orders in 2017 totaling $1.7 million for items that we expect to receive between October and December of 2018. We issued purchase orders in 2018 totaling $15.0 million for items that we expect to receive in 2019.

(2)  We currently lease approximately 52,000 square feet of office space at our corporate headquarters in Minneapolis, Minnesota under a lease that expires in July 2021 and an additional 38,520 square feet of office, assembly and warehouse space at a second leased facility in Minneapolis, Minnesota under a lease that expires in November 2023. We entered into a fleet vehicle program for certain members of our field sales organization in 2016.

(3)  We are required to make quarterly royalty payments to a third party for our Actitouch system revenues through August 2023. Beginning in September 2017, the payments are equal to 6% of our quarterly revenues attributable to our Actitouch system. In any year that these revenues exceed $40.0 million, we are required to pay 7% on revenues over $40.0 million and 6% on revenues of $40.0 million and under. Because our revenues attributable to our Actitouch system, and therefore the amount of royalty payments we will be required to pay in the future, are unknown, this amount only reflects royalties due associated with a portion of our 2018 Actitouch revenues.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements, investments in special purpose entities or undisclosed borrowings or debt. Additionally, we are not a party to any derivative contracts or synthetic leases.

**Recent Accounting Pronouncements**

Refer to Note 3 - "Summary of Significant Accounting Policies" of our condensed consolidated financial statements contained in this report for a description of recently issued accounting pronouncements that are applicable to our business.

**JOBS Act**

We currently are an "emerging growth company" as defined by the JOBS Act. The JOBS Act provides that an emerging growth company can take advantage of the extended transition period for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We elected to avail ourselves of this exemption and, as a result, our financial statements may not be comparable to the financial statements of issuers who are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies. Section 107 of the JOBS Act provides that we can elect to opt out of the extended transition period at any time, which election is irrevocable. However, as of the last business day of our second fiscal quarter of 2018, the market value of our common stock that was held by non-affiliates exceeded $700 million, and as a result, we will no longer qualify as an emerging growth company as of December 31, 2018 and will no longer be able to take advantage of the extended transition period.

Subject to certain conditions, as an emerging growth company, we currently are relying on certain of the exemptions and reduced reporting requirements of the JOBS Act, including without limitation, from providing an auditor's attestation report on our system of internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002 and from complying with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements, known as the auditor discussion and analysis. Because the market value of our common stock that was held by non-affiliates as of the last business day of our second fiscal quarter of 2018 exceeded $700 million, we will be deemed a large accelerated filer as of December 31, 2018 and will no longer qualify as an emerging growth company. As a result, we will no longer be able to take advantage of the reduced disclosure and other

28

benefits available to emerging growth companies after that date, including our exemption from providing our auditor's attestation on our system of internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002. See Part II, Item 1A., "Risk Factors" of this Quarterly Report on Form 10-Q for further discussion of these matters.

**Critical Accounting Policies and Estimates**

A "critical accounting policy" is one that is both important to the portrayal of our financial condition and results and requires management's most subjective or complex judgments, often as a result of the need to make estimates about the effect of items that are inherently uncertain. For additional information, please see the discussion of our significant accounting policies under "Critical Accounting Policies and Significant Estimates" in Management's Discussion and Analysis of Financial Condition and Results of Operations in our Annual Report on Form 10-K for the year ended December 31, 2017.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

*Interest Rate Risk*

We are exposed to market risk from changes in interest rates, primarily related to our investment activities. The principal objectives of our investment activities are to preserve principal, provide liquidity and maximize income consistent with minimizing risk of material loss. The recorded carrying amounts of cash and cash equivalents approximate fair value due to their short maturities. Our interest income is sensitive to changes in the general level of interest rates in the United States, particularly since our investments are generally short-term in nature. Based on the nature of our short-term investments, an immediate 100 basis point change in interest rates would not have a material effect on the fair market value of our portfolio.

*Inflation*

Inflationary factors, such as increases in our cost of goods sold, sales and marketing expenses and reimbursement expenses, may adversely affect our operating results. Although we do not believe that inflation has had a material impact on our financial condition or results of operations to date, a high rate of inflation in the future may have an adverse effect on our ability to maintain and increase our gross margin, and on our sales and marketing and reimbursement expenses as a percentage of our revenues, if the selling prices of our products do not increase as much or more than these increased costs.

*Credit Risk*

As of September 30, 2018 and December 31, 2017, our cash, cash equivalents and marketable securities were maintained with three financial institutions in the United States. We have reviewed the financial statements of these institutions and believe they have sufficient assets and liquidity to conduct their operations in the ordinary course of business with little or no credit risk to us.

Our accounts receivable primarily relate to revenues from the sale of our products to patients in the United States. As of September 30, 2018 and 2017, our accounts receivable were $21.2 million and $17.4 million, respectively. We had accounts receivable from three insurance companies representing approximately 28%, 16% and 11% of accounts receivable as of September 30, 2018, and we had accounts receivable from three insurance companies representing approximately 28%, 17% and 6% of accounts receivable as of September 30, 2017.

*Foreign Currency Risk*

Our business is conducted in U.S. dollars and international transactions have been minimal. As we begin building relationships to commercialize and distribute our products internationally, our results of operations and cash flows may become increasingly subject to changes in foreign exchange rates.

**Item 4. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2018. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of September 30, 2018, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

*Changes in Internal Control over Financial Reporting*

There were no material changes in our internal control over financial reporting during the three months ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings.**

From time to time, we may be subject to various claims and legal proceedings arising in the ordinary course of business. We are not currently a party to any legal proceedings that, in the opinion of our management, are likely to have a material adverse effect on our business. Regardless of outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources, and other factors.

**Item 1A. Risk Factors.**

In addition to the other information set forth in this Quarterly Report on Form 10-Q, you should carefully consider the factors discussed in "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could materially affect our business, financial condition or future results. Except as set forth below, there have been no material changes in our risk factors from those disclosed in that report. The following risk factors are revised or added:

***Changes in United States or Chinese trade policy, including the imposition of tariffs and the resulting consequences, may have a material adverse impact on our business and results of operations.***

The United States government has indicated its intent to adopt a new approach to trade policy and in some cases to renegotiate, or potentially terminate, certain existing bilateral or multi-lateral trade agreements. It has also initiated or is considering the imposition of tariffs on certain foreign goods, including certain raw materials that are included in our products, or on our products directly. Changes in U.S. trade policy could result in one or more of its trading partners adopting responsive trade policy making it more difficult or costly for us to export our products to those countries in the future or import our products or raw materials utilized in making our products. These measures could result in increased costs for goods imported into the United States. Since our prices are often fixed due to the reimbursement policies of, and arrangements with, third party payers, this could result in lowering our margin on products sold.

China has announced a plan to impose tariffs on a wide range of U.S. products in retaliation for new U.S. tariffs. Additional tariffs could be imposed by China in response to proposed increased tariffs on products imported from China. There is also a concern that the imposition of additional tariffs by the United States, including the increases proposed for raw materials utilized in our products, or our products themselves, could result in the adoption of tariffs by other countries. The resulting trade war could have a significant adverse effect on world trade and the world economy. To the extent that trade tariffs and other restrictions imposed by the United States increase the price of, or limit the amount of, the raw materials and products we import into the United States, the costs of our raw materials may be adversely affected and the demand from our customers for products and services may be diminished, which could adversely affect our revenues and profitability. In addition, our margins could be significantly impacted.

We cannot predict future trade policy or the terms of any renegotiated trade agreements and their impact on our business. The adoption and expansion of trade restrictions, the occurrence of a trade war, or other governmental action related to tariffs or trade agreements or policies have the potential to adversely impact demand for our products, our costs, our customers, our suppliers, and the United States economy, which in turn could adversely impact our business, financial condition and results of operations.

***Increases in our operating costs could have an adverse effect on our financial condition and results of operations.***

Reimbursement rates are established by fee schedules mandated by private payers, Medicare, the Veterans Administration and certain Medicaid programs and are likely to remain constant or decrease due, in part, to federal and state government budgetary constraints. As a result, with respect to Medicare and Medicaid related revenues, we may not be able to offset the effects of general inflation on our operating costs through increases in prices for our products. In particular, labor and related costs account for a significant portion of our operating costs and we compete with other healthcare providers to attract and retain qualified or skilled personnel and with various industries for administrative and service employees. This competitive environment could result in increased labor costs. As such, we must control our operating costs, particularly labor and related costs, and failing to do so could adversely affect our financial conditions and results of operations.

31

Our operating costs may fluctuate significantly in the future as a result of a variety of factors, many of which are outside of our control. These factors include:

- increased sales and marketing costs to increase awareness of our products;

- costs to develop new and enhanced features for current products and research and development costs for new products;

- the time, resources, and expense required to develop and conduct clinical trials and seek additional regulatory clearances and approvals for additional treatment indications for our products and for any additional products we develop;

- the costs of preparing, filing, prosecuting, defending, and enforcing patent claims and other patent related costs, including litigation costs and the results of such litigation;

- any product liability or other lawsuits related to our products and the costs associated with defending them or the costs related to the results of such lawsuits;

- the costs to attract and retain personnel with the skills required for effective operations;

- the costs associated with being a public company, which will increase further once we no longer qualify as an emerging growth company as of December 31, 2018; and

- costs associated with entering international markets.

Our failure to anticipate and minimize the impact of these costs could adversely affect our business and results of operations.

***We may be unable to manage our growth effectively.***

Our past growth has provided, and our future growth may create, challenges to our organization. As of September 30, 2018, we have over 460 employees. We intend to continue to grow and may experience periods of rapid growth and expansion. Future growth will impose significant added responsibilities on management, including the need to identify, recruit, train, integrate, retain and motivate additional employees. In addition, rapid and significant growth will place a strain on our administrative personnel, information technology systems and other operational infrastructure. Any failure by us to manage our growth effectively could have an adverse effect on our ability to achieve our development and commercialization goals.

Successful growth is also dependent upon our ability to implement appropriate financial and management controls, systems and procedures. In order to manage our operations and growth, we will need to continue to improve our operational and management controls, reporting and information technology systems and financial internal control procedures, which will become more complex once we no longer qualify as an emerging growth company as of December 31, 2018. If we are unable to manage our growth effectively, it may be difficult for us to execute our business strategy and there could be an adverse impact on our business.

***We currently are an emerging growth company, and the reduced disclosure requirements applicable to emerging growth companies may make our common stock less attractive to investors.***

We currently are an emerging growth company, as defined in the JOBS Act, but, based on the market value of our common stock held by non-affiliates as of the last business day of our second fiscal quarter of 2018, we will no longer qualify as an emerging growth company as of December 31, 2018. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from certain disclosure requirements that are applicable to other public companies that are not emerging growth companies. We have taken advantage of reduced reporting burdens in previous

32

reports and filings, as well as in this report. We cannot predict whether investors will find our common stock less attractive while we continue to rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be reduced or more volatile.

In addition, the JOBS Act provides that an emerging growth company can take advantage of an extended transition period for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of these accounting standards until they would otherwise apply to private companies. We have elected to avail ourselves of this exemption and, as a result, our financial statements may not be comparable to the financial statements of issuers that are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies. We cannot predict whether investors will find our common stock less attractive while we continue to rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be reduced or more volatile.

***As of December 31, 2018, we will no longer be an emerging growth company and, as a result, we will have to comply with increased disclosure and compliance requirements.***

As a result of the market value of our common stock held by non-affiliates exceeding $700 million as of the last business day of our second fiscal quarter of 2018, we will be deemed a large accelerated filer and we will no longer qualify as an emerging growth company as of December 31, 2018. Accordingly, we will be subject to certain disclosure and compliance requirements that apply to other public companies but did not previously apply to us due to our status as an emerging growth company. These requirements include:

- the requirement that our independent registered public accounting firm attest to the effectiveness of our internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act of 2002;

- that we adopt new or revised accounting standards when they are applicable to public companies, instead of delaying their adoption until they are applicable to private companies;

- compliance with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- the requirement that we provide full and more detailed disclosures regarding executive compensation; and

- the requirement that we hold a non-binding advisory vote on executive compensation and obtain stockholder approval of any golden parachute payments not previously approved.

We expect that the loss of emerging growth company status and compliance with the additional requirements of being a large accelerated filer will increase our legal and financial compliance costs and cause management and other personnel to divert attention from operational and other business matters to devote substantial time to public company reporting requirements. In addition, if we are not able to comply with changing requirements in a timely manner, the market price of our stock could decline and we could be subject to sanctions or investigations by the stock exchange on which our common stock is listed, the SEC, or other regulatory authorities, which would require additional financial and management resources.

***We are incurring increased costs and are subject to additional regulations and requirements as a result of being a public company, which costs and requirements will increase in connection with us no longer qualifying as an emerging growth company, which could lower our profits or make it more difficult to run our business.***

As a public company, we have incurred, and are continuing to incur, significant legal, accounting and other expenses that we did not incur as a private company, including costs associated with public company reporting requirements and costs associated with the Sarbanes-Oxley Act and related rules implemented by the SEC and Nasdaq. These expenses and costs will increase as we prepare for, and following, us no longer qualifying as an emerging growth company as of December 31, 2018. These expenses could lower our profits or make it more difficult to run our business.

Furthermore, if we are unable to satisfy our obligations as a public company, we could be subject to delisting of our common stock, fines, sanctions and other regulatory action and potentially civil litigation.

*If we fail to maintain proper and effective internal control over financial reporting, our ability to produce accurate and timely financial statements could be impaired, which could harm our operating results, investors' views of us and, as a result, the value of our common stock.*

Pursuant to Section 404 of the Sarbanes-Oxley Act, our management was required to report upon the effectiveness of our internal control over financial reporting beginning with our Annual Report on Form 10-K for the year ended December 31, 2017. Since we will be a large accelerated filer, and we will cease to be an emerging growth company, as of December 31, 2018, our independent registered public accounting firm will be required to attest to the effectiveness of our internal control over financial reporting beginning with our Annual Report on Form 10-K for the year ending December 31, 2018. The rules governing the standards that must be met for management and our independent registered public accounting firm to assess our internal control over financial reporting are complex and require significant documentation, testing, and possible remediation. In connection with our and our independent registered public accounting firm's evaluations of our internal control over financial reporting, we may need to upgrade our systems, including information technology; implement additional financial and management controls, reporting systems, and procedures; and hire additional accounting and finance staff.

