UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>   vs.<br><br>TACTILE SYSTEMS TECHNOLOGY, INC., et al.,<br><br>                Defendants. | Civ. No. 0:20-cv-02074-NEB-BRT<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

4822-0259-5062.v1

**TABLE OF CONTENTS**

**Page**

I.   Introduction ..................................................................................................... 1

II.  Statement of Facts ........................................................................................... 3

III. Legal Standard................................................................................................. 9

IV.  The Complaint Sufficiently Pleads Violations of §10(b) for Defendants'
     Fraudulent Misrepresentations and Omissions......................................... 10

     A.   The Complaint Alleges Underlying Illegal Sales Practices ........................ 11

     B.   The Complaint Pleads Falsity .................................................................. 20

          1.   Defendants Made Materially Misleading Statements
               Concerning Tactile's Revenues........................................................ 21

          2.   Defendants Made Materially False and Misleading
               Statements Concerning Their Compliance with Federal Law ......... 24

          3.   Defendants Made Materially False Statements Concerning
               Flexitouch's Market .......................................................................... 26

          4.   Defendants Made Materially Misleading Statements
               Concerning the *Qui Tam* Action ....................................................... 28

          5.   The Complaint Adequately Alleges that Defendants Violated
               Item 303 of Regulation S-K ............................................................. 28

V.   The Complaint Sufficiently Pleads Violations of §10(b) for Defendants'
     Fraudulent Scheme or Course of Business............................................... 30

VI.  The Complaint Alleges a Strong Inference of Scienter........................................ 32

     A.   Defendants Personally Benefitted from the Fraud ..................................... 34

          1.   Insider Trading During the Class Period Raises a Strong
               Inference of Scienter ........................................................................ 34

          2.   Incentive Compensation Provides Further Motivation for the
               Fraud................................................................................................. 41

4822-0259-5062.v1

**Page**

B.    Defendants Knew and Had Access to Information that Contradicted Their Public Statements, or Failed to Check Information They Had a Duty to Monitor .................................................................................. 43

C.    Defendants Deliberately Engaged in Illegal Behavior ............................... 46

D.    The Complaint Establishes Corporate Scienter ......................................... 48

E.    Defendants' Suggested Non-Culpable Inference Is Not Compelling ......... 48

VII.    The Complaint States a §20(a) Claim for Control Person Liability ...................... 49

VIII.    The Complaint States §20A Insider Trading Claims ............................................ 50

A.    Each Insider Trading Defendant Sold Stock While Possessing Material, Nonpublic Information ................................................................ 51

B.    Each Insider Trading Defendant Committed a Predicate Exchange Act Violation ............................................................................................. 52

C.    The Insider Trading Defendants Traded Contemporaneously with Plaintiff and the Class.............................................................................. 53

IX.    Conclusion ............................................................................................................ 55

4822-0259-5062.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
No. 09 Civ. 8862(GBD), 2013 WL 1286170
(S.D.N.Y. Mar. 28, 2013) ................................................................................ 46

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ............................................................................. 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................................... 21

*Bluestem Advisors LLC v. Eventure Interactive, Inc.*,
No. SACV 16-02085, 2017 WL 3047895
(C.D. Cal. Apr. 17, 2017) ............................................................................... 20

*Campbell v. Transgenomic, Inc.*,
916 F.3d 1121 (8th Cir. 2019) ....................................................................... 20

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ................................................................... 39, 40

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ........................................................................... 22

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) ...................................................... 15, 21

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
519 F.3d 778 (8th Cir. 2008) ......................................................................... 33

*Cotter v. Gwyn*,
No. 15-4823, 2016 WL 4479510
(E.D. La. Aug. 25, 2016) ................................................................................ 31

- iii -

**Page**

*de la Fuente v. DCI Telecomms., Inc.*,
259 F. Supp. 2d 250 (S.D.N.Y. 2003).......................................................................... 17

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018).......................................................................... 22

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................................... 10

*Dutton v. D&K Healthcare Res.*,
No. 4:04CV147SNL, 2006 WL 1778884
(E.D. Mo. June 23, 2006)................................................................................... 21, 36, 41

*Elam v. Neidorff*,
544 F.3d 921 (8th Cir. 2008) .................................................................................. 39, 43

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ................................................................................*passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................... 37

*Garcia v. Guo*,
No. CV-15-1862-MWF-MRWx, 2016 U.S. Dist. LEXIS 1819
(C.D. Cal. Jan. 7, 2016)............................................................................................... 19

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................... 39

*Gordon v. Vanda Pharms. Inc.*,
No. 1:19-cv-01108-FB-LB, 2021 WL 911755
(E.D.N.Y. Mar. 10, 2021) ............................................................................................ 17

*Hall v. Johnson & Johnson*,
No. 18-1833 (FLW), 2019 WL 7207491
(D.N.J. Dec. 27, 2019) ................................................................................................. 28

*Hefler v. Wells Fargo & Co.*,
No. 16-cv-05479-JST, 2018 WL 1070116
(N.D. Cal. Feb. 27, 2018)............................................................................................. 52

4822-0259-5062.v1

**Page**

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ..................................................................... 42

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209(KBF), 2013 WL 1223844
    (S.D.N.Y. Mar. 27, 2013) ........................................................................... 31

*In re Able Lab'ys Sec. Litig.*,
    No. 05-2681 (JAG), 2008 WL 1967509
    (D.N.J. Mar. 24, 2008) ............................................................................... 52

*In re Am. Bus. Computs. Corp. Sec. Litig.*,
    No. 913 (CLB), 1994 U.S. Dist. LEXIS 21467
    (S.D.N.Y. Feb. 24, 1994) ............................................................................ 54

*In re Ancor Commc'ns, Inc.*,
    22 F. Supp. 2d 999 (D. Minn. 1998) ........................................................... 43

*In re Apogee Enters., Inc. Sec. Litig.*,
    No. 18-CV-3097, 2020 WL 1445856
    (D. Minn. Mar. 25, 2020) ........................................................................... 24

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................... 52, 53

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019) ................................................... *passim*

*In re Chronimed Inc. Sec. Litig.*,
    No. Civ.011092DWFAJB, 2002 WL 1016824
    (D. Minn. May 16, 2002) ............................................................................. 9

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ........................................................ 17

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................. 38, 39

*In re Cree Sec. Litig.*,
    No. 1:03CV00549, 2005 U.S. Dist. LEXIS 21975
    (M.D.N.C. Aug. 2, 2005) ............................................................................ 15

4822-0259-5062.v1

**Page**

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) ........................................................... 44

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    439 F. Supp. 2d 692 (S.D. Tex. 2006) .......................................................... 31

*In re Hertz Glob. Holdings, Inc.*,
    905 F.3d 106 (3d Cir. 2018) .......................................................................... 41

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ......................................................... 20, 21, 28

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13 CV 214(HB), 2014 WL 285103
    (S.D.N.Y. Jan. 27, 2014) ............................................................................... 19

*In re Medtronic Inc., Sec. Litig.*,
    618 F. Supp. 2d 1016 (D. Minn. 2009), *aff'd sub nom.*
    *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800
    (8th Cir. 2010) ............................................................................... 11, 36, 43

*In re Mylan N.V. Sec. Litig.*,
    379 F. Supp. 3d 198 (S.D.N.Y. 2019) ..................................................... 17, 19

*In re Mylan N.V. Sec. Litig.*,
    No. 16-CV-7926 (JPO), 2020 WL 1673811
    (S.D.N.Y. Apr. 6, 2020) ............................................................................... 31

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007) ................................................. 9, 23, 37

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ............................................................. 34, 35, 43

*In re Novastar Fin. Sec. Litig.*,
    No. 04-0330-CV-W-ODS, 2005 WL 1279033
    (W.D. Mo. May 12, 2005) ................................................................. 35, 36, 38

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...................................................................... 29

4822-0259-5062.v1

**Page**

*In re Openwave Sys. Sec. Litig.*,
  528 F. Supp. 2d 236 (S.D.N.Y. 2007)......................................................... 50, 54

*In re Pemstar, Inc. Sec. Litig.*,
  No. Civ. 02-1821 ............................................................................................ 23

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001) ............................................................. 23

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)............................................................... 25, 26

*In re Resideo Techs., Inc., Sec. Litig.*,
  No. 19-cv-2863, 2021 WL 1195740
  (D. Minn. Mar. 30, 2021).............................................................................. 18

*In re Saint Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011)......................................................... 19, 48

*In re Saint Paul Travelers Sec. Litig. II*,
  No. 04-4697, 2006 WL 2735221
  (D. Minn. Sept. 25, 2006) ....................................................... 11, 33, 42, 46

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006)............................................................. 54

*In re Stellent, Inc. Sec. Litig.*,
  326 F. Supp. 2d 970 (D. Minn. 2004)............................................................. 24

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................. 54

*In re Target Corp. Sec. Litig.*,
  275 F. Supp. 3d 1063 (D. Minn. 2017),
  *aff'd*, 955 F.3d 738 (8th Cir. 2020) .............................................................. 29

*In re Target Corp. Sec. Litig.*,
  955 F.3d 738 (8th Cir. 2020) ...................................................................... 33

*In re Tyson Foods, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017)................................................... 34, 37, 47

4822-0259-5062.v1

**Page**

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
No. 15-7658 (MAS) (LHG), 2019 WL 2724075
(D.N.J. June 30, 2019) ...................................................................................... 37

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
286 F. Supp. 2d 1047 (D. Minn. 2003) ............................................................. 49, 50

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................ 16

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) ........................................................................*passim*

*Lewy v. SkyPeople Fruit Juice, Inc.*,
No. 11 Civ. 2700(PKC), 2012 WL 3957916
(S.D.N.Y. Sept. 10, 2012) ................................................................................ 15

*Lustgraaf v. Behrens*,
619 F.3d 867 (8th Cir. 2010) ........................................................................... 20, 49

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................... 10

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013).............................................................. 19, 20

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016).............................................................. 22, 28

*Merchant & Could, PC v. Premier Glob. Servs., Inc.*,
749 F. Supp. 2d 923 (D. Minn. 2010)............................................................... 27

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................... 54

*Minn. Firefighters' Relief Ass'n v. Medtronic, Inc.*,
No. 08-6324, 2010 WL 11469576
(D. Minn. Feb. 3, 2010) ................................................................................... 26, 33

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018)............................................................... 39

- viii -

**Page**

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................. 25

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ...................................................................................... 29

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  No. 18-cv-871, 2019 WL 3336119
  (D. Minn. July 25, 2019) ............................................................................................ 47

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  679 F.3d 972 (8th Cir. 2012) ..................................................................................... 30

*Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ................................................................*passim*

*Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ...................................................................................... 39

*S.E.C. v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*,
  568 U.S. 442 (2013) .................................................................................................. 21

*S.E.C. v. McGee*,
  895 F. Supp. 2d 669 (E.D. Pa. 2012) ........................................................................ 53

*S.E.C. v. True N. Fin. Corp.*,
  909 F. Supp. 2d 1073 (D. Minn. 2012) ...................................................................... 21

*Sanchez v. Centene Corp.*,
  407 F. Supp. 3d 831 (E.D. Mo. 2019) .................................................................. 20, 48

*SEC v. Levin*,
  232 F.R.D. 619 (C.D. Cal. 2005) .............................................................................. 15

*Simon v. Abiomed, Inc.*,
  37 F. Supp. 3d 499 (D. Mass. 2014), *aff'd sub nom.*
  *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015) ..................................................................................... 39

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ..................................................................................... 22

- ix -

**Page**

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ................................................................................*passim*

*United States CFTC v. U.S. Bank, N.A.*,
   No. 13-CV-2041-LRR, 2013 U.S. Dist. LEXIS 158957
   (N.D. Iowa Nov. 5, 2013) ........................................................................ 19

*United States v. Anderson*,
   533 F.3d 623 (8th Cir. 2008) .............................................................. 52, 53

*United States v. Larrabee*,
   240 F.3d 18 (1st Cir. 2001) ...................................................................... 53

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................... 17

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   57 F. Supp. 3d 950 (D. Minn. 2014) ......................................................... 49

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   845 F.3d 384 (8th Cir. 2016) .............................................................. 30, 31

*White v. Jackson*,
   865 F.3d 1064 (8th Cir. 2017) .................................................................. 24

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78t(a) ...................................................................................................... 49
   §78u-4(b)(1)(B) ....................................................................................... 20

Private Securities Litigation Reform Act of 1995 ........................... 2, 17, 20, 21

Securities Exchange Act of 1934
   §10(b) ......................................................................................................... 1
   §20(a) ......................................................................................................... 1
   §20A ........................................................................................................... 1

Federal Rules of Civil Procedure
   Rule 9(b) ............................................................................................. 21, 31
   Rule 11 ...................................................................................................... 17
   Rule 12(b)(6) .............................................................................................. 9

4822-0259-5062.v1

**Page**

17 C.F.R.
    §229.303(a)(2)(ii) ................................................................................................ 28
    §240.10b-5(a), (c) .............................................................................................. 30
    §240.10b-5(b) ..................................................................................................... 10
    §240.10b-5(c) ..................................................................................................... 32

4822-0259-5062.v1

Lead Plaintiff St. Clair County Employees' Retirement System ("Plaintiff"), on behalf of investors who purchased common stock in Tactile Systems Technology, Inc., d/b/a Tactile Medical ("Tactile" or the "Company") between May 7, 2018 through June 8, 2020, inclusive (the "Class Period"), respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Motion") and memorandum of law in support thereof ("Mem."). ECF Nos. 63, 65, 66, 68.[1] For the reasons stated herein, Defendants' Motion should be denied.

