# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, individually and on behalf of all others similarly situated, and ST. CLAIR COUNTY EMPLOYEES' RETIREMENT SYSTEM,<br><br>Plaintiffs,<br><br>v.<br><br>TACTILE SYSTEMS TECHNOLOGY, INC., GERALD R. MATTYS, LYNN L. BLAKE, BRENT A. MOEN, WILLIAM W. BURKE, ROBERT J. FOLKES, RICHARD J. NIGON, BRYAN F. RISHE, and KEVIN H. ROCHE,<br><br>Defendants. | Case No. 20-CV-2074 (NEB/BRT)<br><br><br>ORDER ON DEFENDANTS'<br>MOTION TO DISMISS |

This putative class action alleges claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against Tactile Systems Technology, Inc. ("Tactile") and several of its officers and outside directors. Defendants now move to dismiss. For the reasons below, the Court grants in part and denies in part the motion.

## BACKGROUND

### I.    The Complaint Allegations[1]

### A.    *Tactile and the Flexitouch Device*

Tactile manufactures and sells pneumatic compression devices ("PCD") for at-home treatment of lymphedema[2] and chronic venous insufficiency ("CVI"). (ECF No. 49 ("Compl.") ¶¶ 1–2, 25.) One of Tactile's devices—the Flexitouch—generates 90% of Tactile's revenues. (*Id.* ¶¶ 30–31.) Tactile's business relies in part on so-called third-party payers, including the Centers for Medicare & Medicaid Services ("Medicare") and the Veterans Association ("VA"), which pay for the device for patients. (*Id.* ¶ 33.) The VA represented 18% of Tactile's revenues in 2017; that percentage declined to 13% by 2020. (*Id.*) During the same period, Tactile's revenues from Medicare grew from 8% to 16%. (*Id.*)

Based in part on strong sales to the VA and Medicare, Tactile announced several consecutive quarters of over 30% revenue growth in 2018 and 2019. (*E.g.*, Compl. ¶¶ 79, 81 (1Q18—35% year-over-year); *id.* ¶ 85 (2Q18–30% year-over-year); *id.* ¶¶ 87–88 (3Q18–claiming 27% and 31% year-over-year); *id.* ¶ 89 (4Q18/FY18–"in excess of 30%" driven by

---

[1] The Court sets forth the facts and events alleged in the operative Complaint, which it takes as true in ruling on the motion to dismiss. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 975 (8th Cir. 2012).

[2] Lymphedema is a chronic disease characterized by swelling localized in a body part, such as the arms, legs, neck, or trunk, when the body's lymphatic vessels cannot drain lymph fluid. (Compl. ¶ 26.)

Flexitouch sales); *id.* ¶¶ 95–96 (press release and earnings call regarding 4Q18/FY18); *id.* ¶¶ 105–06 (1Q19–40% year-over-year); *id.* ¶ 109 (2Q19–32% year-over-year); *id.* ¶ 111 (3Q19–37% year-over-year).) Tactile publicly attributed its sales growth to the VA and Medicare, also noting that the market for Flexitouch was untapped, suggesting room for more growth. (*See id.* ¶¶ 133–208 (passim).)

As a general matter, the Complaint alleges that investors who traded Tactile stock between May 7, 2018, and June 8, 2020 ("Class Period") suffered damages under the Exchange Act because Tactile: (1) hid that illegal kickback schemes were a source of its revenue growth; (2) hid that false claims to federal healthcare programs also contributed to revenue growth; and (3) misrepresented the Flexitouch market size to investors.

**B.    *Alleged Kickback Schemes***

According to the Complaint, Tactile participated in two illegal kickback schemes designed to induce prescriptions of Tactile's Flexitouch. (Compl. ¶¶ 36–48.)

In the first scheme, Tactile gave perks and benefits to doctors recruited to be "Key Opinion Leaders" ("KOLs") in exchange for Flexitouch "referrals." (*Id.* ¶ 37.) The KOLs organized speaking events and identified "warm" leads before the event. (*Id.* ¶¶ 40–41.) Tactile hosted these events at luxury hotels and expensive restaurants. (*Id.*) At one event, the bill far exceeded the permitted gift allowance for the four VA employees attending.[3]

---

[3] Tactile allegedly encouraged targeting sales to its VA channel by, for example, establishing the "VA Million Dollar Club" for its sales team in 2018 and distributing

(*Id.* ¶ 40.) The Department of Health and Human Services Office of the Inspector General had flagged these kinds of "speaking arrangements" as high risk for fraud and abuse in a "Special Fraud Alert," and the U.S. Department of Justice and Office of Inspector General had investigated numerous cases in which compensation for "speaking events" was found to be illegal remuneration. (*Id.* ¶ 39.)

In the second scheme, Tactile implemented a "trainer" program to obtain referrals from non-physician healthcare providers, such as therapists. (*Id.* ¶¶ 43–44.) These healthcare providers trained patients on how to use the Flexitouch at home. (*Id.*) Tactile allegedly dismissed trainers who failed to provide enough referrals. (*Id.* ¶¶ 44–45.) Tactile's compliance officer allegedly "documented that Tactile's arrangements with therapists [for its trainer program] posed a high 'Business Risk' for 'kickbacks.'" (*Id.* ¶ 44.)

These two schemes allegedly violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a, *et al.*, which generally prohibits remuneration in return for recommending or arranging for the purchase, lease, or order of an item or service for which a federal health program may provide reimbursement. (Compl. ¶¶ 36–37, 164–65, 200–01.) The kickback schemes also allegedly violated the False Claims Act ("FCA"), 31 U.S.C. § 3729. (*Id.* ¶¶ 50–51.) Violations of the AKS or the FCA could result in exclusion from participating in federal healthcare programs. (*Id.* ¶¶ 48, 56, 200.) Thus, if Tactile was

---

bonuses to sales management specifically for meeting quarterly VA revenue targets. (Compl. ¶¶ 42, 256.)

found to have violated the AKS or the FCA, it could lose nearly one-third of its business. (*Id.* ¶ 48, 56.) Defendants affirmed compliance with the AKS and the FCA in Tactile's SEC filings. (*E.g., id.* ¶¶ 164–65, 201.)

## C.   Alleged False Claims of Medical Necessity

The Complaint next alleges that Defendants made false claims to Medicare about the medical necessity of its devices for patients, in violation of the FCA.[4] (Compl. ¶¶ 52–53.). Medicare's Recovery Audit Contractor ("RAC") conducted an audit of PCDs and the medical necessity requirement. (*Id.* ¶¶ 55, 129.) In its first round of audits, the RAC auditor flagged 71% of Tactile's claims for failure to establish medical necessity; in the second round, that number rose to 81%. (*Id.* ¶ 55.) The Complaint also alleges that Tactile sales representatives routinely provided pre-filled forms to doctors and drafted medical necessity narratives with instructions to doctors to copy to their letterhead and sign. (*Id.* ¶ 54.)

## D.   Assertions about Flexitouch's Market Size

In the last category of false statements, the Complaint alleges that Tactile made false and misleading statements about Flexitouch's market size. First, Tactile allegedly overstated the number of U.S. lymphedema diagnoses, thus overstating the potential

---

[4] The Complaint also alleges that Tactile made false claims about the efficacy of the Flexitouch to Medicare, leading it to cover the device. (Compl. ¶ 53.) In support, the Complaint relies on an anonymous former Tactile employee. (*Id.*) For the reasons discussed below, the Court will not consider allegations attributed to this source.

market, also known as the "total addressable market" ("TAM"). Tactile reported a TAM of $4–$5 billion; the actual market size was at least three times smaller. (*Id.* ¶¶ 35, 59–61, 64.) Second, Tactile's TAM calculation assumed that each lymphedema diagnosis (regardless of severity) would ultimately be severe enough to require using the Flexitouch. But lymphedema is often managed through other treatments that do not require PCDs. (*Id.* ¶¶ 28–29, 66–72.) And some third-party payers consider the Flexitouch "a treatment of last resort," further restricting the number of Flexitouch candidates. Thus, Tactile's use of all lymphedema diagnoses as the basis for its calculation allegedly falsely overstated Tactile's TAM. (*Id.* ¶¶ 66–72.)

### E.    *Qui Tam Action*[5]

The illegal kickback schemes have been the subject of a qui tam action brought by Veterans First Medical Supply, LLC ("VFMS") in the Southern District of Texas. In its amended qui tam complaint, VFMS alleged that Tactile violated the AKS and the FCA by paying illegal kickbacks to doctors to induce Flexitouch prescriptions and making false reimbursement claims. (*Id.* ¶ 90.) Tactile was served with that complaint in early February 2019. (*Id.* ¶ 91.)

Tactile disclosed the qui tam action in its 2018 Form 10-K filed on February 28, 2019. (*Id.* ¶ 93.) In its Form 10-K, Tactile stated that qui tam actions have

---

[5] A qui tam action is an "action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." *Qui Tam Action*, Black's Law Dictionary (11th ed. 2019).

"increased significantly in the healthcare industry in recent years" because the AKS and the FCA allow any person to sue on behalf of the government. (*Id.*; ECF No. 66-22 at 55.) Tactile explained that the action was brought by one of its competitors, and that the government declined to intervene in the action. (Compl. ¶ 93.) Tactile maintained that the allegations were "without merit," and that it intended to "vigorously defend against the lawsuit." (*Id.*; ECF No. 66-22 at 68.)

On March 20, 2019, the court unsealed the qui tam action after the market closed. (Compl. ¶ 101.) On March 22, securities analysts issued reports about the qui tam allegations, noting that Tactile's management "refut[ed] the notion" that it paid kickbacks to doctors.[6] (*Id.* ¶ 102; *see also id.* ¶¶ 105, 108–09 (May 6, 2019 earnings call in which Tactile's CEO Gerald Mattys asserted, "We don't believe [the qui tam] allegations have any merit").) Tactile's stock price fell 7.5% that day. (*Id.* ¶ 103.) According to the Complaint, Defendants' assertions that the qui tam allegations lack merit are also actionable misstatements.

**F.      OSS Reports**

In June 2020, a short-seller report appeared online entitled, "Strong Sell on Tactile Systems: Bloated Stock Needs Compression Therapy." (Compl. ¶ 116; ECF No. 66-3

---

[6] The Southern District of Texas recently granted the qui tam parties' motions for voluntary dismissal, dismissed the claims against Tactile with prejudice, and closed the qui tam action. *Veterans First Med. Supply, LLC v. Tactile Med. Sys. Tech., Inc.*, No. 4:18-cv-2871, ECF Nos. 295–96 (S.D. Tex. Feb. 18, 2022). The court made no findings of liability or wrongdoing.

("June 2020 OSS Rep.").) The report by the anonymous "OSS Research" alleges details about Tactile's illegal sales practices and TAM statements. (Compl. ¶¶ 116–21.) Tactile's stock dropped 12.8% that same day. (*Id.* ¶ 122.) OSS Research published a second report in December 2020 raising similar issues. (*Id.* ¶¶ 128–29; ECF No. 66-4 ("Dec. 2020 OSS Rep.").)

