UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>TACTILE SYSTEMS TECHNOLOGY, INC., et al.,<br><br>                              Defendants. | Civ. No. 0:20-cv-02074-NEB-BRT<br><br><u>CLASS ACTION</u><br><br>MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS<br><br>[FILED UNDER SEAL] |

4894-7221-5602.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 4

        A.      Relevant Factual Background .......................................................... 4

        B.      The Meet and Confer Process ......................................................... 6

                1.      Search Parameters for Request Nos. 2 and 3 ................................... 7

                2.      Search Parameters for Documents Related to Referrals and
                        ROI Generated by KOL Program Speakers and Attendees .............. 8

                3.      Tactile's Area Sales Directors as Custodians for Request No.
                        9 ....................................................................................................... 9

                4.      Performance Assessments Responsive to Request No. 11 ............... 9

                5.      Search Parameters for Request Nos. 14, 15, 18, 19, and 20 ........... 10

III.    ARGUMENT ..................................................................................................... 11

        A.      Defendants Should Be Compelled to Run Lead Plaintiff's Search
                Terms Regarding the KOL and Contract Trainer Programs in the
                Individual Defendants' Custodial Files for Documents Responsive to
                Request Nos. 2 and 3 ...................................................................... 13

        B.      Defendants Should Be Compelled to Conduct an Adequate Search
                for Documents that Concern Tracking ROI and Referrals Generated
                by the KOL Program ...................................................................... 17

                1.      Documents Regarding KOL Speaker Referrals and ROI Are
                        Highly Relevant and Should Be Produced ...................................... 18

                2.      Documents Regarding Referrals and ROI Generated by KOL
                        Program Attendees Are Highly Relevant and Should Be
                        Produced ......................................................................................... 20

                3.      Defendants' Proposed Search Terms Are Deficient, and
                        Defendants Should Be Required to Adopt Lead Plaintiff's
                        Proposed Search Parameters ........................................................... 23

4894-7221-5602.v1

**Page**

C.   Defendants Should Be Compelled to Search the Area Sales Directors' Custodial Files for Documents Responsive to Request No. 9 ...................................................................................................... 25

D.   Defendants Should Be Compelled to Produce the Narrow Compromise Offered by Lead Plaintiff to Respond to Request No. 11 ...................................................................................................... 27

E.   Defendants Should Be Compelled to Run Lead Plaintiff's Search Terms for Document Request Nos. 14, 15, 18, 19, and 20 .......................... 29

IV.   CONCLUSION ............................................................................................. 32

4894-7221-5602.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*3M Innovative Props. Co. v. Tomar Elecs.*,
2006 WL 2670038 (D. Minn. Sept. 18, 2006) ............................................................. 3

*Beseke v. Equifax Info. Servs., LLC*,
2018 WL 6040016 (D. Minn. Oct. 18, 2018) ................................................. 11, 15, 31

*Country Mut. Ins. Co. v. Wade*,
2010 WL 3239105 (E.D. Mo. Aug. 13, 2010) ........................................................... 12

*Custom Hardware Eng'g & Consulting, Inc. v. Dowell*,
2012 WL 10496 (E.D. Mo. Jan. 3, 2012) .................................................................. 24

*Finisar Corp. v. Nisitica, Inc.*,
2014 WL 12887160 (N.D. Cal. Dec. 12, 2014).......................................................... 12

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) .................................................................................... 14

*Hickman v. Taylor*,
329 U.S. 495 (1947)................................................................................................... 11

*Hofer v. Mack Trucks, Inc.*,
981 F.2d 377 (8th Cir. 1992) .................................................................................... 11

*In re Envision Healthcare Corp. Sec. Litig.*,
2020 WL 6750397 (M.D. Tenn. Nov. 16, 2020) ....................................................... 12

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ....................................................................... 14

*Itasca Images, LLC v. Shutterstock, Inc.*,
2021 WL 6849104 (D. Minn. Nov. 22, 2021) ........................................................... 27

*Purcell v. Gilead Scis., Inc.*,
439 F. Supp. 3d 388 (E.D. Pa. 2020) ....................................................................... 21

*Rochester Drug Co.-Operative v. Mylan Inc.*,
2022 WL 1598377 (D. Minn. May 20, 2022)............................................................ 27

4894-7221-5602.v1

**Page**

*Rounds v. Hartford*,
  2021 WL 4150838 (D.S.D. Sept. 13, 2021)............................................................ 11, 12

*Shukh v. Seagate Tech., LLC*,
  295 F.R.D. 228 (D. Minn. 2013).............................................................................. 11

*United States ex rel. Bilotta v. Novartis Pharms. Corp.*,
  50 F. Supp. 3d 497 (S.D.N.Y. 2014)......................................................................... 21

*United States ex rel. Boise v. Cephalon, Inc.*,
  2015 WL 1724572 (E.D. Pa. Apr. 15, 2015) ............................................................ 21

*United States ex. rel. Brown v. Celgene Corp.*,
  226 F. Supp. 3d 1032 (C.D. Cal. 2016) ............................................................... 21, 22

*United States ex rel. Cairns v. D.S. Med., L.L.C.*,
  2020 WL 1873584 (E.D. Mo. Apr. 15, 2020),
  *rev'd and remanded on other grounds*,
  42 F.4th 828 (8th Cir. 2022) ................................................................................. 20

*United States ex. rel. Penelow v. Janssen Prods., LP*,
  2021 WL 6052425 (D.N.J. Dec. 21, 2021)........................................................... 19, 21

*United States ex rel. Veterans First Med. Supply, LLC v. Tactile Sys. Tech., Inc.*,
  No. 4:18-cv-02871 (S.D. Tex.) .................................................................................. 3

*United States v. Pfizer, Inc.*,
  188 F. Supp. 3d 122 (D. Mass. 2016),
  *aff'd*, 847 F.3d 52 (1st Cir. 2017) ...................................................................... 21, 22

*United States v. Procter & Gamble Co.*,
  356 U.S. 677 (1958)................................................................................................ 11

*United States v. Teva Pharm. USA, Inc.*,
  2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019)............................................................ 19

*Viet. Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*,
  8 F. Supp. 3d 188 (D. Conn. 2014)........................................................................... 24

*WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*,
  628 F.3d 1032 (8th Cir. 2011) .................................................................................. 11

4894-7221-5602.v1

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ........................................................................................................ 12
    §78t(a) ........................................................................................................ 12
    §78t-1 ......................................................................................................... 12

42 U.S.C.
    §1320a-7b(b) .............................................................................................. 4

Federal Rules of Civil Procedure
    Rule 26(b)(1) ........................................................................................ 11, 13

17 C.F.R.
    §229.303 .............................................................................................. 3, 4, 31

**SECONDARY AUTHORITIES**

8 Charles Alan Wright, et al., *Federal Practice and Procedure*
    §2001 (2d ed. 1994; 3d ed. updated Apr. 2022) ............................................ 3

Inspector General, *Special Fraud Alert: Speaker Programs* (Nov. 16, 2020),
    https://oig.hhs.gov/documents/special-fraud-
    alerts/865/SpecialFraudAlertSpeakerPrograms.pdf ....................................... 18, 19, 20

4894-7221-5602.v1

Lead Plaintiff St. Clair County Employees' Retirement System respectfully submits this Memorandum of Law in Support of Its Motion to Compel the Production of Documents. Despite engaging in extensive meet-and-confer negotiations, several disputes remain unresolved concerning Lead Plaintiff's First Set of Requests for Production of Documents to Defendants (the "Requests" and each individually a "Request") that were served on April 29, 2022. Ex. 1.[1]  Discovery, including fact depositions, closes on December 15, 2022.

