# EXHIBIT 3

# ROBBINS GELLER RUDMAN & DOWD LLP

| Boca Raton | Melville | San Diego |
|---|---|---|
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

Ashley M. Price
APrice@rgrdlaw.com

June 30, 2022

VIA EMAIL

Matthew Kilby
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402

Re:     *Mart v. Tactile Systems Technology, Inc. et al.*,
        No. 0:20-cv-02074-NEB-BRT (D. Minn.)

Counsel,

We write concerning our meet-and-confer discussion on Wednesday, June 15, 2022 regarding Lead Plaintiff's First Request for Production of Documents to Defendants (the "Requests") and Defendants' Joint Written Response to Lead Plaintiff's First Set of Requests for Production of Documents (the "Responses").

We have begun our review of Defendants' first production, which Lead Plaintiff received on June 22, 2022, and which contains documents previously produced in the *qui tam* litigation (the "Qui Tam Documents"), as defined in ¶D of the Responses.  As stated on the call, although Defendants responded to several Requests by stating that responsive documents would be contained in the Qui Tam Documents, Lead Plaintiff reserves its right to revisit those Requests should it find that the Qui Tam Documents do not sufficiently address the Requests.

In particular, based on Matthew Kilby's email dated June 24, 2022, several of Defendants' proposed custodians for this litigation did not have their custodial files searched in the *qui tam* litigation, including Individual Defendants Gerald Mattys, Robert Folkes, Brent Moen, and Lynn Blake.  Consequently, their documents and communications were not part of the Qui Tam Documents.  Merely producing the Qui Tam Documents, which did not include such highly relevant custodians, insufficiently responds to the Requests.  Therefore, please confirm that once the parties agree to custodians for this litigation, Defendants will undertake searches in those custodians' files for documents relating to the Key Opinion Leader ("KOL") and contract trainer schemes.  Lead Plaintiff believes these documents likely shed evidence on whether these individuals participated, knew, or were recklessly indifferent to the alleged kickback schemes.

**Robbins Geller
Rudman & Dowd** LLP

Matthew Kilby
June 30, 2022
Page 2

Finally, Lead Plaintiff agrees to the date range of January 1, 2018 through September 30, 2020, which Defendants have applied to the Qui Tam Documents, but note that certain documents responsive to the Requests, while outside the date range, may be necessary to understand the context of documents produced within the date range, and therefore should be discoverable (for example, if deposition testimony discusses exhibits that pre-date January 1, 2018). Please confirm that upon identification of such documents, Defendants will be amenable to their production.

Lead Plaintiff addresses the parties' discussion of each Request below:

**Request No. 1**: As discussed on the call, Lead Plaintiff requests that Defendants identify the deposition transcripts or witness declarations that Defendants have not produced. Additionally, please specify the reason such transcripts or declarations were not produced, including if it was pursuant to a protective order or other request for confidentiality, so that Lead Plaintiff can determine those witnesses' willingness to either waive their confidential designations or be brought under the protections of the protective order in this case.

Lead Plaintiff also requested that any exhibits to the transcripts and declarations be produced. While Defendants would not commit to that, Defendants confirmed that if the exhibits were not produced with the transcripts and declarations, the exhibits would be clearly identified in a way that they can be easily located within the Qui Tam Documents.

Lead Plaintiff also asked for clarification on Defendants' response to subpart 1(g). Defendants confirmed that they will produce non-privileged documents and communications in which Mattys was provided information or advice on what to say about the *qui tam* case for the 1Q19 analyst call. Defendants stated they are unwilling to produce all documents that could have informed Mattys's views on the *qui tam* case. Lead Plaintiff agrees to this understanding of the scope of Defendants' production.

**Request No. 2**: Lead Plaintiff clarified that in requesting documents concerning the "oversight" of the KOL program, Lead Plaintiff seeks documents concerning the day-to-day management of the program, as well as whether the program complied with applicable laws and regulations. Defendants stated their expectation that the Qui Tam Documents, which contain documents broadly addressing the KOL program, will include documents particularly addressing these issues.

