# EXHIBIT 5
# [Filed Under Seal]

**Robbins Geller Rudman & Dowd LLP**

Boca Raton    Melville      San Diego
Chicago      Nashville     San Francisco
Manhattan    Philadelphia  Washington, D.C.

Nicole Gilliland
ngilliland@rgrdlaw.com

July 29, 2022

Matthew Kilby
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

      Re:    *Mart v. Tactile Systems Technology, Inc. et al.,*
            No. 0:20-cv-02074-NEB-BRT (D. Minn.)

Dear Mr. Kilby:

I write in response to your July 19 letter concerning Lead Plaintiff's First Set of Requests for Production of Documents (the "Requests"), Defendants' Joint Written Response to Requests for Production of Documents by Lead Plaintiff (Set I) ("Defendants' Joint Written Response"), and the parties' meet and confer process concerning the Requests. This letter also addresses your July 21, 2022 email regarding custodians.

## I.       Time Period

Lead Plaintiff agrees to Defendants' proposed time period of January 1, 2018 through September 30, 2020, with the exception of exhibits used in depositions in the *qui tam* case that pre-date 2018. Lead Plaintiff reserves the right to seek further exceptions to this time period and appreciates Defendants' willingness to consider other exceptions if specifically requested.

## II.      Lead Plaintiff's Requests

**Request No. 1**:  In your July 19 letter, you stated that because of the protective order in place in the *qui tam* case, Defendants are withholding the deposition transcripts of Jody Allen and Vinay Satwah. Please let us know if Defendants are aware of whether Dr. Satwah is represented by counsel, and if so, please provide his counsel's contact information.

As you did not identify any witness declarations that were withheld pursuant to the *qui tam* case's protective order, we understand that all witness declarations and their exhibits were produced. Please confirm this understanding.

655 West Broadway, Suite 1900    San Diego, CA 92101    Tel 619-231-1058    Fax 619-231-7423    rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
July 29, 2022
Page 2

**Requests Nos. 2(f) and 7**: Defendants' Responses to Requests Nos. 2(f) and 7 are essentially the same: "Tactile does not track Key Opinion Leader referrals" (Response No. 2(f)) or "sales referrals from Key Opinion Leaders" (Response No. 7). Yet, your July 19 letter concedes that Tactile does "confirm[] through review" – *i.e.* track – "attendees' referrals." Such documents are plainly responsive to Request No. 2, which broadly seeks documents and communications "concerning Tactile's Key Opinion Leader Program." Request No. 7, moreover, seeks documents and communications concerning Tactile's revenues and income relating to "Flexitouch sales . . . including *as a result of referrals from the Key Opinion Leader or contract trainer programs*." Plainly, documents confirming or tracking attendees' orders are responsive to both of these Requests. Therefore, please confirm that Defendants will be producing documents that track referrals related to the KOL program – whether they are referrals made by the KOLs themselves, or made by the attendees.

To the extent that Defendants are limiting their response based on an interpretation of "referrals" versus "orders," please explain how Defendants define these terms.

**Request No. 3**: Regarding the geographic scope limitation for requests 3(a) and 3(h), you stated that Defendants agree to identify contract trainers who were employed or affiliated with the Department of Veterans Affairs ("VA") and what compensation was provided to them during the relevant time period. Because your prior sentence referred to the "geographic scope limitation" Defendants intend to apply, Defendants' offer is unclear as to whether Defendants intend to also limit these documents to trainers employed by or affiliated with only Texas VA locations. Please clarify at your earliest convenience.

Regarding trainer performance evaluations, Lead Plaintiff accepts Defendants' proposal to produce "annual competency assessments" for contract trainers that were employed by or affiliated with the VA during the relevant time period. As you requested, I enclose with this letter the source of Lead Plaintiff's statement in ¶44 of the Amended Complaint that you state was "allegedly" taken from a contract trainer's performance assessment. This document, Bates-stamped SCCERS0002407, was directly referenced in the *qui tam* summary judgment briefing and was publicly accessible on the *qui tam* docket. It also contains a section titled "performance assessment."

**Request No. 5**: The statement that both defense counsel and Defendants—whose business centers largely on insurance payments—do not understand the meaning of the word "covered" strains credulity. Nevertheless, by "covered," Lead Plaintiff refers to the concept that a healthcare insurer will "either directly pay[] the cost of medical care or provide[] reimbursement therefor."[1]

---

[1]    *See* https://www.lawinsider.com/dictionary/medical-coverage

4864-7493-8668.v1

**Robbins Geller
Rudman & Dowd** LLP

Matthew Kilby
July 29, 2022
Page 3

To make very clear, Lead Plaintiff is referring to whether CMS or the VA will pay for or reimburse a patient for paying for a device.

