## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated,  ) ) ) | |
| Plaintiff,  ) ) | Civ. No. 0:20-cv-2074-NEB-BRT |
| vs.  ) ) | |
| TACTILE SYSTEMS TECHNOLOGY, INC., et al.,  ) ) ) | |
| Defendants.  ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION TO COMPEL DISCOVERY

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.   Tactile, a Medical Technology Company, Employs In-Home Product Trainers and Runs a "Key Opinion Leader" Medical Education Program............ 3

II.   A Failing Competitor Files a *Qui Tam* Lawsuit Against Tactile; Following Voluminous Discovery, the Suit is Dismissed ..................................... 5

III.   Plaintiff Files This Securities Lawsuit Based Almost Entirely On the Failed Allegations From the *Qui Tam* Suit, Which The District Court Then Narrows In Its Motion-To-Dismiss Ruling.................................................. 7

IV.   Defendants Produce Nearly The Entire *Qui Tam* Record And, After An Extensive Search, Almost Ten Thousand Additional Documents........................ 8

V.   Three Weeks Before The Substantial Completion Deadline, Plaintiff Demands That Defendants Run Additional, Needlessly Broad Searches That Would Require Defendants to Review 100,000 More Documents............. 11

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

I.   Plaintiff's Memorandum Violates Local Rule 37.1. ............................................ 13

II.   The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested and Overly Broad Search Terms Regarding Defendants' KOL and Contract Trainer Programs (Request Nos. 2 and 3). ................................... 14

III.   The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested, Overly Broad, and Undefined "Search Parameters" Regarding Defendants' Alleged Tracking of KOL Speaker and Attendee Referrals (Request Nos. 2(f) and 7)................................................................................... 23

IV.   The Court Should Not Compel Defendants Search Four Additional Mid-Level Sales Employees' Documents (Request No. 9). ........................................ 29

V.   The Court Should Deny Plaintiff's Request to Produce VA Sales Employees' Performance Evaluations (Request No. 11)..................................... 33

VI.   The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested and Overly Broad Search Terms Regarding Five Other Disparate Requests (Requests No. 14-15, 18-20). ............................................... 34

CONCLUSION................................................................................................................... 41

Defendant Tactile Systems Technology, Inc. ("Tactile"), together with Individual Defendants Brent Moen, Lynn Blake, Gerald Mattys, Robert Folkes, and Bryan Rishe (the "Individual Defendants," together with Tactile, "Defendants"), submit the following opposition to Lead Plaintiff St. Clair County Employees' Retirement System's ("Plaintiff's") motion to compel the production of evidence:

## **INTRODUCTION**

This is a case about a case. In 2018, a competitor of Tactile's that was failing to gain traction in the market filed a *qui tam* lawsuit alleging that, in violation of the False Claims Act, Tactile was paying kickbacks to physicians and other health care professionals. The *qui tam* relator alleged that kickbacks were paid to (1) unidentified speakers in a Tactile educational program (which Plaintiff calls the "Key Opinion Leader" program) who teach fellow physicians about Tactile's products and the underserved and under-diagnosed disease that they treat (lymphedema); and (2) unidentified health care professionals working as trainers for Tactile on a contract basis who demonstrate to patients how to correctly use Tactile's products at home. Extensive discovery did not substantiate the *qui tam* plaintiff's allegations, however, and thus mere weeks before trial was scheduled to begin—and while Tactile's summary judgment motion was pending—Tactile's competitor voluntarily dismissed the lawsuit for no payment.

In this case, Plaintiff has taken the *qui tam* allegations, assumed they are true (though they were disproven) and added a securities fraud gloss. Plaintiff's central claim is that if it is true (and it's not) that Tactile paid kickbacks to unidentified contract

1

trainers and the physicians who presented at Key Opinion Leader programs, then Defendants deceived investors and violated the Exchange Act by failing to disclose that the alleged kickback payments put Tactile's revenue from federal healthcare programs at risk, because federal law prohibits those programs from working with businesses that pay kickbacks.

The parties in this case have now completed extensive written and document discovery. Defendants produced at the outset of discovery substantially all of the evidentiary record developed in the *qui tam*, totaling more than 67,000 documents from 30 custodians. In addition, due to the securities fraud claims unique to this case, Defendants produced another nearly 9,000 documents from 16 custodians (10 of them new), including all the individual defendants and several other senior Tactile employees. Defendants substantially completed these document productions on September 2, 2022, as required by the scheduling order.

Because the kickback allegations still are not borne out in the enormous factual record, Plaintiff now seeks to compel Defendants to review more than 100,000 additional documents in response to a laundry list of Plaintiff's requests for production. Plaintiff's motion suffers from numerous defects, including that:

- Plaintiff waited until August 12—only three weeks before Defendants' substantial production deadline—to respond to Defendants' proposed search terms and make a counterproposal;

2

- Plaintiff's additional proposed custodians and search terms are vastly overbroad and seek documents having nothing to do with any claim or defense; and

- The additional discovery that Plaintiff seeks would impose a substantial burden on Defendants and would delay progression of fact discovery, which is currently scheduled to close on December 15, 2022.

For all these reasons, Plaintiff's last-ditch effort to vastly expand the scope of discovery and upend the case schedule should be denied.

## BACKGROUND

**I.    Tactile, a Medical Technology Company, Employs In-Home Product Trainers and Runs a "Key Opinion Leader" Medical Education Program.**

Tactile is a publicly traded, Minnesota-based medical technology company focused on developing medical devices for the treatment of chronic diseases. (Dkt. 49 (Am. Compl.) ¶ 1.) The device at issue in this lawsuit is called Flexitouch, an in-home device for treating patients suffering from lymphedema and chronic venous insufficiency. (*Id.* ¶ 2.)

Plaintiff alleges that Tactile paid kickbacks to unidentified people participating in two Tactile programs. *First*, there is Tactile's in-home trainer program (also called the "contract trainer program"). (*Id.* ¶ 43.) In this program, Tactile pays medical professionals who are not Tactile employees a fixed fee to visit patients' homes and train them on how to safely and effectively operate their Flexitouch device. (Declaration of Matthew Kilby ("Kilby Decl."), Ex. A (*Qui Tam* Summ. J. Br.) at 7-14 (describing

3

program).)[1] Tactile does this because it is well recognized within the industry that, when it comes to durable medical equipment like Flexitouch, in-home training at the time of delivery is the most effective model for patient safety and therapy outcomes. (*Id*. at 7-8 (citing expert testimony).) Importantly, Tactile's contract trainers are therapists—*not* physicians—and so cannot prescribe Flexitouch themselves. (*Id*. at 9.)

**Second**, there is Tactile's medical education program (also called the "key opinion leader" or "KOL" program). (Dkt. 49 (Am. Compl.) ¶ 37.) In this program, Tactile, like thousands of other medical companies, engages physicians to speak about the disease that its product treats and their experience with those products. (Ex. A at 15-19 (describing program).) The amounts Tactile pays its KOLs are commercially reasonable and actually at the lower end of the fair market value range. (*Id*. at 18 (citing expert testimony).) This program is important for Tactile because lymphedema is an underserved and under-diagnosed condition, about which many physicians do not receive sufficient education or training. (*Id*. at 15.) Tactile thus seeks to engage well-respected physicians to bridge this knowledge gap. (*Id*. at 15-16.)

Tactile has a robust compliance department that ensures both programs comply with all applicable healthcare laws and regulations. (*Id*. at 19-22.) And both programs have been vetted and approved by outside counsel, including compliance experts at Duval & Associates, multiple times. (*Id*. at 20-21 ("Since 2007, Tactile has [] engaged

---

[1] This brief contains ample evidentiary citation and is publicly available at *Veterans First Medical Supply LLC, ex rel. v. Tactile Medical Sys. Tech., Inc.*, No. 4:18-cv-02871 (S.D. Texas), Dkt. 184. Unless otherwise stated, all citations to "Ex." are to attachments to the Kilby Declaration.

independent outside compliance expert DuVal & Associates to conduct biannual reviews of its operations and compliance program," who has in turn concluded that "Tactile has a strong culture of compliance").)

