# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* VETERANS FIRST MEDICAL SUPPLY, LLC, | § § § § | |
| *Plaintiff, Counterclaim Defendant* | § § § | Civil Action No. 4:18-cv-2871 |
| v. | § § § § | |
| TACTILE SYSTEMS TECHNOLOGY, INC. | § § § | |
| *Defendant, Counterclaim Plaintiff* | § § | |

## DEFENDANT TACTILE SYSTEMS TECHNOLOGY, INC.'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Tactile Systems Technology, Inc. d/b/a Tactile Medical ("Tactile") files

this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure, seeking dismissal of Veterans First Medical Supply, LLC's ("Relator" or

"VFMS") Count II claim for a violation of the federal False Claims Act ("FCA") and Anti-

Kickback Statute ("AKS").

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

II.     CASE STATUS ................................................................................................. 3

III.    STATEMENT OF ISSUES AND LEGAL STANDARD OF REVIEW .............. 4

      A.      Statement of the Issues. ....................................................................... 4

      B.      Summary Judgment Standard. ............................................................. 5

IV.    BACKGROUND ............................................................................................... 5

V.     ARGUMENT AND AUTHORITIES ............................................................... 25

      A.      VFMS's Claims Are Prohibited by the Public Disclosure Bar. ................. 26

           1.      *The Allegations Are About Publicly Disclosed Programs.* ............. 27

           2.      *VFMS Is Not an Original Source.* ....................................................... 29

      B.      Tactile Did Not Violate the Anti-Kickback Statute. ................................. 31

           1.      *Tactile's Programs Fall within the AKS Safe Harbor.* ................... 31

           2.      *Tactile's Programs Comply with Federal Law and Industry Guidance.* ........................................................................................ 34

           3.      *The Undisputed Evidence Supports Tactile's Motion for Summary Judgment.* ...................................................................... 36

      C.      Tactile Did Not Act with the Requisite Scienter. ........................................ 39

      D.      Tactile's Alleged Conduct Was Not Material to the Government's Decision to Pay. ................................................................................. 43

      E.      There Is No Evidence of Claims Being Paid as a Result of the Alleged Violations. ............................................................................. 46

VI.    CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott v. BP Exploration & Production, Inc.*,
851 F.3d 384 (5th Cir. 2017) ...................................................................... 44, 45

*Allison Engine Co., Inc. v. United States ex rel. Sanders*,
553 U.S. 662 (2008) ........................................................................................ 39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505 (1986) ................................................................. 5

*Dillon v. Rogers*,
596 F.3d 260 (5th Cir. 2010) ............................................................................ 5

*Fed. Recovery Servs., Inc. v. United States*,
72 F.3d 447 (5th Cir. 1995) ...................................................................... 27, 30

*Gonzalez v. Fresenius Med. Care N. Am.*,
689 F.3d 470 (5th Cir. 2012) ............................................................. 25, 39, 46

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010) ................................................................................... 26, 27

*Hindo v. Univ. of Health Sciences/The Chi. Med. Sch.*,
65 F.3d 608 (7th Cir. 1995) ............................................................................ 39

*Johnson v. Canal Barge Co.*,
181 F.Supp.3d 413 (S.D. Tex. 2016) ................................................................ 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S.Ct. 1348 (1986) ................................................................. 5

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
964 F.Supp.2d 805 (S.D. Tex. 2013) .............................................................. 37

*Safeco Ins. Co. v. Burr*,
551 U.S. 47 (2007) .......................................................................................... 40

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011) ..................................................................................................... 29

*Shriro v. Summerlin*,
542 U.S. 348 (2004) ..................................................................................................... 34

*Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*,
627 F.3d 134 (5th Cir. 2010) ...................................................................................33-34

*United States ex rel. Bidani v. Lewis*,
No. 97-C-6502, 2001 WL 32868 (N.D. Ill., Jan. 12, 2001)......................................... 43

*United States ex rel. Brown v. Celgene Corp.*,
226 F.Supp.3d 1032 (C.D. Cal. 2016) ................................................................... 41, 43

*United States ex rel. Cairns v. D.S. Med., L.L.C.*,
1:12CV00004 AGF, 2017 WL 3887850 (E..D. Mo. Aug. 31, 2017) .......................... 42

*United States ex rel. Colquitt v. Abbott Lab'ys*,
858 F.3d 365 (5th Cir. 2017) ....................................................................................... 26

*United States ex rel. Fitzgerald v. Novation, LLC*,
2008 WL 9334966 (N.D. Tex. Sept. 17, 2008).......................................................... 27

*United States ex rel. Gillespie v. Kaplan Univ.*,
No. 09-20756-CIV, 2013 WL 3762445 (S.D. Fla. July 16, 2013) ........................ 42, 43

*U.S. ex rel. Gonzalez v. Fresenius Med. Care N. Am.*,
748 F. Supp. 2d 95 (W.D. Tex. 2010) ......................................................................... 39

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
880 F.3d 89 (3d Cir. 2018)...................................................................................... 47, 50

*United States ex rel. Gudur v. Deloitte & Touche*,
2008 WL 3244000 (5th Cir. Aug. 7, 2008).................................................................. 39

*United States ex rel. Harman v. Trinity Indus., Inc.*,
872 F.3d 645 (5th Cir. 2017) .................................................................................. 44, 45

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) .................................................................. 40, 41

*United States ex rel. Hendrickson v. Bank of Am., N.A.*,
   343 F.Supp.3d 610 (N.D. Tex. 2018) .................................................. 26, 40, 41

*United States ex rel. Jamison v. McKesson Corp.*,
   649 F.3d 322 (5th Cir. 2011) ............................................................. 27, 28, 31

*United States ex rel. Janssen v. Lawrence Memorial Hospital*,
   949 F.3d 533 (10th Cir. 2020) ......................................................................... 45

*United States ex rel. Johnson v. Kaner Med. Group, P.A.*,
   641 Fed. Appx. 391 (5th Cir. 2016) ................................................................ 43

*United States ex rel. King v. Solvay Pharm., Inc.*,
   871 F.3d 318 (5th Cir. 2017) ...................................................... 46-48, 50

*United States ex rel. King v. Solvay S.A.*,
   2015 WL 925612 (S.D. Tex. Mar. 3, 2015) ............................................. 27-28

*United States ex rel. Nargol v. DePuy-Orthopaedics, Inc.*,
   865 F.3d 29 (1st Cir. 2017) ............................................................................ 45

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
   519 Fed. Appx. 890 (5th Cir. 2013) ......................................................... 25-26

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
   No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012) ............................. 47

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
   810 Fed. Appx. 237 (5th Cir. 2020) .......................................................... 44-46

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
   355 F.3d 370 (5th Cir. 2004) ..................................................................... 40, 41

*United States ex rel. Rose v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*,
   No. CIV. A. 2:05 CV 216, 2008 WL 4056601 (E.D. Tex. Aug. 25,
   2008) .............................................................................................................. 42

**TABLE OF AUTHORITIES**
(continued)

                                                                    **Page(s)**

*United States ex rel. Rosner v. WB/Steller IP Owner, L.L.C.,*
    739 F.Supp.2d 396 (S.D.N.Y. 2010)...................................................................... 29

*United States ex rel. Ruscher v. Omnicare, Inc.,*
    663 Fed. Appx. 368 (5th Cir. 2016)....................................................................... 39

*United States ex rel. Solomon v. Lockheed Martin Corp.,*
    878 F.3d 139 (5th Cir. 2017) ................................................................................. 28

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
    125 F.3d 899 (5th Cir. 1997) ................................................................................. 25

*United States ex rel. Wall v. Vista Hospice Care, Inc.,*
    2016 WL 3449833 (N.D. Tex. June 20, 2016) ...................................................... 47

*United States ex rel. Winkelman v. CVS Caremark Corp.,*
    827 F.3d 201 (1st Cir. 2016)................................................................................. 27

*United States v. Krikheli,*
    461 Fed. Appx. 7 (2d Cir. 2012) ........................................................................... 47

*United States v. Luce,*
    873 F.3d 999 (7th Cir. 2017) ................................................................................ 46

*United States v. Newport News Shipbuilding, Inc.,*
    276 F.Supp.2d 539 (E.D. Va. 2003) ...................................................................... 42

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016)..................................................................................... 3, 44

**STATUTES**

False Claims Act, 31 U.S.C. § 3729 et seq............................................................. passim

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ...................................................... passim

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure Rule 56............................................................. passim

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Tactile Systems Technology, Inc. d/b/a Tactile Medical ("Tactile") is an exemplary company that does "compliance right," has "best in class" compliance practices, and is known by both customers and employees to be "ethical and compliance-oriented." (Ex. 1 at 1; Ex. 2 at 4; Ex. 3 at 10). According to regulatory experts, "the Company wants to and does do the right things when it comes to doing right by patients and complying with the law." (Ex. 3 at 10).

Tactile's two programs at issue in this case, involving Key Opinion Leader ("KOL") medical education and contract trainers, have been publicly operated for years, have been reviewed and approved repeatedly by outside counsel, and comply with the law. Nonetheless, Veterans First Medical Supply, LLC ("Relator" or "VFMS") falsely alleges that Tactile's KOL and contract trainer programs are illegal kickback schemes.

VFMS is a business competitor to Tactile formed in 2017. As discussed below, many doctors prefer the unique technology of Tactile's device, which sets it apart from the device sold by VFMS. Because VFMS could not fairly compete with Tactile, VFMS has engaged in a continuous effort to discredit and defame Tactile, including coordinating with other Tactile competitors to advance this *qui tam* complaint.

Tactile now moves for summary judgment on several grounds, each of which is an independent basis to grant judgment in favor of Tactile.

*First*, VFMS's claims fail under the public disclosure bar. All payments to KOLs were reported to the government under the Sunshine Act and publicly disclosed. Similarly, Tactile's contract patient trainer program was disclosed in Tactile's public securities filings. VFMS did

not "blow the whistle" on its competitor Tactile—it simply repackaged public information and labeled it "illegal." This is fatal for VFMS because any *qui tam* case that is substantially similar to publicly disclosed information must be dismissed under the public disclosure bar of the FCA when, like here, the relator cannot show it is an original source of the information.

*Second*, the undisputed facts show that Tactile did not violate the anti-kickback statute. VFMS contends that Tactile's medical education and contract trainer programs are disguised kickback schemes, but VFMS can provide no evidence to support that contention. The record lacks *any* evidence that Tactile has ever paid a kickback or told a health care provider that it would compensate them for prescribing its products. It also lacks evidence that any health care provider has ever prescribed Tactile products based on such a belief. To the contrary, the record shows that Tactile's medical education and contract trainer programs were created and operated consistent with federal law. Among other things, the programs were reviewed by outside compliance experts, attorney-approved contracts were used, payment was only made for legitimate services rendered, and payment for those services was at or below fair market value.

*Third*, Tactile did not have the requisite scienter for an alleged violation under the FCA or the AKS. Because VFMS relies on allegations under the AKS to prove its FCA claim, it must come forward with evidence that Tactile "knowingly and willfully" paid kickbacks. Here, the evidence overwhelmingly shows that Tactile took great pains to *not* pay kickbacks and to prevent any improper relationship. Tactile followed industry guidance, relied on the advice of outside counsel, created conflict walls and safeguards, and maintained a robust compliance program. It consistently trained, monitored, and enforced rules preventing financial rewards for product referrals. Independent, outside healthcare attorneys conducted comprehensive bi-

2

annual compliance reviews of Tactile, including the contract trainer and medical education programs. After years of reviews, Mr. DuVal described Tactile as an exemplar company. Testimony of medical professionals with knowledge of Tactile's programs unilaterally agree.

*Fourth,* VFMS cannot prove that the alleged violations are ones the "defendant knows is material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). The record shows that Tactile has consistently been open and transparent about the programs. Government customers and regulators have not raised objections, but instead, continued to purchase and pay for Tactile products even after VFMS has tortiously communicated its allegations to the Department of Justice ("DOJ"), Office of Inspector General ("OIG"), and Veterans Affairs ("VA"). This "is very strong evidence" that the conduct was not material to government's payment decision for the devices, which are medically prescribed, medically necessary, and beneficial to patients.

Finally, VFMS has no evidence to link any alleged violation with an actual paid claim, and thus, cannot show causation.

