# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* VETERANS FIRST MEDICAL SUPPLY, LLC, | § § § § | |
| *Plaintiff, Counterclaim Defendant* | § § | Civil Action No. H-18-2871 |
| v. | § § | |
| TACTILE SYSTEMS TECHNOLOGY, INC., | § § § | |
| *Defendant, Counterclaim Plaintiff* | § § | |


## DEFENDANT TACTILE SYSTEMS TECHNOLOGY, INC.'S
## REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

                                                                                                   **PAGE**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.       VFMS'S CLAIMS ARE BARRED BY THE PUBLIC DISCLOSURE RULE. ......... 2

II.     VFMS HAS NOT RAISED ANY DISPUTED MATERIAL FACTS TO
        SUPPORT ITS CLAIMS. ...................................................................................... 6

        A.      The Undisputed Facts Show That the Trainer Program Is Not a
              Kickback. ...................................................................................................... 7

        B.      The Undisputed Facts Show That the KOL Program Is Not a
              Kickback. .................................................................................................... 12

        C.      There is No Evidence of False Claims Caused by Kickbacks. ......................... 18

        D.      There Is No Evidence That Tactile Knowingly Paid Kickbacks. .................... 20

        E.      Government Has Not Denied Tactile Claims Based on Alleged
              Kickbacks. .................................................................................................... 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bingham v. HCA, Inc.*,
783 F. App'x. 868 (11th Cir. 2019) ........................................................................ 7, 15

*Brown v. Toscano*,
630 F.Supp.2d 1342 (S.D. Fl. 2008) .............................................................................. 24

*Fed. Recovery Servs., Inc. v. United States*,
72 F.3d 447(5th Cir. 1995)............................................................................................. 5

*Gonzalez v. Fresenius Med. Care N. Am.*,
689 F.3d 470 (5th Cir. 2012) .................................................................................. 20, 21

*Green v. AmerisourceBergen Corp.*,
No. 4:15-CV-379, 2017 WL 1209909 (S.D. Tex. Mar. 31, 2017) ................................ 2

*Klaczak v. Consol. Med. Transp.*,
458 F. Supp. 2d 622 (N.D. Ill. 2006) ........................................................................... 8

*LG Philips LCD Co., Inc. v. Tatung Co.*,
243 F.R.D. 133 (D. Del. 2007) ................................................................................... 24

*Purcell v. Gilead*,
439 F. Supp. 3d 388 (E.D. Pa. 2020) .................................................................... 10, 15

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011).................................................................................................... 3

*United States v. Davis*,
132 F.3d 1092 (5th Cir. 1998) ................................................................................... 21

*United States v. Miles*,
360 F.3d 472 (5th Cir. 2004) ..................................................................................... 11

*United States v. Shoemaker*,
746 F.3d 614 (5th Cir. 2014) ..................................................................................... 18

*United States ex rel. Arnstein v. Teva Pharm. USA, Inc.*,
13 Civ. 3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019)................................ 10, 17

**TABLE OF AUTHORITIES**

(continued)

                                                                                    **Page(s)**

*United States ex rel. Bartlett v. Ashcroft*,
   39 F. Supp. 3d 656 (W.D. Pa.2014) ............................................................... 10

*United States ex rel. Bilotta v. Novartis Pharm. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ............................................................... 15

*United States ex rel. Black v. Health & Hosp. Corp.*,
   494 F. App'x 285 (4th Cir. 2012) .................................................................. 3, 4

*United States ex rel. Booker v. Pfizer, Inc.*,
   9 F. Supp. 3d 34 (D. Mass. 2014) .................................................................. 15

*United States ex rel. Brown v. Celgene Corp.*,
   226 F. Supp. 3d 1032 (C.D. Cal. 2016) .......................................................... 14

*United States ex rel. Colquitt v. Abbott Labs*,
   864 F. Supp. 2d 499 (N.D. Tex. 2012) ............................................................. 3

*United States ex rel. Drakeford v. Tuomey Healthcare Systems, Inc.*,
   792 F.3d 364 (4th Cir. 2015) ........................................................................ 10

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
   880 F.3d 89 (3d Cir. 2018) ............................................................................ 19

*United States ex rel. Gohil v. Sanofi U.S. Servs., Inc.*,
   500 F. Supp. 3d 345 (E.D. Pa. 2020) ................................................... 15, 17, 18

*United States ex rel. Harman v. Trinity Indus., Inc.*,
   872 F.3d 645 (5th Cir. 2017) ........................................................................ 25

*United States ex rel. Hendrickson v. Bank of Am., N.A.*,
   343 F. Supp. 3d 610 (N.D. Tex. 2018) ............................................................. 2

*United States ex rel. Jamison v. McKesson Corp*,
   649 F.3d 322 (5th Cir. 2011) .......................................................................... 5

*U.S. ex rel King v. Solvay Pharm., Inc.*,
   871 F.3d 318 (5th Cir. 2017) .................................................................... 19, 20

*United States ex rel. King v. Solvay S.A.*,
   No. H-06-2662, 2015 WL 925612 (S.D. Tex. Mar. 3, 2015) ............................... 3

*United States ex rel. Lockey v. City of Dallas*,
   576 Fed. App'x 431 (5th Cir. 2014) ................................................................. 2

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
  865 F.3d 29 (1st Cir. 2017) ........................................................................ 25

*United States ex rel. Perales v. St. Margret's Hosp.*,
  243 F. Supp. 2d 843 (C.D. Ill. 2003) .......................................................... 9

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
  810 F. App'x 237 (5th Cir. 2020) ............................................................... 25

*United States ex rel. Reed v. KeyPoint Government Solutions KM*,
  923 F.3d 729 (10th Cir. 2019) ..................................................................... 6

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004) ...................................................................... 21

*United States ex rel. Rose v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
  No. 2:05-CV-216, 2008 WL 4056601 (E.D. Tex. Aug. 25, 2008) .............. 23

*United States ex rel. Ruscher v. Omnicare, Inc.*,
  663 F. App'x 368 (5th Cir. 2016) ............................................... 12, 16, 21, 23

*United States ex rel. Schweizer v. Canon*,
  No. 4:16-CV-00582, 2020 WL 242520 (S.D. Tex. Jan. 16, 2020) .............. 5

*United States ex rel. Sonnier v. Standard Fire Ins., Co.*,
  84 F.Supp.3d 575 (S.D. Tex. 2015) ......................................................... 5, 6

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
  No. 3:07-cv-0604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) .......... 19

*United States ex rel. Witkin v. Medtronic, Inc.*,
  189 F. Supp. 3d 259 (D. Mass. 2016) ....................................................... 9, 10

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ............................................................................... 25

**Statutes**

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ........................................... passim

False Claims Act, 31 U.S.C. § 3729 *et seq* .............................................. passim

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 37(c)(1) ............................................................................................ 18

85 Fed. Reg. 77,684 (Dec. 2, 2020)......................................................................... 6

*Compliance Program Guidance for Pharmaceutical Manufacturers*,
    68 Fed. Reg. 23,731 (May 5, 2003) ................................................................ 7

## **INTRODUCTION**

In its opposition, Relator Veterans First Medical Supply, LLC ("VFMS" or "Relator") argues that for over fifteen years Tactile "built its business" by paying kickbacks to hundreds of health care providers across Texas. Yet, VFMS has no evidence of a *quid pro quo*. No witness will testify that Tactile paid kickbacks, explicitly or implicitly offered compensation for prescriptions, or ever took actions suggesting an intent to improperly induce patient referrals.

