# EXHIBIT 1



Short Ideas    Healthcare

# Strong Sell On Tactile Systems: Bloated Stock Needs Compression Therapy

Jun. 08, 2020 8:45 AM ET | **Tactile Systems Technology, Inc. (TCMD)** | 2 Comments | 1 Like



**OSS Research**
37 Followers

## Summary

- Tactile claims to be a dominant player in an extremely underpenetrated market with $5bn TAM growing at 20-30% annually. We think the true TAM is closer to $300mm.

- We address the likely true source of Tactile's growth: a kickback arrangement, we believe, is resulting in rampant over-prescribing. Payers, including the VA, are cracking down and cutting reimbursement to Tactile.

- Medicare has launched an audit, and data reveals Tactile has been found non-compliant on 71% of its claims. We believe management has made no mention of these audits to investors.

- Since 2017, Tactile has seen multiple key departures: CFO, Chief Medical Officer, SVP of Reimbursement & Payer Relations, VP of Reimbursement, and VP of Quality & Regulatory Affairs, and CEO.

- Strong Sell with 70% ($15 PT) downside: Payers are cracking down, and insiders are jumping ship.

*(This article was highlighted for PRO subscribers, Seeking Alpha's service for professional investors. Find out how you can get the best content on Seeking Alpha here.)*

Editor's note: Seeking Alpha is proud to welcome OSS Research as a new contributor. It's easy to become a Seeking Alpha contributor and earn money for your best investment ideas. Active contributors also get free access to SA PREMIUM. Click here to find out more »

## Thesis Overview

- Numerous publicly available studies and claims databases suggest the addressable market for advanced Pneumatic Compression Devices (PCDs) is $300mm, and not $5bn as management claims. In fact, Medicare has covered PCDs since 1986.

- We believe the true source of Tactile's (NASDAQ:TCMD) growth is a kick-back arrangement that we believe has resulted in rampant overprescribing at the expense of patients, insurers, and the public.

- We believe these activities are coming to an end. Medicare has recently launched an industry-wide audit, and Tactile has been disproportionately targeted. **71% of Tactile's claims audited so far have been denied for failure to establish medical necessity.** We have found no mention of these audits by management to investors.

- Regulators have cracked down before – in 1995, the OIG launched an investigation into lymphedema pump fraud and abuse. By 1996, reimbursements had fallen by 92%.

- Changes to 10K disclosures may be foreshadowing some of the legal and regulatory risks for the company.

- Since 2017, Tactile has seen multiple key departures: CFO, CMO, SVP Payer Relations, VP Reimbursement, and VP Regulatory Affairs. CEO Jerry Mattys is stepping down on June 8th this year.

- Insiders, including the CEO, COO, and VP of Sales, have sold more than 50% of their shareholdings in 2019 since the Qui Tam lawsuit was filed, and Medicare audits were launched.

## Company Overview

SCCERS0006670

Tactile Systems Technology Inc. is a manufacturer of Pneumatic Compression Devices (PCD) for patients diagnosed with lymphedema in the United States.



*Example of Flexitouch device*

PCDs used for the treatment of lymphedema are split between two classifications: "standard/basic" devices (HCPCS code E0651) and "advanced" devices (E0652). Basic devices have ASPs ranging from $400 to $1,000, while advanced devices generally go for $4,000+.

~90% of Tactile's revenue comes from its advanced PCD product called Flexitouch. The remaining 10% in revenue is derived from its basic PCD under the Entrée brand.

Since its IPO, management has presented a carefully crafted bull narrative for investors:

- *Growing, $5bn TAM:* According to management, 1.3mm new patients were diagnosed with lymphedema in the last 12 months. At the Flexitouch ASP of ~$4,000, this implies a $5bn+ TAM.

- *Severely Underpenetrated with Significant White Space*

- *Consistent 20-30% Grower*

## Why Tactile's TAM Estimates Are Overstated By Over *15x*

While Tactile publicly touts a $5bn+ market opportunity, analysis of claims data, published medical studies, and state coverage mandate disclosures suggest the true TAM for the Flexitouch product is only ~$300mm.

The true addressable market for Flexitouch is significantly lower for two reasons:

1. The incidence rate of lymphedema is much lower than management claims, and

2. Only a fraction of lymphedema patients are eligible for advanced PCDs from both a medical and a reimbursement perspective.



## TAM Part 1: The True Rate Of Lymphedema Is Lower Than Management Claims

The addressable market can be looked at in two ways: incidence (diagnoses per year) and prevalence (total cumulative patients).

**Incidence:**

While Tactile claims there are 1.3mm lymphedema diagnoses p.a., the true figure is likely between 300,000 and 500,000 – a third of management's estimate.

SCCERS0006671



*Source (1) Feb-19 – Health & Economic Benefits of APCD Study (linked):* A Tactile-funded study analyzing claims data to determine economic and clinical outcomes following Flexitouch usage. The study analyzes the Blue Health Intelligence (BHI) research database covering >165mm members of individual Blue Cross Blue Shield plans from across the US. Notably, Tactile has been using BHI for claims data since 2018.

> This study used deidentified Health Insurance Portability and Accountability Act-compliant commercial administrative claims data from the Blue Health Intelligence (BHI) research database for the complete years 2012 through 2016. The data set contained longitudinal information captured by commercial health insurance claims. The core BHI databases contain >165 million members of individual Blue Cross Blue Shield plans from across the United States. Study data were accessed by procedures compliant with the Health Insurance Portability and

> Diagnosed with non-filarial lymphedema (≥1 inpatient claim or ≥2 outpatient claims within a 30 day period with the first or second ICD-9: 457.0, 457.1, 757.0, ICD-10: I97.2, I89.0, Q82.0)
>
> n = 81,366

During the period studied (2012 – 2016), 81,366 patients were found to have been diagnosed with non-filarial lymphedema, defined as ≥1 inpatient or 2 outpatient claims with the relevant ICD codes. 81,366 diagnoses out of the 165mm covered population imply a 0.05% incidence rate. Note that the 81,366 figure is over four years, so the annual incidence would be even lower.

