# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN MART, Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiff, <br><br>    vs. <br><br> TACTILE SYSTEMS TECHNOLOGY, INC., et al., <br><br>                 Defendants. | Civ. No. 0:20-cv-02074-NEB-DTS <br><br> <u>CLASS ACTION</u> <br><br> DECLARATION OF ASHLEY M PRICE IN SUPPORT OF: (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

4877-8380-4785.v2

ASHLEY M. PRICE declares as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of California and am admitted to this Court *pro hac vice*, for purposes of this litigation (the "Litigation").  I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Lead Counsel" or "Robbins Geller"), and counsel for Lead Plaintiff St. Clair County Employees' Retirement System.[1]  I have been actively involved in the prosecution and settlement of this Litigation since December 2020 and am closely familiar with its proceedings.  I have personal knowledge of the majority of the matters set forth herein based upon my active participation in and supervision of all material aspects of this Litigation.  As to the remaining matters, I have reviewed our litigation files and consulted with other attorneys and support staff who worked on this case.  I could and would testify competently to the matters set forth herein if called upon to do so.

2.      Due to the Court's familiarity with the Litigation, this Declaration does not seek to detail each and every event during the Litigation.  Rather, the Declaration provides the Court with a summary of the prosecution of the Litigation, highlights of the events leading to the Settlement, the basis upon which Lead Counsel and Lead Plaintiff recommend the Settlement's approval, why the proposed plan for allocating the net Settlement proceeds to eligible Class Members (the "Plan of Allocation" or the "Plan") is fair and reasonable and should be approved by the Court, and why the application for an award of attorneys' fees and expenses is reasonable and should likewise be approved.

---

[1]      Unless otherwise noted, all defined terms have the same definitions ascribed to them in the Stipulation of Settlement (the "Stipulation").  ECF 147.

- 1 -

4877-8380-4785.v2

3.      The Settlement will resolve all claims asserted in the Litigation against Defendants on behalf of the Class consisting of all persons who purchased or otherwise acquired Tactile Systems Technology, Inc. publicly traded securities during the period from May 7, 2018 through June 8, 2020, inclusive.  ECF 147 at 5-6.  The Court preliminarily approved the Settlement in an order entered on May 4, 2023 (the "Preliminary Approval Order").  ECF 156.  Since then, the Court-approved Claims Administrator, Gilardi & Co. LLC ("Gilardi"), has notified Class Members of the Settlement by mail in accordance with the Preliminary Approval Order.  A Summary Notice was also published in *The Wall Street Journal* and over a national newswire service.  *See* Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Gilardi Declaration"), Ex. B, ¶12.[2]  In addition, a settlement-specific website and toll-free telephone number were established to provide potential Class Members with additional information.  *Id.*, ¶13.

## I.      PRELIMINARY STATEMENT

4.      After over two years of hard-fought litigation, Lead Plaintiff and Lead Counsel have secured a significant recovery of $5,000,000.00 for the Class.  The Settlement provides a favorable result for the Class, which faced the risk of a much smaller recovery (or no recovery at all) had the case continued through summary judgment, trial, and inevitable appeals.

5.      The $5 million settlement represents roughly 7% of the estimated aggregate damages in this Litigation, which is larger than the median percentage of total damages for

---

[2]      All "Ex. __" references are to this Declaration.

4877-8380-4785.v2

securities class actions settled in the Eighth Circuit between 2013 and 2022. *See* Laarni T. Bulan & Laura E. Simmons, Securities Class Action Settlements: 2022 Review and Analysis at 19, Appendix 3 (Cornerstone Research 2022) ("Cornerstone Report"), available at https://securities.stanford.edu/research-reports/1996-2022/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf.

6.      Before agreeing to settle this Litigation, Lead Plaintiff and Lead Counsel undertook extensive efforts to advance the Class's claims and to ensure that Lead Plaintiff was able to maximize the Class's recovery. Lead Plaintiff's litigation efforts included, among other things, conducting a comprehensive legal and factual investigation into the events underlying the Class's claims, which culminated in the drafting of a highly detailed, 129-page Amended Class Action Complaint ("Complaint"). Furthermore, Lead Plaintiff successfully opposed Defendants' motion to dismiss, which brought forceful challenges to the falsity and scienter elements of Lead Plaintiff's claims. Thereafter, Lead Plaintiff aggressively pursued extensive discovery, including obtaining and reviewing nearly 100,000 documents (totaling over 1.2 million pages) produced by Defendants and third parties, preparing for multiple depositions, conducting one fact deposition, and vigorously litigating and briefing various discovery disputes.

7.      Lead Plaintiff undertook these diligent and exhaustive efforts against a background of significant risks. Indeed, at the pleading stage, although the Court largely denied Defendants' motion to dismiss, Defendants were able to persuade the Court to dismiss certain allegations and claims. Specifically, the Court dismissed Lead Plaintiff's allegations concerning violations of the False Claims Act ("FCA"), 31 U.S.C. §3729,

- 3 -

relating to alleged false certifications of medical necessity and dismissed misrepresentations made in 2020 regarding Tactile's total addressable market ("TAM"). The Court also dismissed scheme liability claims against defendants Lynne Blake and Brent Moen and allegations of insider trading in violation of §20A of the Exchange Act against all but one defendant. Finally, the Court entirely dismissed allegations against the director defendants.[3]

8.      While Lead Plaintiff strongly believed that the remaining claims were meritorious, and that it could prevail on these claims, Lead Plaintiff admits that it faced a risk that its surviving allegations would be dismissed from the case at summary judgment and that it would be unable to prove its claims at trial. For example, Defendants argued that Lead Plaintiff could not prove falsity for the alleged misrepresentations regarding Tactile's revenue and the reasons for its revenue growth because Lead Plaintiff could not prove that Defendants actually engaged in paying kickbacks to medical personnel in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a, *et al.*, and the FCA. Defendants asserted that their sales and marketing practices had not violated the AKS and FCA, but rather, these sales practices were proper and compliant with the law. As evidence, Defendants repeatedly pointed to the voluntary dismissal of *U.S. ex rel. Veterans First Med. Supply, LLC v. Tactile Sys. Tech., Inc.*, 4:18-cv-02871 (S.D. Tex.) (the "*Qui Tam* Action"), which had brought

---

[3]      Because the motion to dismiss order found that the Complaint's allegations "[a]t the very least" "create a strong inference that the members of the Audit [and Compliance] Committee[s] failed to check information they had a duty to monitor, and thereby knowingly or recklessly allowed dissemination of false financial report," Lead Plaintiff moved for clarification once in discovery as to whether the Court had held that misrepresentation and omissions claims under §10(b) were sufficiently stated against the director defendants. ECF 106. The Court subsequently clarified that they were dismissed from the litigation. ECF 112.