Any failure to implement required new or improved controls, or difficulties encountered in their implementation, could cause us to fail to meet our reporting obligations. In addition, any testing by us or our independent registered public accounting firm conducted in connection with Section 404 of the Sarbanes-Oxley Act may reveal deficiencies in our internal control over financial reporting that are deemed to be material weaknesses or that may require prospective or retroactive changes to our financial statements or identify other areas for further attention or improvement. Inferior internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. Internal control deficiencies could also result in a restatement of our financial results in the future. We could become subject to stockholder or other third-party litigation, as well as investigations by the SEC, the stock exchange on which our securities are listed, or other regulatory authorities, which could require additional financial and management resources and could result in fines, trading suspensions, payment of damages or other remedies. Further, any delay in compliance with the auditor attestation provisions of Section 404 could subject us to a variety of administrative sanctions, including ineligibility for short-form resale registration, action by the SEC and the suspension or delisting of our common stock, which could reduce the trading price of our common stock and could harm our business

*Our credit facility contains covenants that restrict our business and financing activities, and the property that secures our obligations under the credit facility may be subject to foreclosure.*

Our revolving credit facility contains a number of restrictions and covenants, which, among other things, restrict our ability to acquire or merge with another entity, dispose of our assets, make investments, loans or guarantees, incur additional indebtedness, create liens or other encumbrances, or pay dividends or make other distributions. The Credit Agreement also requires us to maintain compliance with a maximum leverage ratio and a minimum liquidity covenant. These provisions impose significant operating and financial restrictions on us and may limit our ability to compete effectively, take advantage of new business opportunities or take other actions that may be in our best interests. Our ability to obtain additional or other financing or to dispose of certain assets could also be negatively impacted because we have pledged substantially all of our assets as collateral in connection with the credit facility.

Our ability to comply with the provisions under the Credit Agreement may be affected by events beyond our control, and our inability to comply with any of these provisions could result in a default under the Credit Agreement. If such a default occurs, the lenders may elect to declare all borrowings outstanding, together with accrued interest and other fees, to be immediately due and payable, and they would have the right to terminate any commitments they have to provide further borrowings. If we are unable to repay outstanding borrowings when due, the lenders under the Credit Agreement also have the right to proceed against the collateral, including substantially all of our assets, granted to them to secure the indebtedness under that facility. If our indebtedness under the Credit Agreement were to be accelerated, we cannot assure you that our assets would be sufficient to repay in full that indebtedness. The occurrence of any of these events could have a material adverse effect on our business, financial condition, results of operations and liquidity.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

**Recent Sales of Unregistered Securities**

(a)     *Issuances of Preferred Stock*

None.

(b)     *Issuances of Common Stock*

None.

**Use of Proceeds from Registered Securities**

On August 2, 2016, we issued and sold 4,120,000 shares of our common stock in the initial public offering at a public offering price of $10.00 per share, for aggregate gross proceeds of $41.2 million. All of the shares issued and sold in the initial public offering were registered under the Securities Act pursuant to a Registration Statement on Form S-1 (File No. 333-209115), which was declared effective by the SEC on July 27, 2016. The offering terminated on August 2, 2016.

The net offering proceeds to us, after deducting underwriting discounts of approximately $2.9 million and offering expenses paid by us totaling approximately $2.9 million, were approximately $35.4 million. No offering expenses were paid directly or indirectly to any of our directors or officers (or their associates) or persons owning 10% or more of any class of our equity securities or to any other affiliates. We also paid $8.2 million in cumulative accrued dividends to our Series A preferred stockholders from the issuance proceeds.

At September 30, 2018, the net proceeds from our initial public offering were held in a diversified portfolio of bank deposits, government money market funds, government securities (U.S. Treasury and U.S. government agency securities), and high-grade short-term corporate bonds. All investments were in compliance with our Investment Policy and are highly liquid, with liquidity and capital preservation being the primary investment objectives. There has been no material change in our planned uses of the net proceeds from those described in the Prospectus dated July 27, 2016.

**Item 3. Defaults Upon Senior Securities.**

Not applicable.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

On November 1, 2018, the Compensation and Organization Committee of our Board of Directors approved and adopted the Tactile Systems Technology, Inc. Executive Employee Severance Plan (the "Severance Plan"). Employees who are designated by our Board of Directors or a committee thereof are eligible to be participants in the Severance Plan.  Each of our executive officers (Gerald R. Mattys, Brent A. Moen, Robert J. Folkes, Bryan F. Rishe and Mary M. Thompson), as well as certain other employees, have been designated as participants in the Severance Plan, effective upon the termination of the individual's employment agreement with us (if any) and the entry into a Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement with us.

Under the Severance Plan, a participant will be entitled to receive the specified severance benefits if his or her employment is terminated (i) at our initiative other than for Cause (as defined in the Severance Plan) or (ii) by the participant for Good Reason (as defined in the Severance Plan) (each such type of termination, a "Qualifying Severance Event"). A Participant who experiences a Qualifying Severance Event will be eligible to receive certain severance benefits under the Severance Plan, including:

· if the Qualifying Severance Event occurs prior to a Change in Control (as defined in the Severance Plan), payment of:

   o an amount equal to two times (for our Chief Executive Officer) or one times (for all other participants) his or her annualized base salary as of the termination date, payable in accordance with our regular payroll schedule for 24 months (for our Chief Executive Officer) or 12 months (for all other participants) thereafter; and

   o the portion of the premium costs that we would have paid, if the participant had remained employed by us, for any continued group health insurance coverage following the termination date, at the same level of coverage, for a period of 18 consecutive months (for our Chief Executive Officer ) or 12 consecutive months (for all other participants) after the termination date (or until group health or dental coverage from another employer is received, if earlier); and

· if the Qualifying Severance Event occurs within 12 months after a Change in Control, payment of:

   o an amount equal to two times (for our Chief Executive Officer) or one times (for all other participants) the sum of (i) his or her annualized base salary as of the termination date, plus (ii) his or her target incentive bonus as of the termination date, payable in a lump sum on the first payroll date occurring more than 60 days after the termination date; and

   o the portion of the premium costs that we would have paid, if the participant had remained employed by us, for any continued group health insurance coverage following the termination date, at the same level of coverage, for a period of 18 consecutive months (for our Chief Executive Officer) or 12 consecutive months (for all other participants) after the termination date (or until group health or dental coverage from another employer is received, if earlier).

In addition, if a participant experiences a Qualifying Severance Event and the termination date occurs:

· before a Change in Control, then with respect to any equity-based award that has been granted to him or her under one of our equity plans and is outstanding and not fully vested on such termination date (an "Equity Award"), a pro rata portion of the unvested portion of such Equity Award will vest as of the date the participant's release of claims becomes irrevocable; and

· within 12 months after a Change in Control, then the unvested portion of any Equity Award that is outstanding on such termination date will vest as of the date the participant's release becomes irrevocable.

In either case, if such Equity Award is a stock option or stock appreciation rights award, it will remain exercisable to the extent so vested for one year after the termination date. The Severance Plan also specifies the treatment of performance-based Equity Awards under these circumstances.

To receive benefits under the Severance Plan, a participant must sign and not rescind a release in a form approved by us. Payment of severance benefits under the Severance Plan is also subject to other conditions, and will be terminated if the participant violates his or her ongoing obligations with respect to non-disclosure of confidential information, assignment of intellectual property, non-competition and non-solicitation.

The foregoing description of the Severance Plan does not purport to be complete and is qualified in its entirety by reference to the full text of the Severance Plan, a copy of which is filed as Exhibit 10.2 to this report and is incorporated herein by reference.

Effective November 1, 2018, the employment agreements that we had in place with each of Messrs. Mattys, Folkes and Rishe and Ms. Thompson were mutually terminated in order for the executive officer to become eligible to participate in the Severance Plan. The termination of these employment agreements did not affect the individual's employment status or position with us.  Brent A. Moen, our Chief Financial Officer who was appointed as such effective September 2, 2018, does not have an employment agreement with us.

36

Also effective November 1, 2018, each of our executive officers entered into a Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement ("Restrictive Covenants Agreement") with us. The Restrictive Covenants Agreements provide that, among other matters, while the executive officer is employed by us and for a period of 12 months thereafter, he or she will not (i) engage in competitive business, subject to certain exceptions; (ii) solicit, hire or engage our employees or contractors, or certain former employees; and (iii) solicit, request, advise or induce customers, suppliers or other business contacts of ours to cancel, curtail or otherwise adversely change its relationship with us. Under the Restrictive Covenants Agreements, each executive officer also agrees to disclose and assign to us any and all improvements and inventions that he or she conceives or reduces to practice during his or her employment. In addition, the Restrictive Covenants Agreements contain customary confidentiality provisions.

The foregoing description of the Restrictive Covenants Agreements does not purport to be complete and is qualified in its entirety by reference to the full text of the form of Restrictive Covenants Agreement, a copy of which is filed as Exhibit 10.3 to this report and is incorporated herein by reference.

**Item 6. Exhibits.**

The exhibits filed as part of this Quarterly Report on Form 10-Q are set forth on the Exhibit Index below.

37

**EXHIBIT INDEX**

| Exhibit Number | Description of Exhibit | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File Number | Date of Filing | Exhibit Number | |
| 3.1 | Fourth Amended and Restated Certificate of Incorporation | S-1 | 333-209115 | 06/09/2016 | 3.1 | |
| 3.2 | Amended and Restated By-laws | S-1 | 333-209115 | 05/06/2016 | 3.2 | |
| 10.1* | License Agreement, dated as of October 15, 2018, by and between Tactile Systems Technology, Inc. and Sun Scientific, Inc. | | | | | X |
| 10.2 | Tactile Systems Technology, Inc. Executive Employee Severance Plan | | | | | X |
| 10.3 | Form of Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement | | | | | X |
| 10.4 | Credit Agreement, dated as of August 3, 2018, by and among Tactile Systems Technology, Inc., the lenders from time to time party thereto and, Wells Fargo Bank, National Association | 10-Q | 001-37799 | 08/06/2018 | 10.1 | |
| 10.5 | Separation and Consulting Agreement between Tactile Systems Technology, Inc. and Lynn L. Blake, dated as of August 1, 2018 | 8-K | 001-37799 | 08/06/2018 | 10.1 | |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934, as amended | | | | | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) / 15d-14(a) of the Securities Exchange Act of 1934, as amended | | | | | X |
| 32.1 | Certification of Principal Executive Officer pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | | X |

38

| 101.1 | The following condensed consolidated financial statements from the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2018, formatted in XBRL: (i) Balance Sheets (unaudited), (ii) Statements of Operations (unaudited), (iii) Statements of Comprehensive Income (unaudited); (iv) Statements of Stockholders' Equity (unaudited), (v) Statements of Cash Flows (unaudited), and (vi) Notes to the Condensed Consolidated Financial Statements. | X |

\* Application has been made to the Securities and Exchange Commission to seek confidential treatment of certain provisions of this exhibit. Omitted material for which confidential treatment has been requested has been filed separately with the Securities and Exchange Commission.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Tactile Systems Technology, Inc.**

Date: November 5, 2018                                        By:    /s/ *Brent A. Moen*
                                                                                    Brent A. Moen
                                                                                    Chief Financial Officer
                                                                                    (Principal financial and accounting officer)

40

**CONFIDENTIAL TREATMENT REQUESTED**

Portions of this Exhibit have been redacted pursuant to a request for confidential treatment under Rule 24b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended. Omitted information, marked "[***]" in this Exhibit, has been filed separately with the Securities and Exchange Commission together with such request for confidential treatment.

## LICENSE AGREEMENT

This LICENSE AGREEMENT (this "Agreement") is made and entered into effective as of October 15th, 2018 (the "Effective Date") by and between Tactile Systems Technology, Inc. a Delaware corporation ("Tactile"), and Sun Scientific, Inc., a Delaware corporation ("Sun") (individually a "Party" and collectively the "Parties").

### RECITALS

A.       Each Party is a manufacturer and supplier of medical products.

B.       Tactile desires to receive a license in the Field and in the Territory to certain Sun intellectual property to further develop, modify, produce, market, brand, distribute, and price products relating to such intellectual property and Sun desires to grant such license to Tactile, subject to the terms and conditions of this Agreement.

### AGREEMENT

For good, valuable and sufficient consideration, Sun and Tactile have entered into this Agreement as of the above Effective Date, subject to the following terms and conditions.

1.       **Definitions**

(a)       "Action" shall have the meaning provided in Section 11(a).

(b)       "Affiliate" means any corporation, firm, limited liability company, partnership, other entity, person or governmental authority that directly or indirectly controls, is controlled by or is under common control with another entity.  For purposes of this definition, control means ownership, directly or through one or more Affiliates, of 50% (or such lesser percentage which is the maximum allowed to be owned by a foreign entity in a particular jurisdiction) or more of the shares of the stock entitled to vote for the election of directors, in the case of a corporation, or 50% (or such lesser percentage which is the maximum allowed to be owned by a foreign entity in a particular jurisdiction) or more of the equity interests in the case of any other legal entity and equal or more control of the board of directors or equivalent governing body of such entity.

(c)       "Bankruptcy Code" shall have the meaning provided in Section 12(a).

(d)       "Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Wilmington, Delaware are authorized or required by law to be closed for business.

(e)       "Chosen Firm" shall have the meaning provided in Section 4(b)(i).

**[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(f)       "Commercialization" means the marketing, promoting, distributing, offering for sale or selling the Products resulting in aggregate Net Sales of the Products by Licensee of US$150,000.  When used as a verb, "Commercialize" or "Commercialized"  means to engage in Commercialization.

(g)       "Commercialization Statement" shall have the meaning provided in Section 5(a).

(h)        "Commercialization Statement Date" shall have the meaning provided in Section 5(a).

(i)       "Confidential Information" shall have the meaning provided in Section 9(a).

(j)       "Discloser" shall have the meaning provided in Section 9(a).

(k)        "DVT Prevention Application" means the use of compression including but not limited to use of the Licensed IP, as a prophylaxis for Deep Vein Thrombosis ("DVT").

(l)       "DVT Refusal Period" shall have the meaning provided in Section 7(c)(ii).

(m)        "DVT ROFR Notice" shall have the meaning provided in Section 7(c)(i).

(n)        "Earned Royalty" shall have the meaning provided in Section 3(b).

(o)        "Existing Products" means the Products as sold by Sun Scientific on the Effective Date.

(p)        "Field" means all medical applications with or without prescription, including but not limited to swelling/edema and ulcers (including lymphedema and chronic venous insufficiency conditions), but does not include the DVT Prevention Application.  For the avoidance of doubt, travel applications are included in the Field and the only exclusion from the Field is the DVT Prevention Application.

(q)        "Infringement Claim" shall have the meaning provided in Section 8(b)(i).

(r)       "Licensed Brand" means the brand name "Aero-Wrap" and associated trademarks and brand names relating to Existing Products sold by Sun Scientific and listed on Exhibit B.

(s)       "Licensed IP" means, collectively, all Licensed Know-How, Licensed Patents and Licensed Brands.

(t)       "Licensed Know-How" means all trade secrets, know-how, manufacturing processes, clinical strategies, product specifications, scientific data, clinical trial data, market analyses, designs, training manuals and other non-public information that is necessary or useful to further develop, manufacture, use or sell the Products, including the Licensed Manufacturing Know-How.

2

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(u)    "Licensed Manufacturing Know-How" means Sun's proprietary design and manufacturing processes necessary or useful to manufacture the Products,  including as described in Sun's FDA 510(k) and Medicare PDAC regulatory filings, but in all cases as described in detail in Exhibit C, provided, however, that Licensed Manufacturing Know-How does not include any information to the extent that it: (i) was already legally in the possession and control of Tactile prior to its receipt from Sun; (ii) is independently derived by Tactile without use of the information described on Exhibit C; (iii) is or becomes a matter of public knowledge through no fault of Tactile; (iv) is disclosed by Sun to a third party  without any duty of confidentiality to Sun; (v) is disclosed under operation of law; or (vi) is lawfully obtained from a third party under no obligation of confidentiality to Sun.