## I.      Introduction

This case arises from Defendants' fraudulent misrepresentations and course of conduct that misled investors regarding the sales of Flexitouch, Tactile's primary product, thereby permitting Tactile insiders to reap profits of over $30 million by dumping Tactile stock when its price was artificially inflated. Defendants consistently highlighted to investors the Company's over 30% growth compared to the same quarter the prior year, and pointed out the "strong growth" in the Company's sales channels for patients covered by federal healthcare programs, such as the Veterans Administration ("VA") and Center for Medicare & Medicaid Services ("CMS"). Yet Defendants concealed that illegal kickbacks

---

[1]      Defendants Gerald R. Mattys, Lynn L. Blake, Brent A. Moen, Robert J. Folkes, Bryan F. Rishe, William W. Burke, Richard J. Nigon, and Kevin H. Roche ("Individual Defendants") along with Tactile (collectively, "Defendants") seek to dismiss the claims brought under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act") as alleged in the Amended Class Action Complaint (ECF No. 49) ("Complaint"). Unless otherwise noted, all "¶" or "¶¶" references are to the Complaint. Unless otherwise noted, all "Ex." references are to the Exhibits attached to the Declaration of Ashley M. Price in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss, filed concurrently herewith. Unless otherwise noted, emphasis is added and internal citations are omitted.

- 1 -

and false reimbursement claims targeting the VA and CMS sales channels drove Tactile's purportedly impressive revenue performance. To further impress on investors their growth story, Defendants also reiterated each quarter Flexitouch's market size which Defendants had falsely inflated by at least three times.

As the stock soared on Defendants' positive reports of the Company's revenue growth – driven by Defendants' concealed illegal schemes, Company insiders took advantage of the artificially inflated stock price and sold more than *$38 million* of their Tactile shares during the Class Period. In particular, Tactile's CEO Mattys sold over 46% of his holdings from the beginning of the Class Period for profits of *$11.4 million*.

The truth regarding Defendants' scheme of paying illegal kickbacks and making false claims to federal healthcare providers began to be revealed to the market for the first time when a *qui tam* amended complaint was unsealed on March 20, 2019. Yet Defendants continued to minimize the facts alleged in the *qui tam* lawsuit. Then, on June 8, 2020, *Seeking Alpha* published a report disclosing new details of Defendants' illegal sales practices, that Tactile was embroiled in a CMS audit for submitting claims without establishing medical necessity, and that the market for Flexitouch was actually a fraction of the size reported by Defendants. On that news, Tactile's stock plunged 12.8%, causing substantial damage to investors.

These detailed allegations exceed the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and state claims for securities fraud under §§10(b) and 20(a) and for insider trading under §20A of the Exchange Act. Attempting to undermine the well-pled allegations that Defendants engaged in illegal sales practices that

- 2 -

impacted Tactile's revenues, Defendants disparage the Complaint's sources while ignoring case law permitting the challenged sources and disregarding the sources the Complaint actually used. Defendants' attacks on falsity also fall short, as they attempt to insert fallacious puffery arguments to challenge misstatements regarding Tactile's revenues and fail altogether to address the misstatements regarding the Company's legal compliance. Defendants' challenges are equally ineffectual to the well-pled allegations detailing Defendants' millions of dollars in insider trading that supports a compelling inference of scienter and the §20A claims. Taken together, the Complaint sets forth detailed allegations of Defendants' fraud. Defendants' Motion should be denied.

## II.      Statement of Facts

During the Class Period, Tactile promoted its growth story of ever-increasing sales in its flagship product, Flexitouch. ¶¶1-3, 13. As a medical technology company, Tactile manufactured and sold medical devices for at-home treatment of lymphedema and chronic venous insufficiency ("CVI"). ¶¶1-2, 25. Flexitouch, a pneumatic compression device ("PCD") used to treat lymphedema, was at the forefront of Tactile's sales strategy. ¶¶25, 31.

Lymphedema is a chronic disease characterized by swelling localized in a body part, such as the arms, legs, neck or trunk, that occurs when the body's lymphatic vessels are unable to drain lymph fluid. ¶26. Using complete decongestive therapy, considered the gold standard of lymphedema treatment, lymphedema can be managed and prevented from progressing to more severe stages through massage, compression therapy, exercise, and skin care. ¶¶27-28. Only when the lymphedema becomes more advanced will physicians

- 3 -

4822-0259-5062.v1

prescribe surgery or a PCD, of which there are two types – basic and advanced PCDs.  ¶¶29-30.

Flexitouch was considered an advanced PCD, and was three to four times more expensive than the basic PCD, called the Entre system, that Tactile offered for "patients who do not yet qualify for insurance coverage of an advanced compression device."  ¶30. Though Flexitouch was prescribed in only the most severe cases, Tactile derived roughly 90% of its revenue from Flexitouch sales.  ¶¶30-31.

Tactile's business relied in large part on third-party payers, including private insurers, Medicare and Medicaid, and the VA.  ¶33.  Approximately one-third of Tactile's revenue came from federal healthcare programs.  ¶48.  For private insurers, Tactile typically recognized an "implicit price concession," or downward price adjustments to account for past experience on patient collections.  In the VA channel, by contrast, Tactile's contract was with the VA rather than the patient, and therefore "no implicit concession" was necessary for those sales.  ¶34.  Thus, the Company placed particular emphasis on targeting sales to its VA channel by, for example, establishing for its sales team in 2018 the "VA Million Dollar Club" and distributing bonuses to sales management specifically for meeting quarterly VA revenue targets.  ¶¶42, 256.

Based in part on reportedly strong sales to the VA and Medicare, Tactile announced repeated quarters of over 30% revenue growth.  To investors, Defendants identified that "growth in the Medicare channel" and "growth in the Veterans Administration channel" were factors driving Flexitouch sales growth.  *See e.g.*, ¶¶133, 136, 139, 141, 146, 151, 154, 156-157, 167, 173, 176-177, 181, 185, 187.  Defendants also emphasized that the market for

- 4 -

Flexitouch was untapped, thus reassuring investors that Flexitouch sales had room to continue growing. ¶¶4, 57; *see also* ¶¶134, 141, 149, 159, 168, 193, 199, 207-208.

However, the rosy reports of Tactile's seemingly ascending revenues concealed the fact that Defendants had engaged in illegal sales practices. ¶35. By paying kickbacks and reporting false claims to federal healthcare programs, these illegal sales practices – unbeknownst to investors – contributed to Tactile's upbeat reports of revenue growth. To further buttress its growth story, Defendants falsely inflated the number of lymphedema diagnoses, thereby falsely inflating the market size for Flexitouch. *Id.*

Tactile's kickback schemes targeted physicians, therapists, and other hospital personnel to induce prescriptions of Tactile products, especially the upmarket Flexitouch system. ¶¶36-48. In exchange for making Flexitouch "referrals," Tactile provided perks and benefits to doctors recruited to be a Key Opinion Leader ("KOL") for Tactile. ¶37. The KOLs put on speaking events, often held at luxury hotels and expensive restaurants and hosted by Tactile, who identified "warm" leads before the event. ¶¶40-41. At one such event at a pricey steakhouse, the bill far exceeded the permitted gift allowance for the four VA employees attending. Notably, regulators have flagged such "speaking arrangements" as high risk for fraud and illegal remuneration. ¶39.

In addition to the kickback scheme run through Tactile's KOL program, Tactile implemented a kickback scheme through non-physician healthcare providers, such as lymphedema therapists, who trained patients at home on how to use the Flexitouch product. ¶¶43-44. But Tactile's ulterior purpose in implementing its trainer program was to obtain

- 5 -

referrals from the trainers, who, if they failed to provide enough referrals, were dismissed. ¶¶44-45.

These schemes to induce sales through Tactile's KOL program and the trainer program violated the federal Anti-Kickback Statute ("AKS"), which criminalizes the remuneration of anything of value to any person in order to induce that person to either refer the furnishing or arrange for furnishing of any item reimbursable by federal healthcare programs. ¶¶36-37. Thus, not only did Defendants risk criminal penalties, but Tactile also risked losing nearly one-third of its business if, through a finding of any violation under AKS, Tactile was excluded from participating in the federal healthcare programs. ¶48. While Tactile affirmed its compliance with the AKS in SEC filings, these practices were in clear violation of the AKS. ¶¶164-165, 200-201.

Besides using illegal kickbacks to induce Flexitouch sales, Defendants also concealed that claims made to CMS provided false medical necessity information that duped CMS into covering Flexitouch. ¶¶52-53. For instance, a former Senior Sales Specialist stated that Tactile's basic device, Entre, was "***designed for failure***," and intended only to "demo" the device for an hour before recording that the treatment had failed, qualifying the patient for Flexitouch. *Id.* Similarly, Tactile sales representatives routinely provided pre-filled forms to doctors and drafted medical necessity narratives with instructions to the doctor to copy to his or her letterhead and sign. ¶54.

Audit results by CMS's Recovery Audit Contractor ("RAC") bore out that medical necessity was overwhelmingly absent from Flexitouch claims submitted to CMS. ¶¶55, 129. In fact, in its first round of audits, the RAC auditor flagged 71% of Tactile's claims for

- 6 -

failure to establish medical necessity; in the second round, 81% of Tactile claims were retroactively denied for lack of medical necessity. *Id*.

Like Defendants' kickback schemes, the submission of false claims provided short-term influxes to revenues, but at the risk of serious consequences to Tactile's business. In addition to steep monetary penalties for each false claim, Tactile risked permanent exclusion from federal healthcare programs, jeopardizing one-third of its revenue. ¶56. And while Defendants perpetrated the false claims scheme, they falsely affirmed their compliance with the False Claims Act ("FCA") in SEC filings. ¶¶165, 201.

While concealed illegal sales practices fed Tactile's revenue growth, Defendants also made false and misleading statements regarding Flexitouch's market size. First, Tactile significantly overstated the number of U.S. lymphedema diagnoses, such that Tactile's actual market size was at least three times smaller than the reported total addressable market ("TAM") of a $4-$5 billion market, and according to the *Seeking Alpha* report, as much as ten times smaller. ¶¶59-61, 64. Second, Tactile's TAM calculation assumed that each lymphedema diagnosis (regardless of severity) would ultimately be severe enough to require Flexitouch use. ¶¶66-72. However, lymphedema is often managed through lower-cost treatments such as compression therapy and exercise that do not require PCDs. ¶¶28-29, 67. These treatments often prevent the disease from progressing. ¶66. Some third-party payers even consider the Flexitouch "a treatment of last resort," which further restricts the number of potential lymphedema patients. Defendants' use of *all* diagnoses of lymphedema – without qualification – as the basis for its calculation, falsely overstated Tactile's TAM. ¶¶66-72.

- 7 -

4822-0259-5062.v1

On January 23, 2019, Veterans First Medical Supply LLC ("VFMS") filed a sealed amended *qui tam* complaint alleging that Tactile had violated the AKS and FCA by paying illegal kickbacks to doctors to induce Flexitouch prescriptions and making false reimbursement claims. ¶90.  While the Company was served with the amended complaint on February 13, 2019, it remained sealed from the public as Tactile's stock prices climbed to over $70 per share.  ¶91.  Exploiting his insider knowledge, including, among other things, his knowledge of the allegations in the *qui tam* action, Defendant Mattys sold 50,000 Tactile shares on February 14 and 15, 2019, raking in $3.5 million in proceeds and $2.8 million in profits.  ¶¶92, 221.  Not until two weeks after Mattys's sale did Defendants mention the *qui tam* action in their 2018 Form 10-K.  Even then, Defendants took measures to minimize its import and undermine the credibility of its allegations by claiming that it was merely part of an industry-wide increase in *qui tam* lawsuits and that the allegations were "without merit." ¶93.  Mattys was not alone in trading on insider information.  During the Class Period, six other Tactile insiders dumped Tactile stock, pocketing a total of $27.8 million in profits. ¶220.