## G.   *Alleged Insider Trading*

Along with the allegations against Tactile, the Complaint alleges insider trading by all individual Defendants except Tactile Chief Financial Officer Brent A. Moen.[7] After Tactile was served with the qui tam complaint but before Tactile disclosed the action in its 2018 Form 10-K, Tactile Chief Executive Officer Mattys sold 50,000 Tactile shares on February 14 and 15, 2019, for $2.8 million in profits. (Compl. ¶¶ 14, 92, 221.) Along with Mattys, six other Defendants sold Tactile stock for total of $27.8 million in profits during the Class Period: former CFOs Robert Folkes[8] and Lynn Blake,[9] Senior Vice President of Sales Bryan Rishe, and outside directors Richard Nigon, Kevin Roche, and William Burke. (*Id.* ¶¶ 15, 17–21, 220.)

---

[7] Moen was the CFO of Tactile from September 2, 2018, through the end of the Class Period. (Compl. ¶ 16.)

[8] Folkes was the CFO of Tactile from February 2005 to April 2016. (Compl. ¶ 17.)

[9] Blake was the CFO of Tactile from April 2016 to September 1, 2018. (Compl. ¶ 15.)

## II.      Procedural History

In 2020, Brian Mart brought this putative class action against Tactile and certain executive officers on behalf of purchasers of Tactile securities during the Class Period. (ECF No. 1 ¶ 1.) In February 2021, the Court appointed St. Clair County Employees' Retirement System as lead plaintiff ("Plaintiff"). Like Mart, Plaintiff purchased Tactile securities during the Class Period. (Compl. ¶ 12.) Plaintiff filed an amended complaint that alleges four counts. First, a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), against Tactile and individual defendants Mattys, Blake, and Moen. Second, a violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against all Defendants. Third, a violation of Section 20(a) of the Exchange Act against all Defendants. Fourth, a violation of Section 20A of the Exchange Act against all individual Defendants except Moen for insider trading. (*Id.* ¶¶ 288–311.)

Defendants now move to dismiss the operative Complaint.

## ANALYSIS

## I.      Count I: Section 10(b) and Rule 10b-5 Claim

Count I alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b). (Compl. ¶¶ 288–92.) Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5(b) forbids any person from making "any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Congress imposed heightened pleading requirements on Section 10(b) plaintiffs by enacting the Private Securities Litigation Reform Act ("PSLRA"). *Podraza v. Whiting*, 790 F.3d 828, 836 (8th Cir. 2015); *see In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009) ("The PSLRA goes beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure."). The PSLRA requires that a complaint: (1) "specify each false statement or misleading omission and explain why the omission was misleading," and (2) "state 'with particularity' facts giving rise to a 'strong inference' that the defendant acted with the scienter required for the cause of action." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741–42 (8th Cir. 2002) (citations omitted). These two heightened pleading requirements are intended to end the practice of pleading "fraud by hindsight." *Id*. at 742 (citation omitted).

To survive a motion to dismiss, Plaintiff must plausibly plead a claim for relief under Section 10(b) and Rule 10b–5 when accepting all alleged facts as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The Court considers the complaint as a whole, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Id.*

Defendants make three arguments for dismissing Count I. *First*, they contend that because some of Plaintiff's sources are unreliable, the Court should not consider them in determining whether Count I satisfies the PSLRA standard. *Second*, they assert that the Court should dismiss Count I because it fails to plead an actionable misstatement. *Third*, they maintain that the Complaint fails to allege a strong inference of scienter as to each of the individual Defendants. The Court addresses each of these issues in turn.

## A.        *Reliability of Sources*

To meet the heightened pleading standards of the PSLRA, a plaintiff may include information attributed to confidential witnesses and other anonymous sources. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 797 (S.D.N.Y. 2020). Defendants often object to the use of such sources, challenging them as unreliable—and indeed, courts need to view information attributed to these sources "with caution and care." *Id.*

In this case, Defendants challenge three sources cited in the Complaint as unreliable: (1) an anonymous former Tactile employee; (2) the OSS Reports; and (3) the qui tam action.[10] (ECF No. 65 ("Defs' Br.") at 8–18.) Plaintiff asserts that at this stage of the litigation, the Court "must accept non-conclusory allegations . . . as true, regardless

---

[10] Plaintiff notes that it "relied on extensive investigation and specifically enumerated numerous other sources on which it bases its allegations." (ECF No. 71 ("Pl's Br.") at 17 n.5.) For example, Plaintiff relies on "SEC filings, deposition transcripts, and other filings from an employment action against Tactile, Tactile-sponsored clinical studies, and medical journal articles." (*Id.* at 16 n.3; *see* Compl., passim.) Defendants do not challenge these sources.

of their alleged source." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp.

3d 515, 548 n.24 (S.D.N.Y. 2020). But Defendants are correct that the Court cannot blindly

accept anonymous allegations; both Rule 11 and PSLRA case law provide caution and

guidance in this arena.

    1.      *Legal Standard*

        The Court will consider each source to determine whether it is reliable enough to

be included in the Court's evaluation of the Complaint. First, a note about the case law

on this issue. Under Rule 11 of the Federal Rules of Civil Procedure, an attorney must

"conduct a reasonable inquiry of the factual and legal basis for a claim before filing."

*Vallejo v. Amgen, Inc.*, 903 F.3d 733, 747 (8th Cir. 2018) (citation omitted); *see* Fed. R. Civ.

P. 11(b). This responsibility is personal and nondelegable. *Pavelic & LeFlore v. Marvel Ent.*

*Grp.*, 493 U.S. 120, 126 (1989) (explaining an attorney has a "personal, nondelegable

responsibility" to "validate the truth and legal reasonableness of the papers filed").

Courts have disregarded allegations where plaintiffs did not conduct the required

independent investigation into alleged facts. *E.g.*, *In re Connetics Corp. Sec. Litig.*, 542 F.

Supp. 2d 996, 1005–06 (N.D. Cal. 2008) (striking complaint allegations where plaintiffs

did not independently investigate the facts alleged in an SEC complaint); *Veal v.*

*LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019) (finding that plaintiffs "may

not rely on facts alleged in [an] FTC Action without providing any independent

corroboration").

Under the PSLRA, courts have addressed the dilemma of attributions to confidential or anonymous sources supporting a securities fraud complaint. In *Novak v. Kasaks*, the Second Circuit overturned a district court's finding that sources must be identified by name to satisfy the PSLRA. 216 F.3d 300, 313–14 (2d Cir. 2000). "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Id.* at 314. Under *Novak*, courts in the Southern District of New York "will credit confidential source allegations, generally, in two situations." *Long Miao*, 442 F. Supp. 3d at 798 (citation omitted). Those are first, when independent factual allegations corroborate a confidential source's statements, and second, where the confidential source "whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Id.* (citation omitted).

Courts in the Eighth Circuit follow this general approach. For example, a court in this district considered "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia" to determine whether allegations were pled with sufficient particularity. *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881 (D. Minn. 2007) (citation omitted), *aff'd*, 527 F.3d 749 (8th Cir. 2008); *see Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d

13

645, 668 (8th Cir. 2001) (holding that allegations based on a confidential informant were sufficient because the complaint "recites details of a particular conversation with a particular person"). The testimony of confidential sources may be reliable if the complaint includes the confidential witness's job title, period of employment, employment responsibilities, and personal knowledge of the information provided, among other things. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 900–01 (D. Minn. 2011); *see In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 875 (D. Minn. 2007) (finding that confidential witnesses "would likely have reason to know, based on their job title, job description, and time period," about problems at issue). Thus, a PSLRA-governed complaint need not name confidential sources if it includes "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *NVE*, 551 F. Supp. 2d at 881 (citation omitted). The Court will examine the challenged sources under these general principles.

2.       *Anonymous Former Employee*

Defendants ask the Court not to consider allegations asserted by an anonymous "former Senior Sales Specialist employed by Tactile from August 2011 through September 2015." (Compl. ¶ 45; *see id.* ¶ 53.) Defendants argue that because the Senior Sales Specialist allegedly left Tactile in 2015—three years before the Class Period began— the source lacks knowledge of Defendants' conduct during the Class Period. The Court agrees. Courts have disregarded confidential sources who separated from a defendant

14

company before the defined period of fraudulent activity. *See, e.g.*, *NVE*, 551 F. Supp. 2d at 878, 882–83 (disregarding opinion of confidential witness who ceased working at company 19 months before the class period); *In re Gander Mountain Co. Sec. Litig.*, No. 05-CV-183 (DWF/AJB), 2006 WL 140670, at *10 (D. Minn. Jan. 17, 2006) (finding that confidential sources were "unreliable and offer only vague allegations" where they terminated their employment at defendant company around two years before the class period). Plaintiff cites no case in which a court found that a confidential source who separated from the defendant *years* before the class period was reliable enough to satisfy PSLRA particularity requirements. *Cf. St. Jude*, 836 F. Supp. 2d at 901 (considering information derived from 15 confidential witnesses described as former employees whose information was reliable in part because each worked at defendant company "*during or immediately prior to* the Class Period") (emphasis added). As a result, the Court will disregard the allegations attributed to this confidential source.

3.      *OSS Reports*

Defendants also ask that the Court disregard complaint allegations gleaned from two reports prepared by anonymous "short seller" OSS Research[11] and published online

---

[11] The parties agree that OSS Research is a "short seller." (Defs' Br. at 14; *see* Pl's Br. at 19.) "[S]hort sellers operate by speculating that the price of a security will decrease. They can perform a useful function by bringing information that securities are overvalued to the market. However, they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).

on *Seeking Alpha*[12] ("OSS Reports"). (Defs' Br. at 14–17.) Courts have scrutinized unsubstantiated short-seller reports because of "the risk of motivated reporting by the author of the short-seller report" and "reliability concerns presented by anonymous sourcing."[13] *Long Miao*, 442 F. Supp. 3d at 801 (collecting cases). When "well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports," courts have sustained complaints. *Id.*; *see id.* at 802 (citing examples). But when a plaintiff relies on a short-seller report that in turn relies on confidential or anonymous sources without corroborating those sources, courts have disregarded the allegations. *E.g.*, *id.* at 804 (finding that the complaint failed to plead actionable misstatements when it "relie[d] exclusively on general statements credited to anonymous interviewees in a secondhand short-seller report which contain[ed] demonstrable errors and [wa]s uncorroborated by an independent investigation by counsel"); *Miller v. PCM, Inc.*, No. LACV 17-3364-VAP (KSx), 2018 WL 5099722, at *9 (C.D.

---

[12] The Ninth Circuit has described *Seeking Alpha* as "a crowd-sourced online resource for investors." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 788 (9th Cir. 2020).

[13] Citing caselaw pre-dating *Long Miao*, Plaintiff argues that at this stage of the proceedings, the Court should accept factual allegations from short-seller reports as sufficiently reliable. (Pl's Br. at 19–20); *see, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (rejecting reliability-of-source argument as it applied to short-seller reports); *In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 (HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("The reliability of [a short-seller] report is a question of fact that cannot be decided on a motion to dismiss.") (quotation marks and citation omitted). The Court finds *Long Miao*'s more nuanced approach to considering the reliability of short-seller reports to be the better course.

Cal. Jan. 3, 2018) ("[A]ssuming the truth of the [*Seeking Alpha*] author's statement that he or she 'ha[s] no business relationship' with [defendant company], the author has not established that he or she is reliable and would have personal knowledge to describe [defendant's] inner workings."). As described below, the Complaint contains several allegations from the OSS Reports.

*Industry executives (June 2020 OSS Report).* Relying on the June 2020 OSS Report, the Complaint alleges statements from "lymphedema industry executives" suggesting that "Tactile's kickback violations were wide-spread and well-known within the industry." (Compl. ¶ 117.) These executives did not work at Tactile. Instead, the report refers to them as "Senior Executive, DME Distributor" and "Senior Executive, Lymphedema Product Supplier." (June 2020 OSS Rep. at 14.) The report provides no other information about these two individuals. Because the OSS Report lacks facts establishing the reliability of these sources, the Court disregards the allegations attributed to them.