## I.    INTRODUCTION

This securities fraud class action alleges that Tactile Systems Technology, Inc. ("Tactile") and several of its executives deceived investors with a growth story propped up by kickbacks and lies.[2]  While Defendants reported impressive revenue growth of 30% each quarter thanks to sales of Tactile's flagship product, Flexitouch, they concealed the role of two kickback schemes in boosting those sales.  The first kickback scheme involved Tactile's Key Opinion Leader ("KOL") program through which Tactile hosted so-called "medical education" events, often at high-end restaurants, complete with cocktail receptions.  Tactile illegally paid doctors and other healthcare providers to speak, with the goal of inducing both the speakers and the program attendees to prescribe, or induce others to prescribe, Flexitouch.  The second scheme was Tactile's contract trainer program, through which Tactile paid healthcare providers a flat fee to train Tactile's patients on how to use Tactile's

---

[1]    All "Ex. __" citations herein are to the Declaration of Ashley M. Price in Support of Lead Plaintiff's Motion to Compel Production of Documents.

[2]    Gerald Mattys, Lynn Blake, Brent Moen, Robert Folkes, and Bryan Rishe are the "Individual Defendants" and with Tactile, are the "Defendants" herein.  Additionally, citations are omitted and emphasis is added throughout unless otherwise indicated.

4894-7221-5602.v1

devices. Future assignments – and payments – to the contract trainers were based on whether the contract trainers had provided referrals to Tactile. As Defendants carried out these illicit internal sales programs, Defendants reported to the market that their "VA sales channel" and "Medicare sales channel" saw "strong growth" and "exceptionally strong sales," omitting the fact that kickbacks had contributed to that growth. Doubling down on their growth story, while providing investors information on the size Flexitouch's market, Defendants reported an inflated total addressable market ("TAM") figure.

The discovery disputes brought in this motion involve nearly every aspect of Defendants' fraudulent conduct. First, Defendants refused to offer a reasonable and good faith proposal for searching the Individual Defendants' files for documents and communications relating to the KOL and contract trainer programs. Second, after weeks of delay based on incorrect claims that Tactile did not track referrals generated from its KOL program, Defendants' belated proposal for searching for such documents and communications, including the return on investment ("ROI") generated by the KOL program's speakers and attendees, is grossly deficient. Third, despite the fact that Tactile's five top-level sales executives (the "Area Sales Directors") formed the information conduit between Tactile's sales force and its senior executives, Defendants have rejected Lead Plaintiff's proposal that their custodial files be searched for just one narrow Request relating to annual and quarterly sales reviews. Fourth, ignoring Lead Plaintiff's attempt to address burden, Defendants have refused to produce the performance assessments for a discrete number of salespeople, though evidence suggests that salespeople were evaluated on their ability to expand and use the KOL program to generate more Flexitouch sales. Finally,

- 2 -

4894-7221-5602.v1

Defendants have failed to propose reasonable search terms for documents relating to Lead Plaintiff's allegations concerning TAM, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), and financial reporting.

Defendants' refusal to produce records relevant to Lead Plaintiff's claims – and their unacceptable proposals for searching categories of undisputedly responsive records – flout the Federal Rules, which "impose a more liberalized procedure for pretrial discovery where 'every party to a civil action is entitled to the disclosure of all relevant information in the possession [of] any person, unless the information is privileged.'" *3M Innovative Props. Co. v. Tomar Elecs.*, 2006 WL 2670038, at *3 (D. Minn. Sept. 18, 2006), quoting 8 Charles Alan Wright, et al., *Federal Practice and Procedure* §2001 (2d ed. 1994; 3d ed. updated Apr. 2022). Moreover, Defendants have worn thin the suggestion that they have largely satisfied their discovery obligations by reproducing in this action the production made in the related *qui tam* litigation, *United States ex rel. Veterans First Med. Supply, LLC v. Tactile Sys. Tech., Inc.*, No. 4:18-cv-02871 (S.D. Tex.) (the "*Qui Tam* Production"). In fact, this case brings different legal claims with additional defendants and alleges a broader scope of misconduct. In short, Lead Plaintiff and the Tactile investors it represents are entitled to discovery addressing the issues at stake in this case.

Therefore, Lead Plaintiff respectfully requests that this Court order Defendants to: (1) run Lead Plaintiff's proposed search terms for Request Nos. 2, 3, and 7 in the Individual Defendants' custodial files; (2) in response to Request Nos. 2 and 7, run Lead Plaintiff's proposed search terms and search other central databases and repositories for documents that concern tracking ROI and referrals generated by the KOL program; (3) search the Area Sales

- 3 -

Directors' custodial files in connection with Request No. 9; (4) produce the performance assessments for the Veterans Affairs ("VA") and Government Accounts Managers in response to Request No. 11; and (5) run Lead Plaintiff's proposed search terms for the Requests concerning TAM, Item 303, and Tactile's financial reporting in response to Request Nos. 14, 15, 18, 19 and 22.

## II.    BACKGROUND

### A.    Relevant Factual Background

This is a securities fraud class action brought on behalf of all persons who purchased or otherwise acquired Tactile common stock between May 7, 2018 and June 8, 2020, inclusive (the "Class Period"). *See* Amended Class Action Complaint (ECF 49) (the "Complaint") at 5. Tactile is a medical technology company that develops and sells Flexitouch and other devices used to treat lymphedema and chronic venous insufficiency ("CVI") at home. ¶¶1-2.[3] The Court's order on Defendants' motion to dismiss upheld Lead Plaintiff's allegations that during the Class Period, Tactile and several of its senior executives, specifically, defendants Mattys, Blake, Moen, Folkes, and Rishe, had violated the federal securities laws, including by: (1) concealing two illicit kickback schemes that violated the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) ("AKS"), which made Defendants' public statements concerning Tactile's revenue growth and compliance with the law false and misleading; and (2) fraudulently inflating Tactile's reported TAM. ECF 81 at 27-28, 29-30, 32-33, 35-36, 53, 55-56.

---

[3]    All "¶_" or "¶¶_" references herein are to the Complaint.

- 4 -

The first scheme involved Tactile's KOL program, through which Tactile paid doctors, often thousands of dollars, to give presentations on Flexitouch, lymphedema, and CVI to other healthcare providers. ¶¶37-39. The doctors who spoke at the KOL events were described by Tactile as "clinicians who have a high referral rate to us . . . and have a well-known and highly credible background with which to influence others." ¶37. While the ostensible purpose of the KOL program was "medical education," Defendants used the KOL program to remunerate high-prescribing healthcare providers to induce them to prescribe or influence other healthcare providers to prescribe Flexitouch. *Id.* Because Tactile often hosted the KOL events at high-end restaurants preceded by meet-and-greets with drinks, KOL speakers and attendees received free dining and beverages as a another form of illicit remuneration. ¶41.

To ensure that the events were having their intended effect – *i.e.*, inducing more healthcare providers to order Flexitouch – Tactile's sales and marketing teams tracked ROI and referrals generated by event attendees and speakers. *Id.* Tactile's sales and marketing personnel were also responsible for determining event speakers and invitees, and they were cautioned against inviting program attendees who had never ordered Flexitouch. *Id.* According to a "Special Fraud Alert" issued by the Department of Health and Human Services, Office of the Inspector General, these (and other) features of Tactile's KOL program were considered "suspect characteristics" of medical speaking events. ¶39.