The parties also discussed Defendants' response that "Tactile does not track [KOL] referrals." Though Lead Plaintiff attempted to probe whether further clarification was necessary regarding this subpart, Defendants reiterated explicitly that Tactile does not track referrals. As we stated on the call, if documents produced in this litigation indicate that Tactile does in any way track KOL referrals, Lead Plaintiff will revisit this issue. An initial review of the Qui Tam

4889-5839-7991.v1

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
June 30, 2022
Page 3

Documents reveals that Tactile did track referrals – *see e.g.*, TACTILE_SECLIT_00052720.  In that document, for example, Tactile detailed the "Referral Impact" of the KOL Programs for 2017.  Therefore, please confirm that Defendants will reconsider their position that "Tactile does not track Key Opinion Leader referrals," and that it will produce all other documents responsive to this subpart.[1]

**Request No. 3**: The parties discussed at length Defendants' response to the request for documents and communications concerning Tactile's contract trainers.  Lead Plaintiff disputes Defendants' threshold limitation to producing documents merely related to Tactile's contract trainer program in Texas.  The claims at issue relate to the contract trainer program, without geographic limitation, and the program's impact on Tactile's financial and public statements regarding revenue growth.  The Amended Complaint alleges how the contract trainer program operated nationally, with the scheme spearheaded from Tactile's headquarters in Minneapolis.  ECF 49, ¶44.  It also alleges how Tactile described the program – again, without geographic limitation – to investors in its 2018 Form 10-K, but then notably removed the language in the 2019 Form 10-K filed after the *qui tam* litigation commenced.  *Id.*, ¶43.  Moreover, nothing in the Order on Defendants' Motion to Dismiss (ECF 81) limits the contract trainer claims to Texas.  Thus, whatever limitation may have been imposed in the *qui tam* case to produce documents related to only Texan contract trainers is irrelevant here.[2]

Defendants' response limiting their production to Texas contract trainers appears to apply to only subparts (a), (e), and (h).  Defendants have not specified why it would be onerous to identify those contract trainers who were employed or affiliated with the Department of Veteran Affairs ("VA") and what compensation was provided to them, which are both data that Tactile is likely to maintain (subparts (a) and (h)).  If Defendants represent that Tactile used the same form agreement or contract when engaging its contract trainers, Lead Plaintiff will agree to a production sufficient to show that agreement during the agreed-to date range (subpart (e)).  Please provide Defendants' final position on this issue.

Regarding contract trainer referrals for Flexitouch products in the CMS sales channel (subpart (c)), Defendants represented that Tactile does not have a "CMS sales channel."  Lead

---

[1]    Defendants similarly objected to Request No. 7 by stating that "Tactile does not track sales referrals from Key Opinion Leaders or contract trainers."  Lead Plaintiff requests that Defendants reconsider their position, given the evidence that referrals from these programs are tracked.

[2]    Lead Plaintiff reiterates the request made during the call that Defendants provide any briefing and subsequent ruling on this particular issue limitation in the *qui tam* litigation.

4889-5839-7991.v1

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
June 30, 2022
Page 4

Plaintiff noted that on several occasions during the Class Period, Defendants referred to Tactile's "Medicare channel." *See e.g.*, ECF 49, ¶¶173, 176-178, 184, 185-186; *see also* ¶¶191, 198, 205. Defendants explained that Tactile tracks compensation by payer, but there was not a CMS or Medicare "channel" that had its own unique sales or marketing initiative. However, Defendants agreed to confirm whether there were any individual salespeople or executives dedicated to tracking CMS or Medicare sales and marketing. Please do so at your earliest convenience.

Regarding the production of Tactile's contract trainers' performance evaluations (subpart (g)), Lead Plaintiff explained that it seeks documents regarding the claims that Tactile based its training assignments on an evaluation of whether the contract trainer obtained referrals. ECF 49, ¶44 (citing an contract trainer's performance assessment that stated: "Wish she'd get more patients."). Defendants suggested the evaluations for all the contract trainers would be overly burdensome. Yet, an example of a contract trainer performance evaluation was produced in the *qui tam* litigation. It appears that the evaluations are a single page and performed annually. Furthermore, the evaluations are likely saved in a discrete, easily identifiable location. To further address Defendants' burden, Lead Plaintiff will limit the contract trainer evaluations it seeks to those contract trainers who were employed by or affiliated with the VA, and those contract trainers who worked for medical facilities whose patients were reimbursed by CMS. Please provide Defendants' final position on this issue.