To the extent Tactile's sales and marketing efforts, and especially its KOL and contract trainer programs, had any effect on the discourse between the VA and Tactile, or CMS and Tactile, and regarding whether those agencies agreed to cover Flexitouch, is highly relevant. Please confirm your agreement to produce documents responsive to this Request.

**Request No. 6**: Your July 19 letter addresses only *marketing* practices directed to CMS-covered patients. In her June 30 letter, Ashley asked you to confirm whether Tactile tracked or monitored its *sales* efforts directed to CMS-covered patients. Please clarify at your earliest convenience.

**Request No. 9**: The limited scope of production that Defendants continue to propose in response to this Request is unacceptable. Communications concerning both the Annual Sales Meetings and the Quarterly Business Reviews ("QBRs") are highly relevant as these communications will likely involve reporting to the Individual Defendants and other senior executives the sales efforts of the prior quarter and year, the effectiveness of certain sales programs, including the KOL and contract trainer programs, problems and proposed resolutions that came up during the quarter relating to the sales strategies, and new directions or strategies for the upcoming quarter or year. These communications may also concern decisions made by the Individual Defendants about what issues to discuss at the Annual Sales Meetings and QBRs. We anticipate such communications will include drafts and final versions of the presentations.

We recognize that many employees within Tactile may be involved in preparing the presentations for the Annual Sales Meetings and QBRs; however, your July 19 letter suggested that even identifying the presenters for the QBRs would be burdensome. While we question the likelihood of that assertion given the limited number of times the QBRs could have occurred during the Class Period (at most, eight times), and that the heads of departments likely made the presentations, Lead Plaintiff is willing to limit the search for documents and communications concerning the Annual Sales Meeting and QBRs to the custodians that the parties agree to in this action.

Please inform us whether Defendants agree to search for documents and communications relating to the QBRs and Annual Sales Meetings or whether the parties have reached an impasse on this issue.

**Request No. 11**: As Ashley stated in her June 30 letter, performance evaluations for VA Government and Accounts Managers are relevant to issues central to this case because they are likely to demonstrate whether these personnel were incentivized, pressured, or evaluated based on

4864-7493-8668.v1

**Robbins Geller
Rudman & Dowd LLP**

Matthew Kilby
July 29, 2022
Page 4

their ability to use the KOL and/or contract trainer programs to increase sales to the VA. Regarding your concern that the evaluations may contain private personal information, the Protective Order entered in this case should allay that concern. Nevertheless, Lead Plaintiff is also willing to accept the evaluations with private personal information redacted. Please confirm whether this compromise is acceptable to Defendants.

**Request No. 15**: In your July 19 letter, you stated that you would follow up regarding whether Tactile considered lymphedema severity when calculating TAM. Please do so at your earliest convenience.

**Request No. 16**: Lead Plaintiff agrees to Defendants' proposed compromise that you detailed in your July 19 letter.

**Request No. 17**: To address Defendants' relevance issue relating to the Board's review and approval of SEC filings, Lead Plaintiff agrees that only the SEC filings cited in the Amended Complaint's "False and Misleading Statements" section would come within the scope of responsive documents.

The Board's review of Tactile's stock performance, executive compensation, stock rewards, and insider trading policies, however, are germane to the securities fraud elements of loss causation, materiality, and scienter. With consideration of the proposed compromise above, please provide Defendants' final position.

**Requests Nos. 22-24**: In your July 19 letter, you stated that Defendants are willing to produce communications regarding the Individual Defendants' 10b5-1 trading plans, but restated that Defendants are not willing to produce communications regarding the Individual Defendants' stock holdings, stock transactions, or performance-based awards, including stock options. Lead Plaintiff appreciates Defendants' offer to produce communications regarding the Individual Defendants' 10b5-1 trading plans, but Defendants' communications regarding the stock sales are also highly relevant and should be produced. Therefore, as a final compromise, Lead Plaintiff agrees to limit the scope of responsive documents to the items Defendants stated in their Joint Written Response, communications about the Individual Defendants' 10b5-1 plans, and communications about the Individual Defendants' stock sales during the relevant time period. Please confirm whether Defendants agree to this proposal.

### III. Custodians

Your July 19 letter address two issues regarding custodians. First, your letter addresses Lead Plaintiff's concern that Defendants did not search Mattys's, Folkes's, Blake's, or Moen's custodial files in connection with the *qui tam* litigation. In response, you agreed to "include these

4864-7493-8668.v1

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
July 29, 2022
Page 5

four custodians in all the searches we will undertake in connection with responding to Lead Plaintiff's various RFPs."  Lead Plaintiff appreciates Defendants' willingness to include these four individuals as custodians, and accepts your proposal.