## II.    A Failing Competitor Files a *Qui Tam* Lawsuit Against Tactile; Following Voluminous Discovery, the Suit is Dismissed

On August 20, 2018, a competitor of Tactile's called Veterans First Medical Supply LLC filed a sealed *qui tam* complaint against Tactile. (*See Veterans First Medical Supply LLC, ex rel. v. Tactile Medical Sys. Tech., Inc.*, No. 4:18-cv-02871 (S.D. Texas) (the "*Qui Tam* Action"), Dkt 1.)

Veterans First's owner, Jody Allen, was upset at Tactile because he believed Tactile and certain Texas-based Department of Veterans Affairs ("VA") officials were conspiring to favor Flexitouch over the competing lymphedema pump he distributed. (Ex. A at 6-7, 22-25.) Allen's smear campaign included lodging false allegations against VA procurement officials, claiming they had been paid kickbacks by Tactile in exchange for ordering Flexitouch. (*Id*.) These false allegations were investigated and rejected by the VA. Frustrated with his failed attempts at influencing the VA, Allen (through Veterans First) eventually filed the *qui tam* case. (*Id*.)

The *qui tam* complaint alleged, in short, that payments Tactile made to contract trainers and physician educators were "kickbacks" meant to induce trainers and physicians to prescribe Flexitouch when they otherwise wouldn't have. (*Qui Tam* Action, Dkt. 9.) Every time Tactile failed to disclose the alleged "kickbacks" when it submitted a Flexitouch claim for reimbursement to the VA or the Centers for Medicare & Medicaid

Services ("CMS"), the complaint averred, Tactile violated the federal False Claims Act and Anti-Kickback Statute. (*Id.*; *see also generally U.S. ex rel. Cairns v. D.S. Med., LLC*, 42 F.4th 828 (8th Cir. 2022) (explaining statutes).)

The Department of Justice declined to pursue these allegations itself—despite federal law permitting it to do so if they believed the allegations had merit. *See* 31 U.S.C. § 3730(a). Undeterred, Veterans First served its complaint on Tactile and filed an unsealed version shortly thereafter. (*Qui Tam* Action, Dkts. 5-9.)

Tactile vigorously denied the allegations, *see, e.g.*, Dkt. 49 (Am. Compl.) ¶ 93 (public statements to investors), and filed counterclaims against Veterans First for defamation and tortious interference with business relations. (*Qui Tam* Action, Dkt. 45.)

The parties in the *qui tam* suit then engaged in two years' worth of intensive discovery. As part of this process, Tactile produced approximately 100,000 documents, from 30 custodians. (Declaration of Matt Kilby ("Kilby Decl.") ¶ 6.) The parties took 16 depositions, half of them of Tactile employees or trainers. (*Id.*) Apart from Allen himself, no witness accused Tactile of paying kickbacks—and even then, Allen conceded at his deposition that his "kickback" allegations were based merely on "generalized rumors, the sources and specific content of which Allen could not identify." (Ex. A at 25.) Tactile also produced  affidavits from 14 key opinion leaders and trainers stating that they had never taken a "kickback" from Tactile. (*See Qui Tam* Action, Dkts. 184-5 to 11, 15, 17-18, 22, 24-27 (publicly filed declarations).) And Tactile submitted expert reports confirming that the two programs were unquestionably lawful. (Ex. A at 7-8, 15-17, 31-

6

33 (describing Buthusiem Report findings), Ex. B (*Qui Tam* Summ. J. Reply Br.)[2] at 8-9, 15-16 (detailing Klein Report findings).)

On this strong record, Tactile moved for summary judgment. (*Qui Tam* Action, Dkt. 184.) While the motion was still pending, and just weeks before trial was scheduled to begin, Veterans First unilaterally dropped all its claims—because they lacked a shred of factual support. (*Id.*, Dkt. 295.) Significantly, the government consented to the lawsuit's dismissal and again did not intervene. (*Id.*, Dkt. 297.) Tactile dismissed its own counterclaims, ending the litigation. (Securities Action, Dkt. 78.) Tactile paid nothing. (*Id.*)

### III.    Plaintiff Files This Securities Lawsuit Based Almost Entirely On the Failed Allegations From the *Qui Tam* Suit, Which The District Court Then Narrows In Its Motion-To-Dismiss Ruling.

Brian Mart commenced this securities lawsuit against Tactile and certain of its current and former officers on September 29, 2020, while the *qui tam* suit was still pending. (Dkt. 1.) After being appointed lead plaintiff, St. Clair County Employees' Retirement System ("Plaintiff") filed the Amended Complaint. (Dkt. 49.) Drawing heavily on the allegations from the *qui tam*, the Amended Complaint claims that investors who traded Tactile stock between May 7, 2018 and June 8, 2020 (the proposed "Class Period") suffered damages under the Exchange Act because Tactile allegedly: (1) hid that illegal kickback payments made in the KOL and contract trainer programs were a source

---

[2] This brief also contains ample evidentiary citation and is publicly available at *Veterans First Medical Supply LLC, ex rel. v. Tactile Medical Sys. Tech., Inc.*, No. 4:18-cv-02871 (S.D. Texas), Dkt. 213.

of its revenue growth; (2) hid that false claims to federal healthcare programs also contributed to revenue growth; and (3) misrepresented the total addressable market ("TAM") for Flexitouch.  (*See id.* ¶¶ 5-8.) In addition to Tactile, the Amended Complaint named as defendants several of Tactile's officers (Gerald Mattys, Lynn Blake, Brent Moen, Robert Folkes, and Bryan Rishe) and outside directors (William Burke, Richard Nigon, and Kevin Roche).  (*Id.* ¶¶ 13-21.)

Defendants filed a motion to dismiss the Amended Complaint, which the Court granted in part. (Dkt. 81.) Specifically, the Court dismissed Plaintiff's claims to the extent they were based on alleged false claims to federal health care programs or on Tactile's TAM representations in 2020. (*Id.* at 36.) The Court also dismissed all the claims against the outside director defendants and certain claims against the officer defendants. (*Id.* at 65; *see also* Dkt. 112 (order confirming that the outside director defendants were dismissed from the action).) Thus, following the motion to dismiss, the only remaining claims are those based on the allegations that unidentified payments made in Tactile's KOL and contract trainer programs constituted illegal kickbacks, and that Tactile overstated the TAM for Flexitouch in 2018 and 2019.

## IV.   Defendants Produce Nearly The Entire *Qui Tam* Record And, After An Extensive Search, Almost Ten Thousand Additional Documents.

Given the substantial overlap between the *qui tam* action and this action, once discovery began Defendants immediately agreed to produce the *qui tam* evidentiary record—the declarations and deposition testimony and related exhibits (with limited exceptions for documents designated "confidential" by third parties under the *qui tam*

protective order), as well as documents Tactile produced in the *qui tam* covering the time period relevant in this action (which the parties agree is January 1, 2018 through September 30, 2020). (Kilby Decl. ¶ 7.) These materials totaled more than 67,000 documents. (*Id.*) The majority of these documents were produced to Plaintiff on June 21, 2022, with the remainder produced on July 6, 2022. (*Id.*)

Plaintiff served voluminous requests for production on Defendants on April 29, 2022 (Declaration of Ashley Price ISO Motion to Compel (Dkt. 125) ("Price Ex. _"), Ex. 1), to which Defendants responded in writing on June 7, 2022. (Price Ex. 2.) Defendants generally responded to each request or subpart of a request in one of the following ways:

- Defendants stated they would stand on the *qui tam* production;

- Defendants agreed to produce the documents requested, or a specifically identified subset of the documents requested;

- Defendants agreed to produce responsive documents "that they are able to locate upon a reasonable search of the custodial files of agreed-upon custodians";

- Defendants stated that they do not have any responsive documents; or

- Defendants stood on their objections.

(*See, e.g., id.* at 12-14.)  From mid-June through mid-August, counsel for Plaintiff and Defendants held multiple meet and confers and exchanged several letters regarding disputes over Defendants' responses, and were able to resolve or narrow many of the disputes. (Kilby Decl. ¶ 8.)