For these reasons, Tactile respectfully requests the Court grant judgment as a matter of law in Tactile's favor on Count II of VFMS's Amended Complaint.

## II. CASE STATUS

VFMS filed this *qui tam* lawsuit under seal on August 20, 2018. ECF No. 1. The United States investigated VFMS's claims and declined to intervene in the case on January 22, 2019. ECF No. 2. On January 23, 2019, VFMS filed an amended complaint. ECF No. 6. On February 13, 2019, VFMS filed a second amended complaint. ECF No. 9; see also ECF No. 15. On October 6, 2020, VFMS again amended its complaint to remove unsupported allegations about

3

Houston physician Caroline Fife, M.D., after Tactile sought to strike those allegations. ECF No. 71 (hereafter the "Complaint").

On March 6, 2020, Tactile answered VFMS's complaint and filed its own counterclaims against VFMS for defamation, business disparagement, and tortious interference. ECF No. 45.

On September 8, 2020, Tactile filed a motion for partial summary judgment on Counts I and III. ECF No. 67. On January 2, 2021, VFMS moved for partial summary judgment on Count I. ECF No. 81. The Court granted Tactile's summary judgment on Counts I and III on March 29, 2021, on the ground that those counts do not state legally cognizable claims. ECF No. 114. The Court also denied VFMS's motion for partial summary judgment. *Id.*

VFMS's remaining claim in the Amended Complaint is on Count II. The discovery deadline was April 30, 2021, and the dispositive motion deadline was May 28, 2021 with briefing due August 13, 2021. ECF No. 170. Docket call for trial is set for December 3, 2021. ECF No. 170.

### III. STATEMENT OF ISSUES AND LEGAL STANDARD OF REVIEW

**A. Statement of the Issues.**

The following is the issue for review by the Court under this Motion.

> ***Does VFMS's allegation that Tactile violated the Anti-Kickback Statute and the False Claims Act fail as a matter of law based on the undisputed facts?***

Yes, VFMS's allegations fail as a matter of law based on the undisputed facts. VFMS lacks evidence that Tactile paid illegal remuneration to induce prescriptions of its products, that Tactile acted with the requisite scienter, that Tactile's conduct was material to the government's decision to pay claims, or that there is any causal relationship between the alleged conduct and any paid claims. The evidence also shows that VFMS's claims are prohibited under the public

disclosure bar.

**B.** **Summary Judgment Standard.**

Summary judgment is proper when, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the suit under governing law." *Johnson v. Canal Barge Co.*, 181 F. Supp. 3d 413, 415 (S.D. Tex. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510 (1986)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Johnson*, 181 F. Supp. 3d at 415. In deciding a summary judgment motion, the Court must "construe all facts and inferences in the light most favorable to the nonmoving party." *Id*. (citing *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)). "However, the non-movant cannot avoid summary judgment simply by presenting 'conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation.'" *Id*. (internal citations omitted). If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-movant to provide "specific facts showing the existence of a genuine issue for trial." *Johnson*, 181 F. Supp. 3d at 415 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356 (1986)).

## IV.    BACKGROUND

VFMS was formed on January 24, 2017, when Allen was an employee of a Tactile competitor named Medical Solutions Supply, Inc. ("MSS"). (Ex. 4; Ex 5, Allen Dep. 8:18-9:6). VFMS now distributes lymphedema pumps manufactured by the company Biocompression to VA hospitals in Texas. (Ex. 4; Am. Compl. ¶¶ 24, 35, 39). Allen is a veteran. He formed

VFMS to take advantage of certain procurement preferences as a Service-Disabled Veteran Owned Small Businesses ("SDVOSB"). (Ex 6 at 5; Ex. 5, Allen Dep. 286:18-24).

Tactile manufactures pneumatic compression pumps used to treat lymphedema, chronic venous insufficiency, and other medical conditions, including a pump called the Flexitouch. (Am. Compl. ¶ 9). A patient can only receive a lymphedema pump if it has been prescribed by a physician. (CMS NCD Manual, Ch. 280.6, at https://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=225; Ex. 8, Hoy Dec. ¶ 6). The devices sold by Tactile and VFMS are not the same. Each contains unique features, including different technology, different materials, different pressure-levels, and different mechanisms of action for providing compression. (Ex. 9, Trock Dec., ¶ 3; Ex. 10, Obermiller Dep. 198:18-199:12; Ex. 11, Baltazar Dec. ¶ 7; Ex. 12, Gasparis Dec. ¶ 6). Many physicians prefer Tactile's device to its competitors because the Flexitouch's wave-like motion compression most closely mimics manual lymphedema therapy. (Ex. 13, Melin Dec., ¶ 2; Ex. 10, Obermiller Dep. 199:15-200:1; Ex. 14, Baylor Dec. ¶ 8; Ex. 15, Radhakrishnan Dec. ¶ 4; Ex. 16, Satwah Dec., ¶ 2).

When VFMS failed to obtain its desired VA market share due to physician and patient preference for the Flexitouch, Allen began a smear campaign against Tactile. The campaign included lodging false allegations against VA procurement officials claiming they had been paid kickbacks by Tactile in exchange for ordering Tactile's device. (Ex. 17, Martin Dep. 45:24-50:5, 67:2-67:25). These false allegations–like the false allegations in the Complaint–were investigated and rejected by the VA. (*Id.*). But not before damaging Tactile's reputation and the reputations of the procurement officials, at least one of whom had to surrender bank records to rebut Allen's smears. (*Id.*). Allen continues to threaten and impugn VA officials. (Ex. 5,

6

Allen Dep. 227:20-228:12).  Frustrated with his failed attempts at intimidating the VA, Allen (through VFMS) eventually filed this *qui tam* case.  (Ex. 7, VFMS 30(b)(6) Dep. 72:5-74:3; 90:14-91:6).  At the time he filed the Complaint, Allen knew many of the allegations were false or lacked support, which he has admitted.  (*Infra* at 22-25).

The Complaint alleges that Tactile improperly paid health care providers kickbacks. (Am. Compl. ¶¶ 24, 30). VFMS's case focuses on two Tactile programs: (1) a patient training program that provides customer assistance on how to use the Flexitouch; and (2) a medical education program that spreads awareness of lymphedema and its treatment options.  (Am. Compl. ¶¶ 24, 30).  Both programs are bona fide programs that serve patients and the lymphedema community.  Tactile does not pay kickbacks to providers to prescribe its devices.

## A.     Tactile's In-Home Patient Training Program Serves Customers.

VFMS alleges that Tactile pays "influencers" a fee of $150 for each Flexitouch device prescribed.  (Am. Compl. ¶ 32).  VFMS has no evidence to support this contention.  Tactile has never paid a health care provider for a prescription of its device. (*E.g.,* Ex. 18, Gorham Dep. 311:21-23 (Q: Did Tactile pay money to clinicians in exchange for prescriptions of its products? A: No.")).  Rather, the record shows that Tactile pays licensed providers solely to perform legitimate and necessary customer training on the safe and effective operation of its devices.

Manufacturers of durable medical equipment ("DME") often need to provide patient training on their devices.  Indeed, the government has recognized that patient training may be "critical" for patient safety and requires appropriate training be provided.  (Ex. 19, Buthusiem Rpt. 12; Ex. 20, CMS, DMEPOS Quality Standards at 9).  It is well recognized within the industry that in-home training at the time of delivery is the most effective model for patient

safety and therapy outcomes. (Ex. 19, Buthusiem Rpt. ¶ 32; *see also, e.g.,* Ex. 5, Allen Dep. 77:6-19 (noting that VFMS also offers patient training for devices); Ex. 8, Hoy Dec. ¶ 8.). Qualified health care professionals are often best situated to assist with in-home patient training, and the federal government recognizes that DME providers often employ them as independent contractors for that purpose. (Ex. 19, Buthusiem Rpt. ¶ 32). Indeed, OIG has issued an advisory opinion explaining that the use of licensed health care personnel to provide patient training on DME equipment is not unlawful. (*Id.* at ¶ 90; Ex. 21, OIG Advisory Opinion No. 08-20).

The record in this case demonstrates that such programs are ubiquitous. Allen himself supervised a contract patient training program like Tactile's when he was employed by MSS. (Ex. 22 at 3). Tactile's general counsel also helped run a similar program at a prior company, which sold respiratory therapy devices. (Ex. 23, Hoy Dep. at 42:6-43:6). Like Tactile, this other company contracted with licensed health care providers trained in respiratory therapy to provide patient training and paid a flat fee of $150 for each training. (*Id.*; *see also* Ex. 24 Haspert Dec. ¶ 2 (indicating that she too ran similar programs at Smiths Medical and Disetronic)).

As with the above programs, Tactile recruits licensed therapists to serve as patient trainers because of their clinical knowledge, experience working with patients, and familiarity with Tactile's devices. (Ex. 8, Hoy Dec. ¶ 7). This training includes working on the device's fit, demonstrating how to don and doff the device, and how to run programs. (Ex. 14, Baylor Dec. ¶ 5; Ex 25). Tactile has found that in-person training is important to its physician customers as well; in addition to reducing safety concerns, it improves patient outcomes, increases patient satisfaction with the device, and ensures high level patient care. (*E.g.,* Ex. 26, Ewell Dec. ¶ 8; Ex. 9, Trock Dec. ¶ 9).

All contract trainers sign a one-year contract, using a contract form provided to Tactile by outside legal counsel, Faegre & Benson. (Ex. 23, Hoy Dep. 43:21-24). Since its inception, trainers have been paid a flat rate of $150 per training, plus reimbursement for mileage at the IRS reimbursement rate.[1] (*Id.* at 52:1-6; Ex. 27). Trainers are not reimbursed for any other expenses. (Ex. 27). An in-home patient training typically requires two to three hours of a trainer's time. (Ex. 26 Ewell Dec. ¶ 6; Ex. 28, Kinder Dec. ¶ 4). This typically includes 60-90 minutes of actual training, as well as time driving to and from the patient's home and filling out paperwork and performing other administrative tasks. (*E.g.,* Ex. 26, Ewell Dec. ¶ 6; Ex. 28, Kinder Dec. ¶ 5). This compensation is fair market value for the time and services provided, (Ex. 29, Klein Dec. ¶¶ 13-21), and VFMS has produced no evidence to the contrary. Indeed, VFMS has not even designated an expert on the issue.

Contract trainer work at Tactile is not guaranteed and can be cyclical, so it is not uncommon for trainers to have primary employment elsewhere. (Ex. 30, Haspert Dep. 84:4-8; Exhibit 31). Therapists do not have the authority to prescribe Tactile's devices. (Ex. 8, Hoy Dec. ¶ 6; Ex. 14, Baylor Dec. ¶ 7). Physicians exercising independent medical judgment are solely responsible for prescribing the devices. (Ex. 32; Ex. 33, Trock Dep. 47:5-7).