The record instead shows that VFMS concocted this case to save its business after its initial plans to steal market share from Tactile failed. VFMS has now gathered more than 400,000 documents from Tactile in this litigation. VFMS seeks to survive summary judgment based on a self-invented narrative and approximately $176,000 in supposedly false claims that cannot be connected to any alleged kickback. There is no evidence of a kickback, no evidence of scienter, no evidence of materiality, and no evidence of causation.

The facts surrounding Tactile's patient-trainer and medical-education programs are not in dispute. The parties do not disagree about who was hired, what they were paid, or what services they provided. The facts about the company's policies surrounding these programs are also undisputed. Even the few incidences in which sales staff violated policy and suggested trainers to help with referrals—none of which occurred in Texas—are not disputed. VFMS just studiously avoids mentioning the key, indisputable facts about these handful of incidences: *Tactile had a system to ensure such requests were not fulfilled* and *that system worked.*

When attorney spin is set aside and the record is reviewed, the undisputed facts establish that Tactile's trainer and medical-education programs feature lawful payments, for legitimate services, paid at fair market value, for a proper purpose. No genuine issues of material fact exist

1

- there is no False Claims Act ("FCA") violation and Tactile is entitled to summary judgment.

## ARGUMENT

### I.     VFMS'S CLAIMS ARE BARRED BY THE PUBLIC DISCLOSURE RULE.

VFMS has failed to meet its burden to overcome the public disclosure bar. *See U.S. ex rel. Lockey v. City of Dallas,* 576 Fed. Appx 431, 435 (5th Cir. 2014) (noting that the burden is on relators to show that allegations "were qualitatively different information. . . and not merely the product and outgrowth of publicly disclosed information"). In response to Tactile's Motion, VFMS cannot distinguish the public disclosures Tactile has identified from the allegations asserted in its Complaint. Rather, VFMS only seeks to demean the quantity and argue that Tactile relied on pre-amendment case law. Even after the 2010 amendment, however, the relevant inquiry remains the same: if there has been a disqualifying public disclosure, the lawsuit will be dismissed. *See Green v. AmerisourceBergen Corp.*, No. 4:15-CV-379, 2017 WL 1209909, at *8 (S.D. Tex. Mar. 31, 2017) (under either version, analysis "fundamentally remains the same"); *see also U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 623-24 (N.D. Tex. 2018) ("This change has no real impact, as courts considering the term 'based upon' interpreted it to mean 'substantially the same'").

VFMS argues that Tactile has only pointed to a limited number of public disclosures, but it only takes one. Moreover, VFMS has not, and cannot, articulate any other legitimate informational basis for the allegations in its Complaint – to the contrary, VFMS's owner, Jody Allen, repeatedly acknowledged that he knowingly did not have support for VFMS's allegations, or worse, that certain allegations were false when filed. *See* ECF 195, Def. Mem. Opposing Summary Judgment, at 20-26.

Effectively, VFMS's response boils down to its contention that nowhere in the public disclosures cited does Tactile expressly indicate that it was paying kickbacks to the trainers or Key Opinion Leaders ("KOL") for referrals. ECF 199, VFMS's Opposition to Summary Judgment Motion ("Opp'n"), at 23. While true, this is not the standard to which VFMS's Complaint is held. Rather, with Tactile raising the public disclosure bar, VFMS must meet its burden to show that the allegations in the Complaint were not based on or substantially similar to information that was publicly disclosed. *See U.S. ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 519 (N.D. Tex. 2012). The comparison must be given a "broa[d] sweep." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011). VFMS does not meet its burden here. VFMS's allegations against Tactile do not involve a complex alleged scheme. The allegations are simple. VFMS's Complaint describes Tactile's contract patient trainer program and KOL program in substantially the same substantive manner in which they have been described or reported in the public disclosures,[1] and then concludes the conduct is illegal without any additional substantive support.

In short, VFMS's entire theory is simply that kickbacks must have existed because: (1) Tactile hired contract trainers and KOL speakers (publicly disclosed); and (2) Tactile was receiving a lot of orders from the VA (publicly disclosed). Here, $X + Y = Z$, and this is precisely the case where the public disclosure bar applies. *U.S. ex rel. King v. Solvay S.A.*, No. H-06-2662, 2015 WL 925612, at *8 (S.D. Tex. Mar. 3, 2015) (a disclosure need not "connect all the dots" or "highlight[] exactly how the alleged wrongdoing resulted in" fraud in order to "set the

---

[1] Tactile's Motion for Summary Judgment outlines the public disclosures of the two programs at issue, including specific disclosures made to the SEC, under the Sunshine Act, and in response to FOIA requests to the VA. (ECF 184, at 28-29).

government on the trail of fraud"); *U.S. ex rel. Black v. Health & Hosp. Corp.*, 494 F. App'x 285, 294 (4th Cir. 2012) (public disclosure need not match allegations' specificity).

VFMS tries to present itself as some essential link in uncovering a fraudulent scheme, but it fails to offer any support for this contention.  VFMS argues that it offered non-public information that permitted an inference of fraud that could not have been supported by the public disclosures alone.   Yet, VFMS cannot articulate any "non-public" information it supplied in preparing the Complaint.  Allen's own testimony tells this Court everything it needs to know:

Q. And how did the subject [of a *qui tam* lawsuit] come up [with Ross]?

A. I called Jonathan and said I am thinking about bringing a case against Tactile and **<u>I will need evidence for it, do you have any</u>**.