*Source (2) Dec-14 – Lymphedema Prevalence & Treatment Benefits in Cancer Study:* Tactile's then Chief Medical Officer Alan Hirsch was a co-author of this study. The study conducts retrospective analysis on health claims data from Optum Insight Inc. between 2007 and 2013 that covered >34mm individuals each year.

> De-identified administrative health claims data from the de-identified Normative Health Information (dNHI) database were accessed between 2007 and 2013 for this study. dNHI includes more than 34 million individuals each year, comprised of both commercially-insured and Medicare Managed Care enrollees from a large United States (US) national managed care health insurer affiliated with Optum, Inc. (Eden Prairie, MN). The enrollment database includes a geographically diverse US population (16% West, 20% Midwest, 36% South, and 27% Northeast). In addition, the age and gender distribution of the dNHI is similar to that reported by the US Census Bureau for the commercially insured and the Medicare Managed care population.

> prevalence of 0.95%. The prevalence increased slowly during each subsequent year, rising to 0.977% (9,827/1,005,372) in 2008, 1.035% (11,165/1,078,822) in 2009, 1.102% (12,029/1,092,067) in 2010, 1.127% (12,806/1,135,156) in 2011, 1.209% (13,985/1,156,326) in 2012 and 1.243% (14,775/1,188,860) in 2013.

*Study measured prevalence of lymphedema related to cancer patients, not total population. NOTE* that the study measures prevalence of lymphedema in cancer patients, and therefore calculates prevalence based on 1,188,860 population size of cancer patients. We took the numerator (14,775) against the total database size of 34mm instead.

The study provides the number of diagnoses per year, defined as one or more medical claims with the relevant ICD codes. In the most recent year, 2013, the study found 14,775 patients diagnosed with lymphedema out of 34mm. This figure suggests an incidence rate of ~0.04% or ~140,000 total US diagnoses per year. Note that this study focuses primarily on cancer-related lymphedema (which represents the majority of lymphedema cases in the US). All cases of lymphedema would be higher but not significantly so. In the California case study below, claims data found that total lymphedema was about ~2x the number of breast cancer related lymphedema. This is for just one type of cancer. To get to management's figures, one would need to adjust the incidence rate by ~10x.

SCCERS0006672

**Prevalence:**

A second way to look at the market size is how many total patients suffer from lymphedema at any given point in time. Management estimates this figure to be between 5 and 10 million patients. Research suggests the true figure is closer to 2 million - *a fourth of management's estimate*.



*Source (3): Dec-16– Chronic Oedema: A Prevalent Health Care Problem for UK Health Services:* A study that measured lymphedema prevalence in an urban area within the UK (Note that, while the study refers to chronic oedema instead of lymphedema, these terms are largely interchangeable in the UK - link). This prevalence rate was extrapolated to the US population.

**Prevalence of Chronic Oedema in Derby City**

In all, 992 patients living in Derby City were identified from the services studied. Of these, 21 patients did not have CO but were thought to be at risk of its development and were removed from the analysis. The remaining 971 patients had CO of greater than 3 months duration (Table 3). The mean age (SD) was 68.5 (16.5) years. The total crude prevalence was 3.93/1,000 population (95% CI 3.69-4.19) with a prevalence of 2.48 for men and 5.37 for women. There was an age gradient with a prevalence of 10.31 /1,000 in those aged over 65 to 74 rising further to 28.75 in those aged over 85 years of age.

*Source (4): Apr-05 – California Health Benefits Review Program:* A state-level analysis of healthcare coverage for lymphedema in California. The analysis uses a regional claims database covering 7mm insured base. The prevalence rate of lymphedema found in this database was then extrapolated to the US population.

- Claims data used for this analysis include 7 million insured persons. We assume comparable rates of utilization among our claims data and utilization across the 20,368,000 people in California.

While incidence and prevalence of total lymphedema cases are unknown, it is estimated that the incidence of lymphedema after breast cancer treatment is 26%. This would translate into close to 6,000 cases annually in California. Estimates based on utilization data indicate that the total number of annual cases of lymphedema in California from all causes is 14,000.

Table 1 below summarizes these results in tabular form. It consists of an extensive review of multiple medical studies (some funded by Tactile itself), state and federal disclosures, and private pay-for-use claims databases.

| TABLE 1. US Lymphedema Incidence Rate | | | | |
|---|---|---|---|---|
| Estimates - AFTER adjustments made by author (all adjustments *increased* incidence rates) | | | | |
| | | *Pop. Sample Set Size* | *Implied Total US* | *% of Tactile* |
| **Studies Measuring Incidence (Patients Diagnosed Per Year)** | | | | |
| (1) Feb-19 - Health & Economic Benefits of APCD in Patients with Phlebolymphedema | USA | 165,000,000 | 338,756 | *26.1%* |
| (2) Dec-14 - Lymphedema Prevalence & Treatment Benefits in Cancer | USA | 35,000,000 | 251,894 | *19.4%* |
| **Tactile TAM Guidance - 1.3mm diagnoses per year** | | | 1,300,000 | *100.0%* |
| | | | | |
| **Studies Measuring Total Prevalence (Total Patients)** | | | | |
| (3) Dec-16 - Chronic Oedema: A Prevalent Health Care Problem for UK Health Services | UK | 247,100 | 1,711,528 | *22.8%* |
| (4) Apr-05 - California Health Benefits Review Program, Analysis of Assembly Bill 213 | USA | 7,000,000 | 1,845,037 | *24.6%* |
| **Tactile TAM Guidance - 5 to 10mm patients in the US** | | | 7,500,000 | *100.0%* |
| | | | | |
| **Data Measuring PCD Usage Incidence Only (Patients Prescribed a PCD Per Year)** | | | | *% penetration* |
| (5) 2014 DMEPOS Medicare Claims Data | USA | 49,300,000 | 127,542 | *41.6%* |
| (6) Definitive Healthcare Data | USA | 210,000,000 | 89,552 | *59.2%* |
| **Flexitouch & Entrée Devices Shipped in 2019** | | | 53,000 | |

*Source: Various medical studies outlined below, Definitive Healthcare Claims Data, OSS Research*

SCCERS0006673

*The bottom line:* Multiple external, 3rd party sources - including those used by the company itself - suggest that Tactile's lymphedema diagnoses statistics are significantly overstated. The real figure is likely to approximate 300,000 to 500,000 diagnosed patients per year.