4877-8380-4785.v2

substantially similar factual allegations to this case, and alleged AKS and FCA claims concerning Tactile's kickback payments to medical personnel and false claims submitted to federal healthcare providers. *See Qui Tam* Action, ECFs 293-296. Concluding that the *Qui Tam* Action's plaintiff's voluntary dismissal without any recovery – despite bringing the case to the brink of trial – meant the case was meritless, Defendants urged at every opportunity that the same conclusion should result here. Additionally, Defendants argued that Lead Plaintiff could not prove falsity for the alleged misrepresentations regarding the Company's TAM because they were forward-looking estimates that Defendants warned could be incorrect. Defendants further argued that Lead Plaintiff could not establish scienter since there was no showing that the Individual Defendants knew of the allegedly improper payments to physicians, or that the training program for Tactile's primary product, Flexitouch, was improper, or that the Individual Defendants possessed facts contradicting their TAM statements. Moreover, Defendants disputed Lead Plaintiff's allegations that the Individual Defendants' insider trading supported an inference of scienter, contending that the insider sales were not suspicious and were conducted pursuant to Rule 10b5-1 plans.

9.      Lead Plaintiff also anticipated significant risks in establishing loss causation and damages. Although Lead Plaintiff was confident that, with the assistance of an economics expert, it could establish loss causation and damages, Lead Plaintiff expected Defendants to put forward their own expert(s) and mount a vigorous challenge to these elements. Lead Plaintiff further expected to face a contentious dispute – likewise entailing costly expert opinions – when moving for class certification.

- 5 -

4877-8380-4785.v2

10. While Lead Plaintiff believes that it has strong arguments to respond to these points, there is no question that Defendants' arguments could have been accepted by this Court on summary judgment, or by a jury at trial. If the Court or jury ultimately concluded that Defendants' statements were not materially false or otherwise actionable, that Defendants lacked scienter, or that all (or a substantial portion) of the stock price declines following the alleged corrective disclosures were not attributable to the alleged fraud, the potential recovery would be reduced dramatically, or eliminated altogether. Even a favorable jury verdict would have been subject to an inevitable and uncertain appeals process. Thus, even if Lead Plaintiff had prevailed at summary judgment and trial, it is highly questionable whether Lead Plaintiff would have recovered more than (or even as much as) the substantial recovery provided in the Settlement.

11. The Settlement is also eminently fair, adequate, and reasonable given the extensive, arm's-length settlement negotiations conducted between the Settling Parties, and overseen by Michelle Yoshida, Esq., of Phillips ADR Enterprises, a well-known and experienced mediator. Facilitated by Ms. Yoshida, the Settling Parties participated in a virtual mediation session held on October 18, 2022. In preparation for the mediation, the Settling Parties submitted to the mediator and exchanged extensive briefing regarding key legal and factual disputes in this Litigation and participated in separate pre-mediation sessions with Ms. Yoshida. The mediation consisted of a full day of discussions with Ms. Yoshida, but concluded without resolving the Litigation. Although the mediation did not produce a settlement, the Settling Parties, through Ms. Yoshida, continued their negotiations over the following days, and on October 27, 2022, reached an agreement-in-principle to

- 6 -

4877-8380-4785.v2

settle the Litigation for $5 million. The Settling Parties spent the subsequent weeks negotiating the specific terms of the Settlement. The Stipulation was executed by the Settling Parties on February 28, 2023. *See* ECF 147.

12. As set forth in the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Approval of Plan of Allocation ("Settlement Memorandum"), Lead Plaintiff respectfully submits that the Settlement represents an excellent recovery for the Class and satisfies each of the factors set forth in Federal Rule of Civil Procedure 23(e)(2) and as advised by the Eighth Circuit when considering the settlement approval process. This is especially true given that the Settlement provides a certain, immediate, and substantial cash recovery for the Class, while avoiding highly uncertain, risky, and costly protracted litigation.

13. Significantly, although the deadline for objections and exclusions from the Class has not passed, to date, not a single Class Member has objected to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fee and expense request, nor have any Class Members sought exclusion. This reaction by the Class is particularly significant given that a large portion of the Class consists of sophisticated institutional investors with the resources and motivation to object, if warranted. Moreover, Lead Plaintiff – itself a sophisticated institutional investor which has actively overseen the prosecution of this Litigation and which fully understands its fiduciary obligations to act in the Class's best interests – wholly endorses the Settlement and Lead Counsel's requested fee award. *See* Declaration of Deborah L. Martin in Support of: (a) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (b) Lead

Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Lead Plaintiff Declaration"), submitted herewith as Ex. A.

14.     In addition to seeking the Court's final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation because it is fair and reasonable. The Plan of Allocation was developed in consultation with Lead Plaintiff's damages expert. Under the proposed Plan, Authorized Claimants shall receive their *pro rata* share of the Net Settlement Fund based upon their recognized claim compared to the total recognized claims of all Authorized Claimants.  The Plan of Allocation is substantially similar to other plans approved in securities class actions across the country.

15.     Lead Counsel also requests an award of attorneys' fees for its efforts, and for payment of its litigation costs and expenses.  Specifically, Lead Counsel is applying for an attorneys' fee award of 30% of the Settlement Fund, and for payment of litigation costs and expenses of $120,025.00 to be paid from the Settlement Fund.  Lead Counsel's requested fee is well within the range of fees approved by courts in this Circuit and around the country in comparable securities or complex class actions, and under the facts of this case, is justified considering the benefits that Lead Counsel conferred on the Class, the risks undertaken, the quality of the representation, the nature and extent of the legal services, and the fact that Lead Counsel pursued the case at its own financial risk.  The reasonableness of Lead Counsel's requested 30% fee is also confirmed by a lodestar cross-check, which yields a negative multiplier, and thus is well below the range of multipliers routinely awarded in the Eighth Circuit.

4877-8380-4785.v2

16.    For each reason discussed in this Declaration, its attached exhibits, and in the accompanying memoranda, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved.  In addition, Lead Plaintiff respectfully submits that Lead Counsel's request for attorneys' fees and litigation costs and expenses is also fair and reasonable, and should be approved.

## II.    THE PROSECUTION OF THE ACTION

### A.    The Litigation's Commencement, the Appointment of Lead Plaintiff, and Amending the Complaint

17.    The Litigation was initially filed on September 29, 2020.  ECF 1.  On February 1, 2021, the Court appointed St. Clair as Lead Plaintiff and approved its choice of Lead Counsel.  ECF 36.  After its appointment, Lead Plaintiff conducted an investigation into the claims for the purpose of drafting a comprehensive amended complaint.  During this process, Lead Counsel engaged in a thorough factual investigation that included the review and analysis of publicly available information concerning the Company, including: (i) Tactile's public filings with the SEC; (ii) press releases and other publications disseminated by Tactile; (iii) news articles, shareholder communications, conference call transcripts, and postings on Tactile's website concerning the Company's public statements; (iv) securities analysts' commentary on the Company; (v) Tactile-sponsored clinical studies; (vi) medical journals; (vii) public filings from the *Qui Tam* Action and an employment action against the Company; (viii) analyses of Tactile's stock price movement, pricing, and volume data; (ix) analyses of insiders' sales of Tactile stock; (x) interviews with a former Tactile employee; and (xi) other publicly available information concerning the Company, the industry it is in,

- 9 -

4877-8380-4785.v2

and the medical condition its product is designed to treat.  To support its investigation, Lead

Counsel also consulted with an expert in damages and loss causation.  Lead Counsel also

sought to obtain documents through FOIA requests sent to the U.S. Department of Veterans

Affairs ("VA") and the Centers for Medicare & Medicaid Services ("CMS").   Lead

Counsel's investigation significantly bolstered the strength of Lead Plaintiff's claims.