(v)     "Licensed Patents" means the patents and patent applications (including any patents issued during the Term) in each case as listed in Exhibit A, as they pertain to the Products and specifically excluding any claims not relating to a compression product,  together with all patents that issue therefrom in the Territory and all continuations, continuations-in-part, divisionals, extensions, substitutions, reissues, re-examinations, and renewals of any of the foregoing in the Territory and Field.  For the avoidance of doubt, wound dressing claims relating to PFAB are not included in Licensed Patents.

(w)     "Losses" means all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

(x)     "Net Sales" means the total gross amount of monies or cash equivalent or other consideration paid by unaffiliated third parties for the sale of any product, including a Product, less the sum of the following: (a) discounts allowed in amounts customary in the trade as long as the Products are not unduly discounted to favor other Tactile products; (b) sales, tariff duties, and use taxes directly imposed and with reference to particular sales; (c) outbound transportation prepaid or allowed; (d) amounts allowed or credited on returns; and (e) adjustments made by insurance payers to the allowable amount reimbursed, in each case as determined in accordance with GAAP as applied by Tactile.

(y)     "New Jurisdiction" means any jurisdiction other than the jurisdictions included in the Territory.

(z)     "Option" shall have the meaning provided in Section 7(a).

(aa)     "Option Notice" shall have the meaning provided in Section 7(a).

(bb)     "Option Period" shall have the meaning provided in Section 7(a).

(cc)     "Payment Statement" shall have the meaning provided in Section 3(f)(2).

3

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(dd)    "PFAB" means a locally applied wound dressing, with or without an absorbent layer, that utilizes prefilled or inflatable bladder member.

(ee)    "Products" means (i) all versions of Aero-Wrap, including Aero-Wrap, Aero-Wrap Acute, and Aero-Wrap Lite for prescription and over-the-counter, non-prescription use in the Field,  and/or (ii) any products that are disclosed or covered by the Licensed Patents, Licensed Manufacturing Know-How, or Licensed Brand.

(ff)    "Recipient" shall have the meaning provided in Section 9(a).

(gg)     "Royalty" means collectively, any Earned Royalty and any Sublicensing Royalty.

(hh)     "Sports Application" means the use of compression for athletic enhancement and not medical purposes (making claims only related to athletic performance).

(ii)    "Sublicensing Royalty" has the meaning provided in Section 3(c).

(jj)    "Sun Indemnitee" shall have the meaning provided in Section 11(a).

(kk)     "Tactile Contributions" means any improvements, modifications, derivatives, enhancements, information, or other contributions to the Products made or suggested by Tactile or by Tactile employees or contractors on or after the Effective Date for which patents are granted to Tactile.

(ll)    "Tactile Indemnitee" shall have the meaning provided in Section 11(b).

(mm)     "Territory" means the United States and Canada.

(nn)     "Transaction" shall have the meaning provided in Section 7(a).

(oo)    The terms, "include" and "including," mean includes without limitation or including without limitation.

2.    **License Grant; Sublicensing; Tactile Contributions; Technical Assistance.**

(a)    Patent License.  Sun hereby grants Tactile and Tactile's Affiliates a royalty bearing, exclusive (even with respect to Sun ), sublicensable (including pursuant to Section 2(d) below) license during the Term in the Territory and the Field, under the Licensed Patents to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, import, have imported, export, have exported, distribute, have distributed and otherwise transfer Products.

(b)    Trademark License.  Sun hereby grants Tactile and Tactile's Affiliates a royalty bearing, exclusive (even with respect to Sun), sublicensable (including pursuant to Section 2(d) below) and revocable (to the extent provided for in this Agreement) license during the Term in the Territory and the Field, to use the Licensed Brands relating to the sale and promotion of the Products.

4

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c)    Know-How License.  Sun hereby grants Tactile and Tactile's Affiliates a royalty bearing, exclusive (even with respect to Sun), sublicensable (including pursuant to Section 2(d) below) right to use the Licensed Know-How during the Term in the Territory and the Field for purposes of designing, developing, making, using, selling, offering for sale, and importing the Products.

(d)    Sublicensing.

(i)    Sublicense Grant. Subject to the terms and conditions of this Agreement, Sun hereby grants to Tactile the right to sublicense all or any of its licensed rights to and under the Licensed IP to any third party for the further development of the Licensed IP in such third party's products.   Tactile hereby guarantees the performance of its Affiliates and permitted sublicensees and the grant of any such sublicense shall not relieve Tactile of its obligations under this Agreement, except to the extent they are satisfactorily performed by such sublicensee. Tactile shall remain responsible for all actions or omissions of its sublicensees, including any breach of the terms of this Agreement and the license grants herein.  Any act or omission of a sublicensee that would be a breach of this Agreement if performed by Tactile will be deemed a breach by Tactile of this Agreement.  For the avoidance of doubt, sublicensing does not include any sale of Tactile's Products by dealers, distributors or resellers.

(ii)    Notice of Sublicense Agreement. Tactile shall deliver to Sun a true, complete, and correct copy of each sublicense agreement entered into by Tactile, and any modification or termination thereof, within ten Business Days following the applicable execution, modification, or termination of the sublicense agreement. Any such sublicenses shall be subject to the terms and conditions of this Agreement.

(e)    Reservation of Rights.

(i)    Subject to the rights granted to Tactile under this Section 2, Sun will retain all rights, title and interests in and to the Licensed IP.  Notwithstanding the license grants provided in subsections (a)-(c) above, Sun retains the right to (A) make, have made, and manufacture Products within the Territory for sale outside of the Territory or outside the Field, (B) use the Licensed Brands within the Territory to promote sales outside the Territory or outside the Field, and (C) use the Know-How within the Territory to further design, develop, make, use, sell, and offer for sale the Products outside of the Territory or outside of the Field.

(ii)    In the Territory, Sun retains all rights to the Licensed IP as related to the Sports Application, subject to the following:  (A) branding (including Licensed Brands and name brands) of any product for Sports Application must be distinctly different from Existing Products; (B) product styling must be different from Existing Products and not include a foot strap (making it not optimal for lower leg venous medical applications); and (C) Sun may not license or sell any product for the Sports Application to

5

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

a company known by Sun to be a channel partner of Tactile without the prior written consent of Tactile (such consent by Tactile shall not be unreasonably withheld, delayed or conditioned), or to a company selling medical compression products without the prior written consent of Tactile.  Tactile will not market the Products for Sports Applications but will not be deemed to have breached this Agreement if a Royalty bearing Product sold by Tactile is used in Sports Applications by an end user.

(f)     <u>Tactile Contributions</u>.  Sun acknowledges and agrees that Tactile will retain all rights, title and interests in and to all Tactile Contributions.  Sun will not use, license, or make available any Tactile Contribution for the benefit of any third party, including in connection with any product that is manufactured, supplied, sold, or otherwise distributed for the benefit of any third party, unless Sun and Tactile enter into a mutually acceptable agreement for Sun to license such Tactile Contribution.

(g)     <u>Third Party Manufacturers</u>.  Tactile will have the right to have Products made for Tactile by third party manufacturers, provided that the third-party manufacturer is subject to obligations and restrictions on the use of the Licensed IP as set forth in this Agreement.

(h)     <u>Technical Assistance</u>.  Sun will provide Tactile and its third-party manufacturers reasonable assistance to enable Tactile and its third party manufacturers to manufacture the Products for use or sale within the Territory.  In connection with the foregoing, Sun will provide Tactile (and its third-party manufacturers, as directed by Tactile) all technical data relating to the Products, including the bill of materials, drawings, component and material suppliers, and all other information reasonably necessary to enable Tactile and its third-party manufacturers to manufacture the Products for use or sale within the Territory.  Sun acknowledges and agrees that all such reasonable assistance will be provided free of charge and Sun is not entitled to any fees for any such assistance; provided, however, all travel expenses will be paid by Tactile prior at any Sun personnel travelling outside of Westchester County, New York. Sun will provide to Tactile copies of all documents and records relating to the Licensed Know-How, including copies of all files for the Licensed IP.  Representatives of Tactile will be given reasonable access and opportunity to communicate with Sun engineers familiar with the Licensed IP for the purpose of using the Licensed Know-How, and Sun will provide such other cooperation to Tactile as is reasonably requested to fully use the Licensed IP within the Field.

(i)     Tactile has sole discretion with respect to, developing, modifying, producing, marketing, branding, distributing, and pricing the Products in the Field within the Territory, subject to compliance with all laws and regulations. For the avoidance of doubt, Tactile will not, directly or indirectly, sell, distribute or promote the Products outside of the Territory or outside of the Field within the Territory and will refer all inquiries for Products outside of the Territory or outside of the Field to Sun for Sun to fulfill such orders.

6

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(i)     Sun will cease sales, distribution, promotion or other commercial activity with respect to any products that use the Licensed IP in the Field within the Territory as of the Effective Date and transfer existing customers in the Territory within the Field to Tactile, and, subject to applicable patient privacy laws, provide a list of these customers that have purchased any products from Sun within the three-year period prior to the date hereof and any information relating to sales of Products to these customers, to Tactile so that Tactile may provide Products to these customers.  Any third-party inquiries to Sun for purchase of Product in the Field within the Territory will be answered by Sun stating that Tactile is the appropriate seller.  For the avoidance of doubt, Sun will not sell any Products in the Field within the Territory but will continue to sell and distribute products outside of the Field in the Territory and will continue to promote and engage in other commercial activity within the Territory for sales outside the Territory such as attending trade shows, maintaining a website, and other commercial activities.  Sun will retain all existing business operations and liabilities of Sun relating to any products that use the Licensed IP, including inventory, before the Effective Date.

(k)     Tactile commits to using the Licensed IP as soon as is commercially reasonable after the Effective Date.  If Tactile has not used the Licensed Patents by January 1, 2020, Sun may terminate this Agreement pursuant to Section 6(b)(iv)(A).  Further, Sun may also terminate this Agreement on or before the 21-month anniversary of the Effective Date pursuant to Section 6(b)(iv)(B) if Tactile has not Commercialized the Products within eighteen (18) months of the Effective Date.

(l)     <u>Maintenance</u>.

(i)     Sun is responsible for paying all costs for maintenance of the Licensed Patents and prosecution of patent applications in the Licensed Patents in the Territory.  Sun may elect, on 25 days' prior written notice to Tactile, to discontinue the prosecution and maintenance and payment of all related fees and costs of any patents and patent applications in the Territory forming a part of the Licensed Patents.  Subject to Tactile's rights to assume the same as provided below, Sun may at its own discretion and expense, continue or abandon any or all of such Licensed Patents for which the filing, prosecution or maintenance was discontinued by it.

(ii)    If Sun elects not to continue to pay the patent fees and costs in the Territory for any or all Licensed Patents as described in Section 2(l)(i), or elects not to continue to  prosecute or maintain patents and patent applications, all as provided above, then Tactile may agree to assume the responsibility to pay such patent fees and costs and continue to  prosecute and maintain such patents and patent applications,  and Sun shall assign all right, title and interest in and to such patents or patent applications to Tactile; provided, however, that such patents or patent applications which are assigned to Tactile shall be removed from the list of Licensed Patents.

7

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

3.      **Payments**.

    (a)    <u>Initiation Fee</u>. In consideration of the licenses granted under this Agreement, Tactile will pay on the Effective Date, to Sun a one-time, non-refundable, non-creditable license initiation fee of US$4,000,000 in cash.

    (b)    <u>Earned Royalty</u>.  In consideration of its license to the Licensed IP under this Agreement, Tactile shall pay to Sun a royalty of [***] percent ([***]%) of Tactile's Net Sales of the Products sold by or for Tactile in the Territory during the Term pursuant to the license grant in Section 2 ("<u>Earned Royalty</u>").  Such royalty may be modified as provided in Section 3(d) and Section 5.

    (c)    <u>Sublicensing Royalty</u>. Tactile shall pay to Sun a sublicensing royalty ("<u>Sublicensing Royalty</u>") of [***]% of sublicensee's Net Sales of the Products.  Such royalty may be modified as provided in Section 3(d) and Section 5.  In addition, Tactile shall pay to Sun [***]% of any one-time or lump sum payments made to Tactile by such Sublicensee attributable to the Products (as reasonably agreed by Tactile and Sun) pursuant to any sublicensing agreement, including but not limited to initiation fees, up-front royalties, option payments, milestones, earn-outs and the like. Tactile and Sun will agree to the value of any non-cash consideration received by Tactile from a third party in lieu of cash as consideration from such third party under a sublicense agreement; provided that if Tactile and Sun cannot agree on such value, they will appoint a mutually acceptable appraiser to value the non-cash consideration. For the avoidance of doubt, Sun will be paid its consideration percentage for any non-cash value received by Tactile in cash paid by Tactile.

    (d)    <u>Royalty Stacking</u>. If, during the Term, Tactile modifies a Product such that it requires a third-party license to intellectual property that would not have been required to make, use, or sell the Existing Products, then Sun has no obligation to Tactile and any royalty that Tactile may have to pay is additional to any Royalties owed to Sun. However, if the Existing Products are found to violate a third party's intellectual property, then Tactile after consultation with Sun and with Tactile's IP counsel, may in its sole discretion takes a royalty-bearing license under patent or copyright rights owned by a third party in any country in the Territory to make, use, offer to sell, sell, or import any Product and Tactile pays a royalty to such third party, Tactile may deduct from any Royalty payment due under this Agreement the royalties actually paid by Tactile to each such third party for such Product, but in no event shall such deduction reduce the applicable Earned Royalty payable to Sun by more than half of the Earned Royalty. By way of example, if Tactile makes a third party royalty payment under this Section of [***]% of Net Sales while Tactile is paying an Earned Royalty of [***]% of Net Sales to Sun, then the Earned Royalty paid to Sun will be reduced to [***]% of Net Sales; provided, however, if Tactile is paying an Earned Royalty of [***]% of Net Sales to Sun under Section 5(b)(ii) at such time of the third party royalty of [***]%, then the Earned Royalty paid to Sun would be reduced to [***]% of Net Sales.  Any such deductions from Tactile shall be detailed to Sun as part of the Royalty Statement.

8

**[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(e)     Taxes. Royalties and other sums payable under this Agreement are exclusive of taxes. Sun shall be responsible for all sales, use, excise, and value added taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local Governmental Authority on any amounts payable by Tactile hereunder.

(f)     Royalty Payment Terms and Royalty Statements.

    (i)     Tactile shall pay all Royalties (A) for each Quarterly Period that is not the fourth quarter of Tactile's fiscal year, within 60 days of the last day of such Quarterly Period, and (B) for each Quarterly Period that is the fourth quarter of Tactile's fiscal year, within 80 days of the last day of such Quarterly Period. Tactile shall make all payments in US dollars by wire transfer of immediately available funds to a bank account to be designated in writing by Sun.