Only when the *qui tam* action was unsealed after the market closed on March 20, 2019 did investors learn details for the first time concerning Tactile's illegal sales practices. ¶101.  Securities analysts released reports describing the allegations but noting that Tactile's management "refut[ed] the notion" that it paid kickbacks to doctors.  Tactile's stock price nonetheless tumbled.  ¶¶102-103.  Defendants continued to deny the *qui tam* action's allegations and emphasize the Company's revenue growth and addressable market.  ¶¶104-109.

4822-0259-5062.v1

Then, on June 8, 2020, *Seeking Alpha* published a report written by OSS Research called: "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy," stunning the market with new details concerning Tactile's illegal sales practices and debunking Tactile's addressable market statements. ¶¶116-121. With this new information, Tactile's share prices plunged further, causing damage to Tactile investors. ¶¶122, 217-218.

## III.   Legal Standard

In assessing a defendant's motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "attacked by a Rule 12(b)(6) motion to dismiss" must simply contain sufficient factual matter, accepted as true, "to state a claim" that "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545-46, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 556. "On a motion to dismiss, the question is not whether Plaintiff can be successful on its securities fraud claims, but rather, whether Plaintiff has pled its allegations and supporting facts with particularity such that the Complaint should remain for discovery." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877 (D. Minn. 2007); *In re Chronimed Inc. Sec. Litig.*, No. Civ.011092DWFAJB, 2002 WL 1016824, at *6 (D. Minn. May 16, 2002) (to dismiss plaintiffs' claims "based on an undeveloped record and the mere possibility of an

- 9 -

alternative explanation" to the alleged fraud "would be premature" at the motion to dismiss stage of the litigation).  "Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party."  *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1045 (D. Minn. 2015).

## IV.   The Complaint Sufficiently Pleads Violations of §10(b) for Defendants' Fraudulent Misrepresentations and Omissions

To state a securities fraud claim under §10(b), typically a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Defendants here contest only two elements of Plaintiff's §10(b) claim: material misrepresentation and scienter.[2]

Under Rule 10b-5(b), it is unlawful "to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b). A fact is material under §10(b) """"when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.""""  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

Here, Defendants made material misrepresentations that are actionable.  Defendants "'create[d] an impression of a state of affairs'" that Tactile's revenue growth was the result

---

[2]   Defendants accordingly waive any challenge to any other element.

4822-0259-5062.v1

of legitimate sales practices and that it had a large, untapped market of lymphedema patients, supporting continued growth. *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010) ("*Medtronic I*"). That false impression "materially differed from the one that actually existed." *Id.* In reality, Defendants concealed that illegal sales practices impacted the Company's growth and therefore, that the Company was in violation of the AKS, the Stark Laws, and the FCA. Defendants also falsely inflated Tactile's addressable market, and diminished the import of the *qui tam* action's allegations.

### A.    The Complaint Alleges Underlying Illegal Sales Practices

Underlying this securities fraud is Defendants' illegal scheme involving: (1) paying kickbacks to KOLs and Flexitouch trainers; and (2) making false claims to federal healthcare programs. Information that "reported revenue was derived from a widespread, serious fraud," as Tactile's revenue was, "could be important to a reasonable investor even if the fraud only accounted for a small percentage of [Tactile's] profits; also, the information would be material because the alleged fraud opened [Tactile] to potential civil and criminal liability." *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 724 (D. Minn. 2019). The Complaint alleges "specific facts that, if proven true, lead to an inference that defendants participated" in illegal sales practices. *In re Saint Paul Travelers Sec. Litig. II*, No. 04-4697 (JRT/FLN), 2006 WL 2735221, at *1 (D. Minn. Sept. 25, 2006).

The Complaint particularly alleges that in violation of the AKS, Tactile paid illegal kickbacks in its KOL program and contract trainer program to induce healthcare providers to prescribe Flexitouch to patients covered by federal healthcare programs. ¶¶37-45.

- 11 -

4822-0259-5062.v1

To generate "referrals," *i.e.* Flexitouch sales, Tactile recruited doctors to its KOL speakers program who had "***a high referral rate to us***" and an ability "to influence others," according to an internal document quoted in the *qui tam* action.  ¶37.  Defendants even internally touted that their KOL program spurred sales.  At the Company's 2018 National Sales Meeting, Defendant Rishe presented a slide (later quoted in the *qui tam* action) that blazoned: "KOL SPEAKERS PROGRAM – THE MOST EFFECTIVE TOOL EVER FOR GAINING ACCESS IN YOUR HARD TO SEE ACCOUNTS AND A STRONG COORELATION [sic] TO IMMEDIATE NEW REFERRALS." ¶37.  Tactile's sales and marketing personnel carefully monitored the attendees invited to KOL events and presentations to ensure that it would provide a "return on investment."  ¶41.

In exchange for "influenc[ing]" referrals, the KOL physicians received perks and incentives.  For example, based on evidence cited in the *qui tam* action, Dr. Ron J. Karni, who prescribed 123 Tactile devices in 2019, was one of Tactile's KOLs.  ¶¶38, 40.  Tactile paid Dr. Karni $17,209.29 for his one-week trip to Las Vegas, Scottsdale, and Los Angeles.  During this trip, Dr. Karni presented at a private dinner held for 20 people at a Las Vegas steakhouse.  Notably, the per-person share of the $2,782.89 tab far exceeded the gift allowance permitted to the four invited VA employees.  ¶40.  Another paid KOL was Dr. Arman Kirakosian, a physician at the San Francisco VA, which reported the highest cost in the United States for orders of Tactile devices from 2017 to 2020.  ¶42.  Thus, the KOL program was not only a way for Tactile to fuel sales Company-wide, but to specifically target the VA channel.

4822-0259-5062.v1

These allegations go beyond merely "a few examples and anecdotal evidence," as Defendants suggest. Mem. 12. Instead, the Complaint reveals that the misconduct arising from the KOL program was a Company-wide strategy. It further provides names and amounts of payments – dispelling any contention that there is insufficient details regarding the kickbacks. ¶¶40-42; Mem. 12.

The Complaint also details Tactile's AKS violations through an illicit "contract trainer" program that even Tactile's own Chief Compliance Officer, a lawyer, determined posed a high "Business Risk" for "kickbacks." ¶44. Through its contract trainer program, Tactile paid hospital staff to convince physicians to prescribe Flexitouch. ¶¶43-47. Tactile's contract trainer program was a nationwide program in which it hired, according to its 2018 Form 10-K, "over 560 licensed, independent healthcare practitioners as home trainers" who were specifically "identified through our *sales and marketing interest*." ¶43. For \$150 per training, Tactile hired trainers who were employed at the same hospitals and facilities where Tactile hoped to sell its products, including VA hospitals. ¶¶44, 47. Trainers, familiar with Flexitouch, were supposed to encourage physicians with whom they worked to prescribe Flexitouch to other patients. ¶44. In turn, Tactile, having the ability to withhold trainer assignments, assessed the trainer's number of the referrals rather than the trainer's ability to successfully train patients on the product. *Id.* "[P]erformance assessments" noted when their referrals fell short, even admonishing: "Wish she'd get more patients." *Id.* In fact, a former Senior Sales Specialist employed by Tactile until September 2015, recalled being instructed not to hire or keep a trainer unless they provided referrals for the Company, and

- 13 -

being told on at least two occasions to dismiss trainers who provided an inadequate number of referrals.  ¶45.

Finally, the Complaint adequately alleges the FCA violations.  *See* ¶¶49-56.  First, as alleged in the Complaint, CMS requires that when a provider like Tactile submits a claim for reimbursement, the provider certifies that it is in compliance with the AKS.  ¶50. Accordingly, Tactile's AKS violations also established FCA violations.  *Id*.  Additionally, before CMS will cover an advanced PCD, such as the Flexitouch, it requires a showing of medical necessity, which imposes a strict requirement that a basic PCD must fail to alleviate symptoms after four weeks of use.  ¶¶53, 67.  Yet, a former Senior Sales Specialist stated that Tactile's basic device, Entre, was "***designed for failure***."  ¶53.  Even though Medicare required a patient to record four weeks of using the Entre pump without improvement before qualifying for an advanced PCD like Flexitouch – a fact she only came to learn after leaving the Company – Tactile had no interest in patients continuing to use Entre, the less expensive device.  *Id*.  Instead, the specialist revealed that the Entre was designed only to "demo" the device for an hour and then record that the treatment had failed, thereby enabling a Flexitouch prescription.  *Id*.

Similarly, to obtain coverage for Flexitouch from a federal healthcare program for their patients, doctors were required to submit medical necessity forms.  ¶54.  To secure Flexitouch prescriptions, Tactile sales representatives routinely provided pre-filled forms to doctors and drafted medical necessity narrative templates with instructions to the doctor to copy to his or her letterhead and sign.  *Id*.  In one example uncovered by *Seeking Alpha's* report, a Tactile representative sent a "medical justification template" to doctors at a Dallas

- 14 -

4822-0259-5062.v1

VA hospital. *Id.* The sales representative urged in red at the top of the form: "Please note that Medical Justification is KEY to getting your patient the Flexitouch Plus Pump," and then provided eight examples of language to use to demonstrate medical necessity, of which the sales representative instructed the doctors to choose two. *Id.* As a result of Tactile's sales practices, a CMS RAC auditor flagged 71%-81% of Tactile's claims for failure to establish medical necessity. ¶¶55, 129.

Contrary to Defendants' mischaracterizations, the Complaint offers more than sufficient detail concerning the underlying schemes. *See, e.g.*, *SEC v. Levin*, 232 F.R.D. 619, 624-25 (C.D. Cal. 2005) (fraud's heightened pleading standard does not require pleading "detailed evidence concerning each and every fraudulent act alleged" nor is it required for a complaint to "*prove* the allegations it contains"); *In re Cree Sec. Litig.*, No. 1:03CV00549, 2005 U.S. Dist. LEXIS 21975, at *13 (M.D.N.C. Aug. 2, 2005) ("[p]laintiffs are not required to plead 'detailed evidentiary matter' or 'set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants'").

Faced with the detailed allegations of illegal sales practices and rampant AKS and FCA violations, Defendants resort to attacking the reliability of the Complaint's sources. Mem. 8-18. Defendants' argument is futile and improper because, at the motion to dismiss stage, "the source of [the] allegations is of no moment. The Court must accept non-conclusory allegations in the Amended Complaint as true, regardless of their alleged source." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 548 n.24 (S.D.N.Y. 2020); *see also Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700(PKC), 2012 WL 3957916, at *13-*14 (S.D.N.Y. Sept. 10, 2012) ("A motion to dismiss is not the proper

- 15 -

4822-0259-5062.v1

vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt

to prove their allegations.").  Moreover, Defendants' baseless criticism focuses on only three

of the myriad of sources used and cited in the Complaint: the *qui tam* complaint, the

confidential witness, and the *Seeking Alpha* articles.  Mem. 8-18.[3]

First, allegations sourced from the *qui tam* action are sufficient. Defendants' attack on

those allegations fails for the primary reason that almost all of the Complaint's allegations

did ***not*** rest solely on allegations from the *qui tam **complaint***, but rather, were sourced from

documents produced in the *qui tam **action***, such as the summary judgment motion.[4]

Even the few allegations sourced from the *qui tam* complaint are adequate because

"the weight of authority holds that plaintiffs may base factual allegations on complaints from

other proceedings" since logic and precedent fail to support "'an absolute rule' against doing

---

[3]     The basis for the Complaint's allegations also come from facts from discovery cited in the *qui tam* action, Tactile's SEC filings, deposition transcripts and other filings from an employment action against Tactile, Tactile-sponsored clinical studies, and medical journal articles – none of which Defendants challenge.

[4]     Defendants' Exhibit 2 is blatantly improper and should be stricken.  The Exhibit is a chart wholly created by Defendants, rather than a publicly available document, and includes a column highlighting Defendants' responses to various allegations in the *qui tam* lawsuit. Defs' Ex. 2.  Because Defendants improperly suggest that the Court should take judicial notice of their defenses in the *qui tam* lawsuit – facts that are at the heart of the dispute here – the Exhibit must be disregarded.  *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 832 (8th Cir. 2003) (courts may not take judicial notice of documents "to prove the truth of the matters within them and inferences to be drawn from them"); *accord Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery").  Moreover, Exhibit 2 grossly misstates the Complaint's use of the *qui tam* materials.  For example, it suggests that the Complaint copied the *qui tam* plaintiff's legal arguments when in fact information like the AKS safe harbor is available online, and the contracts with the contract trainers were available as an unsealed exhibit on the *qui tam* docket.  Plaintiff was accordingly able to (and did) conduct its own legal analysis.