*RAC audits (June 2020 OSS Report).* The June 2020 OSS Report also analyzes the RAC audits of Tactile's Medicare claims that were denied for lack of medical necessity. (Defs' Br. at 16 (citing June 2020 OSS Rep. at 20, 21–23; *see* Compl. ¶ 120.) According to the report, the RAC audits show that "Tactile has fundamentally failed to establish grounds for medical necessity on 71% of all its Medicare claims." (June 2020 OSS Rep. at 23.) Defendants contend that the OSS Report's analysis is incorrect. They also argue that

17

the report's analysis does not predict whether Medicare ultimately pays Tactile's claims because "approximately 90% of the claims submitted [to Medicare] are approved," and Tactile's revenues from Medicare increased throughout the Class Period. (ECF No. 66-22 (2018 Form 10-K) at 77); *see* Compl. ¶ 33 (alleging increase in Medicare revenue in dollars and percent of revenues).) This argument raises a question of fact about the accuracy of the report's analysis of the RAC audits. But it does not require that the Court disregard the report as unreliable, and so the Court will consider the allegations about the RAC audits.

*Pre-filled documents (December 2020 OSS Report).* Citing another OSS report, the Complaint claims that "Tactile sales representatives and therapists routinely provided pre-filled medical necessity forms to prescribing physicians." (Compl. ¶ 54.) The December 2020 OSS Report attributes these claims to "a reputable industry insider who works closely with lymphedema patients, distributors, and manufacturers," and who was sent—by mistake—documents suggesting that Tactile employees were providing pre-filled prescriptions and pre-written medical necessity letters to physicians. (Dec. 2020 OSS Rep. at 16.) The report includes copies of redacted cover letters and prescriptions with instructions for physicians to sign them. (*Id.* at 17–20, 33–56.) The Court finds that the documents produced in this OSS Report offer an indicum of reliability supporting the allegations that Tactile employees sent pre-filled documents to physicians. The Court therefore declines to disregard these allegations from the December 2020 OSS Report.

18

4.      *Qui Tam Action*

Defendants also ask the Court to disregard allegations stemming from the qui tam

action, which assert that Tactile engaged in illegal kickback schemes and submitted false

reimbursement claims in violation of the AKS and the FCA. While not clear from the face

of the Complaint, certain key allegations of illegal sales practices stem from documents

in the qui tam case, including the complaint, summary judgment motion, and supporting

documents.[14] (Defs' Br. at 9 (asserting that Compl. ¶¶ 5, 35–44, 47–48 and 130 stemmed

from the qui tam action); Pl's Br. at 16–17.)

The unreliable-source dilemma that courts face in the PSLRA context extends to

qui tam actions. Several courts have decided that qui tam complaints are unreliable

sources because their allegations "are unproven and contested [and] do not amount to

'facts' sufficient to establish a strong inference of scienter." *Teamsters Loc. 456 Pension Fund*

*v. Universal Health Servs.*, 396 F. Supp. 3d 413, 467 (E.D. Pa. 2019) (citing *In re Apollo Grp.,*

*Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *10 n.5 (D. Ariz.

Oct. 27, 2011)), *appeal filed,* No. 20-2094 (3d Cir. June 1, 2020). As noted above, attorneys

have "a 'nondelegable responsibility' to 'personally . . . validate the truth and legal

---

[14] Defendants submit a table comparing certain Complaint allegations with sources of
those allegations in the qui tam action, and Tactile's rebuttal to them in the qui tam action.
(ECF No. 66-2.) Plaintiff objects to this exhibit as misstating the Complaint's use of the
qui tam materials and improperly asking the Court to consider Tactile's defenses to the
qui tam action. (Pl's Br. at 16 n.4.) The Court agrees that this exhibit is not appropriate on
a motion to dismiss, and thus declines to consider this extra-record exhibit. *Kushner v.
Beverly Enters., Inc.,* 317 F.3d 820, 832 (8th Cir. 2003).

reasonableness of the papers filed.'" *Connetics*, 542 F. Supp. 2d at 1005 (citing *Pavelic*, 493 U.S. at 126). Because this responsibility is nondelegable, "it would make little sense that an attorney 'somehow can rely on the analysis of attorneys in different actions and who are presumably from different law firms.'" *Id.* (citing *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002)). On the other hand, at least one court in this district has considered allegations stemming from a qui action without considering the reliability of the source. *See Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d at 1050, 1054 (D. Minn. 2018) (considering the sufficiency of allegations of AKS violations based in part on a qui tam action that had settled).

Adding to the complexity of the issue, the qui tam court recently granted a motion to voluntarily dismiss the claims against Tactile with prejudice. (*See* ECF Nos. 78, 80.) At least one court has considered factual allegations conveyed in a qui tam action that had been dismissed with the opportunity to amend. *Gordon v. Vanda Pharm. Inc.*, No. 1:19-CV-01108-FB-LB, 2021 WL 911755, at *2 (E.D.N.Y. Mar. 10, 2021). The court did so despite contentions that unproven allegations from a qui tam action could not establish securities fraud, and that dismissal of the qui tam action undercut its reliability. *Id.*

Plaintiff has done more than just parrot allegations from the qui tam action. It reviewed the unsealed documents in that action and other publicly available information,

and conducted its own legal analysis of qui tam materials.[15] (Pl's Br. at 16 & n.4, 17 n.5; *e.g.*, Compl. ¶¶ 38 (table of KOL doctors who received renumeration from Tactile, including names, amounts, and number of devices referred); 40 (describing Tactile's renumeration of a KOL doctor).) Plaintiff appears to have done what due diligence it could given its inability to access documents filed under seal in the qui tam action. More importantly, Plaintiff based its allegations on multiple sources, not just the qui tam action. *See In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (finding that allegations originating from a state attorney general's complaint were a proper basis for pleadings where they were verified by plaintiffs' counsel); *de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) (considering allegations similar to those in SEC complaints that had been independently verified by counsel, noting "[t]he PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint"). The Court will consider the Complaint allegations from the qui tam action.

    5.    *Reliability of Sources Summary*

    The Court has considered the reliability of the sources challenged by Defendants and finds the former Tactile employee and two industry executives to be unreliable sources. It therefore disregards allegations based on those sources. (Compl. ¶¶ 45, 53, 117–19.)

---

[15] The Complaint quotes an expert's declaration and report filed in the qui tam action. (Compl. ¶¶ 130–31.) At oral argument, Plaintiff's counsel explained that the expert had since resigned from the qui tam action, so the Court does not consider those allegations.

**B.**          ***Alleged Illegal Sales Practices (Kickback Schemes and False Claims)***

Turning to the allegations supported by sufficiently reliable sources, Plaintiff asserts that Defendants engaged in, and did not disclose, illegal sales practices during the Class Period. "When a securities fraud claim is premised on the defendant's predicate violations of law . . . the facts of that underlying violation must be pled with particularity." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021). "[T]he plaintiff must specify what law or standard the defendant violated and how the alleged violation occurred." *Id.* If the Complaint fails to allege facts that would establish the illegal sales practices, then securities law claims based on the nondisclosure of that illegal conduct fail. *Shoemaker*, 300 F. Supp. 3d at 1053 (collecting cases).

Plaintiff has alleged the predicate violations of law with particularity. *Danske*, 11 F.4th at 99. The Complaint specifies two types of illegal sales practices: kickback schemes and false claims to Medicare. First, the Complaint alleges that Tactile violated the AKS and FCA through its KOL- and trainer-program kickback schemes. The AKS prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback . . .)" to a person to induce that person to, among other things, purchase or recommend purchasing any good that may be paid in whole or in part under a federal health care program. 42 U.S.C. § 1320a–7b(b)(2). And a violation of the AKS may also violate the FCA, as is alleged here—where a claim submitted to the government includes

22

items or services resulting from a violation of the AKS. *Id.* § 1320a–7b(g). The Complaint

allegations (recounted in the Background section above) thus sufficiently plead violations

of the AKS and the FCA via use of the KOL and trainer programs.

Second, the Complaint sufficiently alleges that Tactile violated the FCA by

providing false medical necessity information to Medicare. Tactile representatives

allegedly provided pre-filled medical necessity forms to physicians. (Compl. ¶¶ 54–55.)

Allegations of the existence of these pre-filled forms do not, on their own, allege an FCA

violation.[16] (*Id.* ¶ 55 (acknowledging the practice of providing pre-filled forms "may have

been legal").) But adding the RAC audits to the scale tips the balance in Plaintiff's favor.

Whether or not using pre-filled forms was legal, the RAC audits that allegedly flagged

71% and 81% of Tactile claims for failure to establish medical necessity are persuasive

allegations of illegal sales practices. (Compl. ¶ 55.)

## C.        *Misstatements of Material Facts*

Plaintiff does not claim that the illegal sales practices described above constitute

an Exchange Act violation. Rather, Plaintiff alleges that Defendants made misstatements

to investors in part because they failed to disclose these practices. Defendants contend

that the misstatements are not pled with specificity. Under the PSLRA's heightened

---

[16] The December 2020 OSS Report noted that the pre-filled documents alone do not prove that physicians are not properly examining or reviewing patients, and that "it might be perfectly reasonable to speculate that these practices were put into place for the sake of prescriber convenience and time-efficiency." (Dec. 2020 OSS Rep. at 21.)

pleading standard, Plaintiff must "plead the existence of any facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742. The "circumstances of the fraud must be stated with particularity, including such matters as the time, place and contents of false representations, . . . [t]his means the who, what, when, where, and how." *KV Pharm.*, 679 F.3d at 980 (citing *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)).

The alleged misstatements, addressed below, fall into four categories: (1) statements about Tactile's revenue; (2) statements that Defendants believed Tactile complied with the law; (3) statements about the market for Flexitouch; and (4) SEC Regulation Item 303.

1.   *Statements about Tactile's Revenue*

The Complaint alleges that Defendants reported an increase in Tactile's revenues each quarter—due in part to Flexitouch sales growth in its VA and Medicare channels—but misrepresented this growth, not disclosing that it was impacted by illegal sales practices in those channels.[17] (*E.g.*, Compl. ¶¶ 134, 136, 138–48,151–58, 161–62, 166–70,

_____

[17] Defendants maintain that statements about "strong growth" in the VA channel are inactionable puffery. (Defs' Br. at 20–21); *see In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (holding that no reasonable investor would rely on "'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrase[s] used to

173, 175–178, 180–83.) When parties who disclose material facts in connection with securities transactions speak about a subject, they are required to "provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak." *K-tel*, 300 F.3d at 898 (citation omitted); *see, e.g.*, *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010) (holding that complaints adequately alleged misleading statements because they alleged defendant's false statements and facts supporting an inference that those statements were false when made); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018) ("[S]tatements that put the source of the revenue at issue may be actionable if they fail to disclose the impropriety of the source.").