Tactile's second kickback program for inducing sales was its contract trainer program. Through this program, Tactile paid non-physician healthcare providers (usually physical therapists and nurses) to travel to patients' homes and train them on how to use Flexitouch.

- 5 -

¶43.  Tactile paid the trainers roughly $150 per training, with some trainers receiving more than $15,000 per year.  ¶¶44, 47.  These trainers were often employed at the same medical facilities where Tactile attempted to sell Flexitouch, and they were in a position to recommend that physicians prescribe Flexitouch.  ¶44.  As the Complaint alleges, Tactile intended to use the contract trainer payments to induce contract trainers to order – or influence others to order – Flexitouch.  ¶46.

To assure investors that Tactile's revenue growth was sustainable, Defendants also reported that their TAM was at least *$4 billion*.  ¶¶57, 60.  TAM was calculated by multiplying the total number of lymphedema patients in the U.S. by the average cost of Tactile's products.  ¶58.  The Complaint alleges that Defendants falsely inflated their TAM by exaggerating the total number of U.S. lymphedema patients and failing to account for the fact that a lymphedema diagnosis only seldom resulted in a prescription of Flexitouch, which, as an advanced pneumatic compression device ("PCD"), was considered a treatment of "last resort."  ¶¶59-72.

When the truth about Defendants' illegal kickback schemes and fraudulent misrepresentations was revealed, Tactile's stock price dropped significantly, damaging Lead Plaintiff and other Tactile investors.  ¶¶210-218.

## B.    The Meet and Confer Process

Lead Plaintiff served its First Request for Production of Documents to Defendants on April 29, 2022 (Ex. 1).  Over the next four months, the parties conferred extensively on the Requests' scope and appropriate search parameters to collect responsive documents and communications.  Although the protracted negotiations resulted in numerous areas of

- 6 -

4894-7221-5602.v1

compromise, the parties have reached an impasse on several important topics, summarized below.

### 1. Search Parameters for Request Nos. 2 and 3

Throughout the entire meet and confer process, Defendants have attempted to use the *Qui Tam* Production reproduced in this case as an excuse to skirt their obligation to search for and produce documents responsive to the Requests in **this** case. Exs. 2-4. This is especially true for Request Nos. 2 and 3, which are central to this case. Request No. 2 seeks all documents related to the KOL program, and Request No. 3 seeks all documents related to the contract trainer program. Ex. 1 at 8-10.

Because Defendants Mattys, Folkes, Moen, and Blake were not document custodians in the *qui tam* action, Lead Plaintiff repeatedly raised with Defendants during the meet and confer process the fact that the *Qui Tam* Production would not encompass documents on the critical topics for those critical individuals. *See, e.g.*, Exs. 3, 5-6. And while Defendants acknowledged that searches of the Individual Defendants' custodial files would be undertaken, their search term proposal completely ignored these Requests. Ex. 7. Only after Lead Plaintiff stated its intent to raise the issue with this Court did Defendants propose search terms for Request Nos. 2 and 3: (("key opinion leader" or "KOL") or trainer*) w/50 (fraud* or kickback* or "AKS" or audit* or investigat*). Exs. 6, 8. But such overly restrictive search terms can barely be called a token attempt to compromise, and thus necessitated Lead Plaintiff's motion on this issue.

4894-7221-5602.v1

**2. Search Parameters for Documents Related to Referrals and ROI Generated by KOL Program Speakers and Attendees**

Documents responsive to Request Nos. 2 and 7 include documents concerning the referrals and ROI that Tactile obtained through its KOL programs.  *See* Ex. 1 at 8 (Request No. 2 broadly seeks "[a]ll documents and communications concerning Tactile's Key Opinion Leader program . . . .") and at 11 (Request No. 7 seeks revenue related to Flexitouch sales to the VA and CMS, "including as a result of referrals from the Key Opinion Leader or contract trainer programs.").  However, Defendants refused to produce documents regarding the KOL program's referrals or ROI, claiming that: (1) with regard to its KOL speakers, Tactile did not track the referrals or ROI that they generated; and (2) with regard to the KOL program attendees, under Defendants' narrow reading of the Requests, Lead Plaintiff never specifically requested documents relating to the referrals or ROI they generated, and moreover, that tracking ROI and referrals generated by KOL program attendees was not "surprising or illicit."  Exs. 4, 9.

On August 19, 2022, Lead Plaintiff informed Defendants that it intended to raise this matter with the Court.  Ex. 10.  Only then did Defendants propose the following search terms: ("key opinion leader" or "KOL" or "speaker" or "attendee" or "medical education") w/50 ("ROI" or "return on investment" or refer*).  Ex. 8.  For the reasons discussed below, these search terms should be broader, and Defendants should also search repositories for these documents.

4894-7221-5602.v1

### 3. Tactile's Area Sales Directors as Custodians for Request No. 9

Lead Plaintiff initially requested that Defendants include the Area Sales Directors as custodians on July 1, 2022. Ex. 11. Over the next month and a half, the parties discussed the Area Sales Directors, but were unable to reach an agreement, despite Lead Plaintiff's attempt to address Defendants' burden concerns and search the Area Sales Directors' custodial files in response to only one request, specifically Request No. 9, which seeks documents and communications concerning Tactile's quarterly and annual sales reviews. Exs. 5, 6, 8. On August 19, 2022, Lead Plaintiff sent a letter to Defendants that again explained the necessity of including the Area Sales Directors as custodians for this sole request, and communicated Lead Plaintiff's intent to raise the matter with this Court. Ex. 6. On August 25, 2022, Defendants confirmed that the parties had reached an impasse concerning the "Area Sales Directors." Ex. 8.

### 4. Performance Assessments Responsive to Request No. 11

Request No. 11 originally sought "Performance evaluations for the sales personnel in Tactile's VA sales channel." Ex. 1 at 12. Defendants objected to this request as overly broad, irrelevant, and seeking private personal information. Exs. 2 at 19; 4, 9. In an attempt to compromise, Lead Plaintiff narrowed the Request to performance evaluations for VA and Government Account Managers and stated that Defendants could produce the reviews with private personal information redacted. Exs. 3, 5. Defendants rejected Lead Plaintiff's proposed compromise and parroted the objections from their Joint Written Response (Ex. 2). *See* Ex. 9. Defendants did not explain why the search would be unduly burdensome or why

the reviews would not be relevant.  *Id.*  Accordingly, on August 19, 2022, Lead Plaintiff informed Defendants that it intended to raise this matter with the Court.  Ex. 6.

### 5.   Search Parameters for Request Nos. 14, 15, 18, 19, and 20

Defendants originally proposed search parameters on July 20, 2022, including for Request Nos. 14, 15, 18, 19, and 20.  Ex. 7.  However, Defendants' search parameters were across the board overly narrow, passed over several outstanding issues regarding custodians, and, for numerous Requests, failed to provide *any* proposed search term at all.  Given these deficiencies – and that the parties were still negotiating the scope of multiple Requests – crafting a counter-proposal to Defendants' proposed search parameters took considerable time and effort.  Nevertheless, on August 12, 2022, Lead Plaintiff sent its counter-proposal to Defendants' proposed search parameters, and the parties set a meet and confer to discuss the search parameters on August 19, 2022 at 9:30 a.m. PT.  Exs. 12, 13.