**Request No. 5**: Defendants' refusal to produce documents responsive to this Request appeared to be based on questioning the relevance of "coverage" for Flexitouch. However, as a result of Defendants' kickback schemes, Tactile induced doctors and other medical professionals to prescribe or refer Flexitouch to patients "covered" by the VA and CMS. *See e.g.*, 2018 Form 10-K at 4 ("Health insurance coverage for our Flexitouch . . . is in place with private payers, Medicare, the Veterans Administration, and certain Medicaid programs."). Defendants highlighted every quarter during the Class Period the sales made to the VA and Medicare channels (*see e.g.*, ECF 49, ¶¶134, 136, 139, 143, 146, 148, 154-58, 169-70, 173, 176-78, 181, 184, 186-87, 197), but concealed from investors that these revenues were impacted by kickbacks. Defendants even strategized about timing their sales practices directed to patients covered by the VA and Medicare. *See id.*, ¶47 (Rishe told the sales team to "HOLD BACK ON VA FOR NOW – UNTIL WE CAN GET ON THE FSS"). Thus, documents and communications, including internal communications that concern targeting or gaining access to patients covered by the VA and CMS, are relevant to the goal of Defendants' kickback strategy and should be produced. Please provide your final position on this issue.

**Request No. 6**: With the caveats noted above, Lead Plaintiff will review the Qui Tam Documents to verify whether they sufficiently respond to this Request, as it relates to the VA. As this Request relates to CMS, Defendants stated that they would confirm whether any tracking or

4889-5839-7991.v1

**Robbins Geller
Rudman & Dowd LLP**

Matthew Kilby
June 30, 2022
Page 5

monitoring of Tactile's sales efforts directed to the CMS took place. Please do so as soon as possible.

**Request No. 8**: Defendants objected to this Request by asserting, without citation, that the allegations regarding Tactile's overstatement of its Medicare revenue were dismissed. In reality, the Court held that this misstatement was "an issue of fact to be resolved at a later stage." ECF 81 at 29. Furthermore, the Court held that the scienter allegations, "viewed as a whole, give rise to a strong inference of scienter as to Mattys, Folkes, Rishe, Burke, Nigon, and Roche for the alleged misstatements about Tactile's revenue . . . ." *Id.* at 53. Please provide your final position on this issue, and if you continue to believe that this statement was dismissed, please provide the language and citation from the Order.

**Request No. 9**: As discussed during the call, Lead Plaintiff's Request encompasses both the annual national sales meetings and the quarterly business reviews, including communications concerning both. Lead Plaintiff explained that communications made to the sales team about how to drive sales go to the heart of scienter. Likewise, communications concerning the results of past sales initiatives also speaks to scienter. Nevertheless, Defendants maintained their stance that anything beyond merely the annual sales presentations was overbroad. Please provide your final position on this issue.

**Request No. 10**: Defendants clarified that Defendants did not make transcripts, take minutes, or draft reports after quarterly business reviews and annual national sales meetings. Therefore, Defendants represented that there are no responsive documents to this Request. Should discovery reveal otherwise, Lead Plaintiff reserves its rights to seek documents responsive to this Request.

**Request No. 11**: As discussed on the call, Lead Plaintiff seeks performance evaluations for sales personnel in the VA sales channel to discover whether sales personnel were pressured, incentivized, or otherwise evaluated regarding their use of the KOL and contract trainer programs to generate referrals and sales for Flexitouch. The Qui Tam Documents appear to identify a limited number of "VA and Government Accounts Managers" and the area directors to whom they reported. *See e.g.*, TACTILE_SECLIT_00208264 at Tab: Team Members. Therefore, Lead Plaintiff agrees to limit this Request to performance evaluations for Tactile's VA and Government Account Managers and the area directors to whom they reported for the agreed-to time period. Please provide us your final position on this issue.

**Request No. 15**: The parties discussed whether Defendants would search for documents addressing the severity of lymphedema as it related to TAM. As Lead Plaintiff pointed out, the Court noted that Tactile's TAM calculation assumed that each lymphedema diagnosis would be severe enough to require using Flexitouch, though lymphedema is often managed through other

4889-5839-7991.v1

**Robbins Geller
Rudman & Dowd LLP**

Matthew Kilby
June 30, 2022
Page 6

treatments. ECF 81 at 6. While Defendants represented their understanding that documents regarding TAM estimates would not intersect with the severity of lymphedema, Defendants agreed to look into the matter and further discuss with Lead Plaintiff if it looked like severity was a consideration in reporting TAM. Please let us know if you have an opportunity to do so. In addition, please identify who Defendants intend to include in "Tactile's leadership team," as stated in the response.