Next, your July 19 letter objects to the additional custodians that I proposed in my July 1 email (the "Proposed Custodians").  Of the 30 custodians that were already searched in the *qui tam* case, Lead Plaintiff requested that Defendants run additional, limited, search terms on only four: Thompson, Mosbek, Haspert, and Gorham.  Defendants refused, stating that because these individuals were custodians for the *qui tam* production, Lead Plaintiff has already received the relevant documents from their files.  Yet, when we requested the search terms used to better understand the scope of the *qui tam* litigation's collection, to our surprise, only five narrow search terms were run.  You further asserted without any additional explanation that most of the *qui tam* documents "were located and produced without the use of search terms."  Because your objection to Thompson, Mosbek, Haspert, and Gorham rests on the premise that their files were already ***adequately*** searched in connection with the *qui tam* litigation, please clarify what additional methods were used to search these individuals' custodial files.  Your vague description of the search process used in the *qui tam* case is insufficient to allay our concerns that these custodians' files were adequately searched.

Your letter also states that Defendants do not believe the remaining Proposed Custodians are likely to have non-cumulative, relevant documents that aren't already captured in the *qui tam* production.  However, you letter also states that if Lead Plaintiff had specific reasons for including the Proposed Custodians, Defendants would be willing to meet and confer further on this issue. Please see below for an explanation of why each Proposed Custodian should be included.

| PROPOSED CUSTODIAN | REASONS FOR INCLUSION |
|---|---|
| Brett Demchuk | Mr. Demchuk was Tactile's VP of Quality and Regulatory throughout the relevant time period, and documents reviewed to date show that he was involved in Tactile's compliance efforts, including compliance with the AKS. Additionally, he was interviewed in connection with the investigation that DuVal & Associates undertook to determine whether Tactile complied with various aspects of the law (the "DuVal Report"). |
| Adam Ferkinhoff, Greg Seeling, Andrea Henson, and Angela Neofotistos (the "Sales Directors") | Mr. Ferkinhoff, Mr. Seeling, and Ms. Henson, were Sales Directors throughout the relevant time period. Ms. Neofotistos was a Sales |

4864-7493-8668.v1

Robbins Geller
Rudman & Dowd LLP

Matthew Kilby
July 29, 2022
Page 6

| | Director beginning in January 2020 and through the end of the relevant time period. Each Sales Director is highly likely to have documents central to the claims in this case because they were the most highly ranked sales executives during the relevant time period (below Rishe only), and each reported directly to Rishe. Accordingly, they participated in developing and executing Tactile's sales strategies, including the KOL and contract trainer programs, trained Tactile's salesforce, and reported sales results and strategy to Rishe. Because this case centers largely on illicit sales practices, the highest-level sales executives that developed sales strategy and reported to Rishe—a defendant in this case—are highly likely to have relevant documents. |
|---|---|
| Jill Christensen | Ms. Christensen was a Clinical Affairs Advisor and Clinical Research Manager during the relevant time period. Accordingly, she is likely to have documents relevant to the Tactile-funded study mentioned in the Complaint, which is directly relevant to Lead Plaintiff's TAM claims. *See* ¶¶62-65. |
| Jay Stracke | Mr. Stracke was Tactile's VP of Reimbursement and Payer Relations during the relevant time period. As Tactile's highest-ranking payer relations executive, Mr. Stracke was responsible for developing and maintaining Tactile's relationships with key payers, including the VA and CMS. Accordingly, Mr. Stracke's files likely contain documents relevant to VA and CMS coverage of Tactile's devices, including any changes in coverage decisions, which are directly relevant to the claims in this case. Moreover, because he replaced Maggie Thompson in September 2019 as Vice |

**Robbins Geller**
**Rudman & Dowd** LLP

Matthew Kilby
July 29, 2022
Page 7

|  | President of Reimbursement and Payer Relations, his communications from that time until the conclusion of the Class Period are certainly relevant. |
|---|---|
| Bjorn Larsen | Mr. Larsen was Tactile's Director of Marketing from January 2018-May 2019. As Director of Marketing, Mr. Larsen was highly involved in Tactile's marketing strategy during the relevant time period. According to his LinkedIn, he was responsible for "developing an integrated sales and marketing plan," and he helped to acquire 130 new VA accounts. Because Tactile's marketing practices directed at the VA are central to this case, Mr. Larsen—Tactile's highest-level marketing executive—is highly likely to have documents that are relevant to this case. |

\*    \*    \*

Please let us know your availability next week for a meet and confer on (1) the searches conducted in the *qui tam* litigation; and (2) the proposed custodians in this litigation.

Regards,

*Nicolin*

NICOLE GILLILAND

NG:ydg
cc:  All Counsel of Record

4864-7493-8668.v1