9

As noted, Defendants agreed to search custodial files for documents responsive to certain of Plaintiff's requests, in addition to reproducing the *qui tam* production. On June 24, 2022, Defendants sent Plaintiff a list of 12 proposed custodians in addition to the 30 custodians who comprised the *qui tam* production. (Ex. C.) The 12 additional custodians included the Individual Defendants and other relevant, senior employees of Tactile. On July 20, 2022, Defendants sent Plaintiff proposed search parameters, detailing which custodians would be searched in connection with which requests, and the search terms that would be used. (Ex. D (cover e-mail); Price Ex. 7 (Defendants' Custodians and Search Terms).) Defendants requested a response from Plaintiff by close of the following business day—which was the same amount of time in which Plaintiff had requested a response to its own search terms. (Ex. D.)

Plaintiff did not respond to Defendants' proposed search parameters the next day, or even the next week. Given that Defendants' deadline to substantially *complete* their document production was September 2, 2022, Defendants proceeded to run searches as they had proposed, without any objection from Plaintiff. (*Id.* ¶ 11.) The searches resulted in Defendants producing another 8,861 documents. (*Id.*)

Between the materials re-produced from the *qui tam* case and the additional documents identified and produced in this case, Defendants have produced a total of 76,564 documents from 40 different custodians. (*Id.* ¶ 12.)

**V.      Three Weeks Before The Substantial Completion Deadline, Plaintiff Demands That Defendants Run Additional, Needlessly Broad Searches That Would Require Defendants to Review 100,000 More Documents.**

Plaintiff sent a "Counter Proposal" to Defendants' search parameters on August 12, 2022—23 days after Defendants made their proposal to Plaintiff, and two hours after Defendants served the first of two document productions resulting from Defendants' own searches. (Kilby Decl. ¶ 13; *see* Price Exs. 12-13.) In addition to being untimely, Plaintiff's Counter Proposal was overbroad and burdensome in multiple respects:

- It proposed 12 entirely new searches, including for requests for which Defendants never agreed to use search terms or to produce documents at all.

- It proposed modifications to each of Defendants' 14 searches, bringing the total number of searches to consider to 26. Simply inputting and testing all these searches in Defendants' database took days, including because several of them contained syntax errors or were too long to run as a single search.

- Many of the proposed searches used proximity connectors so broad (e.g., "/250") that they were effectively just "AND" connectors. And some of Plaintiff's proposed searches did not include any terms that would tend to limit the results to relevant documents, as opposed to any document that happens to reference, for example, "Key Opinion Leader" or a synonym.

(*See* Kilby Decl. ¶ 14; Price Ex. 13.)

Running Plaintiff's proposed search terms would have required Defendants to review more than 100,000 additional documents, a process that Defendants estimate would take 2,500 attorney hours. (Kilby Decl. ¶¶ 15-16.) Given that Defendants'

11

substantial completion deadline was just three weeks away, it was not feasible to expand the review so dramatically, nor was doing so warranted. (*Id*. ¶ 17.) Nonetheless, in the interest of compromise and in an effort to avoid burdening the Court, Defendants agreed to add several custodians and searches, and to modify some of Defendants' pre-existing searches as Plaintiff proposed. (*Id*. ¶ 18 (listing compromise measures).) But Plaintiff remained unsatisfied, and now seeks to compel Defendants to undertake even more search and review.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure limit discovery to that which "is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In determining the proper scope of discovery, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. Because the Rules do not "allow [for] fishing expeditions . . . [s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).

These principles and limitations apply to custodian and search term disputes as much as any other discovery dispute. *See, e.g.*, *Dryer v. National Football League*, 2012 WL 12895563 (D. Minn. May 21, 2012) (denying motion to compel defendant to collect

12

documents from four additional custodians because the burden of searching the

custodians' files outweighed the likely benefit); *In re Zurn Plumbing Prods. Liability

Litig.*, 2009 WL 1606653, at *2-3 (D. Minn. June 5, 2009) (denying motion to compel

review of over a dozen search terms that would "likely produce a large number of 'hits'

that have limited relevance to this case").

## ARGUMENT

### I.      Plaintiff's Memorandum Violates Local Rule 37.1.

As an initial matter, Plaintiff's memorandum does not comply with Local Rule

37.1(b)-(d). This Rule requires parties bringing discovery motions to: specify the

discovery in dispute; copy directly into the memorandum the "text" of the underlying

discovery request and response; and then provide a "concise statement" of why the

resulting response or production is improper.

Plaintiff failed to follow these requirements. It did not include in the text of its

memorandum a *single* RFP or response. This is not a technical misstep. To determine

whether a search-term proposal is proper, the Court needs to see the underlying discovery

request that Plaintiff is asking Defendants to respond to; search-term and custodian

disputes are not decided in a vacuum. Defendants thus include below the text of each

pertinent request and response, which Plaintiff should have done at the outset.

13

**II.    The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested and Overly Broad Search Terms Regarding Defendants' KOL and Contract Trainer Programs (Request Nos. 2 and 3).**

Plaintiff's Requests 2 and 3 each stated a single, exceedingly broad request, followed by a web of more targeted sub-parts. The content of those requests and responses is restated below.

<u>**REQUEST NO. 2:**</u>

All documents and communications concerning Tactile's Key Opinion Leader program, including:

(a) Documents sufficient to show the identities of Tactile's Key Opinion Leaders;

(b) Documents and communications concerning contracts or agreements made between Tactile and its Key Opinion Leaders, including agreements concerning speaking arrangements, consulting arrangements, or participation on Tactile's Scientific Advisory Board;

(c) Documents and communications concerning Tactile's practices and policies for recruiting, retaining, and terminating its Key Opinion Leaders;

(d) Documents and communications concerning the budgeting, actual costs, approval, and attendance of the Key Opinion Leader events, meetings, presentations, and programming;

(e) Documents and communications concerning the oversight of the Key Opinion Leader program;

(f) Documents and communications concerning tracking Key Opinion Leaders' referrals;

(g) Documents and communications concerning all monetary and non-monetary compensation provided to the Key Opinion Leaders; and

(h) Documents and communications concerning the Key Opinion Leader program's compliance or non-compliance with the Anti-Kickback Statute.

<u>**RESPONSE TO REQUEST NO. 2:**</u>

Defendants object that the main part of this request is overbroad, unduly burdensome, vague, and seeks documents that do not relate to any claim or defense. Defendants further object that the subparts of this request constitute eight separate requests for purpose of the limit set by the Pretrial Scheduling Order. Subject to these objections, Defendants will produce copies of non-privileged documents responsive to the various subparts as follows:

(a) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents sufficient to show the identities of Tactile's Key Opinion Leaders.

14

Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(b) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning contracts or agreements made between Tactile and its Key Opinion Leaders, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(c) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning Tactile's practices and policies for recruiting, retaining, and terminating its Key Opinion Leaders, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(d) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning the budgeting, actual costs, approval, and attendance of the Key Opinion Leader events, meetings, presentations, and programming, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(e) Defendants object to this subpart on the ground that "oversight" is vague and overly broad, and that depending upon how it is interpreted, it could be unduly onerous and burdensome, and could be seeking documents that do not relate to any claim or defense. Defendants will interpret this subpart as seeking documents and communications concerning review of the Key Opinion Leader program for compliance with applicable laws and regulations. With that understanding, and upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain responsive documents and communications, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(f) Defendants do not have any documents responsive to this subpart because Tactile does not track Key Opinion Leader referrals.

(g) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning all monetary and non- monetary compensation provided to the Key Opinion Leaders, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

(h) Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning the Key Opinion Leader program's compliance or non-compliance with the Anti-Kickback Statute, including legal advice sought and obtained about the Key Opinion Leader program for which Tactile waived

15

privilege in the *qui tam* case, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

## REQUEST NO. 3:

All documents and communications concerning Tactile's contract trainers, including:

**(a)** Documents and communications identifying contract trainers who were employed by or affiliated with the VA;

**(b)** Documents and communications identifying contract trainers who were employed by or affiliated with health care providers, clinics, hospitals, or facilities that prescribed or purchased Flexitouch products and that were reimbursed by CMS;

**(c)** Documents and communications concerning referrals for Flexitouch products in the VA or CMS sales channels obtained directly or indirectly by Tactile's contract trainers;

**(d)** Documents and communications concerning Tactile's practices and policies for recruiting, retaining, and terminating its contract trainers;

**(e)** Documents sufficient to show Tactile's contracts or agreements with its contract trainers;

**(f)** Document and communications concerning Tactile's practices and policies for assigning contract trainers to home visits;

**(g)** Documents and communications concerning the performance evaluations of Tactile's contract trainers;

**(h)** Documents and communications concerning all monetary and non- monetary compensation provided to the contract trainers;

**(i)** Documents and communications concerning the deletion of language in Tactile's Form 10-K for the year ended December 31, 2019, stating that Tactile's "trainers are healthcare professionals . . . who we have identified through our sales and marketing interest"; and

**(j)** Documents and communications concerning the contract trainer program's compliance or non-compliance with the Anti-Kickback Statute.