Because some therapists may work with or advise physicians, however, Tactile designed its trainer program with multiple safeguards to ensure there is no financial incentive or

---

[1] Occasionally, Tactile will approve an additional $50 payment for long distance travel to and from the patient's home. (Ex. 10, Obermiller Dep. 55:20-23). For patients in remote areas or areas where no trainers are close-by, this incentive payment is critical to secure patient care. (Ex. 29, Klein Dec. ¶ 23; *see also* Ex. 10, Obermiller Dep. 55:24-56:2 ("Q. Is it worth your while to drive, to spend a whole day driving and training somebody for an extra $50? A. No.).

inducement to recommend Tactile products. *See, generally,* Ex. 34 (Tactile policy). The

safeguards include the following:

| Safeguard | Purpose and Effect |
|-----------|---------------------|
| Conflict Walls | Tactile requires Trainers to keep the company apprised of their current employment with a clinic or hospital. (Ex. 27 at 6; Ex. 37 at 10). Tactile then internally "redlines" the trainer from all patients associated with that facility. (Ex. 24, Haspert Dec. ¶ 4; Ex. 30 Haspert Dep. 230:5-17). This means that trainers have no financial incentive to refer or promote Tactile products, as it will not increase their income.<br><br>Occasionally, exceptions are granted to allow a trainer to be assigned a patient from their own clinic or hospital. (Ex. 35, Tactile 30(b)(6) Dep. 91:3-92:4). This occurs rarely–and only as an exception granted by the compliance office, usually because no other trainer is available in the geographic area or due to unusual patient needs. (Ex. 30, Haspert Dep. 15-22; Ex. 24, Haspert Dec. ¶ 7; *see also e.g.* Ex. 36; Ex. 26, Ewell Dec. ¶ 10; Ex. 10, Obermiller Dep. 54:11-17 ("In 13 years I had one patient that was mine that I did training for.")). When an exception was necessary, many times the trainers did not receive payment. (Ex. 35, Tactile 30(b)(6) Dep. 92:3-4). |
| Disclosure to Employers and Patients | Tactile's trainer contract requires that trainers disclose their contractual relationship with Tactile any time they recommend use of a Tactile device. (Ex. 27 at 5).<br><br>Tactile later added a requirement that trainers certify they disclosed and obtained approval from their employer to undertake work as a Tactile trainer. (Ex. 37 at 10). While some employers do have conflict policies that are more restrictive than required by law, it is notable that most hospitals and clinics in Texas—including federally run Texas VA hospitals—have not stopped therapists performing contract work for Tactile. (*E.g.,* Ex. 38; Am. Compl. ¶ 60). |
| Assignment by independent coordinators | Tactile uses independent training coordinators who office at headquarters in Minnesota to manage and assign patient trainings. (Ex. 8, Hoy Dec. ¶ 11; Ex. 24, Haspert Dec. ¶¶ 1-7). These individuals have no sales or marketing incentives, but rather assign using a computer algorithm that lists available trainers based on geographic proximity. (Ex. 24, Haspert Dec. ¶ 6; Ex. 8, Hoy Dec. ¶ 11).<br><br>The training coordinators sometime receive requests from product |

| | |
|---|---|
| | specialists to assign a certain trainer in their district. (Ex. 30, Haspert Dep. 175:22-176:12). These can arise for legitimate reasons unrelated to clinic affiliation. (*E.g.*, Ex. 39; Ex. 26, Ewell Dec. ¶ 11). The training coordinators try to honor patient-driven requests, when feasible and reasonable. (Ex. 30, Haspert Dep. 175:22-176:1212). |
| Express Disclaimers to Health Care Providers. | Tactile explicitly tells trainers that it is not paying them for referrals, including in their contract, in their on-boarding, and during annual recertification training. (Ex. 27 ¶ 7(a)(i) (contract); Ex. 40 (training) Ex. 41 (recertification) at 9, 12; *see also* Ex. 42, Baylor Dep. 31:9-12).<br><br>Trainers understand that they are not provided trainings to reward or incentivize recommendations of its products. Indeed, trainers consistently testified that Tactile never used trainings to influence their recommendations of products in their clinical settings. (Ex. 10, Obermiller Dep. 200:13-22; Ex. 9, Trock Dec.¶ 13; Ex. 26, Ewell Dec. ¶ 15; Ex. 28, Kinder Dec. ¶ 9). To the contrary, they are explicit that Tactile is an ethical company. (Ex. 14, Baylor Dec. ¶ 11; Ex. 26, Ewell Dec. ¶ 13-14; Ex. 9, Trock Dec. ¶ 14; Ex. 28, Kinder Dec. ¶ 8). They also plainly state that their treatment of patients in clinics is driven solely by patient-based concerns. (*E.g.,* Ex. 10, Obermiller Dep. 200:9-12; Ex. 42, Baylor Dep. 17:6-18:10). |
| Training of Sales Staff | Sales staff, called product specialists, are also explicitly trained on the AKS and told they cannot induce or reward health care providers for referrals, both in onboarding and in annual trainings. (*E.g.*, Ex. 43 (initial training); Ex. 44 (annual training); Ex. 34 (Tactile policy)). Sales staff have been explicitly told that the trainer program is not and cannot be treated as a sales incentive or reward. (*E.g.,* Ex. 45 at 1-2).<br><br>Outside experts who have reviewed Tactile's FCA compliance have described the training provided as "above average" and "effective." (Ex. 3 at 6, 10). |
| No Tracking of Trainer Referrals | Tactile has never analyzed or tracked referral levels associated with trainers and has no reason to believe that product referrals levels are affected by trainers working with Tactile. (Ex. 24, Haspert Dec. ¶ 6). |

Although Tactile does not track trainer recommendations, data collected by counsel in connection with this lawsuit confirms there is no pattern indicative of a kickback scheme. For example, among the Texas trainers who have received the most compensation for trainings, the majority either are (1) not therapists in a clinical setting at all (meaning they are not in a position

11

to recommend any product), or (2) despite being in a clinical setting, the therapist has been associated with ten or fewer patients over the time period at issue.  (Ex. 31).  In fact, 16 out of the 25 busiest trainers work at a clinic that has ten or fewer associations with Tactile patients.  (*Id*). If Tactile employed kickbacks to drive referrals, there would be a correlation between training opportunities and patient associations.  There is none.

Not surprisingly, VFMS has been unable to identify a single trainer who claims Tactile proposed or entered into a kickback arrangement.  On the contrary, trainers who have provided testimony in this case have uniformly stated no such arrangement existed.  (Ex. 14, Baylor Dec. ¶ 11; Ex. 26, Ewell Dec. ¶ 13-15; Ex. 9, Trock Dec. ¶¶ 13-14; Ex. 28, Kinder Dec. ¶ 8-9; Ex. 10, Obermiller Dep. 200:13-22).

As a medical device company that has been in business for approximately 15 years, fulfilling tens-of-thousands of device prescriptions on an annual basis, Tactile has nonetheless on occasion had to remind sales employees about the company policies and programs or offer prompt corrective responses.  Tactile protects against such issues as follows.

First, as set forth above, Tactile proactively put in place a system that prevents fulfillment.  The training coordinators, who work out of company headquarters in Minnesota and have no connection to the sales function, understand not to honor such requests as they violate company policy.  (Ex. 30, Haspert Dep. 103:14-104:19; 146:9-23 ("They might have asked, but it was never taken into consideration.")).  This is empirically demonstrated by the fact that some of the most high-volume trainers in Texas were individuals with *no* clinical affiliation at all, no ability to impact prescriptions, and/or no known association with Tactile patients.  (Ex. 31).  If Tactile employees were steering training opportunities to therapists to

induce recommendations, one would see the opposite trend.

Second, Tactile has issued compliance reminders to address and educate on the issue when it has arisen. Training coordinators knew to raise these rare inappropriate requests to the attention of their managers and Tactile's compliance officer Sunday Hoy. (Ex. 30, Haspert Dep. 176:19-20 (noting such requests were "sent up the chain")). These programs worked as intended in practice. (Ex. 46 (email to compliance)). Ms. Hoy would issue specific written or oral reminders to the product specialist or employee at issue such as the following:

> I am following up to the email below regarding trainer selection/assignments and need to make sure there good understanding of the role of the sales folks in requesting trainer assignments. **Sales is not permitted to direct or request assignment of specific trainers**, absent some unique requirement by a patient (i.e. we have one trainer that speaks Chinese and the patient speaks only Chinese; or we have a Muslim patient and she requires a female trainer in order to maintain cultural sensitivity...and even in that case, you would not request a trainer by name, merely identify the need for a female trainer)
>
> **This is a critical aspect to maintain the integrity of our training program.** Trainers are not engaged as a reward for past ordering activity or in anticipation of future ordering activity. Nor can training assignments be directed based on such criteria. Such practices may create the appearance of inappropriate kickbacks to trainers and that is not what our training program is about. It is about ensuring that we have highly competent, knowledgeable trainers to ensure our patients will be appropriately trained on the use of our equipment.

(Ex. 47 at 1; *see also* Ex. 46 at 2 ("Just a reminder: absent some very specific and unique issue, Product Specialists should not be requesting specific trainers for patients. The training department will assign trainers based on their criteria."); Ex. 48 at 1 ("Trainings are never assigned based on order volume or referral practices.")). Ms. Hoy would also send broader reminders to all sales staff. For example, in 2016 Ms. Hoy sent an email to all regional sales managers regarding the company's policy:

13

> Training assignments are the responsibility of the training department. Absent some rare or unique circumstances, the field reps should not be contacting Lynn or any of the training coordinators to request specific training assignments. We cannot and do not assign trainings as a reward for past ordering practices or to otherwise encourage future ordering practices. This would be a violation of the anti-kickback statute. In addition, trainings cannot be assigned to a clinician who may have influence over that particular order, which means that clinicians who are at the facility from which the order comes are not assigned trainings from that facility. This is an important concept.

 (Ex. 45 at 2). Tactile's Vice President of Sales followed up with the regional managers, instructing their teams to prioritize the compliance message:

> Team,
> Please make this communication a priority for your next Team CC. The confirming e mail to Sunday is also important.
> Thanks,
> Bryan
>
> **Bryan Rishe**
> **Vice President - Sales**
> D: 612-355-5171
> M: 704-292-5283

(*Id.* at 1). Outside healthcare experts reviewing Tactile's programs have described the use of these compliance reminders to address problems upon discovery as "best practice" and commended Tactile for doing so. (Ex. 3 at 15).

Tactile has been consistent both in the design and operation of its patient training program: the patient training program provides good patient outcomes and customer satisfaction. Licensed providers, especially those familiar with lymphedema, are valuable to patients using the Flexitouch for self-directed home therapy. Tactile's trainer program does not serve a sales function. Tactile pays fair market value for services rendered and assigns trainings based on factors unrelated to provider's clinical practices. Importantly, many of Tactile's most active trainers in Texas had nothing to do with prescribing or recommending Tactile's device – exactly the opposite of what one would see if a kickback arrangement was in place.

14

**B.      Tactile's Medical Education Program Educates the Community on the Diagnosis and Treatment of Lymphedema.**

VFMS also alleges that Tactile's medical education program is an illegal inducement. The Complaint makes allegations about a single doctor, Dr. Ulises Baltazar, a physician in Houston.  (Am. Compl. ¶ 24).  VFMS alleged that Dr. Baltazar told Allen that he would only order Tactile pumps and not order from VFMS because he was a "paid spokesman" and paid "advisor" to Tactile.  (*Id.*).  During the deposition of VFMS, however, Allen admitted that Dr. Baltazar did not actually make these statements.  (Ex. 7, VFMS 30(b)(6) Dep. 207:21-208:5). Rather, Dr. Baltazar only stated that he worked with Tactile (*Id.* at 52:25), and Allen inflated this innocuous statement into a kickback scheme.  Not surprisingly, VFMS never deposed Dr. Baltazar.

The use of health care professionals to provide medical education and other consulting is legally permitted and ubiquitous in the medical device industry.  (*See* Ex. 29, Klein Dec. ¶ 25; Ex. 19, Buthusiem Rpt. ¶¶ 23-24).  The government is aware of these arrangements and the Sunshine Act requires that device manufacturers and pharmaceutical companies report payments made under such arrangements.  (Ex. 29, Klein Dec. ¶ 26; Ex. 8, Hoy Dec. ¶ 13).  This data is posted online and is publicly available.  (*Id.*).  In 2019, non-research payments to physicians in the United States (which includes speaking fees) totaled $2.4 billion.  (Ex. 49).

Like thousands of other companies, Tactile engages physicians, known as KOLs, to speak about the disease that its products treat and their experience with those products.  (Ex. 8, Hoy Dec. ¶ 14).  Lymphedema is an underserved and under-diagnosed condition, about which many physicians do not receive sufficient education or training, and Tactile seeks to engage the

most prominent and well-respected specialists it can to bridge that gap. (*See* Ex. 13, Melin Dec. ¶ 2 ("There is a significant need for ongoing physician education regarding lymphedema. In medical school, physicians typically receive less than an hour of education about lymphedema during four-year program, but the disease affects a significant portion of the population and patients with chronic wounds and venous disease."); Ex. 8, Hoy Dec.¶ 16).

Working with these experts, Tactile sponsors several types of medical education events, from traditional speaker events at a podium, to peer-to-peer events where a KOL meets with one or two professionals to provide a more personalized communication, to "Mingle with the Experts" events at national physician conferences, where Tactile KOLs are present for informal conversations about lymphedema and Tactile's device. (Ex. 50, Weaver Dec. ¶ 4; Ex. 51, Mosbek Dec. ¶ 7; Ex. 52). These are not illicit activities, but rather public and well-accepted collaborations engaged in by almost every medical device and pharmaceutical manufacturer, as the Sunshine Act database reflects.