Ex. 7, VFMS 30(b)(6) Dep. 70:21-24 (emphasis added).  Lacking any insider knowledge about Tactile's programs, VFMS has simply taken Tactile's two industry-accepted, legally vetted, publicly disclosed programs and labeled them "illegal."  VFMS also points to the VA's publicly disclosed FOIA data and argues that "to someone who lacked Allen's non-public knowledge, the FOIA data disclosed only sales numbers, and nothing about how those sales numbers were obtained." Opp'n at 28.  But Allen just read the data and parroted it back without any additional knowledge or information.  *See, e.g.,* Ex. 7, VFMS 30(b)(6) Dep. 123:15-124:6 (claiming he "knew" orders were tainted simply because "the FOIA report shows that all orders that are coming out of the lymphedema center are Flexitouch.").  And therein lies the problem with VFMS's lawsuit, it all rests on one misconstrued theory – that because Tactile was receiving a large number of orders from the VA, there must be fraud.  This is not only an unsound and unsupported theory, but it is one that rests on public information – not "non-public knowledge." Contrary to VFMS's bald assertion, it has not supplied any "missing link".

4

Tactile has never hidden or obscured its contract trainer or KOL programs. Both have been widely publicized, promoted, and vetted, which has included regular disclosures to the SEC, VA and CMS. VFMS simply labelled the disclosed programs "illegal." Other than VFMS's reference to Allen's "non-public knowledge," which it cannot articulate or explain, VFMS can point to no other legitimate, non-public information or knowledge as the basis for its allegations beyond what has been publicly disclosed.[2] As a result, VFMS has failed its burden and the public disclosure rule bars its claims. *See U.S. ex rel. Schweizer v. Canon,* No. 4:16-CV-00582, 2020 WL 242520, at *4 (S.D. Tex. Jan. 16, 2020) ("[O]nce the Defendant had raised the public disclosure defense, the Plaintiff must 'produce evidence sufficient to show that there is a genuine issue of material fact as to whether his action was based on those public disclosures.'").

VFMS likewise has not met its burden to show that it is an original source. Rather, it summarily dismisses and mischaracterizes Tactile's arguments.[3] VFMS contends that it is an original source because its information is "independent of and materially adds to the publicly disclosed allegations or transactions," yet notably, VFMS does not point to any competent

---

[2] With respect to the KOL program, VFMS points to a statement from Dr. Baltazar – a conversation Allen overstated and now has implicitly recognized did not occur in the full manner described in the Complaint. *See* ECF 184, Ex. 7 at 51:15–25; 207:25–208:5; 216:23–217:8; 241:1–20; 242:11–22. This is another example of VFMS's unfounded allegations in the Complaint and is insufficient to support its defense to application of the public disclosure bar.

[3] VFMS claims that Tactile argued that "competitors cannot be an original source." Opp'n at 27. Tactile did not make that argument. Rather, Tactile cites two cases where relators, who were also competitors of defendants, had their cases dismissed under the public disclosure bar for, among other reasons, only offering generalized and conclusory allegations that were based on publicly disclosed information – like VFMS's Complaint here. *See Fed. Recovery Servs., Inc. v. U.S.*, 72 F.3d at 448–49, 451–52; *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 330-32 (5th Cir. 2011).

evidence demonstrating what information it provided for the Complaint that "independently" and "materially" added to the publicly disclosed information. *See U.S. ex rel. Sonnier v. Standard Fire Ins. Co.,* 84 F.Supp.3d 575, 591 (S.D. Tex. 2015). Merely "adding detail or color is [not] enough." *U.S. ex rel. Reed v. KeyPoint Gov't Solutions KM*, 923 F.3d 729, 758 (10th Cir. 2019). VFMS cannot show that it has "independent knowledge" that has "materially" added to what could be derived from the information publicly disclosed, and it simply adding "color or detail" by baselessly concluding that the disclosed programs are "illegal" does not suffice.

VFMS's Response provides unfounded argument and innuendo which fails any legal standard. VFMS's Complaint is based on public disclosures. VFMS is not an original source. Tactile's Motion for Summary Judgment should be granted.

## II. VFMS HAS NOT RAISED ANY DISPUTED MATERIAL FACTS TO SUPPORT ITS CLAIMS.

VFMS focuses heavily on the "personal services" safe-harbor provisions and implicitly suggests that an Anti-kickback Statute ("AKS") violation occurs unless the safe harbor is fully met. *See* ECF 45, Tactile Answer at 9, ¶ 5 (asserting defense). This is not the law. The Office of Inspector General ("OIG") is explicit that meeting a safe harbor is *not* required and that failure to meet a safe harbor is not evidence of a violation. *See, e.g.,* 85 Fed. Reg. 77,684, 77,689 (Dec. 2, 2020) ("[C]ompliance with an anti-kickback statute safe harbor is voluntary, and there are many arrangements that do not fit in a safe harbor that are lawful under the anti-kickback statute").

In the past, there was one element of the personal services safe harbor related to aggregate payments that Tactile could not satisfy because it was inapplicable to its arrangements at issue. However, the OIG recently eliminated that element and recognized that the other elements of

6

the safe harbor provide sufficient protection. *See* 85 Fed. Reg. at 77,839. The fact that Tactile meets the safe harbor as it exists today is yet even more powerful evidence that no AKS violation has occurred.

The evidence also shows that Tactile meets the OIG's non–safe harbor guidance for independent contractor arrangements with a health care provider because: "(i) [its] arrangement[s are] set out in writing; (ii) there is a legitimate need for the services; (iii) the services are provided; (iv) the compensation is at fair market value; and (v) all of the preceding facts are documented prior to payment." *Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23,731, 23,738 (May 5, 2003). Regardless of the framework, the undisputed facts show there is no violation of either the AKS or the FCA.

### A. The Undisputed Facts Show That the Trainer Program Is Not a Kickback.

The facts of Tactile's patient-trainer program are not disputed. Patients need training on Tactile devices. Tactile hires contract employees to conduct trainings and pays $150 per training plus mileage (paid at the IRS rate). Trainers typically are licensed therapists, and some also have clinical positions treating patients. The assignment of patient trainings is done by coordinators in Minnesota, who manage assignments every day across the country. These undisputed facts do not support VFMS's allegations that trainers are paid illegal kickbacks.

First, VFMS has the burden to prove that unlawful "remuneration" was paid. VFMS must prove more than that a payment was made. VFMS must prove that the payment was *in excess of* fair market value. *Bingham v. HCA, Inc.,* 783 F. App'x. 868, 873–74 (11th Cir. 2019) (affirming summary judgment on AKS claims because relator had no evidence that alleged remuneration exceeded fair market value) (citing 42 U.S.C. § 1320a-7a(i)(6) (defining

"remuneration" to be "transfers of items or services for free or for *other than fair market value*");

*Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 679 (N.D. Ill. 2006) ("Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value.")).