*Alternative methodology:* We attended a large industry conference and spoke with a senior member of one of the largest lymphedema education centers in the US. On our conversation regarding the patient population of lymphedema in the US, she offered a different perspective that we lay out here: There are approximately 5,000 lymphedema therapists nationwide of which ~20% are lymphedema-only. On average, therapists treat ~50-60 patients per year. 5,000 therapists × 60 patients = ~300,000 patients per year.

## TAM Part 2: Only A Fraction Of Lymphedema Patients Are Treated With And Eligible For Advanced PCD

PCDs (and especially advanced PCDs) are not the first line of treatment for lymphedema. Research suggests less than 15% of lymphedema patients are ultimately treated with advanced PCDs.

PCDs are considered a treatment of last resort by both practitioners and payers. For diagnosed patients, Complete Decongestive Therapy (CDT) is the universally accepted method of treatment: *"Complete Decongestive Therapy (CDT) is the gold standard for lymphedema management." (Lymphcare USA,* link*)*

Therefore, PCDs are reserved for patients for which CDT was ineffective or not practical. To be eligible for a basic PCD, both public and commercial payers require medical documentation demonstrating compliance to a 4+ week course of CDT that was insufficient in reducing symptoms.

*Advanced* PCDs require further proof that a 1-to-3-month course of basic PCD treatment was similarly insufficient. Medicare and most payers do not recognize clinical differences between basic and advanced devices. Below is an excerpt from Anthem's coverage documentation:



The typical treatment funnel of lymphedema patient that eventually receives an advanced PCD looks something like this:



*Source: OSS Research*

**Studies suggest only ~30% of patients receive PCDs, of which 60% receive advanced PCDs:**

- *Source (1) Feb-19 – Health & Economic Benefits of APCD Study (linked):* The Feb-19 study using BHI data narrowed down to a ~1,065 population that were pursuing continuous lymphedema treatment. Of these patients, 34 used basic PCD only, and 171 patients were on advanced PCDs (roughly half of which were Flexitouch). This would imply ~20% of patients receive a PCD, and about ~83% of these PCD patients eventually go on to receive advanced PCD.

- *Source (2) Dec-14 – Lymphedema Prevalence & Treatment Benefits in Cancer Study:* In the 2014 study (2), the claims data indicate that between 2008 and 2012, 21,104 patients made claims for either a basic or advanced PCD. During this same period, the claims data found a total of 59,812 lymphedema diagnoses, or a PCD treatment penetration rate of ~35%. This 59,812 figure was done by adding the lymphedema diagnoses measured in each year as stated in the report (second screenshot below).

> million individuals each year). Second, we restricted the sample to individuals who had a claim for a simple or advanced PCD identified with HCPCS codes E0651 (pneumatic compressor, segmental home model without calibrated gradient pressure) or E0652 (pneumatic compressor, segmental home model with calibrated gradient pressure) during the time period of January 1, 2008 through November 31, 2012 (n= 21,104). Third, we required the study sample to have at least 12 months of continuous medical and

> prevalence of 0.95%. The prevalence increased slowly during each subsequent year, rising to 0.977% (9,827/1,005,372) in 2008, 1.035% (11,165/1,078,822) in 2009, 1.102% (12,029/1,092,067) in 2010, 1.127% (12,806/1,135,156) in 2011, 1.209% (13,985/1,156,326) in 2012 and 1.243% (14,775/1,188,860) in 2013.

- Definitive Healthcare Data: Definitive Healthcare manages a claims database covering ~210mm patients. For the CY2019 period, Definitive's database found ~57,500 PCD claims out of a 210mm insured base, suggesting a PCD incidence rate of ~0.03%. Extrapolating to the total US population implies a market size of ~87,600 PCD units per year. This compares to a total of 53,000 Flexitouch and Entrée devices shipped during the same period - a market saturation rate of over 59%.

  Of the PCD claims in CY2019 Definitive's database, 28,838 were for advanced devices under the HCPCS code E0652. This suggests ~50% of PCD patients receive advanced PCDs. Recall that E0651 represents the HCPC code for basic PCDs, and E0652 represents advanced PCDs.

  Definitive Healthcare data can be purchased from their website: link

**Data from Definitive Healthcare**

|  | Procedures | % |
|---|---|---|
| E0651 | 28,637 | 50% |
| E0652 | 28,838 | 50% |
| **Total** | **57,475** | |
| DH Covered Pop. (mm) | 210 | |
| % PCD Prescribed | 0.03% | |

> In late 2018, Definitive Healthcare integrated more than three billion medical claims for approximately 210 million de-identified patients into its existing product suite, covering about 65 percent of the U.S. population. Dating back from January 2016,

*Source: link*

## TAM Part 3: Putting It All Together



400,000 patients p.a. × 30% PCD usage × 60% advanced PCD share = **72,000 advanced PCDs shipped p.a.**

72,000 advanced PCDs × $4,000 Flexitouch ASP = **$288mm revenue opportunity for Flexitouch**

- This compares to management's estimate of a $5bn market opportunity.

- This also compares to existing Flexitouch revenue of ~$170mm as of FY2019.

- Medicare has covered PCDs since 1986. The market is not as under-penetrated as the company claims.