18.    On April 19, 2021, Lead Plaintiff filed its 129-page Complaint (ECF 49) which

alleged violations of the federal securities laws in connection with material misstatements

and omissions.  Specifically, the Complaint alleged that, throughout the Class Period,

Defendants engaged in fraudulent schemes and misconduct, and/or made materially false and

misleading statements and omissions, concealing from investors that: (i) to induce sales

growth of Tactile's advanced pneumatic compression device, Flexitouch, Tactile and/or its

employees were engaged in illicit sales and marketing activities involving kickback schemes

and the submission of false claims to the VA and CMS in violation of the AKS and FCA; (ii)

Tactile's revenues were in part the product of unlawful conduct and were thus unsustainable;

(iii) Tactile overstated its revenue from the VA and the CMS; (iv) while Tactile publicly

touted a $4 billion plus or $5 billion plus market opportunity for Flexitouch, in truth, its

TAM was at least three times smaller; (v) because of the Company's engagement in

kickback schemes, Tactile was not in compliance with federal laws and regulations, contrary

to its public representations; and (vi) the *Qui Tam* Action had merit.  The Complaint further

alleged that as these deceptions were ongoing, Company-insiders engaged in millions of

dollars-worth of insider trading.  The Complaint alleged that Tactile's stock price was

artificially inflated throughout the Class Period due to Defendants' alleged fraudulent

- 10 -

4877-8380-4785.v2

schemes and materially false and misleading statements and omissions, and that shareholders were harmed when the truth about that fraud was disclosed. Specifically, Lead Plaintiff alleged that the truth regarding Defendants' fraud was partially revealed after the complaint in the *Qui Tam* Action was unsealed on March 20, 2019, revealing that Defendants had been engaged in illegal sales practices that violated both the AKS and the FCA. The alleged fraud was further revealed on June 8, 2020 when *Seeking Alpha* published a short-seller report expanding on Tactile's illegal sales practices and identifying its overstated market size. Lead Plaintiff and the Class were damaged when Tactile's stock price declined as a result of these disclosures.

**B.    Defendants' Motion to Dismiss**

19.    On June 18, 2021, Defendants (including the subsequently dismissed director defendants) moved to dismiss the Complaint. Defendants challenged the adequacy of the Complaint's allegations with respect to nearly every element of Lead Plaintiff's claims. ECF 65.

20.    Defendants argued that the Complaint lacked reliable sources from which Lead Plaintiff could state with particularity all facts on which the allegations based on information and belief were formed. Specifically, Defendants questioned the reliability of the allegations based on the *Qui Tam* Action, the confidential witness, and the short-seller report. Defendants further argued that Lead Plaintiff failed to allege that Defendants had engaged in illegal sales practices violating the AKS and FCA, and thus statements concerning Tactile's revenue growth, Tactile's compliance with the law, and the *Qui Tam* Action's merits, were not adequately alleged as false or misleading. Defendants also argued that Lead Plaintiff

4877-8380-4785.v2

failed to allege that statements about Tactile's market size were false or misleading, and they argued that each Defendant lacked the requisite scienter. Specifically, they argued that the Complaint alleged only "generalized allegations of knowledge" and that an inference of non-culpable intent was more compelling. *Id.* at 28. Defendants also contended that, despite the millions of dollars of insider sales Individual Defendants earned during the Class Period, such sales were not sufficiently suspicious, and moreover, any inference of scienter to be drawn was negated by the Individual Defendants' Rule 10b5-1 plans. Defendants also moved to dismiss Lead Plaintiff's "scheme liability" claims, §20(a) control person claims, and §20A insider trading claims. *Id.* at 38.

21.    Lead Plaintiff filed its opposition to the motion to dismiss on August 18, 2021. ECF 71. Lead Plaintiff argued that, contrary to Defendants' assertions, the Complaint had alleged highly particularized details from corroborating and reliable sources concerning the kickback schemes that Defendants conducted to induce sales of Flexitouch. Lead Plaintiff further argued that as a result of Tactile's AKS and FCA violations, Defendants had made material misrepresentations concerning Tactile's revenue growth, its compliance with the law, and the merits of the *Qui Tam* Action. Likewise, Lead Plaintiff asserted that the Complaint adequately alleged omissions in violation of Item 303 of Regulation S-K for failing to disclose that Tactile's reported revenues were derived in part from illegal kickbacks and false reimbursement claims, rendering a material uncertainty that could impact Tactile's revenues. Lead Plaintiff also argued that statements about Tactile's TAM were materially false and misleading because they were belied by a medical study that had been authored by Tactile's own Chief Medical Officer. Regarding scienter, Lead Plaintiff

4877-8380-4785.v2

argued that Defendants' motive was alleged through the $38 million in Tactile insider stock sales, as well as the incentive compensation based on increased revenues. Lead Plaintiff further argued that Defendants had access to facts that contradicted their public statements, as demonstrated by, for example, an internal presentation given at Tactile's national sales meeting touting the problematic Key Opinion Leader program and the documentation by Tactile's compliance officer that its contract trainer program posed a risk for kickbacks.

22.     On September 22, 2021, Defendants filed a reply in further support of their motion to dismiss. ECF 74. Defendants' reply reiterated the arguments made in the motion to dismiss – that Lead Plaintiff had failed to plead the underlying illegal conduct, and that even if it had pleaded illegal conduct, it had not pleaded securities fraud because the alleged false statements and scheme were not pled with particularly or a cogent inference of scienter. ECF 74.

23.     On October 4, 2021, the Court held oral argument on Defendants' motion to dismiss, for which Lead Plaintiff diligently prepared. ECF 75.

24.     On March 31, 2022, the Court issued an order granting in part and denying in part Defendants' motion to dismiss. Specifically, the order dismissed the scheme liability claims against defendants Lynn Blake and Brent Moen, and it dismissed the §20A insider trading claims against all Defendants except Bryan Rishe. The court also dismissed claims concerning Defendants' FCA violations resulting from false certifications of medical necessity, and dismissed the director defendants. ECF 81.

25.     Defendants answered the Amended Complaint on June 1, 2022, denying all material surviving allegations of the Amended Complaint and asserting multiple defenses.

- 13 -

4877-8380-4785.v2

ECFs 100-105. Among other things, Defendants contended that they made no materially false or misleading statements, had not engaged in fraudulent schemes, and that they disclosed all information required to be disclosed by the federal securities laws. Defendants also contended that Lead Plaintiff would be unable to meet its burden to prove scienter.

### C. Lead Plaintiff's and Lead Counsel's Extensive Discovery Efforts

26. Given the length of the Class Period, the scope of Lead Plaintiff's claims, and the complex subject matter at issue in this Litigation, factual discovery was an enormous undertaking. Among other things, Lead Plaintiff served document requests on Defendants and subpoenaed documents from 17 third parties. Lead Plaintiff ultimately obtained and reviewed nearly 100,000 documents. The amount of work done by Lead Plaintiff during this time period is compelling evidence of its vigorous prosecution of and commitment to this Litigation, as set forth below.