    (ii)     On or before the due date for the payment of Royalties pursuant to Section 3(f)(i), Tactile shall provide Sun with a statement ("Payment Statement") showing:

        (1)     the total number of Products sold by Tactile and any sublicensees in the relevant Quarterly Period, broken down by Product (as determined by product code/SKU);

        (2)     Tactile's Net Sales of all Products sold (broken down by Product and product code/SKU), the relevant deductions from gross sales to calculate the Net Sales amount, and the total Sublicensing Royalties accrued in the relevant Quarterly Period; and

        (3)     the Quarterly Period for which the Earned Royalties and the Sublicensing Royalties were calculated.

(g)     Interest on Late Payments.  If any payment due to Sun under this Agreement is not paid when due, then Tactile shall pay interest thereon (before and after any judgment) at an annual rate (but with interest accruing on a daily basis) equal to the lesser of (a) the prime rate as reported on the first Business Day of each month such payment is overdue in *The Wall Street Journal*, Eastern Edition, plus two (2) percentage points, and (b) the maximum rate permitted by applicable law.  Interest payable shall run from the day following the date upon which payment of the relevant principal sum became due through the date of payment thereof in full together with such interest.  For the avoidance of doubt, Tactile will continue to pay Royalties and not suspend such payments during any challenge of the validity of any of the Licensed Patents.

4.     **Records; Dispute Resolution**.

(a)     Records Tactile shall keep complete and accurate records of its and its sublicensees' sales, uses, transfers, and other dispositions of Products reasonably necessary for the calculation of payments to be made to Sun hereunder for the

9

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

period required by Tactile's records retention policy but not less than may be required to document or audit the Contingent Payment Requirement of Section 5. Tactile shall ensure that any sublicense agreement contains a record retention provision consistent with this Agreement and both Tactile and any Sublicensee shall make its records reasonably available to the Chosen Firm during normal working hours so that the Chosen Firm may resolve any dispute as set forth in Section 4(b).

(b)    Dispute Resolution.

(i)    The Payment Statement will be binding and conclusive upon the Parties unless Sun gives written notice of disagreement to Tactile within 45 Business Days after receipt of the Payment Statement, specifying in reasonable detail the nature and extent of such disagreement. If Sun and Tactile mutually agree upon the Payment Statement within 30 Business Days after Tactile's receipt of such notice from Sun, such agreement shall be binding upon the Parties. If Tactile and Sun are unable to resolve any such disagreement(s) within such 30-Business Day period, either Sun or Tactile may refer the accounting matters remaining in dispute for final determination to such reputable, national independent accounting firm as Sun and Tactile may designate by mutual agreement (the firm so designated, the "Chosen Firm"). The Chosen Firm shall only have authority to resolve those accounting matters specifically referred to it for resolution related to a dispute regarding the Payment Statement, and shall apply the provisions of this Agreement in resolving any dispute pursuant hereto. The Parties shall use their reasonable commercial efforts to cause the Chosen Firm to resolve any such disputed accounting matters within 30 days after such referral. The decision of the Chosen Firm as to any accounting matters in dispute shall be in writing and shall be final and binding upon all parties hereto for all purposes, absent manifest error. Any disagreements among the parties with respect to any matters of law or the interpretation of this Agreement remain subject to the dispute resolution provisions set forth in Section 12(g), and the Chosen Firm shall have no authority to decide such matters unless specifically agreed by Tactile and Sun at the time, and any dispute as to whether a matter is an accounting matter or a matter of law or interpretation of this Agreement will, unless otherwise agreed by Tactile and Sun at the time, be resolved pursuant to the dispute resolution procedures set forth in Section 12(g). Tactile shall ensure all sublicense agreements include access to records as required to resolve any disputes pursuant to this Section 4(b)(i) relating to such royalties or other consideration to be paid under sublicense agreements.

(ii)    If the Chosen Firm's report shows that payments made by Tactile are deficient, Tactile shall pay Sun the deficient amount within 30 Business Days after Tactile's receipt of the report. If payments made by Tactile are found to be deficient by more than 5%, Tactile shall pay for the cost of the Chosen Firm. If payment made by Tactile are not found to be deficient by more than 5%, Sun shall pay for the cost of the Chosen

10

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Firm.  If payments by Tactile are found to be in surplus, then such surplus shall be credited as advance payment of royalties and may be deducted by Tactile in full from future royalty payments until such credit is fully exhausted.

5.    **Contingent Payment; Royalty Paydown**

   (a)    At Tactile's election, either (i) within 90 days after the seventh anniversary of the date of Commercialization or (ii) at any time after Tactile's cumulative Net Sales of the Products have exceeded US$[***] (if such time occurs before the seventh anniversary of the date of Commercialization) (such date, the "Commercialization Statement Date"), Tactile shall provide Sun with a statement ("Commercialization Statement") showing:

      (1)    the total number of Products sold by Tactile during such period beginning on the date of Commercialization and ending on the Commercialization Statement Date; and

      (2)    Tactile's Net Sales of all Products sold, including the relevant deductions from gross sales to calculate the Net Sales amount during such period beginning on the date of Commercialization and ending on the Commercialization Statement Date.

   The Commercialization Statement will be binding and conclusive upon the Parties unless Sun gives written notice of disagreement to Tactile within 30 Business Days after receipt of the Commercialization Statement, specifying in reasonable detail the nature and extent of such disagreement.  Any disputes relating to the Commercialization Statement shall be resolved in accordance with the procedures set forth in Section 4(b).

   (b)    If Tactile's cumulative Net Sales of the Products during the period beginning on the date of Commercialization and ending on the Commercialization Statement Date exceed US$[***]:

      (i)    Tactile would pay to Sun within 30 Business Days after the Commercialization Statement is finalized, a one-time payment of US$[***], and on the anniversary of the date on which the Commercialization Statement is finalized, a second one-time payment of US$[***], resulting in cumulative payments of US$[***], in each case payable either in cash or freely tradeable Tactile stock, at the sole election of Tactile;  and

      (ii)    The royalty rate in Section 3(b) and Section 3(c) for the quarter in which the initial US$[***] payment described in Section 5(b)(i) is paid by Tactile and for every remaining quarter in the Term is modified to be [***]% of Tactile's Net Sales of the Products.

   (c)    If Tactile's cumulative Net Sales of the Products in the first 7 years after Commercialization do not exceed US$[***], the Commercialization Statement

11

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Date will be within 90 days after the seventh anniversary after the date of Commercialization. If Tactile's cumulative Net Sales of the Products in the first 7 years after Commercialization exceed US$62,000,000 and do not exceed US$[***]:

    (i)    Tactile would pay to Sun within 30 Business Days after the Commercialization Statement is finalized, a one-time payment of US$[***], and on the anniversary of the date on which the Commercialization Statement is finalized, a second one-time payment of US$[***], resulting in cumulative payments of US$[***], in each case payable either in cash or freely tradeable Tactile stock at the sole election of Tactile;  and

    (ii)    The royalty rate in Section 3(b) and Section 3(c) for the quarter in which the initial US$[***] payment described in Section 5(c)(i) is paid by Tactile and for every remaining quarter in the Term is modified to be [***]% of Tactile's Net Sales of the Products.

6.    **Term; Termination**

    (a)    <u>Term</u>.  This Agreement will become effective on the Effective Date and unless earlier terminated in accordance with the terms herein, will continue in force until the date of expiration of the last to expire or be invalidated of the Licensed Patents (the "<u>Term</u>").  If this Agreement has been terminated under Section 6(b), all licenses granted in the Agreement shall immediately terminate.   If this Agreement has not been earlier terminated under Section 6(b), upon expiration of the Term, all licenses granted in the Agreement shall survive expiration of the Agreement and no further Royalties will be owed to Sun by Tactile.

    (b)    <u>Termination</u>.  This Agreement may also be terminated as follows:

        (i)    <u>By either Party for a Material Breach.</u> Each Party may terminate this Agreement upon a material breach of this Agreement that is not capable of being cured or, if capable of being cured, that is not cured within 30 Business Days after receiving notice of the breach from the non-breaching Party.

        (ii)    <u>By Tactile</u>.  Tactile may terminate this Agreement at any time and for any or no reason upon six months' prior written notice to Sun.  If Tactile terminates the Agreement under this Section 6(b)(ii), Tactile will provide Sun with the list of customers to which Tactile sold Products in the three-year period before such termination, subject to applicable patient privacy laws. Such termination under this section 6(b)(ii) does not relieve Tactile of any obligations accrued as of the date of termination including the payment of past Royalties or any obligations that may be earned under Section 5.

        (iii)    <u>By Sun</u>.  Sun may terminate the Agreement upon six months' prior written notice if Tactile's Net Sales of the Products in any calendar year beginning January 1, 2022 do not exceed US$[***].  If Sun elects to terminate the Agreement under this Section 6(b)(iii), Tactile shall have

12

**[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

the option, at its sole discretion, to remedy the shortfall once and only once during the Term, by paying Sun a one-time payment equal to (A) three (3) times the total royalties that would have been paid if Net Sales of the Products were US$[***] in that calendar year minus (B) the total Royalties paid in that calendar year with a sales shortfall.  If Sun terminates the Agreement under this Section 6(b)(iii), Tactile will provide Sun with the list of customers to which Tactile sold Products in the three-year period before such termination, subject to applicable patient privacy laws.

(iv)    By Sun.    (A) Sun may terminate the Agreement on or before January 31, 2020 if Tactile has not used the Licensed Patents by January 1, 2020.  (B) Sun may terminate the Agreement on or before the 21-month anniversary of the Effective Date if Tactile has not Commercialized the Products within eighteen (18) months of the Effective Date.  On or before the 19-month anniversary of the Effective Date, Tactile shall provide to Sun a statement of all Net Sales for the first 18 months from the Effective Date.

(c)    Sell Off Period.  Upon termination of this Agreement for any reason, Tactile will have the right to dispose of all stocks of Products in its possession or control and all Products in the course of manufacture as of the date of termination for a period of one year after the date of termination, in each case, in accordance with the terms and conditions of this Agreement (including Royalty payments).

(d)    Return or Destruction of Licensed Know-How.  Upon termination of this Agreement Tactile, at the request of Sun, shall return or, at the election of Tactile, use reasonable efforts to destroy, and thereafter provide to Sun written certification evidencing such destruction, all data, files, records and other materials in its possession or control relating to the Licensed Know-How, or containing or comprising the Licensed Know-How or other Sun Confidential Information (except one copy of which may be retained solely for archival purposes); provided that Tactile shall have not obligation pursuant to this Section 6(d) to return or destroy any information to the extent that it: (i) was already legally in the possession and control of Tactile prior to its receipt from Sun; (ii) is independently derived by Tactile without use of the Licensed Know-How; (iii) is or becomes a matter of public knowledge through no fault of Tactile; (iv) is disclosed by Sun to a third party  without any duty of confidentiality to Sun; (v) is disclosed under operation of law; or (vi) is lawfully obtained from a third party under no obligation of confidentiality to Sun.

(e)    Effect of Termination on Sublicenses.    Any and all sublicense agreements entered into by Tactile or any of its Affiliates with a sublicensee pursuant to Section 2(d) shall include a provision that upon termination of this Agreement the sublicense agreement shall be converted into a license directly between Sun and the sublicensee, provided that, with respect to each such sublicense agreement, either (i) Sun shall have the right to consent (with such right not to be unreasonably withheld, delayed or conditioned) to such sublicense agreement or

13

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(ii) if Sun has not consented to such sublicense agreement pursuant to clause (i), Sun in its sole discretion may terminate such sublicense agreement.

(f)     Survival.  All provisions which are continuing in nature, including those involving confidentiality and indemnification, will survive termination of this Agreement.  Specifically, all financial obligations of Tactile under Sections 3 and 5 which have accrued prior to the termination date of this Agreement (for any reason) shall continue and such termination will not relieve Tactile from such payments and performing all related obligations.

7.     **Rights of First Negotiation and First Refusal**

(a)     Nothing in this Agreement limits Sun in any way from conducting its business in any manner it so elects outside of the Field or outside of the Territory. This includes the right to enter into distribution agreements, establish joint ventures, or any other activities Sun may elect to pursue to advance its business. However, while Royalties are being paid by Tactile under this Agreement, in the event Sun and its Affiliates decide in their sole discretion to (i) exit all commercial activities, (ii) otherwise sell the business that offers for sale or sells the Products, or (iii) license the Licensed IP (as a method of exiting its then current business) (any such transaction, a "Transaction"), in each case in a New Jurisdiction, Sun grants Tactile a right of first negotiation to acquire Sun's interest in the Products in any Transaction in such New Jurisdiction ("Option"). Sun will contact Tactile promptly when Sun becomes ready to enter into any such Transaction in a New Jurisdiction (the "Option Notice").  The Option Notice will describe in reasonable detail the proposed terms of the Transaction proposed by Sun in the New Jurisdiction, including the consideration to be paid.  If Tactile notifies Sun of its acceptance of the terms of the Option within 30 Business Days of Tactile's receipt of the Option Notice (the "Option Period"), Tactile and Sun shall negotiate in good faith the remaining terms of the Option.  If Tactile does not notify Sun of its acceptance of the terms of the Option within the Option Period, the Option shall automatically expire solely with respect to the New Jurisdiction on the terms set forth in the Option Notice and Sun may offer the Licensed IP in the New Jurisdiction for a period of one year to any third party on terms substantially similar to, or not materially better for such prospective licensee than, the terms that were offered to Tactile in the Option Notice.  If Sun determines to offer the Licensed IP in the New Jurisdiction on terms that are materially better for such prospective licensee than were offered to Tactile in the Option Notice, Sun shall provide a new Option Notice to Tactile, which Option Notice will be subject to the terms of this Section 7(a).

(b)     Nothing in this Agreement limits Sun in any way from conducting its business in any manner it so elects outside of the Field or outside of the Territory. However, during the Term and while Royalties are being paid by Tactile, should Sun in its sole discretion elect to enter into any Transaction (including for purposes of this Section 7(b) any license of the Licensed IP, joint venture or distribution/reseller transaction with a third party) with respect to the DVT Prevention Application, Tactile is granted a right of first refusal to purchase, license, resell, distribute or

14

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

otherwise market, promote, distribute, offer for sale or sell the DVT Prevention Application:

(i) <u>Notice</u>.   If Sun proposes to enter into any Transaction, as the case may be, the DVT Prevention Application in the Territory, then Sun shall promptly give written notice (the "<u>DVT ROFR Notice</u>") to Tactile at least 45 days prior to the closing of such transaction.  The DVT ROFR Notice shall describe in reasonable detail the proposed Transaction, including the consideration to be paid, and the jurisdictions subject to the license, and the name of the prospective third party (providing a confidentiality agreement does not prohibit the release of this information and, in such case, Sun shall provide to Tactile the jurisdiction of organization and approximate revenue ranges by jurisdiction of the counterparty in such Transaction) that will enter into such Transaction with respect to DVT Prevention Application.  Any such Transaction shall be subject to the terms of the license granted to Tactile under this Agreement and Sun shall so inform the prospective purchaser or transferee.