- 16 -

so." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019); *see also de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint.").[5]  In fact, even with the dismissal of a *qui tam* action from which a securities fraud complaint "repeats factual allegations," plaintiffs can still meet the heightened pleading standard.  *See Gordon v. Vanda Pharms. Inc.*, No. 1:19-cv-01108-FB-LB, 2021 WL 911755, at *2 (E.D.N.Y. Mar. 10, 2021).[6]

Defendants also attempt to undermine the legitimacy of the *qui tam* action's allegations by stating that the "government investigated and declined to intervene." Mem. 1, 4.  However, far from any inference that the United States rejected the *qui tam* action, a closer reading of the United States' Notice of Election to Decline Intervention shows that the United States maintained an interest in monitoring the *qui tam* action.  *See* Ex. 1.  It requested that it continued to be served with all filings; that its consent be obtained before

---

[5]     Flippant references to Rule 11 for "cribb[ing]" allegations from another complaint are absurd and unwarranted.  Mem. 11.  In fact, Plaintiff has not merely copied allegations from another case, but has relied on extensive investigation and specifically enumerated numerous other sources on which it based its allegations.  By contrast, not *one* of Defendants' cases are relevant here because they each involve allegations based entirely on complaints filed in other actions with "no corroboration whatsoever." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019); *see also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (plaintiff relied "***entirely*** on another complaint as the ***sole*** basis for [its] allegations") (emphasis in original).

[6]     Defendants' own case – *Shoemaker v. Cardiovascular Sys.* – belies their position. No. 16-568 (DWF/KMM), 2017 WL 1180444 (D. Minn. Mar. 29, 2017).  While in *Shoemaker*, only generalized allegations without corroboration were insufficient to plead the underlying scheme (*id.* at *25-*26) here, by contrast, Plaintiff specifically pleads the illegal sales practices, which are substantiated by other sources.

- 17 -

the action is dismissed, settled, or discontinued; and that it reserved its right to intervene in the action at a later date. *Id.*

Defendants' other attempts to cast aspersions on the *qui tam* action fail. As Defendants acknowledge, the case is still pending, and has survived both a motion to dismiss and a subsequent motion for summary judgment. And while Defendants highlight that some of the claims were dismissed at summary judgment, they neglect to mention that these two counts that were dismissed were ***for standing reasons*** and not because the illegal sales practices were factually unsubstantiated. Ex. 2. The remaining claim – that Tactile violated the FCA – has withstood summary judgment.

Second, Plaintiff's allegations based on its interview with a confidential witness are also sufficient. Courts in this Circuit routinely credit confidential witnesses at the motion to dismiss stage where, as here, "the witness statements [are] corroborate[d] . . . and the complaint includes, for each confidential witness, the job title, period of employment, employment responsibilities, and personal knowledge of the information provided." *In re Resideo Techs., Inc., Sec. Litig.*, No. 19-cv-2863 (WMW/KMM), 2021 WL 1195740, at *6 n.5 (D. Minn. Mar. 30, 2021). Here, the Complaint has done just that. The witness's statements are corroborated by other facts alleged in the Complaint, and the necessary identifying details are provided. ¶45; *see, e.g.*, ¶117 (*Seeking Alpha* report disclosed that Tactile sales representatives encouraged patients not to take basic devices seriously). At this stage, nothing more is required.[7]

---

[7]    Though Defendants object that the witness was employed with Tactile before the Class Period (Mem. 18), there is no bright-line rule stating that such witnesses are

- 18 -

Third, the *Seeking Alpha* articles are adequate sources at this stage of the litigation. *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214(HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("The reliability of the [short-seller's] report is a question of fact that cannot be decided on a motion to dismiss."). Further, Defendants' "argument that the Court should disregard the [short-seller] because [it] shorts [defendant's] securities is unsupported by case law. This argument has been rejected by multiple other district courts in cases involving the reliability of [short-seller] publications on a motion to dismiss." *Garcia v. Guo*, No. CV-15-1862-MWF-MRWx, 2016 U.S. Dist. LEXIS 1819, at *20 (C.D. Cal. Jan. 7, 2016); *see also McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (noting the contention that short reports are unreliable "has been repeatedly rejected in prior cases" and collecting cases).

Though Plaintiff may "unquestionably rely" on information "if it were mentioned in a news clipping," (*Mylan*, 379 F. Supp. 3d at 214), Defendants find fault with other allegations sourced from the *Seeking Alpha* articles. Mem. 14-17. Yet these allegations, such as the failure of Defendants to establish medical necessity when submitting claims, are corroborated by other sources. ¶¶53-55, 129. Additionally, Defendants introduce extraneous facts, improper at this stage, to contend that the *Seeking Alpha* article's RAC Audit analysis was incorrect. Mem. 16-18; *United States CFTC v. U.S. Bank, N.A.*, No. 13-CV-2041-LRR, 2013 U.S. Dist. LEXIS 158957, at *40 (N.D. Iowa Nov. 5, 2013) (the issue "is a question of

---

categorically unreliable. In fact, and courts in this Circuit have given weight to confidential witnesses that were employed before the class period. *See In re Saint Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 901 (D. Minn. 2011) (holding confidential witness statements reliable even when the witness was employed "prior to the Class Period").

- 19 -

fact and, thus, a matter inappropriate at this stage of litigation and more appropriate at trial"). Simply put, "[t]he truth of the [short-seller's] report is 'a factual dispute not appropriate for resolution at this stage.'" *McIntire*, 927 F. Supp. 2d at 105, 124; *see also Bluestem Advisors LLC v. Eventure Interactive, Inc.*, No. SACV 16-02085 AG (JCGx), 2017 WL 3047895, at *1 (C.D. Cal. Apr. 17, 2017) ("this Court won't consider improper extraneous facts in deciding the motion to dismiss").[8]

## B.   The Complaint Pleads Falsity

To adequately plead falsity, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  "A complaint need not prove falsity; instead it need only allege facts 'sufficient to support an inference' that statements were false or misleading when made."  *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 840 (E.D. Mo. 2019) (quoting *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010)).

"'Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury.'"  *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)).  The question of whether a statement is materially false or misleading can be resolved as a matter of law only "'when reasonable minds could not differ.'"  *Id.* (quoting *K-tel*, 300 F.3d at 897).

---

[8]   Defendants further dispute the reliability of the article because the webpage of its author, OSS Research, has expired; yet OSS Research was welcomed to *Seeking Alpha* as a new contributor on June 8, 2020.  ¶216.  Thus, it no longer needed a separate domain to post its articles.

4822-0259-5062.v1

The Complaint alleges that Defendants made materially false and misleading statements regarding Tactile's revenue, Tactile's compliance with relevant federal laws, the size of Flexitouch's market, and its downplaying of the *qui tam* action. Satisfying the PSLRA and Rule 9(b), for each alleged misstatement, the Complaint identifies "the who, what, when, where, and how" of the misleading statements. *Dutton v. D&K Healthcare Res.*, No. 4:04CV147SNL, 2006 WL 1778884, at *5 (E.D. Mo. June 23, 2006).[9] As set forth below, Plaintiff's allegations more than sufficiently demonstrate that Defendants' financial results and public disclosures were false and misleading when made.

### 1.    Defendants Made Materially Misleading Statements Concerning Tactile's Revenues

"'The law is well settled . . . that so-called "half-truths" – literally true statements that created a materially misleading impression – will support claims for securities fraud.'" *S.E.C. v. True N. Fin. Corp.*, 909 F. Supp. 2d 1073, 1115 (D. Minn. 2012) (*quoting S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013) (statute of limitations)); *see also K-tel*, 300 F.3d at 898 (a party who "'discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects'"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout" success of programs, "they were bound to do so in a

---

[9]    Defendants criticize that the Complaint contains lengthy quotes and wishes that the bolding was explained. Mem. 18-19. In fact, as is customary in securities fraud complaints, the bolding signals what is particularly important in the long quote; shortening the quotes would lose context, as, no doubt, Defendants would have been quick to point out. In any case, because the Complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading," the pleading is sufficient. *Constr. Laborers Pension Tr.*, 433 F. Supp. 3d at 530.

manner that wouldn't mislead investors"). As a result, statements are materially misleading "when a corporation puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices.'" *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016).

Here, Defendants reported an increase in revenues each quarter, but misleadingly represented that the reasons for its revenue growth were due in part to Flexitouch sales growth in its VA channel (¶¶133-134, 136, 139-141, 143, 146-148, 151, 154, 156-158, 161-162, 178, 180) and sales growth in its Medicare channel (¶¶167, 173, 176-178, 181, 184, 186-187, 191). In truth, Defendants had concealed that Tactile's reported revenues were partially derived from the illegal sales practices that targeted these very two channels. Such statements "that put the source of the revenue at issue" are actionable because they "fail[ed] to disclose the impropriety of the source." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018); *Singer v. Reali*, 883 F.3d 425, 444 (4th Cir. 2018) ("[b]y alleging that the fraudulent reimbursement scheme was known to the Officers, clearly illegal, and fundamental to [the company's] financial success, the Complaint establishes that the Officers' failure to disclose the scheme presented a danger of misleading" investors).[10]

---

[10]    This direct link between the stated source of Defendants' revenue growth – its VA and Medicare channels – and the concealed illegal sales practices addresses the Defendants' contention that the allegations are "too attenuated." Mem. 21 n.8. Defendants also protest that a company has no duty to disclose uncharged wrongdoing, but acknowledge such a duty may arise where there is "'knowledge of wrongdoing.'" Mem. 21-22. Such is the case here. *See infra*, §IV. Finally, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) is inapposite because there, UBS had already disclosed to investors "its involvement in multiple legal proceedings and government investigations," such that UBS was not obliged to confess to the alleged underlying scheme. Such is not the

- 22 -

Thus, Defendants' contention that statements of "strong growth" in the VA channel "were inactionable 'puffery'" misses the point. *See e.g.*, Mem. 20-21; ¶133. The fraud alleged is not that Defendants stated the VA channel had "strong" sales growth when in fact it was weak; the fraud is that Defendants pointed to the so-called "strong" VA sales channel without mentioning that those sales were impacted by illegal sales practices. *Tile Shop*, 94 F. Supp. 3d at 1049 (statements making attributions for "a significant amount of its success" to supplier relationships are not immaterial puffery, but a "factual statement" about which the company was obligated to disclose the involvement of an employee's ownership interest with the supplier); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (if the company was "engaged in a series of illegal or fraudulent business practices and were those practices responsible for inflating revenue, profit, and the customer base, such information would clearly alter the mix of information available to the public").

Likewise, Defendants' assertion that they had disclosed "the ***potential*** legal and regulatory risks" Tactile faced, is to no avail. Mem. 22. Such "cautionary language can not be 'meaningful' when [they] know that the potential risks they have identified have in fact already occurred." *Nash Finch*, 502 F. Supp. 2d at 873; *In re Pemstar, Inc. Sec. Litig.*, No. Civ. 02-1821 DWFSRN, 2003 WL 21975563, at *8 (D. Minn. Aug. 15, 2003) ("Although Defendants' risk disclosures warned investors of potential risks that could occur in the future, such language is insufficient to render immaterial presently known facts about the problems at the company."). Defendants' identified warnings failed to inform investors that,

---

case here, especially as Defendants continued to deny the illegal sales practices even after the *qui tam* complaint was unsealed. ¶172.

- 23 -

4822-0259-5062.v1

as Defendants knew, the illegal sales practices were already occurring and already placed a significant portion of Tactile's business at risk. *See e.g.*, ¶44 (Tactile Chief Compliance Officer recognized the trainer program posed a high "Business Risk" for "kickbacks").[11]

Finally, the Complaint alleges overstatement of Tactile's Medicare revenue. ¶128. According to FOIA information cited by the *Seeking Alpha* article, Tactile's self-reported Medicare revenue was $22 million in 2019, while Medicare paid only $14 million to Tactile in 2019. *Id.* Likewise, in the first half of 2020, Tactile's self-reported Medicare revenue was approximately $11 million while Medicare paid $6 million to Tactile. *Id.* Thus, Defendants are mistaken in suggesting that the Complaint failed to allege the amount of the overstatement. Mem. 21 n.7.[12]

### 2. Defendants Made Materially False and Misleading Statements Concerning Their Compliance with Federal Law

Defendants failed to challenge – and therefore concede the falsity of – the alleged misstatements regarding their belief in their compliance with pertinent federal statutes, namely the federal AKS, the Self-Referral Laws (a/k/a the "Stark Law"), and the FCA. ¶¶164-165, 200-201. *White v. Jackson*, 865 F.3d 1064, 1076 n.1 (8th Cir. 2017) (where

---

[11]   *In re Apogee Enters., Inc. Sec. Litig.*, No. 18-CV-3097, 2020 WL 1445856, at *10 (D. Minn. Mar. 25, 2020) is inapposite because there, "as Defendants learned more about problems, they disclosed them to investors." Here, Defendants did not disclose the illegal sales practices and in fact, when served with the *qui tam* complaint, Mattys profited by $2.8 million in two days of insider sales – two weeks before telling investors about the *qui tam* suit. ¶225.