Defendants focus on the fact that Tactile's reported financial statements have not been withdrawn, restated, or proven false, and follow Defendants' general, positive

─────────────────────

champion the company but [] devoid of any substantive information.'") (citation omitted). But Plaintiff does not allege that this language alone comprised the fraud; the alleged fraud is that Defendants addressed the revenue from the VA and Medicare channels without disclosing that those sales were impacted by illegal sales practices. *See In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824–25 (E.D. Pa. 2001) (finding that statements attributing Providian's "good fortunes to its 'customer focused approach' . . . put[] the topic of the cause of Providian's success in play," thereby obligating the company "to disclose information concerning the source of its success"); *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1049 (D. Minn. 2015) (finding that the statement that Tile Shop's "direct sourcing model remain[ed] a material competitive advantage over the other players in the tile industry" was "not an expression of corporate optimism or opinion, but rather a factual statement directly attributing Tile Shop's financial success to the strength of its supplier relationships" obligating it to disclose a related party's involvement with those relationships).

statements. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008)

(affirming dismissal where defendant "never restated its financials, and there are no

people, documents, or sources that say [its] numbers were false"). And, Defendants

argue, Tactile disclosed "potential legal and regulatory risks" relating to the AKS and the

FCA.[18] (Defs' Br. at 22.) Thus, Defendants maintain that Tactile disclosed everything

investors had a right to know about "the relevant legal and regulatory landscape." (*Id.*

(citation omitted).)

Defendants are correct that they have no duty to disclose "soft information"—"a

matter of opinion, predictions, or a belief as to the legality of the company's own actions."

---

[18] For example, Tactile's 2019 Form 10-K warned of potential actions based on FCA
violations and other alleged misconduct and their potential effect on Tactile's business,
and disclosed the qui tam action:

> Any failure by physicians and other clinicians to properly document the
> medical records for patients using our products could invalidate claims,
> impair our ability to collect submitted claims and subject us to overpayment
> liabilities, [FCA] liabilities and other penalties including exclusion from the
> Medicare, Medicaid or private insurance programs.
>
> . . .
>
> [A]ctions [based on employee misconduct] could have a significant impact
> on our business, including the imposition of significant civil, criminal and
> administrative penalties, damages, monetary fines, disgorgement, possible
> exclusion from participation in Medicare, Medicaid and other federal
> healthcare programs, contractual damages, reputational harm, diminished
> profits and future earnings and curtailment or restructuring of our
> operations, any of which could adversely affect our ability to operate.

(ECF No. 66-35 at 19, 37; *see id.* at 63 (disclosing the qui tam action and its allegations that
Tactile violated the AKS and FCA).) The Complaint quotes additional disclosures in
Tactile's financial reports. (*E.g.*, Compl. ¶¶ 200 (quoting AKS disclosure in 2019 Form 10-
K), 201 (quoting FCA disclosure in 2019 Form 10-K).)

*Kushner*, 317 F.3d at 831 (citation omitted). But an opinion stops being soft information "when contradicted by actual knowledge of wrongdoing." *Id.* Thus, "if Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized, and that their forward-looking statements were false or misleading, then their forward-looking statements are not protected." *Nash Finch*, 502 F. Supp. 2d at 873; *see In re Pemstar, Inc. Sec. Litig.*, No. 02-CV-1821 (DWF/SRN), 2003 WL 21975563, at *8 (D. Minn. Aug. 15, 2003) ("By failing to reference problems that they had already been made aware of at the company, Defendants' disclosures could be materially misleading even though these disclosures contained information regarding certain future risks."). As the Complaint demonstrates, a duty to disclose can arise "when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices," even when the corporation has not been charged with wrongdoing. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (quotation marks and citation omitted).

*Kickback schemes.* The Complaint alleges that Defendants' disclosures were insufficient also because they knew of or had access to information about the alleged kickback schemes but failed to disclose them. Besides allegations that Mattys, Folkes, and Rishe were deeply involved in the sales strategy for Flexitouch and closely tracked its sales, the Complaint alleges that the federal government had flagged "speaking arrangements" like the KOL program as high risk for fraud, abuse, and illegal

remuneration, and that Tactile's compliance officer "documented that Tactile's arrangements with therapists [for its trainer program] posed a high 'Business Risk' for 'kickbacks.'" (Compl. ¶¶ 39, 44, 258–66; *see* Pl's Br. at 24 (citing Compl. ¶ 44, and asserting this officer was "Tactile Chief Compliance Officer").) It is reasonable to infer that Defendants (including compliance and audit committee members) would have had access to information documented by Tactile's chief compliance officer. Thus, the Complaint adequately alleges that Defendants knew or had access to information about these kickback schemes. If true, Tactile's warnings failed to disclose that these illegal sales practices were occurring and placing Tactile's business at risk.

*False claims relating to medical necessity.* The same is not true for the alleged misstatements stemming from Tactile's alleged submission of false claims based on lack of medical necessity. As noted above, the Complaint sufficiently alleges violations of the FCA based on these false claims. But it fails to allege sufficient facts connecting Defendants' knowledge of or access to information about the pre-filled medical necessity documents, the RAC audits, or submission of false claims based on lack of medical necessity. Thus, the misstatements stemming from this alleged illegal sales practice is not pled with sufficient specificity to support Count I, and a securities fraud claim based on that allegation will not stand.

*Allegedly overstated Medicare revenue.* The Complaint also alleges that Tactile overstated its Medicare revenue by $8 million in 2019 and by $5 million in the first half

of 2020. (Compl. ¶ 128.) This allegation is based on the December 2020 OSS Report that analyzed data from a FOIA request and Tactile's SEC filings.[19] (*Id.*; Dec. 2020 OSS Report at 7.) According to Defendants, this difference is based on a "timing difference between when Medicare revenues are recognized and Medicare payments are actually received." (ECF No. 74 ("Defs' Reply") at 8.) And Tactile informed investors of when it recognizes Medicare revenue and books it as accounts receivable in its Form 10-Ks. (*E.g.*, ECF No. 66-22 at 77.) In effect, Defendants argue that the OSS analysis is wrong and no misstatement occurred. This is an issue of fact to be resolved at a later stage.

2.      *Statements about Compliance with the Law*

According to the Complaint, Defendants falsely stated in securities filings that they "believe" Tactile complied with the AKS, the FCA, and other laws. (Compl. ¶¶ 164–65, 201.) Opinions are actionable under the Exchange Act only if: (1) the speaker did not hold the stated belief; (2) the statements "contain embedded statements of fact"; or (3) the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

---

[19] The December 2020 OSS Report allegedly compared Tactile's self-reported Medicare revenue of about $22 million in 2019, with information received under a FOIA request showing Medicare only paid Tactile $14 million in 2019. (Compl. ¶ 128; *see also id.* (alleging Tactile's self-reported Medicare revenue of $11 million in the first half of 2020, while FOIA records showed revenue of only $6 million).)

*Pension Fund*, 575 U.S. 175, 184–89 (2015). Plaintiff contends that Defendants' compliance statements were materially false and misleading because Tactile was engaged in illegal sales practices. (Compl. ¶¶ 166(e), 203(h)); *see In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 726 (D. Minn. 2019) (finding that the complaint alleged falsity where it alleged "Defendants issued misleading statements about regulatory risks when they represented as merely possible risks that had already materialized . . . and concealed the fact that [their] illegal practices were unsustainable.").

The Complaint contains allegations sufficient to place this case into the category of actionable opinions because the disclosures omit material facts. The Complaint alleges widespread kickback schemes that violated both the AKS and the FCA. (Compl. ¶¶ 50–51.) This is more than isolated conduct: the KOL-program misconduct was a company-wide strategy targeted to the VA channel. (Compl. ¶¶ 37–42.) Indeed, Rishe allegedly promoted the KOL program at Tactile's national sales meeting as "the most effective tool ever" to access difficult accounts and had a strong correlation to immediate new referrals. (*Id.* ¶ 37.) The federal government allegedly flagged speaking arrangements like the KOL program as high risk for fraud and illegal remuneration. (*Id.* ¶ 39.) And, as noted above, the Complaint alleges that Tactile's compliance officer flagged the trainer program as a high business risk for kickbacks, suggesting a widespread company strategy. (*Id.* ¶ 44.) Given the facts detailed in the Complaint, the allegations about Tactile's assurances that it complied with the law state a claim.

*Statements about the qui tam action.* During Tactile's May 6, 2019 earnings call, Mattys stated that "we continue to believe the allegations [in the qui tam action] are without merit." (*Id.* ¶ 172.) Plaintiff contends that this statement concealed that the qui tam action's allegations—which included the illegal kickback schemes—were true. (Pl's Br. at 28.) A defendant's "knowledge of unsubstantiated qui tam allegations, on their own," does not suggest awareness of continued corporate misconduct. *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 567 (D.N.J. 2011). But the Complaint alleges more than just Mattys's awareness of the qui tam action; it alleges that Mattys was deeply involved in the sales strategy for the Flexitouch, including collaborating to set sales quotas and objectives and closely tracking each Tactile representative's sales. (Compl. ¶¶ 258–69.) And it alleges that Mattys was aware of illegal kickback schemes before the May 2019 earnings call. (*See id.* ¶ 81 (alleging that in 2018, "Mattys misleadingly attributed Flexitouch's sales growth solely to legitimate activities . . . while omitting [Tactile's] illegal sales practices").) The Court therefore finds that Mattys's statement is not an inactionable statement of opinion, and a securities fraud claim based on it can stand.

3.    *Statements about the Market for Flexitouch*

Plaintiff maintains that statements about Tactile's calculations of its total addressable market (TAM) are actionable. In 2018, Tactile calculated TAM by multiplying the average cost of a Flexitouch ($4,000) by the number of U.S. lymphedema diagnoses

31

(1.1 million) to arrive at a $4.4 billion TAM. (Compl. ¶¶ 58, 60.) According to its 2018 Form 10-K, Tactile had commissioned an "analysis of claims data" from which it "estimated" that 1.1 million patients were diagnosed with lymphedema in 2018. (*Id.* ¶ 163; *see also id.* ¶ 159 (Mattys stating during a Feb. 28, 2019 earnings call that 1.1 million patients were diagnosed with lymphedema in the 12-month period ending June 30, 2018).) Tactile's 2019 Form 10-K similarly estimated—based on "an analysis of claims data"—that 1.3 million patients were diagnosed with lymphedema during the 12 months ending June 30, 2019. (*Id.* ¶ 199.) By multiplying 1.3 million patients by the $4,000 cost of a Flexitouch, Tactile calculated TAM to be around $5 billion in 2019. (*Id.* ¶¶ 60, 195.)

Relying on an article co-authored by Tactile's Chief Medical Officer, Plaintiff asserts that Tactile's TAM estimates were overstated. (*Id.* ¶¶ 62–64; ECF No. 66-8 ("O'Donnell Study").) The Complaint alleges that the incidence rate of lymphedema was six times smaller than reported by Defendants in 2018, which would result in TAM "at least three times smaller than Defendants reported." (Compl. ¶ 64.) Defendants contend that comparing the O'Donnell Study to Tactile's claims data analysis was an "apples-to-oranges" comparison because they studied different time periods and did not address the incident rate of lymphedema in the average U.S. population. (Defs' Br. at 24.)