At approximately 8:00 p.m. PT the night before the parties' scheduled meet and confer on search parameters, Defendants sent a letter informing Lead Plaintiff that Defendants had – with no warning of any kind – run their original proposed search terms for Request Nos. 14, 15, 18, 19, and 20. Ex. 14.  During the meet and confer the next day, Lead Plaintiff expressed its dismay at Defendants proceeding with search terms that had not been agreed to and without informing Lead Plaintiff until after they were run and collected.  Lead Plaintiff accordingly requests that Defendants be compelled to run Lead Plaintiff's proposed search terms for Request Nos. 14, 15, 18, 19, and 20.

4894-7221-5602.v1

## III.    ARGUMENT

The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).  As the Supreme Court has recognized, "[m]odern instruments of discovery serve a useful purpose" to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation")).  Indeed, the Eighth Circuit has affirmed that "[b]road discovery is an important tool for the litigant." *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1039 (8th Cir. 2011).

"Generally, any matter 'relevant and reasonably calculated to lead to the discovery of admissible evidence' is discoverable." *Beseke v. Equifax Info. Servs., LLC*, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018) (quoting *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)).  And "'[i]nformation is generally discoverable unless it is clear that the information sought has **no bearing** upon the subject matter of the action.'" *Id.* at *3 (quoting *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 237 (D. Minn. 2013)).

The party seeking discovery must make a "'threshold showing'" that the information requested falls within Rule 26's "broad and liberal scope of discovery." *Id.*  Once that showing is made, the "'party resisting discovery must show specifically how each . . . request for production is not relevant or how each question is overly broad, burdensome, or oppressive.'" *Rounds v. Hartford*, 2021 WL 4150838, at *9 (D.S.D. Sept. 13, 2021),

- 11 -

4894-7221-5602.v1

*adopted*, 2022 WL 703204 (D.S.D. Mar. 9, 2022).  To satisfy this heavy burden, the resisting party must specifically detail the reasons why each request is improper.  *Id.*

None of the Requests sought herein are unduly burdensome, duplicative, or disproportionate to the needs of the case.  Having refused to run the searches requested, Defendants provided Lead Plaintiffs scant details as to what burden these searches purportedly cause, much less the number of additional documents on which Lead Plaintiff's search terms hit.  *See Country Mut. Ins. Co. v. Wade*, 2010 WL 3239105, at *1 (E.D. Mo. Aug. 13, 2010) ("Bare assertions that the discovery requested is overly broad, unduly burdensome, oppressive, or irrelevant are ordinarily insufficient to bar production."); *Finisar Corp. v. Nisitica, Inc.*, 2014 WL 12887160, at *2-*3 (N.D. Cal. Dec. 12, 2014) (to claim burden based on the number of hits from a search term, that party must provide the opposing party with the number of hits).  Instead, Defendants have largely resisted further searches by maintaining the obstructionist position that simply reproducing the *Qui Tam* Production suffices.  It does not, nor can it be considered duplicative when most of the Individual Defendants' custodial files were not even searched in the *qui tam* litigation.  Furthermore, Lead Plaintiff need not establish that the *Qui Tam* Production or Defendants' narrower search proposals are deficient to successfully compel discovery of relevant documents.  *In re Envision Healthcare Corp. Sec. Litig.*, 2020 WL 6750397, at *4 (M.D. Tenn. Nov. 16, 2020).

Finally, the Requests sought herein are not disproportionate to the needs of the case which involves: (a) establishing violations of the Anti-Kickback Statute *and* claims of securities fraud brought under §§10(b), 20(a), and 20A of the Securities Exchange Act of

4894-7221-5602.v1

1934; (b) proving claims against six defendants, including a well-resourced corporate defendant, Tactile; (c) establishing these claims for a Class Period lasting over two years; and (d) seeking relief for the economic losses suffered by hundreds, if not thousands, of Tactile investors. *See* Fed. R. Civ. P. 26(b)(1) (the court must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit"). Under these considerations and as further described below, compelling Defendants' production of the Requests specified herein is justified.

**A.     Defendants Should Be Compelled to Run Lead Plaintiff's Search Terms Regarding the KOL and Contract Trainer Programs in the Individual Defendants' Custodial Files for Documents Responsive to Request Nos. 2 and 3**

Request Nos. 2 and 3, which seek documents regarding the KOL and contract trainer programs, respectively, were directed to the Individual Defendants, not just Tactile – a fact Defendants appear to have ignored. Instead, Defendants have attempted to abdicate their discovery obligations by relying on the reproduction of the *Qui Tam* Production. Yet the *qui tam* litigation did not collect documents from most of the Individual Defendants, including Chief Executive Officer ("CEO") Mattys. Now offering only the most constricted search proposals, Defendants have all but refused to search the Individual Defendants' custodial files for documents concerning the two sales programs at the crux of Defendants' kickback schemes. Yet, what information the Individual Defendants knew, or had access to, regarding how Tactile used the KOL and contract trainer programs to induce Flexitouch sales is the

- 13 -

lynchpin in proving scienter and Lead Plaintiff's securities fraud claims. On its face, a production that fails to search the Individual Defendants' communications and documents regarding the sales programs at issue is inadequate and prejudicial.

There can be no dispute that to prove its securities fraud claims, Lead Plaintiff must establish that Tactile and Individual Defendants Mattys, Folkes, and Rishe knew or were recklessly indifferent to the ongoing kickback schemes involving these programs. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (describing the "classic" scienter fact pattern where defendants published statements but "they knew facts or had access to information suggesting that their public statements were materially inaccurate"); *see also In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 896 (D. Minn. 2011) ("The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity."). Therefore, searches in the Individual Defendants' custodial files regarding the KOL and contract trainer programs would produce highly relevant documents speaking to Defendants' knowledge about the use of these programs to illicitly induce sales of Flexitouch.

Yet, to date, Defendants' proposals for searching these crucial topics in the Individual Defendants' files have been grossly inadequate. Defendants initially responded that many of the responsive documents, with the exception of a couple discrete categories, would be produced as a result of the reproduction of the *Qui Tam* Production. Ex. 2 at 4, 6. However, the custodial files for Individual Defendants Mattys, Folkes, Moen, and Blake were ***never***

- 14 -

searched in the *qui tam* litigation.[4] While defendant Rishe's custodial files were searched in the *qui tam* litigation, the *qui tam* action **only applied three narrow terms** regarding the KOL and contract trainer programs – specifically: ("key opinion leader"), ("training" and "referral"), and ("train!" and "assign"). But Tactile used several other terms to discuss these programs and their resulting sales, including "KOL" or "contract trainer," which were not searched in the *qui tam* litigation. Thus, Defendants' suggestion that they have satisfied their discovery obligations by simply offering a copy-paste of the *Qui Tam* Production is clearly deficient when the files and email for four Individual Defendants in this case were never searched in the *qui tam* litigation, and for defendant Rishe, were searched using only narrow terms.

Having never searched most of the Individual Defendants' custodial files, Defendants cannot – nor have they thus far – claimed that such a search would be duplicative. Their burden contentions, to the extent they have made any, remain vague suggestions that the searches would only result in voluminous documents regarding the claimed innocent purposes of the sales programs. Yet, even if there are documents that are irrelevant to the kickback allegations, "[t]he possibility of returning false hits does not create a burden." *Beseke*, 2018 WL 6040016, at *5. Moreover, Defendants' protests put the cart before the horse: no plaintiff needs to prove that the alleged conduct was unlawful **before** obtaining the documents relevant to the conduct. Similarly, Defendants' repeated insistence that the *qui*

---

4    As a demonstration of the dearth of documents produced thus far on these key sales programs from the Individual Defendants' files, there are only 12 documents with the phrase "key opinion leader" for which defendant Mattys is a custodian, and all of them are SEC Forms 10-K or drafts thereof.