**Request No. 16**: Lead Plaintiff explained during the call that in addition to "analyses" prepared by Tactile's Chief Medical Officer ("CMO") or members of the Scientific Advisory Board ("SAB") regarding the number of lymphedema patients and the market for Flexitouch, the Request includes communications regarding the same. Defendants represented that they would consider looking for communications between the CMO and the Board of Directors ("Board") regarding Tactile's total addressable market. However, this proposal fails to include communications between the SAB and the Board, and communications between either the CMO or the SAB and Tactile's executives who were evaluating what public statements to make regarding TAM.

Additionally, analyses regarding the number of lymphedema patients and the market for Flexitouch may have been incorporated into articles or studies drafted or published by the CMO or SAB members. Monetary or nonmonetary compensation for such articles or studies is relevant for two reasons. First, such compensation may show bias if the CMO or SAB members were influenced to state that the market for Flexitouch was larger than it actually was. Second, to the extent that the Key Opinion Leaders overlapped with the CMO or SAB, then they may be implicated in the kickback scheme. Defendants offered that they may be willing to produce documents sufficient to show such compensation; Lead Plaintiff agrees to this offer. Please confirm Defendants' final position on this Request.

**Request No. 17**: Lead Plaintiff articulated during the call that Defendants' response limiting their production of Board-related materials to four topics (TAM, the KOL program, the contract trainer program, and the *qui tam* case) does not include relevant documents regarding the Board's review and approval of Tactile's SEC filings, which include the misrepresentations at issue in this case. Additionally, the Board's consideration of Tactile's common stock performance, executive compensation, stock rewards, and insider trading policies are relevant to Lead Plaintiff's claims. Please confirm that Defendants will produce these additional categories of Board-related materials and communications; otherwise, please confirm Defendants' final position on this Request.

**Request No. 21**: The parties discussed the scope of the documents and communications related to Tactile's external auditor's reviews, inquiries, and audits of the Company. Regarding subpart 21(b), Lead Plaintiff explained that the false statements at issue concern Tactile revenue growth in its VA and Medicare channels. Defendants agreed to produce documents concerning the

4889-5839-7991.v1

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
June 30, 2022
Page 7

auditor's review and input on the alleged misrepresentations, including Defendants' statements concerning Tactile's revenue growth.  Please confirm Defendants' agreement.

As is the case for Defendants' response to Request No. 8, because the misrepresentations regarding Tactile's overstated Medicare revenues were not dismissed, documents responsive to subpart 21(c) should be produced.  Please confirm Defendants' final position on this Request.

**Request Nos. 22-24**: To address Defendants' concern that these Requests (which concern the Individual Defendants' holdings in Tactile stock, their Rule 10b5-1 trading plans, and the incentive awards made to them) are overbroad, Lead Plaintiff explained that their burden will be mitigated by the limited number of custodians – namely, the Individual Defendants – and specific search terms.  Given that the Requests will be significantly narrowed by custodian search terms and time period, please confirm that Defendants will produce responsive documents and communications for these Requests; otherwise, please provide Defendants' final position on these Requests.

**Request No. 26**: Defendants agreed to consider producing documents related to the departures from Tactile of Bryan Rishe and Maggie Thompson, in addition to Gerald Mattys, Robert Folkes, and Lynn Blake.  Please confirm Defendants' final position on this Request.

**Request No. 28**: Defendants agreed that in addition to documents that "show or describe Tactile's internal organizational structure at the senior management level," Defendants will inquire whether there are organizational charts that can be identified in the Qui Tam Documents or produced which will provide the organizational structure of the VA sales channel and indicate who oversaw the KOL and contract trainer programs.  Please provide that information as soon as possible.

We look forward to your response.

Regards,

ASHLEY M. PRICE

AMP:tlc
cc:    Jessica Shinnefield

4889-5839-7991.v1

Robbins Geller
Rudman & Dowd LLP

Matthew Kilby
June 30, 2022
Page 8

        Nicole Gilliland
        Joseph Tull
        June Hoidal
        Rory Collins
        Anderson Tuggle

4889-5839-7991.v1