## RESPONSE TO REQUEST NO. 3:

Defendants object that the main part of this request is overbroad, unduly burdensome, vague, and seeks documents that do not relate to any claim or defense. Defendants further object that the subparts of this request constitute ten separate requests for purpose of the limit set by the Pretrial Scheduling Order. Subject to these objections, Defendants will produce copies of non-privileged documents responsive to the various subparts as follows:

16

**(a)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications identifying contract trainers based in Texas who were employed by or affiliated with the VA. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people. To the extent this subpart seeks documents concerning contract trainers based outside of Texas, Defendants object on the grounds that the request is overly broad, unduly burdensome, and seeks documents that do not relate to any claim or defense.

**(b)** Defendants do not have any documents responsive to this subpart because neither contract trainers, health care providers, clinics, or hospitals were or are reimbursed by CMS for Tactile products or services. Defendants preserve the objections that they would otherwise have to this request, including that "employed by or affiliated with" is vague and ambiguous and that the request is overly broad and burdensome.

**(c)** Tactile does not have any documents responsive to this subpart because it does not look to contract trainers to make referrals and does not track such information. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people. Defendants preserve the objections that they would otherwise have to this request, including that "CMS sales channel" is vague and Tactile does not have a "CMS sales channel" as it understands the term.

**(d)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications sufficient to show Tactile's practices and policies for recruiting, retaining, and terminating its contract trainers. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

**(e)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications sufficient to show Tactile's contracts or agreements with its contract trainers based in Texas. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people. To the extent this subpart seeks documents concerning contract trainers based outside of Texas, Defendants object on the grounds that the request is overly broad, unduly burdensome, and seeks documents that do not relate to any claim or defense.

**(f)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications sufficient to show Tactile's practices and policies for assigning contract trainers to home visits. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

**(g)** Defendants object to this subpart on the grounds that it is overbroad, unduly burdensome, vague, and seeks documents that do not relate to any claim or defense.

**(h)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning all monetary and non-monetary

17

compensation provided to the contract trainers based in Texas, to the extent such documents exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people. To the extent this subpart seeks documents concerning contract trainers based outside of Texas, Defendants object on the grounds that the request is overly broad, unduly burdensome, and seeks documents that do not relate to any claim or defense.

    **(i)** Defendants will produce copies of any non-privileged responsive documents that they are able to locate upon a reasonable search of the custodial files of agreed-upon custodians in the manner prescribed in the ESI Protocol.

    **(j)** Upon reasonable inquiry, Defendants believe that the Qui Tam Documents contain documents and communications concerning the contract trainer program's compliance or non-compliance with the Anti-Kickback Statute, including legal advice sought and obtained about the contract trainer program for which Tactile waived privilege in the *qui tam* case, to the extent they exist. Therefore, for its response to this request, Tactile will produce copies of Qui Tam Documents. The Remaining Individual Defendants do not have any additional responsive documents that they hold as private people.

* * *

In its motion, Plaintiff does not take issue with Defendants' detailed written responses setting forth the scope of Defendants' production. Rather, Plaintiff argues that the resulting production was insufficient because Defendants did not search the Individual Defendants' custodial data for "any and all" documents regarding Tactile's KOL and contract trainer programs. Specifically, Plaintiff faults Defendants for not running the following two search terms on the Individual Defendants' data:

- "key opinion leader" or "key opinion leaders" or "KOL" or ("medical education" /3 program!) or (physician! /3 speak!) or "P2P" or "peer to peer" or "peer-to-peer" or (speak! w/3 program!) or (speak! /3 bureau! or "speaker event" or "speaker presentation")

- (trainer! or (train! w/100 therapist! or "RN" or nurse! or contract!)) /250 (order! or refer! or prescription! or prescrib! or pay! or paid! or remunerat! or "AKS" or kickback! or compensat! or budget! or expense! or cost! or reimburs! or assign! or enroll! or recuit! or influenc! or connection! or comply! or compli! or monitor! or "ROI" or "return on investment" or quota! or strateg!

18

or target! or account! or lead! or revenue! or income! or sale! or "FTOC" or "VA" or "veterans affairs" or "veteran's affairs" or "veterans administration" or "veteran's administration" or "@va.gov" or "CMS" or "C.M.S." or medicare or medicaid or "@cms.hhs.gov")

(Plaintiff's Memorandum ISO Motion to Compel ("Mot.") at 17.)

For two reasons, Plaintiff's request is untenable. *First*, Plaintiff did not ask Defendants to run these sweeping terms until three weeks before Defendants' substantial completion deadline, and thus failed to timely assert its rights. *Second*, Plaintiff's request is disproportionate in light of the substantial discovery Plaintiff has already received on these two programs, the terms' detachment from the issues relevant to this securities fraud case, and the burden running the terms would impose on Defendants.

*Timing*. As the above responses show, Defendants did not agree to run search terms on any part of the Requests except for Request 3(i); rather, Defendants rested its response on the *Qui Tam* Production. This was because that voluminous production contained thousands of documents addressing every element of Tactile's contract trainer and KOL programs.

Despite receiving Defendants' response on June 7, however, Plaintiff waited *over two months*, until August 12, before belatedly asserting that Defendants should run search terms in addition to the *Qui Tam* Production. (Price Ex. 12-13.) This was nearly a month after Defendants made their initial search-term proposal, and, more importantly, *only three weeks before* Defendants' September 1 substantial production deadline. This delay was inexcusable and, given the terms' breadth, substantially prejudiced Defendants' ability to comply with the Court's Scheduling Order. This is reason enough

19

to reject Plaintiff's motion: parties should be reprimanded, not rewarded, for failing to timely assert their rights in discovery, especially when operating under a clear scheduling order like the Court's here. *See Elfus v. Impact Sports Basketball, LLC*, 2019 WL 3916539, at *2 (S.D. Fla. Aug. 14, 2019) (observing that parties cannot "sit on their hands and then wait until the last moment to seek additional discovery"; "such conduct unnecessarily burdens the Court").

*Proportionality*. The Court should also deny Plaintiff's motion as disproportionate under Rule 26. For starters, Plaintiff's rhetoric ignores that Plaintiff has already received a substantial number of documents related to Tactile's KOL and trainer programs. Defendants have produced 28,879 documents containing the words "KOL" or "key opinion leader" or "medical education" or "trainer"—1,423 of which are from the files of the Individual Defendants. (Kilby Decl. ¶ 19.)[3] This is unsurprising because, in addition to the *Qui Tam* Production, Defendants ran *eight* searches on the Individual Defendant' data seeking targeted information regarding the KOL and trainer programs. (*See id.* ¶ 20 (listing searches).)

Plaintiff nevertheless argues that Defendants should run broad searches designed to return any reference to KOL and trainer programs because those programs are *generally* relevant to Plaintiff's claims. (Mot. at 14.) But Plaintiff fails to explain why searching for "any and all" documents the Individual Defendants had regarding these

---

[3] Given these productions, Plaintiff's assertion that "Defendants have all but refused to search the Individual Defendants' custodial files for documents" is patently false. (Mot. at 13-14.)

20

programs is relevant and proportionate to proving *securities fraud*. Searching for still more documents showing Individual Defendants knew the programs *existed*, in the abstract, is a pointless but costly exercise. What Plaintiff must ultimately prove is that the Individual Defendants *knew* that particular payments made to educators and contract trainers *violated the law*, and that this illegality materially contributed to Tactile's sales revenue. (*See* Dkt. 81 (MTD Order) at 28 ("Tactile's warnings [allegedly] failed to disclose that [] *illegal* sales practices were occurring and placing Tactile's business at risk."), 29 ("Defendants [allegedly] falsely stated in securities filings that they 'believed' Tactile complied with [the Anti-Kickback Statute and other laws].").)