Tactile maintains and follows a lawful policy for financial interactions with healthcare professionals that applies to its KOL arrangements. (Ex. 34). Among other things, the policy requires that any KOL program be supported by a legitimate business or educational need. (*Id.* at 8). The decision of which speaker to use for a program is determined by an independent program administrator in Minneapolis and is based on legitimate factors such as subject matter, audience, location, and speaker availability. (Ex. 51, Mosbek Dec. ¶ 3).

Although VFMS alleges that Tactile "made payments to doctors for purported speaker programs that either did not occur at all or that had few or no attendees," (Am. Compl. ¶ 26), the undisputed record demonstrates that Tactile speakers do not and never have presented to

16

empty rooms. (Ex. 51, Mosbek Dec. ¶ 3; Ex. 12, Gasparis Dec. ¶ 8; Ex. 13, Melin Dec. ¶ 11; Ex. 15, Radhakrishnan Dec. ¶ 10). Tactile tracks program RSVPs and cancels any programs if sufficient attendance is not expected. (Ex. 51, Mosbek Dec. ¶ 3 ("If there appears to be little or no interest in a program, Tactile cancels the program 48 hours prior to the program."); Ex. 53 at 5 (Event Planning Kit); *see also* Ex. 19, Buthuseim Rpt. ¶ 60 (noting that of three KOL events in 2019 with zero attendees recorded, two were cancelled 48 hours in advance and the remaining event was a conference at which attendance was not tracked); Ex. 54, Karni Dec. ¶ 13 (noting one instance where KOL program was canceled due to insufficient interest)).

Tactile's events are also carefully documented. (Ex. 51, Mosbek Dec. ¶ 6.)). Tactile employees track attendees, as well as all receipts and expenses for the event. (Ex. 51, Mosbek Dec. ¶ 6; Ex. 53). Speakers submit an invoice and receipts to Tactile describing "with specificity" the services provided, including an itemization of the services performed and the charges assessed pursuant to the rate set forth in the Agreement. (*Id*.). These receipts are reviewed to ensure compliance to Tactile's policies. (Ex. 51, Mosbek Dec. ¶ 6).

Tactile requires its KOLs enter into written agreements. (Ex. 34 at 8 ("There must be a written contract that describes the services to be provided."). Tactile sought the advice of outside counsel who specialize in health care compliance in drafting the contracts. (Ex. 55). They are industry standard. (Ex. 29, Klein Dec. ¶ 28; Ex. 19, Buthusiem Rpt. ¶¶ 7(b), 29). Among other things, the agreements state: "Both parties understand that this Agreement, and any consideration paid hereunder, is not contingent upon Physician's use, ordering, recommending, or prescribing of any of Company's products . . . ." (*See, e.g.,* Ex. 56 ¶ 4.02; Ex. 58 ¶ 5.02). Thus, it is unsurprising that public institutions, such as the University of Texas

17

and University of Minnesota, know physicians in their employ are working with Tactile and have approved the relationships. (Ex. 54, Karni Dec. ¶ 7; Ex. 13, Melin Dec. ¶ 3).

The amounts Tactile has paid to KOLs are commercially reasonable and actually "at the lower end of the fair market value range." (Ex. 29, Klein Dec. ¶ 32). These compensation rates were based on a fair market value assessment provided by outside consulting agency Sullivan Cotter, as well as advice from outside healthcare attorneys DuVal & Associates. (*See* Ex. 58; Ex. 59; Ex. 8, Hoy Dec. ¶ 15; Ex. 82, DuVal Dec. ¶¶ 8, 11, 20). As a practical matter, Tactile's speaker compensation does not replace the income physicians lose by leaving their practice to prepare for and provide the educational sessions. (*See* Ex. 15, Radhakrishnan Dec. ¶ 13; Ex. 54, Karni Dec. ¶ 8; Ex. 16, Satwah Dec. ¶ 4; Ex. 50, Weaver Dec. ¶ 5).

The record shows that Tactile also does not track or reward referrals from KOLs with speaking opportunities. (Ex. 50, Weaver Dec. ¶¶ 6-7). Dr. Ronald Karni, a Texas physician who has spoken at Tactile events, explains: "Nobody from Tactile ever told me or implied that I would receive more speaking engagements or remuneration if I referred more devices to patients" and that, if there had been, he would "not have begun or continued my relationship with Tactile." (Ex. 54, Karni Dec. ¶ 2; *see also id.* ¶¶ 5-6, Ex. 11, Baltazar Dec. ¶ 5; Ex. 16, Satwah Dec. ¶ 3-4; Ex. 13, Melin Dec. ¶ 5; Ex. 15, Radhakrishnan Dec. ¶¶ 5-7, 14; Ex. 9, Trock Dec. ¶ 13; Ex. 12, Gasparis Dec. ¶¶ 6, 9; Ex. 60, Kirakosian Dec. ¶ 4; Ex. 61, Eidson ¶¶ 3-4). Rather, when Tactile's KOLs prescribe the device, they do so because in their clinical judgment it is the most appropriate device for the patient and provides the best clinical outcomes. *Id.*

Tactile's KOL program administrators confirm that Tactile internally also does not consider its medical education program to have any relation to product prescription levels. (Ex.

18

50, Weaver Dec. ¶ 5, 7; Ex. 51, Mosbek Dec. ¶ 4). They have never heard of or made any statements suggesting that Tactile would provide speaking or travel opportunities in exchange for physician prescriptions. (*Id*.) Tactile's medical education program is not intended to be an inducement to increase referrals by KOLs.

**C.     Tactile Maintains a Robust Compliance Program, Which Has Included Regular Audits and Reviews by Outside Health Care Attorneys.**

The U.S. Department of Health and Human Services OIG issues recommendations to health care companies, including recommendations that they maintain compliance programs with certain characteristics. (*E.g.,* Ex. 3 at 7-8 (collecting applicable OIG guidance on compliance programs). Tactile has worked diligently with both internal stakeholders and external experts to ensure it has a robust and effective compliance program.

Tactile has a dedicated Compliance Office, with an executive level compliance officer and three additional employees. (Ex. 35, Tactile 30(b)(6) 43:2-4, 43:16-45:19). Tactile also has two compliance committees—a board of directors' committee and a senior management committee. (*Id*. at 51:10-53:8). Both meet regularly to discuss compliance issues. (*Id*.) Tactile has promulgated and enforces policies specifically related to payments to health care professionals to ensure compliance with the AKS and other laws. (*E.g.,* Ex. 34). Employees and contract trainers are trained on this and other compliance matters as part of new employee training and in annual refresher trainings, as described above. (*E.g.,* Exs. 40, 41, 43, 44; Ex. 35, Tactile 30(b)(6) Dep. 105:22-107:9; Ex. 23, Hoy Dep. 117:8-23, 118:9-119:2). Tactile also has a compliance email address, as well as an anonymous compliance reporting hotline through which employees can report any concerns about unethical or improper conduct. (Ex. 35, Tactile

30(b)(6) Dep. 70:1-72:10). Employees are provided a wallet card to care carry with them to ensure access to these resources at all times. (*Id.* 72:10-12).

Tactile also has in place oversight and audits of its programs, to ensure they are operating as intended. This means review of clinic affiliations for outside trainers, regular review of expenses and pay associated the KOL program, ongoing checks and review for any other expenses or payments to health care providers, and annual Sunshine Act reporting, among others. Ex. 23, Hoy Dep. 190:8-22 (discussing overall compliance effort), 25:6-27:9; Ex. 35, Tactile 30(b)(6) Dep. 129:1-130:3 (discussing review and audit of KOL program); Ex. 8, Hoy Dec. ¶13*;* Exs. 62-66 (examples of policies, compliance meeting minutes, and compliance activities)).

Since 2007, Tactile has also engaged independent outside compliance expert DuVal & Associates to conduct biannual reviews of its operations and compliance program. DuVal has concluded that Tactile "follows [the OIG] guidelines" for compliance programs and "does an admirable job implementing them." (Ex. 3 at 10). DuVal also reports that Tactile has a "strong culture of compliance." (*Id.* at 3). Based on interviews with employees "from a wide variety of disciplines" at Tactile, DuVal found that "[t]he 'tone at the top' consistently reinforces that the Company wants to and does do the right things when it comes to doing right by patients and complying with the law." (*Id.* at 10). Moreover, DuVal explained that the "attitude seems to have infiltrated the ranks below the executive level and, importantly, really does seem to be part of the fabric of the sales and marketing organization." (*Id.*).

DuVal further determined that Tactile "follow[s] up" and "carrie[s] through" on its desire to be compliant, both generally and specifically in response to feedback from DuVal in prior

20

reviews. (*Id.* at 10-11). This includes proper compliance reporting structures, a commendable practice of sending "compliance "reminders" when an issue is discovered, and investigations conducted with "exemplary" speed and thoroughness when necessary. (*Id.* at 15-16).

As to payments to health care providers, DuVal also explained:

A "payment" is a transfer of value, such as cash or in-kind transfers for compensation, food, entertainment, gifts, travel, consulting fees, honoraria, research funding or grants, education or conferences funding, stocks or stock options, ownership or investment income, royalties or licenses, or charitable contributions. . . . Discerning when remuneration rises to the level of an inducement is subject to interpretation and many companies chose to be fairly conservative in their approach. . . .Tactile is among them.

(*Id.* at 28). DuVal ultimately determined that Tactile was "careful to ensure therapists are not influencing referrals, prescribing behavior or purchasing decisions." (*Id.* at 5). This is consistent with the advice DuVal has provided over the years. (*See* Ex. 67, 2011 DuVal Report; Ex. 2, 2015 DuVal Report; Ex. 68, 2019 DuVal Report).

Significantly, Tactile has also maintained accreditation since 2008 with Accreditation Commission for Health Care ("ACHC"), which is a CMS approved accrediting body. (Ex. 8, Hoy Dec. ¶ 19). Absent ACHC accreditation, Tactile cannot participate in Medicare. (*Id.*). The accreditation process involves site visits every three years by ACHC assessors, employee and contractor phone and in-person interviews, and review of all Tactile's documentation of its business programs, including detailed review of its policies and procedures. (*Id.*). This includes review of Tactile's patient trainer contracts, patient training protocols and checklists, and interviews of patient training staff and contract trainers. (*Id.*). ACHC has never once flagged Tactile's patient training programs as illegitimate or inappropriate. (*Id.*).

Given the above, it is not surprising that Tactile is recognized by health care providers

21

for its culture of compliance and professionalism. As a therapist explains:

> [A]side from providing superior products to lymphedema patients— Tactile's commitment to ethics and compliance is one of the qualities that sets it apart from its competitors. Unlike many medical device companies and distributors in the lymphedema space, Tactile is one of the rare companies who do not cut ethical corners in order to make more money.

(Ex. 25, Ewell Dec. ¶ 13; *see also* Ex. 15, Radhakrishnan Dec. ¶ 15; Ex. 9, Trock Dec. ¶ 14; Ex. 69, Harrelson Dec. ¶¶ 9-10; Ex. 70, Fife Dec. ¶ 9; Ex. 11, Baltazar Dec. ¶ 9; Ex. 28, Kinder Dec. ¶ 8; Ex. 14, Baylor Dec. ¶ 11; Ex. 54, Karni Dec. ¶ 7; Ex. 16, Satwah Dec. ¶ 9; Ex. 13, Melin Dec. ¶ 5; Ex. 12, Gasparis Dec. ¶ 12; Ex. 60, Kirakosian Dec. ¶ 4; Ex. 61, Eidson Dec. ¶ 4).

## D. VFMS Made Serious Allegations Against Tactile without Any Knowledge to Support Them.

Because Allen is a veteran, VFMS is eligible for certain procurement preferences provided to SDVOSB. Allen proposed to MSS, another Tactile competitor, that it enter into a corporate agreement with VFMS to take advantage of these preferences and take away Tactile's market share. (*See* Ex. 71). Per this agreement, MSS would loan startup funds to VFMS and stop selling pumps at certain Texas VA hospitals. (*Id.*). In exchange, VFMS would leverage its SDVOSB status to capture market share from Tactile at these hospitals and return a portion of the proceeds to MSS. (*See id.* ¶ 12, 14). VFMS would relinquish this territory back to MSS after several years. Allen explained: "At the end of the transition period, MSS will take back a much higher producing territory." (Ex. 6). This plan was likely unlawful[2] and appears not to have materialized with MSS; however, VFMS is now a distributor for a different manufacturer,

---

[2] *See, e.g.,* DOJ Website, https://www.justice.gov/usao-dc/pr/former-mcc-construction-company-officer-and-owner-pleads-guilty-conspiring-obstruct.