Tactile has provided undisputed evidence that it paid trainers at a fair market value rate. Adam Klein has a 20-year-long career as a specialist in market evaluations in the health care field, including specifically valuing physician and provider services. (Ex. 29, "Klein Rpt."). Klein identified therapist salaries that would provide reliable comparator data and developed an average total-compensation range.[4] (*Id.* ¶ 15). He then divided the compensation range by hours worked to obtain hourly rates of pay for comparable therapists. (*Id.*). Klein reports that the median pay for a comparable therapist is $73.15 an hour. (*Id.*).

Klein then analyzed 500 Tactile invoices to determine average trainer pay and average time for a training, which was just under 2 hours. (*Id.* ¶ 21; *see also* Ex. 26 Ewell Dec. ¶ 6 (reporting that trainings take 2–3 hours); Ex. 28, Kinder Dec. ¶ 4 (same)). Based on this, Klein found that Tactile paid an hourly rate of $75.64, which was effectively at the median and well below the 75th percentile – which is both the industry standard *and* the standard routinely advocated for by the Government in other FCA cases. (Klein Rpt. ¶ 21).

VFMS failed to designate its own fair market value expert and has no contrary expert evidence, and its attempt to manufacture a fact issue falters under scrutiny. VFMS attempts to argue that Tactile employees have said that the rate is without basis and too high, but this

---

[4] VFMS criticizes Klein for using physical-therapist salaries rather than lymphedema therapists for comparator data. Klein explains his reason for doings so and VFMS provides no evidence that there is a meaningful difference between the two.

8

misstates the evidence. *Compare,* Opp'n at 5 (claiming Hoy's basis for the $150 training rate was simply that "it seemed fair to me") *with* Ex. 8, Hoy Dep. at 52:7-61:13 (explaining the rate was based on prior experience with comparable therapist rates, similar programs at other companies, and review by outside counsel, among other things); *compare* Opp'n at 6 (claiming Jackie Gorham opined on fair market value and citing X-30) *with* Ex. 18, Gorham Dep. at 68:17-72:15 (explaining that X-30 involved payments to a pilot project with a distributor, not $150 patient trainings) and 305:15-307:17 (explaining training cost reductions referred to company expense reduction, not fair market value). In reality, Tactile has never had anyone contend that its $150 training fee exceeds fair market value.

VFMS also tries to use evidence of other payment amounts, but points only to incomplete information that does not consider the relevant factors. *See U.S. ex rel. Perales v. St. Margret's Hosp.*, 243 F. Supp. 2d 843, 849–50 (C.D. Ill. 2003) (in granting summary judgment, explaining that relator failed to create a fact issue on fair market value because their evidence failed to consider relevant factors and was, therefore, not probative). VFMS points out that: (1) Denise Baylor testified that she was paid $40-$60 an hour as a therapist, which is not significantly below the median identified by Klein, and (2) Jody Allen testified that a prior employer paid $65 for a "delivery." Without additional information, this testimony is not probative. *Id.* VFMS does not know whether these amounts consider taxes, total compensation, or other benefits; nor does it explain whether the prior employer's delivery contractors had similar qualifications, conducted trainings, invested similar time, or if differences between the devices would affect patient interactions. *Id*. Nor do these data points constitute a reliable market analysis, as "one payor among many . . . does not in and of itself establish the market rate." *U.S. ex rel. Witkin*

9

*v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 270 (D. Mass. 2016).

VFMS fails to create a genuine issue of fact on fair market value. The cases cited by VFMS do not support a different result. *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 382 (4th Cir. 2015) (unlike here, defendant was given differing opinions about whether pay was above fair market value and jury was allowed to weigh the credibility of this conflicting advice); *U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656 (W.D. Pa. 2014) (allowing case to go to jury when only evidence is disputed party testimony); *U.S. ex rel. Arnstein v. Teva Pharm. USA, Inc.*, 13 Civ. 3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) (finding disputed fact issues when evidence suggested potential inappropriate payment levels). Here, there is no disputed evidence. The competent evidence shows only that Tactile paid fair market value.

Second, VFMS does not seriously claim that training services provided by Tactile are illegitimate services. Unlike the so-called "sham" case cited by VFMS—see *Purcell v. Gilead*, 439 F. Supp. 3d 388, 400 (E.D. Pa. 2020) (finding only that allegations "are better suited for review after discovery")—the case here has a record that indisputably proves that the trainers furnished services that were necessary. VFMS tries to argue instead that the training services could be performed by unlicensed employees. VFMS ignores that Tactile had legitimate reasons to use licensed professionals, including their expertise in the disease state, experience with treatment protocols, professionalism, and the confidence it gave both patients and their treating doctors. (Ex. 8, Hoy Dec. ¶ 7; Ex. 26, Ewell Dec. ¶ 8; Ex. 9, Trock Dec. ¶ 9; Ex. 19, Buthusiem Decl. at 32-33; *see also generally* Ex. 21, OIG Advisory Opinion No. 08-20.). Tactile's trainer assignments further proves it prioritized the qualification of a health care provider over clinical affiliation—it is undisputed that many of Tactile's busiest trainers had no clinical affiliation.

10

(Ex. 31 (showing numerous unaffiliated trainers)). Nor does VFMS allege that Tactile ever hired clinical staff that were not similarly credentialed. This prioritization continues today.[5]

Third, VFMS lacks evidence of an improper purpose. *U.S. v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004) (relator must show that a purpose of remuneration is to induce referrals). Tactile paid fair market value for legitimate services without regard to trainer affiliations because its program was driven by proper purposes—namely good service, good clinical outcomes, and patient satisfaction. (*See* Ex. 26, Ewell Dec. ¶ 8; Ex. 9, Trock Dec. ¶ 9; Ex. 38, Rishe Dep. at 30:8-16; Ex. 85, Gorham Dep. at 305:15-22).

Importantly, Tactile also put in place specific controls to ensure its trainer-assignment process was divorced from any potential inducement of referrals. Training assignments were controlled by coordinators who did not track referrals and, even if asked, who *would not* assign trainings for such a purpose. (Ex. 30, Haspert Dep. 103:14–104:19; 146:9–23 ("They might have asked, but it was never taken into consideration.")).

VFMS meticulously ignores this key evidence because it is fatal to their claim. Out of hundreds of training assignments that occurred every day, VFMS has collected only a handful of instances in which sales a representative connected training to referrals. (Opp'n at 10). None of these instances involve Texas or resulted in an improper training assignment:

- A 2015 email from Pennsylvania, forwarded to compliance with a note that the coordinator was annoyed and "not responding to these kinds of emails." (VFMS X-38);

---

[5] As with many companies, Tactile had to make unusual temporary adjustments during COVID, but it did not permanently change its program. (*E.g.,* Ex. 23, Hoy Dep. at 219:1-220:20 ("we have not changed our program, so contract trainers are the same types of individuals they were before COVID as they are now.")). VFMS ignores Tactile's testimony to this effect.