SCCERS0006675

So, how has Tactile been able to grow at 20-30% without TAM and market saturation constraints?

## A Deep Dive Into Tactile's Marketing Strategy

*A recent Qui Tam lawsuit* *alleges Tactile is employing highly aggressive marketing arrangements to induce sales growth and share gains. This lawsuit was followed by a sharp decline in VA sales as well as a Medicare audit that has disproportionately targeted Tactile.*

On August 20, 2018, a Houston-based competitor Veterans First Medical Supply (VFMS) filed a Qui Tam civil suit against Tactile. Qui Tam suits are filed on behalf of the US Attorney General and the typical legal route for whistleblowers to expose fraud, particularly as it relates to healthcare and public payer reimbursement.

Central to the lawsuit is its allegation of Tactile's use of unlawful financial incentives and marketing strategy to induce sales and share gains. A copy of the complaint can be found on Pacer as Case 4:18-cv-02871. Essentially, the plaintiff claims that Tactile has a group of "contractors" that it hires to deliver and train patients on the use of Flexitouch devices. It turns out that these contractors are actually clinicians and therapists that are critical in the decision making process for prescribing these devices. These contractors are paid $150 + gas per session. To put that in context, these therapists only receive ~$30-40 an hour for a typical a therapy session with patients.

> 30. Defendant's illegal kickbacks are paid to employees of the hospitals from which Defendant's CTPs are prescribed. Buried in Defendant's SEC filings is the admission that it contracts with "over 470" certified clinicians that do the in-home set-up and patient training. Not stated, however, is that these clinicians are employees of the very same facilities from which Defendant solicits prescriptions/orders from.
>
> 31. Moreover, in practice and in the hospitals where it pushes its CTPs, Defendant routinely refers to its "over 470" contractor clinicians as "influencers" and Defendant openly recruits them from the ranks of the hospitals where it pushes its products.
>
> 32. By remunerating these clinicians as "influencers", Defendant violates 42 USC §1320a-7b(b)(3)(C)(i) and (ii) in the following ways:
>
>     a. The "influencers" are paid a fee of $150 per CTP unit prescribed but are not persons who are authorized to act as purchase agents for the Hospitals.
>
>     b. The "influencers" are paid a fee of $150 per CTP unit prescribed but do not have written contracts with the Hospitals or other entities that are providers of services.
>
>     c. Defendant does not disclose to the entities that are providers of services the amounts received from Defendant with respect to CTP purchases made by or on behalf of the entity.
>
>     d. Defendant offers to pay and does pay its "influencers" $150 as a "fee" to induce these persons to arrange for the furnishing of the CTP devices and disguises this as a "delivery fee" of Defendant's CTPs to patients.
>
>     e. Defendant does not disclose its payments to "influencers" to the Government, in its 10-k or to Medicare, Medicaid or the Hospitals.

*Source: Case 4:18-cv-02871, Qui Tam Lawsuit, VFMS v Tactile*

Based on Tactile's rebuttal in the court case as well as conversations with sell-side analysts, we have heard the following arguments for why this lawsuit should be dismissed by investors:

- VFMS is a disgruntled competitor.

- Contractor nurses and therapists have contractual relationships with Tactile – they are not allowed to train patients from any facilities that they are affiliated with.

- Nurses and therapists do not sign prescriptions – this is the responsibility of physicians. This means they are removed from the decision making on PCD treatment for patients.

However, Tactile appears to be downplaying what we think is actually a 'daisy-chaining' kickback arrangement.

SCCERS0006676

*The diagram above from OSS Research illustrates a simplified version of the indirect kickback arrangement.*

Tactile's contract training program is not as innocent as the company claims for two key reasons:

- Nurses & Therapists are Key Decision Makers: Unique to the lymphedema industry, diagnoses are made by physicians, but treatment decision making is commonly made by nurses and therapists. ***This suggests Tactile is offering financial rewards directly to key decision makers that recommend their product to patients.***

*"It's kind of strange over here. So if you have lymphedema, you go to your GP which is the prescriber a lot of times over here. But they're sending patients out for lymphedema treatment, and then **whatever treatment protocols the lymphedema therapist or nurse draws up, the prescriber just signs off on it**."*

*– Senior Executive, DME Distributor, emphasis added*

- Quid Pro Quo Dynamics for Participants: Older SEC filings from the company indicate that trainers are actually identified by the company's sales and marketing staff. This suggests a clear conflict of interest and that Therapists and clinicians are likely aware of the quid quo pro nature of their contractor relationship with Tactile.

*"And I talked to [a therapist] who said he's referring out about [mid-teens] patients a month for a Tactile device. And then I asked him, 'How many setups are you doing then in turn?' **And he said he's probably doing about the same in setups, and he gets $150 per**... It's meant a lot for his family..."*

*– Senior Executive, Lymphedema Product Supplier, emphasis added*

**Tactile's legal liability here is perhaps best left to Tactile itself:** *(from the company's FY2019 10K)*

Notably, since the lawsuit, Tactile has actually changed language in its 10K that is relevant to these laws:

SCCERS0006677

*Removed claim contract trainers are independent. No longer disclosing the fact that **the individuals trying to push the product onto decision makers are the ones selecting who gets lucrative training contracts.***

> Several states require that durable medical equipment providers be licensed in order to sell products to patients in that state. Certain of these states require that durable medical equipment providers maintain an in-state location. Most of our state licenses are renewed on an annual or bi-annual basis. ~~Although we believe we are in compliance with all applicable state regulations regarding licensure requirements, if we were found to be noncompliant, we could lose our licensure in that state, which could prohibit us from selling our current or future products to patients in that state. In addition, we are subject to certain state laws regarding professional licensure. We believe that our certified clinicians are in compliance with all such state laws. If our clinicians were to be found non-compliant in a given state, we would need to modify our approach to providing education, clinical support and customer service in such state. In~~ addition, we are subject to certain state laws regarding professional licensure.