### 1. Discovery Obtained from Defendants

27. Lead Plaintiff served Defendants with its First Request for Production of Documents on April 29, 2022. These 31 requests sought, among other things, documents concerning: (i) the *Qui Tam* Action, including the documents produced in the *Qui Tam* Action; (ii) Tactile's sales practices, including the Key Opinion Leader and contract trainer programs at issue for the kickback payments; (iii) Tactile's revenue earned through patients covered by federal healthcare programs – *i.e.* the VA and CMS; (iv) Tactile's TAM; (v) investigations by various federal agencies into the Company's sales practices; (vi) Defendants' communications with analysts and shareholders; and (vii) Tactile's stock price

- 14 -

declines on March 21-22, 2019 and June 8, 2020. Defendants served their responses and objections to Lead Plaintiff's first document request on June 7, 2022.

28. On July 12, 2022, Lead Plaintiff served its First Set of Interrogatories to All Defendants. These 11 interrogatories sought information concerning: (i) payments to certain contract trainers; (ii) calculations regarding Tactile's TAM; (iii) Tactile's Key Opinion Leader events; (iv) internal complaints involving Tactile's sales practices; and (v) the process involved in compiling and editing Tactile's Class Period SEC filings. Defendants served their responses to Lead Plaintiff's First Set of Interrogatories on August 11, 2022.

29. Beginning in June 2022, the parties frequently exchanged written correspondence and held numerous meet-and-confer conferences to negotiate the appropriate scope of the discovery Lead Plaintiff sought. Those interactions involved lengthy and vigorous disputes about Defendants' document production, including the appropriate search terms for the production, the relevancy of certain of Lead Plaintiff's document requests, the appropriate number of custodians (and who those custodians should be), the relevant time period for certain requests, and whether Defendants' document production should be confined to the documents that had already been produced in the *Qui Tam* Action.

30. In response to Lead Plaintiff's requests, Defendants made multiple document productions, beginning on June 21, 2022, and concluding on October 10, 2022 which collectively contained roughly 440,000 pages of information contained in nearly 80,000 documents.

31. Lead Counsel also closely reviewed several privilege logs that Defendants produced with their document productions. Lead Counsel challenged certain assertions of

- 15 -

4877-8380-4785.v2

privilege as inadequate, and met and conferred with Defendants on several occasions to discuss the same. Ultimately, Defendants amended their privilege logs to provide more detailed explanations of privilege asserted, and produced certain documents that they originally claimed were privileged.

### 2.    Discovery Obtained from Third Parties

32.    Between roughly May 13, 2022 and October 11, 2022, Lead Plaintiff served subpoenas on 17 third parties. Lead Counsel also engaged in dozens of meet-and-confers with third party representatives to explain the relevance of the discovery requests to the Litigation, determine the proper scope of the discovery requests, and, where necessary, negotiate search terms and other production details. These parties collectively produced, and Lead Plaintiff collected and reviewed, approximately 20,680 documents. The subpoenaed third parties included the VA, the CMS, the plaintiff in the *Qui Tam* Action, Tactile's outside counsel on compliance matters, Tactile's outside investor relations firm, a healthcare research and data company, securities analysts covering Tactile, and several of Tactile's former employees. Lead Plaintiff carefully analyzed the third-party productions, which aided in developing the facts supporting Lead Plaintiff's claims and addressing Defendants' defenses.

### 3.    Discovery from Lead Plaintiff

33.    On April 29, 2022, Defendants served their first set of document requests on Lead Plaintiff, requesting 14 separate categories of documents seeking a broad range of information about this Litigation. Among other things, the requests sought information concerning Lead Plaintiff's relationship with Lead Counsel, Lead Plaintiff's investment in

4877-8380-4785.v2

Tactile securities, the role of Lead Plaintiff's investment advisors, and the other matters in which Lead Plaintiff served as a representative party. On the same day, Defendants also served six interrogatories on Lead Plaintiff seeking information on similar topics.

34. Lead Plaintiff served its objections and responses to both the interrogatories and the requests for production on May 31, 2022. Thereafter, the parties met and conferred to negotiate the substance and scope of Lead Plaintiff's production.

35. Once the scope of production was largely agreed to, Lead Plaintiff and Lead Counsel expended significant effort collecting, reviewing, preparing, and producing documents in response to Defendants' discovery requests. In total, Lead Plaintiff produced over 1,000 documents to Defendants amounting to over 17,600 pages.

### 4. Lead Counsel's Document Review and Deposition Preparation

36. Collectively, the Defendants and third parties produced over 1.2 million pages contained in nearly 100,000 documents (nearly 8,000 of which were excel spreadsheets), to Lead Plaintiff in discovery. Lead Counsel devoted substantial time to reviewing and analyzing these documents. Lead Counsel also generated an effective and efficient discovery plan and took significant steps designed to quickly identify the custodians and documents most important to uncovering the facts at the heart of the Litigation. As a result of these efforts, Lead Counsel was able to utilize this discovery when preparing for depositions and during the Settling Parties' settlement negotiations. Accordingly, the extensive and targeted discovery work conducted by Lead Counsel was crucial to achieving the highly favorable Settlement for the Class.

- 17 -

4877-8380-4785.v2

37.     Lead Counsel's discovery plan leveraged a sophisticated electronic document hosting system and a dedicated team of staff attorneys with substantial experience in electronic document discovery, depositions, and trial preparation.  Lead Counsel trained document reviewers concerning detailed case information for their use in coding documents for level of responsiveness or importance to the case.  Throughout document discovery, attorneys in the litigation team met regularly with staff attorneys to ensure their understanding of the case and discuss key facts uncovered by the document review.

38.     Many of the documents produced to Lead Plaintiff were substantively complex and laden with healthcare, lymphedema, regulatory, and Tactile-specific jargon and terms of art.  Additionally, many of the documents were cumbersome excel files with extensive tabs containing a vast amount of data and formulas.  Throughout the course of discovery, Lead Counsel conducted independent analysis and research to enhance its understanding of the documents.

39.     The efforts undertaken to uncover documents probative of Lead Plaintiff's claims supported and led to the depositions of relevant witnesses.  At the time of Settlement, Lead Counsel had conducted one deposition and was preparing for multiple pending depositions, including a deposition of Tactile pursuant to Rule 30(b)(6).  To prepare for these fact witness depositions, Lead Plaintiff closely considered whether and how particular witnesses would support Lead Plaintiff's claims.  That process also included having attorneys on the review team conduct in-depth reviews of the potential deponents' custodial files and identify key documents and issues for each potential deponent.  During this process,

- 18 -

attorneys met multiple times to discuss potential candidates, review samples of relevant documents for these candidates, and debate the relative merits of each.

### 5.    Discovery Disputes

40.    Several disputes arose between the Settling Parties in discovery. Although many disputes were resolved through the diligent negotiations of the Settling Parties, certain disputes were put before the Court, including: (i) when the deadline for substantial completion of Defendants' document production should be set in relation to Lead Plaintiff's deadline to seek leave to amend the pleadings or add parties (ECFs 86, 108); (ii) the scope of a carve-out for identifying privileged documents relating to the *Qui Tam* Action on Defendants' privilege log (ECF 96); and (iii) whether the director defendants remained in the case on claims that they had made fraudulent misrepresentations (ECF 106).