(ii) <u>Right of First Refusal.</u> For a period of 30 days following receipt of the DVT ROFR Notice (the "<u>DVT Refusal Period</u>"), Tactile shall have the right, exercisable by written notice to Sun, to enter into the Transaction covered by the DVT ROFR Notice with respect to, as the case may be, the DVT Prevention Application on the same terms and conditions as set forth in the DVT ROFR Notice.  Upon expiration or termination of the DVT Refusal Period, unless Sun has received written confirmation from Tactile regarding its exercise of its right of first refusal, Sun shall be free to enter into such transaction described in the DVT ROFR Notice with respect to the DVT Prevention Application on the terms and to the prospective purchaser or transferee pursuant to the DVT ROFR Notice.  If such license shall not have closed within 120 days after termination (extended for up to 60 days in connection with any regulatory waiting period such as pursuant to the Hart-Scott-Rodino Act) of the DVT Refusal Period, then Sun shall be obligated to give Tactile a new DVT ROFR Notice and right of first refusal pursuant to this Section 7(c)(ii).

(iii) <u>Exercise of First Refusal Rights.</u>   If Tactile exercises its right of first refusal, it shall be obligated to enter into the transaction for the DVT Prevention Application as the case may be on the terms set forth in the DVT ROFR Notice; provided, however, that if any consideration to be delivered to Sun is other than money, Tactile may deliver the monetary equivalent thereof in full payment of the purchase price.

8. **Enforcement of Licensed Patents and Licensed Know-How and Third-Party Infringement Claims**.

(a) <u>Notification of Infringement.</u>   Each Party agrees to provide written notice to the other Party promptly after becoming aware of any infringement by a third party

15

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

of the Licensed IP. Neither Party is aware of any third party infringers as of the Effective Date.

(b)      Right to Bring Action or Defend.

(i)      Tactile shall have the first right, but not the obligation, to institute, prosecute, and control any action, suit, or proceeding with respect to infringement or misappropriation of the Licensed IP in the Field within the Territory, including any declaratory judgment action (collectively an "Infringement Claim"), at its own expense, using counsel of its own choosing. If Tactile is funding the Infringement Claim, Tactile may enter into any settlement or consent judgment or other voluntary final disposition of such Infringement Claim without the prior written consent of Sun provided such settlement is only within the Field within the Territory and has no implications on any Sun intellectual property or sales of Products outside the Field or Territory at which time Sun's prior written consent is required (which may not be unreasonably withheld, delayed or conditioned). If Tactile is not funding the Infringement Claim, no settlement or consent judgment or other voluntary final disposition of such Infringement Claim may be entered into by Tactile without the prior written consent of Sun (which may not be unreasonably withheld, delayed or conditioned).

(ii)     If Tactile does not exercise such right within 90 days of any notice provided by Sun under Section 8(a), then Sun shall have the right, but not the obligation, to pursue such Infringement Claim.

(iii)    Each Party shall cooperate and assist the other in pursuing any such Infringement Claim, including joining in any action or providing power of attorney if necessary. Each Party shall bear its own costs and expenses in connection with such pursuit. The controlling Party in any Infringement Claim brought under this Section shall provide the other Party, promptly following the controlling Party's receipt or creation thereof, with copies of all documents filed or publicly disclosed in or in connection with such claim or action. Any amounts recovered pursuant to an Infringement Claim under this Section 8(b) or any settlement thereof shall be applied (1) first to reimburse the Party instituting, prosecuting and controlling such Infringement Claim and its Affiliates for their costs and expenses, including reasonable attorneys' fees, in connection therewith, (2) second to reimburse the costs and expenses of the other party and its Affiliates in connection with such Infringement Claim, and (3) any remaining amount shall be paid to the Party and its Affiliates that pursued the Infringement Claim; provided, however, that if Tactile pursues and solely funds such Infringement Claim then it shall pay Sun 30% of such remaining proceeds and if an ongoing royalty is part of the Infringement Claim it shall be subject to the Sublicensing Royalty and sharing of any one-time or lump sum payments under Section 3(c).

16

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

9.    **Confidentiality and Publicity**

(a)    Confidential Information.  "Confidential Information" means all data, information and how-how disclosed by one Party ("Discloser") to the other Party ("Recipient") during the term of this Agreement (or in contemplation of it) regarding technology, designs, know-how, inventions, patent applications, trade secrets, data, business information, products, markets, and business plans relating to the subject matter of this Agreement (but will not include information excluded by Section 9(c) below).  Disclosures may be made in any manner, including through written documents, magnetic media, electronic transmissions, verbal disclosures, visual presentations and facility tours.  The obligations of this Agreement will apply to all information which the Recipient knows or has reason to know or believe that the Discloser considers to be Confidential Information.

(b)    Obligations.  Each Party agrees it will make no use of Confidential Information of the other Party except for the purpose of this Agreement.  Such Confidential Information will not be disclosed without written permission of the owner; provided, however, that Tactile will be entitled to disclose Confidential Information of Sun to Tactile's contractors and third-party manufacturers so long as such third parties are bound by written obligations of confidentiality.

(c)    Exclusions.  The obligations set forth in Section 9(b) above will not apply to a Party's information, and such information will not be deemed to be Confidential information, to the extent that it (i) was already legally in the possession and control of the Recipient prior to its receipt from the Discloser; (ii) is independently derived by the Recipient without use of the Discloser's Confidential Information; (iii) is or becomes a matter of public knowledge through no fault of Recipient; (iv) is disclosed to a third party by Discloser without a duty of confidentiality on the third party; (v) is disclosed under operation of law; (vi) is disclosed by Recipient with Discloser's prior written approval; or (vii) is lawfully obtained from a third party under no obligation of confidentiality to the Discloser.

(d)    Publicity.  Neither Party may make any public announcement about or advertise the existence of this Agreement or divulge its terms and conditions other than with the prior written agreement of the other Party.  Tactile shall have the right to disclose information as required in SEC filings.

(e)    Confidentiality Period.  Confidential Information disclosed under this Agreement will remain subject to the restrictions set forth in this Agreement until five years from the expiration or termination of this Agreement.

10.    **Representations, Warranties and Covenants**.

(a)    Mutual Representations and Warranties.  Each Party represents, warrants, and covenants to the other Party that:

(i)    it is duly organized, validly existing, and in good standing as a corporation or other entity as represented herein under the laws and

17

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

regulations of its jurisdiction of incorporation, organization, or chartering;

(ii)     it has, and throughout the Term will retain, the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(iii)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate or organizational action of the Party;

(iv)     it has not entered into any agreement which conflicts with the terms of this Agreement and that it will not do so during the Term of this Agreement; and

(v)      when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of that Party, enforceable against that Party in accordance with its terms.

(b)     Sun Representations and Warranties.  Sun represents, warrants, and covenants to Tactile that as of the Effective Date:

(i)      it is the sole and exclusive owner or licensee of the Licensed IP and that to its knowledge all such Licensed IP is valid and enforceable;

(ii)     to its knowledge, neither the Existing Products nor the Licensed IP as used in any Existing Products  does or would infringe, misappropriate, or otherwise violate any patent, trade secret, or other intellectual property of any third party;

(iii)    the Licensed IP includes all the intellectual property owned by Sun, or in which Sun has a licensable interest, that are necessary or useful for Tactile to make, have made, use, offer to sell, sell, import, export and otherwise transfer the Existing Products in the Field within the Territory;

(iv)     it has retained, and throughout the Term will retain, the right, power, and authority to grant the license hereunder;

(v)      neither its grant of the license, nor its performance of any of its obligations, under this Agreement does or will at any time during the Term:

(1)      conflict with or violate any applicable law, regulation, rule, order;

(2)      require the consent, approval, or authorization of any governmental or regulatory authority, or other third party; or

18

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(3)      require the provision of any payment or other consideration to any third party;

(vi)      it has not granted and will not grant any licenses or other contingent or non-contingent right, title, or interest under or relating to Licensed IP in the Field within the Territory, or is or will be under any obligation, that does or will conflict with or otherwise affect this Agreement, including any of Sun's representations, warranties, or obligations or Tactile's rights or licenses hereunder;

(vii)      there is no settled, pending or to its knowledge threatened litigation or reissue application, re-examination, post-grant, inter partes, or covered business method patent review, interference, derivation, opposition, claim of invalidity, or other claim or proceeding (including in the form of any offer to obtain a license):

(1)      challenging Sun's ownership of, or right to practice or license, any Licensed IP, or alleging any adverse right, title, or interest with respect thereto; or

(2)      alleging that the practice of any Licensed IP or the making, using, offering to sell, sale, importation, exportation, or other transfer of any Product does or would infringe, misappropriate, or otherwise violate any patent, trade secret, or other intellectual property of any third party; and

(viii)      it has not received any written, oral, or other notice of any litigation, claim, or proceeding described in Section 10(b)(vii) and, upon receipt of any such notice, Sun will promptly notify Tactile of such notice; and

(ix)      that it is the sole and exclusive owner of an FDA 510K clearance for each Existing Product.

(c)      Tactile Representations, Warranties and Covenants.  Tactile represents, warrants and covenants to Sun that as of the Effective Date:

(i)      it shall not intentionally damage the reputation of Sun during the Term of this Agreement;

(ii)      it will fulfill all of its obligations in this Agreement, work in good faith with Sun with respect to the Products, and market and sell Products in good faith;

(iii)      it will not take any action in bad faith or with an intent of avoiding or reducing any amount payable to Sun hereunder;

(iv)      it will not sell, promote, or distribute the Products outside of the Field or Territory; and

19

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

(v)     it has no knowledge of infringement by the Existing Products of any third party intellectual property rights.

CASE 0:20-cv-02074-NEB-DTS    Doc. 66-18    Filed 06/18/21    Page 62 of 91

(d)     <u>Disclaimer</u>.  OTHER THAN THE EXPRESS WARRANTIES HEREIN, EACH PARTY MAKES NO OTHER WARRANTY AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ANY OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, INCLUDING ANY WARRANTY OF QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OR ANY WARRANTY AS TO THE VALIDITY OF ANY PATENTS OR THE NON-INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

11.     **Indemnification; Limitation of Liability**

(a)     <u>General Indemnification by Tactile</u>.  Tactile will indemnify, defend, and hold harmless Sun and its Affiliates and its and their officers, directors, employees, agents, successors, and assigns (each, an Sun <u>Indemnitee</u>") against all Losses arising out of or resulting from any third-party claim, suit, action, or proceeding (each an "<u>Action</u>") related to, arising out of, or resulting from Tactile's (i) breach of any representation, warranty, covenant, or obligation under this Agreement, (ii) manufacture, promotion, distribution and sale of the Products by Tactile after the Effective Date, or (iii) gross negligence or willful misconduct by Tactile.

(b)     <u>General Indemnification by Sun</u>.  Sun will indemnify, defend, and hold harmless Tactile and its Affiliates and its and their officers, directors, employees, agents, successors, and assigns (each, an "Tactile <u>Indemnitee</u>") against all Losses arising out of or resulting from any <u>Action</u> related to, arising out of, or resulting from Sun's (i) breach of any representation, warranty, covenant, or obligation under this Agreement, (ii) manufacture, promotion, distribution and sale of the Products by Sun prior to the Effective Date or by Sun outside of the Field or the Territory after the Effective Date, or (iii) gross negligence or willful misconduct by Sun.

(c)     <u>Infringement Claims</u>.  Sun will indemnify, defend, and hold harmless each of the Tactile Indemnitees against all Losses arising out of, resulting from or relating to any Action involving a claim of infringement of any patent or other intellectual property rights of any third party by (i) any manufacture, use, sale, offer for sale, importation, exportation, or transfer of any Existing Product, or (ii) the exercise of any rights or privileges by Tactile granted to it under this Agreement for the use of the Licensed IP with respect to the Existing Products.

(d)     <u>Indemnification Procedure</u>. The applicable Tactile Indemnitee or Sun Indemnitee will promptly notify the indemnifying party in writing of any Action and cooperate with the indemnifying party at the indemnifying party's sole cost and expense. The indemnifying party will immediately take control of the defense and investigation of the Action and will employ counsel reasonably acceptable to the applicable Tactile Indemnitee or Sun Indemnitee to handle and defend the same, at the indemnifying party's sole cost and expense. The indemnifying party

20

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

will not settle any Action in a manner that adversely affects the rights of any indemnified party without the indemnified party's prior written consent, which will not be unreasonably withheld or delayed. The indemnified party's failure to perform any obligations under this Section 11(d) will not relieve the indemnifying party of its obligation under this Section 11 except to the extent that the indemnifying party can demonstrate that it has been materially prejudiced because of the failure. The indemnified party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

(e)     Exclusion of Consequential and Other Direct Damages. To the fullest extent permitted by law, neither Tactile nor Sun will be liable to the other party for any injury to or loss of goodwill, reputation, business production, revenues, profits, anticipated profits, contracts, or opportunities (irrespective of how these are classified as damages), or for any consequential, incidental, indirect, exemplary, special, punitive, or enhanced damages whether arising out of breach of contract, tort (including negligence) or otherwise (including the entry into, performance or breach of this Agreement), regardless of whether such damage was foreseeable and whether or not such party has been advised of the possibility of such damages.

12.     **Miscellaneous**

(a)     Bankruptcy. All rights and licenses granted by Sun under this Agreement are and will be deemed to be rights and licenses to "intellectual property" and all Products are and will be deemed to be "embodiment(s)" of "intellectual property" for purposes of, and as such terms are used in and interpreted under, Section 365(n) of the United States Bankruptcy Code (the "Bankruptcy Code"). Tactile will have the right to exercise all rights and elections with respect to all Products. Without limiting the generality of the foregoing, Sun acknowledges and agrees that, if Sun or its estate will become subject to any bankruptcy or similar proceeding:

(i)     subject to Tactile's rights of election under the Bankruptcy Code, all rights and licenses granted to Tactile hereunder will continue subject to the terms and conditions of this Agreement, and will not be affected, even by Sun's rejection of this Agreement; and

(ii)    Tactile will be entitled to a complete duplicate of (or complete access to, as appropriate) all such intellectual property and embodiments of intellectual property comprising or relating to any Product, and the same, if not already in Tactile's possession, will be promptly delivered to Tactile, unless Sun elects to and does in fact continue to perform all its obligations under this Agreement.

(b)     Further Assurances. Each Party will, upon the reasonable request of the other Party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.  Upon execution of this Agreement and each renewal of the Term, Sun will file proper registration of

21

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

this Agreement with all necessary government authorities pursuant to the relevant laws and regulations for Sun to perform its obligations hereunder.

(c)    Independent Contractors. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party will have authority to contract for or bind the other Party in any manner whatsoever.

(d)    Assignment.  This Agreement may not be assigned by either Party, without the prior written consent of the other Party, except to (i) an Affiliate; or (ii) any third party who will acquire, by sale of assets or otherwise (including merger), all or substantially all the assets of such Party.  No such assignment will relieve the assigning Party of its obligations hereunder.  Any permitted sale or transfer of the Licensed IP by Sun is expressly subject to the terms and conditions of this Agreement and Sun shall so inform the prospective purchaser or transferee.

(e)    Notices.  All notices, requests or other communication required or permitted to be given under this Agreement will be in writing and will be delivered in person (including express courier, such as Federal Express) or sent by certified or registered mail, postage and certification prepaid, to Tactile or Sun, at the address set forth below. The notifying party will provide electronic mail copy to the other of the written hard copy communication promptly after it is mailed. Any notice given as aforesaid will be deemed given and effective upon actual delivery.  Any Party may change its address for notice by notice given in accordance herewith.