[12]   Because "[i]n general, 'the quantity of a revenue overstatement, in and of itself, is not . . . dispositive' of materiality" (*In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004)), Defendants' questioning whether the overstated amounts were material is misplaced. Mem. 21 n.7.

parties "have not presented any 'meaningful argument' in their opening brief," their claims are waived).

Defendants only mention these statements when arguing, in the context of Tactile's misleading revenue representations, that these statements should have informed investors that Tactile's financial results were subject to "potential legal and regulatory risks." Mem. 22. Yet, risk disclosures, such as those alleged here, are actionable "when they represented as merely possible risks that had already materialized," such as engaging in illegal schemes to pay kickbacks for Flexitouch prescriptions and making false reimbursement claims. *CenturyLink*, 403 F. Supp. 3d at 726; *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

Had Defendants not waived their arguments on these statements, Defendants could not have successfully resorted to an argument suggesting that using the word "believe" before the affirmative statements rendered them non-actionable. Rather, the law is clear that: "[T]hose magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015). The statements are actionable because they omitted material facts – namely, that Tactile was already engaging in illegal sales practices. *Id.* at 189 (opinion is actionable if it "omits material facts [that] . . . a reasonable investor would take from the statement itself").

- 25 -

### 3.    Defendants Made Materially False Statements Concerning Flexitouch's Market

"Information about . . . the potential for the product to continue to experience [sales] growth," such Tactile's reported figures on market opportunity, "is almost by definition the sort of information on which investors rely when making investment decisions." *Minn. Firefighters' Relief Ass'n v. Medtronic, Inc.*, No. 08-6324 (PAM/AJB), 2010 WL 11469576, *5 (D. Minn. Feb. 3, 2010). Thus, "[i]t is not a 'prediction' or a 'matter[] of opinion' that is not actionable." *Id.*

Defendants repeatedly highlighted to investors in their public statements "the $4 billion-plus addressable market opportunity in the United States lymphedema market." *See* ¶¶134, 141, 149, 154, 156, 159, 163, 168, 171, 179, 185, 190; *see also* ¶¶193, 195, 199, 204, 207 (regarding the "$5+ billion" addressable U.S. market opportunity). These statements, with the exception of those found in the Forms 10-K (¶¶163, 199), provided no caveat or notification that the figure was an estimate. Regardless, the figure was an "[u]nrealistic and knowingly false projection[]," whose basis was contradicted by the published study of Tactile's own Chief Medical Officer, Thomas O'Donnell ("O'Donnell"). ¶¶62-64; *Prudential*, 930 F. Supp. at 74.

Specifically, the Complaint details that out of 165 million patients in the Blue Health Intelligence ("BHI") research database, O'Donnell only found 81,366 diagnosed with lymphedema. ¶64. This calculates to an incidence rate of .05% for a nationwide sample of patients covered by Blue Cross Blue Shield for the years 2012-2016. ¶¶63-64. That .05% incidence rate was *six times smaller* than the incidence rate reported by Defendants in 2018.

4822-0259-5062.v1

¶¶59, 64.  Applying the .05% incidence rate to the US population (325 million) yields only about 160,000 new lymphedema diagnoses per year.  Even applying Tactile's claimed 18% growth rate in lymphedema diagnoses each year only results in 310,200 new diagnoses in 2020.  ¶64.  By contrast, using the same BHI database, Defendants claimed that there were 1.1 and 1.3 million new diagnoses for the 12 months ending June 30, 2018 and 2019, respectively.  ¶63.  The resulting TAM (diagnoses times average selling price per device) was at least three times smaller than the amount Defendants publicly reported.  ¶¶58, 64.[13]

Although Defendants object that the O'Donnell study's data was "apples-to-oranges" when compared to the data Defendants used to draw their incidence rates, Plaintiff applied Tactile's own reported growth rate to adjust for the different years.  ¶64.  Moreover, Plaintiff's analysis is weighted in Tactile's favor by using the same BHI database as Tactile used for assessing its diagnoses per year, because the BHI data necessarily captured data from people with access to healthcare, and in which it can be inferred that lymphedema diagnoses would be greater than in the U.S. population as a whole.  ¶63.  Furthermore, whether lymphedema is "'underdiagnosed'" (Mem. 24, citing Ex. 8) is a fact outside the four corners of the Complaint, making its consideration at this stage of the litigation improper. *Merchant & Could, PC v. Premier Glob. Servs., Inc.*, 749 F. Supp. 2d 923, 932 (D. Minn. 2010) (courts must generally "ignore materials outside the pleadings").  Likewise irrelevant is Defendants' say-so regarding what a reasonable investor would have understood TAM to

---

[13]   Defendants insinuate that because the *Seeking Alpha* report undertook an analysis to determine whether TAM was properly stated by Tactile, that Plaintiff's analysis is ipso fact wrong.  Mem. 24.  In fact, Plaintiff conducted its own calculations.  *Compare* ¶61 and ¶64.

- 27 -

represent. Mem. 23. "Generally, the issue of whether a public statement is misleading is a mixed question of law and fact *for the jury*" and only "'decided as a matter of law . . . when reasonable minds could not differ.'" *K-tel*, 300 F.3d at 897.

### 4. Defendants Made Materially Misleading Statements Concerning the *Qui Tam* Action

"[A] duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring." *Menaldi*, 164 F. Supp. 3d at 581. Here, when Mattys told investors, "We don't believe those allegations [in the *qui tam* action] have any merit" (¶172), the market understood it to be a "routine" denial, as Defendants now claim. Mem. 25. Thus, Mattys's statement concealed the true significance of the allegations, namely that the allegations in the *qui tam* action were true, as Defendants had implemented illegal sales practices to drive revenue growth.[14]

### 5. The Complaint Adequately Alleges that Defendants Violated Item 303 of Regulation S-K

Defendants had an express duty under Item 303 of SEC Regulation S-K to disclose, in their periodic reports, "any known trends or uncertainties that have had or that are reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(2)(ii). Contravening this duty, Defendants violated Item 303 by failing to disclose that their reported revenues were derived in part from illegal kickbacks and false reimbursement claims. ¶¶123-127.

---

[14]   *Hall v. Johnson & Johnson*, No. 18-1833 (FLW), 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) is distinguishable because in that case, unlike here, "'numerous'" jury verdicts in favor of the company supported dismissing alleged misstatements that the company had "'substantial defenses.'"

4822-0259-5062.v1

When a defendant fails "to disclose that its illegal sales practices were a material driver of its reported revenue," Item 303 violations may give rise to §10(b) liability. *See, e.g.*, *CenturyLink*, 403 F. Supp. 3d at 726.[15]

Here, Defendants violated Item 303 by failing to disclose that their illegal kickback and false claims schemes were material drivers of Tactile's revenue. ¶¶123-127. As alleged in the Complaint, Tactile's AKS and FCA violations created an uncertainty that could materially impact the Company's revenues. ¶¶124-127. As Defendants acknowledged, "to the extent we are found not to be in compliance" with the AKS or FCA, "the federal government may also seek exclusion from participation in all federal healthcare programs." ¶124. Because Tactile garnered roughly 30% of its revenue from federal healthcare programs, the violations risked a significant portion of Tactile's overall revenues. ¶¶48, 56, 125. Further, because commercial insurance plans were "frequently influenced by Medicare coverage determinations," Medicare exclusion could have even wider consequences. ¶125.

The illegal sales practices were also "known" to Defendants. As alleged in the Complaint, Defendant Rishe specifically acknowledged that the KOL program allowed the Company to gain referrals, and he encouraged sales representatives to use the contract trainer

---

[15] Even though Ninth Circuit precedent was expressly rejected in this district, Defendants erroneously rely on *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055-56 (9th Cir. 2014). Mem. 26 n.9; *compare Tile Shop*, 94 F. Supp. 3d at 1047 (rejecting *NVIDIA*). Defendants also argue that *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) held Item 303 violations cannot give rise to §10(b) liability. Mem. 26 n.9. However, as explained in *Tile Shop*, *Oran* only held that that Item 303 does not ***automatically*** give rise to §10(b) liability. *Tile Shop*, 94 F. Supp. 3d at 1047. Defendants also misconstrue *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1081 (D. Minn. 2017), *aff'd*, 955 F.3d 738 (8th Cir. 2020), where, in fact, the court assumed without deciding that an Item 303 violation could give rise to liability under §10(b). Mem. 26 n.9.

4822-0259-5062.v1

program to "capitalize" on the VA channel.  ¶¶37, 47.  Defendants Rishe, Mattys, and Folkes

were all also intimately involved in and aware of the Flexitouch sales strategy which, as its

flagship product, was integral to the Company's success.  ¶¶31, 251-270.  For example,

Mattys, Rishe, and Folkes collaborated to set sales quotas and objectives during the Class

Period.  ¶259-260.  They also closely tracked each sales representative's sales.  ¶265.  The

Complaint thus adequately alleges Tactile management "knew, or **had access to**

**information**," about the trends and uncertainties arising from Tactile's illegal sales practices.

*See Tile Shop*, 94 F. Supp. 3d at 1047-48.[16]

## V.     The Complaint Sufficiently Pleads Violations of §10(b) for Defendants' Fraudulent Scheme or Course of Business

Defendants are further liable for their "use of 'any device, scheme, or artifice to

defraud' and 'any act, practice, or course of business which operates . . . as a fraud or deceit

upon any person, in connection with the purchase or sale of any security.'"  *W. Va. Pipe*

*Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016) (citing

17 C.F.R. §240.10b-5(a), (c)) ("*Medtronic II*").  Thus, scheme liability makes "deceptive

conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."

*Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 986 (8th Cir. 2012).  Contrary to

Defendants' assertion and citation to an unpublished, out-of-circuit opinion (Mem. 7, 38), the

Eighth Circuit has recognized that the PSLRA's heightened pleading requirements do not

apply to claims under Rule 10b-5(a) and (c).  *KV Pharm. Co.*, 679 F.3d at 986.  Instead, the

---

[16]     Defendants' argument that Tactile's revenue from government payers increased after
the *qui tam* lawsuit is irrelevant because no conclusion can be drawn about whether the
illegal sales practices actually ceased.  Mem. 27.  Further, because the *qui tam* action is
ongoing, Tactile still stands to be excluded from participation in federal healthcare programs.

- 30 -

4822-0259-5062.v1

alleged scheme liability only must satisfy the pleading requirements under Rule 9(b).  *Id.* The Complaint satisfies this standard.

The Eighth Circuit has found an actionable scheme liability claim from allegations of "paying physicians to induce their complicity" to edit language in clinical studies.  *See Medtronic  II*, 845 F.3d at 393.[17]  Likewise, here, the Complaint alleges that Defendants induced Flexitouch prescriptions through illegal sales practices.  ¶¶36-56.  By engaging in illegal kickbacks and seeking false reimbursement claims from federal healthcare providers, Defendants concealed from investors that Tactile's sales relied in part on illegal business practices, rather than legitimate means.  *See e.g. In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2020 WL 1673811, at *5 (S.D.N.Y. Apr. 6, 2020) (finding the submission of "cover bids" "create[d] the false impression that [defendants] were competitive," which was a deceptive act sufficient to support a scheme liability claim).

While the Eighth Circuit has found that to "merely repackage" misrepresentation allegations as scheme allegations is insufficient, it also refused to find that an "alleged scheme can never involve any misrepresentation."  *Medtronic II*, 845 F.3d at 393; *see also IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209(KBF), 2013 WL 1223844, at *8 (S.D.N.Y. Mar. 27, 2013) ("statements may simply be part of the fabric of the fraudulent scheme alleged"); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 439 F. Supp. 2d 692, 723 (S.D. Tex. 2006) (recognizing that a material misstatement may create

---

[17]    The conduct here, while also intertwined with alleged omissions, is sufficiently distinct.  *See Cotter v. Gwyn*, No. 15-4823, 2016 WL 4479510 at *7-*8 (E.D. La. Aug. 25, 2016) (sustaining a scheme liability claim where plaintiff alleged that defendant company facilitated self-interested transactions in addition to failing to report them).

- 31 -

a "nexus" between the securities market and the scheme). Likewise, here, Defendants' concealed illegal sales practices were a "course of business" that defrauded investors who believed that Tactile's sales and revenue growth arose from legitimate sales practices. 17 C.F.R. §240.10b-5(c).[18]

## VI.     The Complaint Alleges a Strong Inference of Scienter

The Complaint pleads a strong inference of scienter. Even under the PSLRA's heightened pleading standards, the scienter inference "need not be irrefutable" (*i.e.*, of the "'smoking-gun' genre"); nor "even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A court looks "holistically" at the complaint, rather than assessing whether any "individual allegation, scrutinized in isolation" pleads scienter. *Id.* at 310. Thus, the required inquiry is "whether **all** of the facts alleged, taken collectively," give rise to "an inference of scienter **at least as likely** as any plausible opposing inference." *Id.* at 322-23, 329 (emphasis in original). Under this analysis, even a tie goes to the plaintiff. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).