Setting aside the factual arguments, Defendants note that Tactile's financial disclosures characterized TAM as an "estimate . . . based in large part on current trends

in diagnosing lymphedema and [CVI]." (*E.g.*, ECF No. 66-22 at 37.) Tactile further disclosed that its estimate "may prove to be incorrect" and that if the actual number of patients and TAM are smaller than Tactile estimated, Tactile's "future growth could be adversely impacted." (*Id.*) In noting these disclosures, Defendants appear to assert a type of safe harbor defense under the PSLRA. *See Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920 (8th Cir. 2015) (noting the PSLRA's safe-harbor provision protects defendants from liability when they "made forward-looking statements accompanied by meaningful cautionary language"); 15 U.S.C. § 78u-5. But given the parties' dearth of analysis on this issue, the Court declines to decide at this stage of the case whether statements about the calculations of Tactile's TAM in 2018 and 2019 are forward-looking or whether the statements included sufficiently meaningful cautionary language. *See generally Nash Finch*, 502 F. Supp. 2d at 873 (concluding that cautionary language cannot be "'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false"). The Court therefore finds that a securities fraud claim based on the 2018 and 2019 TAM statements can stand.

The Complaint also points to Tactile's statements in early 2020 that a new clinical study "suggested that the prevalence of [CVI] is approximately 16 million in the U.S. alone." (Compl. ¶ 194 (Mattys statement during Feb. 26, 2020 earnings call); *see also id.* ¶ 206 (May 4, 2020 Form 8-K), *id.* ¶ 208 (Mattys statement during May 4, 2020 earnings

call).) Plaintiff contends that this estimate was overstated because the study at issue was based on "skin changes associated with CVI," not diagnoses of CVI. (*Id.* ¶ 76.) But Mattys disclosed this information on the same date the study was announced, stating during the February 2020 earnings call that the study's estimate of 16 million was based on "prior literature estimating the 5% of the population has some skin changes associated with CVI." (*Id.* ¶ 194.) Moreover, the study at issue was published, so investors could review the study and decide for themselves. (*See* ECF No. 66-9); *Mathews v. Kidder, Peabody & Co.,* 260 F.3d 239, 252 (3d Cir. 2001) ("[I]nvestors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments."). For these reasons, the Complaint fails to sufficiently allege a misstatement related to the 2020 clinical study of the prevalence of CVI in the United States.

4.   *SEC Regulation Item 303*

The Complaint alleges that throughout the Class Period, SEC Regulation Item 303 required Tactile to disclose that its allegedly "illegal sales practices put at risk a material portion of [Tactile's] reported revenue—in particular the revenues obtained from Tactile's [Medicare] and VA business segments." (Compl. ¶ 124.) Item 303 requires a reporting entity to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). As discussed above, the Complaint sufficiently alleges that Tactile engaged in illegal

kickback schemes during the Class Period. It also adequately alleges that "these practices presented a significant uncertainty," because, as Tactile acknowledged in financial statements, "to the extent [Tactile is] found not to be in compliance" with the AKS or the FCA, Tactile could be excluded from participating in "all federal healthcare programs," which would affect nearly 30% of Tactile revenues. (Compl. ¶¶ 124–25); *see CenturyLink*, 403 F. Supp. 3d at 726 (finding that the complaint adequately alleged that Item 303 required a corporation to disclose that its illegal sales practices were a material driver of its reported revenue).

Plaintiff also adequately alleges that Tactile management knew of the allegedly illegal kickback schemes. "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). The Complaint alleges that Tactile management's knowledge because Rishe acknowledged that the KOL program allowed Tactile to gain referrals, and encouraged sales representatives to use its trainer program in the VA channel. (Compl. ¶¶ 37, 47.) It also alleges that Rishe, Mattys, and Folkes were deeply involved in the sales strategy for Flexitouch, which "accounted for approximately 90% of Tactile's revenues during the Class Period," including collaborating to set sales quotas and objectives and closely tracking each Tactile representative's sales. (*Id.* ¶¶ 267; *see id.* ¶¶ 258–68.) These assertions adequately allege

that Tactile management knew of the illegal kickback schemes. Thus, the Court finds that a securities fraud claim based on the alleged violation of Item 303 can stand.

5.      *Summary of Alleged Misstatements*

For the reasons above, the Court finds that the Complaint adequately alleges that Tactile made the following misstatements under the PSLRA, but only in so far as they were inaccurate due to illegal kickback schemes: (1) statements about Tactile's revenue; (2) statements that Tactile believed it complied with the law; and (3) violations of SEC Regulation Item 303. In addition, the Complaint adequately alleged misstatements about Tactile's TAM in 2018 and 2019. Alleged misstatements are not actionable to the extent that they relate to the efficacy of Flexitouch, FCA claims based on lack of medical necessity, or TAM in 2020.

D.      **Scienter**

To survive a motion to dismiss, Plaintiff must also allege particular facts supporting a "strong inference" that Defendants made misstatements with the requisite scienter. *Navarre*, 299 F.3d at 745 (citing 15 U.S.C. § 78u-4(b)(2)). Scienter is "the intent to deceive, manipulate, or defraud," *id.* at 741, and "requires a showing of 'reckless or intentional wrongdoing.'" *Podraza*, 790 F.3d at 836 (citation omitted). Plaintiff can establish scienter from: (1) allegations of "motive and opportunity"; (2) facts showing "a mental state embracing an intent to deceive, manipulate or defraud"; or (3) conduct that rises to "severe recklessness." *Id.* (citation omitted). Severe recklessness refers to "highly

unreasonable omissions or misrepresentations that . . . present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it." *Id.* at 836 n.3 (quotation marks and citation omitted).

In determining whether alleged facts support a strong inference of scienter, the Court considers inferences favoring Plaintiff as well as "plausible, nonculpable explanations" for Defendants' conduct. *Id.* at 837 (citing *Tellabs*, 551 U.S. at 323, 324). An inference of scienter must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. The Court takes the factual allegations as true, and, assessing them collectively, determines whether a reasonable person would find "the inference of scienter at least as strong as any opposing inference." *Id.* at 326; *see Podraza*, 790 F.3d at 837 ("An inference of scienter is strong . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (quotation marks and citation omitted). The Complaint's allegations must "raise a strong inference of scienter for each defendant and with respect to each alleged misrepresentation." *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (citations omitted).

A strong inference of scienter may arise by sufficiently alleging that the defendants "(1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in

deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor." *Kushner*, 317 F.3d at 827. Plaintiff asserts that a strong inference of scienter arises here because individual Defendants benefitted from the alleged misstatements through incentive compensation and insider trading, and had access to information suggesting Defendants' public statements were inaccurate. The Court addresses each of these arguments in turn.

### 1.     *Incentive Compensation*

The Complaint alleges that Mattys, Moen, Blake, Folkes, and Rishe earned incentive compensation ranging from $78,406 to $728,471 during the Class Period. (Compl. ¶¶ 245–50.) Pleading that "a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings." *Kushner*, 317 F.3d at 830 (citation omitted). According to Plaintiff, allegations of the kickback schemes coupled with allegations that "senior executives had compensation tied to the company's performance," support a strong inference of the executives' scienter. *In re St. Paul Travelers Sec. Litig. II*, No. 04-CV-4697(JRT/FLN), 2006 WL 2735221, at *4 (D. Minn. Sept. 25, 2006). But a plaintiff must show that "the benefit to an individual defendant is unusual, for example, that the benefit is of an overwhelming magnitude and received under suspicious circumstances." *Horizon*

*Asset Mgmt.*, 580 F.3d at 766 (cleaned up, citing *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005)).

The Complaint does not allege facts showing that the compensation plan or benefits paid to Defendants were unusual.[20] *See, e.g., id.* (holding that bonuses totaling $258,000 were insufficient where complaint lacked "allegations of suspicious timing"); *Cerner*, 425 F.3d at 1085 (holding aggregate $1 million bonus based on company-wide performance was insufficient where "no suspicious circumstances" were alleged). The general allegations of the kickback schemes, standing alone, do not show that incentive compensation paid to Mattys, Moen, Blake, Folkes, or Rishe was overwhelming and suspicious. So the Court does not find an inference of scienter by these defendants on this ground.

2.      *Insider Trading*

Plaintiff argues that its allegations of insider trading support a strong inference of scienter. All individual Defendants except Moen were insiders who traded Tactile stock during the Class Period. (Compl. ¶¶ 220–44.) Insider trading is "not inherently suspicious," but it becomes suspicious "when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Navarre*, 299 F.3d at 747 (quotation marks and citation

---

[20] For example, the Complaint alleges that bonuses paid under Tactile's Management Incentive Plan were based on the company's annual revenue and adjusted EBITDA metrics. (Compl. ¶¶ 245–47, 249.)

omitted). It is not enough to allege that Defendants benefitted from trading because of a false or misleading statement. *Id.* To give rise to the requisite inference of scienter, "the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Id.* (citing *Green Tree*, 270 F.3d at 659). Plaintiff asserts that all individual Defendants except Moen engaged in these types of unusual trades during the Class Period.[21] (Pl's Br. at 35–38.)

 *10b5-1 trading plans.* The parties argue about the effect of 10b5-1 trading plans on the scienter requirement. Defendants contend their 10b5-1 plans insulate them from allegations of scienter. Plaintiff argues that the adoption of multiple plans during the Class Period demonstrates certain Defendants' scienter. The Court finds that the 10b5-1 plans neither insulate Defendants from allegations of scienter *nor* establish, by themselves, an inference of scienter. "A 10b5-1 plan is an agreement which allows

---

[21] Plaintiff asserts that the fact that seven of the eight individual Defendants sold stock at investors' expense supports an inference of scienter. (Pl's Br. at 38.) As Defendants note, "an inference of scienter from insider trading is lessened when, as here, the class period is well over a year." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018). It is hard to infer intent from the mere fact of a stock sale during a long class period because "it is not unusual for insiders to trade at some point during their tenure with a company." *Id.* (finding that a 29-month class period "caution[ed] against inferring scienter from the alleged insider trading" where two individual defendants sold stock 4 and 5 times). But Plaintiff alleges more than mere stock sales; several individual Defendants made many sales during the Class Period. (*E.g.*, Compl. ¶¶ 231 (alleging Folkes sold Tactile stock 62 times), 234 (alleging Rishe sold Tactile stock 57 times).)

corporate insiders to set a schedule by which to sell shares over time." *Elam v. Neidorff*, 544 F.3d 921, 928 n.3 (8th Cir. 2008) (citation omitted); 17 C.F.R. § 240.10b5-1(c)(1)(i). Sales made under 10b5-1 plans "can raise an inference that the sales were prescheduled and not suspicious." *Elam*, 544 F.3d at 928 (citation omitted).

Mattys, Blake, Folkes, Rishe, and Burke traded Tactile shares under 10b5-1 plans; all except Blake adopted plans during the Class Period.[22] (Compl. ¶¶ 227, 230, 233, 236, 239.) When an insider adopts a 10b5-1 plan during the period of alleged fraudulent activity, the fact that the insider traded under such a plan, by itself, "is not 'a cognizable defense to scienter allegations.'" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (noting that a "10b5-1 plan does less to shield [an insider] from suspicion [when] he instituted the plan . . . after the start of the class period"). In such cases, trading under a 10b5-1 plan is "not a complete defense to scienter because the insider might be aware of an impending price drop and could use a 10b5-1 plan to make his or her premeditated stock dump appear legitimate." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, No. 19-CV-8720 (AJN), --- F. Supp. 3d ---, 2021 WL 4481119, at *6 (S.D.N.Y. Sept. 30, 2021). To show scienter, Plaintiff must

---

[22] The Court finds that the two trades Blake made under her 10b5-1 plan do not support scienter, but notes that she also sold Tactile shares outside of her 10b5-1 plan. (*See* Compl. ¶¶ 228, 230.) The Court addresses that trade below. Plaintiffs do not allege that Nigon or Roche sold Tactile shares under 10b5-1 plans during the Class Period. (*Id.* ¶¶ 241, 243.)

allege facts strongly inferring that, around the time Defendants scheduled trades under their 10b5-1 plans, "Defendants were aware that a price drop would be coming after their allegedly fraudulent statements or omission were revealed and that they planned to execute the trades before that happened." *Id.* at *6; *see Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) ("When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations."); *Lululemon*, 14 F. Supp. 3d at 585 (finding that insider's trading did not support a strong inference of scienter where the complaint pled no facts suggesting that the insider entered into the 10b5-1 plan "'strategically' so as to capitalize on insider knowledge").