*tam* plaintiff dismissed its case is not evidence that the misconduct did not occur. Such a contention is irrelevant to Defendants' obligation to search and produce the documents responsive to Lead Plaintiff's document requests. Because Lead Plaintiff ***in this case*** – not the *qui tam* litigation – must show that the Individual Defendants knew or recklessly disregarded that the misconduct was taking place, the Individual Defendants' documents must be searched and produced.

Defendants' efforts to compromise ignore reality and impose connectors that require "KOL" to be within 50 words, or approximately two sentences, of (fraud* or kickback* or "AKS" or audit* or investigat*). Such a proposal can hardly be offered in good faith. It would all but require the Individual Defendants' communications to draw legal conclusions of their activities and even to admit guilt – a rather incredible form of discourse for a CEO or Chief Operating Officer to engage in when conducting their daily business. Defendants' proposal ignores Individual Defendants' oversight of the programs and their day-to-day communications in which they might be receiving or considering the programs' effects on Flexitouch prescriptions. Such documents offer the very evidence Lead Plaintiff needs to establish the Individual Defendants' knowledge of, or access to information concerning, the KOL and contract trainer programs.

To reasonably obtain relevant documents from the Individual Defendants' files and communications, Lead Plaintiff proposed on August 12, 2022 the search terms below, which are limited by applying the time period of January 1, 2018 through September 30, 2020 and using the five Individual Defendants as custodians:

- 16 -

4894-7221-5602.v1

**Request No. 2**

| Mattys, Gerald<br>Blake, Lynn<br>Moen, Brent<br>Folkes, Robert<br>Rishe, Bryan | "key opinion leader" or "key opinion leaders" or "KOL" or ("medical education" /3 program!) or (physician! /3 speak!) or "P2P" or "peer to peer" or "peer-to-peer" or (speak! w/3 program!) or (speak! /3 bureau! or "speaker event" or "speaker presentation") |
| --- | --- |

**Request No. 3**

| Mattys, Gerald<br>Blake, Lynn<br>Moen, Brent<br>Folkes, Robert<br>Rishe, Bryan | (trainer! or (train! w/100 therapist! or "RN" or nurse! or contract!)) /250 (order! or refer! or prescription! or prescrib! or pay! or paid! or remunerat! or "AKS" or kickback! or compensat! or budget! or expense! or cost! or reimburs! or assign! or enroll! or recuit! or influenc! or connection! or comply! or compli! or monitor! or "ROI" or "return on investment" or quota! or strateg! or target! or account! or lead! or revenue! or income! or sale! or "FTOC" or "VA" or "veterans affairs" or "veteran's affairs" or "veterans administration" or "veteran's administration" or "@va.gov" or "CMS" or "C.M.S." or medicare or medicaid or "@cms.hhs.gov") |
| --- | --- |

Ex. 13. Defendants' collection, review, and production of documents hitting on these search terms for Request Nos. 2 and 3 is necessary to discover what information the Individual Defendants knew, or deliberately disregarded, concerning whether Tactile's KOL and contract trainer programs engaged in misconduct that violated the AKS.

**B.    Defendants Should Be Compelled to Conduct an Adequate Search for Documents that Concern Tracking ROI and Referrals Generated by the KOL Program**

Documents that concern tracking referrals and ROI generated by KOL program attendees and speakers are responsive to Request Nos. 2 and 7, and are highly relevant to

- 17 -

4894-7221-5602.v1

Lead Plaintiff's claims as evidence that illegal kickback practices impacted Tactile's reported sales.  Indeed, the Office of the Inspector General ("OIG") for the Department of Health and Human Services recently stated that tracking ROI generated by speaker program attendees and speakers is highly "suspicious."  *See* Dep't of Health and Human Servs., Office of Inspector General, *Special Fraud Alert: Speaker Programs* (Nov. 16, 2020) ("OIG Special Fraud Alert"), https://oig.hhs.gov/documents/special-fraud-alerts/865/SpecialFraudAlert SpeakerPrograms.pdf.

Nonetheless, throughout the entire meet and confer process, Defendants refused to search for such documents, claiming – inaccurately – that they did not track KOL speaker ROI and referrals and that tracking referrals made by KOL attendees is a permitted business practice.  Ex. 4.  Only after Lead Plaintiff informed Defendants that it intended to raise this matter with the Court, Defendants feigned an attempt to compromise by proposing extremely restrictive search terms.  Ex. 8.  Defendants' evade-and-delay tactic should not be permitted, and they should be required to conduct an adequate search for these crucial documents.

### 1.   Documents Regarding KOL Speaker Referrals and ROI Are Highly Relevant and Should Be Produced

From the outset of the meet and confer process, Defendants attempted to avoid producing documents concerning tracking KOL speaker referrals and ROI by arguing that the documents did not exist because Tactile did not track such referrals.  Ex. 4.  But a review of the *Qui Tam* Production belies Defendants' assertion.  *See, e.g.*, Ex. 15 and ¶37 ("Key Opinion Leaders or KOLs are clinicians who have a ***high referral rate*** to us"); Ex. 16 (listing Dr. Baltazar's 2019 prescriptions); Ex. 17 (listing physician referrals over an 18-

month period, including referrals by, for example, KOL speakers Dr. Satwah, Dr. Melin, and Dr. Karni); Ex. 18 at 20 (discussing Tactile's "Top Doctor Report" which "[s]hows total referrals . . . by physician"). Moreover, Jackie Gorham, a former Area Sales Director for Tactile, testified during her deposition in the *qui tam* action that Tactile's marketing department measured whether referrals increased after a KOL event, stating: "The goal was, when we brought a KOL person in, they would track after that KOL left if our referrals went up.· That was the goal.· We were measured on that." Ex. 19 at 152:20-152:23.

Documents that concern tracking referrals and ROI generated by KOL program speakers are critical to this case because they bear directly on whether Defendants paid their KOL speakers with the intent to induce the speakers to order or influence others to order Flexitouch. *See, e.g.*, *United States ex. rel. Penelow v. Janssen Prods., LP*, 2021 WL 6052425, at *11 (D.N.J. Dec. 21, 2021) ("a reasonable jury could conclude that one purpose of [defendant's] [s]peaker [p]rograms was to induce the physicians to prescribe more [of defendant's products]" in part because the defendant "tracked the ***prescriptions*** of the paid ***speakers***"); *United States v. Teva Pharm. USA, Inc.*, 2019 WL 1245656, at *13 (S.D.N.Y. Feb. 27, 2019) (denying defendant's motion for summary judgment on violations of the AKS because "[t]he sales representatives responsible for a given region, as well as their managers, closely tracked prescriptions of all health care providers for whom they were responsible, ***especially paid speakers***"); OIG Special Fraud Alert at 5-6 (warning that it is "suspect" when a company selects "***speakers*** or attendees based on past or expected revenue that the ***speakers*** or attendees have or will generate by prescribing or ordering the company's product(s)"). Documents showing that Tactile tracked whether their KOL speakers

- 19 -

prescribed Flexitouch evidences Tactile's intent when providing payments and perks to those doctors, and is important to establishing the underlying AKS violations that were concealed from investors when Defendants made false and misleading statements reporting on their revenue growth and compliance with the law.