Plaintiff's search-term proposal, however, is not designed to return documents showing knowledge of any illegal practices. Instead, Plaintiff's proposal seeks to capture *any* document in the Individual Defendants' possession that so much as *mentions* the KOL or trainer programs, rather than just those documents they could plausibly relate to the Individual Defendants' *knowledge* of *illegality*.

By contrast, the KOL and trainer search terms that Defendants did run are appropriately tailored. (*See* Kilby Decl. ¶ 20.) These terms searched for documents showing, among other things, the Individual Defendants' knowledge of audits or investigations regarding the programs,[4] or their discussion of the programs in the context of investor disclosures.[5]

---

[4] ("Key opinion leader" or "KOL") or trainer*) w/50 (fraud* or kickback* or "AKS" or audit* or investigat*).

[5] (Call! or present! or meeting! or report! or statement! or agenda! or script!) /30 (shareholder! or analyst! or media! or publication! or press! or reporter! or journalist! or

21

Plaintiff claims these searches are inadequate because a "/30" or "/50" connector supposedly "ignores" the "reality" of corporate communication. (Mot. at 16.) But if the Individual Defendants received information stating that someone was "auditing" or "investigating" the "KOL" or "trainer" programs, or that the programs posed a material risk of "fraud" or "kickbacks," surely those words would be within a few sentences of each other—not sprawled paragraphs away. It is thus a mystery how Plaintiff's broad "any and all" search terms are more likely to capture *relevant* information than Defendants' more targeted searches.

Plaintiff's proposed terms also pose an undue burden on Defendants. After receiving Plaintiff's August 12 proposal, Defendants ran a hit-count report—which given the complexity and length of Plaintiff's terms took days just to run. (Kilby Decl. ¶ 14.) That hit-count report revealed that running Plaintiff's proposed search terms across the Individual Defendants' data would require Defendants to review nearly ***20,000 more*** documents: 9,775 for Request 2 and 9,547 for Request 3. (*Id*. ¶ 15.) This in turn would require at least 500 hours of additional attorney work. (*Id.*) The searches would thus impose a material burden on Defendants, and there is no reason to believe they would turn up relevant, non-cumulative documents given that Defendants have already produced 28,879 documents containing the words "KOL" or "key opinion leader" or "medical education" or "trainer."

---

banker! or investor!) /30 (("TAM" or "total addressable market") or ("KOL" or "key opinion leader") or trainer! or ("qui tam" or "relator" or "Veteran's First" or "VFMS")).

22

For these reasons, the Court should deny Plaintiff's motion regarding Defendants'

KOL and contract trainer programs.

**III.   The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested, Overly Broad, and Undefined "Search Parameters" Regarding Defendants' Alleged Tracking of KOL Speaker and Attendee Referrals (Request Nos. 2(f) and 7).**

In its requests for production, Plaintiff included the following two requests

arguably relevant to this aspect of its motion. Those requests, and Defendants' June 7

responses, are restated below.

<u>**REQUEST NO. 2(f):**</u>

All documents and communications concerning Tactile's Key Opinion Leader
program, including:
    [ . . .]
**(f)** Documents and communications concerning tracking Key Opinion Leaders'
referrals;
    [. . . ]

<u>**RESPONSE TO REQUEST NO. 2(f):**</u>

Defendants object that the main part of this request is overbroad, unduly
burdensome, vague, and seeks documents that do not relate to any claim or defense.
Defendants further object that the subparts of this request constitute eight separate
requests for purpose of the limit set by the Pretrial Scheduling Order. Subject to these
objections, Defendants will produce copies of non-privileged documents responsive to
the various subparts as follows:
    [ . . . ]
**(f)** Defendants do not have any documents responsive to this subpart because
Tactile does not track Key Opinion Leader referrals.
    [ . . . ]

<u>**REQUEST NO. 7:**</u>

All documents and communications concerning Tactile's reported quarterly and
annual revenues and operating income that relate to Flexitouch sales in the VA and CMS
sales channels, including as a result of referrals from the Key Opinion Leader or contract
trainer programs.

## RESPONSE TO REQUEST NO. 7:

Defendants object to this request on the ground that the term "CMS sales channel" is vague and ambiguous. Tactile does not use the term "CMS sales channel" and does not know what the phrase means, but interpreting the phrase according to the plain meaning of the words, Tactile does not have any documents responsive to that part of this request because Tactile does not undertake sales or marketing activities directed to a "CMS sales channel."

Defendants will produce copies of Tactile's SEC filings that contain the requested information regarding quarterly and annual revenues. Tactile does not track sales referrals from Key Opinion Leaders or contract trainers, and thus Defendants do not have any documents responsive to that part of the request.

To the extent that this request seeks a broader range of documents, Defendants object to it on the grounds that it is overly broad, unduly onerous and burdensome, and seeks documents that do not relate to any claim or defense.

\* \* \*

In its motion, Plaintiff first attempts to refute Defendants' statement that Tactile didn't track referrals by KOLs (*i.e.*, the paid speakers at KOL events)—the only people relevant to Plaintiff's KOL-related kickback claims. Plaintiff then claims that, to fairly comply with Requests 2 and 7, Defendants should search for, and produce, any and all "documents that concern tracking referrals and ROI generated by KOL program *attendees* and speakers." (Mot. at 17 (emphasis added).) Plaintiff's arguments are untenable for three independent reasons.

*First*, as Defendants already explained, there are no documents responsive to Request 2—which concerns only the KOL speakers themselves—because Tactile does not track referrals made by KOLs. There are simply no responsive documents to produce. *Second*, to the extent Plaintiff seeks information about Tactile tracking KOL event *attendees'* referrals, Requests 2 and 7 do not request such documents and so Plaintiff's motion is procedurally improper. *Third*, with respect to attendees in particular,

24

Plaintiff's motion seeks irrelevant documents and is also disproportionate in light of the substantial discovery Plaintiff has already received on the KOL program.

***Defendants do not track referrals by KOLs***. In their June 7 responses, Defendants stated they would not produce documents in response to Request 2(f) or Request 7 (to the extent it sought internal documents showing the effect of KOL referrals on Tactile's reported revenue) because "Tactile does not track [KOL] referrals." This statement is true, and it is also consistent with the mountain of evidence produced in the *qui tam* litigation and then reproduced in this case. As the Tactile employee responsible for running Tactile's KOL program stated in a sworn declaration: "We do not track whether our KOLs are changing prescribing practices based on the number of speaking engagements in which they participate." (Ex. E (Weaver *Qui Tam* Decl.) ¶ 6); *see also, e.g.*, *id.* Ex. A at 18-19 (citing voluminous evidence showing that Tactile "does not track or reward referrals from KOLs with speaking opportunities," all of which has been reproduced in this case).)

This evidence and Tactile's response to the request should end the inquiry: because Tactile does not track KOL referrals, there is no purpose to running a search and reviewing irrelevant and non-responsive documents.

In an attempt to avoid this threshold issue, Plaintiff cites five documents and counterfactually asserts that Tactile *does* track referrals by KOLs. Those documents cannot withstand scrutiny. Exhibit 15 is a snippet from a draft training manual that offers a generic description of KOLs; it does not suggest or say anything about Tactile "tracking" referrals made by KOLs. Exhibits 16 and 17 are form reports listing Tactile-

25

prescribing doctors and their patients; they do not say anything about the KOL program. Exhibit 18 is a presentation briefly mentioning a "Top Doctors Report" created by a third party; it also says nothing about the KOL program. And Exhibit 19 is an excerpt from a deposition taken in the *qui tam* litigation that merely confirms that Tactile's marketing department analyzed "overall" <u>unpaid attendee</u> referrals after KOL events, *not* the *paid* KOL speakers' referrals. (*Accord* Ex. E (Weaver *Qui Tam* Decl.) ¶ 6 (Tactile tracked "the overall increase in Flexitouch orders by program attendees," to see if the "medical education programs" were having a measurable impact).) None of the exhibits undermines Tactile's written response or shows the kind of "close tracking of paid speakers' prescriptions" discussed in Plaintiff's cited cases. (Mot. at 19.)