BioCompression.

VFMS's business model has always focused on stealing market share from Tactile. (*E.g.*, Ex. 7, VFMS 30(b)(6) Dep. 71:23-72:12; 129:15-131:9, 237:4-240:10).[3] Indeed, VFMS brought this case in collaboration with the CEO of one of Tactile's national competitors, who provided VFMS exhibits for its complaint. (*See* Ex. 77, VFMS 30(b)(6) Dep. 69:20-70:8).

While VFMS had a motive to attack Tactile, it lacked any unique or non-public knowledge about Tactile programs. Rather, when asked for the basis for its allegations, Allen could only point to vague and unsupported rumors he heard second-hand. (Ex. 7, VFMS 30(b)(6) Dep. at  27:2-5, 218:22-219:4, 46:3-49:12, 52:22-55:20, 97:10-98:7, 103:16-104:7, 107:13-108:14 , 111:11-112:13; 217:14-22). More troubling, Allen outright admitted that his complaint contained known falsehoods, including the following:

> Q:     So paragraph 35 states starting in 2017 defendant began to take orders away from

---

[3] VFMS was focused on intercepting prescriptions for Tactile's product from VA physicians and flipping those orders to its own product, misleading veterans or the VA in the process. (*See e.g.,* Ex. 72 (failing to inform a patient concerned about copay that he could obtain the prescribed Tactile device at no cost); Ex. 73 (falsely telling the patient that the prescribed Flexitouch device was no longer available); Ex. 74 (advising patient to circumvent doctors order for Flexitouch)). Faced with physicians who insisted that their patients receive Flexitouch devices, Allen harangued VA procurement personnel to ignore clinician prescriptions for the Flexitouch. (*E.g.,* Ex. 75). One frustrated procurement official ultimately wrote Allen:

> I do not have the authority to force clinicians to prescribe your item, and I do not have authority to change prescriptions to benefit your company. . . . I apologize your product was found to be inferior by the subject matter experts who provide direct patient care.  Please accept that clinicians have found **the patented technology** of your competitor has better outcomes.

(Ex. 76 at VFM0809).  VA officials have testified that VFMS's actions were unprofessional and distracted VA personnel from taking care of veterans. (*See* Ex. 17, Martin Dep. 24:18-25:2; 46:1-49:3).  They also confirmed that Allen made false statements. (*Id*. at 21:16-24; 35:23-36:1; 61:20-64:11; 72:24-73:16).

Relator Veterans First. That's not accurate; is it?

A:  This entire section was inaccurate.

Q:  This whole paragraph is inaccurate?

A:  Yes.

Q:  When you reviewed the complaint, did it raise any concern, the inaccuracies in here?

A:  I do not remember.

*  *  *  *  *

Q:  Did you have any concern at all that you are smearing innocent people in a pleading available to the public? Not just available to the public, it is being used and ba[ntie]ed about by investor publications later on. But did you have any concern that you were smearing innocent people in this complaint?

. . . .

A:  It was incorrect.

Q:  I mean you are -- you are not just talking about general physicians and clinicians. You are talking about hospital staff members at a specific hospital taking bribes. You didn't have any concern when you read this?

A:  It was incorrect.

(*Id*. at 232:15-234:2).

Q:  Paragraph 39 states in addition, the Sugar Land Hospital conducts a major lymphedema clinic which had been a top prescriber of Allen and Gibbs until 2017 when defendant began taking all of that business by paying fees to hospital staff. What specific factual support did you have for the allegations of this paragraph?

A:  None.

(*Id.* at 240:11-19).

Q:  And what specific activities and other hospitals supported the allegation that Tactile induced VA Hospital employees to ignore your SDVOSB status?

A:  Without Tactile's typical mode in the VA Hospital, the clinicians would have been more in support and the prosthetics department would not have been so irrationally resistant.

Q:  Can you point to a specific conversation that supports that allegation?

A:  No.

Q:  Can you point to a specific document that supported that allegation?

A:  No.

(*Id.* at 248:13-249:1; *See also id.* at 105:23-106:13; 111:7-20; 111:21-114:10; 123:3-125:10; 206:3-208:9; 209:7-25; 217:10-219:4; 219:5-220:1; 220:2-21; 225:15-226:9; 227:15-229:7; 231:2-17; 231:18-232:14; 236:17-237:3).

The Complaint filed by Mr. Allen also included false allegations against innocent third

24

parties, one of whom – Texas physician Dr. Caroline Fife – required Court filings before Allen finally removed what he knew to be false allegations. (*See id.* at 220-223 (describing lack of support for allegations smearing Dr. Caroline Fife); 241:9-20 (admitting allegations against Dr. Baltazar were based on innuendo only)).

In short, VFMS filed its Complaint as a disgruntled competitor, making allegations that Allen knew lacked a factual basis or were supported only by generalized rumors, the sources and specific content of which Allen could not identify. VFMS has not identified any knowledge to support its allegations, let alone any knowledge that is unique or non-public.

## V. ARGUMENT AND AUTHORITIES

The False Claims Act imposes liability on individuals who submit "a false or fraudulent claim for payment or approval" of government funds. 31 U.S.C. § 3729(a)(1)(A). The FCA requires a relator to prove the following four elements to demonstrate a violation: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012). VFMS cannot meet any of these requirements.

The Anti-Kickback Statute "prohibits (1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997) (citing 42 U.S.C. § 1320a–7b(b)). This requires plaintiffs to prove: (1) the defendant knowingly and willfully entered into a kickback arrangement; and (2) the arrangement actually induced – in other words, caused – referral of patients. *United States ex*

25

*rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) ("actual inducement is an element of the AKS violation," so plaintiff must prove "a kickback provided *in turn for the referral of patients*") (emphasis added). VFMS cannot show this.

In addition, to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits", the FCA includes a public disclosure bar. *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 295 (2010); *see also United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 373 (5th Cir. 2017). The public disclosure bar requires dismissal where the allegations have been publicly disclosed and the relator is not an original source (as VFMS is not in this case). 31 U.S.C. § 3730(e)(4).

Tactile has not violated the FCA or the AKS and the undisputed material facts provide numerous independent reasons for granting Tactile's summary judgment.

## A. VFMS's Claims Are Prohibited by the Public Disclosure Bar.

The Court must dismiss this action under the public disclosure bar "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" and VFMS does not qualify as an original source. 31 U.S.C. § 3730(e)(4); *see also United States ex rel. Hendrickson v. Bank of Am., N.A.,* 343 F. Supp. 3d 610, 623 (N.D. Tex. 2018) (collecting cases)*, aff'd,* 779 F. App'x 250 (5th Cir. 2019). VFMS's complaint is based upon publicly disclosed information and VFMS is not an original source.

Tactile has publicly disclosed that it contracts with trainers and KOLs for years. VFMS, as a competitor to Tactile solely in Texas, does not have direct, unique, or "original" knowledge or information regarding Tactile's programs. In fact, VFMS's founder has admitted that many of the allegations in the Complaint were knowingly unsupported or speculative when filed, or

26

worse, knowingly false. VFMS is precisely the type of relator the public disclosure bar is designed to prohibit and it is fatal to VFMS's remaining claim.

###### 1. *The Allegations Are About Publicly Disclosed Programs.*

Congress had no desire to reward "opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Wilson*, 559 U.S. at 281. As a result, the public disclosure bar prevents individuals from pursuing actions where the basic underlying allegations are already known. 31 U.S.C. § 3730(e)(4). The public disclosure bar requires courts to dismiss a *qui tam* complaint where the allegations are substantially the same as information previously disclosed in certain specified sources, unless the relator can prove that he is an "original source" of the information. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

The standard for the bar to apply is "not onerous." *United States ex rel. Fitzgerald v. Novation, LLC*, 2008 WL 9334966, at *3 (N.D. Tex. Sept. 17, 2008). According to *Fitzgerald*, allegations will meet this standard "so long as those claims 'are based at least in part on allegations already publicly disclosed,' even if the relator 'uncovered some nuggets of new, i.e., non-public, information.'" *Id.* "As a general matter, a public disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (quotations omitted). If the claims are even "partly based" on public disclosures, they fail under the public disclosure bar. *See e.g., Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995). Each fact supporting a relator's fraud theory need not be disclosed, so long as the public information is sufficient to "'set the government on the trail of

27

the fraud' and ensure that the government will not 'need to comb through myriad transactions performed by various types of entities in search of potential fraud.'" *United States ex rel. King v. Solvay S.A.*, 2015 WL 925612, at *4 (S.D. Tex. Mar. 3, 2015) (King II) (quoting *Jamison*, 649 F.3d at 329); *see also United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 144 (5th Cir. 2017).

For years, Tactile has publicly disclosed its trainer and medical education programs. Information regarding these programs is reported directly to the government. For example, Tactile has filed public reports with the Security and Exchange Commission ("SEC") explaining that it "utilize[d] over 400 licensed, independent healthcare practitioners as home trainers who educate patients on the proper use of our solutions." (Ex. 81, Tactile's Feb. 2017 SEC 10-K Report at 3). Tactile further discloses that:

> After delivery, we coordinate a visit from one of our over 400 licensed, independent contract trainers that go to our patients' homes to provide individualized training to our patients, when requested. These trainers are healthcare professionals, licensed in their state of residence, who we have identified through our sales and marketing interest and instructed on proper use of our products. Training visits are coordinated from our offices in Minneapolis and training sessions assigned by our staff. Upon completion of training, the independent contractor submits an invoice to us for payment for the patient's training and their travel.

(*Id.* at 13). Tellingly, VFMS specifically cites this document as a basis for key allegations in the case. (Ex. 7, VFMS 30(b)(6) Dep. 103:16-104:3).

Tactile also reports details of its payments to all physicians directly to CMS consistent with the Sunshine Act. (Ex. 8, Hoy Dec. ¶ 13). This information is publicly available on CMS's open payments database and can be broken down into individual payments and categorized as consulting fees (such as speaking), food and beverage, and travel or lodging. (*See* CMS Open

28

Payment Website, https://openpaymentsdata.cms.gov/).

VFMS's Complaint also focuses on Tactile's sales at VA hospitals in Texas and is based on information VFMS obtained from FOIA requests related to sales at those facilities. *See, e.g.,* Ex. 7, VFMS 30(b)(6) Dep. 123:15-124:6 (claiming he "knew" orders were tainted by a paid therapist because "the FOIA report shows that all orders that are coming out of the lymphedema center are Flexitouch.").

Each of these is a public "report" under the public disclosure bar set forth in the FCA. 31 U.S.C. § 3730(e)(4)(A); *Schindler Elevator Corp. v. United State ex rel. Kirk*, 563 U.S. 401 (2011) (information disclosed by government in response to a FOIA request is a "report"); *United States ex rel. Rosner v. WB/Steller IP Owner, L.L.C*, 739 F.Supp.2d 396, 401 (S.D.N.Y. 2010) (public database on city's website was a report subject to public disclosure bar) (superseded on New York state law grounds not applicable here). VFMS's Complaint is solely focused on programs that Tactile operated openly and publicly. The two programs that form the basis of the allegations are included in public reports and have been publicly disclosed.

### 2. *VFMS Is Not an Original Source.*

Because VFMS seeks to pursue claims based on publicly disclosed information, VFMS must be an "original source" for the information. To qualify as an original source: (1) the relator must have voluntarily disclosed the information on which the publicly disclosed allegations are based "to the Government" "prior to a public disclosure," or (2) the relator must "ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2019). It is indisputable that VFMS does not meet this test.