11

- A 2015 email from Arizona in which no training assignment was actually at issue. (VFMS X-33);

- A 2016 email from New York, requesting that trainings be sent to a former firefighter who is not a referral source. (VFMS X-46);

- A 2015 email from North Carolina, forwarded immediately to a supervisor with a note that the training coordinator "will not respond." (VFMS X-39); and

- A 2019 email from Pennsylvania, forwarded immediately to compliance. (VFMS X-93).

Tactile did not acquiesce in the requests. Compliance officials at Tactile were notified and acted in response. (*E.g.,* Exs. 48 (2015), 45 (2016), 47 (2019)). Although VFMS advocates that employees who violate policy should be fired, there is no evidence these were intentional bad acts and, ultimately, such an extreme reaction proved unnecessary. Hoy's written warnings and education were effective—there is no indication these employees repeated the behavior.

Although VFMS may have identified a few instances in which sales staff expressed a hope about referrals, "[t]here is no AKS violation . . . where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes." *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016). The undisputed facts show that Tactile's training program was designed for the purpose of providing patient care, and Tactile made sure it operated accordingly. In the end, VFMS does not identify a single improper request that resulted in the desired training assignment, and Tactile's analysis of trainer assignments confirms that the program did not favor clinically affiliated trainers.

### B. The Undisputed Facts Show That the KOL Program Is Not a Kickback.

VFMS's scattershot arguments regarding the KOL program can be reduced to these three assertions, made without an evidentiary basis: (1) the education programs were a sham; (2) the payments to physicians for medical education programs exceed fair market value; and

12

(3) physicians were selected to speak at KOL programs to induce referrals. The record belies these accusations and, unsurprisingly, VFMS points to no evidence to support these claims.

First, Tactile's KOL medical-education program is not a sham. Unlike the cases on which VFMS relies, the speakers in the Tactile program did not present to empty rooms. (*See* Ex. 51, Mosbek Dec. ¶ 3; Ex. 12, Gasparis Dec. ¶ 8; Ex. 13, Melin Dec. ¶ 11; Ex. 15, Radhakrishnan Dec. ¶ 10). To the contrary, there is unrefuted evidence that Tactile tracks program RSVPs and will cancel a program if there is insufficient attendance. (Ex. 51, Mosbek Dec. ¶ 3 ("If there appears to be little or no interest in a program, Tactile cancels the program 48 hours prior to the program."); Ex. 54, Karni Dec. ¶ 13 (noting an instance where KOL program was canceled due to insufficient interest)).

Tactile's robust medical-education program has a legitimate educational purpose: informing physicians about a little understood and often underserved condition. Many doctors are unfamiliar with lymphedema, and Tactile's KOL program is designed to engage with highly regarded specialists to provide much-needed education and training. (*See, e.g.*, Ex. 13, Melin Dec. ¶ 2 ("There is a significant need for ongoing physician education regarding lymphedema. In medical school, physicians typically receive less than an hour of education about lymphedema during a four-year program, but the disease affects a significant portion of the population and patients with chronic wounds and venous disease."); Ex. 15, Radhakrishnan Dec. ¶ 9 ("Many physicians and clinicians do not even know what lymphedema is. Consequently, the majority of my KOL presentations covered the causes of lymphedema and how to identify and treat it."); Ex. 16, Satwah Dec. ¶ 4 ("As a KOL for Tactile, I want to help educate others on how to diagnose, assess, treat and manage lymphedema, as it is a chronic disease process that is

13

underrecognized and therefore undertreated."); Ex. 8, Hoy Dec.¶ 16).  Indeed, speakers are so enthusiastic about providing educational opportunities to their fellow practitioners that they are willing to *lose* money to do so; speaker compensation does not fully replace—let alone exceed— the income that doctors lose in preparing for and giving talks.  (*See, e.g.*, Ex. 15, Radhakrishnan Dec. ¶ 13; Ex. 16, Satwah Dec. ¶ 4; Ex. 50, Weaver Dec. ¶ 5; Ex. 54, Karni Dec. ¶ 8).

VFMS points to a November 2020 OIG Special Fraud Alert.  In it, OIG highlights some characteristics of problem speaker programs: speakers paid over fair market value; lavish locations or events; lack of substantive educational content; attendees with no business reason to attend or who attend repeated events on the same topic; selection of speakers based on prescribing levels; etc.  The record proves that Tactile does not engage in these problematic activities.  Tactile's programs are educational in purpose and attendees are health care professionals with a legitimate reason to attend; it does not pay for attendee travel, and monitors costs per attendee to ensure it is modest; it selects speakers based on expertise, not prescription levels; it pays speakers only fair market value; and it tracks event success to determine efficacy of its educational content, not for improper remunerative purposes.  (*See generally, supra,* Ex. 50, Weaver Dec., Ex. 51, Mosbeck Dec.)  Courts have recognized that payments to speakers as part of medical-education programs can be lawful.  *See, e.g.*, *U.S. ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1055 (C.D. Cal. 2016) ("On this showing, no reasonable jury could find that Celgene's payments to physician-speakers violated the AKS.").  Tactile's programs are educational and intended to spread awareness of an underdiagnosed and undertreated disease—it wants to sell pumps to patients who need them, not pay kickbacks.

Also, the record here is very different from the cases on which VFMS relies.  Of the five

cases cited by VFMS to attack the KOL program, three are orders in response to motions to dismiss. *See U.S. ex rel. Booker v. Pfizer, Inc.*, 9 F. Supp. 3d 34, 40 (D. Mass. 2014); *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d. 497, 501 (S.D.N.Y. 2014); *Purcell*, 439 F Supp. at 390. As noted, Rule 12 cases are inapplicable on summary judgment—especially when those Rule 12 cases explicitly note that they "are better suited for review after discovery." *See, e.g., Purcell*, 439 F. Supp. 3d at 400. The other cases are inapposite. For example, in *U.S. ex rel. Gohil v. Sanofi U.S. Servs., Inc.*, there was evidence that the defendant provided program *attendees* with "all-expenses paid trips . . . in desirable locations in connections with valuable entertainment." 500 F. Supp. 3d 345, 369 (E.D. Pa. 2020). The record in this case shows only that speakers were paid for their work and VFMS points to no evidence that Tactile's programs were the kind of window dressing for golf outings and beach resorts described in *Gohil*.