> The Ethics in Patient Referrals Act, commonly known as the "Stark Law," prohibits a physician from making referrals for certain "designated health services" payable by Medicare to an entity, including a company that furnishes durable medical equipment, in which the physician or an immediate family member of such physician has an ownership or investment interest or with which the physician has entered into a compensation arrangement unless an exception applies. Violation of the Stark Law could result in denial of payment, disgorgement of reimbursements received under a noncompliant arrangement, civil penalties and exclusion from Medicare or other governmental programs. ~~Although we believe that we have structured our provider arrangements to comply with current Stark Law requirements, these requirements are highly technical and there can be no guarantee that regulatory authorities will not determine or assert that our arrangements do not meet applicable Stark Law exceptions.~~

> The Federal Anti-Kickback Statute applies to certain arrangements with healthcare providers, product end users and other parties, including marketing arrangements and discounts and other financial incentives offered to our clinicians in connection with the sales of our products. ~~Although we believe that we have structured such arrangements to be in compliance with the Anti-Kickback Statute and other applicable laws, regulatory authorities may determine that our marketing, pricing, or other activities violate the Federal Anti-Kickback Statute or other applicable laws.~~ Noncompliance with the Federal Anti-Kickback Statute can result in civil, administrative and criminal penalties, restrictions on our ability to operate in certain jurisdictions, and exclusion from participation in Medicare, Medicaid or other federal healthcare programs. In addition, to the extent we are found to not be in compliance, we may be required to curtail or restructure our operations. ~~Any penalties, damages, fines, exclusions, curtailment or restructuring of our operations could adversely affect our ability to operate our business, our financial condition and our results of operations.~~

*Removed various statements and assertions to compliance with key legislation such as the Anti-Kickback Statute and Stark Law.*

## Veterans Affairs (VA) Case Study – A Roadmap For Other Channels

While the Qui Tam lawsuit is expected to reach jury trial by April next year, ***the VA has already clamped down on PCD spending since the lawsuit was filed.*** Studying the VA offers a potential roadmap for the rest of the industry, including Medicare and the commercial channel.

As VFMS primarily services the VA, many of its allegations are related to Tactile's practices revolving around this particular channel. This may be why the VA has been ahead of the curve on cracking down on Tactile reimbursement. A closer look at publicly available VA spending data suggests the following:

- VA spending patterns corroborate many of VFMS' allegations around the timeline of Tactile's aggressive marketing activities

- VA decision makers are taking the allegations seriously - growth in VA spending dramatically slowed immediately following the filing of the Qui Tam lawsuit and Tactile has lost significant share

From the lawsuit, VFMS alleges that Tactile began its aggressive marketing practices in 2017:



> Starting 2017, Defendant began to take orders away from Relator VFMS. Doctors would switch their orders to Defendant without any notice to VFMS and when VFMS enquired of hospital staff, the staff members confirmed that they had begun ordering from Defendant because they were the Defendant's "contractors" who received compensation from the Defendant for each pneumatic pump ordered.
>
> 38.    In addition, the Sugarland Hospital conducts a major lymphedema clinic and wound care business which had been a top prescriber of Allen and Gibbs until 2017 when Defendant began taking all of that business, by paying fees to hospital staff.

VA spending data is publicly available via the Freedom of Information Act. While we are unable to provide the raw data, interested readers can access this information via a FOIA request to the VA. Our analysis below is conducted using VA spending data received through FOIA.

We found that the data on E0652 reimbursement corroborated the lawsuits allegations around timing, with significant acceleration starting in 2017:

SCCERS0006678



*Source: OSS Research, Dept. of VA Affairs, National Prosthetic Patient Database, Monthly Sales $*

This growth was in large part driven by Tactile:



*Source: OSS Research, TCMD SEC filings, Dept. of VA Affairs, National Prosthetic Patient Database, Monthly Sales $, Data shows TCMD VA revenue greater than total VA spending. VA spending data above includes only the E0652 code, Tactile includes revenue from E0651 and E0652, as well as accessory products.*

More importantly, the filing of the Qui Tam lawsuit coincided with a significant falloff in VA spending on E0652 devices:



*Source: OSS Research, TCMD SEC filings, Dept. of VA Affairs, National Prosthetic Patient Database, Monthly Sales $*

This is especially noticeable when looking at Tactile's VA revenue:



*Source: OSS Research, TCMD SEC filings*

Although Tactile's VA revenue just witnessed its worst quarter in history (down 8% YoY), the worst may be yet to come. The lawsuit, filed in August 2018, was severely delayed owing to a change in judge. Proceedings resumed at the end of 2019 and on February 21, 2020, *Tactile's motion to dismiss the suit was denied*. The discovery deadline has been set in November 2020 with the jury trial to be held in April 2021.

SCCERS0006679

What is also interesting is that VA spending on E0652 grew by 6% YoY in 1Q20, while TCMD VA revenue declined 8%, suggesting Tactile has started losing share. COVID-19 has also had a delayed impact on E0652 reimbursement. It appears Tactile's next quarter results will be severely challenged:



*Source: OSS Research, TCMD SEC filings, Dept. of VA Affairs, National Prosthetic Patient Database, Monthly Sales $, note May data above is missing 5 days so full month results will be slightly higher*

The VA is not alone: other channels are following suit and will likely experience the same trajectory over time.

## Medicare Has Hit Back With Audits Against Tactile

On January 23rd, 2019, the Region-5 (i.e. Durable Medical Equipment) RAC auditor for Medicare, Performant Recovery Inc., quietly announced the following CMDS approved audit issue (link). Prior to this, Performant had never audited E0651 or E0652 claims in its history as RAC auditor.



*Source: Medicare Region 5 RAC Auditor (Performant Recovery) website*

Our research did not find any disclosure of this by Tactile to investors.