41.    Lead Plaintiff also researched, drafted, and filed on September 9, 2022 a motion to compel that particularly sought to obtain the production of documents evidencing Individual Defendants' knowledge of the allegedly illegal sales and marketing practices. Specifically, the motion addressed several outstanding issues concerning Defendants' document production, including: (i) the search parameters relating to Tactile's Key Opinion Leader and contract trainer programs, including whether the Individual Defendants' and certain key sales representatives' custodial files should be searched; (ii) the relevance of certain documents concerning Defendants' Key Opinion Leader program; and (iii) the appropriate search parameters for documents relating to Tactile's sales into the VA sales channel, Tactile's TAM, government investigations of Tactile, and Tactile's communications to investors. Defendants filed their opposition to the motion to compel on September 21,

- 19 -

4877-8380-4785.v2

2022. ECF 134. This motion remained pending when the Settling Parties mediated and ultimately settled the Litigation.

42. Defendants also moved to compel on September 9, 2022, seeking discovery on Lead Plaintiff's preliminary damages estimates. ECF 116. On September 21, 2022, Lead Plaintiff filed its opposition, arguing that such an estimate required the analysis and opinion of an expert and therefore was premature, as expert discovery had not commenced. ECF 136. This motion also remained pending when the Settling Parties mediated and ultimately settled the Litigation.

**D.    The Mediation**

43. In the First Amended Pretrial Scheduling Order entered on June 24, 2022, the Court ordered the Settling Parties to "meet and confer and file a joint report no later than September 1, 2022, informing the Court of their mediator selection and the scheduled date of the private mediation." ECF 110 at 11. Accordingly, the Settling Parties engaged Michelle Yoshida, Esq., a well-respected and experienced mediator party at Phillips ADR Enterprises, to assist in a mediation scheduled for October 18, 2022.

44. In advance of the session, Defendants and Lead Plaintiff submitted and exchanged detailed mediation statements explaining the relevant facts and analyses concerning falsity, scienter, loss causation, and damages. Additionally, in advance of the mediation session, the Settling Parties conferred separately with Ms. Yoshida regarding their views on the strengths and weaknesses of the Litigation, the risk to both sides of taking the Litigation to summary judgment and trial, and the damages at issue. During the mediation, the Settling Parties and Defendants' liability insurance carriers engaged in extended and

- 20 -

vigorous negotiations through Ms. Yoshida regarding the evidence supporting the claims and defenses, the challenges both sides anticipated in continuing the Litigation, and the sources and amount for a potential resolution of the Litigation.

45.    After a full, 12-hour day of presentations and discussions with Ms. Yoshida, the mediation concluded without resolution of the Litigation. The Settling Parties continued their negotiations through Ms. Yoshida over the coming days, and ultimately reached an agreement to resolve the Litigation for $5 million, subject to Court approval following notice to the Class.

## III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

46.    As set forth in the Settlement Memorandum filed contemporaneously herewith, the Settlement is fair, reasonable, and adequate in light of: (i) the favorable recovery; (ii) the unique risks and difficulties that further litigation presented to Lead Plaintiff; (iii) the extensive litigation efforts expended by Lead Plaintiff and Lead Counsel during the two-year course of the case; (iv) the complexity and expense of further litigation; (v) the arm's-length settlement negotiations conducted by the Settling Parties; and (vi) the overwhelmingly positive reaction of the Class. As set forth below and in the Settlement Memorandum, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement readily meets all of the relevant factors that courts in the Eighth Circuit consider under Rule 23(e)(2) and *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

### A.    The Settlement Agreement and Preliminary Approval

47.    The Settling Parties engaged in arm's-length negotiations during the October 18, 2022 mediation session, but were unable to reach an agreement. Through Ms. Yoshida,

- 21 -

the Settling Parties continued mediation discussions over the following days, and on October 27, 2022, the Settling Parties agreed to resolve the Litigation for $5 million. After further negotiations outlining the terms of the Settlement, the Settling Parties executed a Memorandum of Understanding on November 20, 2022 memorializing their agreement. The agreement included, among other things, the Settling Parties' agreement to settle the Litigation in return for a cash payment of $5 million for the Class's benefit, subject to the negotiation of the terms of a Stipulation of Settlement and Court approval.

48.     After agreeing on the broad contours of the proposed Settlement, the Settling Parties engaged in extensive negotiations regarding the material terms of the Stipulation; the Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Class reach a certain threshold (a standard agreement in securities class action settlements generally called a "blow provision"); and various supporting documents, including proposed Class notices and proposed orders for the Court.

49.     On February 28, 2023, Lead Plaintiff filed its motion for preliminary approval of the proposed Settlement, along with the Stipulation and its exhibits. ECFs 146, 147.

50.     On May 4, 2023, the Court preliminarily approved the Settlement, authorized the Notice to be disseminated to potential Class Members, and scheduled the Settlement Hearing to consider, among other things, whether to grant final approval to the Settlement (the "Preliminary Approval Order"). ECF 156.

**B.     Reasons for the Settlement**

51.     The Settlement provides the Class with an immediate and certain cash benefit of $5 million, which exceeds the median percentage of total damages for securities class

actions settled in the Eighth Circuit between 2013 and 2022. It also offers a concrete benefit to the Class while avoiding the substantial costs and risks associated with continued litigation.

52. Lead Plaintiff and Lead Counsel fully endorse the Settlement. Court-appointed Lead Plaintiff is a sophisticated institutional investor that has actively overseen the prosecution of this Litigation for two years and understands and has executed its fiduciary duty to act in the Class's best interest. *See* Ex. A. Lead Counsel specializes in complex securities class action litigation, and is highly experienced in such litigation. *See* Ex. C (Robbins Geller firm resume). Moreover, Lead Counsel was substantially assisted by the experience and litigation expertise provided by Zimmerman Reed LLP ("Zimmerman Reed") and Hagens Berman Sobol Shapiro LLP ("Hagens Berman"). *See* Hoidal Declaration, Ex. D at Exhibit E; Gilmore Declaration, Ex. E at Exhibit C (Zimmerman Reed and Hagens Berman firm resumes). Based on their experience and knowledge of the facts and applicable law in this Litigation, Plaintiff's Counsel and Lead Plaintiff have determined that the Settlement is in the Class's best interest.

53. Although Lead Plaintiff and Lead Counsel believe that the claims asserted in this Litigation are meritorious, continued litigation against Defendants posed significant risks that made recovery in any amount uncertain. For example, Lead Plaintiff was aware of the significant challenges Defendants raised in their motion to dismiss and mediation statement on the key issues of falsity and/or scheme, scienter, loss causation, and damages. Indeed, although Lead Plaintiff was largely successful at the motion to dismiss stage, the Court dismissed several defendants, insider trading claims, and part of the underlying scheme on

- 23 -

which Lead Plaintiff's claims were based.  Moreover, Defendants steadfastly maintained that their sales and marketing practices involving the Key Opinion Leader and contract trainer programs were proper and complied with the law.  Meanwhile, for Lead Plaintiff, proving the underlying violations of the AKS and the FCA added further complexity to an already complex securities fraud action, as Lead Plaintiff faced establishing that these violations occurred and that the Individual Defendants knew or recklessly disregarded that fact.  This premise was hotly contested, as Defendants repeatedly pointed out that the *Qui Tam* Action was voluntarily dismissed just before trial by the plaintiff with no recovery.  Because the motion to dismiss order did not fully resolve the key issues listed above, the attendant risks concerning these issues did and would have continued to resurface at every subsequent stage of the litigation – at class certification, on summary judgment, at trial, and on appeal.  Had any of Defendants' arguments been accepted in whole or in part, any potential recovery would have been dramatically reduced or eliminated altogether.