If to Sun:

145 Palisade Street,
Suite LL11
Dobbs Ferry, New York 10522
Attn: Dr. Sundaram Ravikumar
Email:  ravi@sun-scientific.com
and      Vikram@sun-scientific.com

With a copy (which shall not constitute notice) to:

William F. Shea, LLC
1010 Poinsettia Road
Del Ray Beach, Florida 33483
Attn: William F. Shea
Email:  wshea@sheallc.com

If to Tactile:

Tactile Systems Technology, Inc.

22

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

1331 Tyler Street NE
Suite 200
Minneapolis, MN  55413
Attn: Darin Oenning
Email:  doenning@tactilemedical.com

With a copy (which shall not constitute notice) to:

Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Center Street
Minneapolis, MN  55402
Attn:  Jonathan Zimmerman and Jonathan Nygren
Email:           jon.zimmerman@faegrebd.com
                     jon.nygren@faegrebd.com

(f)      Consents.  Any approval, authorization or consent required by this Agreement must be in writing, duly signed by an authorized representative of the granting party.  The withholding of an approval, authorization or consent for regulatory, quality, or competitive reasons will not be deemed unreasonable.

(g)       Governing Law and Forum.  This Agreement will be construed in accordance with and governed by the laws of the State of Delaware, USA, without regard to its conflicts of law principles.  EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN WILMINGTON, DELAWARE IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND TO THE RESPECTIVE COURTS TO WHICH AN APPEAL OF THE DECISIONS OF ANY SUCH COURTS MAY BE TAKEN, AND EACH PARTY AGREES NOT TO COMMENCE, OR COOPERATE IN OR ENCOURAGE THE COMMENCEMENT OF, ANY SUCH ACTION, SUIT OR PROCEEDING, EXCEPT IN SUCH A COURT.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE THEREIN OF SUCH AN ACTION, SUIT OR PROCEEDING.  EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN ANY SUCH ACTION, SUIT OR PROCEEDING.

(h)       Entire Agreement; Amendments.  This Agreement represents the complete agreement of the Parties relative to the covered subjects and supersedes and controls any prior representations or agreements relative to those subjects.  This Agreement may be modified only by an instrument in writing executed on behalf of Sun and Tactile by their respective duly authorized officers.

(i)      Waiver.  No waiver by either Party of any default of the other Party will be held to be a waiver of any other or subsequent default.  The election by either Party of any particular right or remedy will not be deemed to exclude any other; and all rights and remedies of either Party will be cumulative.

23

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(i)      Severability.  If any provision contained or referred to in this Agreement will be determined to be legally invalid or unenforceable, such provision will be ineffective to the extent of such invalidity or unenforceability without affecting the remaining provisions of this Agreement which will continue to be valid and enforceable to the fullest extent permitted by law.

(k)      Counterparts.  This Agreement may be signed in one or more counterparts (including faxed copies), each of which will be deemed one and the same original. Reproductions of this executed original (with reproduced signatures) will be deemed to be original counterparts of this Agreement.

[Signature page follows]

24

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

The Parties have caused this Agreement to be executed as of the Effective Date.

**TACTILE SYSTEMS TECHNOLOGY, INC.**                    **SUN SCIENTIFIC, INC.**

By: /s/  Gerald  R.  Mattys                                      By:                                       /s/  S  Ravikumar

Print Name: Gerald R. Mattys            Print Name:                    S Ravikumar

Title:        CEO                                       Title:        CEO

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

Exhibit A

**Licensed Patents**

| Status | Pat/Pub No. | App. No. | Filing Date | Grant Date | Assignee |
|---|---|---|---|---|---|
| Active | US7850629 | 11/120,057 | 5/2/2005 | 12/14/2010 | N/A |
| Active | US7559908 | 11/110,323 | 4/20/2005 | 7/14/2009 | N/A |
| Active | US9033906 | 12/855,185 | 8/12/2010 | 5/19/2015 | Sun |
| Active | US7276037 | 11/050,104 | 1/24/2005 | 10/2/2007 | Sun |
| Pending | US2012/0316480 | 13/444,600 | 4/11/2012 | | Sun |
| Pending | US2015/0245975 | 14/714,706 | 5/18/2015 | | Sun |
| Pending | | PCT/US17/048241 | 8/23/2017 | | Sun |

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

Exhibit B

**Licensed Brands**

**Common-Law Marks:**

Aero-Wrap™
Aero-Wrap Acute™
Aero-Wrap Lite™
AeroGauge™
AeroGauge Lite™

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

EXHIBIT C
Licensed Manufacturing Know-How

1. Approach for addressing the customer complaint as outlined in the iiMed memo dated October 9, 2017 with the topic entitled "Aero-Wrap Top Strap Tearing"
2. Welding techniques as described in the one-page file called "SSci - Multi-Fabric Layered weld Overview.pdf"
3. Manufacturing drawings and kits for manufacturing Existing Products:
   a. AW6X80-XX-D Aero-Wrap Kits.PDF
   b. AW8X80-XX-B Aero-Wrap Lite Kits.PDF
   c. AW5150-XX-A Brace Assy-Small, Short.PDF
   d. AW5250-XX-A Brace Assy-Medium, Short.PDF
   e. AW5350-XX-A Brace Assy-Large, Short.PDF
   f. AW5550-XX-A Brace Assy-XLarge, Short.PDF
   g. AW6015-1 Valve Cap Assy.PDF
   h. AW6063-XX-B Display Box.PDF
   i. AW6072-XX-B Contents Label.PDF
   j. AW6073-XX-D Barcode Label.PDF
   k. AW6074-A Tamper Tape.PDF
   l. AW6150-XX-D Brace Assy-Small.PDF
   m. AW6250-XX-D Brace Assy-Medium.PDF
   n. AW6350-XX-D Brace Assy-Large.PDF
   o. AW6550-XX-D Brace Assy-XLarge.PDF
   p. AW7020-XX-A Comfort Stockinette Pair.PDF
   q. AW8073-XX-A Barcode Label (Lite).PDF
   r. DW6003-B Face Connector.PDF
   s. DW6074-XX-B Dispenser Box Contents Label.PDF
   t. DW6077-A Polybag.PDF
   u. DW6150-C Brace Assy-Small.PDF
   v. DW6250-C Brace Assy-Medium.PDF
   w. DW6350-C Brace Assy-Large.PDF
   x. DW6550-C Brace Assy-XLarge.PDF
   y. PA2011-A PV-13 Check Valve.PDF

28

[***] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

z.   PA2019-A Tube.PDF
aa.  PA2020-XX-A Baffle Drape.PDF
bb.  PA2021-A Valve Base.PDF
cc.  PA2025-A Male Luer Slip.PDF
dd.  PA2030-XX-A Cyanoacrylate Adhesive.PDF
ee.  PA2031-A Umbrella Valve.PDF
ff.  PA2032-A O-Ring.PDF
gg.  PA2033-A Detent Spring.PDF
hh.  PA2034-A Detent Ball.PDF
ii.  PA2035-A Drive Screw.PDF
jj.  PA2036-A Washer.PDF
kk.  PA2045-XX-B Pump Label.PDF
ll.  PA2046-A Grease.PDF
mm.  PA2047-A Polybag.PDF
nn.  PA2051-7 Squeeze Bulb Assy.PDF
oo.  PA2052-XX-B AeroGauge.PDF
pp.  VU6010-C Valve Cap.PDF
qq.  VU6154-XX-A1 Extension Panel Assy, Small.PDF
rr.  VU6354-XX-A1 Extension Panel Assy, Large.PDF
4.  Product specification documents for Existing Products:
   a.  PS-AW6050, revB.pdf – for Aero-Wrap
   b.  PS-AW7050 Rev. A Aero-Wrap Lite Product Specification.pdf – for Aero-Wrap Lite
   c.  PS-DK6050Rev A, KIT PRODUCT SPECIFICATION latest.pdf – for Aero-Wrap Acute
   d.  PS-PA2052-A AeroGauge Product Specification.pdf – for Aerogauge

29

**[\*\*\*] = Indicates confidential information omitted and filed separately with the Securities and Exchange Commission pursuant to a request for confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

**TACTILE SYSTEMS TECHNOLOGY, INC.**
**EXECUTIVE EMPLOYEE SEVERANCE PLAN**
**(Adopted Effective November 1, 2018)**

## I.      INTRODUCTION

Tactile Systems Technology, Inc. (the "*Company*") has established the Tactile Systems Technology, Inc. Executive Employee Severance Plan (the "*Plan*") to provide severance pay and other benefits to eligible executive-level employees of the Company whose employment terminates under certain covered circumstances.  The Company, in its complete and sole discretion, will determine who is an eligible employee under the Plan, the requirements to receive severance benefits under the Plan, and the amount of any severance benefits under the Plan.

This Plan supersedes and replaces any policy, plan or practice that may have existed in the past regarding the payment of severance benefits to eligible employees.

This document is both the "Plan document" and the "Summary Plan Description" for the Plan.

## II. ELIGIBILITY

All employees designated by the Company's Board of Directors ("*Board*") or a committee thereof as eligible to be a participant in the Plan are eligible to become participants in the Plan.  An eligible employee becomes a participant ("*Participant*") as of the later of (i) the effective date of this Plan or (2) the date he or she is first classified by the Board or a committee thereof as an eligible employee.  In order for an eligible employee to become a Participant under this Plan the eligible employee must sign a Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement (or similarly titled agreement) in a form approved by the Board or a committee thereof, unless such requirement is waived in writing by the Board or a committee thereof.  You will cease to be a Participant in this Plan when you cease to be designated by the Board or a committee thereof as eligible to be a participant in the Plan.

## III. SEVERANCE EVENTS

In general, if you are an eligible Participant in this Plan, and you comply with all provisions and requirements of the Plan, then you will receive severance benefits if your employment with the Company is terminated (either before a Change in Control or within 12 months following a Change in Control) (i) at the initiative of the Company other than for Cause or (ii) by you for Good Reason.  These concepts are described in detail below.

**"For Cause".**  You will not be eligible for benefits under this Plan if your employment is terminated by the Company "for Cause."  "*Cause*" means:

(i)      an act or acts of dishonesty undertaken by you and intended to result in personal gain or enrichment of you or others at the expense of the Company;

(ii)      unlawful conduct or gross misconduct by you that, in either event, is materially injurious to the Company;

(iii)      you being convicted of a felony; or

(iv)      any material breach by you of any terms or conditions of any written agreement between you and the Company which breach has not been cured by you within 15 days after written notice thereof to you from the Company.

For the purposes of clauses (ii) and (iv) above, no act or failure to act on your part shall be considered "Cause" if done by you pursuant to specific authorization evidenced by a resolution duly adopted by the

Board or pursuant to specific advice given by counsel for the Company, unless such specific authorization or advice results in whole or in part from material misrepresentations or omissions by you.

**"Good Reason".**  If you initiate the termination of your employment with the Company, you will be eligible for Plan benefits only if you terminated with Good Reason, as defined below.

"*Good Reason*" means the occurrence of any of the following events without your consent:

> (i)     the assignment of you to a position with responsibilities or duties of a materially lesser status or degree than your position as of the date this Plan was adopted;

> (ii)    any material breach of any terms or conditions of any written agreement between the Company and you by the Company not caused by you; or

> (iii)   the requirement by the Company that you relocate out of the Minneapolis/St. Paul Metropolitan area or metropolitan area designated by the Company at the later of your initial employment date or the date this Plan is adopted by the Company.

"Good Reason" shall not exist unless you have first provided written notice to the Company of the occurrence of one or more of the conditions under clauses (i) through (iii) above within 90 days of the condition's initial occurrence, such condition is not fully remedied by the Company within 30 days after the Company's receipt of written notice from you, and your termination of employment with the Company occurs no later than 130 days after the condition's initial occurrence.

**"Change in Control".**  For purposes of this Plan, a qualifying "*Change in Control*" means a "Change in Control" as defined in the Tactile Systems Technology, Inc. 2016 Equity Incentive Plan.

**"Disability".**  For purposes of this Plan, "*Disability*" means your inability to perform on a full-time basis the duties and responsibilities of your employment with the Company by reason of your illness or other physical or mental impairment or condition, if such inability continues for an uninterrupted period of 90 days or more during any 180-day period.  A period of inability is "uninterrupted" unless and until you return to full-time work for a continuous period of at least 30 days.

**"Termination Date".**   For purposes of this Plan, "*Termination Date*"  means the date on which a "separation from service" has occurred for purposes of Section 409A of the Internal Revenue Code, as amended, and the regulations and guidance thereunder (the "Code").

**Timely Release Required.**  Regardless of the reason for your termination, you will not be eligible for Plan benefits unless you sign an approved release form after your employment with the Company actually terminates, timely deliver such signed release form to the Company and do not rescind the release during any period during which rescission is permissible.  You may obtain a copy of the current release form at any time by contacting the Company's Human Resources Department.  However, the Company will determine the contents of the release form, and may revise it from time to time as appropriate to deal with particular severance situations.  As such, the release form you will be required to sign to receive benefits under the Plan may differ from any release form you previously received.

The release will generally include provisions addressing a full release of all claims you may have against the Company and related individuals and entities (to the full extent permitted under applicable law) and provisions concerning your ongoing compliance with your non-disclosure of confidential information, assignment of intellectual property, non-competition and non-solicitation obligations to the Company, including those obligations that survive the termination of your employment with the Company.   Severance benefits will be paid only after any period for rescinding the release has expired.  If you violate any provisions of the release, the Company will no longer be required to pay you any remaining severance benefits due to you under the Plan.

**Ineligibility for Benefits.**  Severance benefits will not be paid under this Plan in any of the following circumstances:

-2-

Ø  You are offered another position with the Company (or the successor/ purchasing entity) and you refuse to accept that position, other than for Good Reason.

Ø  You voluntarily terminate your employment with the Company (or the successor/purchasing entity), other than for Good Reason.

Ø  Your termination of employment occurs more than 12 months after a Change in Control occurs.

Ø  Your termination of employment does not qualify as a "separation from service" under Section 409A of the Code.

Ø  Your employment is terminated by the Company (or the successor/ purchasing entity) for Cause.

Ø  Your employment terminates due to death, Disability, or failure to return to work for the Company following a leave of absence, layoff or any other period of authorized absence from the Company.

Ø  You have not signed a Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement.

Ø  You refuse to sign the release form prepared by the Company, or you rescind the release before it becomes final.

Ø  You breach any provisions included in the release form prepared by the Company.

## IV.  PLAN BENEFITS

A Participant who experiences a qualifying severance event under Section III while a Participant will be eligible to receive severance benefits under the Plan, including severance pay and vesting of equity awards as set forth below.

### Severance Pay (CEO)

If you are a Participant, you are the Chief Executive Officer of the Company, and you experience a qualifying severance event and you otherwise qualify for benefits under the Plan, then you will be entitled to the severance pay and benefits described below.