A "strong inference" of scienter "can be established through: "(1) 'facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud'[;] (2)

---

[18]     Defendants erroneously argue that Plaintiff does not allege each Defendant's participation in the scheme. Mem. 39. In fact, Rishe was Tactile's Senior Vice President of sales – the very department implicated in the scheme and the person directing the sales team to use the KOL program for referrals. ¶¶18, 37. Rishe, Folkes, and Mattys were each intimately involved in Flexitouch sales: they set the salaries for the Regional Sales Managers and Area Directors, determined Flexitouch sales quotas, and closely monitored Flexitouch sales. ¶¶251-266. With their access to daily information on Flexitouch sales, Blake and Moen were likewise implicated in the scheme. ¶265. Burke, Nigon, and Roche were each members and/or chairmen of the compliance and audit committees – where they failed to ensure compliance with, among other laws, the AKS. ¶¶19-21.

4822-0259-5062.v1

'conduct which rises to the level of severe recklessness'[;] or (3) 'allegations of motive and opportunity.'" *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020) (citing *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)); *Detroit Gen. Ret. Sys.*, 621 F.3d at 808; *CenturyLink*, 403 F. Supp. 3d at 730.

A showing of recklessness, as opposed to actual knowledge, is sufficient to establish scienter. *Kushner*, 317 F.3d at 828. Recklessness is alleged "where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it." *Id*. Recklessness is also sufficiently alleged where "defendants' knowledge of facts or access to information contradict[ed] their public statements," or where "alleged facts demonstrate that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.*; *see also Saint Paul Travelers*, 2006 WL 2735221, at *3 (citing *Kushner*, 317 F.3d at 827) ("badges of fraud" include whether the defendants: "(1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor").

"Allegations of motivation or opportunity . . . coupled with actual knowledge or recklessness . . . bolster a plaintiff's showing of scienter." *Minn. Firefighters' Relief Ass'n*, 2010 WL 11469576, at *7. The Eighth Circuit has also found that the "same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless." *Kushner*, 317 F.3d at 830; *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001).

- 33 -

Here, under a holistic analysis, the Complaint alleges a compelling inference of scienter because Defendants benefitted in a concrete and personal way from millions of dollars of insider sales, as well as incentive compensation tied to the illegal sales practices. The Complaint also pleads the "'classic' fact pattern" of scienter "that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002) (citing *Fla. State Bd. of Admin.*, 270 F.3d at 665).

### A.   Defendants Personally Benefitted from the Fraud

While the "absence of a motive allegation is not fatal" to pleading scienter, a defendant's "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Here, Defendants' personal gains weigh decidedly in favor of a scienter inference. Profiting from insider sales while the Company perpetrated illegal sales practices and misled investors regarding the Company's revenue growth and growth prospects, Defendants were motivated to prop up Tactile's stock price as they dumped Tactile shares. ¶¶220-244. Moreover, outsized bonuses tied to revenue targets incentivized Defendants to engage in illegal sales practices. ¶¶245-250. Personal benefits to Defendants make the scienter inference compelling here.

### 1.   Insider Trading During the Class Period Raises a Strong Inference of Scienter

"There is no doubt that 'insider sales are probative of motive,'" especially when "'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 997 (W.D. Ark. 2017) (citing *Navarre*, 299 F.3d at 746-

- 34 -

4822-0259-5062.v1

47).  Insider trading allegations "can give rise to the required inference of scienter when the insider trades are unusual either in the amount of profit made, the amount of stock traded, the portion of stocks sold, or the number of insiders involved." *In re Novastar Fin. Sec. Litig.*, No. 04-0330-CV-W-ODS, 2005 WL 1279033, at *6 (W.D. Mo. May 12, 2005) (citing *Navarre*, 299 F.3d at 747).  Here, the Class Period insider trading was extremely unusual, both in timing and in amount.  ¶¶220-244.

First, each Insider Trading Defendant's Class Period sales were dramatically out of line with prior trading practices and made at unusual times that were calculated to maximize personal benefit[19]:

- *Mattys.*  In the 12 months before the Class Period, Mattys sold $4,505,316 of his stock.  ¶222.  During the Class Period, Mattys sold $17,534,888 of his stock – a nearly *400%* increase from his pre-Class Period sales.  *Id.*  Many of Mattys's single-day trades during the Class Period were double or triple his highest single-day trades before the Class Period.  ¶223.  Mattys's most unusually-timed sales occurred on February 14 and 15, 2019 – the two days after the Company was served with the sealed *qui tam* complaint, and two weeks before it disclosed the Complaint to investors.  ¶225.  On February 14, 2019, Mattys sold 36,118 shares for proceeds of $2,506,135, and on February 15, 2019, he sold 13,882 shares for proceeds of $972,06, totaling $3,478,196 in proceeds of his Tactile stock – close to his total sales for the entire year before the Class Period.  *Id.*

- *Blake.*  In the 15 months before the Class Period, Blake sold 11,945 shares for $490,578.  ¶229.  In four months during the Class Period, Blake sold 6,322 shares for $347,021.  *Id.*  Her average monthly insider trading proceeds increased by *265%* during the Class Period.  *Id.*  Her largest sale was after the false and misleading statements in the 1Q18 and 2Q18 earnings announcements had dramatically increased the stock price from roughly $35 per share pre-Class Period to $57.04.  ¶230.

---

[19]   The "Insider Trading Defendants" are defined as Defendants Mattys, Blake, Folkes, Rishe, Burke, Nigon and Roche.  ¶22.

- 35 -

- *Folkes*.  Before the Class Period, Folkes sold once or twice per month for no more than $300,000 per month.  ¶232.  Beginning in September 2018, Folkes' sales skyrocketed.  *Id.*  In September 2018 alone, he sold $716,162 worth of his shares, and in November 2018 alone he sold $1,431,800 worth of his shares – *477%* more than his monthly pre-Class Period sales.  *Id.*

- *Rishe*.  Before the Class Period, Rishe mechanically sold 3,000 shares each month.  ¶235.  In June 2019 – while the Company continued to lie about its revenue growth, its TAM, and the merits of the *qui tam* lawsuit – he increased his monthly sales three-fold to 9,625 shares per month.  *Id.*

- *Burke*.  In the year before the Class Period, Burke sold only 3,500 shares for $95,595.  ¶238.  During the Class Period, he sold 16,662 shares for $924,961 – 967% more than he sold before the Class Period.  *Id.*  His largest sale during the Class Period was of 10,000 shares for $550,000 on June 18, 2019.  *Id.*  This sale was five times larger than any of his pre-Class Period sales.  *Id.*

- *Nigon*.  Nigon sold no stock before the Class Period, but from May 2019 to September 2019 – in a mere five months – he sold 59% of his holdings for $1,343,375.  ¶241.

- *Roche*.  During the Class Period, Roche sold 50,000 shares for $2,608,247 in proceeds.  ¶242.  He routinely sold shares within days after false and misleading earnings announcements significantly increased the stock price.[20]  ¶243.  His first Class Period sale occurred on May 10, 2018 – three days after the 1Q18 earnings announcement increased Tactile's stock price by 26.9%.  *Id.*

Second, the stock sales were suspicious in amount because each Defendant sold a significant proportion of the stock that he or she held at the beginning of the Class Period.  *See Medtronic I*, 618 F. Supp. 2d at 1037 ("'When evaluating stock sales, . . . the proportion of sales actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious.'").  As alleged in the Complaint, Mattys sold

---

[20]   Defendants argue that selling after making false positive statements is "precisely what the law requires."  Mem. 35.  This is untrue.  Selling shares shortly after issuing false positive statements is classic evidence of suspiciously-timed insider trading.  *See*, *e.g.*, *Dutton*, 2006 WL 1778884, at *10 (stock sales supported a scienter inference because they were made "on the heels of false positive financial statements").

- 36 -

46.01% of his shares during the Class Period, Blake sold 19.43%, Folkes sold 66.94%, Rishe sold 76.33%, Nigon sold 59.05%, Roche sold 56.83%, and Burke sold 74.04% – a considerable portion of the stock that each Defendant held before the Class Period. ¶220; *see*, *e.g.*, *Nash Finch*, 502 F. Supp. 2d at 882 (holding that sales of 24.47% of stock supported the scienter inference); *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, No. 15-7658 (MAS) (LHG), 2019 WL 2724075, at *53-*57 (D.N.J. June 30, 2019) (holding sale of 22% of holdings supported a scienter inference).

Defendants argue that because Mattys wound up with more Tactile stock at the end of the Class Period – due to vesting stock options – the proportion of sales sold is not unusual. Mem. 34. However, that argument has been rejected in this Circuit: "[t]hat Defendants acquired much (and perhaps all) of their retained shares through performance awards and other employment benefits, rather than on the open market, reduces . . . the significance of those holdings." *Tyson Foods, Inc.*, 275 F. Supp. 3d at 1002. Because Defendants acquired shares at no cost of their own, and with no risk, the scienter inference is not negated. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("[defendant] acquired shares at no cost to him, which does not demonstrate lack of scienter").

Further, even using Defendants' approach (considering stock grants as acquisitions), each Defendant apart from Mattys still sold off a *significant* portion of their stock:

| Defendant[21] | Shares Held At Class Period Start | Shares Held At Class Period End | Percentage of Stock Sold During |
|---|---|---|---|

---

[21]     The numbers in this chart are sourced from Defendants' Ex. 6.

- 37 -

|        |         |        | **Class Period** |
|--------|---------|--------|-----------|
| Blake  | 61,980  | 55,004 | 11.3%     |
| Folkes | 120,718 | 76,303 | 36.8%     |
| Rishe  | 88,328  | 43,567 | 50.7%     |
| Burke  | 7,679   | 5,843  | 23.9%     |
| Nigon  | 43,486  | 16,785 | 61.4%     |
| Roche  | 81,784  | 35,311 | 60.5%     |

Third, the number of insiders involved supports the scienter inference. *Novastar Fin. Sec. Litig.*, 2005 WL 1279033, at *6. As alleged in the Complaint, ***seven of eight*** Individual Defendants capitalized on the fraud by illegally selling ***$38,819,527*** of their stock at investors' expense. ¶220. Whether there was "coordination among the insiders" as to when they sold their shares is irrelevant and unsupported by legal authority, as is evident by Defendants' lack of citation for their assertion. Mem. 35-36.

Finally, Defendants' abuse of their 10b5-1 insider trading plans and their trading outside of the plans support a strong inference of scienter. ¶¶226, 230, 233, 239, 242, 230. "10b5-1 plans [] were created to allow corporate insiders to 'passively' sell their stock based on triggers, such as specified dates and prices, without direct involvement." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008). However, research has demonstrated that trading plans are easily manipulated, and SEC Commissioner Gary Gensler recently commented: "In my view, these plans have led to real cracks in our insider-trading regime."[22]

---

[22]   Dave Michaels and Mark Maurer, *SEC Chairman Calls for New Restrictions on Executive Stock-Trading Plans*, Wall Street Journal (June 7, 2021, 4:32 pm ET) , available at https://www.wsj.com/articles/secs-gary-gensler-speaks-at-wsj-event-1623070099.

4822-0259-5062.v1

Accordingly, courts have increasingly recognized that "the mere adoption of a trading plan during the Class Period may give rise to an inference of scienter, [and] that inference becomes stronger when trades executed pursuant to a trading plan are sporadic." *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018); *see also Countrywide Fin. Corp.*, 554 F. Supp. 2d at 1068 (holding "[t]he timing of [a defendant's] amendments to his 10b5-1 plans [were] probative of scienter" because "he actively amended and modified his 10b5-1 plans").[23]

Likewise, entering an insider trading plan during the Class Period does not serve as a defense to insider trading. *See*, *e.g.*, *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (holding a 10b5-1 plan "provide[d] no defense to scienter allegations" because it was entered into "during the class period"); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting defendant's attempt to use 10b5-1 plan as a "non-suspicious explanation" for trading because the defendant adopted the plan during the class period).[24] Thus, the Insider Trading Defendants' 10b5-1 plans fails to counteract an inference of scienter:

---

[23]   Thus, Defendants' citation to *Elam v. Neidorff*, 544 F.3d 921, 928 n.3 (8th Cir. 2008) (Mem. 32), is irrelevant because of Defendants' trades outside of their plans, modifications to existing plans, and creation of new plans during the Class Period.

[24]   Defendants cite no authority to support the proposition that multiple plans executed during the Class Period cannot support an inference of scienter. *See Elam*, 544 F.3d at 928 (discussing plans executed three months before the Class Period began); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 584 n.9 (S.D.N.Y. 2011) (noting a trading plan can serve as a defense to insider trading if "before becoming aware of the information, the trader had adopted a written plan for trading in the security"). Additionally, Defendants misread *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 523-24 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015). Mem. 32 n.14.