The Complaint alleges that during the Class Period, Mattys adopted seven 10b5-1 plans, Folkes and Rishe each adopted five 10b5-1 plans, and Burke adopted three 10b5-1 plans. (Compl. ¶¶ 227, 233, 236, 239.) Because these Defendants adopted 10b5-1 plans during the Class Period, trades made under those plans are not a complete defense to scienter allegations. The question is whether the Complaint sufficiently alleges facts strongly inferring that these Defendants adopted the 10b5-1 plans to profit from inflated stock prices.

Plaintiff alleges that Mattys, Folkes, Rishe, and Burke adopted 10b5-1 plans while "in possession of material, nonpublic information" concerning Tactile's fraudulent

conduct. (*Id.* ¶¶ 226, 233, 236, 239.) Rishe allegedly knew and directed "illegal sales practices" as Tactile's SVP of Sales, and knew that these practices contributed to Tactile's revenue growth; Burke allegedly knew of the kickback schemes as a member of Tactile's compliance and audit committees; and Mattys, Folkes, and Rishe were allegedly involved in the Flexitouch sales strategy and setting sales quotas. (*Id.* ¶¶ 235, 238, 258–66.) But these allegations, without allegations of suspicious timing in adopting the 10b5-1 plans, do not support a strong inference of scienter. *See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 226 (E.D.N.Y. 2019) (finding plaintiffs failed to allege facts suggesting that an insider's decision to adopt a 10b5-1 plan during the class period involved strategic trading or manipulative intent).

Nor is the Court persuaded that Mattys's February 14–15, 2019 stock sales were unusually timed because they occurred two days after Tactile was served with the qui tam complaint. (Compl. ¶ 225.) Mattys adopted the 10b5-1 plan under which the sales were made in December 2018, well before service of the qui tam complaint. (*Id.* ¶ 227.) The Complaint does not allege facts leading to an inference that Mattys had non-public information about the qui tam complaint when he adopted the 10b5-1 plan in December 2018. The Court thus finds that these allegations do not support a strong inference of scienter.

In sum, the Court finds that the trades Blake made under her 10b5-1 plan do not support scienter. And because Mattys, Folkes, Rishe, and Burke adopted 10b5-1 plans

during the Class Period, trades made under those plans do not provide a complete defense to allegations of scienter. On the flip side, without factual allegations of strategic trading or manipulative intent, their adoption of 10b5-1 plans during the Class Period do not support a strong inference of scienter.

*Unusual trading.* Setting the 10b5-1 plans aside, the Court must still analyze whether Defendants' trades were "'unusual' . . . in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved" such that they "give rise to the required inference of scienter." *Navarre*, 299 F.3d at 747 (citation omitted).

The Complaint alleges that certain Defendants sold off much of their Tactile stock during the Class Period: Mattys, 46.01%; Blake, 19.43%; Folkes, 66.94%; Rishe, 76.33%; Nigon, 59.05%; Roche, 56.83%; and Burke, 74.04%.[23] (Compl. ¶ 220); *see Nash Finch*, 502 F. Supp. 2d at 882 (finding plaintiff sufficiently pled scienter based in part on allegations that two individual defendants sold approximately 24% and 77% of their stock and vested options during the class period). And all but Mattys owned less Tactile stock at the end of the Class Period than before. (ECF No. 66-6.) Given the unusual number of insiders who made significant proportions of stock sales, the Complaint pleads facts that suggest

---

[23] In its brief, Plaintiff recalculated these percentages to account for stock grants as acquisitions, and asserted that "apart from Mattys," these Defendants sold a significant portion of their Tactile stock: Blake, 11.3%; Folkes, 36.8%; Rishe, 50.7%; Nigon, 61.4%; Roche, 60.05%; and Burke, 23.9%. (Pl's Br. at 37–38.)

scienter. The narrower question is whether these sales support the *strong* inference required by the PSLRA. The Court's answer is yes, for all Defendants but Blake.

Defendants are correct to argue that percentages of sales mean little without more information. "[L]arge percentages of holdings sold at first blush appearing suspicious are not sufficient to infer scienter when other factors, such as the timing of the relevant sales, weigh against that inference." *Hertz*, 905 F.3d at 121 (finding considerations weighing against scienter limited the strength of the scienter inference from individual defendants' sales of 24.7% and 62.3% of their pre-class holdings). But Plaintiff does not rely merely on Defendants' unusual percentages of Tactile stock sales; it points to other factors as well. Plaintiff contends that Defendants' sales during the Class Period were dramatically out of line with prior trading practices. (Pl's Br. at 35–36); *see, e.g.*, *Nash Finch*, 502 F. Supp. 2d at 882–83 (finding that scienter was sufficiently alleged in part because one insider sold six times more shares during the class period than before it, and other insiders sold 9,000 shares during the class period, and none before it).

*Mattys*. Mattys's class-period sales allegedly increased 400% from his pre-class-period sales, and resulted in over $11.4 million in profits.[24] (Compl. ¶¶ 221–22.) And his

---

[24] Defendants argue that the proportion of Matty's sales is not unusual because Mattys held more Tactile stock at the end of the Class Period due to vesting stock options that were sold as they vested. (Defs' Br. at 34); *see In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017) (finding increased stock holdings during the class period "is inconsistent with an inference of scienter, because when a defendant has insider knowledge of wrongdoing it is in his financial interest to deplete his reservoir of stock

single-day trades were allegedly double or triple his highest pre-class-period sales. (*Id.* ¶ 223 (alleging Mattys's first class-period sale of 20,000 shares netted double his highest single-day proceeds from a pre-class-period sale).) Mattys allegedly increased his stock sales as Tactile's false statements caused its stock price to increase, and decreased his sales as the stock price declined. (*Id.* ¶ 224.)

*Folkes*. Folkes's sales were allegedly unusual in timing and amount because, beginning in September 2018, he sold much more stock than his pre-class-period trend of selling no more than $300,000 of shares per month. (*Id.* ¶ 232 (alleging Folkes sold $716,162 and $1,431,800 of stock in Sept. and Nov. 2018, respectively).) Folkes's four largest trades were made outside of his 10b5-1 trading plans, and equaled one quarter of his class-period trading proceeds. (*Id.* ¶ 233.) In all, Folkes reaped over $5.6 million in profits during the Class Period. (*Id.* ¶ 231.)

*Rishe*. Rishe's sales were allegedly unusual because he sold 3,000 shares per month before the Class Period, but in June 2019, he increased his monthly sales to 9,625 shares per month. (*Id.* ¶ 235.) Allegedly, Rishe did so while Tactile "lied about its revenue growth, its [TAM], and the merits of the qui tam lawsuit." (*Id.*) As Tactile's SVP of Sales,

---

holdings before the wrongdoing becomes public"). The fact that Mattys acquired much of his retained shares through employment benefits, rather than on the open market, "reduces—but does not negate—the significance of those holdings." *Tyson*, 275 F. Supp. 3d at 1002.

Rishe allegedly "knew and had directed" Tactile's illegal sales practices. (*Id.*) He reaped more than $6.1 million in profits during the Class Period. (*Id.* ¶ 234.)

*Burke*. Burke's sales were allegedly unusual because he sold only 3,500 shares before the Class Period, then sold over 16,000 shares during the Class Period, including a single sale of 10,000 shares on June 18, 2019. (*Id.* ¶ 238.) Burke allegedly reaped over $824,000 in profits, while knowing "the truth about the kickback scheme and [FCA] violations" and that Tactile was lying about the merits of the qui tam action, by virtue of his positions on Tactile's compliance and audit committees. (*Id.* ¶¶ 237–38.)

*Nigon*. Nigon's sales were allegedly unusual because after selling no stock before the Class Period, he allegedly sold 59% of his stock within five months of the beginning of the Class Period, reaping over $786,000 in profits. (*Id.* ¶¶ 240–41.) Like Burke, Nigon allegedly knew "the truth" about the kickback schemes and FCA violations, and that Tactile was lying about the merits of the qui tam action, because of his positions on Tactile's compliance and audit committees. (*Id.* ¶ 241.) He also allegedly knew Tactile was lying about its revenue growth and TAM. (*Id.*)

*Roche*. Roche's sales were allegedly unusual because he regularly sold shares a few days after Tactile made allegedly misleading quarterly earnings announcements that resulted in significant increases in share price. (*Id.* ¶ 243 (highlighting Roche's sales three and four days after Tactile's 1Q18, 2Q18, and 1Q19 earnings announcements, with 7% to 26.9% share price increases).) Roche allegedly "took advantage of his position" on the

audit and compliance committees to profit from Tactile's misstatements and omissions, reaping over $2.6 million in profits from selling his Tactile shares. (*Id.* ¶¶ 242–43.) Courts have viewed stock sales made "on the heels of false positive financial statements" as "unusual and suspicious." *E.g.*, *Dutton v. D&K Healthcare Res.*, No. 4:04CV147 SNL, 2006 WL 1778884, at *10 (E.D. Mo. June 23, 2006). But suspicious timing of stock sales "is insufficient to establish a strong inference of scienter in the absence of any other information indicating unusual insider trading." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009), *aff'd*, 621 F.3d 800 (8th Cir. 2010). Here, the Complaint alleges other information suggesting insider trading: Roche was a member of Tactile's compliance and audit committees, and Tactile's compliance officer had documented a high business risk from kickbacks.

The Court finds that the Complaint's allegations of unusual insider trading support a strong inference of scienter for Mattys, Folkes, Rishe, Burke, Nigon, and Roche.

*Blake*. The allegations of Blake's insider trading differ from those of other Defendants. As noted above, two of her three trades were made under a pre-class-period 10b5-1 plan, which do not support an inference of scienter. Blake also sold 5,000 shares outside of her 10b5-1 plan on August 16, 2018. (Compl. ¶¶ 228, 230.) This trade was allegedly out of line with Blake's pre-class-period sales (the largest of which was 2,727 shares), and occurred after allegedly false and misleading statements in Tactile's 1Q18 and 2Q18 earnings announcements increased Tactile's stock price from the pre-class-

period price of around $35 to $57.04 per share. (*Id.* ¶¶ 228–30.) But the Complaint also alleges that the August 2018 sale occurred two weeks before Blake retired.[25] (*Id.* ¶ 230.) Courts have found that a retiring insider's sale of stock was "a 'normal and expected' consequence of his retirement" rather than part of a conspiracy to defraud. *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013). The Court agrees that for Blake's trade, this is "the most plausible inference," and thus the allegations of Blake's insider trading do not support a strong inference of scienter. *Id.*

3.      *Access to Contrary Information*

Plaintiff also maintains that the Complaint alleges a strong inference of scienter because Defendants allegedly knew and had access to information that contradicted

---

[25] Plaintiff contends that the fact that Blake, Mattys, and Folkes left Tactile supports a strong inference of scienter. (Pl's Br. at 47.) "[A]lone, evidence of premature executive resignations is inadequate to show scienter as there may be many plausible reasons for earlier than expected resignations." *CenturyLink*, 403 F. Supp. 3d at 734; *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter."). But "in the context of the other evidence and coupled with evidence of timing . . . evidence of these resignation[s] at least marginally assists Plaintiff[] in alleging scienter." *CenturyLink*, 403 F. Supp. 3d at 734. Blake resigned for personal reasons four months into the Class Period, Mattys retired within a year after the qui tam action was unsealed, and Tactile eliminated Folkes's position of COO a few months after the June 2020 OSS Report was published. (Compl. ¶¶ 274–76.) The Court finds that "while not much standing alone," to the extent that Plaintiff offers other indicia of scienter, these departures may "buttress[] the inference of scienter under the holistic approach." *Plymouth Cnty. Ret. Sys. v. Patterson Cos.*, No. 18-CV-871 (MJD/SER), 2019 WL 3336119, at *20 (D. Minn. July 25, 2019), *report & recommendation adopted as modified*, 2019 WL 4277302 (D. Minn. Sept. 10, 2019).