**2.    Documents Regarding Referrals and ROI Generated by KOL Program Attendees Are Highly Relevant and Should Be Produced**

Documents that concern tracking referrals and ROI generated by KOL attendees are also plainly relevant to Lead Plaintiff's claims because they bear on Defendants' intent to use the KOL program to pay healthcare providers to induce them to order or influence others to order Flexitouch.  *See United States ex rel. Cairns v. D.S. Med., L.L.C.*, 2020 WL 1873584, at \*2 (E.D. Mo. Apr. 15, 2020), *rev'd and remanded on other grounds*, 42 F.4th 828 (8th Cir. 2022) ("The Anti-Kickback Statute is violated if . . . [a]t least one purpose for the solicitation or receipt of the remuneration was in return for arranging for or recommending the purchasing or ordering of an item . . . .").  These documents are also directly relevant to Lead Plaintiff's allegations that Defendants invited KOL program attendees who had ordered a Flexitouch device in the past and then remunerated those same attendees with lavish dinners and cocktail receptions.

The OIG and courts across the country recognize that tracking speaker program attendee referrals and ROI is a "suspect characteristic" of speaker programs.  *See* OIG Special Fraud Alert at 6 (warning that it is "suspect" for a company to select "speakers or **attendees** based on past or expected revenue that the speakers or **attendees** have or will generate by prescribing or ordering the company's product(s) (*e.g.*, a return on investment

- 20 -

analysis is considered in identifying **participants**)”); *see also Janssen Prods.*, 2021 WL 6052425, at \*11 (“a reasonable jury could conclude that one purpose of [defendant’s] [s]peaker [p]rograms was to induce the physicians to prescribe more [of defendant’s products]” in part because the defendant “tracked the prescriptions of the paid speakers **and** all **attendees** . . . to monitor the return on investment of its [s]peaker [p]rograms”) (emphasis in original and added).

Tracking speaker program attendee referrals and ROI is especially suspect where, as here, those same attendees are remunerated with lavish dinners and cocktail receptions. *See United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 517-18 (S.D.N.Y. 2014) (upholding a complaint concerning kickbacks paid to doctors that were either “**attendees** or speakers at lavish . . . speaker events” in part because the doctors “increased their prescriptions for [defendant’s] drugs, after **attending** speaker events”); *United States ex rel. Boise v. Cephalon, Inc.*, 2015 WL 1724572, at \*11 (E.D. Pa. Apr. 15, 2015) (upholding allegations that “‘expensive meals’” “‘also served as kickbacks to the attendees’”); *Purcell v. Gilead Scis., Inc.*, 439 F. Supp. 3d 388, 392 (E.D. Pa. 2020) (upholding a complaint concerning speaker programs in part because the “sales and marketing team selected paid **invitees** based on data about prescription writing volume and habits”).

Accordingly, Defendants’ argument that there is “nothing surprising or illicit” about tracking KOL attendee referrals and ROI contravenes case and regulatory precedent. Ex. 4.[5]

---

[5]   To the extent that Defendants continue to rely on *United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122 (D. Mass. 2016), *aff’d*, 847 F.3d 52 (1st Cir. 2017) and *United States ex. rel.*

- 21 -

It is also beside the point. In discovery, parties are not required to prove that activity is illegal in order to obtain any discovery on the conduct in the first place. Further, Defendants' argument that Lead Plaintiff never alleged the KOL program attendees were remunerated through the speaker program is disingenuous at best, given that these allegations are stated clearly in the Complaint:

> ***Tactile also hosted lavish dinners and extravagant "cocktail receptions" for high-referring health care providers***. The dinners were organized by Tactile's marketing department and hosted by salespeople. ***When determining the event's invitees, the Company identified "warm" leads and accounts that had referred patients before the event. Tactile was also careful not to invite health care providers that it thought may not provide a great return on investment***. For example, in one conversation, a Tactile employee stated: "I feel hesitant to have Dr. Satwah or any other MDs fly out to speak to a group which I am not confident will render a great ROI."

¶41; *see also* ¶37 ("Tactile ran a Key Opinion Leader ("KOL") program under which it remunerated healthcare providers to induce them to promote and prescribe its products.").[6]

---

*Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032 (C.D. Cal. 2016), to show that tracking KOL attendee referrals and ROI is benign, that reliance is misplaced. Importantly, both cases were decided in 2016 – four years before the OIG Special Fraud Alert highlighted that tracking attendee ROI and referrals was "suspect." Further, neither case involved allegations that the attendees themselves were illicitly remunerated in exchange for referrals, or that the defendants selected attendees based on past referral practices, as occurred here. *See Celgene*, 226 F. Supp. 3d at 1055 (discussing whether a "speaker program was intended to influence the **speakers'** prescribing decisions") (emphasis in original); *Pfizer*, 188 F. Supp. 3d at 134-36; *see also* ¶41.

[6]   What documents have been produced regarding Tactile wining and dining KOL attendees with the purpose of increasing Flexitouch referrals confirm these allegations. *See, e.g.*, Ex. 20 (detailing a KOL event held at III Forks Steakhouse with a "meet and greet with drinks" to precede the speaking event); Ex. 21 (same); Ex. 22 (detailing a KOL event held at The Winery Restaurant, also with a "meet and greet with drinks"); Ex. 23 (discussing that "audience matters" for KOL events, and encouraging salespeople to "plan your event around" providers that had already prescribed at least one Tactile device; also discussing "[p]lanning an event and Tracking ROI"); Ex. 24 (tracking referrals three and six months before and after KOL events); Ex. 25 (email from Megan Mosbek to Kristen Weaver stating,

4894-7221-5602.v1

Equally baseless considering Lead Plaintiff's broad Requests concerning the KOL program are Defendants' assertions that Lead Plaintiff had "pivot[ed]" to request documents concerning referrals and ROI related to the KOL program attendees. Ex. 12. Thus, Defendants' arguments to the contrary should be set aside and documents concerning referrals and ROI obtained from KOL program attendees should be produced.

### 3. Defendants' Proposed Search Terms Are Deficient, and Defendants Should Be Required to Adopt Lead Plaintiff's Proposed Search Parameters

After arguing for months that they would not produce documents that concerned tracking KOL speaker and attendee ROI and referrals, Defendants agreed – less than one week before their substantial completion date – to search for responsive documents. Ex. 9. However, Defendants' proposed searches fall well short of adequate. First, the proposed search terms are impermissibly narrow and likely to exclude a high number of relevant documents. Second, Defendants declined searching any document repositories or databases, such as their FileMaker and Info Source systems, where relevant documents are likely kept. *See* ¶265.

Defendants' proposed search term for this topic – ("key opinion leader" or "KOL" or "speaker" or "attendee" or "medical education") w/50 ("ROI" or "return on investment" or refer*) – is likely to miss large numbers of relevant documents responsive to Request Nos. 2 and 7. For example, if documents showed Tactile employees were tracking "orders" for a specific KOL program attendee or speaker, those documents would be missed by

"[a]ttendees – each event has a sign in sheet and we need to get those from the rep host after the event and save them, we enter them into FileMaker to track ROI").

- 23 -

Defendants' proposed search terms. These terms would also miss documents in which Tactile employees listed prescriptions by specific doctors. *See, e.g.*, Ex. 16 (listing Dr. Baltazar's 2019 prescriptions); *see also Viet. Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 217 (D. Conn. 2014) (noting that search terms seemed "too narrow" because "potentially relevant documents may not have been retrieved by the search").

Therefore, as part of their search and collection process for the search terms proposed above (§III.A) for Request No. 2, Defendants should be required to include all documents and communications that concern tracking, noting, listing, or showing referrals and ROI garnered from the KOL program, its speakers, and its attendees. Defendants should also be required to search their repositories and databases like FileMaker and Info Source that are likely to contain responsive documents. For example, the *Qui Tam* Production revealed that Defendants tracked ROI for its KOL program through the program FileMaker. *See, e.g.*, Ex. 25 ("Attendees – each event has a sign in sheet and we need to get those from the rep host after the event and save them, we enter them into FileMaker to track ROI"). To the extent that other repositories exist that are likely to include responsive documents, Defendants should be required to search those repositories.