    ***Plaintiff did not request all documents relating to unpaid attendee referrals***. Because the evidence is so clear that Defendants did not track KOL speaker referrals, Plaintiff pivots to arguing that what it really wants is information about how Tactile "tracked" KOL *attendees*' referrals. (Mot. at 21.) But this pivot is procedurally improper. To obtain discovery, a party must first request that discovery under Rule 34, with "reasonable particularity." *See* Fed. R. Civ. P. 34(b); *Zissa v. County of Los Angeles*, 2019 WL 13074698, at *5 (N.D. Cal. Nov. 7, 2019) (emphasizing the importance of this "reasonable particularity" requirement when making a broad "any and all documents relating to . . ." request). Here, however, Plaintiff never fairly requested information about Tactile's tracking of KOL *attendees*' referrals. Request 2(f) asks for "Documents and communications concerning tracking <u>Key Opinion Leaders' referrals</u>"—not unpaid attendees. Request 7 could conceivably be read to request information about referrals by

26

anyone in a KOL program, but the request has two other limitations—the documents must also "[1] concern[] Tactile's reported quarterly and annual revenues and operating income that relate to Flexitouch sales [2] in the VA and CMS sales channels." Plaintiff's Motion, however, does not mention these two limitations stated in Request No. 7, and instead seeks any document relating to referrals by attendees. That is improper.

*Documents relating to referrals by unpaid attendees are irrelevant and disproportionate*. Plaintiff's motion also seeks irrelevant documents and is disproportionate under Rule 26. Defendants have already produced 9,077 documents containing the words "KOL" or "key opinion leader" or "medical education." (Kilby Decl. ¶ 21.) Among these are internal Marketing Department folders containing every document Tactile has about every KOL event during the Class Period—including speakers, payments, locations, and attendees. (*Id*.) Defendants also searched the Individual Defendants' data for documents specifically responsive to Plaintiff's "tracking" request and produced any responsive documents they found. (Price Ex. 8 at 2-3.)[6] Given the wealth of KOL documents Plaintiff now has—from both the company generally and the executives specifically—it is unclear why Plaintiff needs yet more.

---

[6] Specifically, Defendants ran the following search: ("Key opinion leader" or "KOL" or "speaker" or "attendee" or "medical education") w/50 ("ROI" or "return on investment" or refer*). Although Plaintiff quibbles with semantics (Mot. at 23-24), it does not seriously attempt to argue that if an Individual Defendant received any information about Tactile tracking KOL speaker or attendee "referrals"—to generate "ROI"—this search would've captured it.

Plaintiff's motion also fails because the one issue on which further responsive documents may exist—Tactile's analysis of *attendee* referrals—is irrelevant to this securities fraud case. Again, to prove securities fraud, Plaintiff needs to show that the Individual Defendants *knew* that certain, identified <u>payments</u> made in the KOL program were illegal kickbacks and then failed to disclose that fact. Attendees, however, are not paid. As Defendants have already explained to Plaintiff, there is nothing unlawful about "Tactile confirming through review of program <u>attendees' referrals</u> that its KOL program is educating health care providers and having a positive impact." (Price Ex. 4 at 2 (emphasis added).) If anything, the fact that Tactile monitored the number of prescriptions written by unpaid attendees, but not the number written by paid speakers, "cuts against [Plaintiff's] argument that the speaker program was intended to influence the *speakers'* prescribing decisions." *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1055 (C.D. Cal. 2016); *accord* Ex. B (*Qui Tam* SJ Reply) at 23 ("Tracking [attendee] attendance and orders actually prove[s] the [KOL] programs were not a sham—they were for legitimate purposes.").)[7]

---

[7] The authorities Plaintiff cites on this front are all distinguishable. (Mot. at 20-21.) The OIG "Special Fraud Alert" post-dates the Class Period and merely cautions companies against "*selecting* . . .[program] attendees . . . based on past or expected revenue"; it does not suggest that the kind of after-the-fact analysis Tactile performed here is unlawful. *Cf. United States ex rel. Camburn v. Novartis Pharm. Corp.*, 2022 WL 4217749, at *6-7 (S.D.N.Y. Sept. 13, 2022) (company's ROI analysis of KOL speakers did not violate law where there was no connection between the "ROI analysis and speaker prioritization"). And the cases Plaintiff cites are all either Rule 12 cases containing little-to-no on-point legal analysis or *qui tam* cases involving far more compelling evidence of kickbacks than what Plaintiff claims to have here (despite having an entire *qui tam* record at its disposal). *See, e.g., Penelow v. Janssen Prods., LP*, 2021 WL 6052425, at *11 (D.N.J. Dec. 21,

Finally, despite spending nearly nine pages arguing about this issue, Plaintiff does not propose search terms or offer a concrete proposal as to what it wants Defendants to do were the Court to grant its motion, effectively amend the Requests, and require Tactile to produce documents regarding unpaid attendees' referrals. All Plaintiff requests is that the Court order Defendants to search for and produce "all documents and communications that concern tracking, noting, listing, or showing referrals and ROI garnered from the KOL program, its speakers, and its attendees." (Mot. at 24.) Plaintiff has not shown why the search Defendants already ran as a compromise is insufficient under the circumstances: "Key opinion leader" or "KOL" or "speaker" or "**attendee**" or "medical education") w/50 ("ROI" or "return on investment" or refer*). (Kilby Decl. ¶ 18.)

For these reasons, the Court should deny Plaintiff's motion with respect to referrals by KOLs or KOL attendees.

## IV. The Court Should Not Compel Defendants Search Four Additional Mid-Level Sales Employees' Documents (Request No. 9).

Plaintiff next argues that Defendants should search the files of four additional custodians, who were "Area Sales Directors" for Tactile, in connection with Request 9. That request, and Tactile's June 7 response to it, are as follows:

### REQUEST NO. 9:

All documents and communications concerning the preparation for and presentations at the quarterly business reviews and the annual national sales meetings for the years 2018, 2019, and 2020, including documents and communications concerning

---

2021) (sworn testimony of "seven current and former employees" that the purpose of the speaker program was to "induc[e] and reward[] prescriptions").

revenues, revenue growth, sales strategies, budgeting, quotas, targets, and incentives for the VA and CMS sales channels.

### RESPONSE TO REQUEST NO. 9:

Defendants object to this request on the ground that the term "CMS sales channel" is vague and ambiguous. Tactile does not use the term "CMS sales channel" and does not know what the phrase means, but interpreting the phrase according to the plain meaning of the words, Tactile does not have any documents responsive to that part of this request because Tactile does not undertake sales or marketing activities directed to a "CMS sales channel."

Defendants will produce copies of presentations made at annual sales meetings about sales strategies, targets, quotas, budgeting, compensation, or revenues from the time period January 1, 2018 through September 30, 2020. Defendants object to producing a broader range of documents on the grounds that the request is overly broad, unduly onerous and burdensome, and seeks documents that do not relate to any claim or defense.

* * *

As stated in their response, Defendants produced presentations made at annual sales meetings. In subsequent meet and confers with Plaintiff, Defendants agreed to and since have produced documents and communications concerning annual sales meetings and quarterly business reviews that Defendants identified by running agreed-upon searches against 11 different custodians' files. (*See* Price Ex. 9 at 4; Kilby Decl. ¶ 23 (listing search terms & custodians for Request 9).) Now Plaintiff wants to add four more custodians to the search—on top of the 11 already searched for this request, and the 40 custodians whose data was collected and searched in this case. Plaintiff's request to add four more custodians to the existing 40 is disproportionate to the needs of the case.

*First*, the additional custodians are not likely to have responsive, relevant documents beyond what has already been produced from the 40 other custodians' files. Plaintiff has not cited any particular reason—let alone any evidence—to suggest that

30

kickbacks were discussed at quarterly business reviews. Indeed, none of the exhibits that Plaintiff cites refer to anything even remotely resembling a kickback payment. (*See* Price Ex. 26 (email from Rishe outlining what topics to cover in the quarterly business review); Ex. 27 (slides from a quarterly business review); Ex. 28 (slides and speaker notes from a quarterly business review).) The mere fact that these documents address sales efforts does not make them relevant to the kickback allegations or suggest that other similar documents would contain evidence of kickbacks. (*See* Mot. at 25-26.)