29

In his depositions, Allen repeatedly admitted that VFMS has no specific, unique, or direct inside information regarding either program, which makes sense because VFMS is merely an outside competitor. Rather, VFMS made allegations based on assumptions drawn from public information or generalized rumors. (*See, e.g.,* Ex. 7, VFMS 30(b)(6) Dep. 46-49 (allegations based on unspecified comments from competitor reps); 52-69 (allegations based loosely on comments or conversations with others); 97:10-25 (allegations purportedly based on information from clinicians); 103:16-104:7 (allegations based on comments from others, SEC 10-K Report, etc.); 107:13-108:14 (admitting he "was not present" when any alleged product referral was induced and that he instead inferred it from a decline in his business); 111-113). Notably, even these purported rumors are incredibly suspect, as Allen consistently failed to identify a single individual from whom he heard that Tactile had engaged in misconduct, a single instance in which such speculative information was presented to him, or a single piece of information regarding Tactile's conduct. (*E.g. id.* at 218:22-219:4 ("Q: Okay. And who informed you of that? A: Many people in the industry. Q: Can you give me a single specific example? A: No.); 111:11-112:13 (similar); 217:14-22 (similar); 27:2-5 (similar); 49:3-9 (similar)).

As Allen admitted, he brought the lawsuit in hopes it would "open up the market" for him to sell more of his devices. (*Id.* at 72:3-12). And he pursued the case only after the VA stopped complying with his demand that they change physician orders for Tactile devices to his company. (*Id.* at 72:5-74:3; 90:14-91:6 (explaining that he brought the suit because VA officials were rude and did not prescribe his device)). VFMS did not "blow the whistle" or uncover any unknown conduct by Tactile. VFMS did not have access to any information other than that

30

which was publicly disclosed. VFMS simply repackaged public information and mislabeled it "illegal." VFMS has no evidence that is independent and materially adds to the already publicly disclosed information. VFMS is not an original source. *See Fed. Recovery Servs., Inc. v. U.S.*, 72 F.3d at 448–49, 451–52 (finding that relators who brought suit against competitor and other defendants were not original sources); *U.S. ex rel. Jamison*, 649 F.3d at 332 (dismissing claims of relator who brought FCA claims against competitors).

VFMS's allegations are prohibited by the public disclosure bar and must be dismissed.

**B.      Tactile Did Not Violate the Anti-Kickback Statute.**

Tactile's KOL and contract trainer programs comply with federal law and are common throughout the health care industry. The program and services furnished under such programs were reviewed and approved by outside legal counsel and were publicly reported through various federal agencies or platforms. Moreover, the programs have been implemented and operated with appropriate safeguards in place to ensure compliance and curb any potential improper behavior. (*Supra* at 10-11).

VFMS cannot articulate a legally viable theory explaining how Tactile's programs violate the law. And now more than two years into the case and after the close of discovery, VFMS cannot present the Court with any evidence to support its incorrect theories. The undisputed material facts show Tactile complied with the law.

**1.      *Tactile's Programs Fall within the AKS Safe Harbor.***

It is well recognized that some relationships between health care providers and health care companies can serve patient interest, and the AKS does not bar all relationships between a health care company and health care providers. (Ex. 19, Buthusiem Rpt. ¶¶ 23-25, 30-34).

31

CMS requires that Tactile train patients on its device, and Tactile meets that requirement by hiring trainers to meet with patients in their home. (*Id.*; Ex. 8, Hoy Dec. ¶ 8). Tactile also contracts with physicians to speak about lymphedema and the clinical benefits of the Flexitouch. (Ex. 8, Hoy Dec. ¶ 14). There is nothing improper, or even unusual, about such arrangements. (*E.g.,* Ex. 19, Buthusiem Rpt. ¶¶ 23-25, 30-34). Programs like Tactile's trainer and medical education programs are common throughout the health care industry. (*Id.;* Ex. 23, Hoy Dep. 42:6-43:6; Ex. 22 at 3).

Indeed, the OIG has promulgated regulatory safe harbors for such conduct. Any conduct that complies with a safe harbor is deemed to not violate the AKS. *See* 42 C.F.R. § 1001.952. Tactile consulted with outside counsel to ensure it relationships followed OIG guidance and complied with applicable regulations. (Ex. 23, Hoy Dep. 42:6-:45:17, 45:24-46:13 (discussing reliance on outside law firms, including to draft contracts); Ex. 82, Duval Dec. ¶ 21). Tactile structured its program agreements to fall within a regulatory safe harbor for personal services because the arrangements: (i) are set out in writing, (ii) are signed by the parties, (iii) last one year, (iv) identify the services contemplated to be furnished, (v) and set the compensation in advance, consistent with fair market value, and without taking into account the volume or value of referrals. 42 C.F.R. § 1001.952(d); *see also* 85 Fed. Reg. 77,684, 77,839 (Dec. 2, 2020).

The undisputed record establishes that for both the contract trainer and KOL programs, all providers worked pursuant to written contracts that were signed by both Tactile and the provider. (*See, e.g.,* Ex. 27 (exemplar training contract); Ex. 83 (exemplar speaker contract); *see also* Ex. 34 (internal policy)). Contractors were paid for services furnished. (*See, e.g., supra* at 8-9 (collecting testimony of trainers) and 15-16, 18 (collecting testimony of speakers)). The

individuals furnishing such services were paid at or below fair market value. (Ex. 29, Klein Dec. ¶¶ 13-21; 25-35; Ex. 58; Ex. 59; Ex. 8, Hoy Dec. ¶ 15; Ex. 23, Hoy Dep. 53:10-61:10, 66:13-68:6; Ex. 35, Tactile 30(b)(6) Dep. 129:1-21).

The OIG's update to the AKS safe harbors in 2020 further establishes the regulatory protection for Tactile. 85 Fed. Reg. at 77,839. The OIG revisions clarified that the safe harbor applies so long as the formula for determining compensation is set out in advance. *Id*. More specifically, there were two elements of the prior version of the safe harbor that, as a practical matter, were impractical: (1) setting aggregate compensation in advance; and (2) listing the exact dates services would be provided. Agreements that lacked these elements are common throughout the healthcare industry, and the absence of these two inapplicable elements does not render those agreements unlawful. (*See, e.g.,* Ex. 19, Buthusiem Rpt. ¶ 18). For these reasons, the OIG modified the safe harbor to confirm that an arrangement may qualify without fixing aggregate compensation in advance. *See* 85 Fed. Reg. at 77,839. The OIG explained that the other protections in the safe harbor, including that compensation be consistent with fair market value, provide sufficient protection. As part of the safe harbor modifications, the OIG also deleted the need to specify the schedule of part-time arrangements – noting that the expectation of such specificity unreasonably impeded otherwise lawful arrangements. 85 Fed. Reg. at 77,841. Tactile's speaker and trainer agreements fall within the safe harbor protection.

Importantly, the current language of the safe harbor also informs past applications. Both the historic and current versions of the safe harbor were promulgated pursuant to the same statutory language. Consequently, any arrangements which are now permissible under the AKS would be permissible in the past also. *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.,*

33

627 F.3d 134, 141 (5th Cir. 2010) ("It is a fundamental precept of administrative law that an agency action, rule, or regulation cannot overcome the plain text enacted by Congress." (internal quotations omitted) (citation omitted)). Moreover, in circumstances where a rule change narrows the substantive scope of a criminal prohibition (as the OIG has done here by eliminating an element of the safe harbor), courts apply the new rule retroactively because new substantive rules "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces punishment that the law cannot impose upon him." *Shriro v. Summerlin*, 542 U.S. 348, 352 (2004) (internal quotation marks and citations omitted).

Tactile's programs fall within the AKS safe harbor.

### 2. *Tactile's Programs Comply with Federal Law and Industry Guidance.*

Even setting aside the safe harbor, Tactile's programs are consistent with federal law. Meeting a safe harbor is not required to comply with the AKS and many arrangements outside of a safe harbor are lawful. *See, e.g.,* 85 Fed. Reg. 77,684, 77,689 (Dec. 2, 2020) (stating "compliance with an anti-kickback statute safe harbor is voluntary, and there are many arrangements that do not fit in a safe harbor that are lawful under the anti-kickback statute."). As the OIG has stated:

> [C]ompliance with an antikickback statute safe harbor is voluntary, and **there are many arrangements that do not fit in a safe harbor that are lawful under the antikickback statute**. Deviating from a safe harbor does not mean that an arrangement violates the anti-kickback statute. For arrangements that do not fit in a safe harbor, liability is determined based on the totality of facts and circumstances, including the intent of the parties.

85 Fed. Reg. 77,684, 77,689 (Dec. 2, 2020) (emphasis added).

The OIG has provided specific guidance beyond the safe harbors confirming that certain

personal services arrangements, like Tactile's programs, are lawful. For example, the OIG has recognized that independent contractor arrangements with health care providers are compliant where: "(i) [t]he arrangement is set out in writing; (ii) there is a legitimate need for the services; (iii) the services are provided; (iv) the compensation is at fair market value; and (v) all of the preceding facts are documented prior to payment." *Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23,731, 23,738 (May 5, 2003).

Tactile's programs satisfy the OIG criteria. As set forth above, Tactile's arrangements with speakers and trainers are memorialized in written agreements for a term of at least one year, specify the services to be provided and compensation paid, and compensation is paid at fair market value. (*Supra* at 8-9; 17-18).

Finally, the services furnished under the two programs were for legitimate business and educational needs. The training program provides services required under CMS regulations and guidance, which mandates that DME suppliers like Tactile: "must document that it or another qualified party has at an appropriate time, provided [patients] with necessary information and instructions on how to use [its products] safely and effectively). 42 C.F.R. § 424.57(b)(12); *see also* Ex. 20, DMEPOS Accreditation Guidelines (requiring that DME supplier provide in-home patient training).[4] The record is replete with testimony from Tactile employees and health care providers who speak to the practical benefit its training has, including better patient outcomes and patient satisfaction. (*E.g.,* Ex. 8, Hoy Dec. ¶ 7; Ex. 85, Rishe Dep. 30:8-16; Ex. 30, Haspert

---

[4] In Advisory Opinion No. 08-20, the OIG considered a patient training arrangement nearly identical to Tactile's and advised the arrangement would not run afoul of the AKS. (Ex. 21).

35

Dep. 18:14-19:21; Ex. 28, Kinder Dec. ¶ 5; Ex. 9, Trock Dec. ¶¶ 8-10; Ex. 26, Ewell Dec. ¶ 8).

Likewise, Tactile's medical education programs also meet clearly identified, legitimate business and educational needs. Lymphedema is an under-diagnosed and under-treated condition, and the program raises awareness of lymphedema and its treatment options among health care professionals. (E.g., Ex. 15, Radhakrishnan Dec. ¶ 9; Ex. 13, Melin Dec. ¶ 2). Tactile has a legitimate (and demonstrable) business interest in introducing health care professionals to the clinical benefits of its device. This also inures to the benefit of patients, who may be unable to maintain an ongoing schedule of in-person lymphatic treatment, whether due to limits in insurance coverage or other logistical reasons. (E.g., Ex. 12, Gasparis Dec. ¶ 5).

Finally, as laid out above, the compensation paid is fair market value. Tactile's compensation expert has confirmed the fair market value payments. (Ex. 29, Klein Dec. ¶¶ 13-21; 25-35). VFMS has no expert opinion on the compensation amounts and has not proffered, and cannot proffer, any contrary evidence.

Tactile's trainer and KOL agreements satisfy the OIG criteria and comply with the AKS.

### 3. *The Undisputed Evidence Supports Tactile's Motion for Summary Judgment.*

Every outside physician, therapist, contractor, and Tactile employee to offer sworn testimony has stated that remuneration was not paid to induce product referrals. (E.g., Ex. 9, Trock Dec. ¶¶ 13-14; Ex. 10, Obermiller Dep. 200:13-22; Ex. 30, Haspert Dep. 122:3-10; Ex. 85, Rishe Dep. 74:11-76:21; Ex. 85, Gorham Dep. 311:21-312:3; Ex. 28, Kinder Dec. ¶ 9; Ex. 26, Ewell Dec. ¶¶ 9-11; Ex. 14, Baylor Dec. ¶¶ 6-7, 10; Ex. 15, Radhakrishnan Dec. ¶ 14; Ex. 11, Baltazar Dec. ¶¶ 6, 9; Ex. 12, Gasparis Dec. ¶ 9, 15; Ex. 13, Melin Dec. at ¶ 5; Ex. 54, Karni Dec. at ¶ 2; Ex. 16, Satwah Dec. ¶ 4). Not a single witness has offered admissible testimony to

36

the contrary.[5]

This is not surprising. Tactile specifically designed and ran its programs to ensure they only lawfully paid for legitimate services, and to avoid unlawful remuneration. The trainer program was implemented with numerous guardrails in place. (*Supra* at 10-11). As set forth above, this included a Tactile policy that prohibited assignment of trainers to their own patients, preventing any financial incentive for therapists to recommend its products. (*Id.*; Ex. 24, Haspert Dec. ¶ 4; Ex. 30, Haspert Dep. 230:5-17; Ex. 23, Hoy Dep. 26:19-27:9). Tactile also made sure assignments were (1) controlled by employees without a sales incentive and (2) based on location, availability, and willingness. (*Supra* at 10-11, 16 (citing, *e.g.*, Ex. 8, Hoy Dec. ¶ 11; Ex. 24, Haspert Dec. ¶¶ 1-7)).