Second, VFMS once again fails to meet its burden of proving that the payments for speaking programs were in excess of the fair market value. *Bingham*, 783 F. App'x. at 874. Tactile relied on advice from outside attorneys and experts in setting compensation for KOLs. (Ex. 58; Ex. 59; Ex. 8, Hoy Dec. ¶ 15; Ex. 23, Hoy Dep. at 60:15-61:10). The analysis of expert Adam Klein once again is compelling and undisputed. Because payments to physicians are publicly available under the Sunshine Act, Klein relied on industry data from 2019 to set benchmarks. (Klein Rpt. ¶ 33). After evaluating the time necessary to prepare and present an educational program, he concluded that Tactile's compensation rate to KOLs was $200-$300 an hour. (Klein Rpt. ¶ 31). The rate fell well below the median and was "on the lower end of the fair market value range[.]" (Klein Rpt. ¶ 32). This is consistent with the undisputed testimony of KOLs, who note that speaker compensation does not come close to substituting for their

15

foregone income on travel and presentation days. (*See* Ex. 15, Radhakrishnan Dec. ¶ 13; Ex. 16, Satwah Dec. ¶ 4; Ex. 50, Weaver Dec. ¶ 5; Ex. 54, Karni Dec. ¶ 8).

VFMS does not attempt to show that KOL payments exceeded fair market value. Instead, it merely reports aggregate numbers in the hopes that the Court will infer something nefarious. (Opp'n at 19–20). As an example, VFMS states that Tactile paid Dr. Karni $132,729.34. What VFMS fails to note is that these payments were both KOL stipends and reimbursement for expenses; and that the amount represented payment for 19 educational programs on head and neck lymphedema, for which Tactile had recently released the first at-home compression device. (VFMS X-135; Ex. 87, Tactile News Release (May 2017)). VFMS's broad-brush implications are not a substitute for the evidence necessary to meet their burden on summary judgment.

Third, VFMS has introduced no evidence that KOL speakers were selected or paid for anything other than their work. Although VFMS implies that a payment to a physician is per se unlawful, that assertion is wrong as a matter of law. *See Ruscher*, 663 F.App'x at 374 (recognizing circumstances in which financial benefits paid for legitimate purposes are not an AKS violation). As Klein notes in his report, Tactile made no effort to conceal these legitimate payments to KOL speakers—indeed, the data is publicly available through Sunshine Act reporting. (Klein Rpt. ¶ 27). After reviewing the consulting agreements and the voluminous record in this case, Klein concluded that "[n]one of the agreements described duties related to marketing activities, nor did I identify any documents showing physicians' performance was evaluated or paid based on their sales impact[.]" (Klein Rpt. ¶ 27). Klein's report is supported by unrefuted physician testimony that Tactile did not track or reward referrals from KOLs: "[n]obody from Tactile ever told me or implied that I would receive more speaking engagements

16

or remuneration if I referred more devices to patients[.]" (Ex. 54 ¶ 2; *see also id.* ¶¶ 5-6, Ex. 11 ¶ 5; Ex. 16 ¶ 3–4; Ex. 13 ¶ 5; Ex. 15 ¶¶ 5-7, 14; Ex. 9 ¶ 13; Ex. 12 ¶¶ 6, 9; Ex. 60 ¶ 4; Ex. 61 ¶¶ 3–4).

Tactile selected speakers based on expertise, not sales. (Ex. 51, Mosbek Dec. ¶ 3; *see also* Ex. 88 (showing internal notes focus on content)). Although VFMS points to charts that refer to return on investment ("ROI"), the charts plainly track "post-program revenue"— meaning revenue in the territory after the KOL presentation—or total revenue and then consider those amounts relative to the cost of the program. (VFMS X-21, X-26; *see also* Ex. 85, Gorham Dep. at 152:20-153:8 (explaining that Tactile looked at whether *attendees* prescribed more after events). Attendees were not paid, and tracking their attendance and orders actually prove the programs were not a sham—they were for legitimate purposes. VFMS must prove Tactile intended to induce prescriptions from the speakers, but Tactile did not track speaker prescriptions nor expect them. (Ex. 50 Weaver Dec. ¶ 5, 7; Ex. 51, Mosbek Dec. ¶ 3-4). These charts only prove that Tactile's medical-education program was doing what it was designed to do: informing doctors about a poorly understood disease in an effort to increase diagnosis and treatment. (VFMS X-26; VFMS X-21).

Once again, the cases on which VFMS relies are inapposite. In *Arnstein*, the court noted record evidence showing that Teva both "track[ed] *speakers'* prescription writing" and "tracked attendee prescribing at *speaker training* programs." *Arnstein*, 2019 WL 1245656, at *13 (initial emphasis added, latter in original). Tactile was not tracking speaker referrals. In *Gohil*, the court noted the record evidence showing that Aventis "provided doctors all-expenses paid trips and honoraria to *attend speaker 'training' and 'development'* programs in desirable locations

17

like Las Vegas and offered valuable 'social activit[ies] to attendees.'" *Gohil*, 500 F. Supp. 3d at 370. Tactile did not hold speaker trainings or pay for attendee trips and honoraria.

VFMS can point the Court to no evidence that Tactile's KOL programs were shams, that payments to physicians for those programs exceeded fair market value, or that physician speakers were compensated for anything other than their work because no such evidence exists.

**C.      There is No Evidence of False Claims Caused by Kickbacks.**

VFMS has the burden to not only identify claims, but also provide evidence those claims resulted from or were caused by Tactile's alleged payment of kickbacks. VFMS failed to timely identify even a single alleged false claim in this case. Now, in response to summary judgment, VFMS claims to have identified false claims, relying on proposed expert testimony in the form of a Declaration from Brian Piper, an expert witness that VFMS has been precluded by the Court from using because he was not timely disclosed. (Ex. 89). VFMS's claims are inadmissible because they are disclosed unjustifiably late, and Piper is precluded from sponsoring this proposed expert evidence. *See, e.g., id.*; Fed. R. Civ. P. 37(c)(1) ("a party that fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

In any event, VFMS also lacks any evidence causally connecting those claims to Tactile's training and medical-education programs. For example, VFMS asserts that Piper has identified 226 claims as false, based on "specific referrals" from four Texas therapists who have also worked as trainers for Tactile. Opp'n. at 48, 50 (citing *U.S. v. Shoemaker*, 746 F.3d 614, 626–30 (5th Cir. 2014) (holding liability could attach for recommendations)). But VFMS has no

18

evidence proving that a therapist referral, in fact, occurred for any of these 226 patients.

VFMS's evidence is comprised of data collected by Tactile in its corporate databases, which monitor patient prescriptions. But that data does not track therapist referrals. It includes the prescribing physician; it also includes the therapist—if the patient has one and it is known. But therapists are not always involved in the decision of which pump to prescribe, and Tactile does not track it either way. Although VFMS derides Tactile's use of the word "association" to describe the connection, it is accurate not euphemistic. The record does not contain any evidence as to whether any of the four therapists were involved in selecting the lymphedema pump for these 226 patients. In other words, VFMS's contentions are entirely speculative.