Figures on the number and results of these audits can be requested from CMS via the Freedom of Information Act. We requested information on audits performed by Performant Recovery on claims with E0651 and E0652 codes. The data we received included the provider audited (e.g. Tactile), dates of findings, and results of the claim audit (denial reason, demand amounts e.g. clawback, etc.) A snapshot of the data can be seen below. Each row is a separate claim audited by Performant. Tactile's NPI is 1427131424.

SCCERS0006680



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-11-06
Baltimore, Maryland 21244-1850

**Office of Strategic Operations and Regulatory Affairs/Freedom of Information Group**
Refer to: ████████████████████████

████2020



Dear █████████████████

This letter is in response to your Freedom of Information Act (5 U.S.C. §552) request of
████2020, which you sent to the Centers for Medicare & Medicaid Services. Within your
correspondence, you requested the following: "Region 5 RAC audit records of audits performed
by Performant Recovery.████████████████████████████████████████

| Claim Number | Provider NPI | DME Ordering Provider NPI | Date Results letter sent to provider | Date Demand letter sent | Date Claim closed | Date No findings letter sent | Date Technical Denial Notification Sent | Demand Letter Amount | Denial Reason Code |
|---|---|---|---|---|---|---|---|---|---|
| (b)(6) | 1427131424 | 1124035357 | 20191223 | 20200211 | | | | $ 1,325.87 | Medical necessity |
| (b)(6) | 1427131424 | 1306959051 | 20190703 | 20190821 | | | | $ 1,357.25 | Medical necessity |
| (b)(6) | 1427131424 | 1710040555 | 20190703 | 20190918 | | | | $ 951.41 | Medical necessity |
| (b)(6) | 1427131424 | 1528326667 | 20191226 | 20200213 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1376940411 | 20191223 | 20200210 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1528025277 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1639449697 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1104898188 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1891757878 | 20191223 | 20200211 | | | | $ 1,325.87 | Medical necessity |
| (b)(6) | 1427131424 | 1699794693 | 20191220 | 20200311 | | | | $ 1,325.87 | Medical necessity |
| (b)(6) | 1427131424 | 1336187897 | 20190703 | 20190821 | | | | $ 1,178.99 | Medical necessity |
| (b)(6) | 1427131424 | 1144339920 | 20190705 | 20190829 | | | | $ 946.87 | Medical necessity |
| (b)(6) | 1427131424 | 1346200987 | 20190703 | 20190821 | | | | $ 1,357.25 | Medical necessity |
| (b)(6) | 1427131424 | 1922095926 | 20191219 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1013968163 | 20191223 | 20200210 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1720245244 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1427070606 | 20191223 | 20200212 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1821085937 | 20191223 | 20200207 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1336571447 | 20191223 | 20200212 | | | | $ 1,227.91 | Medical necessity |
| (b)(6) | 1427131424 | 1083614135 | 20191223 | 20200212 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1649534488 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1285699512 | 20191219 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1063407567 | 20191223 | 20200212 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1811174691 | 20191223 | 20200210 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1336128107 | 20191226 | 20200211 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1780971598 | 20191219 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1598794570 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1427040153 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1730193301 | 20191220 | 20200311 | | | | $ 1,143.26 | Medical necessity |
| (b)(6) | 1427131424 | 1205806452 | 20191223 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1063659928 | 20191226 | 20200210 | | | | $ 1,413.55 | Medical necessity |
| (b)(6) | 1427131424 | 1669880993 | 20191220 | | | | | | Medical necessity |
| (b)(6) | 1427131424 | 1144295486 | 20191227 | 20200212 | | | | $ 1,413.55 | Medical necessity |

Our analysis below is based off data sent directly to us by CMS and can be easily verified by submitting a FOIA request to CMS.

While Tactile is a smaller player in the E0651 space (Tactile's focus is on E0652), the company nevertheless received a disproportionate share of audit requests (*10% of all reviews* conducted so far):



*Source: OSS Research, CMS Public Liason, Region 5 RAC Auditor*

Tactile also had the highest number of medical necessity denials:

SCCERS0006681



In fact, using the data from CMS, we also looked at ratio of denials vs no issue for Tactile's claims audited. We found that 71% of all Tactile's claims have been flagged for issues. Or, to put it differently, from January 2019 to December 2019, Performant audited 164 claims submitted by Tactile. Of these 164 claims, 117 were retroactively denied.

These were not for clerical reasons but were listed as denied due to medical necessity. ***Performant is claiming that Tactile has fundamentally failed to establish grounds for medical necessity on 71% of all its Medicare claims.***



*Source: OSS Research, CMS Public Liason, Region 5 RAC Auditor*

Claim audits are also accelerating (findings come in batches):



*Source: OSS Research, CMS Public Liason, Region 5 RAC Auditor*

Data from 2020 has not been included as audit results have not yet been finalized. Nevertheless, despite the impact of COVID-19, Performant has conducted another 491 audits through March of 2020 (i.e. run-rating at above 2019).

Multiple industry participants believe the growth from Tactile was one factor in putting the industry under the microscope:

> *"The RAC is being very aggressive about claims, and asking for money back. **It is my belief that the entire reason that this RAC audit started is Tactile Medical**. They're after them. We all know it. And so, when you see some of the data, which you can get your hands on. I mean, there's this thing called an HME data bank, and you can buy this data about who's prescribing pumps under the 651 and 652 categories, through Medicare each year. Tactile on the 52s files more claims with Medicare than every other DME in the country combined. So, who do you think they're after. So, this RAC audit started."*
>
> *– Senior Executive, Lymphedema Product Supplier, emphasis added*

SCCERS0006682

*"…the industry is such that nobody has ever had a ton of pump business until Tactile got in and really, really went after it strong and went after it very aggressively with the types of relationships that they have. And as you know, from that lawsuit, there are people who are questioning some of the relationships. So again, we're going to be very cautious. **We're not going to operate the way we believe Tactile is, because we think that's probably causing damage and harm long-term to pump coverage if it keeps blowing up.***

*– Senior Executive, Compression Garment & Pump Manufacturer, emphasis added*

E0651 audits are likely paving the way for a wave of E0652 claims. Indeed, RAC auditors have financial incentives to maximize clawbacks, and E0652 claims are worth 4-8x more than E0651 claims.