54.    Indeed, Lead Plaintiff anticipated facing significant hurdles in certifying the class, opposing summary judgment, defending its experts, withstanding motions *in limine*, and successfully trying the case before a jury.  For instance, Lead Plaintiff anticipated that in addition to opposing falsity, scheme, and scienter, Defendants would hotly contest the element of loss causation, either at summary judgment or in a motion to exclude Lead Plaintiff's expert.  Lead Plaintiff recognized that proving this element was far from assured.  Specifically, the first alleged disclosure causing Lead Plaintiff's loss came after an amended complaint was unsealed on March 20, 2019 in the related *Qui Tam* Action.  However, it took market analysts two days to publish reports regarding the *Qui Tam* Action's complaint and

- 24 -

Lead Plaintiff faced challenges relating to whether the news had in fact caused Tactile's stock to decline. Regarding the second alleged disclosure, Lead Plaintiff anticipated challenges that the disclosure, arising from a short-seller's report, was not corrective because it reported on already-public information, including details alleged in the *Qui Tam* Action. To establish that these disclosures caused damages to the Class would have required a loss causation and damages expert, whose opinions would have been challenged by Defendants' own experts. Litigating this element would have been expensive and without any guarantee of success. Lead Plaintiff likewise expected Defendants to vigorously dispute class certification. Thus, with each stage of the case, there would be an opportunity for Defendants to minimize or dismiss the Litigation. Moreover, even if Lead Plaintiff had prevailed in proving liability at trial, it was further aware that following a "battle of the experts," the jury could have agreed with the opinions proffered by Defendants' experts and awarded minimal – or no – damages. Any verdict awarding substantial damages to the Class would have faced a vociferous and lengthy appeal by Defendants.

55. Furthermore, the proceeds of Defendants' insurance policies were rapidly diminishing, and Defendants' insurance carriers asserted defenses that could have eliminated potential funds from which the Class could recover. Continued litigation likely would have exhausted the remaining proceeds and left the Class with no recovery, even if the Class had prevailed in full at summary judgment and trial. Thus, there were very significant risks attendant to the continued prosecution of the Litigation against Defendants.

4877-8380-4785.v2

56. The Settlement eliminates these substantial risks and guarantees the Class a favorable, certain cash recovery. Lead Counsel firmly believes that settling the Litigation with Defendants at this stage of the litigation is in the Class's best interests.

## IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

57. As required by the Court's Preliminary Approval Order, beginning on May 25, 2023, Lead Plaintiff, through Gilardi, notified Class Members of the Settlement by mailing a copy of the Notice to Class Members and their nominees. *See* ECF 156; Gilardi Declaration, ¶¶5-9.

58. The Court-approved Notice also requires brokers/nominees, within ten calendar days, to either: (i) request additional copies of the Notice to send to the beneficial owners of the securities; or (ii) provide to Gilardi the names and addresses of such persons.

59. In the aggregate, as of July 13, 2023, Gilardi has disseminated 22,214 copies of the Notice to Class Members and their nominees. *See* Gilardi Declaration, ¶11.

60. In addition, on June 1, 2023, the Summary Notice was published in *The Wall Street Journal* and over *Business Wire*. *See* Gilardi Declaration, ¶12. Information regarding the Settlement, including copies of the Notice and Claim Form, was posted on the website established by Gilardi specifically for the Class Notice and updated for this Settlement. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the [proposed judgment]." Fed. R. Civ. P. 23(e)(1).

61.    The Notice advises Members of the Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time, and place for the Settlement Hearing.

62.    The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed Plan of Allocation.  As explained in the Settlement Memorandum, the Notice fairly apprises Class Members of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23 of the Federal Rules of Civil Procedure, and due process.

## V.    THE PLAN OF ALLOCATION

63.    Lead Plaintiff has proposed a plan to allocate the proceeds of the Settlement Fund among Members of the Class who submit valid proofs of claim.  The objective of the proposed Plan of Allocation is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those Members of the Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

64.    Lead Plaintiff engaged an expert to assist in formulating the Plan of Allocation. In developing the Plan of Allocation, the expert calculated the amount of estimated artificial inflation in the per share closing price of Tactile common stock that was allegedly proximately caused by Defendants' false and misleading statements.  In so doing, Lead Plaintiff's expert considered price changes in Tactile's common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces, and for non-fraud related Company-specific information.

- 27 -

65.     The Notice set forth and explained the proposed Plan of Allocation to Class Members.  It was prepared in consultation with Lead Plaintiff's expert, tracks a theory of damages asserted by Lead Plaintiff, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Class as a whole.

66.     In response to over 22,000 Notices, there have been zero objections to the proposed Plan of Allocation, further underscoring its fairness.

## VI.   COUNSEL'S FEE APPLICATION IS REASONABLE

### A.     The Excellent Result Achieved Supports the Requested Fee Award of 30%

67.     The $5 million Settlement achieved in this Litigation is an excellent result for the Class, particularly when considered against the *Qui Tam* Action's voluntary dismissal without any recovery.  Moreover, as explained in the Fee Memorandum, the $5 million Settlement represents roughly 7% of likely maximum recoverable damages – a percentage that exceeds the median recovery in securities class action settlements.

68.     The Settlement is a very favorable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Litigation were to continue through summary judgment, to trial, and through likely post-trial motions and appeals.

### B.     The Risks, Magnitude, and Complexity of the Litigation Awarding the Requested Fee

69.     The risks undertaken and difficulties presented in a complex securities class action such as this one favor approval of the requested fee award.  As detailed above, the Litigation – asserting violations of §§10(b) and 20(a) of the Exchange Act, as well as

- 28 -

underlying violations of the AKS and FCA – involved challenging issues of law and fact that presented considerable risk to Lead Plaintiff's case. Thus, when Lead Counsel undertook this representation, there was no assurance that the Litigation would survive a motion to dismiss or other challenges, and therefore no assurance Lead Counsel would recover any payment for their services. Indeed, as discussed above, the Court had already dismissed portions of Lead Plaintiff's case at the motion to dismiss stage.

70.     Defendants made credible arguments directly challenging the sufficiency of Lead Plaintiff's allegations on the basis of falsity, scheme, and scienter. Defendants also made credible arguments regarding Lead Plaintiff's ability to prove underlying AKS and FCA violations, which each have their own complex set of requirements. Moreover, had the Litigation continued, Lead Plaintiff expected to face Defendants' full-throated opposition to its motion for class certification. Likewise, because the elements of loss causation and damages for Lead Plaintiff's securities fraud claims generally require the analysis and calculation of an expert, Lead Plaintiff expected to face vehement challenges in opinions offered by Defendants' competing experts, as well as a motion to exclude Lead Plaintiff's expert. If the Court granted such a motion, it could imperil Lead Plaintiff's ability to prove these elements.