**Qualifying Severance Event Before a Change in Control:**

The Company will pay you an amount equal to two times your annualized base salary as of your Termination Date, payable in substantially equal installments in accordance with the Company's regular payroll schedule commencing with the first normal payroll date of the Company following the Termination Date and continuing for 24 months thereafter, provided that any installments that would have been paid during the 60 day period immediately following the Termination Date shall be held by the Company until the first payroll date occurring more than 60 days after the Termination Date.

If you are eligible for and take all steps necessary to continue your group health insurance coverage with the Company following the Termination Date, the Company will pay for the portion of the premium costs for such coverage that the Company would pay if you had remained employed by the Company, at the same level of coverage that was in effect as of the Termination Date, for a period of 18 consecutive months after the Termination Date (or until you receive group health or dental coverage from another employer, if earlier).

**Qualifying Severance Event Within 12 Months After a Change in Control:**

The Company will pay you an amount equal to two times the sum of (i) your annualized base salary as of your Termination Date, plus (ii) your target incentive bonus as of your Termination Date, less applicable

-3-

withholdings, payable in a lump sum on the Company's first payroll date occurring more than 60 days after the Termination Date (but no later than 75 days after the Termination Date).

If you are eligible for and take all steps necessary to continue your group health insurance coverage with the Company following the Termination Date, the Company will pay for the portion of the premium costs for such coverage that the Company would pay if you had remained employed by the Company, at the same level of coverage that was in effect as of the Termination Date, for a period of 18 consecutive months after the Termination Date (or until you receive group health or dental coverage from another employer, if earlier).

### Severance Pay (Non-CEO)

If you are a Participant, you are employed in any position other than Chief Executive Officer of the Company, and you experience a qualifying severance event and you otherwise qualify for benefits under the Plan, then you will be entitled to the severance pay and benefits described below.

**Qualifying Severance Event Before a Change in Control:**

The Company will pay you an amount equal to one times your annualized base salary as of your Termination Date, payable in substantially equal installments in accordance with the Company's regular payroll schedule commencing with the first normal payroll date of the Company following the Termination Date and continuing for 12 months thereafter, provided that any installments that would have been paid during the 60 day period immediately following the Termination Date shall be held by the Company until the first payroll date occurring more than 60 days after the Termination Date.

If you are eligible for and take all steps necessary to continue your group health insurance coverage with the Company following the Termination Date, the Company will pay for the portion of the premium costs for such coverage that the Company would pay if you had remained employed by the Company, at the same level of coverage that was in effect as of the Termination Date, for a period of 12 consecutive months after the Termination Date (or until you receive group health or dental coverage from another employer, if earlier).

**Qualifying Severance Event Within 12 Months After a Change in Control:**

The Company will pay you an amount equal to one times the sum of (i) your annualized base salary as of your Termination Date, plus (ii) your target incentive bonus as of your Termination Date, less applicable withholdings, payable in a lump sum on the Company's first payroll date occurring more than 60 days after the Termination Date (but no later than 75 days after the Termination Date).

If you are eligible for and take all steps necessary to continue your group health insurance coverage with the Company following the Termination Date, the Company will pay for the portion of the premium costs for such coverage that the Company would pay if you had remained employed by the Company, at the same level of coverage that was in effect as of the Termination Date, for a period of 12 consecutive months after the Termination Date (or until you receive group health or dental coverage from another employer, if earlier).

### Equity Vesting

If you experience a qualifying severance event and you otherwise qualify for benefits under the Plan, and the Termination Date occurs before a Change in Control, then with respect to any equity-based award that has been granted to you under the Company's 2016 Equity Incentive Plan or any predecessor or successor plan and is outstanding and not fully vested on such Termination Date (an "Equity Award"), a pro rata portion of the unvested portion of such Equity Award will vest as of the date your release becomes irrevocable. The pro rata portion shall be determined by multiplying the number of shares or stock units subject to the Equity Award by a fraction whose numerator is the number of days during the applicable vesting or performance period prior to your Termination Date and whose denominator is the total number of days in the vesting or performance period, and subtracting from that product the number of shares or

-4-

stock units as to which the Equity Award had vested prior to your Termination Date. If such Equity Award is a stock option or stock appreciation rights award, it will remain exercisable to the extent so vested for one year after your Termination Date. If the vesting of the Equity Award is subject to the satisfaction of performance goals over a performance period, the number of shares or stock units subject to the Equity Award for purposes of this paragraph will be deemed to be the number that would otherwise vest at the end of the applicable performance period if target level performance had been achieved.

If you experience a qualifying severance event and you otherwise qualify for benefits under the Plan, and the Termination Date occurs within 12 months after a Change in Control, then the unvested portion of any Equity Award that is outstanding on such Termination Date will vest as of the date your release becomes irrevocable. If such Equity Award is a stock option or stock appreciation rights award, it will remain exercisable to the extent so vested for one year after your Termination Date. If the vesting of the Equity Award is subject to the satisfaction of performance goals over a performance period, the unvested portion of such Equity Award will be determined by subtracting from the number of shares or stock units that would otherwise vest at the end of the applicable performance period if target level performance had been achieved the number of shares or stock units as to which the Equity Award had vested prior to your Termination Date.

### Section 409A

This Plan is intended to provide for payments and benefits that are exempt from, or that comply with, the requirements of Section 409A(a)(2), (3) and (4) of the Code, including current and future guidance and regulations interpreting such provisions, and should be interpreted accordingly. Each payment or benefit made pursuant to this Plan shall be deemed to be a separate payment for purposes of Code Section 409A. In addition, payments or benefits pursuant to this Plan shall be exempt from the requirements of Code Section 409A to the maximum extent possible as "short-term deferrals" pursuant to Treasury Regulation Section 1.409A-1(b)(4), as involuntary separation pay pursuant to Treasury Regulation Section 1.409A-1(b)(9)(iii), and/or under any other exemption that may be applicable, and this Plan shall be construed accordingly. To the extent that any amounts payable under this Plan are required to be delayed under Code Section 409A, such amounts are intended to be and should be considered for purposes of Code Section 409A as separate payments from the amounts that are not required to be delayed. Notwithstanding anything herein to the contrary, if any Participant is considered a "specified employee" (as defined in Treasury Regulation Section 1.409A-1(i)) as of the Termination Date, then no payments of deferred compensation subject to Code Section 409A and payable due to such Participant's separation from service shall be made under this Plan before the first business day that is six months after the Termination Date (or upon the Participant's death, if earlier) (the "*Specified Period*"). Any deferred compensation payments that would otherwise be required to be made to a Participant during the Specified Period will be accumulated by the Company and paid to the Participant on the first day after the end of the Specified Period. The foregoing restriction on the payment of amounts to a Participant during the Specified Period will not apply to the payment of employment taxes.

### Section 280G

If any payment or benefit to be paid or provided to a Participant under this Plan, taken together with any payments or benefits otherwise paid or provided to such Participant by the Company or any corporation that is a member of an "affiliated group" (as defined in Section 1504 of the Code without regard to Section 1504(b) of the Code) of which the Company is a member (the "*other arrangements*"), would collectively constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), and if the net after-tax amount of such parachute payment to such Participant is less than what the net after-tax amount to such Participant would be if the aggregate payments and benefits otherwise constituting the parachute payment were limited to three times such Participant's "base amount" (as defined in Section 280G(b)(3) of the Code) less $1.00, then the aggregate payments and benefits otherwise constituting the parachute payment shall be reduced to an amount that shall equal three times such Participant's base

-5-

amount, less $1.00. Should such a reduction in payments and benefits be required, such Participant shall be entitled, subject to the following sentence, to designate those payments and benefits under this Plan, or the other arrangements, that will be reduced or eliminated so as to achieve the specified reduction in aggregate payments and benefits to such Participant and avoid characterization of such aggregate payments and benefits as a parachute payment. The Company will provide such Participant with all information reasonably requested by such Participant to permit the Participant to make such designation. To the extent that such Participant's ability to make such a designation would cause any of the payments and benefits to become subject to any additional tax under Code Section 409A, or if such Participant fails to make such a designation within ten business days of receiving the requested information from the Company, then the Company shall achieve the necessary reduction in such payments and benefits by first reducing or eliminating the portion of the payments and benefits that are payable in cash and then by reducing or eliminating the non-cash portion of the payments and benefits, in each case in reverse order beginning with payments and benefits which are to be paid or provided the furthest in time from the date of the Company's determination. A net after-tax amount shall be determined by taking into account all applicable income, excise and employment taxes, whether imposed at the federal, state or local level, including the excise tax imposed under Section 4999 of the Code.

**Reductions of Severance Benefits**

Except as otherwise provided in this Plan, all severance benefits payable under this Plan will be reduced, as and when it is otherwise payable, by the amount of any severance or similar payment required to be paid to you by the Company under applicable federal, state, and local laws. Cash severance payments are also subject to all applicable withholding due on any severance benefits, including state and federal income tax withholding and FICA and Medicare tax withholding.

**Coordination/Offsets for Employment Agreements**

If you are party to an individual written employment contract or agreement with the Company (or a subsidiary) that provides for the payment of any benefits upon termination of your employment, then your cash severance benefits under this Plan will be reduced as follows. Any cash severance pay under this Plan will be reduced (offset), as and when it is otherwise payable, by the amount of any cash payment made or due to be made by the Company to you pursuant to an employment contract, agreement or other severance arrangement, to the extent such payment is called a severance payment or otherwise becomes payable due to a termination of your employment with the Company (but not including any cash severance payments that are specifically due to COBRA premiums or outplacement) . If such an agreement, contract or arrangement provides for cash severance payments in excess of those provided under this Plan, no severance pay will be due under this Plan. However, you may still be eligible for other benefits under the Plan, to the extent benefits are not duplicative of what you are receiving under the agreement, contract or arrangement.

**Termination of Severance Benefits**

All severance benefits payable under this Plan will be terminated if the Company determines that you have violated your ongoing obligations with respect to non-disclosure of confidential information, assignment of intellectual property, non-competition and non-solicitation, including those obligations under your Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement and any other agreement with the Company that survive the termination of your employment with the Company. Specifically with respect to Equity Awards, and notwithstanding anything to the contrary in any agreement evidencing an Equity Award, if you violate any of your ongoing obligations described above, then (i) you will immediately forfeit all outstanding Equity Awards and any right to receive shares thereunder, and (ii) with respect to shares that have been issued pursuant to an Equity Award within two (2) years prior to such violation, you shall either (A) return such shares to the Company or (B) pay to the Company in cash an amount equal to the fair market value of the shares as of the date their receipt became taxable to you.

-6-

CASE 0:20-cv-02074-NEB-DTS    Doc. 66-18    Filed 06/18/21    Page 77 of 91

## V. AMENDMENT AND TERMINATION OF THE PLAN

Except as provided below, the Company reserves the right in its discretion to amend or terminate this Plan, or to alter, reduce, or eliminate any severance benefit, practice or policy hereunder, in whole or in part, at any time and for any reason without the consent of or notice to any employee or any other person having any beneficial interest in this Plan.  Such action may be taken by the Board of the Company, the Compensation Committee of the Board, or by any other individual or committee to whom such authority has been delegated by the Board.

However, during the 12-month period following a Change in Control, the Plan may not be amended, terminated or otherwise altered to reduce the amount (or negatively change the terms) of any severance benefit that becomes payable to a Participant who was a Participant in the Plan on the day prior to the Change in Control.  In addition, if a Change in Control occurs within the 6-month period following the effective date of an amendment to terminate the Plan or otherwise reduce the amount (or negatively alter the terms) of any severance benefit under the Plan, such amendment (or portion of such amendment) will become null and void upon the Change in Control.  Upon the Change in Control, the Plan will automatically revert to the terms in effect prior to the adoption of said amendment.

Notwithstanding the above limitations, the Plan may be amended at any time (and such amendment will be given affect) if such amendment is required to bring the Plan into compliance with applicable law, including but not limited to Section 409A of the Internal Revenue Code of 1986, as amended (and the regulations or other applicable guidance thereunder).

## VI. SUBMITTING CLAIMS FOR BENEFITS

Normally, the Company will determine an employee's eligibility and benefit amount on its own and without any action on the part of the terminating employee, other than returning the release form.  The severance payments will begin as soon as administratively feasible after the date the release becomes irrevocable.

**Formal Claims for Benefits.**  If you think you are entitled to benefits but have not been so notified by the Company, if you disagree with a decision made by the Company, or if you have any other complaint regarding the Plan that is not resolved to your satisfaction, you or your authorized representative may submit a written claim for benefits. The claim must be submitted to the Company's Human Resources Department within six months after the date you terminated employment.  Claims received after that time will not be considered.

The Company will ordinarily respond to the claim within 90 days of the date on which it is received.  However, if special circumstances require an extension of the period of time for processing a claim, the 90-day period can be extended for an additional 90 days by giving you written notice of the extension, the reason why the extension is necessary, and the date a decision is expected.

The Company will give you a written notice of its decision if it denies your claim for benefits in whole or in part.  The notice will explain the specific reasons for the decision, including references to the relevant plan provision upon which the decision is based, with a description of any additional material or information necessary for you to perfect your claim, and the procedures for appealing the decision.

**Appeals.**  If you disagree with the initial claim determination, in whole or in part, you or your authorized representative can request that the decision be reviewed by filing a written request for review with the Company's Human Resources Department within 60 days after receiving notice that the claim has been denied.  You or your representative may present written statements describing reasons why you believe the claim denial was in error, and should include copies of any documents you want us to consider in support of your appeal.  Your claim will be decided based on the information submitted, so you should make sure that your submission is complete.  Upon request to the Company, you may review all

-7-

documents we considered or relied on in deciding your claim. (You may also receive copies of these documents free of charge.)

Any appeal will be reviewed and decided by person(s) other than the person(s) who made the determination on your original claim. Generally, the decision will be reviewed within 60 days after the Company receives a request for review. However, if special circumstances require a delay, the review may take up to 120 days. (If a decision cannot be made within the 60-day period, you will be notified of this fact in writing.) You will receive a written notice of the decision on the appeal, which will explain the reasons for the decision by making specific reference to the Plan provisions on which the decision is based.

**Limitations Period**.   The claims procedure above is mandatory. If an employee has completed the entire claims procedure and still disagrees with the outcome of the employee's claim, the employee may commence a civil action under § 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The employee must commence such civil action within one year of the date of the final denial, or the employee will waive all rights to relief under ERISA.

## VII.        PLAN ADMINISTRATION

The following information relates to the administration of the Plan and the determination of Plan benefits.

**Type of Plan:** The Plan is a severance benefit plan.

**Plan Administrator/Plan Sponsor:** The Company is the "Plan Sponsor" and "Plan Administrator" of this Plan. Communications to the Company regarding the Plan should be addressed to:

> Tactile Systems Technology, Inc.
> 1331 Tyler Street NE, Suite 200
> Minneapolis, MN 55413
> Attention: Chief Financial Officer
> Telephone:  (612) 355-5100

As Plan Administrator, the Company has complete discretionary authority to interpret the provisions of the Plan and to determine which employees are eligible to participate and eligible for Plan benefits, the requirements to receive severance benefits, and the amount of those benefits. The Company also has authority to correct any errors that may occur in the administration of the Plan, including recovering any overpayment of benefits from the person who received it.