- 39 -

- Mattys sold stock on 13 separate days during the Class Period, pursuant to seven separate trading plans – each adopted during the Class Period. ¶227. Roughly every other sale during the Class Period, he adopted a new plan. *Id.* His sales made under the plans lacked a pattern – in either timing, amount, or price – to suggest that his trading was "passive" and meaningfully constrained by his trading plans. *Id.*

- Blake traded pursuant to a plan that was adopted before the Class Period. However, her largest Class Period sale was made outside of the plan. ¶229.

- Folkes used five separate trading plans during the Class Period, four of which were adopted during the Class Period. ¶233. His four heaviest trading days during the Class Period were made outside of any trading plan and totaled roughly one quarter of his overall Class Period insider trading proceeds. *Id.*

- Rishe also used five separate trading plans during the Class Period – four of which were adopted during the Class Period. ¶236.

- Burke sold stock five times during the Class Period. ¶237. His first two sales were made outside of any trading plan, and his last three sales were made under three separate trading plans – each of which was adopted during the Class Period. ¶239.

Faced with clear allegations of unusual and suspicious insider trading, Defendants mischaracterize the Complaint's allegations by arguing that the Complaint focuses on proceeds alone (which it clearly does not). Mem. 33. In fact, the facts alleged regarding the insider sales detail proceeds, profits, timing of sales, frequency of sales, number of shares sold, number of insiders involved, proportion of shares sold, and 10b5-1 plan abuse. *See* ¶¶220-244.[25]

---

There, the court determined the appropriate time frame for assessing insider sales was the class period (and not the 33-month period of the alleged off-label marketing leading up to the class period), which, if anything, supports Plaintiff's arguments.

[25]    Defendants also argue that they did not sell more ***often*** during the Class Period than before. Mem. 33-34. This argument is misleading given the frequency of sales fails to take into account the number of shares sold, which is the relevant metric. Defendants also state that because Folkes sold at equal ***rates*** before and during the Class Period, that his sales were

- 40 -

Defendants' last ditch attempt to mitigate the compelling inference of scienter arising from the insider selling spree is to argue that because the Class Period is longer than one year, insiders could be expected to sell "some" stock. Mem. 33. Yet the mere existence of a long Class Period is irrelevant where, as here, Defendants traded prolifically throughout the ongoing fraud. In fact, Defendants' sole authority on the point weighs in favor of scienter. In *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 119 (3d Cir. 2018), the individual defendants sold only four and five times over a 26-month Class Period, paling in comparison to the fact that Mattys sold *32* times during the 25-month Class Period, Folkes sold *62* times, and Rishe sold *57* times. ¶¶221, 231, 234. Furthermore, a court in this Circuit held insider trading allegations supported a compelling scienter inference when a class period was 25 months – the same class period length here. *See Dutton*, 2006 WL 1778884, at *1, *11.

### 2. Incentive Compensation Provides Further Motivation for the Fraud

Arrangements that qualify a defendant to obtain excessive bonus compensation are probative of scienter. *Green Tree*, 270 F.3d at 661. Here, Tactile's Management Incentive Plan ("MIP") allowed Defendants to rake in cash bonuses when Tactile met certain revenue targets that were tied to Flexitouch sales. Accordingly, the MIP motivated Defendants to engage in the illegal Flexitouch sales practices. ¶¶245-250.

---

not unusual in amount (he sold 27 times in the 15 months before the Class Period and 62 times in the 25-month Class Period). Mem. 34. This characterization is misleading because while Folkes sold at the same rate (*i.e.* executed sales at the same frequency), the ***number*** of shares he sold each time he sold skyrocketed. ¶232.

4822-0259-5062.v1

Under Tactile's MIP, Defendants Mattys, Moen, Blake, Folkes, and in 2019, Rishe,[26] could gain cash incentives upon reaching performance goals, for which revenue performance was weighted at 80%. ¶¶246-247. Since the calculation was weighted so heavily to revenue performance, increasing sales – by whatever means – meant these Defendants secured hundreds of thousands of dollars in incentive payments, weighing in favor of inferring scienter. *Id.*; *Saint Paul Travelers*, 2006 WL 2735221, at *4 (allegations of a kickback scheme coupled with "the fact that senior executives had compensation tied to the company's performance" were sufficient to raise a "strong inference of scienter for the senior executives").

Defendants argue that there is nothing "'suspicious'" about their bonuses. Mem. 31. Yet, there is a difference between a vague allegation of "bonuses based upon corporate performance" and the incentives alleged here, which were directly tied to Tactile's revenues, and thus the underlying illegal sales practices. *See Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009). In any case, the incentives that Defendants earned as a direct result of the illegal sales practices cannot be "scrutinized in isolation," but should be considered among "*all* of the facts alleged, taken collectively," including Defendants' insider sales and participation in the illegal sales practices. *Tellabs*, 551 U.S. at 323. Under that analysis, Defendants' cash incentives support the scienter inference.

---

[26] While not part of the MIP in 2018, Defendant Rishe's bonuses were still specifically tied to attaining a revenue quota and a quota of units sold to the VA. ¶248.

- 42 -

B.       **Defendants Knew and Had Access to Information that Contradicted Their Public Statements, or Failed to Check Information They Had a Duty to Monitor**

"One of the classic fact patterns giving rise to a strong inference of scienter" is when defendants "knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin.*, 270 F.3d at 665; *Navarre*, 299 F.3d at 746. Moreover, "[a] court may infer 'that individuals in top management of a corporation are aware of matters central to that business's operation.'" *Medtronic I*, 618 F. Supp. 2d at 1034; *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (facts central to a business's operation are assumed to be known to senior management).[27] Similarly, where defendants "fail[] to check information they had a duty to monitor," an inference of scienter may arise. *Kushner*, 317 F.3d at 827.

The Individual Defendants' scienter is inferred here because, by accounting for 90% of the Company's sales, Flexitouch was, as Mattys stated, the Company's "signature product," and thus, was of dominating importance to Tactile's business. ¶¶2, 30, 268. Flexitouch revenues and growth were the headlining features of Defendants' earnings announcements – demonstrating that Defendants were aware of and tracked Flexitouch sales. *See e.g.*, ¶79. Defendants unquestionably focused on specific metrics regarding sales growth

---

[27]   Defendants eschew the "core operations" doctrine, contending that the Eight Circuit has declined to adopt it. Mem. 36. In reality, the Eighth Circuit recognized, without deciding, that knowledge may be imputed to a company's key officers when the information is at the core of its operations and when allegations establish, as they do here, a foundation from which to infer that facts critical to a business's core operations are known within the company at the time the statements were made. *Elam*, 544 F.3d at 929-30; *see also CenturyLink*, 403 F. Supp. 3d at 731 (reasonable to assume management's knowledge of matters central to the business's operations).

4822-0259-5062.v1

– as Mattys testified, "growth year-over-year is a big one for us." ¶269.[28]  This focus meant Defendants knew and had access to information that Tactile's revenues were impacted by the illegal sales practices.

Specifically, the Complaint details the involvement of Defendants Mattys, Folkes, and Rishe, who helmed the Company's sales strategy.  ¶258.  These three individuals were in charge of setting sales quotas for the Company's sales representatives, approving the sales team's incentive plans, determining regional sales leadership, setting the yearly budget, and running the Quarterly Business Review and annual National Sales Meetings.  *Id.*  As part of the annual budgeting process, Rishe presented the next year's sales objectives to the senior management team, including Mattys and Folkes, and once approved by management, the sales objectives were presented to the Board of Directors, which included Defendants Burke, Nigon, and Roche.  ¶259.

In fact, all employees in the Company's upper echelons examined the minutia of the Company's sales performance, with senior management and every member of the sales team receiving the "plan versus actual" report that was generated by Tactile's enterprise software system every night.  ¶265.  As Mattys stated during a deposition in an employment discrimination case, senior management had "data . . . by individual representative," thus

---

[28]     Moreover, Mattys, Blake, and Moen signed the SOX Certifications in which they stated they had reviewed the SEC filing and had ensured that material information relating to Tactile was "made known" to them.  ¶137.  Defendants protest that "bald" allegations of false SOX certifications cannot support the scienter inference, despite the review they certified they had done.  Mem. 36; ¶137.  Courts have noted that the signing of SOX certifications supports an inference of scienter.  *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468-69 (S.D.N.Y. 2017).

- 44 -

affirming, "[e]ach rep we track." *Id.* Mattys also testified that he reviewed and provided feedback on sales quotas by region and even by individual product specialists. ¶260. Given the access to sales data, there can be no reasonable inference that Defendants were unaware of the illegal sales practices.

This conclusion is bolstered by the fact that it was Rishe who promoted the KOL program at the Company's National Sales Meeting. ¶¶37, 259. Rishe told the audience that the KOL program was "the most effective tool ever" to access difficult accounts and had a strong correlation to "immediate new referrals. ¶37. Rishe was also the direct supervisor to the Regional Director who instructed the Senior Sales Specialist to fire trainers who had not provided enough referrals to Flexitouch. ¶45. Thus, Rishe, reporting directly to Tactile senior management like Mattys and Folkes, spearheaded the illegal sales practices. ¶¶37, 45, 259.

Defendants also monitored Tactile's KOL program and trainer program. For example, Tactile's marketing department organized the KOL events, which were hosted by Tactile's sales team. ¶41. To determine the invitees to the KOL events, Tactile monitored information on "warm" leads and accounts that had referred patients to its products, and determined whether the KOL event would provide a return on investment. *Id.* Because Rishe could affirm that the KOL program was strongly correlated to "immediate new referrals," it is evident that Individual Defendants had access to such information and oversaw this process. ¶37.

Likewise, for its trainer program, Tactile's Minneapolis headquarters assigned trainers, again with information on the trainers' referrals at their fingertips. ¶44. When

- 45 -

4822-0259-5062.v1

trainers failed to provide "more patients," those trainers were not retained. ¶¶44-45. The Individual Defendants, and particularly Rishe, had access to trainer evaluations. ¶45.

Defendants also had reason to know that their statements regarding Flexitouch's addressable market were false and misleading because they contradicted the figures published by the Company's own Chief Medical Officer. ¶¶62-65. This inference is heightened given their specialization in lymphedema products and the known requirements of third-party payers before covering an advanced PCD. ¶¶25, 66-72.

Finally, Defendants were served with the *qui tam* complaint weeks before they disclosed it to investors. ¶¶91-92. In that gap of time, Mattys took advantage of his insider knowledge about the *qui tam* action and the legitimacy of the allegations regarding Tactile's illegal sales practices: in a two-day selling spree, he sold $3.5 million in Tactile stock for profits of $2.8 million. *Id*.

### C.    Defendants Deliberately Engaged in Illegal Behavior

Defendants' engagement in the "deliberately illegal behavior" of paying kickbacks to medical professionals and submitting false reimbursement claims in violation of the AKS and the FCA supports a strong inference of scienter. *Saint Paul Travelers*, 2006 WL 2735221, at *3; *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 Civ. 8862(GBD), 2013 WL 1286170, at *7 (S.D.N.Y. Mar. 28, 2013) ("allegations of deliberate misbehavior are sufficient to create the strong inference of scienter required"). Because the Complaint is replete with facts detailing the illegal sales practices in which Defendants engaged, a compelling inference of scienter may be drawn. ¶¶36-48 (detailing the kickback scheme); ¶¶49-56 (detailing the false claims scheme); *see also supra*, §IV.A.

- 46 -

Defendants were aware that the kickback schemes posed a risk to nearly one-third of their business. ¶¶33, 48. For example, Tactile's own Chief Compliance Officer, a lawyer, documented that Tactile's arrangements with therapists for the trainer program posed a high "Business Risk" for "kickbacks." ¶44. Only an unreasonable inference would assume that such information was not reported to Tactile's audit and compliance committees. Likewise, in Tactile's 2018 and 2019 Forms 10-K, which each Individual Defendant signed, Defendants went from asserting their belief that "we have structured such arrangements [with our clinicians in connection with the sales of our products] to be in compliance with the [AKS] and other applicable laws," to entirely striking the language the next year. ¶¶160, 164, 196, 199. The retraction of this language after the filing of the *qui tam* action confirms that Defendants no longer could stand by their belief that their sales practices complied with AKS.