Tactile's public statements. (Pl's Br. at 43–46.) A "'classic' fact pattern giving rise to a strong inference of scienter" is that defendants "made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *Navarre*, 299 F.3d at 746 (citing *Green Tree*, 270 F.3d at 665). But conclusory allegations that contrary information "must have existed and must have been known" by Defendants do not support an inference of scienter. *Elam*, 544 F.3d at 930; *see Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010) (affirming a dismissal where plaintiff had not alleged facts to support the inference that any particular individual defendant was aware of the information that allegedly should have been disclosed).

Plaintiff alleges that knowledge of Tactile's illegal kickback schemes can be imputed to the individual Defendants because Flexitouch accounted for 90% of Tactile's revenues during the Class Period. (Compl. ¶¶ 267, 270.) This allegation presumes that "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give[] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015) (citation omitted). The Eighth Circuit has not yet decided whether a plaintiff can use this "core operations" theory to plead scienter. *See Elam*, 544 F.3d at 929. But it has held that, to attribute knowledge to company officers, a plaintiff must at least show that the relevant information "was known within the company at that time." *Id.; see CenturyLink*, 403 F.

Supp. 3d at 731 ("[A]t the motion to dismiss stage, it is reasonable to assume that top management were 'aware of matters central to that business's operation.'") (citation omitted).

As noted above, Tactile's compliance officer allegedly documented that "Tactile's arrangements with therapists [in their trainer program] posed a high 'Business Risk' for 'kickbacks'" and the federal government had flagged speaking arrangements like the KOL program as high risk for fraud and illegal remuneration. (Compl. ¶¶ 39, 44.) The allegations that Mattys, Folkes, and Rishe were deeply involved in the sales strategy for Flexitouch and closely followed representatives' sales performance, and Rishe's promotion of the KOL program at Tactile's national sales meeting as "the most effective tool ever" to access difficult accounts and had a strong correlation to immediate new referrals, reasonably infer that Mattys, Folkes, and Rishe had access to information about the alleged kickback schemes. (*Id.* ¶ 37; *see id.* ¶¶ 258–69.) At this stage of the case, given the alleged facts above, the inference that Mattys, Folkes, and Rishe knew about the kickback schemes is at least as compelling as the inference that they were unaware of them. *Podraza*, 790 F.3d at 837. Thus, these allegations support an inference of scienter as to these Defendants.

Turning to Burke, Nigon, and Roche, each was an outside director and member of Tactile's audit and compliance committees. (Compl. ¶¶ 19–21.) Allegations of scienter "may not rest on the inference that defendants must have been aware of [information]

based on their positions within the company." *Medtronic*, 618 F. Supp. 2d at 1033 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)). But here, Tactile's compliance officer allegedly documented that its arrangements with therapists for the trainer program posed a high business risk for kickbacks, (Compl. ¶ 44), and it is reasonable to infer that Tactile's compliance committee had access to this documentation. At the very least, the Complaint alleges "facts that create a strong inference that the members of the Audit [and Compliance] Committee[s] failed to check information they had a duty to monitor, and thereby knowingly or recklessly allowed dissemination of false financial reports."[26] *St. Paul Travelers*, 2006 WL 2735221, at *4.

### 4.  Summary of Scienter

The multiple allegations giving rise to the strong inference of scienter must be viewed not in isolation, but holistically. *Tellabs*, 551 U.S. at 326. And even under a PSLRA pleading standard, the Court must assume the truth of the factual allegations pleaded in the Complaint. *Id.* at 322. When the Court considers all of the allegations, under the

---

[26] Even though the Court finds that the Complaint alleges an inference of scienter based on what information Defendants knew or had access to, the Court cannot agree that the Complaint supports an inference of *deliberate* misconduct. *See Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1057 (D. Minn. 2003) (finding a strong inference of scienter when a complaint identified "*with precision* the opportunities Defendants had to engage in the scheme, their pecuniary motive, and how the scheme was carried out") (emphasis added); *cf. St. Paul Travelers*, 2006 WL 2735221, at *2, *4 (finding a strong inference of scienter where a confidential witness asserted that defendants were "heavily involved" in illegal activity and that the company's CEO "was aware" that a certain insurance project was not true reinsurance, which, if true, would show that the CEO "deliberately engaged in misbehavior").

analysis above, it finds that the Complaint allegations support a finding of at least severe recklessness in certain Defendants' failure to disclose material information about the alleged illegal kickback schemes. *See Horizon Asset Mgmt.*, 580 F.3d at 766 (holding that "severe recklessness" requires allegations of "highly unreasonable omissions or misrepresentations amounting to an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it") (citation omitted). These allegations, viewed as a whole, give rise to a strong inference of scienter as to Mattys, Folkes, Rishe, Burke, Nigon, and Roche for the alleged misstatements about Tactile's revenue, compliance with the law, and SEC Regulation Item 303. And Mattys allegedly made misstatements about Tactile's 2018 and 2019 TAM. (*E.g.*, Compl. ¶¶ 159, 195.) The allegations of scienter as to Mattys and Folkes are enough to impute scienter to Tactile. *See St. Jude*, 836 F. Supp. 2d at 896 ("The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity."). On the other hand, the Court finds that the Complaint fails to allege a strong inference of scienter as to Blake or Moen.[27]

---

[27] The Complaint alleges that Mattys, Blake, and Moen signed false certifications under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rules 13a-15(e), 13a-15(f), 15d-15(e), 15d-15(f) and 18 U.S.C. Section 1350 ("SOX Certifications"). (*E.g.*, Compl. ¶¶ 137, 152, 273.) According to Plaintiff, these allegedly false SOX Certifications support a strong inference of scienter. The Eighth Circuit has repeatedly rejected this argument, explaining that "if an allegation that a mandatory Sarbanes–Oxley certification was later

The motion to dismiss Count I is granted in part and denied in part as detailed above.

## II.        Count II: Scheme Liability

Defendants move to dismiss Count II, which asserts a scheme liability claim under Section 10(b) of the Exchange Act and Rule 10b–5(a) and (c) against all Defendants. Scheme liability concerns the use of "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5; *see KV Pharm.*, 679 F.3d at 986 ("Claims brought under Rules 10b–5(a) and (c) are generally referred to as 'scheme liability' claims."). To prevail on a scheme liability claim, Plaintiff must show that: Defendants committed a deceptive act with scienter; the act affected the market for securities or was otherwise in connection with their purchase or sale; and Defendants' actions caused Plaintiff's injury.[28] *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016).

_____

proven to be inaccurate is sufficient to give rise to the requisite strong inference, 'scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" *Horizon Asset Mgmt.*, 580 F.3d at 766 (citing *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008)). Thus, the Court does not find that allegations of false SOX Certifications support a strong inference of scienter.

[28] The Eighth Circuit has also held that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)." *KV Pharm.*, 679 F.3d at 987. Defendants do not contend that Count II fails for this reason and acknowledges the Supreme Court's subsequent holding that dissemination of false or

The Eighth Circuit has applied the Rule 9(b) standard to scheme liability claims, requiring a plaintiff to "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *KV Pharm.*, 679 F.3d at 986 (citation omitted). Defendants contend that Count II fails to satisfy this standard because it does not assert any factual allegations unique to Count II, and it employs "group pleading" to assert that the illegal sales practices occurred under a scheme in which "each Defendant was a 'primary participant.'" (Defs' Br. at 39.)

*Rishe, Folkes, and Mattys.* Count II incorporates prior complaint allegations and alleges that "Defendants carried out a plan, scheme and course of conduct" to: deceive the investing public; enable Tactile to artificially inflate its stock price; cause Plaintiff and other class members to purchase Tactile stock at artificially inflated prices; and allow certain Defendants to sell Tactile stock at inflated prices. (Compl. ¶¶ 293–94.) In furtherance of the scheme, Defendants allegedly "[e]xaggerated and distorted clinical study results and claims data analyses to convey that Flexitouch's market size was three to four times greater than it actually was," and paid illegal kickbacks to induce doctors and hospital staff to prescribe the Flexitouch. (*Id.* ¶ 294.) Defendants also allegedly issued false and misleading statements in furtherance of the scheme which "was intended to,

---

misleading statements with intent to defraud can fall within the scope of Rule 10b–5(a) and (c). (Defs' Br. at 40 n.16 (citing *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)).)

and did, drive Flexitouch sales, and with it, Tactile's revenues and share price." (*Id.*) Count II does not identify any specific individual defendant, but Plaintiff asserts that Rishe, who as Tactile's SVP of Sales, directed the sales team to use the KOL program, and that Rishe, Folkes, and Mattys were deeply involved in Flexitouch sales, setting sales quotas, sales managers salaries, and closely monitoring Tactile representatives' sales of the Flexitouch. (Pl's Br. at 32 n.18 (citing Compl. ¶¶ 18, 37, 251–66).) The Court finds that these complaint allegations—which are incorporated into Count II—sufficiently allege scheme liability as to Rishe, Folkes, and Mattys.

*Outside directors.* Plaintiff asserts scheme liability for the outside directors (Burke, Nigon, and Roche) based solely on their membership on Tactile's compliance and audit committees and their alleged failure to ensure compliance with the AKS. (*Id.* (citing Compl. ¶¶ 19–21).) Scheme liability based on such thin allegations cannot survive a motion to dismiss. *See KV Pharm.*, 679 F.3d at 987 (affirming dismissal of scheme liability claim where plaintiffs failed to allege with specificity what conduct defendants engaged in beyond knowing of the misrepresentations and omissions).

*Blake and Moen.* Plaintiff's briefing does not point to any complaint allegations alleging that Blake or Moen are liable under Count II. As a result, the Court finds that Count II does not sufficiently allege scheme liability as to Burke, Nigon, Roche, Blake, and Moen.

**III.        Count III: Control Person Liability under Section 20(a)**

Count III alleges the individual Defendants are liable as control persons under Section 20(a) of the Exchange Act. Section 20(a) is "remedial and is to be construed liberally. It . . . requir[es] only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Lustgraaf*, 619 F.3d at 873 (citation omitted). Under this standard, Plaintiff must prove that: (1) "a 'primary violator' violated the federal securities laws"; (2) "the alleged control person actually exercised control over the general operations of the primary violator"; and (3) "the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated." *Id.* (citation omitted). The first element of the control-person test is analyzed under the PSLRA standard; the second and third prongs are analyzed under the "ordinary notice-pleading standard." *Id.* at 875. Thus, "naked allegations of control will typically suffice." *W.V. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 984 (D. Minn. 2014) (citation omitted).