Defendants have offered no evidence that running a more fulsome search for these documents would be unduly burdensome or otherwise unacceptable, and Defendants cannot continue to object to this reasonable search without providing evidence that the search should not be run. *See Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, 2012 WL 10496, at *3 (E.D. Mo. Jan. 3, 2012) ("Defendants object that Plaintiff's list contains

- 24 -

common terms that will produce an unreasonable number of irrelevant results. Defendants have shown the Court no evidence in support of this claim.").

    **C.**      **Defendants Should Be Compelled to Search the Area Sales Directors' Custodial Files for Documents Responsive to Request No. 9**

Defendants have refused to search the custodial files of ***any*** Area Sales Director for ***any*** document request.  As discussed exhaustively during the meet and confer process, the Area Sales Directors are important witnesses to Tactile's efforts to sell Flexitouch, including through its KOL and contract trainer programs.  Exs. 5-6.  Reporting directly to defendant Rishe, the Area Sales Directors were Tactile's next highest-level sales executives and responsible for running one of the roughly five sales regions Tactile had partitioned nationally.  *See* Ex. 19 at 17:8-17:15.

Despite their critical role in Tactile's sales force, to reach a compromise, Lead Plaintiff proposed that Defendants search the Area Sales Directors' files in connection with only ***one*** request – Request No. 9, which seeks documents and communications concerning the preparations and presentations for Tactile's Quarterly Business Reviews ("QBR's") and Annual Sales Meetings ("NSM's") for 2018, 2019, and 2020.  The Area Sales Directors' documents and communications concerning the QBR's and NSM's are directly relevant to this case because they will likely involve communications about Tactile's sales tactics (including the KOL and contract trainer programs), their effectiveness, and any problems and resolutions concerning those sales programs.  These documents are also likely to show the Area Sales Directors communicating regarding sales directives from defendant Rishe and the other Individual Defendants, sales efforts that were rewarded, and how best to promote sales,

- 25 -

including through the KOL and contract trainer programs.  Because the QBR's involved reports from the Area Sales Directors to, among others, defendants Rishe and Mattys, these documents are also critical to establishing what the Individual Defendants knew about the KOL and contract trainer programs.

Documents from the *Qui Tam* Production reviewed to date confirm that the Area Sales Directors' documents concerning the QBR's and NSM's are plainly relevant to this case.  *See, e.g.*, Ex. 26 (email from defendant Rishe to area directors stating that defendant Mattys wanted the area directors to present the following at an upcoming QBR: "Highest Priorities within your Area or Region"; "Issues or Challenges that are impeding your progress"; and "Solutions – what can be done to address them"); Ex. 27 (Jackie Gorham's first quarter QBR "Sales Update" which included as a goal for the sales team: "Re-engaging the VA channel" and a "CURRENT STATE OF BUSINESS" to report to defendants Rishe and Mattys); Ex. 28 at 10, 34 and ¶37 (defendant Rishe's 2018 NSM slide notes for his presentation given to Tactile's sales team: "KOL SPEAKERS PROGRAM – THE MOST EFFECTIVE TOOL EVER FOR GAINING ACCESS IN YOUR HARD TO SEE ACCOUNTS AND A STRONG COORELATION [sic] TO IMMEDIATE NEW REFERRALS").

Defendants cannot reasonably claim that searching these custodial files would be unduly burdensome, duplicative, or disproportionate to the needs of the case.  First, this search was not run for the *Qui Tam* Production, which solely focused on the western region where the *qui tam* relator was located.  Therefore, only one Area Sales Director's custodial files were searched at all.  By requesting the Area Sales Directors' custodial files be searched

- 26 -

solely for quarterly and yearly sales reviews, Lead Plaintiff has addressed Defendants'

burden arguments by foregoing a broader search in their custodial files of all documents and

communications concerning the KOL and contract trainer programs – even though such

searches would be highly relevant and responsive to the Requests.  Instead, Lead Plaintiff

has made a reasonable compromise for documents and communications that essentially deal

with the highlights from each quarter, when information is passed from the sales force to

senior executives.  Second, the complexity of this case – a class action involving millions of

dollars in damages, five individual defendants, one corporate defendant, multiple violations

of the federal securities law and AKS – weighs in favor of compelling Defendants to search

these additional custodians' files in connection with this single, discrete document request.

*See Itasca Images, LLC v. Shutterstock, Inc.*, 2021 WL 6849104, at \*3 (D. Minn. Nov. 22,

2021) (compelling production of "plainly relevant" documents); *Rochester Drug Co.-*

*Operative v. Mylan Inc.*, 2022 WL 1598377, at \*10 (D. Minn. May 20, 2022) (overruling

burden objections made by a "sophisticated company" about a request for only "a subset of

the documents that [defendant] possesses").  Accordingly, Defendants should be compelled

to include the Area Sales Directors as custodians for Request 9.[7]

> **D.     Defendants Should Be Compelled to Produce the Narrow**
> **Compromise Offered by Lead Plaintiff to Respond to Request**
> **No. 11**

Request No. 11 seeks performance evaluations for the sales personnel in Tactile's VA

sales channel.  Performance evaluations shed insight on what supervisors and managers

---

[7]    Defendants proposed search terms for Request 9 on August 18, 2022, which Lead
Plaintiff accepted on August 19, 2022.  *See* Exs. 6, 14.

- 27 -

expected or incentivized their sales personnel to do, and thus may provide information on whether sales personnel were evaluated on their success in obtaining Flexitouch referrals through the KOL or contract trainer programs. Indeed, the Complaint alleged that one contract trainer's evaluation stated: "Wish she'd get more patients." ¶44. Likewise, Jackie Gorham's 2017 evaluation stated that an area for her "Continued Development" for the upcoming year was to "[p]lan and execute at least 24 KOL speaking events to boost awareness and create new diagnosers." Ex. 29. If Tactile's sales personnel in the VA channel were assessed based on their success in using KOL or contract trainer programs to gain sales, then such evaluations may be probative of the underlying kickback allegations and Defendants' scienter.

Defendants argue, however, that even if such evaluations did address the programs at issue, there is nothing unlawful stated in the evaluations. Once again, such an argument requires Lead Plaintiff to prove misconduct before Defendants produce relevant documents. This is improper and is no basis for refusing production.

Moreover, the production would be far from burdensome. Instead of seeking evaluations of the sales personnel for the entire VA sales channel, Lead Plaintiff agreed to limit the production to only the six Tactile employees with the title "VA Government and Accounts Manager" during the relevant time period. To protect the individuals' privacy, Lead Plaintiff also agreed that their personal information could be redacted. Because the

documents are relevant and very few in number, Defendants should be compelled to produce them.[8]

### E.    Defendants Should Be Compelled to Run Lead Plaintiff's Search Terms for Document Request Nos. 14, 15, 18, 19, and 20

Acknowledging the relevance of Request Nos. 14, 15, 18, 19, and 20, Defendants largely agreed to produce documents responsive to each of these Requests. Ex. 2 at 21-23, 24-27. Nonetheless, Defendants proposed woefully inadequate search terms and then ran those terms without warning and without Lead Plaintiff's agreement. Defendants should not be permitted to propose exceptionally limited search terms, run those terms without Lead Plaintiff's consent, and then argue that running Lead Plaintiff's proposed searches would be unduly burdensome. Instead, Defendants should be compelled to run Lead Plaintiff's proposed search terms, which are more complete but still reasonable.