Plaintiff's request also focuses on the wrong level within the organization. As the District Court noted in its order granting in part Defendants' motion to dismiss, Plaintiff has alleged "widespread kickback schemes," Dkt. 81 at 30, and to prevail Plaintiff must show that Defendants knew or had access to information about the alleged schemes, *id.* at 28. Thus, the likely sources of information to prove or disprove Plaintiff's claims are Tactile's executives—who are already among the 11custodians that Defendants have searched in connection with Request 9. Although Plaintiff tries to play up the significance of the Area Sales Directors, *see* Mot. at 25, they are mid-level employees, not executives.

To the extent that Area Sales Directors' communications may be relevant, Defendants' searches and productions already encompassed such communications. Because Defendants ran searches in connection with Request 9 on files collected from Tactile's former SVP of sales (Defendant Rishe) and former CEO (Defendant Mattys), among others, *see* Kilby Decl. ¶ 23, those searches would have included reports sent to them from Area Sales Directors. *See Dryer*, 2012 WL 12895563, at *4 (denying motion to add lower-level custodian where documents produced by his superiors were an

31

"alternative source" of the information sought). In fact, two of the three exhibits that Plaintiff cites are communications with Rishe. (*See* Price Exs. 26, 28.) And Plaintiff already has documents collected from one Area Sales Director, Jackie Gorham, because she was a custodian in the *qui tam*. (Ex. C (June 24 email listing *qui tam* custodians).)

**Second**, adding four Area Sales Directors as custodians at this stage in discovery would be burdensome for Defendants. Defendants would need to collect these custodians' data for the first time (as opposed to running more searches on data already collected), process and load it into their database, run the search terms, and then review the resulting documents (likely several thousand of them, based on Defendants' experience applying this search to other custodians' files). This all would take several weeks and divert Defendants' counsel's attention at a time when the parties should be focusing on deposition discovery to meet the December 15, 2022 fact discovery deadline.

Because Plaintiff has not identified a persuasive reason why searching these four custodians' files in addition to the 11 already being searched would add anything to the case, and because conducting the searches would be burdensome, Plaintiff's proposal is disproportionate under Rule 26. *See Dryer*, 2012 WL 12895563, at *3-5 (denying motion to compel discovery from four additional custodians because the burden outweighed the likely benefit).

32

**V.       The Court Should Deny Plaintiff's Request to Produce VA Sales Employees' Performance Evaluations (Request No. 11).**

Plaintiff also seeks performance evaluations for certain Tactile employees in the VA sales channel. This stems from Plaintiff's Request 11, which is set forth below along with Defendants' June 7 response:

**REQUEST NO. 11:**

Performance evaluations for the sales personnel in Tactile's VA sales channel.

**RESPONSE TO REQUEST NO. 11:**

Defendants object to this request on the grounds that it is overly broad, is unduly onerous and burdensome, seeks private personal information, and seeks documents and information that do not relate to any claim or defense.

* * *

This case is about supposed kickbacks paid to unidentified doctors and contract trainers. (*See* Dkt. 49 (Am. Compl.) ¶¶ 37, 43.) Plaintiff does not offer any persuasive explanation why performance evaluations of individual sales personnel are likely to contain evidence of kickback payments. Plaintiff argues that Gorham's 2017 evaluation, produced in the *qui tam* case, supports its bid to obtain additional evaluations because it stated that an area for her "Continued Development" for the upcoming year was to "[p]lan and execute at least 24 KOL speaking events to boost awareness and create new diagnosers." (Mot at 28.) That is the very purpose of legal KOL programs—they boost awareness and create new diagnosers. That Tactile wanted to have such events is not conceivably evidence of "kickbacks." *See Purcell v. Gilead Sciences, Inc.*, 439 F. Supp. 3d 388, 393 (E.D. Pa. 2020) (noting that speaker programs "can be legitimate educational programs for the medical community").

33

Plaintiff's other example fares no better. Plaintiff points to an allegation that one *contract trainer's* "evaluation" stated: "Wish she'd get more patients." (Mot. at 28 (citing Am. Compl. ¶ 44).) But a desire to see a (presumably good) contract trainer train more patients is not evidence that any <u>kickbacks</u> were being paid. Once again, Plaintiff's strained examples only further demonstrate the *irrelevance* of the documents that Plaintiff seeks.

Plaintiff's request for performance evaluations is especially unwarranted given the volume of more relevant documents—many thousands—about the structure, operation, and legal compliance of the KOL and contract trainer programs that were produced in the *qui tam* and re-produced to Plaintiff months ago. (Kilby Decl. ¶¶ 12-13, 19, 22.)

Because Plaintiff has not shown that performance evaluations are likely to contain relevant evidence, this part of Plaintiff's motion to compel should be denied.

**VI.    The Court Should Not Compel Defendants To Run Plaintiff's Belatedly Requested and Overly Broad Search Terms Regarding Five Other Disparate Requests (Requests No. 14-15, 18-20).**

Finally, Plaintiff argues that Defendants should be required to run, in addition to the searches Defendants already applied, Plaintiff's proposed searches for Requests 14, 15, 18, 19, and 20. Those requests, and Defendants' June 7 responses to them, are reproduced here:

<u>**REQUEST NO. 14:**</u>

All documents and communications concerning any inquiry, audit, formal or informal investigation, or request for information made by the VA, CMS, the U.S. Department of Justice, or the U.S. Securities and Exchange Commission concerning Tactile's sales and marketing efforts directed toward the VA or CMS. This request

34

includes all documents provided or produced to those agencies as a result of such inquiry, investigation, audit, or request for information.

## RESPONSE TO REQUEST NO. 14:

Defendants object to this request to the extent it seeks production of privileged attorney-client communications and work product.  Defendants are not waiving any privilege except as to the scope of documents referenced in response to Requests 2(h) and 3(j) above.  Defendants also object to this request on the grounds that the phrase "Tactile's sales and marketing efforts directed toward the VA or CMS" is vague and overly broad, and that depending upon how it is interpreted, the request could be unduly onerous and burdensome, and could be seeking documents that do not relate to any claim or defense, or relate to allegations that have been dismissed.  Defendants will interpret this phrase as limited to Tactile's Key Opinion Leader and contract trainer programs. With that understanding, Defendants will produce copies of non-privileged documents responsive to this request, to the extent such documents exist and can be located after a reasonable search.

## REQUEST NO. 15:

Documents and communications concerning Tactile's total addressable market, including:

(a)   Documents and communications assessing the accuracy of the public statements made regarding Tactile's total addressable market or market size for Flexitouch products;

(b)   Documents and communications concerning Tactile's determination that there were 1.1 million lymphedema diagnoses in 2018 and 1.3 million diagnoses in 2019; and

(c)   Documents and communications concerning the determination of coverage for Flexitouch products based on the severity of a patient's lymphedema or chronic venous insufficiency.

## RESPONSE TO REQUEST NO. 15:

Defendants object that the main part of this request is overbroad, unduly burdensome, vague, and seeks documents that do not relate to any claim or defense. Defendants further object that the subparts of this request constitute three separate requests for purpose of the limit set by the Pretrial Scheduling Order.  Subject to these objections, Defendants will produce copies of non-privileged documents responsive to the various subparts as follows:

35

(a)    Defendants will produce copies of documents showing Tactile's estimates of the total addressable market for Flexitouch products and communications among Tactile's executive leadership team regarding same that they are able to locate upon a reasonable search, as prescribed in the ESI Protocol.  Defendants object to producing a broader range of documents on the grounds that the request is vague in its use of the phrase "market size"; is overly broad, unduly onerous and burdensome; and seeks documents that do not relate to any claim or defense.

(b)    Defendants will produce copies of documents showing Tactile's estimates of lymphedema diagnoses and communications among Tactile's leadership team regarding same that they are able to locate upon a reasonable search, as prescribed in the ESI Protocol.  Defendants object to producing a broader range of documents on the grounds that the request is vague in its use of the phrase "market size"; is overly broad, unduly onerous and burdensome; and seeks documents that do not relate to any claim or defense.

(c)    Defendants object to this subpart of the request on the grounds that it relates to theories that have been dismissed from the case; it seeks documents that are not relevant to any remaining claims or defenses, or likely to lead to the discovery of admissible evidence; and it is vague, overly broad, and burdensome.