The effectiveness of this policy is borne out by discovery. Witnesses uniformly testified that trainings were not assigned based on referral levels or referral potential. As the training coordinator explained, she was not aware of any effort to use trainings to affect product referral levels. (Ex. 30, Haspert Dep. 146:9-13). Rather, when assigning she was "just doing my job, trying to [] get patients trained." (*Id.*) This remained true even on the off-hand occasion when sales staff strayed from policy and made such a request – a request the training department simply would not honor. (*Id* at 103:14-104:13; *see also* Ex. 26, Ewell Dec. ¶ 11).[6]

---

[5] Allen's testimony revealed that not only does he lack personal information to support his allegations, but he also cannot identify a single witness or person to testify in support of his allegations which only consist of general rumors. (*Supra* at 22-24, 30). Because such testimony is inadmissible hearsay, it is not competent summary judgment evidence and cannot support his claim. *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 835 (S.D. Tex. 2013).

[6] Tactile produced its voluminous procedures, evidence of its compliance efforts, and information about the advice it received from outside counsel demonstrating the lawfulness of

Tactile data confirms this testimony—the majority of the busiest trainers in Texas over the relevant time period were clinically associated with less than ten Tactile patients throughout their contract history, and many were not in a referral position at all. (Ex. 31). Tactile simply did not track referral levels of its trainers or allow that to be a factor in any way regarding their assignment. (Ex. 30, Haspert Dep. 121:23-122:2 (patient training coordinator she had no knowledge of product referrals); Ex. 18, Gorham Dep. 106:24-107:4 (as sales staff she wasn't "responsible for who got trained" and "wouldn't know" who got trainings)). Rather, Tactile used trainers based on their ability to perform the job they were hired to complete—namely, location, availability, and willingness to train patients who received a device. (Ex. 30, Haspert Dep. 73:3-18, 82:15-83:1, 96:14-23).

The same is true of Tactile's KOL program, which paid fair market value for time and expenses incurred by physicians who spoke about lymphedema diagnosis and treatment. (Ex. 29, Klein Dec. ¶¶ 13-21; 25-35; *see also, e.g.,* Ex. 16, Satwah Dec. ¶ 4 (physician-speaker noting he has "turned down speaking opportunities in the past because, quite frankly, the compensation I receive as a Tactile KOL does not compare the practice revenue lost . . ."); Ex. 54, Karni Dec. ¶ 8 (similar)). While Tactile tracks whether attendees at programs ultimately begin to use its products, the undisputed evidence establishes that Tactile does not pay the physician speakers to prescribe it products. (Ex. 50, Weaver Dec. ¶ 6; *see also* Ex. 30, Gorham Dep. 152:17-153:8).

---

the programs. VFMS's expert in the case purported to assess Tactile's compliance program, but notably VFMS never provided her *any* of this highly relevant discovery. Ex. 84, Brock Dep. 156:2-157:6 (did not review Compliance policies or documents), 152:12-25 (did not review materials showing accreditation agency evaluated the trainer program), 153:12-154:12 (did not review DuVal compliance audit documents).

The KOL and trainer programs were established consistent with federal law and agency guidance. The evidence shows that there is no AKS violation and that VFMS cannot prove the first required element of any alleged FCA violation.

**C.  Tactile Did Not Act with the Requisite Scienter.**

To establish a violation under the FCA, VFMS must also establish that Tactile acted with the requisite scienter. The FCA requires a knowing violation and the AKS requires a knowing and willful violation – both of which VFMS must prove to establish a violation. Here, the uncontroverted summary judgment evidence establishes that Tactile has not knowingly violated the FCA or knowingly and willfully violated the AKS.

For a false claim predicated on an AKS violation, VFMS must show that Tactile "knowingly and willfully entered into an illegal kickback scheme." *Gonzalez,* 689 F.3d at 476; *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016). Absent legally sufficient evidence of this "criminal intent to induce referrals," Relator cannot obtain, let alone survive, summary judgment. *See U.S. ex rel. Ruscher*, 663 F. App'x at 376 (citing *U.S. ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 113 (W.D. Tex. 2010)).

The FCA is not "an all-purpose antifraud statute," *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008), and it is "not the appropriate vehicle for policing regulatory compliance." *United States ex rel. Gudur v. Deloitte & Touche*, 2008 WL 3244000, at *2 (5th Cir. Aug. 7, 2008). Negligent or innocent mistakes do not satisfy the knowledge element. *Hindo v. Univ. of Health Sciences/The Chi. Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995). The Fifth Circuit has noted that only a "lie is actionable," not an "error." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004); *United*

*States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("In short, we made clear that a palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act."). "FCA liability does not attach when a defendant reasonably, yet erroneously, interprets its legal obligations." *United States ex rel. Hendrickson*, 343 F. Supp. 3d at 636. As the Supreme Court has explained, where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 70 n. 20 (2007).

Here, VFMS must show some intent to pay remuneration to induce referrals. No such evidence exists. VFMS's assertion that Tactile knowingly and willfully entered into kickback arrangements is conclusively contradicted by the record. The sworn declarations, the depositions, and the thousands of pages of documents produced by Tactile all support this central fact: Tactile did not intend to, and did not, enter into kickback arrangements with hundreds of physicians and therapists. (*E.g.,* Ex. 9, Trock Dec. ¶¶ 13-14; Ex. 10, Obermiller Dep. 200:13-22; Ex. 30, Haspert Dep. 122:3-10; Ex. 85, Rishe Dep. 74:11-76:21; Ex. 18, Gorham Dep. 311:21-312:3; Ex. 28, Kinder Dec. ¶¶ 7-8; Ex. 26, Ewell Dec. at 9-11; Ex. 14, Baylor Dec. ¶¶ 6-7, 10; Ex. 15, Radhakrishnan Dec. ¶ 14; Ex. 11, Baltazar Dec. ¶¶ 6, 9; Ex. 12, Gasparis Dec. ¶ 9; Ex. 13, Melin Dec. ¶ 5; Ex. 54, Karni Dec. ¶ 2; Ex. 16, Satwah Dec. ¶ 4).

The uncontroverted summary judgment evidence is that Tactile did everything a reasonable company would do to ensure its programs were compliant with federal law. Tactile followed federal agency guidance in establishing the programs. (Ex. 82, Duval Dec. ¶ 21; Ex.

40

3, at 4-5; Ex. 19, Buthusiem Rpt. ¶¶ 45-61; Ex. 23, Hoy Dep. 40:19-45:17 (explaining that Tactile followed the guidance of outside attorneys)). Tactile trained its employees on the program and compliance and enforced its policies. Tactile also publicly disclosed the programs to the government through various filings and reporting mechanisms, including reporting under the Sunshine Act and SEC regulations.

Even if VFMS alleges that Tactile was wrong in its interpretation of the AKS (which Tactile was not), then there is still no evidence of a knowing or willful violation. In such situations, the violation would be an error and not an FCA or AKS violation. *See United States ex rel. Riley*, 355 F.3d at 376; *United States ex rel. Hendow*, 461 F.3d at 1172. "FCA liability does not attach when a defendant reasonably, yet erroneously, interprets its legal obligations." *United States ex rel. Hendrickson*, 343 F. Supp. 3d at 636. Courts have recognized that payments to speakers as part of medical education programs can be run lawfully. *See, e.g., United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1055 (C.D. Cal. 2016) ("On this showing, no reasonable jury could find that Celgene's payments to physician-speakers violated the AKS."). OIG also has recognized that using therapists as patient trainers for DME products can be lawful.

In addition to its own diligence and compliance efforts, Tactile took further steps to ensure its programs complied with the law. Tactile hired outside counsel to regularly advise on its operations, including the programs at issue here. (Ex. 23, Hoy Dep. 40:19-45:17, 46:17-47:11, 62:3-24; Ex. 82, Duval Dec. ¶ 8). "A defendant may avoid liability under the FCA if it can show that it acted in good faith on the advice of counsel." *United States ex rel. Cairns v. D.S. Med., L.L.C.*, 1:12CV00004 AGF, 2017 WL 3887850, at *3 (E.D. Mo. Aug. 31, 2017); *see*

41

*also, United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, fn. 13 (E.D. Va. 2003) ("good faith reliance on the advice of counsel may contradict any suggestion that a contractor 'knowingly' submitted a false claim, or did so with deliberate ignorance or reckless disregard"); *United States ex rel. Gillespie v. Kaplan Univ.*, No. 09-20756-CIV, 2013 WL 3762445, at *8 (S.D. Fla. July 16, 2013) (stating "not only did Kaplan employees read the statute, Kaplan also took steps to ensure compliance by tasking employees with compliance and by consulting with outside counsel. Thus, Gillespie has failed to establish scienter, a necessary element of his claim."); *United States ex rel. Rose v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, No. CIV. A. 2:05 CV 216, 2008 WL 4056601 (E.D. Tex. Aug. 25, 2008) (granting summary judgment for defendant by finding that in light of the unclear law and advice of counsel, there was insufficient evidence that ETMC acted with the necessary scienter under the FCA).

Here, Tactile relied on the advice of counsel in setting up its contract trainer program and asked for guidance when it developed its medical education program. (Ex. 8, Hoy Dec. at 40:19-45:17, 46:17-47:11, 62:3-24). Tactile also hired outside attorneys who are health law experts to provide bi-annual reviews, and provided them accurate, material facts and open access to Tactile's documents and employees. (*Id.*; Ex. 82, Duval. Dec. ¶ 8). Those reviews specifically involved an analysis of any financial relationship with health care providers, including through the trainer and medical education programs. *(Id.*; *see also* Ex. 67, 2011 DuVal Report; Ex. 2, 2015 DuVal Report; Ex. 3, 2017 DuVal Report, Ex. 68 DuVal Report). When DuVal made recommendations, Tactile followed them. (*See generally id.*; Ex. 3 at 6 (noting Tactile implementation of prior suggestions for new policy and compliance committees); Ex. 64 (compliance meeting minutes noting implementation of DuVal Report recommendations)).

42

Ultimately, outside reviews never found the trainer and medical education programs to run afoul of FCA and AKS. (Ex. 23, Hoy Dep. 42:6-47:16).

Because Tactile did not hide pertinent facts, "was continually advised [its] operations were lawful," and when advised of necessary changes or adjustments, "revised [its] conduct," the undisputed facts show that Tactile reasonably believed its programs were lawful. *United States ex rel. Bidani v. Lewis*, No. 97-C-6502, 2001 WL 32868, at *10 (N.D. Ill., Jan. 12, 2001) (granting summary judgment to Defendant who obtained and followed advice of counsel as to legality of its operations); *United States ex rel. Gillespie*, 2013 WL 3762445, at *8 (stating "not only did Kaplan employees read the statute, Kaplan also took steps to ensure compliance by tasking employees with compliance and by consulting with outside counsel. Thus, Gillespie has failed to establish scienter, a necessary element of his claim.")

Simply stated, there is no evidence of a knowing or willful violation (yet alone any actual violation) and VFMS "has presented no summary judgment evidence on which a reasonable jury could find that [Tactile] acted with actual knowledge, deliberate ignorance, or reckless disregard." *See United States ex rel. Johnson v. Kaner Med. Group, P.A.*, 641 F. App'x 391, 394 (5th Cir. 2016); *United States ex rel. Brown*, 226 F. Supp. 3d at 1055.

Tactile did not violate the FCA and did not act with the requisite scienter under the AKS or the FCA, and Tactile is entitled to summary judgment.