This is a fatal flaw for VFMS's claim. The Fifth Circuit has held that a relator must identify evidence that a kickback "actually caused" the submission of false claims. *U.S. ex rel King v. Solvay Pharm., Inc.*, 871 F.3d 318, 329, 332 (5th Cir. 2017) (affirming dismissal where the relator failed to identify any evidence that alleged kickbacks "actually caused" the submission of false claims). VFMS has no evidence that would meet this standard.

VFMS tries to argue around *Solvay*, advocating instead for a lower Third Circuit standard that focuses on whether a "link" exists. *U.S. ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018). The Fifth Circuit has not adopted this standard. But even if it had, this is a prominent example of a case that lacks even a link. *Id.* at 98–100 (affirming summary judgment on AKS allegations because relator failed to identify a single claim in which he could prove the patient actually was recommended or referred by the kickback recipient); *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-0604-M, 2016 WL 3449833, *1 (N.D. Tex. June 20, 2016) (granting summary judgment and finding that relator "did not sufficiently link the

19

payment of a bonus to a referral, patient, or claim").

VFMS also makes no attempt to show that the compensation paid to speakers at Tactile medical-education events caused claims to be submitted. Recognizing that it does not meet the Fifth Circuit standard, VFMS attempts to distinguish *Solvay*. It cannot meaningful do so. As in *Solvay*, VFMS's evidence only "shows (1) physicians participating in [Tactile's] programs in which they were compensated for consultations or presentations, and (2) subsequent prescriptions by those physicians of [Tactile's products to Medicare] patients." *Solvay Pharm.*, 871 F.3d at 331. The court explained that this was insufficient as a matter of law to show *cause*:

> Nowhere, however, do Relators cite to evidence creating a genuine issue of material fact that such compensation, or any incidental benefits, caused those physicians to prescribe to Medicaid patients.

*Id.* at 332.[6] Just like in *Solvay*, the undisputed record shows only that Tactile compensated physicians for their work as speakers and did not condition the invitation to speak on prescribing its products to Medicare patients. *See id.* at 332; (*see also, e.g.*, Tactile Exs. 9-10, 11-12, 13-16, 54, 60). Despite relying on the same arguments and evidence as the relator in *Solvay*, VFMS asks the Court to reach the opposite conclusion. It cannot do so. Finally, VFMS also provides no evidence of any government payment on many of the identified claims. *See* VFMS X-2 at Attach. 2-3.

### D. There Is No Evidence That Tactile Knowingly Paid Kickbacks.

Tactile's trainer and medical-education programs are both legitimate programs and not kickback schemes. At a minimum, Tactile certainly had a reasonable belief that its programs were lawful. VFMS is unable to identify any fact to support its claim that Tactile "knowingly

---

[6] VFMS also suggests without explanation that the 2010 amendments somehow require a different outcome. But *Solvay* was decided in 2015.

and willfully entered into an illegal kickback scheme." *Gonzalez v. Fresenius Med. Care N. Am.,* 689 F.3d 470, 476 (5th Cir. 2012); *Ruscher*, 663 F. App'x at 374.

The requirement that a kickback be knowing and willful is significant. An action is only taken knowingly if it is done "voluntarily and intentionally, not because of mistake or accident." *U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (citation omitted). An action is taken willfully if it "was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *Id*. Negligence, reasonable mistakes, and even errors are not actionable—only a "lie is actionable." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

As set forth above, Tactile undertook its trainer and medical-education programs with a thoughtful eye towards its legal responsibilities. Tactile modeled its program on lawful programs used by other companies. (Ex. 8, Hoy Decl. ¶ 8; Ex. 23, Hoy Dep. 48:8-49:15; 52:9-25; 57:2-58:9; *see also* Ex. 24 Haspert Dec. ¶ 2 (discussing similar programs at Smiths Medical and Disetronic)). Tactile operated openly—for example, asking contractors to inform their employers of the work, (Ex. 37 at 10), regularly seeking outside advice from experts and lawyers, (Ex. 23, Hoy Dep. at 43:21-47:11; Exs. 3, 67, 68; Ex. 90, DuVal Suppl. Decl.), inviting the general counsel from one of the biggest health care companies in the country to be on its board and chair of its compliance committee, (Ex. 90, DuVal Supp. Decl. ¶9) and going through legal due diligence to become a publicly traded company (Ex. 23, Hoy Dep. at 44:20-45:9).

Tactile was audited by CMS-affiliated agencies which approved accreditation knowing these programs existed. (Ex. 8, Hoy Dec. ¶ 19; Ex. 3, 2017 DuVal Report at 5). Physicians, hospitals, therapists, and employees in Texas understood who was providing patient training for

21

Tactile and who was speaking at medical-education events. (*See generally* Exs. 25, 9, 11-16, 28, 54, 60-61, 69, 70). Even government officials understood—the Department of Veterans Affairs investigated employee contracts with Tactile but did not find any actionable issues, and physician payments were reported to CMS. (Ex. 38; Am. Compl. ¶ 60; Ex. 54 ¶ 7).

Tactile's programs were not a secret. Not a single person or organization ever claimed that Tactile pays illegal kickbacks—except VFMS, an admittedly self-interested business competitor. (Ex. 23, Hoy Dep. 45:10-17; Ex. 91, Tactile Response to 4th RFP No. 14). VFMS's strategy in this case is to take Tactile's committed compliance effort—a recognized strength of the company—and use that against it. The strategy highlights the Morton's Fork choice often faced by medical-device companies. Should the company avoid identifying risks so as not to document them and risk being attacked for a weak compliance program? Or should the company develop robust compliance efforts that proactively identify potential risk and face the prospect that its own words may be used against it? VFMS would claim evidence of wrongdoing either way. But Tactile did the right thing. Tactile funded a robust compliance program led by an experienced in-house attorney, who proactively identified the areas in its organization where a "motive" or "opportunity" to take shortcuts may exist. (*E.g.,* X-42 (memorandum to the chair of the compliance committee)). When risks were identified, Tactile actively and effectively mitigated them. (Ex. 90, Duval Supp. Decl. ¶9).

Tactile also committed to undergo biannual reviews of its company programs by a highly respected health care legal expert, Mark DuVal, for the specific purposes of identifying and addressing legal risks. (Ex. 23, Hoy Dep. at 42:6-19). DuVal has been conducting audits of Tactile since 2007, well before the time period at issue in this case. (*Id.* 62:7-9). DuVal is

22

unambiguous—he *did* understand the characteristics and parameters of these programs and issued his opinion with that knowledge. (Ex. 90, Duval Supp. Decl. ¶¶ 4-5).