So far, Performant has only conducted 33 audits on E0652 claims through November 2019. ***Of these 33 audits, 25 (i.e. more than 75%) have been claims requested from Tactile.***



*Source: OSS Research, CMS Public Liason, Region 5 RAC Auditor*

Investors should note that these audits have already impacted Tactile's financials. While the company has continued to book Medicare revenues as usual, ***receivable days for Medicare-related accounts receivable have increased nearly 40% in the wake of the audit results***.



*Source: OSS Research, TCMD SEC Filings – Annualized A/R days defined as Medicare A/R divided by Medicare revenue * 90*

This suggests Medicare is likely taking the results of the RAC audits seriously and withholding cash reimbursement to Tactile. Yet the company has continued to book Medicare revenues, and we believe management have not informed investors of these developments.

Investors can look to history for a roadmap of what comes next. This is not the first time the industry has been investigated for abuse. A July 1998 report from the Office of Inspector General (OIG) offers some insight into the last time a major wave of audits and clampdowns hit the industry (link). ***Spoiler: E0652 reimbursements fell 92% from ~$107mm in 1995 to ~$9mm in 1996. (Yes. 25 years ago, this market that Tactile claims to be $5bn+ was a $100mm revenue industry. And that was at its peak before the OIG crackdown.)***

> **The Office of Inspector General focused a national initiative on fraudulent lymphedema pump suppliers**
>
> In September of 1994, the Office of Investigations, Office of Inspector General (OIG) began a national initiative to curtail lymphedema pump fraud and abuse. Resulting from that initiative, some DME suppliers were convicted for fraudulently misrepresenting the type of pump issued to Medicare beneficiaries in order to obtain higher reimbursement.

*Source: July 1998 Report by OIG, Medicare Allowances for Lymphedema Pumps*



As illustrated in Figure 2, Medicare allowed charges for the most expensive type lymphedema pump (E0652) dropped from $108.7 million in 1995 to $8.3 million in 1996—a 92 percent decrease in 1 year.

*Source: July 1998 Report by OIG, Medicare Allowances for Lymphedema Pumps*

As Performant begins to take action on E0652 claims, Tactile sits in an extremely precarious position. The results also bode poorly for its existing Qui Tam lawsuit and what may come out in discovery

Moreover, in addition to clawbacks from Medicare, it is likely that commercial payers, therapists, doctors, and nurses will also respond to industry noise generated from these audits.

## Potential Changes To Commercial Payer Reimbursement

As mentioned above, one key issue here is the fact that Tactile earns 90% of its revenue from Flexitouch (advanced PCD, E0652) devices. No other DME distributor has been able to achieve such a high share of E0652 volume. Reimbursements for E0652 are significantly more stringent and require extensive documentation proving prior use of CDT and basic, E0651 devices.

While Medicare has clamped down significantly on E0652 reimbursements over time, commercial payers have been looser on adherence to coverage requirements. This appears to be changing as a result of rapid growth in reimbursements for these codes. A sample of what our conversations with various industry participants revealed:

> *"...in the past year, six months to a year, commercial plans have certainly been changing to follow the Medicare guidelines a lot more strictly.* **What we've been finding is that where it used to be very easy for us to process an E0652 or an expensive item through a commercial plan, it's no longer.** *They want the same or similar requirements. They want you to do authorization, or they want you to do a three-month trial with pre and post measurements. So, everywhere, it's getting kind of stringent...But definitely in the past six months, I would say, all of the health plans have really just ...* **They did a mid-year update, and they kind of really tightened their grasp on everything. So, they're really making it more along the lines of Medicare...."**

> – *VP of Reimbursement, West Coast DME Distributor, emphasis added*

> *"...there are a number of private insurance companies that follow the Medicare LCD, but that doesn't mean they're going to follow the RAC audit. But I believe it will become public knowledge if they have real issues of violating the way they're filing claims, and other people may start looking at them...* **Blue Cross Blue Shield has totally just redone their policy, and filing a 52 claim in [Midwest US state]...has become almost impossible.** *And things like that are going to really start to hurt Tactile as well. I think what's going on in Blue Cross Blue Shield...is starting to trickle down to other places as well, and I wouldn't be surprised if it had an impact on [the industry]."*

> – *Senior Executive, Lymphedema Product Supplier*

## Follow The Insiders

*Insider departures:* Since 2017, Tactile has witnessed a spate of senior exec departures - many of which would have had firsthand knowledge into Tactile's marketing strategy and regulatory liability:

- *VP of Quality & Regulatory Affairs:* Thomas Dold

- *VP of Reimbursement:* Mary Anderson

- *SVP of Reimbursement & Payer Relations:* Mary Thompson

- *Chief Medical Officer:* Alan Hirsch

SCCERS0006684

- Chief Financial Officer: Lynn Blake

- Chief Executive Officer: Jerry Mattys *(stepping down on June 8th, 2020)*

CEO Jerry will be stepping down on June 8th - forcing the firm to transition management in the middle of a once-in-a-century pandemic that has had a seismic impact on prescribers, payers, and patients. His successor, Dan Reuvers, is set to step in barely two weeks after the company's announcement of Jerry's departure date.

*Disclosure changes:* Subtle but material changes to the company's most recent FY2019 10K offer some insight into the company's precarious position: (additions in blue, underline and removals in red, strike-through)



*Insider Selling:* Insiders have been aggressively cashing out.