71.     Likewise, whether at summary judgment or trial, had Defendants' arguments prevailed, the pool of available damages would be a small fraction of what it was at the time of the Settlement. Moreover, at trial, a jury could have dramatically reduced the available damages by finding that only a part of the stock drops after the disclosures was a result of the

- 29 -

4877-8380-4785.v2

fraud. Accordingly, Lead Counsel's ability to successfully navigate these and other complex legal and factual obstacles fully supports the requested fee award.

72.     Furthermore, as with all contingency fee cases, Lead Counsel faced a substantial risk that it would obtain no fee whatsoever. From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. Had Lead Counsel not willingly and vigorously undertaken the responsibility of representing the Class's interests here, the Class would almost certainly have recovered nothing for their claims.

73.     Thus, with no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Securities class actions such as this one are not only time- and labor-intensive, but require substantial up-front cost outlays. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Litigation, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. Lead Counsel not only had to pay for its standard overhead expenses during the entirety of the Litigation, but also had to cover costs and expenses, including substantial electronic discovery costs and the fees of various experts, all without guarantee of any recovery. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis, which heavily supports the requested fee.

4877-8380-4785.v2

74. Plaintiff's Counsel received no compensation during the course of the Litigation but have dedicated 7,300 hours of time with a lodestar value of $4.1 million and have incurred $123,000.00 in expenses in prosecuting the Litigation for the benefit of the Class. *See* Firm Declarations (Exs. B-E), submitted herewith. Given the complexity and risk undertaken to achieve a successful result for the Class, and in light of the time and resources dedicated to prosecute the Litigation, the requested fee is appropriate here.

**C.      The Skill Required and the Experience, Reputation, and Ability of the Attorneys Support the Requested Fee**

75. Lead Counsel comprises a team of highly skilled and experienced securities litigators who expended a substantial amount of time and effort litigating the Litigation – a Litigation that presented unique and difficult challenges that were not easy to overcome. The attorneys who were principally responsible for leading the prosecution of this case have prosecuted securities claims throughout their careers, overseen numerous litigations, and secured significant recoveries on behalf of investors.[4] Informed by this experience, they developed and implemented strategies to overcome myriad obstacles raised by Defendants.

76. Lead Counsel's depth of skill and experience, including its experience in this Circuit and throughout the country successfully prosecuting securities class actions, allowed

---

[4]      Recent securities class action settlements obtained by Lead Counsel include *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y. 2020) ($1.025 billion); *Smilovits v. First Solar, Inc. et al.*, No. 2:12-cv-00555-DGC (D. Ariz. 2020) ($350 million); *Monroe Cty. Emps. Ret. Sys. v. S. Co., et al.*, No. 1:17-cv-00241-WMR (N.D. Ga. 2020) ($87.5 million); *Pension Fund v. Bank OZK*, No. 18-cv-00793 (E.D. Ark. 2022) ($45 million); *Odeh v. Immunomedics, Inc., et al.*, No. 2:18-cv-17645-EP-ESK (D.N.J. 2023) ($40 million); *In re Uniti Grp. Inc. Sec. Litig.*, No. 4:19-cv-00756-BSM (E.D. Ark. 2022) ($38.875 million); *Micholle v. Ophthotech Corp.*, No. 1:17-cv-00210-VSB-GWG (S.D.N.Y. 2022) ($29 million).

- 31 -

Lead Plaintiff and the Class to achieve a result that might not have been achieved by less skillful or experienced counsel. Despite significant hurdles, Lead Counsel managed to negotiate this significant Settlement.

77. Successfully bringing claims of securities fraud – always a challenging and complex endeavor under the PSLRA – presented unique challenges here that required skilled lawyering. When Defendants moved to dismiss all of Lead Plaintiff's claims, Lead Plaintiff faced the heightened pleading standards of the PSLRA, requiring Lead Plaintiff to set forth falsity with particularity and to allege sufficient facts to plead a strong inference of scienter. Notably, too, the PSLRA imposes a stay of discovery while a motion to dismiss is pending. Thus, only as a result of an extensive pre-Complaint investigation – without the benefit of formal discovery – could Lead Plaintiff bring to bear sufficient facts to surmount the hurdles imposed by the PSLRA. This Litigation involved complex and intricate legal and factual issues, and the AKS and FCA laws implicated in this Litigation also added a significant level of difficulty unique to this case.

78. Lead Counsel also received significant assistance in prosecuting the case from Hagens Berman, who provided critical support in investigating the Complaint, opposing the motion to dismiss, and in developing the case in discovery. Lead Counsel also was greatly supported by its local counsel, Zimmerman Reed, who provided extremely knowledgeable consultation on briefing and matters related to the Court's procedures and rules.

79. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Faegre Drinker Biddle & Reath LLP, a highly respected, 1,200-person

- 32 -

national law firm that has substantial experience defending securities class actions and other complex litigation.[5] Lead Counsel believes that all of these factors support the requested fee award.

### D.    The Significant Time and Labor Devoted by Lead Counsel

80.    As described above, Lead Counsel engaged in an exhaustive and comprehensive investigation, drafted a 129-page Amended Complaint, and opposed and orally argued Defendants' motion to dismiss.  Lead Counsel engaged in extensive discovery negotiations, including multiple meet-and-confers with Defendants and third parties, and exchanged substantial amounts of contentious correspondence and challenged several of Defendants' assertions of privilege.  By the time of the settlement, Lead Plaintiff had served 11 interrogatories, 31 document requests to Defendants, and multiple deposition subpoenas. Lead Counsel further researched and drafted several disputes in discovery, including disputes concerning: (i) the scope of Defendants' search terms as applied to the Individual Defendants' custodial files; and (ii) whether Lead Plaintiff need produce a preliminary damages analysis before expert discovery.  Lead Counsel reviewed and analyzed nearly 100,000 documents with over 1.2 million pages, had taken one deposition and was in the process of preparing for multiple more, consulted with economics experts, and devoted substantial time researching the AKS and FCA to better understand the underlying issues in the case.  Lead Counsel had also conducted significant third-party discovery, obtaining over 20,000 documents from 17 third parties.  As is often the case with complex securities class actions, prosecuting this Litigation was significantly labor-intensive and the attorneys

---

[5]    *See* https://www.faegredrinker.com/en/about#tab-Overview.

involved routinely spent significant stretches of time focusing exclusively or near-exclusively on litigating this Litigation, and ultimately bringing it to its successful resolution. In total, Lead Counsel expended over 6,156.50 hours litigating this matter.

81.    Moreover, by negotiating the Settlement, Lead Counsel avoided the significant expenses, and resources that would have been used if the case continued to trial and subsequently to appeal.    Accordingly, Lead Counsel's extensive litigation efforts fully support the requested fee.

### E.    The Lodestar Crosscheck

82.    As set forth in the Fee Memorandum, a lodestar "cross-check" also confirms the reasonableness of Lead Counsel's fee request.    Lead Counsel expended a total of 6,156.50 hours prosecuting and investigating this Litigation.    The resulting lodestar is $3,643,919.00.    In light of this, the requested fee of 30% of the Settlement Fund yields a multiplier of .35.    As set forth in the Fee Memorandum, this is a negative multiplier – in which the fee requested does not cover the fees dedicated to the Litigation – and further demonstrates the reasonableness of the requested fee.    Indeed, as further elaborated in the Fee Memorandum, courts in this District, Circuit and nationwide have routinely awarded a 30% fee in circumstances involving multipliers comparable to or higher than this one in cases with comparable or higher settlement amounts that settled at a stage of litigation similar to or even much earlier than this case.