**Employer Identification Number:** 41-1801204

**Plan Year:** The calendar year. The first Plan Year is a short Plan Year, starting on the date the Plan was initially adopted and ending on December 31, 2018.

**Agent for Service of Legal Process:** Legal process regarding the Plan may be served on the Company at the address listed above.

**Assignment of Benefits:** You cannot assign your benefits under this Plan to anyone else, and your benefits are not subject to attachment by your creditors. The Company will not pay Plan benefits to anyone other than you (or your estate, if you die after having a qualifying severance event but before receiving the complete severance amount payable to you up to the date of your death).

**Governing Law:** This Plan, to the extent not preempted by ERISA or any other federal law shall be governed by and construed in accordance with, the laws of the State of Minnesota.

**Employment Rights:** Establishment of the Plan shall not be construed to in any way modify the parties' at-will employment relationship, or to give any employee the right to be retained in the Company's service or to any benefits not specifically provided by the Plan. The right of an employer to terminate the

-8-

employment relationship of an employee (or to accelerate the termination date) will not in any way be affected by the terms of this Plan or any release.

**Successor/Purchasing Entity:**  For the avoidance of doubt, references in this Plan to the "Company" include, after a Change in Control or other corporate transaction, the successor to the Company or purchasing entity.

-9-

Exhibit 10.3

**TACTILE SYSTEMS TECHNOLOGY, INC.**
**Confidentiality, Assignment of Intellectual Property and**
**Restrictive Covenants Agreement**

This Confidentiality, Assignment of Intellectual Property and Restrictive Covenants Agreement (this "*Agreement*") is entered into effective [_____], 20[__] (the "*Effective Date*") by and between **Tactile Systems Technology, Inc.**, a Delaware corporation (the "*Company*"), and [_____], a resident of [_____] ("*Executive*").

## RECITALS

A.        The Company and Executive previously entered into an Employment Agreement (the "*Employment Agreement*").

B.        The Company has adopted the Tactile Systems Technology, Inc. Executive Employee Severance Plan (the "*Plan*"), and has informed Executive that Executive will be designated as a Participant (as defined in the Plan) subject to Executive executing this Agreement, executing a Termination of Employment Agreement (the "Termination Agreement") (terminating the Employment Agreement), and otherwise satisfying the conditions to become and remain a Participant under the Plan.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, including without limitation Executive becoming a Participant (as defined in the Plan) in exchange for Executive entering into this Agreement and the Termination Agreement, the Company and Executive agree as follows:

1.    Affiliated Entities.  As used in this Agreement, "*Affiliates*" includes the Company and each corporation, partnership, or other entity which controls the Company, is controlled by the Company, or is under common control with the Company (in each case "*control*" meaning the direct or indirect ownership of 50% or more of all outstanding equity interests).

2.    Confidential Information.  Except as permitted by the Company, Executive will not at any time divulge, furnish or make accessible to anyone or use in any way other than in the ordinary course of the business of the Company or its Affiliates, any confidential, proprietary or secret knowledge or information of the Company or its Affiliates that Executive has acquired or will acquire about the Company or its Affiliates, whether developed by Executive or by others, concerning (i) any trade secrets, (ii) any confidential, proprietary or secret designs, programs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of the Company or of its Affiliates, (iii) any customer or supplier lists, (iv) any confidential, proprietary or secret development or research work, (v) any strategic or other business, marketing or sales plans, (vi) any financial data or plans, or (viii) any other confidential or proprietary information or secret aspects of the business of the Company or of its Affiliates.  Executive acknowledges that the above-described knowledge and information constitutes a unique and valuable asset of the Company and represents a substantial investment of

1

time and expense by the Company, and that any disclosure or other use of such knowledge or information other than for the sole benefit of the Company or its Affiliates would be wrongful and would cause irreparable harm to the Company. Executive will refrain from intentionally committing any acts that would materially reduce the value of such knowledge or information to the Company or its Affiliates. The foregoing obligations of confidentiality shall not apply to any knowledge or information that (i) is now or subsequently becomes generally publicly known, other than as a direct or indirect result of the breach of this Agreement, (ii) is independently made available to Executive in good faith by a third party who has not violated a confidential relationship with the Company or its Affiliates, or (iii) is required to be disclosed by law or legal process. Executive understands and agrees that Executive's obligations under this Agreement to maintain the confidentiality of the Company's confidential information are in addition to any obligations of Executive under applicable statutory or common law.

3. <u>Ventures</u>. If, during Executive's employment with the Company, Executive is engaged in or provides input into the planning or implementing of any project, program or venture involving the Company, all rights in such project, program or venture belong to the Company. Except as approved in writing by the Company's Board of Directors, Executive will not be entitled to any interest in any such project, program or venture or to any commission, finder's fee or other compensation in connection therewith. Executive will have no interest, direct or indirect, in any customer or supplier that conducts business with the Company.

4. <u>Noncompetition and Nonsolicitation Covenants</u>.

(a) <u>Agreement Not to Compete</u>. During the Restricted Period (defined below), Executive will not, directly or indirectly, engage in any business, in the United States or in any other location in which the Company is then doing business, for the development, sale, service, or distribution of medical devices to treat lymphedema patients or any other business that is competitive with the then-current businesses of the Company or its Affiliates, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise. Ownership by Executive, as a passive investment, of less than 2.5% of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this Section 4(a). Notwithstanding the foregoing, Executive's direct or indirect engagement in a business whose sole purpose is the development, sale, service, or distribution of compression garments (but not pumps or other devices) to treat lymphedema patients or other patients shall not constitute a breach of this Section 4(a).

(b) <u>Agreement Not to Solicit or Hire Employees or Contractors</u>. During the Restricted Period (defined below), Executive will not, directly or indirectly, solicit, hire or engage any person who is then an employee or contractor of the Company or who was an employee of the Company at any time during the immediately preceding six (6) month period (or, following Executive's termination of employment, at any time during the six (6) month period immediately preceding Executive's termination of employment), in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise, or otherwise directly or indirectly request, advise or induce any then current employee or contractor of the Company to terminate or otherwise adversely change its relationship with the Company.

2

(c)     Agreement Not to Solicit Others.  During the Restricted Period (defined below), Executive will not, directly or indirectly, solicit, request, advise or induce any then current customer, supplier or other business contact of the Company to cancel, curtail or otherwise adversely change its relationship with the Company, in any manner or capacity, including without limitation as a proprietor, principal, agent, partner, officer, director, stockholder, employee, member of any association, consultant or otherwise.

(d)     Restricted Period.  For purposes of this Agreement "*Restricted Period*" is the period during Executive's employment with the Company or any Affiliates and for a period of twelve (12) consecutive months from and after the termination of Executive's employment, whether such termination is with or without cause, or whether such termination is at the instance of Executive or the Company.

(e)     Acknowledgment.  Executive hereby acknowledges that the provisions of this Section 4 are reasonable and necessary to protect the legitimate interests of the Company and that any violation of this Section 4 by Executive will cause substantial and irreparable harm to the Company to such an extent that monetary damages alone would be an inadequate remedy therefor.  Executive represents and warrants that Executive is not subject to any other agreements prohibiting the performance of Executive's obligations under this Agreement, including any non-competition agreement.

(f)     Blue Pencil Doctrine.  If the duration of, the scope of or any business activity covered by any provision of this Section 4 is in excess of what is determined to be valid and enforceable under applicable law, such provision will be construed to cover only that duration, scope or activity that is determined to be valid and enforceable.  Executive hereby acknowledges that this Section 4 will be given the construction which renders its provisions valid and enforceable to the maximum extent, not exceeding its express terms, possible under applicable law.

5. Patents, Copyrights and Related Matters.

(a)     Disclosure and Assignment.  Executive must immediately disclose to the Company any and all improvements and inventions that Executive has conceived or reduced to practice, or may conceive or reduce to practice, individually or jointly or commonly with others while Executive has been or is employed with the Company or any of its Affiliates with respect to (i) any methods, processes or apparatus concerned with the development, use or production of any type of products, goods or services sold or used by the Company or its Affiliates, and (ii) any type of products, goods or services sold or used by the Company or its Affiliates.  Any such improvements and inventions will be the sole and exclusive property of the Company and Executive hereby immediately assigns, transfers and sets over to the Company Executive's entire right, title and interest in and to any and all of such improvement and inventions as are specified in this Section 5(a), and in and to any and all applications for letters patent that may be filed on such inventions, and in and to any and all letters patent that may issue, or be issued, upon such applications.  In connection therewith and for no additional compensation therefor, but at no expense to Executive, Executive will sign any and all instruments deemed necessary by the Company for:

CASE 0:20-cv-02074-NEB-DTS   Doc. 66-18   Filed 06/18/21   Page 83 of 91

(i)     the filing and prosecution of any applications for letters patent of the United States or of any foreign country that the Company may desire to file upon such inventions as are specified in this Section 5(a);

(ii)    the filing and prosecution of any divisional, continuation, continuation-in-part or reissue applications that the Company may desire to file upon such applications for letters patent; and

(iii)   the reviving, re-examining or renewing of any of such applications for letters patent.

This Section 5(a) will not apply to any invention for which no equipment, supplies, facilities, confidential, proprietary or secret knowledge or information, or other trade secret information of the Company was used and that was developed entirely on Executive's own time, and (i) that does not relate (A) directly to the business of the Company, or (B) to the Company's actual or demonstrably anticipated research or development, or (ii) that does not result from any work performed by Executive for the Company.

(b)     Copyrightable Material.  All right, title and interest in all copyrightable material that Executive shall conceive or originate individually or jointly or commonly with others, and that arise in connection with Executive's services hereunder or knowledge of confidential and proprietary information of the Company, will be the property of the Company and are hereby assigned by Executive to the Company of its Affiliates, along with ownership of any and all copyrights in the copyrightable material. Where applicable, works of authorship created by Executive relating to the Company or its Affiliates and arising out of Executive's knowledge of confidential and proprietary information of the Company shall be considered "works made for hire," as defined in the U.S. Copyright Act, as amended.

(c)     Remedies.     Executive acknowledges that it would be difficult to fully compensate the Company for monetary damages resulting from any breach by Executive of this Section 5.  Accordingly, in the event of any actual or threatened breach of any such provisions, the Company will, in addition to any other remedies it may have, be entitled to injunctive and other equitable relief to enforce such provisions, and such relief may be granted without the necessity of proving actual monetary damages.

6. Return of Records and Property.  Upon termination of Executive's employment or at any time upon the Company's request, Executive will promptly deliver to the Company any and all Company and Affiliate records and any and all Company and Affiliate property in Executive's possession or under Executive's control, including without limitation manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, source codes, data, tables or calculations and all copies thereof, documents that in whole or in part contain any trade secrets or confidential, proprietary or other secret information of the Company or its Affiliates and all copies thereof, and keys, access cards, access codes, passwords, credit cards, personal computers, telephones and other electronic equipment belonging to the Company or its Affiliates.

4

7. Miscellaneous.

(a)    Governing Law.  All matters relating to the interpretation, construction, application, validity and enforcement of this Agreement will be governed by the laws of the State of Minnesota without giving effect to any choice or conflict of law provision or rule, whether of the State of Minnesota or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the State of Minnesota.

(b)    Jurisdiction and Venue.  Executive and the Company consent to jurisdiction of the courts of the State of Minnesota and/or the federal courts, District of Minnesota, for the purpose of resolving all issues of law, equity, or fact, arising out of or in connection with this Agreement.  Any action involving claims of a breach of this Agreement must be brought in such courts.  Each party consents to personal jurisdiction over such party in the state and/or federal courts of Minnesota and hereby waives any defense of lack of personal jurisdiction.  Venue, for the purpose of all such suits, will be in Hennepin County, State of Minnesota.

(c)    Entire Agreement.  This Agreement and the Termination Agreement contain the entire agreement of the parties relating to Executive's employment with the Company and supersede all prior agreements and understandings with respect to such subject matter, including without limitation the Employment Agreement, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement that are not set forth herein; provided, however, that nothing in this Agreement is intended to supersede, replace or modify the terms of the Plan or the Company's 2016 Equity Incentive Plan or any equity award agreements issued to Executive under the Company's 2016 Equity Incentive Plan, each of which shall remain in full force and effect in accordance with their terms.

(d)    Amendments.  No amendment or modification of this Agreement will be deemed effective unless made in writing and signed by the parties hereto.

(e)    No Waiver.  No term or condition of this Agreement will be deemed to have been waived, except by a statement in writing signed by the party against whom enforcement of the waiver is sought.  Any written waiver will not be deemed a continuing waiver unless specifically stated, will operate only as to the specific term or condition waived and will not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

(f)    Assignment.  This Agreement will not be assignable, in whole or in part, by either party without the prior written consent of the other party, except that the Company may, without the consent of Executive, assign its rights and obligations under this Agreement (1) to an Affiliate or (2) to any corporation or other person or business entity to which the Company may sell or transfer all or substantially all of its assets; provided, however, that the Company's  assignment of rights may only take place if the assignee accepts and agrees to all of the obligations to Executive  under this Agreement.  After any such assignment by the Company, the Company will be discharged from all further liability hereunder and such assignee will thereafter be deemed to be "the Company" for purposes of all terms and conditions of this Agreement, including this Section 7. For the avoidance of doubt, in the event of Executive's death, all payments and obligations to Executive shall be paid to Executive's estate.

5

(g)    Counterparts.  This Agreement may be executed by facsimile signature and in any number of counterparts, and such counterparts executed and delivered, each as an original, will constitute but one and the same instrument.

(h)    Severability.  Subject to Section 5(f) hereof, to the extent that any portion of any provision of this Agreement is held invalid or unenforceable, it will be considered deleted herefrom and the remainder of such provision and of this Agreement will be unaffected and will continue in full force and effect.

(i)    Captions and Headings.  The captions and paragraph headings used in this Agreement are for convenience of reference only and will not affect the construction or interpretation of this Agreement or any of the provisions hereof.

6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date first above written.

**COMPANY**

By:_____
                 Name:
                 Title:

**EXECUTIVE**

_____

7

**CERTIFICATION PURSUANT TO RULE 13a-14(a)/15d-14(a) OF THE SECURITIES EXCHANGE ACT
OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Gerald R. Mattys, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Tactile Systems Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Gerald R. Mattys
**Gerald R. Mattys**
*Chief Executive Officer*

Date: November 5, 2018

**Exhibit 31.2**

CERTIFICATION PURSUANT TO RULE 13a-14(a)/15d-
14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Brent A. Moen, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Tactile Systems Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.


_/s/ Brent A. Moen_
**Brent A. Moen**
_Chief Financial Officer_

Date: November 5, 2018

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Tactile Systems Technology, Inc. (the "Company") for the period ended September 30, 2018, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Gerald R. Mattys, Chief Executive Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/ Gerald R. Mattys*
**Gerald R. Mattys**
*Chief Executive Officer*

Date: November 5, 2018

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Tactile Systems Technology, Inc. (the "Company") for the period ended September 30, 2018, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, Brent A. Moen, Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

(1)  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


*/s/ Brent A. Moen*
**Brent A. Moen**
*Chief Financial Officer*


Date:    November 5, 2018