Moreover, as the illegal sales practices came to light, senior Tactile executives departed from the Company, adding to an inference of scienter. *Tyson Foods, Inc.*, 275 F. Supp. 3d at 1005 (finding the "temporal proximity" of an executive's resignation to the alleged scheme "support[s] an inference of scienter"); *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-cv-871 (MJD/SER), 2019 WL 3336119, at *20 (D. Minn. July 25, 2019) (finding that corporate departures buttress scienter inference); *CenturyLink*, 403 F. Supp. 3d at 734 (same). Thus, the facts that: (1) mere months after the allegations of the *qui* action were unsealed, Mattys suddenly announced his departure; (2) three months after the *Seeking Alpha* article disclosed Defendants' fraud, Tactile announced that it was terminating Folkes;

- 47 -

4822-0259-5062.v1

and (3) two other senior executives exited the Company during the Class Period, provide suspicious timing and circumstances that support the scienter inference.  ¶¶274-277.

### D.     The Complaint Establishes Corporate Scienter

Finally, "[t]he knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity."  *Saint Jude*, 836 F. Supp. 2d at 896; *Tile Shop*, 94 F. Supp. 3d at 1054.  Having established the scienter for Mattys, Blake, and Moen, scienter is imputed to Tactile.

### E.     Defendants' Suggested Non-Culpable Inference Is Not Compelling

Defendants' attempts to demonstrate non-culpable intent are to no avail.  Mem. 37-38. "The strong-inference pleading standard does not license [the court] to resolve disputed facts at the [pleadings] stage of the case."  *Fla. State Bd. of Admin.*, 270 F.3d at 666.  As addressed above, *supra* §IV.A, Defendants' dispute of the Complaint's sources does not mitigate that when "accepted as true and taken collectively" the allegations are stronger than an inference of innocence.  *Tellabs*, 551 U.S. at 325.  Moreover, Defendants' supposed "cautionary disclosures" were insufficient in the face of the continuing AKS and FCA violations.  Courts have cast aside Defendants' remaining arguments.  *Sanchez*, 407 F. Supp. 3d at 847 (where defendants argued that a case had "none of the hallmarks of a securities fraud case," including government investigations, scienter was nevertheless inferred); *Saint Jude*, 836 F. Supp. 2d at 889 ("But the lack of any such formal restatement does not preclude a claim for securities fraud.").  Scienter is cogently pled and Defendants' challenge fails.

- 48 -

**VII.    The Complaint States a §20(a) Claim for Control Person Liability**

Section 20(a) "provides for liability of those who . . . 'directly or indirectly' control a primary violator of the federal securities laws.'" *Lustgraaf*, 619 F.3d at 873 (citing 15 U.S.C. §78t(a)).  Control person allegations are not subject to the heightened pleading standards, and thus "'naked allegations of control will typically suffice.'" *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 984 (D. Minn. 2014). "Culpable participation" need not be "part of a plaintiff's prima facie case." *Lustgraaf*, 619 F.3d at 873-74.  Moreover, questions of control are fact-intensive and not suitable for determination on a motion to dismiss.  *See In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1060 (D. Minn. 2003).

Here, apart from their contention that Plaintiff has failed to state a §10(b) claim, Defendants concede that Mattys, Blake, and Moen are control persons.  Mem. 40.  Because the Complaint has adequately stated a §10(b) claim, it adequately states a control person claim as to Mattys, Blake, and Moen.

The Complaint also alleges specific facts demonstrating that Folkes and Rishe controlled Tactile's general operations and were involved in the fraudulent scheme.  Mem. 41.  First, the Complaint specifically alleges Rishe's control because he was Senior Vice President of Sales, and because he was a "core member[] of management . . . who determined the Company's sales strategy."  ¶¶18, 258.  He was intimately involved in, and oversaw the very department perpetrating the illicit sales schemes alleged.  The Complaint likewise alleges Folkes' specific involvement as a core management member, as he was

- 49 -

involved in setting the salaries for the Regional Sales Managers and Area Directors and determining Flexitouch sales quotas.  ¶¶17, 258-264.

Burke, Nigon, and Roche were members and/or chairmen of the compliance and audit committees, and thus were each responsible for ensuring compliance with the very laws implicated by Defendants' illegal sales schemes.  ¶¶19-21.  The schemes had also risen to board-level authority and attention because Tactile's own Chief Compliance Officer, a lawyer, had flagged the contract trainer program as a high "business risk" for "kickbacks."  ¶44.  Defendants argue that Burke, Nigon, and Roche cannot be control persons because they are directors, and "directors are not *usually* responsible for a company's day-to-day business operations."  Mem. 41.  This argument is a red herring because there is no categorical rule that directors cannot be controlling persons under §20(a).  In fact, courts within this district have upheld §20(a) claims against director defendants.  *See, e.g.*, *Xcel Energy*, 286 F. Supp. 2d at 1050, 1060 (upholding §20(a) claim against a director defendant).  The Complaint sufficiently alleges claims under §20(a).

## VIII.   The Complaint States §20A Insider Trading Claims

During the Class Period, the Insider Trading Defendants collectively raked in nearly $28 million when they dumped their Tactile stock while possessing inside knowledge of the ongoing fraud.  Thus, Plaintiff states §20A claims by pleading that the Insider Trading Defendants: (1) sold stock while in possession of material, nonpublic information ("MNPI"); (2) traded contemporaneously with Plaintiff and the class; and (3) committed an underlying (predicate) Exchange Act violation.  *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007).

- 50 -

4822-0259-5062.v1

### A.    Each Insider Trading Defendant Sold Stock While Possessing Material, Nonpublic Information

The Complaint adequately alleges that each Defendant traded while possessing MNPI for two reasons: (1) each Insider Trading Defendant knew about underlying AKS and FCA violations; and (2) each Insider Trading Defendant knew the falsity of the Company's misstatements.

First, the Complaint adequately alleges that each Insider Trading Defendant sold stock while knowing that the Company was engaged in rampant AKS and FCA violations. ¶307. Defendants Mattys, Folkes, and Rishe possessed MNPI about the illicit kickback and false claims schemes because they were directly involved in the violations. ¶¶258-263. For example, they were each central in determining Flexitouch sales strategies, setting sales quotas for the Company's sales representatives, approving the sales team's incentive plans, setting the regions covered by regional managers and area directors, determining the yearly sales budget, and running the annual National Sales Meetings. *Id.* Rishe himself even championed the KOL speaker program as the "most effective tool ever" for generating "immediate new referrals," and encouraged sales representatives to "capitalize" on the illegal contract trainer program. ¶¶37, 47. Burke, Nigon, and Roche also each knew about the AKS and FCA violations because each was a member and/or chairman of the Board's audit and compliance committees, which were tasked with ensuring compliance with the AKS and FCA – the very laws the Company routinely violated. ¶¶19-21.

Second, by adequately alleging each Insider Trading Defendant's scienter for the underlying §10(b) claim, the Complaint adequately alleges that each knew Tactile's

- 51 -

misstatements were materially false and misleading.  *See In re Bear Stearns Cos., Inc. Sec.,*

*Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011) (holding allegations

showing "**access** to adverse, material, and nonpublic information" were sufficient both to

establish scienter and to "form[] the basis of Plaintiffs' §20A claims"); *Hefler v. Wells Fargo*

*& Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at \*12 n.10 (N.D. Cal. Feb. 27, 2018)

(holding plaintiffs adequately alleged possession of MNPI when they "adequately pleaded

scienter for their Section 10(b) and Rule 10b-5 claims").

**B.     Each Insider Trading Defendant Committed a Predicate
        Exchange Act Violation**

The Complaint adequately alleges, for reasons discussed above, that each Insider

Trading Defendant committed the following predicate Exchange Act violations: Defendants

Mattys, Blake, Burke, Nigon, and Roche violated the misstatement, scheme, and control

person provisions of the Exchange Act, and Defendants Folkes and Rishe violated the

scheme and control person provisions of the Exchange Act.  ¶¶305-308.  *See*, *e.g.*, *In re Able*

*Lab'ys Sec. Litig.*, No. 05-2681 (JAG), 2008 WL 1967509, at \*26 (D.N.J. Mar. 24, 2008)

(holding that sufficiently alleged §10(b) claim satisfied predicate violation requirement).[29]

Further, each Insider Trading Defendant committed a predicate Exchange Act

violation because trading on the basis of MNPI violates §10(b) and thus is, itself, a predicate

Exchange Act violation.  *See United States v. Anderson*, 533 F.3d 623, 628-29 (8th Cir.

---

[29]     Defendants argue that the Complaint does not allege possession because each
Defendant must have possessed varying information throughout the Class Period. Mem. 42.
This may be a proper argument if the illegal sales practices had persisted only for a short
period of time.  However, these practices, which were MNPI, persisted through the Class
Period.  Minor variances in information that each Defendant may have possessed is of no
moment.

4822-0259-5062.v1

2008) ("Section 10(b) [of the Exchange Act] is violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."); *In re Bear Stearns Cos.*, 763 F. Supp. 2d at 487 (explaining that a §10(b) insider trading violation is itself a predicate Exchange Act violation).

To state a §10(b) insider trading claim, a complaint must state: (1) that defendants were in the possession of MNPI; and (2) circumstantial evidence suggesting defendants used that information when insider trading. *See Anderson*, 533 F.3d at 630. Each Insider Trading Defendant possessed MNPI during the Class Period. *See supra* §IV. In addition, each Insider Trading Defendant's Class Period sales were extremely unusual, both in timing and amount. ¶¶220-244. This is classic circumstantial evidence sufficient to prove that Defendants traded on the basis of then MNPI. *See, e.g.*, *United States v. Larrabee*, 240 F.3d 18, 20-22 (1st Cir. 2001) (holding that unusual and suspicious "timing" and "pattern of trades" was sufficient circumstantial evidence to prove insiders used MNPI to trade); *S.E.C. v. McGee*, 895 F. Supp. 2d 669, 683-84 (E.D. Pa. 2012) (holding that "circumstantial evidence" including "trades atypical to the [trader's] investment patterns" was sufficient to establish that defendants knew they were trading on MNPI).

## C.    The Insider Trading Defendants Traded Contemporaneously with Plaintiff and the Class

The Complaint also adequately alleges contemporaneous trading. Defendants admit the contemporaneity of Defendant Rishe's December 10, 2019 sale. Mem. 43-44. Each Insider Trading Defendant also traded contemporaneously with members of the class. ¶¶221, 228, 231, 234, 237, 240, 242, 301. This suffices to satisfy the "contemporaneity"

- 53 -

requirement. *See In re Openwave*, 528 F. Supp. 2d at 255-56 ("[T]he Complaint alleges that members of the putative class traded Openwave stock contemporaneously with the defendants named in the Section 20A cause of action, and has specified the dates of the defendants' trades. Such averments are sufficient to state a cause of action under Section 20A.").[30]

Further, contrary to Defendants' assertions, §20A does ***not*** require that Plaintiff purchased Tactile's stock the ***same day*** that Defendants sold – in fact, that assertion is "contrary to the weight of authority." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008). Rather, "the term 'contemporaneously' may embrace the entire period while relevant material non-public information remained undisclosed." *In re Am. Bus. Computs. Corp. Sec. Litig.*, No. 913 (CLB), 1994 U.S. Dist. LEXIS 21467, at *10 (S.D.N.Y. Feb. 24, 1994); *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) ("Thus, applying the *Am. Bus. Computs. Corp.* rule, any trading done by Plaintiff before the [truth was revealed] was contemporaneous with the Individual Defendants' stock sales."). Therefore, the "contemporaneity" requirement is satisfied because the Insider Trading Defendants and Plaintiff each traded during the Class Period, and before the truth of the scheme was revealed. ¶¶220-243.

---

[30] Defendants note the undisputed class certification requirement that a class representative and class members must "'suffer the same injury.'" Mem. 43. However, "[c]are must be taken, when dealing with apparently standing-related concepts in a class action context, to analyze individual standing requirements separately and apart from Rule 23 class prerequisites." *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 605 (S.D.N.Y. 2006).

4822-0259-5062.v1

## IX.  Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss the Amended Complaint should be denied in its entirety.

DATED:  August 18, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
JESSICA T. SHINNEFIELD (admitted *Pro Hac Vice*)
ASHLEY M. PRICE (admitted *Pro Hac Vice*)
NICOLE Q. GILLILAND (admitted *Pro Hac Vice*)

*s/ Ashley M. Price*
ASHLEY M. PRICE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jshinnefield@rgrdlaw.com
aprice@rgrdlaw.com
ngilliland@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ZIMMERMAN REED LLP
CAROLYN G. ANDERSON, MN 275712
JUNE P. HOIDAL, MN 033330X
BEHDAD C. SADEGHI, MN 393374
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Behdad.Sadeghi@zimmreed.com

Local Counsel

- 55 -

4822-0259-5062.v1

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

HAGENS BERMAN SOBOL
  SHAPIRO LLP
REED R. KATHREIN
LUCAS E. GILMORE (admitted *Pro Hac Vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

HAGENS BERMAN SOBOL
  SHAPIRO LLP
STEVE W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

Counsel for Plaintiff Brian Mart

- 56 -

4822-0259-5062.v1