*Mattys, Blake, and Moen.* As discussed above, Plaintiff adequately pleads a primary violation of Section 10(b) by Tactile. And Defendants do not dispute that Mattys was a controlling person as Tactile's CEO, or that Blake and Moen were controlling persons while acting as Tactile's CFO.[29] *See, e.g., Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128

---

[29] The Eighth Circuit has held that "culpable participation by an alleged control person in the primary violation is not an element of [a Section 20(a)] claim." *Lustgraaf*, 619 F.3d at

(8th Cir. 2019) (reversing dismissal of Section 20(a) claim against CEO and interim CFO). Under the notice pleading standard, Count III states a Section 20(a) claim against Mattys, Blake, and Moen.

*Folkes and Rishe*. Defendants assert that Count III fails to satisfy the second element as to Folkes and Rishe because it lacks allegations that they exercised actual control over Tactile's general operations. Whether a defendant is a controlling person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1060 (D. Minn. 2003) (quotation marks and citation omitted). During the Class Period, Folkes was Tactile's COO and Rishe was its SVP of Sales. (Compl. ¶¶ 17–18.) Folkes and Rishe were also allegedly "core members of management . . . who determined [Tactile's] sales strategy." (*Id.* ¶ 258; *see id.* ¶¶ 257–66 (alleging how Mattys, Folkes, and Rishe determined Flexitouch sales strategy); *see also id.* ¶ 296 (alleging each individual defendant "had the power to influence and control and did influence and control, directly and indirectly, the

---

877. Thus, Blake and Moen may be control persons despite the lack of allegations of their scienter. But liability as control persons is limited to their actions as Tactile's CFO. Plaintiff does not dispute that the Complaint lacks factual allegations showing Blake's continued involvement in the alleged fraud after she resigned as Tactile's CFO, or showing Moen's alleged misconduct predated his becoming CFO. (Compl. ¶¶ 15–16); *see In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1101 (D. Minn. 1998) ("[P]laintiffs cannot state a claim against [the company] for false or misleading disclosures published after he left the company."), *aff'd*, 14 F. App'x 714 (8th Cir. 2001).

decision-making of [Tactile]").) These allegations suffice under the notice pleading standard. *See, e.g., CenturyLink*, 403 F. Supp. 3d at 737 (finding plaintiffs sufficiently alleged a § 20(a) claim against SVP of operations transformation and treasurer who allegedly exercised control over the corporation's general operations and had "'the power to determine the specific acts' giving rise to the claim") (citation omitted).

*Outside directors.* Finally, Defendants contend that Count III fails as to Burke, Nigon, and Roche because it lacks allegations showing that they had the power to determine specific acts or omissions on which Tactile's alleged liability is based. (Defs' Br. at 41.) Courts have found that pleading job titles alone fails to show actual control. *E.g., Tile Shop*, 94 F. Supp. 3d at 1055 ("Without more, their titles as directors and signatures on registration statements . . . do not establish that [individual defendants] actually exercised control over [company defendant].") The Complaint alleges that Burke, Nigon, and Roche were allegedly members of Tactile's compliance and audit committees and responsible for "overseeing" compliance with the AKS and the FCA. (Compl. ¶¶ 19–21.) But it does not allege facts suggesting that the outside directors, "or even the Audit [and Compliance] Committee[s] more generally, had the ability to control day-to-day operations" of Tactile. *Jensen v. Thompson*, No. 17-CV-4014-LLP, 2018 WL 1440329, at *17 (D.S.D. Mar. 22, 2018). Because these allegations do not sufficiently allege that the outside directors were control persons, Count III does not state a Section 20(a) claim against Burke, Nigon, or Roche.

**IV.        Count IV: Insider Trading under Section 20A of the Exchange Act**

Count IV alleges that all individual Defendants except Moen sold securities while in possession of material, nonpublic information in violation of Section 20A of the Exchange Act. (Compl. ¶¶ 300–11.) Under Section 20A, a person who (1) violates any provision of the Exchange Act or its rules or regulations (2) by purchasing or selling securities "while in possession of material, nonpublic information" will be liable to (3) "any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold" the same class of securities. 15 U.S.C. § 78t-1(a). Courts apply the heightened PSLRA and Rule 9(b) standards to Section 20A claims. *E.g.*, *Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019).

*Contemporaneous trading*. Count IV alleges that certain Defendants sold Tactile shares "contemporaneously with members of the Class, including [] Plaintiff, who purchased Tactile shares on December 10, 2019." (Compl. ¶ 301.) Defendants maintain that Count IV fails to adequately plead Section 20A's contemporaneous trading requirement—that the insiders' trades were "contemporaneous" with the investor/plaintiff's trades. Section 20A does not define "contemporaneously," and neither the Eighth Circuit nor district courts in this circuit have addressed its scope. As another court has explained, interpretations of this term fall on a continuum: "'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same

day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remained undisclosed.'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (citation omitted, collecting cases); *see In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 3:15-CV-07658 (MAS) (LHG), 2019 WL 6799090, at *3–4 (D.N.J. Dec. 5, 2019) (considering various district courts' interpretations of "contemporaneous" trading).

Defendants urge the Court to interpret "contemporaneously" narrowly and require same-day trading. (Defs' Br. at 43 (citing *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007)).) District courts in the Second Circuit have rejected the same-day trading rule as "run[ning] contrary to the weight of authority" in that circuit, and found that trades were contemporaneous where they "occur within a reasonable period of time, usually limited to a few days, of one another." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008) (collecting cases); *see also Valeant*, 2019 WL 6799090, at *5 (declining defendants' request to certify to the Third Circuit whether "contemporaneous" requires only "same-day trading"); *MicroCapital Fund LP v. Conn's Inc.*, No. 4:18-CV-1020, 2019 WL 3451153, at *24 (S.D. Tex. July 24, 2019) (declining to apply the same-day trading rule where no court in the Fifth Circuit had applied it, and allowing a § 20A claim where plaintiffs' purchases occurred within four days after insider's sales), *report & recommendation adopted*, 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019).

Plaintiff suggests a much broader interpretation, asserting that its general allegation that unnamed class members traded stock contemporaneously with Defendants is sufficient. (Pl's Br. at 53–54 (citing *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255–56 (S.D.N.Y. 2007)).) According to Plaintiff, because Defendants allegedly failed to disclose relevant material nonpublic information during the entire Class Period, the term "contemporaneously" embraces the entire period of nondisclosure. (*Id.* at 54.) In support, Plaintiff cites a 1994 unpublished decision that noted "the term 'contemporaneously' may embrace the entire period while relevant material non-public information remained undisclosed." *In re Am. Bus. Computs. Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994). It also cites the Central District of California for the proposition that under this period-of-nondisclosure standard, "any trading done by Plaintiff before the [truth was revealed] was contemporaneous with the Individual Defendants' stock sales." (Pl's Br. at 54 (citing *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007)).) Neither case is compelling. In *Middlesex*, the plaintiff had submitted a declaration attesting that it had traded within a few days of certain individual defendants. 527 F. Supp. 2d at 1196. And the *Middlesex* court later found that trades made within five days were "within the bounds of 'contemporaneous' trading" under Section 20A, but that a two-year delay—a period similar to the Class Period here—was "*far beyond* the bounds of 'contemporaneous' trading." *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863

DOC (RNBx), 2008 WL 7084629, at *15 (C.D. Cal. July 10, 2008) (emphasis added). Thus, the *Middlesex* decisions do not support the proposition that the standard is as broad as Plaintiff contends.

The Court rejects Plaintiff's broad interpretation of "contemporaneously" under Section 20A. Without a broad interpretation of contemporaneity, Count IV fails almost entirely. The allegation that Defendants sold Tactile shares contemporaneously with class members, standing alone, does not satisfy the PSLRA and Rule 9(b). *See Middlesex*, 2008 WL 7084629, at *14 n.5 ("[E]ven if it were enough that other members of the class traded contemporaneously with Defendants, the allegation that 'Class members, including Lead Plaintiff, contemporaneously purchased Quest common stock . . .' would not be sufficient to satisfy Rule 9(b)."). The Complaint includes just one allegation of a contemporaneous stock sale: Rishe allegedly sold Tactile shares on Plaintiff's purchase date of December 10, 2019. (Compl. ¶ 234.) This trade satisfies the narrowest "same-day" trading rule.[30] Although the Complaint alleges other dates on which individual Defendants sold shares, (*id.* ¶¶ 221, 228, 231, 234, 237, 240, 242), it lacks factual allegations showing that Plaintiff or other putative class members purchased shares on or near the dates of those

---

[30] The Court notes that Folkes allegedly sold Tactile shares two days after Plaintiff's purchase on December 12, 2019. (Compl. ¶ 231.) Plaintiff does not assert that this sale was contemporaneous under the few-days standard applied by some district courts, possibly because "a growing number of courts have held that to be 'contemporaneous,' *plaintiffs'* trades must . . . only take place after the insider trading transaction at issue." *Fed. Nat'l Mortg.*, 503 F. Supp. 2d at 47 (emphasis added, collecting cases).

sales. The Complaint fails to allege facts supporting a Section 20A claim based on those trades, no matter if the Court interpreted the term "contemporaneously" as trading on the same day or within a few days.

Aside from Plaintiff's purchase and Rishe's sale on December 10, 2019, the Complaint does not allege facts suggesting any other class member's trades were made contemporaneously with Defendants. The Section 20A claims against Mattys, Blake, Folkes, Burke, Nigon, and Roche are therefore dismissed.

*Material, nonpublic information.* Defendants assert that the Section 20A claim lacks factual allegations identifying what material, nonpublic information each defendant possessed as of the dates of their Tactile share sales. (Defs' Br. at 42.) Only the Section 20A claim against Rishe for his December 10, 2019 sale remains, so the Court focuses on that claim. The Complaint alleges that Rishe, as SVP of Sales, was deeply involved in the sales strategy for Tactile's leading product Flexitouch, and closely tracked its sales. (Compl. ¶¶ 258–67.) The Complaint also alleges that Rishe touted the KOL program at Tactile's 2018 National Sales Meeting, well before entering into the 10b5-1 plan for the December 10, 2019 sale in November 2019. (Compl. ¶¶ 37, 234–36.) These allegations sufficiently allege that Rishe possessed the requisite material, nonpublic information.

*Exchange Act violation.* Finally, under Section 20A, an inside trader must have "committed an independent violation of the Exchange Act or SEC rules and regulations promulgated under that law." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175

(3d Cir. 2014). The Complaint alleges that individual Defendants (including Rishe) violated Section 10(b) of the Exchange Act. (Compl. ¶¶ 306–07.) The Court finds that this requirement is satisfied for Rishe because, as discussed above, the Complaint sufficiently pleads that he knew about the kickback schemes. The Court thus finds that the Complaint adequately alleges a Section 20A claim against Rishe.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Counts I, II, III, and IV remain pending except for the following claims against particular individual defendants:

1. Count I against Blake and Moen is DISMISSED;

2. Count II against Burke, Nigon, Roche, Blake, and Moen is DISMISSED;

3. Count III against Burke, Nigon, and Roche is DISMISSED; and

4. Count IV is DISMISSED against all individual Defendants except Rishe.

Dated: March 31, 2022                    BY THE COURT:

                                         s/Nancy E. Brasel
                                         Nancy E. Brasel
                                         United States District Judge