In summary, the Requests at issue seek documents and communications concerning the following:

- Request No. 14:    Investigations by the VA, CMS, U.S. Department of Justice, or the U.S. Securities and Exchange Commission concerning the sales programs at issue in the Complaint;

- Request No. 15:    Defendants' TAM, including assessments regarding its accuracy and whether Defendants accounted for the severity of a patient's lymphedema when determining TAM;

- Request No. 18:    Drafts of Defendants' public filings, press releases, and conference calls containing the alleged misstatements;

---

[8]    While Lead Plaintiff proposed search terms and custodians for Request No. 11, *see* Ex. 13, Lead Plaintiff presumes these would not be necessary for locating such documents, as performance evaluations are likely to be located in a centralized file. Indeed, the ease of accessing such documents mitigates against any burden argument Defendants could make.

- 29 -

- Request No. 19:  Communications, conference calls, presentations, or meetings with shareholders, analysts, or the media that pertained to the alleged misstatements and misconduct; and

- Request No. 20:  Analysis of whether the sales practices conducted in the KOL or contract trainer programs could be a considered a known trend or uncertainty that could have a materially unfavorable impact on Tactile's revenues.

Ex. 1. While Defendants did not dispute these Requests' relevance, their search parameters effectively limited the Requests' scope by: (1) relying only on the exact terms in the Request without considering relevant synonyms; (2) applying overly restrictive proximity connectors; and (3) omitting relevant search terms entirely.

A few examples illustrate the problems with Defendants' search terms.  For instance, to collect documents responsive to Request No. 15, Defendants provided the following search term: (("TAM" or "total addressable market") /15 (estimate! or stud! or analys! or data! or daignos!) /40 ("flexitouch" or "FT").  Ex. 7 at 2.  Because Tactile insiders did not always solely use the term "total addressable market," or even "TAM," but also used terms like "addressable market," Defendants' search omits potentially responsive documents by relying only on formal jargon.  Moreover, Defendants' search is narrowly constrained by two extremely limited connectors and fails to include highly relevant terms like "calculat!" or "accura!"

Likewise, Defendants' search terms for Request No. 14, unlike Lead Plaintiff's, do not include the terms "VAOIG" or "VA OIG" even though it is likely that this is the entity that would carry out any investigation on Tactile's sales and marketing efforts toward the VA.  Ex. 13.  Moreover, Defendants' connectors "/15" and "/50" are so narrow that they

- 30 -

nearly require that the terms be in the same sentence.  Ex. 7.  Lead Plaintiff's proposed connector "/200," which would allow terms to be within the same paragraph, is still reasonable, but more likely to capture relevant documents, and is in line with this Court's view of potential "false hits."  *See Beseke*, 2018 WL 6040016, at *5, discussed *supra*.

Similarly, Defendants' search terms for Request No. 18 neglects terms like "press release," "conference call," and "redline."  Ex. 7.  To address the upheld allegations concerning Defendants' violation of Item 303, Lead Plaintiff sought in Request No. 20, documents and communications concerning known trends or uncertainties relating to the illicit sales practices, but Defendants' search terms failed to even include "Item 303" as a term.[9]

The deficiencies in Defendants' searches could have been avoided had Defendants provided notice to Lead Plaintiff before running their search terms and collecting documents. Indeed, such consultation is provided for in the Stipulation Regarding Discovery of Electronically Stored Information, which provides that the parties "agree to cooperate in good faith regarding . . . the disclosure of appropriate search methodologies."  ECF 93 at 2. Yet, Defendants failed to mention to Lead Plaintiff that they were proceeding with their originally proposed search terms until the night before the parties' scheduled meet and confer on Lead Plaintiff's Counter-Proposal. Ex. 14.  Having proceeded with their searches without receiving Lead Plaintiff's agreement and knowing that the scope of numerous Requests was still being discussed, Defendants now complain of the inevitable consequence of needing to

---

[9]   A side-by-side comparison of the parties' search terms for these five Requests demonstrates the insufficiency of Defendants' searches.  *See* Ex. 30.

- 31 -

run different searches.  Defendants should thus be compelled to run Lead Plaintiff's search terms for Request Nos. 14, 15, 18, 19, and 20.

## IV.    CONCLUSION

For the foregoing reasons, Lead Plaintiff's motion to compel the searches and production related to Request Nos. 2, 3, 7, 9, 11, 14, 15, 18, 19, and 20 should be granted.

DATED:  September 9, 2022   ROBBINS GELLER RUDMAN
            & DOWD LLP
           JESSICA T. SHINNEFIELD
           (admitted *pro hac vice*)
           ASHLEY M. PRICE
           (admitted *pro hac vice*)
           NICOLE Q. GILLILAND
           (admitted *pro hac vice*)
           JOSEPH J. TULL
           (admitted *pro hac vice*)

             s/ Ashley M. Price
           ASHLEY M. PRICE

           655 West Broadway, Suite 1900
           San Diego, CA  92101
           Telephone:  619/231-1058
           619/231-7423 (fax)
           jshinnefield@rgrdlaw.com
           aprice@rgrdlaw.com
           ngilliland@rgrdlaw.com
           jtull@rgrdlaw.com

           Lead Counsel for Lead Plaintiff

- 32 -

4894-7221-5602.v1

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

ZIMMERMAN REED LLP
CAROLYN G. ANDERSON, MN 275712
JUNE P. HOIDAL, MN 033330X
BEHDAD C. SADEGHI, MN 393374
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Behdad.Sadeghi@zimmreed.com

Local Counsel

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
LUCAS E. GILMORE
(admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)
reed@hbsslaw.com
lucasg@hbsslaw.com

- 33 -

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

Counsel for Plaintiff Brian Mart

- 34 -

4894-7221-5602.v1

# Mailing Information for a Case 0:20-cv-02074-NEB-BRT Mart et al v. Tactile Systems Technology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Carolyn G Anderson**
  carolyn.anderson@zimmreed.com,karen.colt@zimmreed.com

- **Rory Collins**
  rory.collins@faegredrinker.com,katie.daubenmeyer@faegredrinker.com

- **Nicole Quaid Gilliland**
  ngilliland@rgrdlaw.com

- **Lucas Gilmore**
  lucasg@hbsslaw.com,sf_filings@hbsslaw.com

- **Daniel E Gustafson**
  dgustafson@gustafsongluek.com,mmorgan@gustafsongluek.com

- **Daniel C Hedlund**
  dhedlund@gustafsongluek.com

- **June Pineda Hoidal**
  june.hoidal@zimmreed.com,julianne.vannorman@zimmreed.com

- **Matthew B Kilby**
  matthew.kilby@faegredrinker.com,terrilyn.storlien@faegredrinker.com

- **Ashley M Price**
  aprice@rgrdlaw.com,CReis@ecf.courtdrive.com,e_file_SD@rgrdlaw.com,creis@rgrdlaw.com

- **Behdad C Sadeghi**
  behdad.sadeghi@zimmreed.com,leslie.harms@zimmreed.com

- **Jessica Shinnefield**
  jshinnefield@rgrdlaw.com,e_file_SD@rgrdlaw.com,JShinnefield@ecf.courtdrive.com,mwaligurski@rgrdlaw.com

- **Anderson Tuggle**
  anderson.tuggle@faegredrinker.com,mimi.dilorenzo@faegredrinker.com

- **Joseph J. Tull**
  jtull@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)