## REQUEST NO. 18:

All documents and communications concerning drafts of Tactile's Forms 10-K, Forms 10-Q, Forms 8-K, quarterly and annual earnings press releases, financial analyst conference call scripts or presentations, containing the false and misleading statements alleged in ¶¶133- 208 of the Complaint. This request includes any meeting minutes, reports, memoranda, analyses or notes concerning such filings or issuances.

## RESPONSE TO REQUEST NO. 18:

Defendants will produce copies of non-privileged documents responsive to this request that relate to the remaining claims or defenses that they are able to locate upon a reasonable search, as prescribed by the ESI Protocol.

To the extent this request seeks documents concerning allegations, conduct, or statements that have been dismissed from the case, Defendants object on the grounds that the request is overly broad and burdensome, and seeks documents that are not relevant to any remaining claims or defenses, or likely to lead to the discovery of admissible evidence.

## REQUEST NO. 19:

All documents concerning any communications, conference calls, presentations or meetings with any Tactile shareholders, financial analysts, institutional investors, financial publications, news reporters, journalists or investment bankers concerning Tactile's

revenue growth and performance, Tactile's VA and CMS sales channels, Tactile's Key Opinion Leader program or contract trainer program, Flexitouch's market size, or the *qui tam* case.

## RESPONSE TO REQUEST NO. 19:

Defendants object to this request as overly broad and burdensome in that it seeks documents concerning communications with "any Tactile shareholders," which includes all Tactile directors and officers and many Tactile employees. Defendants object to producing and will not produce communications among people who happen to be Tactile shareholders but who are involved in a communication in some other capacity, e.g., in their role as a Tactile director, officer, or employee.

Defendants also object to this request on the ground that the term "CMS sales channel" is vague and ambiguous. Tactile does not use the term "CMS sales channel" and does not know what the phrase means, but interpreting the phrase according to the plain meaning of the words, Tactile does not have any documents responsive to this part of this request because Tactile does not undertake sales or marketing activities directed to a "CMS sales channel."

Subject to these objections, Defendants will produce copies of documents responsive to this request concerning (i) the total addressable market for Flexitouch products, (ii) the Key Opinion Leader program, (iii) the contract trainer program, or (iv) the *qui tam* case, that they are able to locate upon a reasonable search of the custodial files of agreed-upon custodians in the manner prescribed in the ESI Protocol.

## REQUEST NO. 20:

All documents and communications concerning any analysis of whether any of Tactile's sales practices directed toward the VA and CMS sales channels, including the Key Opinion Leader and contract trainer programs, could be considered a known trend or uncertainty that could have a material unfavorable impact on Tactile's net sales, revenues, or income from continuing operations.

## RESPONSE TO REQUEST NO. 20:

Defendants object to this request on the ground that it assumes the Key Opinion Leader program and contract trainer program were "directed toward" the "VA and CMS sales channels," when in fact this is not true—these programs are part of Tactile's general practices and are not "directed toward" particular sales channels.

Defendants also object to this request on the ground that the term "CMS sales channel" is vague and ambiguous. Tactile does not use the term "CMS sales channel" and does not know what the phrase means, but interpreting the phrase according to the plain meaning of the words, Tactile does not have any documents responsive to this part

37

of this request because Tactile does not undertake sales or marketing activities directed to a "CMS sales channel."

Defendants will produce copies of any non-privileged responsive documents that they are able to locate upon a reasonable search of the custodial files of agreed-upon custodians in the manner prescribed in the ESI Protocol.

* * *

Plaintiff's motion to compel Defendants to run Plaintiff's proposed searches for these requests should be denied because Plaintiff waited unreasonably long to make the proposal and because Plaintiff's searches are disproportionate in light of the substantial discovery already produced, and the burden that running the searches would impose on Defendants.

*Timing*. Plaintiff tries to fault Defendants for not "provid[ing] notice . . . before running their search terms and collecting documents," Mot. at 31, but this is not true. Defendants sent their proposed search terms to Plaintiff on July 20. (Ex. D; Price Ex. 7.) It was Plaintiff who waited more than three weeks—until Defendants' substantial completion deadline was mere weeks away—to respond with its own proposal. *See* Background § V.  Plaintiff's delay was prejudicial to Defendants because, given the approaching substantial completion deadline, Defendants reasonably proceeded with reviewing documents based on the searches they proposed. This alone is reason to deny Plaintiff's motion to compel additional searches. *See Elfus*, 2019 WL 3916539, at *2 (denying motion to compel and noting that parties cannot "sit on their hands and then wait until the last moment to seek additional discovery").

*Proportionality*. Compounding the problem of Plaintiff's delay, the additional proposed searches are extremely broad and, thus, would impose a heavy burden on

38

Defendants. When Defendants tested the searches in their database, each one returned thousands of additional documents that would need to be reviewed, as shown below:

| Request No. | Number of unreviewed documents (including families) returned by Plaintiff's proposed search |
|---|---|
| 14 | 8,668 |
| 15(a) | 8,326 |
| 15(b) | 14,286 |
| 18 | 19,019 |
| 19 | 27,098 |
| 20 | 29,296 |

(Kilby Decl. ¶ 15.) Adding any one of these searches would impose an undue burden; adding all of them would require 2,500 hours of additional document review and would extend document discovery by months. (*Id*. ¶ 16.)

Plaintiff's proposed searches return so many results because they lack any meaningful limiting terms. Consider the proposed search for request No. 20:

> ("KOL" or "key opinion leader" or "key opinion leaders" or trainer! or "VA" or "veterans affairs" or "veteran's affairs" or "veterans administration" or "veteran's administration" or "CMS" or medicare or medicaid) /200 ("Item 303" or trend! or uncertain! or effect! or affect! or alter! or impact! or impair! or influence! or "MD&A" or "management's discussion") /200 (profit! or revenue! or financ! or income! or positive or negative or loss or gain or lose or sale! or result! or operation!)

(Price Ex. 30 (listing both side's search terms).) This search consists of three strings of common terms (such as "VA") connected by "OR," with the strings connected by "/200."

39

Because of how open-ended the search is, it's no surprise that it hit on 29,296 additional documents.

By contrast, the search terms that Defendants ran *are* appropriately tailored. (*See* Price Ex. 30.) These searches used terms from the text of Plaintiff's document requests and used proximity connectors (such as "/30") to ensure a close connection between the various topics included in the search. While Plaintiff criticizes Defendants' searches as being too narrow, this criticism is misplaced—for example, searching "VA," as Defendants did for request No. 14, would also pick up references to "VA OIG," as Plaintiff is concerned about. (Mot. at 30.) More generally, it is easy for Plaintiff to criticize Defendants' searches, but Plaintiff has not proposed any reasonable alternative searches.

Given this burden, Plaintiff's additional proposed searches for request Nos. 14-15 and 18-20 are disproportionate compared to the (questionable) value of the case and the discovery that Defendants already have produced. Plaintiff did not claim *any* damages in its initial disclosures, and when asked in an interrogatory to identify its damages, Plaintiff refused to do so, because there are none. (*See generally* Dkt. 116 (Defendants' Motion to Compel).) Indeed, Plaintiff cannot possibly show damages caused by the alleged kickbacks given that Tactile never was excluded or lost revenue from CMS or VA patients, which is how the Amended Complaint alleged shareholders would be harmed. (*See* Dkt. 49 (Am. Compl.) ¶ 48 ("Tactile's kickback schemes risked Tactile losing nearly one-third of its business if . . . Tactile was excluded from participating in the federal health care programs.").) There is no justification for forcing Defendants to review

40

100,000 more documents, at great expense, where Defendants already produced 76,564 documents from 40 custodians, and Plaintiff has not quantified even one dollar in damages.

## **CONCLUSION**

For these reasons, the Court should deny Plaintiff's motion to compel in its entirety.

Date:  September 21, 2022.

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Matt Kilby*

Matthew Kilby (#0335083)
Rory F. Collins (#0397415)
Anderson Tuggle (#0400277)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Phone: (612) 766-7000

*Attorneys for Defendants Tactile Systems Technology, Inc., Gerald Mattys, Lynn Blake, Brent Moen, Robert Folkes, and Bryan Rishe*

41