**D.      Tactile's Alleged Conduct Was Not Material to the Government's Decision to Pay.**

Independent from its other deficiencies, VFMS's claim further fails because it cannot prove that any of Tactile's alleged violations were material to the government's decision to pay a claim. Under the FCA, VFMS must show that the violation was material to the government's

43

decision to pay. The undisputed material facts show that the alleged violation (assuming one even existed) was not material to the government's decision to pay in this case.

Materiality is an essential element of FCA liability. *United States ex rel. Escobar*, 136 S. Ct. at 2001 ("Under the Act, misrepresentation must be material to the other party's course of action."). The Supreme Court instructs that the FCA's materiality requirement is "rigorous" and "demanding." *Id.* at 2002-03. The materiality analysis requires the court to "look to the effect on the likely or *actual* behavior of the recipient of the alleged misrepresentation." *Id*. at 2002 (emphasis added). A plaintiff has to show more than "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id*.

The Fifth Circuit has explained that the government's continued payment "after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *See United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 663 (5th Cir. 2017). Courts in this Circuit routinely dismiss FCA claims for lack of materiality when a plaintiff fails to overcome that burden. *See Abbott v. BP Exploration & Production, Inc.*, 851 F.3d 384, 388 (5th Cir. 2017); *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020); *Trinity Indus., Inc.*, 872 F.3d at 665.

Tactile discloses all of its payments to physicians to the government and the public, as required by the Sunshine Act. (Ex. 8, Hoy Dec. ¶ 13.) Tactile also publicly discloses the nature of the patient training and KOL programs pursuant to its SEC disclosure obligations. (*E.g.,* Ex. 81, Tactile's Feb. 2017 SEC 10-K Report.) Tactile also discloses these programs to CMS-

affiliated agencies in seeking accreditation. (Ex. 8, Hoy Dec. ¶ 19; Ex. 3, 2017 DuVal Report at 5). In fact, CMS regulations *require* that Tactile ensures that patients receiving the device are adequately educated on how to use it. (Ex. 20 at 9; *see also* Ex. 8, Hoy Dec. ¶ 3).

With knowledge about the payments that Tactile makes to its contract trainers and KOL speakers, the government has continued paying claims without interruption. A FCA claim fails if there is unrebutted evidence that the government paid the claims at issue despite knowledge of the alleged predicate violation. *See Trinity Indus., Inc.*, 872 F.3d at 665 (noting that although "no single factor is outcome determinative, the 'very strong evidence' here of FHWA's continued payment remains unrebutted"); *see also Abbott*, 851 F.3d at 388 (noting that absence of rebuttal evidence of continued payment "failed to raise genuine dispute of material fact as to materiality");*United States ex rel. Janssen v. Lawrence Memorial Hospital*, 949 F.3d 533, 535–38 (10th Cir. 2020) (The government's "inaction in the face of detailed allegations from a former employee suggest immateriality."). That is the case here.

Moreover, the government's course of conduct after learning of the allegations shows alleged conduct is not material in this case. *See, e.g. United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017) ("Such very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position."); *United States ex rel. Porter*, 810 F. App'x at 242 ("[W]e note that the Mississippi Division of Medicaid took no action after Plaintiff-Appellant informed the Division that Magnolia was staffing care and case manager positions with licensed practical nurses. Instead, it continued payment and renewed its contract with Magnolia several times. . . . [C]ontinued payment by the federal

45

government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality") (internal citations and quotations omitted). Here, even after VFMS's allegations have been supplied to the DOJ, OIG, and VA, the government's conduct has not changed – including its continued payment for Tactile's devices.

Having nothing to rebut the evidence that the alleged conduct was not material to the government's decision to pay, including after the government was fully informed of VFMS's allegations, VFMS's claim fails.

**E.     There Is No Evidence of Claims Being Paid as a Result of the Alleged Violations.**

Finally, there is no evidence of any causal link between any paid claims and the alleged violations as required under the FCA.  VFMS must identify evidence showing the "kickbacks" it alleges "actually caused" physicians to submit false claims.  *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 329 & 332 (5th Cir. 2017) (affirming dismissal of AKS claims were Relator failed to identify any evidence that alleged kickbacks "actually caused" physicians to submit false claims); *see also Gonzalez,* 689 F.3d at 476  *(*affirming judgment as a matter of law where insufficient evidence that assistants' ability to work at the clinic induced referrals); *United States v. Luce*, 873 F.3d 999, 1012-13 (7th Cir. 2017) (explaining why proximate cause governs FCA's causation element).

As an initial matter, VFMS has never identified any claim it contends is false.  Tactile asked VFMS to identify "each false claim alleged to have been submitted to the United States government."  (Ex. 86 at No. 4).  In response, VFMS objected to the request as premature and stated it would "supplement this response when sufficient discovery has been conducted . . . ." *Id*.  Despite the conclusion of discovery and production of all claims data sought by VFMS

46

months prior to the summary judgment deadline, VFMS has failed to identify a single alleged false claim. This is alone sufficient reason to grant summary judgment.

Second, VFMS also has *no evidence of any connection or causal link* between the compensation they allege is a kickback and the submission of false claims. This requires more than just proof of temporal proximity between the alleged kickbacks and the submission of claims. *Solvay*, 871 F.3d at 333-34. Instead, it requires some evidence of a linkage, such as a quid pro quo. *See, e.g., United States v. Krikheli*, 461 F. App'x 7, 11 (2d Cir. 2012) (approving jury instructions "ma[king] clear that the government was required to prove that any payments to middlemen were made to induce referrals in a quid pro quo transaction."); *United States ex rel. Greenfield v. Medco Health Sols., Inc.,* 880 F.3d 89, 98 (3d Cir. 2018) (holding it is insufficient for a plaintiff to argue the defendant paid kickbacks and submitted claims in the same time period without evidence "link[ing]" the claim to a kickback); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, *1 (N.D. Tex. June 20, 2016) (granting judgment for defendant and finding that relator "did not sufficiently link the payment of a bonus to a referral, patient, or claim[,]" and did not present "evidence of any claim that was false based on an AKS violation, asking the Court to assume that all claims submitted while Defendants were paying incentive bonuses were false."); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012) (Relator failed to allege inducement where there were "no allegations that any particular physicians were induced to alter their referral decisions on account of their financial relationship with the Defendants").

In *United States ex rel. King v. Solvay Pharmaceuticals, Inc.*, the Court was faced with AKS allegations that "Solvay paid illegal kickbacks to physicians through various marketing

47

programs." 871 F.3d at 331. The relator contended that "Solvay knew these kickbacks would induct physician to write prescriptions" for their products and cause the submission of fraudulent claims to the government for reimbursement. *Id.*

In support of his allegations, the relator in *Solvay* provided evidence showing "(1) physicians participating in Solvay programs in which they were compensated for consultations or presentations and (2) subsequent prescriptions by those physicians of Solvay's drugs to Medicaid patients." *Id.* The Fifth Circuit explained, though, "there was nothing illegal about paying physicians for their participation in these types of programs and there is no evidence that participation was conditioned upon prescribing Solvay's drugs to Medicaid patients." *Id.* at 332. And the relator failed to "cite to evidence creating a genuine issue of material fact that such compensation, or any incidental benefits, caused those physicians to prescribe to Medicaid patients." *Id.* Thus, the Court explained that "[a]lthough it is not an unreasonable inference that Solvay intended these programs to boost prescriptions, it would be speculation to infer that compensation for professional services legally rendered *actually caused the physicians to prescribe* Solvay's drugs to Medicaid patients." *Id.* (emphasis added).

As discussed above, Tactile likewise contracted with health care providers to provide services that were necessary and legitimate, and participation was not conditioned on prescription of Tactile devices. In fact, Tactile contracted with physicians who did not prescribe its products and non-employed clinicians who could not recommend its products. (*See, e.g.,* Ex. 51, Mosbeck Dec. ¶ 4 (explaining Dr. Sevick is a Ph.D. with no ability to prescribe); Ex. 31 (showing numerous unaffiliated trainers)). Indeed, most of the busiest trainers in Texas either do not even work in a clinical setting or have no known history of product referrals. (Ex. 31).

48

The record evidence, including sworn declarations and deposition testimony, confirm that Tactile does not tell, suggest, or even imply to trainers and KOLs that there was a connection between device recommendations or prescriptions and training or speaking opportunities. (*Supra* at 10-12, 18-19 (collecting testimony from health care providers who all deny any such suggestion); *see also, e.g.,* Ex. 18, Gorham Dep. 311:24-312:3 (When asked if she was "aware of any employee who you managed, directly or indirectly, telling a clinician they would be paid money if they prescribed or referred Tactile products," Area Sales Director for Texas answered "Never.")). Each clinician and physician to offer testimony in this case has confirmed that they knew Tactile did not pay kickbacks and were under no expectation to prescribe products. (*Supra* at 10-12, 18-19 (collecting testimony); Ex. 10, Obermiller Dep. at 100:23-101:2 (Q: "Is it your understanding that you're expected by Tactile to promote the Flexitouch? A. No.")).

Rather, the physicians and clinicians all prescribed or recommended the Flexitouch only for specific clinical reasons, not because of their participation in the speaker or trainer programs. (*E.g.,* Ex. 15, Radhakrishnan Dec. ¶ 4-7; Ex. 13, Melin Dec. ¶ 5; Ex. 16, Satwah Dec. ¶¶ 2-4; Ex. 54, Karni Dec. ¶ 5-6; Ex. 11, Baltazar Dec.¶ 4-5, 7; Ex. 12, Gasparis Dec. ¶¶ 6, 9; Ex. 60, Kirakosian Dec. ¶ 4; Ex. 61, Eidson Dec. ¶ 3, Ex. 9, Trock Dec. ¶ 3; Ex. 10, Obermiller Dep. 198:20-200:1; Ex. 14. Baylor Dec. ¶ 8).

With respect to the contract trainer program, causation is even more attenuated. To the extent Tactile's contract trainers have clinical health care positions—and many do not—they uniformly lack the authority to prescribe Tactile devices because they are not physicians. As to each claim VFMS asserts is false, VFMS would need to show not only that a trainer preference was caused by kickbacks, but also that the trainer was actually involved in referring the Tactile

49

product to that particular patient *and* that the physician who prescribed it deferred to the trainer and did not exercise independent judgment. *See United States ex rel. Greenfield,* 880 F.3d at 98 (holding it is insufficient for a plaintiff to argue the defendant paid kickbacks and submitted claims in the same time period without evidence actually "link[ing]" the claim to a kickback). The record lacks any such evidence.

Ultimately, there is no evidence that claims submissions were caused by alleged kickbacks from Tactile. The Fifth Circuit has confirmed in *Solvay* that VFMS cannot survive summary judgment. Tactile respectfully requests the Court grant its summary judgment.

## VI. CONCLUSION

For the foregoing reasons, Tactile requests that this Court grant its motion for summary judgment on Count II of Relator's Amended Complaint, dismiss Relator's FCA claims with prejudice, and grant Tactile all relief at law or equity to which it is justly entitled.

Dated: August 13, 2021

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Scott McBride*
B. Scott McBride
TX State Bar No. 24002554
*scott.mcbride@morganlewis.com*
John Petrelli
TX State Bar No. 24056125
*john.petrelli@morganlewis.com*
1000 Louisiana Street, Suite 4000
Houston, TX 77002
(713) 890-5000 Telephone
(713) 890-5001 Facsimile

**FREDRIKSON & BYRON, P.A.**

*/s/ Leah Huyser*
David M. Glaser *(pro hac vice)*
MN State Bar No. 228874
*dglaser@fredlaw.com*
Alethea M. Huyser *(pro hac vice)*
MN State Bar No. 0389270
*ahuyser@fredlaw.com*
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 Telephone
(612) 492-7077 Facsimile

**LAW OFFICE OF KEVIN C. RIACH, PLLC**

*/s/ Kevin C. Riach*
Kevin C. Riach *(pro hac vice)*
MN State Bar No. 0389277
125 Main Street SE, Suite 339
Minneapolis, MN 55414
Telephone: (612) 203-8555
kevin@riachdefense.com

*Attorneys for Defendant*

51

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a true and correct copy of the foregoing was filed electronically on August 13, 2021.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties entitled to notice by electronic notification.

/s/ B. Scott McBride
B. Scott McBride