VFMS elected not to take DuVal's deposition, or to earnestly engage Tactile officials on the topic. VFMS stays on the surface, making self-serving allegations about tidbits of DuVal's reports for which it lacks any context. DuVal explains that his audits involved interviews and document reviews, and that Tactile never directed the substance of his findings in any way. (Ex. 90, Duval Supp. Decl. ¶¶ 3, 8). As to the training program, DuVal has long understood the parameters of the training program, including that it used licensed health care providers who had clinical positions. (*Id.* ¶ 5). DuVal's comfort with the program came from the controls that prevented improper inducement, not a misunderstanding of how it operated. (*Id.*). DuVal's firm advised Tactile on the contracts and structure of the KOL program when it was developed in 2018. (*Id.* ¶ 6). Again, during his audits he had a complete understanding of the program's operation, including who was selected as speakers. (*Id.*). Finally, DuVal reaffirms that Tactile was an exemplar company—it took compliance seriously, it sought input and improvement in good faith, and it implemented his advice. (*Id.* ¶ 9).

In short, VFMS's unsubstantiated assertions are not sufficient to survive summary judgment. DuVal's declaration affirms what the record overwhelming establishes—that Tactile reasonably and in good faith ran programs it believed were lawful. *Ruscher,* 689 F.3d at 476 (absent evidence of a "criminal intent to induce referrals," summary judgment must be granted). The record also substantiates that Tactile reasonably relied on advice of counsel, which is an additional reason why summary judgment is appropriate.[7] *See, e.g., U.S. ex rel. Rose v. E. Tex.*

---

[7] VFMS makes an unsupported claim that Tactile waived the advice-of-counsel defense or did

*Med. Ctr. Reg'l Healthcare Sys.*, No. 2:05-CV-216, 2008 WL 4056601 (E.D. Tex. Aug. 25, 2008) (granting summary judgment for defendant by finding that, due to law ambiguity and advice of counsel, there was insufficient evidence of scienter under the FCA).

Finally, although VFMS attempts to distinguish it, the 2008 OIG Advisory Opinion also lends support to the reasonableness of Tactile's understanding that its programs were lawful. As to the relevant portion, OIG was considering a program by a medical device supplier who planned to use licensed respiratory therapists on-site at hospitals to provide training and education to patients. (Ex. 21, OIG 08-20 at 2). Just as with the lymphedema pump, the patient training and education was provided in compliance with DMEPOS Quality Standards. (*Id.* at 3). Just like Tactile, the therapists did not have a relationship with patient or the clinic for whom they were training. (*Id.*). Based on these facts, OIG did not identify a concern.

**E.    Government Has Not Denied Tactile Claims Based on Alleged Kickbacks.**

Finally, although VFMS contends that kickbacks are inherently material to government payments, it cannot rebut a key, undisputed fact: the government has continued paying Tactile claims, and as such, materiality is lacking. As Tactile explained in its initial memorandum, the government has long been apprised of Tactile's actions, including the following:

- Tactile discloses payments pursuant to the Sunshine Act. (Ex. 8, Hoy Dec. ¶ 13);

- Tactile publicly discloses the nature of the patient training and KOL programs pursuant to its SEC disclosure obligations. (*E.g.,* Ex. 81, Feb. 2017 SEC Report);

---

not make a sufficient disclosure of the attorney-client advice. This should be rejected. *See, e.g., LG Philips LCD Co., Inc. v. Tatung Co.*, 243 F.R.D. 133 (D. Del. 2007) (advice of counsel defense is not an affirmative defense that must be asserted in pleadings); *Brown v. Toscano*, 630 F.Supp.2d 1342 (S.D. Fl. 2008) (same). VFMS cannot claim prejudice as it conducted discovery on the defense. Tactile disclosed all relevant attorney-client advice. If VFMS had a good-faith belief that relevant material was not disclosed, VFMS would have moved to compel.

24

- Tactile discloses details about its programs to CMS-affiliated agencies in seeking accreditation. (Ex. 8, Hoy Dec. ¶ 19; Ex. 3, 2017 DuVal Report at 5); and

- VFMS made numerous and consistent allegations to the VA, which conducted an investigation and found no wrongdoing, as well as the Department of Justice.

With this knowledge, the government has never denied payment on Tactile claims. This is "very strong evidence" that VFMS's contentions in this case are not material. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016); *see also U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc*., 865 F.3d 29, 35 (1st Cir. 2017) ("Such very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position."); *U.S. ex rel. Harman v. Trinity Indus., Inc*., 872 F.3d 645, 665 (5th Cir. 2017) (unrebutted evidence that the government did not decline pay after learning of allegations is "strong evidence" that substantially increased relator's burden); *U.S. ex rel. Porter v. Magnolia Health Plan, Inc*., 810 F. App'x 237, 242 (5th Cir. 2020) (same).

The government has had a clear look at VFMS's allegations in this case. Whether framed as materiality, or whether it is just indicative that government officials have not found the allegations to be compelling evidence of an AKS violation, the import is the same—the government has not denied claims based on VFMS's allegations.

## CONCLUSION

Based on the undisputed facts in this case, Tactile respectfully requests that the Court grant its Motion for Summary Judgment and dismiss VFMS's claims with prejudice. Tactile further requests that the Court grant Tactile all other relief at law or equity to which it is entitled.

Dated: October 1, 2021

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Scott McBride*
B. Scott McBride
TX State Bar No. 24002554
*scott.mcbride@morganlewis.com*
John Petrelli
TX State Bar No. 24056125
*john.petrelli@morganlewis.com*
1000 Louisiana Street, Suite 4000
Houston, TX 77002
(713) 890-5000 Telephone
(713) 890-5001 Facsimile

**FREDRIKSON & BYRON, P.A.**

*/s/ Leah Huyser*
David M. Glaser *(pro hac vice)*
MN State Bar No. 228874
*dglaser@fredlaw.com*
Alethea M. Huyser *(pro hac vice)*
MN State Bar No. 0389270
*ahuyser@fredlaw.com*
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 Telephone
(612) 492-7077 Facsimile

**LAW OFFICE OF KEVIN C. RIACH, PLLC**

*/s/ Kevin C. Riach*
Kevin C. Riach *(pro hac vice)*
MN State Bar No. 0389277
125 Main Street SE, Suite 339
Minneapolis, MN 55414
Telephone: (612) 203-8555
kevin@riachdefense.com

*Attorneys for Defendant*

26

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of the foregoing was filed electronically on October 1, 2021. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties entitled to notice by electronic notification and a copy will be emailed to all counsel of record.

/s/ B. Scott McBride
B. Scott McBride