- While CEO Jerry Mattys currently owns ~300,000 shares, he has sold ~350,000 shares since the beginning of 2018 (including derivative exercise sales), of which ~130,000 shares were in 2019 alone. The largest transaction in which he sold 50,000 shares (15% of his then shareholdings excluding options) occurred on February 13/14, 2019...***three weeks after the RAC audits were announced.***



- In total, insiders have sold ~900,000 shares (or ~$46mm worth) since 2018.
    - ***COO*** Robert Folkes has reduced his shareholdings by a little under 50% since the end of 2018.

    - ***VP of Sales*** Bryan Rishe has sold ~48% of his stock since the end of 2018.

    - Mary Thompson, former ***VP of Payor Relations***, held ~24,000 shares at the beginning of 2019. She currently holds ~3,700 shares, a reduction of nearly ***85%***.

If Tactile is truly best-in-breed in a $5bn market and growing at 20%+ annually:

- Why has the CEO (only 60) decided to retire this year in the middle of the COVID-19 crisis?

- Why have so many senior executives, particularly those knowledgeable about reimbursement and regulatory affairs, left over the last few years?

- Why have virtually all insiders reduced their stakes by high double-digit percentages?

*We have contacted Tactile's investor relations team for comment and feedback on our findings about the Qui Tam lawsuit, marketing arrangement, and recent RAC audit results. We have not heard back from the company.*

SCCERS0006685

## Valuation & Financials

Since 2013, Tactile has grown its revenue more than five-fold from $37mm to $190mm, or a CAGR of ~31% over six years. During this time, the company has demonstrated **ZERO** operating leverage. In fact, its EBITDA margin of ~6% today as of FY2019 is **nearly exactly** the same as it was six years ago in FY2013.



*Source: OSS Research, TCMD SEC Filings*

Comparing FY2013 with FY2019, major cost centers COGS and Sales & Marketing have both **increased** as a percentage of revenue. As it turns out, the main source of operating leverage has actually come from R&D.

| ZERO Operating Leverage Demonstrated | | | |
|---|---|---|---|
| **Operating Expenses as a % of Revenue** | | | |
| | **2013** | **2019** | **Δ** |
| COGS % of Revenue | 26.3% | 29.2% | 2.9% |
| S&M % of Revenue | 38.5% | 41.6% | 3.2% |
| R&D % of Revenue | 6.6% | 2.7% | (3.8%) |
| G&A % of Revenue | 22.3% | 20.3% | (1.9%) |
| Total Costs % of Revenue | 93.6% | 93.9% | 0.3% |

*Source: OSS Research, TCMD SEC Filings*

Tactile's growth is overwhelmingly the result of aggressive sales tactics, marketing arrangements, and reimbursement appeals. All of these activities require Tactile to spend money to buy growth.

Since FY2013, the company has cumulatively generated a total of $24mm in Cash Flow from Operations while spending $16mm in Capital Expenditures. A whopping $8mm in total Free Cash Flow over **six** years.

Without operating leverage, Tactile will need to grow its revenue to over $700mm (or another 4x) just to trade at 15x EBITDA. That's **twice** the estimated TAM.

More realistically, $250mm of forward revenue at 8% EBITDA margins and a 12x multiple yields a share price of ~$15 for **70% downside**. This is without taking into consideration any potential legal liabilities, clawbacks, or revenue shrinkage due to the regulatory and legal actions against the company.

| TCMD | | |
|---|---|---|
| **Valuation Table** | | |
| | **Current** | **Est.** |
| TTM Revenue | $196 | $250 |
| *EV / Revenue* | *4.6x* | *1.0x* |
| | | |
| TTM EBITDA | $12 | $20 |
| *EV / EBITDA* | *73.2x* | *12.0x* |
| | | |
| Enterprise Value | $894 | $240 |
| Net Cash | 45 | 45 |
| Equity Value | $939 | $285 |
| | | |
| Share Price | $48.00 | $14.56 |
| *Downside* | | *(70%)* |

### Grab the growth, tame the risk

Facebook and Amazon were part of a $4 trillion+ mobile economy that may be past its peak.

The next major boom? AI and Machine Learning are predicted to be 4x larger than the mobile economy, and **these new Tech Kings are leading the way...**

Banks, media, healthcare, tech and other industries are spending billions on AI and ML. Facebook alone will spend at least $10 billion this year in its pursuit of the metaverse. Beth Kindig is a Silicon Valley insider with her finger on the pulse of the

SCCERS0006686

companies that stand to benefit most from this huge increase in capital expenditure.

For a limited time, **save 52% on your annual membership** to her service Tech Insider Network. You'll get all the new Tech Kings plus a **simple hedging strategy to help** you offset volatility.

Join the next boom »

Seeking Alpha<sup>α</sup> Marketplace

---

*Source: OSS Research, TCMD SEC Filings*

---

This article was written by



**OSS Research**
37 Followers

Office of Strategic Shorts (OSS) https://ossresearch.comDifferentiated short-biased research with a focus on small and mid-cap equities traded in the US. "Even a regimented press will, again and again, betray their nation's interests to a painstaking observer." – William "Wild Bill" Donovan

Show More

Follow

**Disclosure:** I am/we are short TCMD. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** The author of this report has a short position in TCMD and may buy or sell the Company's securities at any time. This report is for informational purposes only. Under no circumstances should this report or any information herein be construed as investment advice, or as an offer to sell or the solicitation of an offer to buy any securities or other financial instruments. This report is based on publicly available information, industry expert interviews and the author's due diligence and analytical processes. To the best of the author's belief, all information contained herein is accurate and reliable, and has been obtained from public sources. However, such information is presented "as is," without warranty of any kind, whether express or implied. The author makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. This report expresses the opinion of the author and includes a significant number of assumptions and forward-looking statements. All expressions of opinion are subject to change without notice, and the author does not undertake to update or supplement this report or any of the information, analysis and opinion contained in it.

1 Like                                                                                          2 Comments

---

## Comments (2)

Sort by    Newest ▼    ⋮