83.    Moreover, each attorney who prosecuted this Litigation performed substantive work that directly benefitted the Class.    The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Lead

- 34 -

4877-8380-4785.v2

Counsel's and Lead Plaintiff's ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the Litigation.

84.    Furthermore, Lead Counsel's hourly rates are reasonable and are in fact the same as, or comparable to, the rates submitted by comparable firms for lodestar cross-checks in other complex class action fee applications and other settlements that have been granted in this District, Circuit, and nationwide.

85.    Additionally, besides drafting the motion for final approval and reply in support thereof, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Class Member claims, will respond to shareholder inquiries, will file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.

86.    In sum, based on the excellent result achieved for the Class, the quality of work performed, and the risks of prosecuting the action against Defendants, Lead Counsel submits that its request for a 30% fee award is fair, reasonable, and consistent with other similar fee awards in this District.

## VII.    THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

87.    Lead Counsel seeks payment from the Settlement Fund of $120,025.00 in litigation costs, charges, and expenses reasonably and necessarily incurred in connection with prosecuting this Litigation.  The Notice informed the Class that Lead Counsel will apply for payment of litigation expenses of no more than $139,000.00, plus interest earned at

- 35 -

the same rate as earned by the Settlement Fund. *See* Ex. B. The amount requested is below this cap. To date, no objection to Lead Counsel's request for expenses has been raised.

88.     As set forth in the expense schedules, Plaintiff's Counsel has incurred a total of $123,248.81 in litigation expenses in connection with the prosecution of the Litigation. *See* Exs. C-E. These expenses are reflected on the books and records maintained in the ordinary course by Plaintiff's Counsel. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. Plaintiff's Counsel's declarations identify the specific category of expense – *e.g.*, expert fees, document management and storage system(s), electronic research, service of process fees, filing fees, and mailing expenses.

89.     A significant component of Lead Counsel's expenses is the cost of experts and investigators, which totals $39,278.29 or approximately 33% of total expenses. These professionals were essential to the prosecution of the Litigation. Lead Counsel relied on experts and investigators in developing the case's theories and bolstering the facts supporting the claims. Specifically, when conducting its investigation for the Complaint, Lead Counsel relied on investigators from L.R. Hodges & Associates, Ltd. ("LRH&A") to identify potential witnesses and conduct interviews of witnesses who potentially had information relevant to the claims. Lead Counsel also consulted with LRH&A regarding the reports of potential witnesses and apprised LRH&A of case developments pertinent to its investigation on Lead Plaintiff's behalf. Lead Counsel also relied on the analysis and consulting of economics experts when amending the Complaint and as discovery developed. Lead Counsel further consulted with its economics expert to prepare for mediation.

4877-8380-4785.v2

90.     EDiscovery database hosting related to the Litigation totals $30,661.40.  The amount requested reflects charges for the hosting of roughly 1.2 million pages of documents produced by Defendants, Lead Plaintiff, and third parties in this Litigation.  Robbins Geller has installed top tier database software, infrastructure, and security.   The platform implemented (Relativity) is offered by over 100 vendors and is currently being used by 198 of the AmLaw200.  Over 50 servers are dedicated to Robbins Geller's Relativity hosting environment with all data stored in a secure SSAE 16 Type II data center with automatic replication to a datacenter located in a different geographic location.  By hosting in-house, Robbins Geller is able to charge a reduced, all-in rate that includes many services which are often charged as extra fees when hosted by a third-party vendor.  Robbins Geller's hosting fee includes user logins, ingestion, processing, OCRing, TIFFing, bates stamping, productions, and archiving – all at no additional per unit cost.  Also included is unlimited structured and conceptual analytics (*i.e.*, email threading, inclusive detection, near-dupe detection, concept searching, active learning, clustering, and more).  Robbins Geller is able to provide all these services for a cost that is typically much lower than outsourcing to a third-party vendor.  Utilizing a secure, advanced platform in-house has allowed Robbins Geller to prosecute actions more efficiently, utilize advanced AI technology, and has reduced the expense associated with maintaining and searching electronic discovery databases.  Similar to third-party vendors, Robbins Geller uses a tiered rate system to calculate hosting charges.

91.     Computerized electronic research totaled $17,650.72.  These are the costs of computerized factual and legal research services, including PACER, Thomson Financial,

- 37 -

4877-8380-4785.v2

Westlaw, Lexis/Nexis, Bloomberg, and CFRA. These services allowed counsel to perform media searches, obtain analysts' reports and financial data, and conduct legal research – and was vital to numerous aspects of the Litigation, including amending the Complaint, researching the claims, opposing the motion to dismiss, developing the case strategy, addressing discovery issues, and preparing for mediation.

92.   Lead Counsel's costs incurred in connection with the Mediation totaled $9,580.00.

93.   The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged by firms with clients who pay by the hour. These expenses include, among others, printing costs, service and filing fees, and delivery expenses.

94.   All of the litigation expenses incurred, which total $123,248.81, were necessary to the successful prosecution and resolution of the claims against Defendants.

95.   In view of the complex nature of the Litigation, the expenses incurred were reasonable and necessary to pursue the Class's interests. Accordingly, it is respectfully submitted that the expenses incurred by Plaintiff's Counsel should be paid in full from the Settlement Fund.

## VIII.   THE CLASS'S REACTION

96.   As mentioned above, consistent with the Preliminary Approval Order, a total of 22,215 Notices have been mailed to potential Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, *i.e.*, $1,500,000.00 plus any accrued interest, and payment of expenses in an amount not

- 38 -

greater than $139,000.00.  *See* Ex. B.  Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over *Business Wire*.  *See* Gilardi Declaration, ¶12. The Notice has also been available on the settlement website, www.TactileSecuritiesSettlement.com, maintained by the Claims Administrator.  *Id*., ¶14.

97.   While the deadline set by the Court for Class Members to object has not yet passed, it is significant that, to date, not a single Member of the Class has filed an objection to the Settlement, Plan of Allocation, or request for attorneys' fees and expenses.

98.   Moreover, Lead Plaintiff is a sophisticated institutional investor that closely supervised and monitored the prosecution and the settlement of the Litigation.  As discussed in the declaration submitted by Lead Plaintiff, Lead Plaintiff has evaluated Lead Counsel's fee and expense application and believes that Lead Counsel's requested fee is fair and reasonable in light of the work counsel performed, the risks of the litigation, and the results achieved.

99.   Lead Counsel will respond to any objections received in its reply papers, which are due on August 16, 2023.

IX.   **CONCLUSION**

100.   For all the reasons discussed above and in the Settlement Memorandum, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  In addition, as set forth above and in the Fee Memorandum, Lead Plaintiff and Lead Counsel further submit that the requested 30% fee award should be approved as fair and reasonable, and the request for litigation expenses in the total amount of $123,248.81 should be approved.

4877-8380-4785.v2

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 19th day of July, 2023, in San Diego, California.

s/ Ashley M. Price
ASHLEY M. PRICE

4877-8380-4785.v2